1  HARVEY Y MORRIS, SBN 87902
   HELEN W. YEE, SBN 119434
2  DARWIN E. FARRAR, SBN 152735
   CALIFORNIA PUBLIC UTILITIES COMMISSION
3  505 Van Ness Avenue
   San Francisco, CA  94102
4  Telephone:    (415) 703-1599
   Facsimile:    (415) 703-2262
5  Email: EDF@cpuc.ca.gov

6  Attorneys for Defendants
   California Public Utilities Commission
7  and the Commissioners in their official
   and individual capacity

8

9              UNITED STATES DISTRICT COURT

10        FOR THE NORTHERN DISTRICT OF CALIFORNIA

11               SAN FRANCISCO DIVISION

12

13 CAlifornians for Renewable Energy          Case No. C08-01954-JL
   and Stephan C. Volker,
14                                            DEFENDANTS' NOTICE OF MOTION
                Plaintiffs,                   AND MOTION TO DISMISS FIRST
15                                            AMENDED COMPLAINT
           vs.
16                                            MEMORANDUM OF POINTS
   California Public Utilities Commission,    AND AUTHORITIES
17 Michael Peevey, in his official and        (F.R.C.P. 12(b)(1))
   individual capacity, Dian Grueneich, in
18 her official and individual capacity, John  Date:  October 8, 2008
   Bohn, in his official and individual       Time:  9:30 a.m.
19 capacity, Rachelle Chong, in her official   Place: Hon. Magistrate James Larson
   and individual capacity, Timothy Simon,
20 in his official and individual capacity, and [Filed with: Defendants' Request for
   Geoffrey Brown, in his official and        Judicial Notice; [Proposed] Order Granting
21 individual capacity,                        Defendants' Request for Judicial Notice;
                                              and [Proposed] Order Granting Defendants'
22              Defendants.                    Motion to Dismiss]

23

24

25

26

27

28

1

## TABLE OF CONTENTS

**NOTICE OF MOTION AND MOTION** ...........................................................................1

**MEMORANDUM OF POINTS AND AUTHORITIES** ..........................................2

    **I.**       **FACTUAL AND PROCEDURAL BACKGROUND**...........................3

    **II.**     **ARGUMENT**........................................................................9

        **A.**  **Plaintiffs' Claims Are Barred As Res Judicata**.............................9

        **B.**  **The Johnson Act Divests The Court Of Jurisdiction Over Plaintiffs' Claims** ...........................................................13

        **C.**  **The Court Lacks Jurisdiction Because Defendants Are Shielded From Federal Actions By Eleventh Amendment Sovereign Immunity Protections.**............................................19

        **D.**  **Plaintiffs' Claim Against The Commissioners In Their Individual Capacity Fails To State A Claim Upon Which Relief Can Be Based.** ...................................................................22

    **III.**    **CONCLUSION** ........................................................................25

2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

i

Defendants' Notice of Motion & Motion to Dismiss 1st Amended Complaint, Memo. Points & Authorities
Case No. C08-01954-JL

1

## TABLE OF AUTHORITIES

2

**Federal Cases**

3

4

*Belanger v. Madera Unified Sch. Dist.*, 963 F.2d 248 (10th Cir. 1992)..............................9

5

*Bender v. Williamsport Area Sch. Dist.*, 475 U.S. 534 (1985) ........................................22

6

*Blonder-Tongue v. University of Illinois Foundation,* 402 U.S. 313 (1971).....................18

7

*Boreta v. Kirby, 328 F.Supp.* 670 (N.D. Cal. 1971) ..........................................................8

8

*Brown v. Felsen,* 442 U.S. 127 (1979) ..............................................................................11

9

*Communications Telesystems Int'l v. California Pub. Utils. Comm'n,*
196 F.3d 1011 (9th Cir. 1999) .....................................................................................16, 18

10

11

*Edelman v. Jordan*, 415 U.S. 651 (1974) ............................................................................9

12

*Employees v. Missouri Dept. of Public Health and Welfare*, 411 U.S. 279 (1973) ...........8

13

*Ford Motor Co.  v. Department of Treasury of Indiana*, 323 U.S. 459 (1945).................20

14

*Fordyee v. City of Seattle*, 55 F.3d 436 (9th Cir. 1995) ......................................................9

15

*Hale v. State of Ariz.*, 993 F.2d 1387 (9th Cir. 1993)..........................................................8

16

*Hans v. Louisiana*, 134 U.S. 1 (1890) ................................................................................7

17

*Hensley v. Eckerhart*, 461 U.S. 424 (1983)......................................................................23

18

*Kalinsky v. Long Island Lighting Co.*, 484 F. Supp. 176 (E.D.N.Y. 1980)......................12

19

*Kay v. City of Rancho Palos Verdes*, 504 F.3d 803 (9th Cir. 2007)....................................9

20

*Kentucky v Graham*, 473, U.S. 159 (1985)........................................................................22

21

*Lyng v. Payne*, 476 U.S. 926 (1986)..................................................................................14

22

*McCarthy v. United States*, 850 F.2d 558 (9th Cir. 1988)..................................................1

23

*Monroe v. Pape*, 365 U.S. 167 (1961) .........................................................................8, 22

24

25

26

27

28

*New York Central R. Co. v. Illinois Commerce Commission*,
77 F. Supp. 520 (N.D.Ill.1948) ................................................................................12

*Palomar Mobilehome Park Ass'n v. City of San Marcos*,
989 F.2d 362 (9th Cir. 1993) ..........................................................................16, 17

*Pennhurst State School & Hosp. v. Halderman*, 465 U.S. 89 (1983)................................9

*Peoples National Utility Company v. City of Houston*,
837 F.2d 1336 (5th Cir. 1988) ......................................................................12, 15

*Pudlik v. Public Service Co. of Colorado*, 166 F. Supp. 921 (D.Colo. 1958) ...................13

*Quern v. Jordan*, 440 U.S. 332 (1979) ....................................................................8

*Robi v. Five Platters*, Inc., 838 F.2d 318 (9th Cir.1988) ...........................................11

*Romano v. Bible,* 169 F.3d 1182 (9th Cir. 1999)....................................................22

*San Remo Hotel v. San Francisco*, 545 U.S. 323 (2005)..........................................18

*Setzler v. City & County of San Francisco*, 2008 U.S. Dist. LEXIS 43072
(N.D. Cal. 2008) .......................................................................................9

*Stanislaus Food Products Co.,* v. PUC, 560 F.Supp. 114 (N.D. Cal. 1982) ..............11, 13

*State of California ex rel. Lockyer v. F.E.R.C.,* 329 F.3d 700 (9th Cir. 2003)................14

*Sunkist Growers, Inc. v. Fisher*, 104 F.3d 280 (9th Cir. 1997) ...............................16

*Tennyson v. Gas Service Co.*, 506 F.2d 1135 (10th Cir. 1974) ...............................11

*Trabucco v. Carlile*, 57 F. Supp. 2d 1074 (D. Ore. 1999).......................................1

*U S West v. Nelson*, 146 F.3d 718 (9th Cir. 1998).........................................12, 13

*Wellborn Freeman v. Oakland Unified School District*,
179 F.3d 846 (9th Cir. 1999) .......................................................................9

*Zucker v. Bell Tel. Co. of Pennsylvania*, 373 F.Supp. 748 (E.D. Penn. 1974)
aff'd 510 F.2d 971 (5th Cir. 1975) ...........................................................13, 14

**State Cases**

*Balasubramanian v. San Diego Community College Dist.*,
80 Cal. App. 4th 977 (2000) ............................................. 16

*Bernhard v. Bank of America National Trust & Savings Association*,
19 Cal. 2d 807 (1942) ...................................................... 18

*Lucas v. County of Los Angeles*, 47 Cal. App. 4th 277 (1996) ........................... 16

*Southern California Edison Co., v. Peevey*, 31 Cal.4th 781 (2003) ............................ 8, 11

*Southern California Edison Co. v. Public Utilities Com.*,
117 Cal. App. 4th 1039 (2004) ......................................... 12

*Weikel v. TCW Realty Fund II Holding Co.*, 55 Cal. App. 4th 1234 (1997) .................... 16

**Federal Statutes**

28 U.S.C. § 1342 ........................................................... passim

28 U.S.C. § 1367 ................................................................ 9

42 U.S.C. § 1983 ................................................................ 8

42 U.S.C. § 1985 ................................................................ 8

42 U.S.C. § 1988 ................................................................ 9

**State Statutes**

Cal. Const., Art. XII ........................................................ 2, 8

Cal. Pub. Util. Code §§ 1701-1736 .................................... passim

Cal. Pub. Utilities Code §§1801-1812 ................................ passim

Cal. Pub. Util. Code § 311 ................................................ 11

Cal. Rules of Ct. 8.500(a)(2) .............................................. 7

**CPUC Cases**

D.03-01-058..................................................................................................3

D.04-08-046................................................................................................16

D.05-11-031...........................................................................................passim

D.06-04-018...........................................................................................passim

D.06-06-025..........................................................................................6, 14

D.06-10-023..........................................................................................6, 14

D.07-12-004...................................................................................2, 10, 12, 17

D.07-12-007...................................................................................2, 10, 12, 17

D.08-03-024................................................................................................17

D.08-04-060................................................................................................17

*Re San Diego and Electric Company*, 1996 Cal. PUC LEXIS 1016 [CPUC Decision
D.96-10-036] (October 19, 1996) 68 Cal.P.U.C. 434..................................................4, 13

*Re Wild Goose Storage, Inc*., 1997 Cal. PUC LEXIS 975 [CPUC Decision D.97-10-070]
(October 22, 1997) 76 Cal.P.U.C. 246 ................................................................4, 13

Resolution ALJ-184....................................................................................passim

v

Defendants' Notice of Motion & Motion to Dismiss 1st Amended Complaint, Memo. Points & Authorities
Case No. C08-01954-JL

1
2

# NOTICE OF MOTION AND MOTION

3

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

4

NOTICE IS HEREBY GIVEN that on October 8, 2008, at 9:30 a.m., or as soon

5

thereafter as counsel may be heard by the above-titled court, located at Court F, 15th Floor,

6

450 Golden Gate Avenue, San Francisco, CA 94102, in the courtroom of the Honorable

7

Magistrate Judge James Larson:

8
9

DEFENDANTS WILL AND HEREBY DO MOVE to dismiss this action pursuant

10

to Rule 12(b)(1) of the Federal Rules of Civil Procedure on the grounds that: (a) Plaintiffs

11

are barred by the doctrine of res judicata from bringing this action; (b) the Johnson Act, 28

12

U.S.C. § 1342, divests this Court of jurisdiction over Plaintiffs' claims; (c) Defendants

13

CPUC and the individual Commissioners are immune from suit as this action is barred by

14

the Eleventh Amendment; (d) Plaintiffs fail to state a claim upon which relief can be based

15

against the named Commissioners in their individual capacity; and (e) the Court has no

16

jurisdiction over Plaintiffs' federal constitutional and statutory claims under 42 U.S. §§

17

1983, 1985.[1]

18
19

This motion is based on this Notice of Motion and Motion; the Memorandum of

20

Points and Authorities below; and the Defendants' Request for Judicial Notice ("Def.

21

RJN"), filed herewith.

22
23
24

────────────────────

25

[1] All of these grounds for dismissal are jurisdictional and brought solely under Federal Rule
of Civil Procedure 12(b)(1).  Accordingly, the Court may consider extrinsic evidence to
resolve these issues without converting the motion into one for summary judgment.  *See*

26
27
28

## MEMORANDUM OF POINTS AND AUTHORITIES

Though couched in the cloth of civil rights law and due process, the complaint is an attempt by CAlifornians for Renewable Energy ("CARE") and Mr. Stephan C. Volker (jointly, "Plaintiffs") to relitigate the interpretation of the Intervenors Compensation Statutes ("IC Statutes"), Cal. Pub. Util. Code, §1801, et seq., and the application of these state statutes to the hourly rates awarded to Mr. Volker by Defendant California Public Utilities Commission ("CPUC") for his participation in CPUC proceedings. Plaintiffs' claims represent no more than a relitigation of their failed collateral attacks on CPUC orders, including Resolution ("Res.") ALJ-184 and CPUC decisions, D.05-11-031, D.06-04-018, D.06-06-025, D.06-10-023, D.07-12-004, and D.07-12-007, which are final and nonappealable. Plaintiffs have already unsuccessfully brought these challenges before the CPUC and the state courts with jurisdiction over the issues. Plaintiffs now attempt to relitigate these matters in the federal court, which does not have jurisdiction.

Defendants respectfully submit that Plaintiffs' complaint must be dismissed pursuant to the following provisions of law:

- Res judicata bars a party from attempting to litigate any claims it has litigated, or *could have asserted*, in an earlier action against the same party or parties in privity with parties to the earlier action. Plaintiffs already obtained judicial review of the primary right at issue here in state court. Whether they litigated each cause of action asserted here or not, Plaintiffs are now barred from trying to raise and relitigate a cause of action related to their prior claims.

- The Johnson Act divests federal courts of jurisdiction over constitutional challenges to state agencies' public utility

---

*McCarthy v. United States*, 850 F.2d 558, 560 (9th Cir. 1988); *Trabucco v. Carlile*, 57 F. Supp. 2d 1074, 1076 n.2 (D. Ore. 1999).

ratemaking decisions.  This rule requires dismissal of all of
Plaintiffs' claims against all defendants.

- Sovereign Immunity - the CPUC is shielded from federal actions
  by Eleventh Amendment sovereign immunity protections which
  the CPUC has not waived and which Congress did not abrogate
  with the passage of 42 U.S.C. §§ 1983 and 1985 or 28 U.S.C. §§
  1331 and 1343.  This immunity is available to the named
  Commissioners in their official and individual capacity.

- Plaintiffs fail to state a claim upon which relief can be based
  against the named Commissioners in their individual capacity.

## I.     FACTUAL AND PROCEDURAL BACKGROUND

Mr. Volker's first request for intervenor compensation for an appearance before the

California Public Utilities Commission ("CPUC") was in Application (A.) 99-12-025, on

behalf of the Sierra Club.  After notice and hearings, the CPUC awarded Mr. Volker an

hourly rate of $250 for work performed in 2000 in D.03-01-058.[2]  Rather than being the

result of a cap on the hourly rate that the Sierra Club could request, the CPUC deemed this

hourly rate as being consistent with Mr. Volker's experience at the CPUC and in other

venues.[3]  Neither CARE nor Mr. Volker sought rehearing of D.03-01-058.

On August 25, 2004, the CPUC issued Resolution ("Res.") ALJ-184.[4]  Res. ALJ-184

adopts "an annual process for setting and updating hourly rates for use by intervenors in

---

[2] Defendants' Request for Judicial Notice ("RJN") Exh. A [D.03-01-058] at 7.

[3] While, Section 1804(a)(2)(ii) directs intervenors to file a notice of intent to claim
compensation that includes an "itemized estimate of the compensation that the customer
expects to request" this is simply an estimate.  There is nothing in section 1804, the
Commission rules, or the record of the proceeding suggesting that Mr. Volker or his client
were prohibited from subsequently requesting a higher rate. *See* Cal. Pub. Util. Code,
§1804(a)(2)(ii).

[4] Public notice was given of the CPUC's consideration and adoption of Res. ALJ-184.  *See*
Def. RJN Exh. B [CPUC's Public Agenda for August 19, 2004], at 35.
[http://docs.cpuc.ca.gov/published/agenda/docs/3137.pdf].

seeking compensation for substantially contributing to a CPUC decision, as provided in the statutory intervenor funding program."[5]  Def. RJN Exh. D [Res. ALJ-184] at 1, citing Cal. Pub. Utilities Code, §§1801-1812.  However, Res. ALJ-184 did "not adopt a base year rate… . " Def. RJN Exh. D [Res. ALJ-184] at 6.  Instead, for 2004 Res. ALJ-184 adopted an escalation factor for year 2003 rates and allowed intervenors to use that factor to calculate award requests for work done in 2004.  In adopting this 8% escalation factor for work done in 2004, Res. ALJ-184 established a "rebuttable presumption" that the escalated rate was reasonable.  Def. RJN Exh. D [Res. ALJ-184] at 6-7.  Indeed, Res. ALJ-184 specifically provides that "an intervenor may request an adjustment to an adopted hourly rate but must show good cause" for the adjustment.[6]  (Def. RJN Exh. D [Res. ALJ-184] at 2 & 4.)

        In Rulemaking (R.) 04-10-010, the CPUC undertook to gather data on intervenor compensation rates so as to carry out its Section 1806 obligation to set intervenors' hourly compensation rates.  Notice of this rulemaking was provided in the Daily Calendar and on the CPUC website.[7]  Rather than set rates for specific individuals, in R.04-10-010, the CPUC

---

[5] The statutory intervenor compensation program is funded through rates paid by customers of a public utility.  See Cal. Pub. Util. Code, §1807.

[6] Res. ALJ-184 specifically provides that "if a court or regulatory agency awarded the advocate a higher hourly rate for work in the same calendar year, the intervenor may ask us to use the higher rate."  However, "the burden is on the intervenor to justify the higher rate, … . [W]e would expect the intervenor to address, among other things, the standard used by the court or agency in setting the higher rate and the comparability of the work performed at the Commission to the work performed at the court or agency." Def. RJN Exh. D [Res. ALJ-184] at 3.

[7] Def. RJN Exh. E [CPUC Daily Calendar for October 7, 2004], p. 6 [http://docs.cpuc.ca.gov/published/AGENDA/docs/3140.pdf]; see Def. RJN Exh. G [Daily Calendar for October 21, 2004], p. 13 [http://docs.cpuc.ca.gov/word_pdf/DAILY_CALENDAR/40699.pdf].  Due process is met with such notice for an administrative agency's rulemaking.  Personal service by the Commission is only required on the filing of a complaint against a person or corporation.

1    undertook to "approve principles to govern hourly rates for intervenors' representatives."[8]  To

2    this end, the CPUC examined "the authorized hourly rates paid to intervenors in 2003 and 2004

3    in light of the data from utilities on their expenses for representation in our proceedings…."

4    See Def. RJN Exh. I [D.05-11-031] at 9, 12 & 28.

5        Based on the hourly rates of hundreds of attorneys that have done CPUC related

6    work, in D.05-11-031[9] the CPUC found that "the hourly rates currently authorized for

7    intervenors for work performed in 2003 and 2004 is slightly higher than the rates utilities

8    pay their in-house representative with similar training and experience" and concluded that,

9    except in limited situations, increases in hourly rates for work performed by intervenors in

10   2005 should not be authorized above rates previously authorized for 2004.[10]  Consistent with

11   Res. ALJ-184, D.05-11-031 did not permanently lock intervenors into a previously set

12   hourly rate.  Rather, the orders established a rebuttable presumption that could be overcome

13   by justifying the higher rate requested.[11]

---

*See* Cal. Pub. Util. Code, §1704.  Except in complaint cases, the CPUC's Daily Calendar provides proper notice.  *See Re San Diego and Electric Company,* 1996 Cal. PUC LEXIS 1016 [CPUC Decision D.96-10-036] (October 19, 1996) 68 Cal.P.U.C.2d 434, 448, 456-457 [Conclusion of Law No. 3]; *see also, Re Wild Goose Storage, Inc.*, 1997 Cal. PUC LEXIS 975 [CPUC Decision D.97-10-070] (October 22, 1997) 76 Cal.P.U.C.2d 246, 248.

In addition to providing notice of R. 04-10-010 on its Daily Calendar and its website, the CPUC served the Sierra Club (the party that Mr. Volker represented in A.99-12-025) with notice of R.04-10-010 by mail.   See Def. RJN Exh. F [R.04-10-010], Attachment 3, p. 5.

[8] Def. RJN Exh. I [D.05-11-031] at 2.

[9] D.05-11-031 was issued in R.04-10-010.  Public notice was given of CPUC's consideration and adoption of this decision.  See Def. RJN Exh. H [CPUC's Public Agenda for November 18, 2005], p. 16 [http://docs.cpuc.ca.gov/published/agenda/docs/3162.pdf].

[10] Def. RJN Exh. I [D.05-11-031] at 12 & 15-16.

[11] Def. RJN Exh. I [D.05-11-031] at 29 and Def. RJN Exh. D [Res. ALJ-184] at 3.

1    Mr. Volker's second request for compensation for an appearance at the CPUC

2    related to his work in A.02-09-043 on behalf of CARE.  After notice and hearings, in

3    D.06-04-018, the CPUC awarded CARE compensation for Mr. Volker's 2004 work in the

4    amount of $270 per hour.  Though this amount reflected an upward adjustment of 8% over

5    Mr. Volker's prior award, it was less than the $400 per hour requested because CARE did

6    not present sufficient evidence to justify an increase above this amount.[12]

7

8    Plaintiffs did not file an application for rehearing of D.06-04-018, a jurisdictional

9    prerequisite to any subsequent court challenge to a CPUC decision.  See Cal. Pub. Util.

10    Code, §1732.  Instead on April 15, 2006, CARE filed a petition for modification of D.06-04-

11    018.[13]  CARE's petition for modification argued that D.06-04-018 did not conform to

12    section 1806, that Mr. Volker's market rate was at least $400 per hour and his prior rate was

13    the result of a "cap".  Absent from CARE's petition for modification was any showing of

14    how the work associated with the higher rates Mr. Volker obtained outside the CPUC was

15    comparable to his work at the CPUC, as called for in Res. ALJ-184.

16

17    The CPUC issued D.06-06-025 denying CARE's petition for modification on June

18    16, 2006.  In the absence of an application for rehearing, D.06-04-018 became final on May

19    15, 2006, and by law, CARE's right to file a court challenge to that decision was then

20

21

22

23

24

25    _____

26    [12] Def. RJN Exh. J [D.06-04-018] at 61.

27    [13] Def. RJN Exh. K [CARE's Pet. for Mod. of D.06-04-018].

28

1    foreclosed.[14]  CARE ignores this fact and has repeatedly attempted to challenge the findings

2    of D.06-04-018.

3         On July 13, 2006, CARE filed an application for rehearing of D.06-06-025 that

4    alleged the same error, on the same issues, and sought the same relief as its petition for

5    modification.[15]  The CPUC denied this rehearing application in D.06-10-023, and noted that

6    CARE's rehearing application constituted an impermissible collateral attack on D.06-04-018

7

8    as it merely repeated arguments presented in the petition for modification and again failed to

9    identify legal error.[16]

10        On November 3, 2006, after the CPUC denied its application for rehearing of D.06-

11   06-025, CARE petitioned the California Court of Appeal for a writ of review ("writ

12   petition").[17]  In its Answer, filed on December 6, 2006, the CPUC pointed out that CARE's

13   writ petition was an impermissible collateral attack on the interpretation of California Public

14

15   Utility Code §§ 1801 et. seq. found in Res. ALJ-184, D.05-11-031, and D.06-06-025.[18]  The

16   CPUC also reiterated that CARE failed to make the type of showing required to obtain an

17   increase in Mr. Volker's hourly rate, and explained how the CPUC's annual process for

18

19

20

21   _____

22   [14] Section 1732(b) provides that "no cause of action arising out of any order or decision of
     the commission shall accrue in any court," unless an application for rehearing has been filed.
23   Cal. Pub. Util. Code, § 1732.

24   [15] Def. RJN Exh. M [CARE's App. for Rhrg. of D.06-06-025].

25   [16] Def. RJN Exh. N [D.06-10-023], at 1.

26   [17] Def. RJN Exh. O [CARE's Writ Petition, A115703].

27   [18] Def. RJN Exh. P [CPUC Answer, A115703] at 7.

28

1    setting intervenor compensation rates is consistent with California's IC statutes.[19]  On

2    January 9, 2007, CARE filed a reply brief, responding to the CPUC's Answer.  In its reply

3    brief, CARE specifically identified its notice issue as a due process claim.[20]  On January 31,

4    2007, the California Court of Appeal summarily denied CARE's writ petition.[21]

5         On February 28, 2007, CARE submitted a Petition for Review to the California

6    Supreme Court, seeking review of the lower appellate court's summary denial on the

7    merits.[22]  Here again, CARE sought to challenge Res. ALJ-184, D.05-11-031, and D.06-06-

8    025 via D.06-04-018, again alleging a due process violation on claims of lack of notice.[23]

9    By letter dated March 5, 2007, the California Supreme Court rejected CARE's late-filed

10   Petition for Review.[24]

11        On April 14, 2008, Plaintiffs filed the instant federal court action.  On May 28, 2008,

12   the CPUC filed its motion to dismiss.  Subsequently, on July 16, 2008, Plaintiffs filed their

13   First Amended Complaint, in which they added as defendants the named Commissioners in

14   their official and individual capacity.  In response, Defendants filed the instant motion to

15   dismiss this amended complaint on the grounds that this Court has no jurisdiction to hear the

16   case.

17

18

19   _____

20   [19] Def. RJN Exh. P [CPUC Answer, A115703] at 14-17.

21   [20] Def. RJN Exh. Q [Plaintiffs' Reply Brief, A115703] at 28-31.

22   [21] Def. RJN Exh. R [California Court of Appeal's Summary Denial, A115703].

23   [22] Concurrent with its request for Supreme Court review, CARE filed a motion for relief
     from default and supporting documents.  These documents were necessary as CARE's
24   Petition for Review of the California Court of Appeal's summary denial was filed after the
     February 10, 2007 due date.

25   [23] Def. RJN Exh. S [CARE's Petition for Review, S150635] at 17-19 & 21-26.

26   [24] Def. RJN Exh. S [California Supreme Court's Summary Denial, S150635].

27

28

1    **II.     ARGUMENT**

2         **A.     Plaintiffs' Claims Are Barred As Res Judicata.**

3         The doctrine of res judicata "operates as a bar to maintaining a second suit between

4    the same parties or parties in privity with them on the same cause of action."

5    *Balasubramanian v. San Diego Community College Dist.*, 80 Cal. App. 4th 977, 991 (2000).

6    It "precludes piecemeal litigation by splitting a single cause of action or relitigation of the

7    same cause of action on a different legal theory or for different relief."  *Lucas v. County of*

8    *Los Angeles*, 47 Cal. App. 4th 277, 285 (1996).  Under California law, the doctrine of *res*

9    *judicata* focuses on three questions: (1) whether the previous case was adjudicated on the

10   merits; (2) whether the previous decision was final; and (3) whether the current dispute

11   involves the same "claim" or "cause of action." *Setzler v. City & County of San Francisco*,

12   2008 U.S. Dist. LEXIS 43072 (N.D. Cal. 2008), citing *Kay v. City of Rancho Palos Verdes*,

13   504 F.3d 803, 808 (9th Cir. 2007).  To determine whether the prior litigation involves the

14   same claim or cause of action as the current litigation, "California has consistently applied

15   the 'primary rights' theory, under which the invasion of one primary right gives rise to a

16   single cause of action." *Kay v. City of Rancho Palos Verdes*, 504 F.3d at 809.  As the Ninth

17   Circuit has explained, a cause of action is comprised of a primary right of the plaintiff, a

18   corresponding primary duty of the defendant, and a wrongful act by the defendant

19   constituting a breach of that duty. The most salient characteristic of a primary right is that it

20   is indivisible: the violation of a primary right gives rise to but a single cause of action.  The

21   primary right is simply the plaintiff's right to be free from the particular injury suffered. (*Id*.)

22        The primary right now at issue is and has been whether the CPUC deprived Mr.

23   Volker of his right to be compensated in the manner prescribed by California Public Utilities

Defendants' Notice of Motion & Motion to Dismiss 1st Amended Complaint, Memo. Points & Authorities
Case No. C08-01954-JL

1   Code § 1801 et. seq.  Specifically, after failing to exhaust their administrative remedies to

2   obtain review of Res. ALJ-184, D.05-11-031, and D.06-04-018, Plaintiffs collaterally

3   attacked these decisions in their challenge to D.06-06-025 and D.06-10-023.  In CARE's

4   Petition for Modification of D.06-04-018, CARE's Application for Rehearing of D.06-06-

5   025, and CARE's Petition for Writ of Review, Plaintiffs alleged that by following the

6   intervenor compensation methodology set forth in D.05-11-031 the CPUC deprived them of

7   their statutory right to have Mr. Volker's fee determined in the manner required by

8   California Public Utilities Code § 1806.  (*See* Def. RJN Exh. K at 3; Def. RJN Exh. M at 5;

9   and Def. RJN Exh. O at 15-16, respectively.)[25]

10          In the action now before this court Plaintiffs claim a violation of the same primary

11  right previously at issue.  Specifically, by reference to D.07-12-004, D.07-12-007 and the

12  yet-to-be-decided C.07-03-006, Plaintiffs launch yet another collateral attack on the CPUC's

13  interpretation of California Public Utilities Code § 1806 as set forth in Res. ALJ-184 and

14  D.05-11-031.  CARE contended in its Application for Rehearing of D.07-12-007, "[D.07-

15  12-007] does not grant compensation for Mr. Volker's time at his market rate, contrary to

16  Public Utilities Code section 1806."[26]  That this is the same primary right addressed in the

17  California Court of Appeal is acknowledged by Plaintiffs in their Application for Rehearing

18  of D.07-12-004 where they state:

19              Intervenors have previously sought to correct the Commission's assignment
20              of a non-market rate to Mr. Volker.  Most notably, Californians for
                Renewable Energy ('CARE') sought judicial review of the Commission's
21              parallel rate determinations in D.06-04-018.

22  _____

23  [25] CARE made this same claim in the Petition for Review of the Decision of the Court of
    Appeal it submitted to the California Supreme Court.  *See* Def. RJN Exh. S at 17.

24  [26] Def. RJN Exh. W [Application of CARE for Rehearing of D.07-12-007] at 6-7.

1   (Def. RJN Exh. V [Application of Friends of the Eel River and California Sportfishing

2   Protection Alliance for Rehearing of D.07-12-004] at 1, citing *CALifornians for Renewable*

3   *Energy v. The Public Utilities Commission*, California Court of Appeal, First Appellate

4   District, Case No. A115703.)  Thus the same primary right that formed the basis for and was

5   rejected in Plaintiffs' Petition for Modification, Application for Rehearing, and Petition for

6   Writ of Review now serves as the basis for Plaintiffs' First Amended Complaint.  In each

7   instance Plaintiffs assert a violation of the statutory right to have Mr. Volker "be

8   compensated for his legal services, in the manner prescribed by California Public Utilities

9   Code section 1806… ." (*See* Plaintiffs' First Amended Complaint, at 11.)

10          Plaintiffs' recent assertion, that CARE's Petition for Writ of Review in the California

11  Court of Appeal "raised only statutory claims based on the language of California Public

12  Utilities Code section 1806, and did not allege any constitutional violations" merely confirms

13  that the same primary right is at issue and does nothing to change that fact that Plaintiffs' claim

14  is barred as res judicata.  (*See* First Amended Complaint, at 10.)  Consistent with California's

15  primary right approach, even if CARE had not raised the due process issue and presented only

16  statutory claims in the California Court of Appeal, res judicata would still bar this action.  As

17  noted in *Robi v. Five Platters, Inc.*, 838 F.2d 318, 322 (9th Cir.1988), quoting from *Brown v.*

18  *Felsen*, 442 U.S. 127, 131 (1979), "[c]laim preclusion 'prevents litigation of all grounds for, or

19  defenses to, recovery that were previously available to the parties, regardless of whether they

20  were asserted or determined in the prior proceedings.'"

21          Moreover, Plaintiffs' assertion that they only raised statutory claims is misleading and

22  contradicted by the record.  Plaintiffs raised their due process, lack of notice argument going to

Defendants' Notice of Motion & Motion to Dismiss 1st Amended Complaint, Memo. Points & Authorities
Case No. C08-01954-JL

1    Res. ALJ-184 and D.05-11-031 in the California Court of Appeal proceeding wherein they

2    purported to challenge D.06-06-025 and D.06-10-023. [27]    Plaintiffs made this argument in

3    spite of the fact that CARE participated in the hearings underlying the latter two decisions.

4    Now, after again having actively participated in hearings in A.99-09-053 and R.06-03-004, the

5    proceedings underlying D.07-12-004 and D.07-12-007 (respectively), Plaintiffs allege a

6    violation of their due process rights, again on claims of lack of notice related to Res. ALJ-184

7    and D.05-11-031.[28]  In spite of Plaintiffs' references to recent and ongoing proceedings, the

8    only due process violation Plaintiffs claim actually relates to an alleged lack of notice of the

9    proceedings underlying Res. ALJ-184 and D.05-11-031.  This is the same claim CARE

10   presented to and lost on in the California Court of Appeal.

11           On January 31, 2007, the California Court of Appeal issued a summary denial of

12   CARE's writ petition.[29]  The California Court of Appeal's summary denial constitutes a

13   final judgment on the merits; federal courts must give it the same preclusive effect as a

14   California court would.  *See Communications Telesystems Int'l v. California Pub. Utils.*

15   *Comm'n*, 196 F.3d 1011, 1019 (9th Cir. 1999); *Sunkist Growers, Inc. v. Fisher*, 104 F.3d

16   280, 283 (9th Cir. 1997).  On March 5, 2007, the California Supreme Court rejected

17   CARE's untimely petition for review and the decision of the California Appellate Court is

18

19

20   ────────────────────────

21   [27] In its January 9, 2007, Reply to Answer of Respondent, CARE claimed that because
22   neither CARE nor Mr. Volker received actual notice of Res. ALJ-184 and the proceeding
     leading to D.05-11-031, "[t]he Commission therefore failed to comply with the procedural
23   due process guarantees of the California Constitution… ."  (*See* Def. RJN Exh. Q [Reply to
     Answer of Respondent] at 26-27.)

24   [28] Plaintiffs speculate that "if the Commission once again employs its unconstitutional
     [because of lack of notice of Res. ALJ-184 and D.05-11-031] rate freezing mechanism" the
25   decision in C.07-03-006 will afford Mr. Volker an improperly low hourly rate.   However, as
     no decision has issued this issue is not yet ripe for review.

26   [29] Def. RJN Exh. R [California Court of Appeal, Summarily Denial of CARE's Writ
27   Petition].

28

Defendants' Notice of Motion & Motion to Dismiss 1st Amended Complaint, Memo. Points & Authorities
Case No. C08-01954-JL

final.[30]  There has been a final decision on the merits, addressing both the primary right again at issue here (Mr. Volker's right to be compensated in the manner prescribed by Public Utilities Code section 1806) and the due process claim now again asserted related to notice of Res. ALJ-184 and D.05-11-031.  In addition to involving the same primary claim, the prior litigation involved the same parties and/or parties in privity with the parties to the prior action as the current litigation.  Under California law Plaintiffs' claims are therefore barred as res judicata.  As the Ninth Circuit has admonished, "[w]hile every litigant deserves his day in court, few deserve two."  *Palomar Mobilehome Park Ass'n v. City of San Marcos*, 989 F.2d 362, 365 (9th Cir. 1993).

## B.     The Johnson Act Divests The Court Of Jurisdiction Over Plaintiffs' Claims.

The Johnson Act, 28 U.S.C. §1342, immunizes state commissions from suit in federal court over constitutional challenges concerning orders affecting utility rates.  In relevant part, the Johnson Act provides:

> The district courts shall not enjoin, suspend or restrain the operation of, or compliance with, any order affecting rates chargeable by a public utility and made by a State administrative agency or a ratemaking body of a State political subdivision, where:
>
> (1) Jurisdiction is based solely on diversity of citizenship or repugnance of the order to the Federal Constitution; and
>
> (2) The order does not interfere with interstate commerce; and
>
> (3) The order has been made after reasonable notice and hearing; and
>
> (4) A plain, speedy and efficient remedy may be had in the courts of such State.

---

[30] Def. RJN Exh. S [California Supreme Court, Letter Rejecting CARE's Petition for Review].

28 U.S.C. § 1342.  Pursuant to the Johnson Act "the district courts shall not enjoin, suspend or restrain the operation of, or compliance with, any order affecting rates chargeable by a public utility and made by a State Administrative agency or a ratemaking body of a State political subdivision."  *Stanislaus Food Products Co., v. PUC*, 560 F.Supp. 114, 117 (N.D. Cal. 1982).  "[B]y its broad wording it is clear that it [the Johnson Act] was intended to keep constitutional challenges to orders affecting rates out of the federal courts 'lock stock and barrel'…"  *Tennyson v. Gas Service Co.*, 506 F.2d 1135, 1138 (10th Cir. 1974); and *see Stanislaus Food Products Co.*  560 F.Supp. at 117.

As noted above, the CPUC is a state administrative agency within the meaning of the Johnson Act.  *See Stanislaus Food Products Co.* 560 F.Supp. at 117; *Southern California Edison Co., v. Peevey*, 31 Cal.4th 781, 792 (2003).  Moreover, though paid by the utility, the hourly rate afforded intervenors directly affects utility rates.  This requirement is established by section 1807 which, in relevant part, provides:

> … any award paid by a public utility pursuant to this article shall be allowed by the commission as an expense for the purpose of establishing rates of the public utility by way of a dollar-for-dollar adjustment to rates imposed by the commission immediately on the determination of the amount of the award, so that the amount of the award shall be fully recovered within one year from the date of the award.

Cal. Pub. Util. Code, § 1807; *see also, Southern Cal. Edison Co. v. Public Utilities Com.*, 117 Cal. App. 4th 1039, 1051 n. 10 (2004)**.**

Having satisfied the Johnson Act's threshold requirements, we next examine the Johnson Act's four prong requirements.  The first prong of the Johnson Act requires that jurisdiction be based on either diversity of citizenship or repugnance of the order to the Federal Constitution.  Plaintiffs assert that their due process claim is strictly constitutional and the district court's jurisdiction over this claim is based on an alleged violation of the

1  Federal Constitution.  Thus the first prong of the Johnson Act is met.  *See Peoples National*

2  *Utility Company v. City of Houston*, 837 F.2d 1336, 1337 (5th Cir. 1988).  Next, for the

3  Johnson Act to apply the order must not, and here does not, interfere with interstate

4  commerce.  The application of the Johnson Act is not deterred where an intrastate rate-

5  making policy merely "affects" interstate commerce.  *U S West v. Nelson*, 146 F.3d 718, 724

6  (9th Cir. 1998).  In particular, state agency orders setting intrastate rates do not interfere with

7  interstate commerce, for the purposes of Johnson Act analysis.  *U S West*, 146 F.3d at 724.

8  

9       Third, the Johnson Act requires that the order was made after reasonable notice and

10  hearing.  However, "[t]he Johnson Act does not engraft its own undefined standards of

11  notice and hearing upon the rate making bodies of the several states but requires no more

12  than that which is appropriate to an order affecting rates.'"  *Stanislaus Food Products Co.,*

13  560 F.Supp. at 118.  Sections 1701-1736 of the California Public Utilities Code set forth

14  notice and hearing requirements for the CPUC.  Consistent with these requirements, due

15  process is satisfied on public notice of an administrative agency's rulemaking.  *See also* Cal.

16  Pub. Util. Code § 311.  Here the CPUC published notice of the various proceedings at issue

17  at least 30 days in advance.[31]  Contrary to Plaintiffs' intimations that they had to be

18  personally served, under California law personal service by the CPUC is only required on

19  the filing of a complaint against a person or corporation.  *See* Cal. Pub. Util. Code, §1704;

20  *see also Re San Diego and Electric Company* [CPUC Decision D.96-10-036] (October 19,

21  1996) 68 Cal.P.U.C.2d 434, 448, 456-457 [Conclusion of Law No. 3]; *and see also, Re Wild*

22  *Goose Storage, Inc.* [CPUC Decision D.97-10-070] (October 22, 1997) 76 Cal.P.U.C.2d

23  246, 248.

24  
25  _____

26  [31] Def. RJN Exh. E [CPUC Daily Calendar for October 7, 2004], at 8, and Def. RJN Exh. H
27  [CPUC's Public Agenda for November 18, 2005], at 16.

28

1    Enforcement of the Johnson Act does not require personal service.  *Zucker v. Bell*

2    *Tel. Co. of Pennsylvania*, 373 F.Supp. 748, 754 (E.D. Penn. 1974) *aff'd* 510 F.2d 971 (5th

3    Cir. 1975).  As *Zucker* acknowledges, constructive notice is more than sufficient where, as is

4    the case here, the complexity of the subject matter and size of the population to be informed

5    (more than 30 million Californians) renders personal notification impractical if not

6    impossible.  *Zucker*, 373 F.Supp. at 754.  More generally, the necessity and validity of

7    constructive notice has been repeatedly affirmed by the federal courts.  For example, with

8    regard to the sufficiency of notice of a loan program by publication by the Secretary of

9    Agriculture, the Supreme Court in *Lyng v. Payne*, 476 U.S. 926 (1986) held that, "the notice

10   published in the Federal Register, as well as that afforded by the Secretary in full

11   compliance with his own procedures, was more than ample to satisfy any due process

12   concerns."  *Lyng v. Payne*, 476 U.S. at 942 citing 44 U.S.C. § 1507.  Similarly, in *State of*

13   *California ex rel. Lockyer v. F.E.R.C.*, 329 F.3d 700 (9th Cir. 2003) the court addressed due

14   process claims asserting that notice provided by publication in the Federal Register was

15   inadequate.  The court dismissed this argument and held that "[p]ublication in the *Federal*

16   *Register* is legally sufficient notice to all interested or affected persons regardless of actual

17   knowledge or hardship resulting from ignorance, … ."  *State of California ex rel. Lockyer*,

18   329 F.3d at 707.

19   Moreover, the fact is, Plaintiffs had notice of and actively participated in hearings in

20   A.02-09-043, the proceeding underlying D.04-08-046, D.06-04-018, D.06-06-025, and D.06-

21   10-023, as well as A.99-09-053 and R.06-03-004, the proceedings underlying D.07-12-004 and

22   D.07-12-007 (respectively).  Thus, in spite of Plaintiffs' references to recent and ongoing

23   proceedings, the only lack of notice Plaintiffs claim relates to allegations that constructive

24

25

26

27

28

1  notice of the proceedings underlying Res. ALJ-184 and D.05-11-031 was not sufficient.  This

2  is the same claim CARE presented to and lost on in the California Court of Appeal.[32]

3      Finally, plain, speedy and efficient remedies were available to Plaintiffs as required

4  by the Johnson Act.  As a matter of CPUC policy, Plaintiffs were afforded the opportunity to

5  obtain an increase in Mr. Volker's hourly rate each time compensation was sought.  As

6  noted in D.08-03-024 [Def. RJN Exh. X], at 7-8 (denying rehearing of D.07-12-004), and

7  D.08-04-060 [Def. RJN Exh. Y], at 6-7 (denying rehearing of D.07-12-007): "[A]n

8  intervenor may request an adjustment to an adopted hourly rate but must show good cause

9  for doing so. … The burden is on the intervenor to justify the higher rate … ."  (*Id.* at 2-4.)

10  (*See also*, D.06-04-018, at 61 and D.06-10-023, at  3.)  Thus, had Plaintiffs wrongly been

11  afforded an improper hourly rate in D.05-11-031, as a plain, speedy and efficient remedy

12  they need only show good cause to obtain an adjustment to their hourly rate.  That Plaintiffs

13  repeatedly failed to make the required showing is a matter of record. As set forth in D.08-

14  04-060:

15          While CARE presented evidence of Mr. Volker's having received a higher
16          award in other venues, it failed to set forth the standard used to set that rate,
            and made no attempt to show how the work performed at that hourly rate was
17          comparable to the work done at the Commission for which the hourly rate
            increase was being sought.  Indeed, in addition to noting that Mr. Volker's
18          'work on this particular case primarily involved meeting with or editing the
            work of other attorneys' D.07-12-007 specifically notes that 'CARE's request
19          for compensation fails to mention prior awards to Volker… .'

20  (D.08-04-060, p. 8.)[33]

21      Additionally, under California law following hearings, parties have the opportunity

22  to file a Petition for Modification and/or Application for Rehearing.  *See* Cal. Pub. Util.

23  _____

24  [32] In its January 9, 2007, Reply to Answer of Respondent, CARE claimed that because
    neither CARE nor Mr. Volker received actual notice of Res. ALJ-184 and the proceeding
25  leading to D.05-11-031, "[t]he Commission therefore failed to comply with the procedural
    due process guarantees of the California Constitution… ."  (See Def. RJN Exh. Q [Reply to
26  Answer of Respondent] at 26-27.)

27  [33] See also D.08-03-024, at 6-7.

28

Code, §§ 1731 & 1732.  After having participated in the proceedings leading up to D.06-04-018, D.07-12-004, and D.07-12-007, Plaintiffs had available to them a plain, speedy and efficient remedy in the form of an application for rehearing of those decisions.  Indeed, Plaintiffs availed themselves of this opportunity and filed Applications for Rehearing of D.07-12-004 and D.07-12-007. *See* Def RJN Exh. V and Def RJN Exh. W.  Plain, speedy, and efficient remedies were also available to Plaintiffs pursuant to Pub. Util. Code § 1756. Consistent with section 1756, "[w]ithin 30 days after the commission issues its decision denying the application for a rehearing …any aggrieved party may petition for a writ of review in the court of appeal or the Supreme Court… ."  Perhaps because CARE had already obtained review of the same primary right when it filed its prior Petition for Writ of Review in the California Court of Appeal, Plaintiffs did not seek appellate review of D.07-12-004 or D.07-12-007.[34]  That Plaintiffs did not receive the outcome they desired and/or failed to fully avail themselves of these plain, speedy, and efficient remedies does not alter the fact that these remedies were available to Plaintiffs.

Rather than seek review of the above decisions in the proscribed and statutorily required manner, Plaintiffs now seek review of these decisions in the federal district court. However, "[t]he Johnson Act demonstrates Congress' intent that plaintiffs avail themselves of state remedies."  *Peoples National Utility Company*, 837 F.2d at 1368.  Plaintiffs "cannot circumvent the Johnson Act by refusing to pursue [their] state remedies." *Id*.  That Plaintiffs failed to avail themselves of the several opportunities for review of the aforementioned decisions and/or do not believe that they will prevail in seeking these remedies does not allow circumvention of the Johnson Act.  Pursuant to the Johnson Act, this court may not enjoin, suspend or restrain the operation of, or compliance with the CPUC orders at issue.

---

[34] See Def RJN Exh. O.

1

2

**C.    The Court Lacks Jurisdiction Because Defendants Are Shielded From Federal Actions By Eleventh Amendment Sovereign Immunity Protections.**

3    The Eleventh Amendment of the United States Constitution grants states and their

4    branches immunity from suit in federal courts, providing:

5

6

7

> The Judicial Power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by citizens of another state, or by citizens or subjects of any Foreign State.

8    Eleventh Amendment immunity is based on the principle that "[i]t is inherent in the nature

9    of sovereignty not to be amenable to the suit of an individual without consent." *Hans v.*

10    *Louisiana*, 134 U.S. 1, 13 (1890). Pursuant to the Eleventh Amendment, "an unconsenting

11

12    State is immune from suits brought in federal courts by her own citizens as well as by

13    citizens of another state." *Employees v. Missouri Dept. of Public Health and Welfare*, 411

14    U.S. 279, 280 (1973). Eleventh Amendment sovereign immunity also bars state law claims

15    from being brought against public officials in their individual and/or official capacity.

16    *Pennhurst State School & Hosp. v. Halderman*, 465 U.S. 89, 102-103 (1983), citing

17

18    *Edelman v. Jordan*, 415 U.S. 651 (1974). Here the CPUC has neither consented to suit nor

19    waived its Eleventh Amendment immunity.

20    The Eleventh Amendment's limitation on claims also extends to "arms of the state."

21    *Hale v. State of Ariz.*, 993 F.2d 1387, 1398 (9th Cir. 1993). The CPUC is a constitutionally

22    created state administrative agency that has been given broad powers by the California State

23    Legislature. *See* Cal. Const., Art. XII, §1, et seq.; *see generally*, Cal. Public Utilities Code.

24    "[T]he courts have described [C]PUC as 'a state agency of constitutional origin with far-

25    reaching duties, functions and powers' whose 'power to fix rates [and] establish rules' has

26

27

28

Defendants' Notice of Motion & Motion to Dismiss 1st Amended Complaint, Memo. Points & Authorities
Case No. C08-01954-JL

1    been 'liberally construed.'"  *Southern California Edison Co., v. Peevey*, 31 Cal.4[th] 781, 792

2    (2003).

3         In the present case, Plaintiffs ask the court to interpret, and then compel the CPUC to

4    comply with what they believe state law to be.  (Plaintiffs' First Amended Complaint, at 3 –

5    7.)  Specifically, Plaintiffs ask the Court to reinterpret California Public Utilities Code §

6    1806 as requiring payment of the rate Mr. Volker commands in his practice area and to

7    forgo the interpretation of California Public Utilities Code § 1806 found in Res. ALJ-184

8    and D.05-11-031.  By way of relief Plaintiffs wrongly ask the United States District Court to

9    interpret state law against the state (and in a manner contrary to the California Court of

10    Appeal).  For example, Plaintiffs first ask this court to issue "[a] declaration that the non-

11    market rates that the Commission has assigned to Mr. Volker … are invalid." (First

12    Amended Complaint, at 12.)  Next, Plaintiffs seek "[a]n injunction directing the

13    Commissioners to recalculate Mr. Volker's attorney's fees based on his market rates … ."

14    (First Amended Complaint, at 12.)  Also, in seeking "[a]n injunction restraining the

15    Commissioners from using non-market rates when assigning a rate to Mr. Volker in the

16    future" Plaintiffs ask this court to reject the CPUC's interpretation of California Public

17    Utilities Code § 1806 as requiring that market rates be considered, in favor of their

18    interpretation of this section as requiring that the CPUC pay the rate the individual

19    commands in their practice area.  Plaintiffs seek no relief beyond a reinterpretation of state

20    law against the state.  The Eleventh Amendment bars federal courts from interpreting state

21    law against the state and therefore precludes the requested relief.  *Pennhurst State School &*

22    *Hosp.*, 465 U.S. at 106, 121.

1   Moreover, Plaintiffs cannot skirt the Eleventh Amendment's restriction on suits by

2   naming the individual Commissioners. "The Eleventh Amendment bars a suit against state

3   officials when 'the state is the real, substantial party in interest.'" *Pennhurst State School &*

4   *Hosp.*, 465 U.S. at 101, citing *Ford Motor Co. v. Department of Treasury of Indiana*, 323

5   U.S. 459 (1945). The fiction of *Ex Parte Young*, 209 U.S. 123 (1908) that naming

6   individual state officials and seeking prospective relief avoids the Eleventh Amendment's

7   bar to federal court jurisdiction does not apply when Plaintiffs claim that state officials

8   "violated *state* law." *Pennhurst State School & Hosp.*, 465 U.S. at 106 (emphasis in

9   original). That Plaintiffs' action is in fact an action against the state is illustrated by the

10  relief sought in the prayer for relief. Plaintiffs pray for declarations directing the CPUC to

11  reinterpret state law such that the CPUC must recalculate Mr. Volker's attorney fees and an

12  injunction restraining the CPUC from using its current interpretation of state law going to

13  the intervenor compensation calculation method. As noted in *Pennhurst*,

14

15  > [I]t is difficult to think of a greater intrusion on state sovereignty than when a
    > federal court instructs state officials on how to conform their conduct to state
    > law. Such a result conflicts directly with the principles of federalism that
    > underlie the eleventh Amendment.

16

17

18

19  *Pennhurst State School & Hosp.*, 465 U.S. at 106.

20  Nor is State sovereign immunity under the Eleventh Amendment subservient to

21  claims brought under 28 U.S.C. §§1331, 1343 or 42 U.S.C. §§1983, 1985. As noted in

22  *Pennhurst* "the entire judicial power granted by the Constitution does not embrace authority

23  to entertain a suit brought by private parties against a State without consent given …"

24  *Pennhurst State School & Hosp.*, 465 U.S. at 98. In particular, "[s]ection 1983 does not

25  abrogate the states' Eleventh Amendment immunity from suit." *Hale v. State of Ariz.*, 993

F.2d 1387, 1398 (9th Cir. 1993) citing *Quern v. Jordan*, 440 U.S. 332, 344-345 (1979) and

*see Boreta v. Kirby*, 328 F.Supp. 670, 672 (N.D. Cal. 1971) citing *Monroe v. Pape*, 365 U.S.

167 (1961).

Similarly, Plaintiffs' assertion that the Court "has supplemental jurisdiction over

[P]laintiffs' state law claims pursuant to 28 U.S.C. § 1367 and 42 U.S.C. §1988" are also

barred by the Eleventh Amendment.  (*See* First Amended Complaint, at 3.)  The Eleventh

Amendment "applies … to state law claims brought into federal court under pendent

jurisdiction."  *Wellborn Freeman v. Oakland Unified School District*, 179 F.3d 846, 846-847

(9th Cir. 1999), citing *Belanger v. Madera Unified Sch. Dist.*, 963 F.2d 248, 250 (10th Cir.

1992) and *Fordyee v. City of Seattle*, 55 F.3d 436, 441 (9th Cir. 1995).  Ultimately,

Plaintiffs' claims of supplemental jurisdiction serve only to acknowledge that Plaintiffs'

claims are, in reality, strictly matters of state law.

 D. **Plaintiffs' claim against the Commissioners in their Individual Capacity Fails to State a Claim Upon Which Relief can be Based.**

By way of their caption headings Plaintiffs purport to bring their action against the

named Commissioners in their individual as well as official capacities.  However, there is

nothing in Plaintiffs' First Amended Complaint to support the suggestion that such relief is

or can be sought against the Commissioners in their individual capacity.  As noted in *Bender*

*v. Williamsport Area Sch. Dist.*, 475 U.S. 534, 543 (1985), the mere incantation of the term

"individual capacity" is not enough to transform an official capacity action into an individual

capacity action.  Rather, to establish personal liability in a § 1983 action a plaintiff must

show that "the official acting under color of state law caused the deprivation of a federal

right."  *Kentucky v Graham*, 473, U.S. 159, 166 (1985) citing *Monroe v. Pape*, 365 U.S. 167

1   (1961); *see also*, *Romano v. Bible,* 169 F.3d 1182, 1185-1186 (1999), citing *Hafer v. Melo*,

2   502 U.S. at 25.  In notable contrast, "a governmental entity is liable under § 1983 only when

3   the entity itself is a 'moving force' behind the deprivation.  *Kentucky v Graham*, 473, U.S.

4   159, 166 (1985), citing *Polk County v. Dodson*, 454 U.S. 312, 326 (1981).

5          Here Plaintiffs do not and cannot allege that an individual official (i.e. one of the

6   named Commissioners) acted under color of state law and caused a deprivation of a federal

7   right.  Rather, Plaintiffs allege that the Commissioners as a body were the moving force

8   behind the deprivation.  As required by law, each of the decisions identified in the complaint

9   were adopted by the Commission as a body, with the Commissioners acting solely in their

10  official capacity.  Specifically, the decisions at issue were adopted during regularly

11  scheduled, publicly noticed Commission meetings, by a majority vote of the

12  Commissioners.  *See* e.g. Cal. Pub. Util. Code, §311; *see also*, Def RJN Exh. E, and Def

13  RJN Exh. G.  In their individual capacity Commissioners have no authority, and cannot act

14  under color of law, to issue Commission decisions.

15         Plaintiffs' claim must be viewed as an action against the CPUC because the relief

16  Plaintiffs seek cannot be had from the Commissioners in their individual capacity.

17  Specifically, Plaintiffs seek injunctive and declaratory relief.  As noted in *Kentucky v.*

18  *Graham*, 473, U.S. 159, 166 (1985), citing *Hensley v. Eckerhart*, 461 U.S. 424 (1983), "[a]

19  victory in a personal capacity action is a victory against the individual defendant, rather than

20  against the entity that employs him."  Because any modification of a prior Commission

21  decision or new decision going to intervenor compensation would require a Commission

22  vote (see Pub. Util. Code §§ 15.1 et. seq.), and because some or all of the individually

23  named Commissioners may not then be on the Commission, a victory over the

1  Commissioners in their individual capacity would not give rise to the declaratory or

2  injunctive relief requested by Plaintiffs.  Thus, as a matter of law, the named Commissioners

3  cannot provide the requested relief in their individual capacity.

4      Finally, the Federal Rules of Civil Procedure also suggest that Plaintiffs' First

5  Amended Complaint should be read as being directed at the Commissioners in their official,

6  rather than individual capacity.  Federal Rule 25(d) provides that "[a]n action does not abate

7  when a public officer who is a party in an official capacity … ceases to hold office while the

8  action is pending."  (Federal Rule 25(d), emphasis added.)  Instead, the officer's successor is

9  automatically substituted.

10  As Plaintiffs point out, "Defendant Geoffrey Brown served on the Commission from

11  January 18, 2002 until he was replaced by Commission[er] Simon in February 2007."  (*See*

12  Plaintiffs' First Amended Complaint, at 5.)  Accordingly, Commissioner Simon was not on

13  the Commission and did not act under color of law or in any other manner when the

14  Commission issued D.05-11-031, and Commissioner Brown was not on the Commission

15  and did not act under color of law or in any other manner when D.07-12-007 and D.07-12-

16  004 issued.  On its face, Federal Rule 25(d) applies to actions brought against public officers

17  in their official capacity only.  Thus, while Federal Rule 25(d) provides that a public

18  officer's successor (Brown was succeeded by Simon), is automatically substituted in an

19  official capacity action, there is no such substitution in an individual capacity action.  At a

20  minimum, Plaintiffs' claims against Commissioners Brown and Simon in their individual

21  capacities are defective.  Indeed, Plaintiffs only seek injunctive and declaratory relief, which

22  would be to no avail against former Commissioner Brown, because he no longer has

1    authority to vote on matters for the Commission. Here again, contrary to Plaintiffs' caption

2    headings, their action only goes to the Commissioners in their official capacity.

3    **III.    CONCLUSION**

4            For the foregoing reasons, Defendants respectfully request that the Court dismiss this

5    action.

6

7    DATED:  August 13, 2008                          Respectfully submitted,

8

9                                                     HARVEY Y MORRIS, SBN 87902
                                                      HELEN W. YEE, SBN 119434
10                                                    DARWIN E. FARRAR, SBN 152735

11

12                                        By:    /s/      DARWIN E. FARRAR

13                                                _____
                                                         Darwin E. Farrar
14
                                                 Attorneys for Defendants
15                                               California Public Utilities Commission
                                                 505 Van Ness Avenue
16                                               San Francisco, CA  94102

17

18

19

20

21

22

23

24

25

26

27

28

1  HARVEY Y MORRIS, SBN 87902
   HELEN W. YEE, SBN 119434
2  DARWIN E. FARRAR, SBN 152735
   CALIFORNIA PUBLIC UTILITIES COMMISSION
3  505 Van Ness Avenue
   San Francisco, CA  94102
4  Telephone:    (415) 703-1599
   Facsimile:    (415) 703-2262
5
   Attorneys for Defendants
6  California Public Utilities Commission
   and the Commissioners in their official
7  and individual capacity

8

9                 UNITED STATES DISTRICT COURT

10        FOR THE NORTHERN DISTRICT OF CALIFORNIA

11                  SAN FRANCISCO DIVISION

12

13 | CAlifornians for Renewable Energy | Case No. C08-01954-JL |
14 | and Stephan C. Volker, | |
   | | **DEFENDANTS' REQUEST FOR** |
15 | Plaintiffs, | **JUDICIAL NOTICE IN SUPPORT OF** |
   | | **MOTION TO DISMISS PLAINTIFFS'** |
16 | vs. | **FIRST AMENDED COMPLAINT** |
17 | California Public Utilities Commission, | Date:    October 8, 2008 |
   | Michael Peevey, in his official and individual | Time:    9:30 a.m. |
18 | capacity, Dian Grueneich, in her official and | Place:  Hon. Magistrate James Larson |
   | individual capacity, John Bohn, in his official | |
19 | and individual capacity, Rachelle Chong, in her | |
   | official and individual capacity, Timothy | |
20 | Simon, in his official and individual capacity, | |
   | and Geoffrey Brown, in his official and | |
21 | individual capacity, | |
22 | Defendants. | |

23        Defendants, by and through their attorneys, hereby request the Court to take judicial

24 notice pursuant to Federal Rule of Evidence 201 of the following facts:

25        1.      On January 31, 2003, the California Public Utilities Commission ("CPUC")

26 issued D.03-01-058.  A copy of D.03-01-058 is attached hereto as Exhibit A.

27

28

1    2.    The CPUC gave public notice of its consideration and adoption of Resolution

2  ALJ-184 in its Public Agenda for August 19, 2004.  A copy of the relevant portions of the

3  CPUC's Public Agenda for August 19, 2004 is attached hereto as Exhibit B.

4    3.    On August 23, 2004, the CPUC issued D.04-08-046.  A copy of D.04-08-046

5  is attached hereto as Exhibit C.

6    4.    On August 25, 2004, the CPUC issued Resolution ALJ-184.  A copy of

7  Resolution ALJ-184 is attached hereto as Exhibit D.

8    5.    The CPUC gave public notice of its consideration of the commencement of

9  R.04-10-010 in its Public Agenda for October 7, 2004.  A copy of the relevant portions of

10  the CPUC's Public Agenda for October 7, 2004 is attached hereto as Exhibit E.

11    6.    On October 12, 2004, the CPUC issued Order Instituting Rulemaking 04-10-

12  010.  A copy of Order Instituting Rulemaking 04-10-010 is attached hereto as Exhibit F.

13    7.    The CPUC gave public notice of R.04-10-010 in its Daily Calendar for

14  October 21, 2004.  A copy of the relevant portions of the CPUC's Daily Calendar for

15  October 21, 2004 is attached hereto as Exhibit G.

16    8.    The CPUC gave public notice of its consideration and adoption of D.05-11-

17  031 in its Public Agenda for November 18, 2005.  A copy of the relevant portions of the

18  CPUC's Public Agenda for November 18, 2005 is attached hereto as Exhibit H.

19    9.    On November 29, 2005, the CPUC issued Decision (D.) 05-11-031. A copy

20  of D.05-11-031 is attached hereto as Exhibit I.

21    10.    On April 14, 2006, the CPUC issued D.06-04-018.  A copy of D.06-04-018 is

22  attached hereto as Exhibit J.

23    11.    On April 15, 2006, Californians for Renewable Energy ("CARE") filed a

24  Petition for Modification of Decision D.06-04-018 of the CPUC.  A copy of CARE's

25  Petition for Modification is attached hereto as Exhibit K.

26    12.    On June 16, 2006, the CPUC issued D.06-06-025, denying CARE's Petition

27  for Modification of D.06-04-018.  A copy of D.06-06-025 is attached hereto as Exhibit L.

28

1   13. On July 13, 2006, CARE filed an Application for Rehearing of Decision

2 D.06-06-025 of the CPUC.  A copy of CARE's Application for Rehearing is attached hereto

3 as Exhibit M.

4   14. On October 6, 2006, the CPUC issued D.06-10-023, denying CARE's

5 Application for Rehearing of D.06-06-025.  A copy of D.06-10-023 is attached hereto as

6 Exhibit N.

7   15. On November 3, 2006, CARE sought a writ of review from the California

8 Court of Appeals requesting review of the CPUC's decisions denying CARE's Application

9 for Rehearing.  A copy of CARE's petition for writ of review, Case No. A115703, is

10 attached hereto as Exhibit O.

11   16. On December 6, 2006, the CPUC filed an answer to the writ petition, to

12 which CARE filed a reply brief (dated January 9, 2007).  A copy of the CPUC's answer and

13 CARE's reply brief in the writ proceeding are attached hereto as Exhibit P and Exhibit Q,

14 respectively.

15   17. On January 31, 2007, the California Court of Appeals summarily denied

16 CARE's petition for writ of review.  A copy of this denial is attached hereto as Exhibit R.

17   18. On February 28, 2007, CARE sought a petition for review of the decision of

18 the California Court of Appeals with the California Supreme Court, Case No. S150635,.  By

19 letter dated March 5, 2007, the California Supreme Court rejected CARE's untimely petition

20 for review.  A copy of this letter and CARE's petition for review are attached hereto as

21 Exhibit S.

22   19. On December 7, 2007, the CPUC issued D.07-12-004.  A copy of D.07-12-

23 004 is attached hereto as Exhibit T.

24   20. On December 7, 2007, the CPUC issued D.07-12-007.  A copy of D.07-12-

25 007 is attached hereto as Exhibit U.

26

27

28

1    21.    On December 17, 2007, Friends of the Eel River and California Sportfishing

2 Protection Alliance filed an Application for Rehearing of Decision D.07-12-004 of the

3 CPUC.  A copy of this Application for Rehearing is attached hereto as Exhibit V.

4    22.    On December 20, 2007, CARE filed an Application for Rehearing of

5 Decision D.07-12-007 of the CPUC.  A copy of CARE's Application for Rehearing is

6 attached hereto as Exhibit W.

7    23.    On March 17, 2008, the CPUC issued D.08-03-024, denying Friends of the

8 Eel River and California Sportfishing Protection Alliance's Application for Rehearing of

9 D.07-12-004.  A copy of D.08-03-024 is attached hereto as Exhibit X.

10    24.    On May 1, 2008, the CPUC issued D.08-04-060, denying CARE's

11 Application for Rehearing of D.07-12-007.  A copy of D.08-04-060 is attached hereto as

12 Exhibit Y.

13    Pursuant to Federal Rule of Evidence 201(b), "a judicially noticed fact must be one

14 not subject to reasonable dispute in that it is either (1) generally known within the territorial

15 jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to

16 sources whose accuracy cannot reasonably be questioned."  Rule 201(d) further provides

17 that "[a] court shall take judicial notice if requested by a party and supplied with the

18 necessary information."

19    Courts routinely take judicial notice of legal documents filed in related litigation,

20 including pleadings, motions, and judgments.  *See*, *e.g.*, *Papai v. Harbor Tug & Barge Co.*,

21 67 F.3d 203, 207, n. 5 (9th Cir. 1995), rev'd on other grounds, 520 U.S. 548 (1997)

22 ("Judicial notice is properly taken of orders and decisions made by other courts and

23 administrative agencies."); *United States ex rel. Robinson Rancheria Citizens Council v.*

24 *Borneo, Inc.*, 971 F.2d 244, 248 (9th Cir. 1992) (court took judicial notice of a California

25 court's final judgment and related filings that had a direct relation to matters at issue);

26 *Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1276-77 (11th Cir. 1999) (court took judicial

27 notice of public documents filed with the SEC in a securities fraud action because there was

28

no serious question as to their authenticity); *MacMillan Bloedel Limited v. Flintkote Co.*, 760 F.2d 580, 587-88 (5th Cir. 1985) (court took judicial notice of the pleadings, files, proceedings, opt-out actions and companion criminal prosecutions in related multi-district litigation because there was no need for formal introduction of evidence which was beyond reasonable dispute); *Schweitzer v. Scott*, 469 F. Supp. 1017, 1020 (C.D. Cal. 1979) (court took judicial notice of court files and records revealing that the petitioner was also a plaintiff in at least three other civil actions arising from the same series of transactions).  Courts also routinely take judicial notice of the records, orders, and decisions of administrative bodies. *See Papai*, 67 F.3d at 207, n. 5, rev'd on other grounds, 520 U.S. 548 (1997); *Mack v. South Bay Beer Distributors*, 798 F.2d 1279, 1282 (9th Cir. 1986) citing *Interstate Natural Gas Co. v. Southern California Gas Co.*, 209 F.2d 380, 385 (9th Cir. 1953).

Defendants respectfully request that the Court take judicial notice of the documents listed above and attached hereto as Exhibits A-Y because they are public documents filed with or issued by the California courts or the CPUC, a state agency.  These documents are pertinent to the instant litigation including the claims related to Resolution ALJ-184 and D.05-11-031, and to the extent that CARE has raised the same claims before the Commission and in state court, these documents are highly relevant to CARE's current action before this Court.

For the foregoing reasons, Defendants respectfully request that the Court take judicial notice of the documents attached hereto as Exhibits A-Y.

DATED:  August 13, 2008

HARVEY Y MORRIS, SBN 87902
HELEN W. YEE, SBN 119434
DARWIN E. FARRAR, SBN 152735

By:   /s/   DARWIN E. FARRAR
_____
DARWIN E. FARRAR

1

2          Attorneys for Defendants

3          California Public Utilities Commission
           505 Van Ness Avenue
4          San Francisco, CA  94102
           (415) 703-1599
5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Defendants' Request for Judicial Notice
Case No. C08-01954-JL

HARVEY Y MORRIS, SBN 87902
HELEN W. YEE, SBN 119434
DARWIN E. FARRAR, SBN 152735
CALIFORNIA PUBLIC UTILITIES COMMISSION
505 Van Ness Avenue
San Francisco, CA 94102
Telephone:    (415) 703-1599
Facsimile:    (415) 703-2262
Email: edf@cpuc.ca.gov

Attorneys for Defendants
California Public Utilities Commission
and the Commissioners in their official
and individual capacity

# UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| CAlifornians for Renewable Energy and Stephan C. Volker, | Case No. C08-01954-JL |
| Plaintiffs, | **[PROPOSED] ORDER GRANTING DEFENDANTS' REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF MOTION TO DISMISS THE FIRST AMENDED COMPLAINT** |
| vs. | |
| California Public Utilities Commission, Michael Peevey, in his official and individual capacity, Dian Grueneich, in her official and individual capacity, John Bohn, in his official and individual capacity, Rachelle Chong, in her official and individual capacity, Timothy Simon, in his official and individual capacity, and Geoffrey Brown, in his official and individual capacity, | Date:  October 8, 2008 Time:  9:30 a.m. Place:  Hon. Magistrate James Larson |
| Defendants. | |

The Request for Judicial Notice of Defendants California Public Utilities

Commission and the named Commissioners in their official and individual capacity

1

1   (hereinafter, "CPUC") came regularly for hearing on October 8, 2008, the Honorable James

2   Larson, United States District Judge, presiding.

3        The Court has considered Defendants' Request for Judicial Notice and all pleadings

4   and papers on file in this action, and the arguments of counsel presented on the hearing of

5   this Request for Judicial Notice.

6        The Court finds that the documents attached as Exhibits A-Y to Defendants' Request

7   for Judicial Notice meet the requirements of Federal Rule of Evidence 201(b) because they

8   are not subject to reasonable dispute and they are either (1) generally known within the

9   territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by

10  resort to sources whose accuracy cannot reasonably be questioned.

11       IT IS HEREBY ORDERED THAT the Defendants' Request for Judicial Notice is

12  granted in its entirety

13

14

15  Dated:                    _____

16                                The Honorable James Larson
                                  United States Magistrate Judge
17

18

19

20

21

22

23

24

25

26

27

28

1  HARVEY Y MORRIS, SBN 87902
   HELEN W. YEE, SBN 119434
2  DARWIN E. FARRAR, SBN 152735
   CALIFORNIA PUBLIC UTILITIES COMMISSION
3  505 Van Ness Avenue
   San Francisco, CA  94102
4  Telephone:      (415) 703-1599
   Facsimile:      (415) 703-2262
5
   Attorneys for Defendants
6  California Public Utilities Commission
   and the Commissioners in their official
7  and individual capacity

8

9            UNITED STATES DISTRICT COURT

10       FOR THE NORTHERN DISTRICT OF CALIFORNIA

11             SAN FRANCISCO DIVISION

12

13

14  CAlifornians for Renewable Energy
    and Stephan C. Volker,                          Case No. C08-01954-JL

15                 Plaintiffs,          [PROPOSED] ORDER GRANTING
                                        DEFENDANTS' MOTION TO DISMISS
16          vs.                         PLAINTIFFS' FIRST AMENDED
                                        COMPLAINT
17  California Public Utilities Commission,
    Michael Peevey, in his official and individual
18  capacity, Dian Grueneich, in her official and
    individual capacity, John Bohn, in his official
19  and individual capacity, Rachelle Chong, in
    her official and individual capacity, Timothy
20  Simon, in his official and individual capacity,
    and Geoffrey Brown, in his official and
21  individual capacity,

22

23                 Defendants.

          The Motion to Dismiss of Defendants California Public Utilities Commission ("the
24
    CPUC") and the named Commissioners in their official and individual capacity came
25
    regularly for hearing on October 8, 2008, the Honorable James Larson, United States
26
    Magistrate Judge, presiding.
27

28

                                        1

1         The Court has considered the Defendants' Motion to Dismiss, the accompanying

2    Memorandum of Points and Authorities, all pleadings and papers on file in this action, and

3    the arguments of counsels presented on the hearing of this motion.

4         The Court finds that it lacks subject matter jurisdiction over claims asserted by

5    Plaintiffs CAlifornians for Renewal Energy (CARE) and Stephan C. Volker.  In addition,

6    Plaintiffs' complaint is barred because of the Eleventh Amendment prohibition on lawsuits

7    against state agencies in federal court, Johnson Act, res judicata, and collateral estoppel.

8         IT IS HEREBY ORDERED THAT the Defendants' Motion to Dismiss is granted,

9    and Plaintiffs' complaint is dismissed with prejudice.

10

11

12   Dated:                  _____

13                            The Honorable James Larson

14                            United States Magistrate Judge

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1  HARVEY Y MORRIS, SBN 87902
   HELEN W. YEE, SBN 119434
2  DARWIN E. FARRAR, SBN 152735
   CALIFORNIA PUBLIC UTILITIES COMMISSION
3  505 Van Ness Avenue
   San Francisco, CA  94102
4  Telephone:    (415) 703-1599
   Facsimile:    (415) 703-2262
5
   Attorneys for Defendants
6  California Public Utilities Commission
   and the Commissioners in their official
7  and individual capacity

8

9                    UNITED STATES DISTRICT COURT

10           FOR THE NORTHERN DISTRICT OF CALIFORNIA

11                      SAN FRANCISCO DIVISION

12

13  CAlifornians for Renewable Energy
    and Stephan C. Volker,
14                                              Case No. C08-01954-JL
                    Plaintiffs,
15                                              **PROOF OF SERVICE**
            vs.
16
    California Public Utilities Commission,
17  Michael Peevey, in his official and
    individual capacity, Dian Grueneich, in her
18  official and individual capacity, John Bohn,
    in his official and individual capacity,
19  Rachelle Chong, in her official and
    individual capacity, Timothy Simon, in his
20  official and individual capacity, and
    Geoffrey Brown, in his official and
21  individual capacity,

22                  Defendants.

23

24        I am a citizen of the United States, over 18 years of age, employed in the City and County

25  of San Francisco, and not a party to the subject cause.  My business address is the California

26

27

28

                                        1

1    Public Utilities Commission, Legal Division, 505 Van Ness Avenue, San Francisco, California

2    94102.

3          On August 13, 2008, I served the following documents:

4
5            • **DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS THE FIRST AMENDED COMPLAINT; MEMORANDUM OF POINTS AND AUTHORITIES;**
6
7            • **DEFENDANTS' REQUEST FOR JUDICIAL NOTICE;**

8            • **[PROPOSED] ORDER GRANTING DEFENDANTS' REQUEST FOR JUDICIAL NOTICE;**
9
10           • **[PROPOSED] ORDER GRANTING DEFENDANTS' MOTION TO DISMISS**
11

12    on the parties to this action, Case No. C08-01954-JL by mailing by first-class a copy thereof

13    properly addressed to the following party:

14                         STEPHAN C. VOLKER
                          JOSHUA A.H. HARRIS
15                        BRIDGET A. ROBERTS
                          Attorneys for Plaintiffs Californians for
16                        Renewable Energy and Stephan C. Volker
                          436-14th Street, Suite 1300
17                        Oakland, Ca 94612

18
19          I declare under penalty of perjury that the foregoing is true and correct.

20          Executed on August 13, 2008, at San Francisco, California.

21

22                              /s/     MARTHA PEREZ
                          _____
23                               MARTHA PEREZ

24

25

26

27

28

ALJ/BDP/jyc                                          **Mailed 1/31/2003**

Decision 03-01-058  January 30, 2003

## BEFORE THE PUBLIC UTILITIES COMMISSION OF THE STATE OF CALIFORNIA

| | |
|---|---|
| Application of Valenica Water Company (U34-W) seeking approval of its updated Water Management Program as ordered in Commission Resolution W-4154 dated August 5, 1999. | Application 99-12-025 (Filed December 17, 1999) |

### OPINION ON REQUEST
### FOR INTERVENOR COMPENSATION

This decision awards the Angeles Chapter of the Sierra Club (Sierra Club) $46,990.96 for its contribution to Decisions (D.) 00-10-049 and D.01-11-048 granting Valencia Water Company (Valencia) permission to expand its service area.

### 1.  Background

In this proceeding, the Commission reviewed Valencia's Water Management Program (WMP) in conjunction with its Advice Letters (ALs) 88 and 90 requesting authorization to expand its service area.  The proceeding entailed an interim decision by the Commission, numerous rulings, two prehearing conferences (PHCs), testimony by 18 expert witnesses, eight days of hearings covering 1,100 transcript pages, and receipt into evidence of 66 exhibits. Sierra Club was an active participant in this proceeding.

Valencia opposes Sierra Club's request for compensation on the grounds that the request was not timely filed and Sierra Club's participation duplicated and overlapped that of the County of Ventura (Ventura).  We address these issues below.

140436                          - 1 -

A.99-12-025 ALJ/BDP/jyc

## 2. Requirements for Awards of Compensation

Intervenors who seek compensation for their contributions in Commission proceedings must file requests for compensation pursuant to Pub. Util. Code §§ 1801-1812. Section 1804(a) requires an intervenor to file a Notice of Intent (NOI) within 30 days of the PHC or by a date established by the Commission. Other code sections address requests for compensation filed after a Commission decision is issued. Section 1804(c) requires an intervenor requesting compensation to provide "a detailed description of services and expenditures and a description of the customer's substantial contribution to the hearing or proceeding." Section 1802(h) states that "substantial contribution" means that,

> "in the judgment of the commission, the customer's presentation has substantially assisted the commission in the making of its order or decision because the order or decision has adopted in whole or in part one or more factual contentions, legal contentions, or specific policy or procedural recommendations presented by the customer. Where the customer's participation has resulted in a substantial contribution, even if the decision adopts that customer's contention or recommendations only in part, the commission may award the customer compensation for all reasonable advocate's fees, reasonable expert fees, and other reasonable costs incurred by the customer in preparing or presenting that contention or recommendation."

Section 1804(e) requires the Commission to issue a decision that determines whether or not the customer has made a substantial contribution and the amount of compensation to be paid. The level of compensation must take into account the market rate paid to people with comparable training and experience who offer similar services, consistent with § 1806.

Section 1801.3(f) states the intent of the Legislature that the Commission administer intervenor's fees and expenses in a manner that avoids unproductive or unnecessary participation that duplicates the participation of similar interests

- 2 -

A.99-12-025 ALJ/BDP/jyc

otherwise adequately represented, or participation that is not necessary for a fair determination of the proceeding.

### 3.  Notice of Intent to Claim Compensation

By Assigned Commissioner's Ruling dated December 14, 2000, Sierra Club was found eligible to claim intervenor compensation in this proceeding pursuant to § 1804(b).

### 4.  Timeliness

Section 1804(c) provides that:

> "(c) Following issuance of a final order or decision by the commission in the hearing or proceeding, a customer who has been found, pursuant to subdivision (b), to be eligible for an award of compensation may file within 60 days a request for an award. . . "

On June 19, 2002, the California Supreme Court mailed its Order Denying Sierra Club's Petition for Review. Sierra Club filed its request for compensation on July 24, 2002. Therefore, for purposes of this compensation award, we will consider Sierra Club's compensation request timely filed.[1]

### 5.  Contribution to Resolution of Issues

Sierra Club states that it made a substantial contribution to this proceeding in two respects. First, Sierra Club argues that its Motion for Determination of Applicability of California Environmental Quality Act (CEQA) filed May 30,

---

[1] Section 1801.3 states:

> "It is the intent of the Legislature that; (b) the provisions of this article shall be administered in a manner that encourages the effective and efficient participation of all groups that have a stake in the public utility regulation process."

A.99-12-025 ALJ/BDP/jyc

2000, together with the Reply in Support of Motion of Sierra Club for Determination of the Applicability of CEQA filed July 14, 2000, resulted in this Commission's Interim Opinion, dated October 19, 2000, finding CEQA applicable to this proceeding, and directing Valencia to comply with CEQA requirements for environmental review (D.00-10-049). The Commission's Interim Opinion subsequently resulted in Valencia's preparation of its Proponent's Environmental Assessment (PEA) in accordance with this Commission's regulations implementing CEQA. Sierra Club claims that Valencia's preparation of its PEA as a result of the Sierra Club's motion substantially assisted the Commission in addressing the merits of Valencia's Application for approval of its updated WMP.

However, Ventura preceded Sierra Club in raising these issues by filing its Motion on May 22, 2000.[2] Ventura also timely filed its Reply Brief in support of the motion, a week before Sierra Club filed its Reply Brief. Because Sierra Club's filings followed after Ventura's and pursued nearly identical issues, the time spent by Sierra Club on these filings did not result in a substantial contribution to D.00-10-049. However, Sierra Club's cross-examination on these issues during the evidentiary hearings was unique and resulted in a substantial contribution. We address our specific reduction in hours for the time that did not result in a substantial contribution below.

Second, Sierra Club states that its participation through submission of argument and evidence with regard to the potential cumulative watershed effects of the proposal by Valencia's parent corporation, Newhall Land and

---

[2] The ALJ raised the likelihood that the filing might be unnecessary at hearing, see reporter's transcript dated May 22, 2000, Vol. 1, pp. 2-4.

A.99-12-025 ALJ/BDP/jyc

Farming Company, to construct a large residential development in the future, including its proposal to develop over 21,000 houses in its Newhall Ranch project, resulted in the Commission ruling that its approval of Valencia's WMP did not authorize the extension of water service to the proposed Newhall Ranch. The Commission directed that "[e]xtending service to large-scale future developments, such as those that may result from the Newhall Ranch Specific Plan, will call for review of more current information, such as the 2000 UWMP or a future update to this WMP. If Valencia proposes to serve this development, it must file an application, an updated WMP and advice letter for such a project." (D.01-11-048 p. 35.) Sierra Club also raised several issues during the consideration of the WMP on which it did not prevail. However, the issues raised were useful to the Commission's consideration of the WMP and resulted in a more informed decision by the Commission. Therefore, all of Sierra Club's time associated with the hearings and briefings leading to D.01-11-048 made a substantial contribution.

## 6. Overall Benefits of Participation

In D.98-04-059, the Commission adopted a requirement that a customer demonstrates its participation was "productive," as that term is used in § 1801.3, where the Legislature gave the Commission guidance on program administration. (See D.98-04-059, mimeo. at pp. 31-33, and Finding of Fact 42.) In that decision we discuss the requirement that participation must be productive in the sense that the costs of participation should bear a reasonable relationship to the benefits realized through such participation.

The intervention of Sierra Club and Ventura in this proceeding resulted in an exhaustive review by the Commission of the adequacy of water supplies available to meet Valencia's current requirements, including the proposed

- 5 -

A.99-12-025  ALJ/BDP/jyc

service area expansions covered by ALs 88 and 90.  Allegations regarding the inadequacy of water supplies to meet these needs have been dispelled, thereby boosting customer confidence and reinforcing property values, to the benefit of all Valencia's customers.  We, therefore, conclude that Sierra Club's participation, although not subject to precise quantification, was productive and meets the requirements of § 1801.3.

## 7.  Reasonableness of Requested Compensation

Sierra Club provided a description of its services and expenditures and requested compensation in the amount of $57,440.96.  Sierra Club's request is summarized below:

| **Attorney's fees** | | |
|---|---|---|
| Stephan C. Volker | 223.0 hours x $250/hour | = $55,750.00 |
| **Other Costs** | | |
| Copying, postage, airfare etc. | | 1,690.96 |
| | | 57,440.96 |

### 7.1  Hours Claimed

Sierra Club described the general tasks performed by Volker during specific months but did not always allocate time to particular tasks.  Sierra Club also failed to separately identify time spent traveling to evidentiary hearings by Volker. A reasonable allocation of time for travel is 8.0 hours during each month in which evidentiary hearings occurred (May 2000, June 2000, and June 2001) given that Volker's offices are in Oakland, CA and the hearings were held in Los Angeles, CA.  We find that the hours claimed associated with preparing for, traveling to, and participating in the May 2000, June 2000, and June 2001 evidentiary hearings are reasonable, as well as the time claimed in October 2000, and July and August 2001.  The remainder of the claimed hours did not result in a substantial contribution to the Commission's decisions.  Thus we will authorize

- 6 -

A.99-12-025  ALJ/BDP/jyc

compensation for 169.2 hours for professional services and 24.0 hours for travel. The hours claimed and compensated breakdown as follows:

| May 2000 | EH/preparation | 47.7 hours | Compensable |
| | Travel | 8.0 hours | Compensable |
| | Motion related | 9.8 hours | Not compensable |
| June 2000 | EH/preparation | 18.3 hours | Compensable |
| | Travel | 8.0 hours | Compensable |
| | Motion related | 2.0 hours | Not compensable |
| July 2000 | Motion related | 18.0 hours | Not compensable |
| October 2000 | Comments | 15.9 hours | Compensable |
| May/June 2001 | EH/preparation | 18.3 hours | Compensable |
| | Travel | 8.0 hours | Compensable |
| July/August 2001 | Briefs | 42.3 hours | Compensable |

### 7.2  Hourly Rates

Attorney Volker states that he has over 27 years experience as a practicing environmental lawyer in California and has been awarded attorney's fees at the hourly rate of $300 based on his extensive experience in the field of environmental litigation.  We conclude that based on Volker's experience, the requested hourly rate of $250 for services provided in 2000 and 2001 is reasonable.  Consistent with past practice, travel time will be compensated at half the authorized professional rate.

### 7.3  Other Costs

We have reviewed Sierra Club's summary of out of pocket expenses for postage, facsimile, copying, telephone charges, airfare, mileage, lodging, parking, and meals and find them reasonable given the scope of this proceeding.

### 7.4  Award

Sierra Club is awarded $46,990.96 as detailed below.

- 7 -

A.99-12-025 ALJ/BDP/jyc

| Volker, professional | 169.2 hours | $250/hour | $42,300.00 |
|---|---|---|---|
| Volker, travel | 24.0 hours | $125/hour | $ 3,000.00 |
| | | Other Costs | $ 1,690.96 |
| | | Total | $46,990.96 |

Consistent with previous Commission decisions, we will order Valencia to pay the award to Sierra Club plus any interest due (calculated at the three-month commercial paper rate), commencing October 7, 2002 (the 75th day after Sierra Club filed its compensation request) and continuing on the unpaid amount until full payment of the award.

As in all intervenor compensation decisions, we put Sierra Club on notice that the Commission staff may audit Sierra Club's records related to this award. Thus, Sierra Club must retain adequate accounting and other documentation to support its claim for intervenor compensation.

## 8. Public Review and Comment

Pursuant to Rule 77.7(f)(6), the otherwise applicable 30-day period for public review and comment of this compensation decision is being waived.

## 9. Assignment of Proceeding

Geoffrey Brown is the Assigned Commissioner and Bertram Patrick is the assigned Administrative Law Judge in this proceeding.

## Findings of Fact

1. Sierra Club has made a timely request for compensation for its contribution to D.01-11-048.

2. Sierra Club has made a showing of significant financial hardship by demonstrating the economic interests of its individual members would be small compared to the costs of participating in this proceeding.

- 8 -

A.99-12-025  ALJ/BDP/jyc

3. Throughout this proceeding, Sierra Club had a pattern of filing its motions, testimony, and briefs after Ventura had done so.

4. Because Ventura and Sierra Club pursued nearly identical issues and Sierra Club's pleadings were filed after Ventura's, Sierra Club's time spent on those pleading did not result in a substantial contribution.

5. Sierra Club's claimed Other Costs are reasonable given the scope of this proceeding.

6. The adopted hourly rate for attorney Volker is no greater than the market rate for individuals with comparable training and experience.

7. The hours claimed for attorney Volker, with the exception of the time associated with the pleadings described above, are reasonable given the scope of this proceeding.

8. The appendix to this Opinion summarizes today's award.

**Conclusions of Law**

1. Sierra Club has fulfilled the requirements of §§ 1801-1812, which govern awards of intervenor compensation.

2. Sierra Club should be awarded $46,990.96 for its contribution to D.00-10-049 and D.01-11-048.

3. Per Rule 77.7(f)(6) of the Commission's Rules of Practice and Procedure, the comment period for this compensation decision is being waived.

4. This order should be effective today so that Sierra Club may be compensated without unnecessary delay.

A.99-12-025 ALJ/BDP/jyc

## O R D E R

**IT IS ORDERED** that:

1. The Angeles Chapter of the Sierra Club (Sierra Club) is awarded $46,990.96 in compensation for its substantial contribution to Decision (D.) 00-10-049 and D.01-11-048.

2. Valencia Water Company (Valencia) shall pay Sierra Club $46,990.96 within 30 days of the effective date of this order. Valencia shall also pay interest on the award at the rate earned on prime, three-month commercial paper, as reported in Federal Reserve Statistical Release H.15, with interest, beginning October 7, 2002, and continuing until full payment is made.

3. The comment period for today's decision is being waived.

4. This proceeding is closed.

This order is effective today.

Dated January 30, 2003, at San Francisco, California.

MICHAEL R. PEEVEY
President
CARL W. WOOD
LORETTA M. LYNCH
GEOFFREY F. BROWN
SUSAN P. KENNEDY
Commissioners

A.99-12-025  ALJ/BDP/jyc

# APPENDIX

## Compensation Decision Summary Information

| | |
|---|---|
| **Compensation Decision(s):** | D0301058 |
| **Contribution Decision(s):** | D0010049, D0111048 |
| **Proceeding(s):** | A9912025 |
| **Author:** | ALJ Patrick |
| **Payer(s):** | Valencia Water Company |

## Intervenor Information

| Intervenor | Claim Date | Amount Requested | Amount Awarded | Reason Change/Disallowance |
|---|---|---|---|---|
| Sierra Club | 7/9/02 | $57,440.96 | $46,990.96 | Failure to make substantial contribution; failure to discount travel time. |

## Advocate Information

| First Name | Last Name | Type | Intervenor | Hourly Fee Requested | Year Hourly Fee Requested | Hourly Fee Adopted |
|---|---|---|---|---|---|---|
| Stephan | Volker | Attorney | Sierra Club | $250 | 2000 | $250 |
| Stephan | Volker | Attorney | Sierra Club | $250 | 2001 | $250 |

## (END OF APPENDIX)

# *Public Utilities Commission of the State of California*

### *Public Agenda 3137*
### *Thursday, August 19, 2004 10:00 a.m.*
### *San Francisco, California*

### Commissioners
### Michael R. Peevey, President
### Geoffrey F. Brown
### Susan P. Kennedy
### Loretta M. Lynch
### Carl W. Wood

*For each agenda item, a summary of the proposed action is included; the Commission's decision may, however, differ from that proposed.*

*Website: http://www.cpuc.ca.gov*

### Scheduled Commission Meetings
### 505 Van Ness Avenue, San Francisco

| *Ratesetting Deliberative Meeting\** *Room 5305* *(1:30 p.m.)* **Closed to the Public** | *Commission Meeting* *Auditorium* *(10 a.m.)* **Open to the Public** |
|---|---|
| Monday, August 30, 2004 (San Francisco) | Thursday, August 19, 2004 (San Francisco) |
| Monday, September 20, 2004 (San Francisco) | Thursday, September 02, 2004 (San Francisco) |
| Monday, October 04, 2004 (San Francisco) | Thursday, September 23, 2004 (San Francisco) |
|  | Thursday, October 07, 2004 (San Francisco) |
|  |  |

*\*Ratesetting Deliberative Meeting dates are reserved as noted but will be held only if there are ratesetting matters to be considered and a Commissioner has requested that a Ratesetting Deliberative Meeting be held.*

---

*Matters of Public Interest*
*For the convenience of the public and media representatives, items of widespread public interest will be taken up at the beginning of the meeting.*

---

For further information contact the Public Advisor
(415) 703-2074    E-mail: public.advisor@cpuc.ca.gov

---


This location is accessible to people with disabilities.  If specialized accommodations for the disabled are needed, e.g. sign language interpreters, please call the Public Advisor at (415) 703-2074 or TTY# (415) 703-5282 or toll free # 1-866-836-7825 three business days in advance of the meeting.

**Regular Agenda - Other Utility Resolutions and Reports**

**92**

[3354]    ' 

**Res ALJ 184**

This resolution adopts an annual process for setting and updating hourly rates for use by intervenors in seeking compensation for substantially contributing to a Commission decision, as provided in the statutory intervenor funding program.  The hourly rates that the Commission establishes through this process will govern intervenors and their representatives who have recently participated in Commission proceedings, and will provide guidance to other intervenors and representatives.

*Pub. Util. Code § 311 – This item was mailed for Public Comment.*

Agenda 3132, Item 61 4/22/2004 (Staff);

Agenda 3133, Item 61 5/6/2004 (Wood);

Agenda 3134, Item 58 5/27/2004 (Wood);

Agenda 3135, Item 42 6/9/2004 (Peevey);

Agenda 3136, Item 78 7/8/2004 (Brown)

http://www.cpuc.ca.gov/Cyberdocs/AgendaDoc.asp?DOC_ID=175482

ALJ/CFT/tcg                                      **Mailed 8/23/2004**

Decision 04-08-046  August 19, 2004

**BEFORE THE PUBLIC UTILITIES COMMISSION OF THE STATE OF CALIFORNIA**

| | |
|---|---|
| In the Matter of the Application of Pacific Gas and Electric Company (U 39 E) for a Certificate of Public Convenience and Necessity Authorizing the Construction of the Jefferson-Martin 230 kV Transmission Project. | Application 02-09-043 (Filed September 30, 2002) |

(See Attachment A for List of Appearances.)

**OPINION GRANTING A CERTIFICATE OF PUBLIC CONVENIENCE AND NECESSITY**

A.02-09-043  ALJ/CFT/tcg

**TABLE OF CONTENTS**

**Title**                                                                                                  **Page**

OPINION GRANTING A CERTIFICATE OF PUBLIC CONVENIENCE
AND NECESSITY ............................................................................................. 1
I.      Summary ............................................................................................... 2
II.     Background ........................................................................................... 5
        A.  The Project and Environmentally Superior Alternatives ........... 5
        B.  Procedural History ........................................................................ 7
        C.  Motions Requesting Recirculation of FEIR ............................... 11
        D.  Scope of Proceeding ...................................................................... 17
III.    Overview of Positions of the Parties .............................................. 18
IV.     Project Need ........................................................................................ 21
        A.  Reliability Evaluation .................................................................. 22
            1.  Reliability Standards .............................................................. 22
            2.  Generation Capacity .............................................................. 25
            3.  Transmission Capacity ........................................................... 29
            4.  Distributed Generation, Energy Conservation, and Demand
                Response Programs ................................................................. 30
            5.  Load Forecasts ......................................................................... 32
            6.  Parties' Reliability Need Analyses ....................................... 34
        B.  Delay or the No Project Alternative ........................................... 39
        C.  Discussion ...................................................................................... 41
V.      Project Alternatives Studied ............................................................ 48
        A.  Southern Alternatives ................................................................... 49
            1.  Proposed Project--Southern Segment .................................. 49
                a)  Rebuild of Existing 60 kV Line ....................................... 50
                b)  Transition to Northern Segment ..................................... 51
            2.  Route Option 1B ..................................................................... 54
            3.  Partial Underground Alternative and Modified
                Partial Underground Alternative .......................................... 61
            4.  Hybrid Southern Alternatives ............................................... 67
            5.  NPS Concerns .......................................................................... 69

A.02-09-043 ALJ/CFT/tcg

## TABLE OF CONTENTS

**Title**                                                                 **Page**

    B.  Northern Alternatives.................................................................73
        1.  Proposed Project—Northern Segment ...................................74
        2.  Collocation Alternative...........................................................77
        3.  Undergrounding of Existing Lines into Martin Substation..............83
        4.  Other Northern Alternatives .................................................85
    C. Other Project Alternatives....................................................88
VI.  EMF Issues.......................................................................89
    A.  Scientific Research Regarding EMF ..........................................91
    B.  EMF along Routes under Consideration .....................................93
    C.  EMF Management Plan for the Jefferson-Martin Project ....................101
VII. Determination of Approved Route..............................................108
    A.  Southern Segment .............................................................109
    B.  Northern Segment ............................................................115
VIII. Environmental Analysis.........................................................118
    A.  Mitigation and Mitigation Monitoring........................................119
    B.  Adequacy and Certification of the FEIR .....................................125
IX.  Consistency with Public Utilities Code Section 1002........................127
X.   Compliance with Public Utilities Code Section 625 .........................128
XI.  Project Costs ..................................................................129
XII. Comments on Proposed Decision................................................133
XIII. Assignment of Proceeding .....................................................138
Findings of Fact....................................................................138
Conclusions of Law .................................................................142
O R D E R ..........................................................................144

Attachment A - List of Appearances
Appendix A -   Addendum to Final Environmental Impact Report
Appendix B -   Environmental Mitigation Measures Applicable to Approved
               Transmission Line Route

A.02-09-043 ALJ/CFT/tcg

## OPINION GRANTING A CERTIFICATE OF
## PUBLIC CONVENIENCE AND NECESSITY

### I.  Summary

This decision grants a certificate of public convenience and necessity
(CPCN) to Pacific Gas and Electric Company (PG&E) to construct a new
230 kilovolt (kV) electric transmission line between PG&E's Jefferson substation
and PG&E's Martin substation, along with related facilities.  The facilities will be
constructed in the County of San Mateo and will traverse or be adjacent to the
towns of Hillsborough and Colma and the Cities of Brisbane, Daly City,
San Bruno, and South San Francisco.  A portion of the project will be within the
San Francisco Public Utilities Commission (SFPUC) watershed near Interstate
(I) 280.  We adopt a construction cost cap[1] of $206,988,000 for the authorized
Jefferson-Martin project.

The record demonstrates that the 230 kV Jefferson-Martin project is needed
in order to allow PG&E to continue to reliably meet electric demand in the
San Francisco Peninsula Area beginning in 2007.  In addition, the project has
diversification, economic, and environmental benefits that warrant its
construction more quickly than that.  All major transmission lines importing
power into San Francisco currently receive power from the East Bay and travel
through a single corridor from the San Mateo substation to the Martin substation.
The Jefferson-Martin project will help protect the San Francisco Peninsula from

---

[1] Pub. Util. Code § 1005.5(a) provides that "Whenever the commission issues to an
electrical…corporation a certificate authorizing the new construction of any addition to
or extension of the corporation's plant estimated to cost greater than fifty million dollars
($50,000,000), the commission shall specify in the certificate a maximum cost
determined to be reasonable and prudent for the facility."

A.02-09-043  ALJ/CFT/tcg

events disrupting supply at the San Mateo substation and/or along the San Mateo-Martin corridor. In addition, the project will tap power originating from south of the Peninsula area, thus diversifying the source of power. We find that the Jefferson-Martin project by itself is not sufficient to support closure of the Hunters Point power plant. However, a combination of the Jefferson-Martin project and additional transmission reinforcements north of the Martin substation and south of the Jefferson station would allow that plant to be closed, bringing additional economic and environmental benefits. For these reasons, the project is clearly necessary.

The proposed Jefferson-Martin project is characterized as having a southern segment and a northern segment, and the project could be configured in various ways through combinations of southern and northern route alternatives. In the southern segment, we choose a hybrid configuration that combines part of a southern underground alternative called Route Option 1B with a portion of PG&E's southern aboveground Proposed Project. Immediately north of the Jefferson substation, the authorized 230 kV Jefferson-Martin line will be located within Cañada Road and Skyline Boulevard, entirely underground except for an aboveground crossing of the Crystal Springs Dam. The underground line will transition to an aboveground configuration at a new intermediate transition tower west of Trousdale Drive. The 230 kV line will continue north on rebuilt towers and will be collocated with one circuit of an existing double-circuit 60 kV line. The aboveground 230 kV circuit will exit the SFPUC watershed at a new Glenview Drive transition tower, where it will connect to the underground northern segment.

The Final Environmental Impact Report (FEIR) identified the underground Route Option 1B to be environmentally superior in the southern segment, but we find that this hybrid configuration is preferable because it avoids Route Option

- 3 -

A.02-09-043 ALJ/CFT/tcg

1B's effects on residences and businesses along Trousdale Drive and El Camino
Real and is more consistent with the values and wishes of the communities along
the route.

The FEIR identified two underground routes for the northern segment as
both being environmentally superior, and we choose one of these routes, PG&E's
Proposed Project with Route Option 4B, for the northern segment. From the
Glenview Drive transition tower, this northern segment will be constructed
beneath San Bruno Avenue and will turn north into Huntington Avenue to the
Bay Area Rapid Transit (BART) right of way. This route may be modified
slightly, depending on the preference of the City of San Bruno, to avoid a
planned Huntington Avenue grade separation project. From the BART right of
way, the 230 kV line will turn east into the new Lawndale Boulevard, north into
Hillside Boulevard, east into East Market Street, which becomes Guadalupe
Canyon Parkway and crosses San Bruno Mountain. Finally, the line will turn
north on Bayshore Boulevard to the Martin substation.

The FEIR finds that the authorized route for the Jefferson-Martin project
has no significant unmitigable (Class I) environmental impacts. Thus, no
Statement of Overriding Considerations is needed. We adopt the mitigation
measures proposed in the FEIR, with certain minor modifications that are
included in an Addendum to the FEIR. We certify the FEIR and the Addendum.

During this proceeding, there was a great deal of public interest and
concern regarding potential health effects from exposure to electric and magnetic
fields (EMF) that would be created by the Jefferson-Martin project. In response
to these concerns, we require several changes to PG&E's preliminary EMF
management plan for the Jefferson-Martin project. A significant body of scientific
research has developed since we investigated EMF matters in Investigation (I.)
91-01-012, as reported in a comprehensive review of EMF studies undertaken at

- 4 -

A.02-09-043  ALJ/CFT/tcg

the Commission's direction by the California Department of Health Services
(DHS).

## II. Background

### A. The Project and Environmentally Superior Alternatives

PG&E seeks a CPCN to construct a new 230 kV electric transmission line
between PG&E's Jefferson and Martin substations.  The major elements of
PG&E's Proposed Project are:

- Installation of a new 27-mile 230 kV transmission circuit, comprised of 14.7 miles of overhead line to be installed on a rebuild of an existing 60 kV double-circuit transmission line (the southern segment), and 12.4 miles of new underground duct bank (the northern segment).

- Dismantling the existing 60 kV double-circuit tower line and rebuilding the towers to enable the east side to support a single 60 kV circuit and the west side to carry the new 230 kV circuit.

- Construction of a new transition station near the intersection of San Bruno Avenue and Glenview Drive to transition from the overhead to underground transmission segments.

- Modification of the existing Jefferson and Martin substations to accommodate the new 230 kV transmission line.

- Modification of equipment at the existing San Mateo, Ralston, Millbrae, Carolands, and Monta Vista substations, and the Hillsdale Junction switching station.

The Proposed Project would parallel I-280 for much of the southern
segment, crossing Peninsula watershed lands owned by the City and County of
San Francisco (CCSF).  It would cross Edgewood County Park and Natural
Preserve (Edgewood Park) and the Pulgas Ridge Open Space Preserve (Pulgas
Ridge Preserve), and would pass near the San Mateo Highlands area of
unincorporated San Mateo County and the Towns of Hillsborough, Burlingame,
and Millbrae before entering the City of San Bruno.

- 5 -

A.02-09-043 ALJ/CFT/tcg

The northern segment of the Proposed Project would route along
San Bruno Avenue and the San Francisco BART right of way in the City of
San Bruno, follow the BART right of way through the City of South
San Francisco, and then route along a number of city streets through the Town of
Colma, Daly City, and Brisbane to the Martin substation.

The proposed overhead segment of the 230 kV transmission line,
collocated with the rebuilt 60 kV line, would be supported on lattice steel towers.
The underground segment of the 230 kV circuit would consist of three cross-
linked, polyethylene-insulated (XLPE) solid-dielectric, copper-conductor cables
buried in a concrete-encased duct bank system. The transition station near San
Bruno Avenue and Glenview Drive would be approximately 80 feet by 100 feet
in size and enclosed by a masonry wall. Equipment at the transition station
would include ground grid and conduit system, a 230 kV dead-end structure, a
control building, and an underground vault.

The FEIR finds that the environmentally superior alternative comprises
PG&E's southern Route Option 1B in conjunction with either the Proposed
Project's northern segment or a northern alternative called the Collocation
Alternative. In the southern segment, Route Option 1B would be entirely
underground within roadways except for the crossing of the Crystal Springs
Dam. It would follow Cañada Road and Skyline Boulevard along the I-280
corridor, turning east into Trousdale Drive and then north into El Camino Real.
The FEIR describes several alternative crossings of Crystal Springs Dam that
would be possible within the environmentally superior alternative.

In the environmentally superior alternative, the southern Route Option 1B
would join either the northern segment of PG&E's Proposed Project or the
Collocation Alternative at the intersection of El Camino Real and San Bruno
Avenue. The FEIR states that the environmentally superior route in this area

- 6 -

A.02-09-043  ALJ/CFT/tcg

could be modified by Mitigation Measure T-9a, in which the route would continue north on El Camino Real past San Bruno Avenue, then turn east on Sneath Lane and (for the Collocation Alternative ) Tanforan Drive.

For the northern segment of PG&E's Proposed Project, the environmentally superior alternative would incorporate Route Option 4B, which would avoid Hoffman and Orange Streets by continuing north on Hillside (past Hoffman) and turning east on East Market Street.

As the second environmentally superior northern alternative, the Collocation Alternative would be located closer to the San Francisco Bay and would be routed through primarily commercial and industrial areas. It would use a portion of the route of an existing underground 230 kV transmission line through Brisbane, but would follow a new route segment through South San Francisco and adjacent cities. The FEIR includes in the environmentally superior Collocation Alternative four route options (Route Options A, D, E, and F) developed in response to comments on the draft EIR. We describe the Collocation Alternative in more detail in Section V.B of this order.

As the FEIR recognizes, the Commission considers other factors such as cost and timing of need along with the environmental information presented in the FEIR to make the ultimate determination regarding which route (if any) is to be approved.

## B. Procedural History

PG&E and the ISO report that the genesis of the Jefferson-Martin project was a December 8, 1998 outage event, which triggered an evaluation of reliability in the San Francisco peninsula by a stakeholder group sponsored by the ISO. The stakeholder group evaluated six potential transmission projects: Jefferson-Martin 230 kV, Jefferson-Hunters Point 230 kV, Jefferson-Potrero 230 kV, San

A.02-09-043  ALJ/CFT/tcg

Mateo-Martin 230 kV, Moraga-Potrero 230 kV, and San Mateo-Martin #4 60 kV
to 115 kV conversion.  The Jefferson-Martin 230 kV line was selected over the
San Mateo-Martin option largely on incremental reliability benefits resulting
from additional diversification of the transmission grid.

This ISO stakeholder group recommended that PG&E initiate permitting
activities of the Jefferson-Martin 230 kV line, "so that the project can be in place
when needed, should the alternative solution of new generation not materialize."
The ISO Board of Governors approved permitting activities for the Jefferson-
Martin project in October 2000 and gave final approval for addition of the project
to the ISO-controlled grid on April 25, 2002.

PG&E filed its application on September 30, 2002.  With its application,
PG&E supplied a Proponent's Environmental Assessment.  The Commission, as
Lead Agency, then retained outside consultants to conduct environmental
review of the Proposed Project, pursuant to the California Environmental
Quality Act (CEQA), and to examine alternatives, including the "No Project"
alternative.  The Commission's Energy Division oversaw the consultants' work.

A prehearing conference (PHC) was held on January 10, 2003.  At the PHC,
the United States Department of the Interior (DOI) stated its position that the
Proposed Project is subject to the requirements of the National Environmental
Policy Act (NEPA) because a portion of the project would traverse National Park
Service (NPS) easements on San Francisco watershed land.  As the lead federal
agency for NEPA, DOI stated its preference that the Commission prepare a joint
environmental document, combining NEPA and CEQA review.  PG&E and
CCSF stated that they do not believe that DOI has approval authority over the
project or that NEPA compliance is required.

The Commission has not taken a position regarding whether DOI has
federal jurisdiction over the proposed project.  However, after meetings with

- 8 -

A.02-09-043 ALJ/CFT/tcg

DOI and other parties, Commission staff informed DOI on January 24, 2003 that it would not be feasible for the Commission to undertake the preparation of a joint CEQA/NEPA environmental document for the Jefferson-Martin project. Commission staff explained that at least three factors contributed to this decision: the ongoing dispute about whether the DOI has any federal jurisdiction related to the proposed project; the fact that DOI had not yet determined the scope or form of a federal NEPA document for the project; and the fact that expanding the scope of the CEQA review to comply with NEPA requirements would result in substantial delay in this proceeding. This discussion was also presented in the March 19, 2003 Scoping Memo and Ruling of Assigned Commissioner.

The Commission's Energy Division held four scoping meetings in January and February 2003 prior to selection of alternatives and preparation of the Environmental Impact Report. It attended eight consultation meetings with agencies and local jurisdictions to discuss the Proposed Project. The Draft Environmental Impact Report (DEIR) was released on July 16, 2003. The Commission provided for wide dissemination of and public input on the DEIR. The DEIR was mailed to 117 interested parties and agencies, made available on the Commission's website and in public libraries, and handed out on compact disk at the workshops and PPHs. The Commission oversaw the mailing of 8,764 notices of the availability of the DEIR. The Notice of Release was mailed to agencies, special districts, all owners and tenants of property located within 300 feet of the proposed and alternate project sites, and County Clerks' offices. Newspaper advertisements announced all public meetings. The Commission's Energy Division held four public informal workshops on the DEIR in San Bruno and San Mateo. PG&E was required to publish and post notice about, and arrange for print and electronic media coverage of and public service announcements regarding the four public hearings. The Final Environmental

A.02-09-043 ALJ/CFT/tcg

Impact Report (FEIR) was released in November 2003. It was made available at 14 repository locations and distributed to parties in the proceeding and to federal, State, and local governmental agencies that commented on the DEIR, as well as to some members of the public.

The assigned administrative law judge (ALJ) held six public participation hearings in the affected communities. Seventeen days of evidentiary hearings were held between January 12 and February 5, 2004. Several parties intervened in the proceeding and participated actively during the evidentiary hearings and subsequent briefing. These parties include the following: the Commission's Office of Ratepayer Advocates (ORA), the California Independent System Operator (ISO), the City of Burlingame, Daly City, the City of San Bruno City Council and Redevelopment Agency (City of San Bruno), the City and County of San Francisco (CCSF), the City of South San Francisco, the County of San Mateo, 280 Corridor Concerned Citizens (280 Citizens), CAlifornians for Renewable Energy (CARE), and Women's Energy Matters (WEM).[2] The City of Millbrae, Concerned Businesses East of 101 (CBE-101) and HMS Oyster Point, LLC, and Golden Gate Produce Terminal, Ltd. each sponsored a witness but did not file briefs. Genentech, Inc. (Genentech) did not participate actively in the evidentiary hearings but filed a reply brief. Numerous other groups and individuals participated in the environmental review process and commented on the DEIR, as described fully in the FEIR.

---

[2] We do not grant PG&E's motion to strike WEM's opening and reply briefs, in which PG&E asserts that WEM's briefs misrepresent the evidentiary record and are misleading. We consider the arguments in WEM's briefs on their merits.

A.02-09-043 ALJ/CFT/tcg

The evidentiary record was submitted on March 19, 2004 following receipt of late-filed exhibits and initial and reply briefs. The ALJ reopened the record for the receipt of load forecast information for the San Francisco Peninsula Area, as petitioned by the ISO, and for the receipt of additional information regarding construction along the BART right of way. The evidentiary record was resubmitted on June 4, 2004. We affirm the ALJ's ruling denying CARE and WEM motions for the receipt of additional evidence regarding biological impacts of trenching in serpentine grasslands and other matters.

Elsewhere in this decision, we address several motions and other procedural matters that occurred after the proposed decision was filed in this proceeding.

## C. Motions Requesting Recirculation of FEIR

On December 15, 2003, the City of South San Francisco and CBE-101 filed a motion requesting that the FEIR be recirculated. PG&E filed a response to the motion.[3] On January 9, 2004, Daly City submitted a joinder in the motion of South San Francisco and CBE-101.[4] PG&E filed an opposition to Daly City's joinder, and Daly City filed a reply brief to PG&E's opposition.

South San Francisco and CBE-101 assert that recirculation is required because the discussion in the draft EIR of the Collocation Alternative was

---

[3] PG&E requests that the Commission refrain from ruling on the motion to recirculate until after a project route is approved on the basis that the motion would be moot if the Commission adopts PG&E's Proposed Project in the northern segment. PG&E also urges rejection of the motion on its merits.

[4] Daly City's joinder did not meet our filing requirements initially. It was accepted for filing on February 10, 2004.

A.02-09-043 ALJ/CFT/tcg

inadequate and because the six new route options developed for the Collocation Alternative in the FEIR constitute significant new information. They also state that recirculation would allow the Commission an opportunity to make clear whether the requirement that several environmental regulatory agencies evaluate and approve construction-related disturbance to contaminated sites would make infeasible the completion of the Collocation Alternative by the summer of 2005, as required by the project description.

We disagree with South San Francisco and CBE-101 regarding the need to recirculate the FEIR. The CEQA[5] provision governing recirculation reads as follows:

> When significant new information is added to an environmental impact report after notice has been given pursuant to Sections 21104 and 21153, but prior to certification, the public agency shall give notice again pursuant to Section 21092, and consult again pursuant to Sections 21104 and 21153 before certifying the environmental impact report. (Cal. Pub. Res. Code § 21092.1.)

South San Francisco and CBE-101 first challenge the adequacy of the draft EIR's discussion of the Collocation Alternative. The draft EIR laid out the route of the Collocation Alternative and identified and discussed its possible environmental impacts at length. Parties were able to, and did, submit extensive and substantive comments on the Collocation Alternative. We do not find that the draft EIR was "so fundamentally and basically inadequate and conclusory in

---

[5] The CEQA statute appears at Cal. Pub. Res. Code § 21000 *et seq.*

A.02-09-043  ALJ/CFT/tcg

nature that meaningful public review and comment were precluded." (CEQA
Guidelines § 15088.5(a)(4).[6])

We also disagree regarding the need to recirculate the FEIR based on the
six new route options. An FEIR always contains new information not in the draft
EIR, in the form of public comments and responses thereto. New information
added to an EIR is not "significant" for purposes of triggering the recirculation
requirement unless "the EIR is changed in a way that deprives the public of a
meaningful opportunity to comment upon a substantial adverse environmental
effect of the project." (CEQA Guidelines § 15088.5(a).)

The route options for the Collocation Alternative added in the FEIR do not
constitute significant new information for which recirculation is required. The
route options would move the Collocation Alternative route only slightly, at
most only a block or two. While the parties point out that Route Option A would
bore under roadways and the Colma Creek Tributary, the original Collocation
Alternative proposed and the draft EIR described possible environmental
impacts of the use of bores in similar conditions. The environmental impacts of
Route Option E would be similar to, but less than, the impacts of the original
Collocation Alternative. South San Francisco and CBE-101 describe the route
options as having impacts due to "unstable fill soil" and moving underground
construction work nearer to San Francisco Bay, but these are general
characteristics of the Collocation Alternative that were identified and discussed
in the draft EIR. We conclude that the six route options would not introduce

---

[6] The CEQA Guidelines appear at California Code of Regulations Title 14, Div. 6,
Chapter 3, §§ 15000 – 15387 and Appendices A – K.

A.02-09-043 ALJ/CFT/tcg

"new significant environmental impacts" or a "substantial increase in the severity of an environmental impact," conditions which would require recirculation. (CEQA Guidelines §15088.5(a)(1) and (2).)

Nor do we see a need to recirculate the FEIR to address impacts of needed regulatory approvals on the feasibility of completion of the Collocation Alternative by the summer of 2005, one of the goals identified in PG&E's application. Noting that comments on the draft EIR identified that the Collocation Alternative would require permits from the County of San Mateo, the Bay Area Regional Water Quality Control Board and the Bay Conservation and Development Commission, South San Francisco and CBE-101 argue that the FEIR failed to analyze this issue adequately. In particular, they take issue with the allegedly conclusory statement that, "Regarding the concern that agency review of this alternative could lead to project delays, the CPUC believes that appropriate pre-construction planning and coordination by PG&E would allow this alternative to be implemented without delay" (FEIR, Vol. 3 at 662). They submit that recirculation would allow us another opportunity to address this issue.

We find that the FEIR adequately addressed permitting requirements for the Collocation Alternative. The FEIR estimated that it would take three to six months to acquire permits from the County of San Mateo and the Regional Water Quality Control Board and also identified the need for a permit from the Bay Conservation and Development Commission. The parties recognize that CEQA does not require recirculation due to an inadequate response to comments. Even assuming arguendo that the FEIR did not completely respond to comments in this regard, parties had adequate opportunity during the evidentiary hearing process to address the effect of regulatory permitting requirements on the

- 14 -

A.02-09-043  ALJ/CFT/tcg

completion date of the project.  There is no need to recirculate the FEIR to cure any supposed shortcoming in this regard.

In its joinder, Daly City proposes that an alternative routing for the northern segment of the Proposed Project be developed and added to the FEIR and that the FEIR then be recirculated for comment.  This alternative routing would collocate the new 230 kV line, in either an underground or overhead configuration, with the existing Jefferson-Martin 60 kV line over San Bruno Mountain.  PG&E opposes Daly City's request as untimely and also contends that Daly City's new alternative is likely infeasible from regulatory and project timing perspectives.

Daly City explains that it is proposing study of this alternative comparatively late in the process because, initially, it was not aware that it could propose such alternative routes and, later, its concerns regarding proximity of the Proposed Project to Daly City schools were assuaged by the draft EIR's identification of the Collocation Alternative as the sole environmentally superior route.  It is making its current proposal because the FEIR has now identified the northern portion of the Proposed Project, including Route Option 4B,[7] as also environmentally superior and because several parties strongly object to the Collocation Alternative.  Daly City states that its proposal is intended to "solve pitting schools, cities and businesses against one another" and asks that the

---

[7] Daly City notes that Route Option 4B is immediately adjacent to two Daly City schools that would not be affected by PG&E's proposed Route Option 4A, although two other Daly City schools would be affected regardless of whether Route Option 4A or 4B is chosen.

A.02-09-043  ALJ/CFT/tcg

Commission consider this alternative to "keep( ) peace in North San Mateo County."

As Daly City notes, in developing its Proposed Project PG&E considered an option that would rebuild the existing overhead line that traverses San Bruno Mountain but rejected it as infeasible due to land use conflicts and potentially significant adverse environmental impacts on San Bruno Mountain.  No party suggested an alternative traversing San Bruno Mountain during the alternatives screening process, nor is such an alternative mentioned in the draft EIR or the FEIR.

As the FEIR notes, one of the most important aspects of the environmental review process is the identification and assessment of reasonable alternatives that have the potential for avoiding or minimizing the impacts of a Proposed Project.  CEQA guidelines emphasize the selection and analysis of a reasonable range of feasible alternatives.  At the same time, an EIR need not consider every conceivable alternative to a project. (CEQA Guidelines § 15126.6(a).)  The FEIR contains full analysis of several alternatives for the northern segment of the Proposed Project.  The Collocation Alternative would avoid all, and Route Option A of the Proposed Project would avoid most, of the impacts that Daly City fears for its schools.  We find these alternatives, along with the other alternatives considered for the northern segment of the Proposed Project, to constitute a reasonable range of feasible alternatives, as required by the CEQA guidelines.  As a result, it is not necessary to amend the FEIR as Daly City suggests or to recirculate the FEIR for comments on Daly City's suggested alternative.  In Section VIII.B, we certify the FEIR as in compliance with CEQA.

A.02-09-043  ALJ/CFT/tcg

### D. Scope of Proceeding

In March 2003, the Assigned Commissioner found that the scope of this proceeding includes the following as to the proposed project using PG&E's preferred route and configuration, alternative routes and configurations, the No Project alternative, and non-wires alternatives:

- Need for the project (Pub. Util. Code § 1001), including consideration of the decision by the ISO that the project is needed to maintain system reliability.
- Consideration of the following factors contained in Pub. Util. Code § 1002:
    1) Community values;
    2) Recreational and park areas;
    3) Historical and aesthetic values; and
    4) Influence on the environment
- Consideration of whether, pursuant to General Order (G.O.) 131-D, the project promotes the safety, health, comfort, and convenience of the public.
- Consideration, pursuant to G.O. 131-D, of measures to reduce the potential exposure to electric and magnetic fields (EMFs) generated by the proposed facilities.
- Consideration, pursuant to the California Environmental Quality Act (Public Resources Code § 21000 *et seq.*), of significant effects on the environment of the project, alternatives to the project, the manner in which significant environmental effects can be mitigated or avoided, and whether economic, social or other conditions make it infeasible to mitigate significant effects on the environment.
- The appropriate planning horizon to use in evaluating need for the project.
- How PG&E will comply with Pub. Util. Code § 625.
- Effect on economic development.
- Impacts on the transmission grid and other transmission users.
- Cost effectiveness and cost allocation.

- 17 -

A.02-09-043 ALJ/CFT/tcg

- Costs, and advisability and amount of a cap on project cost.

## III. Overview of Positions of the Parties

During the course of the proceeding, PG&E changed its position, so that it now recommends that the new Jefferson-Martin 230 kV line be constructed along what it calls the All-Underground Alternative (AUA) route, which would consist of PG&E's underground Route Option 1B in the southern segment and PG&E's Proposed Project in the northern segment. PG&E states that, given the risk of a veto by the NPS and the FEIR's conclusions regarding the environmentally superior route, PG&E supports the Commission's selection of the AUA despite the approximately $24 million increased capital cost compared to the Proposed Project.

The ISO states that it has found the Jefferson-Martin project will be needed by 2006 to meet applicable reliability criteria and, therefore, urges the Commission to expeditiously grant PG&E's application.

ORA recommends that the Commission include the four combustion turbines owned by CCSF in determining the appropriate supply forecast for the project area and, consequently, the need for the Jefferson-Martin project. ORA submits that either Jefferson-Martin or the CCSF turbines can meet reliability needs in the project area. It is concerned that, should the CCSF turbines and Jefferson-Martin both come online by 2006, ratepayers will overpay for reliability.

CCSF supports the Jefferson-Martin project as a cost-effective way to increase electric grid reliability for San Francisco and the upper San Francisco Peninsula. CCSF maintains that the project will help reduce energy costs by reducing reliability must run (RMR) costs, eliminating the need for air emission equipment, and reducing the potential for economic loss caused by a blackout. CCSF supports Route Option 1B in the southern segment, which it states would

- 18 -

A.02-09-043 ALJ/CFT/tcg

eliminate visual and biological impacts to the San Francisco Peninsula watershed.

WEM is working to close the Hunters Point power plants and is concerned that the Jefferson-Martin project may greatly benefit PG&E but actually hurt the Bayview Hunters Point and Potrero neighborhoods. It points to studies that indicate that the addition of Jefferson-Martin could create constraints elsewhere in the transmission system that would reduce rather than increase the load serving capability (LSC) of the system in San Francisco. PG&E's current transmission expansion plan indicates that those constraints will be corrected by 2008. WEM is concerned that Hunters Point may have to keep running in the meantime.

CARE supports the Jefferson-Martin project as an opportunity to increase the transmission capacity of San Francisco while eliminating the need for the Hunters Point and Potrero power plants. It supports the AUA as the configuration for the Jefferson-Martin project with the least environmental impact and without regulatory delays due to federal compliance issues and other obstacles.

280 Citizens maintains that there is no current need for the Jefferson-Martin project and there will be no need under reasonable planning assumptions until after 2012. 280 Citizens maintains that high voltage transmission lines are fundamentally inconsistent with residential land uses and recommends that, if the project is approved, the Commission adopt the PUA configuration or a variation thereof in the southern segment. Because of concerns regarding EMF exposure, 280 Citizens asks that the Commission adopt a standard that EMF from the existing 60 kV and new 230 kV lines should not exceed 1 milligauss (mG) at residential property boundaries.

- 19 -

A.02-09-043 ALJ/CFT/tcg

The County of San Mateo opposes Route Option 1B because of its placement through the highly populated area along Trousdale Drive and El Camino Real. San Mateo takes issue with PG&E's assertions that siting choices are constrained by the need for construction to be completed by the end of 2005 and also by NPS concerns. San Mateo suggests that the most appropriate alternative may be one of the hybrid alternatives which minimizes biological and visual impacts in the southern portion of the watershed but still avoids placing the line adjacent to the school, day care center, hospital, residences, and commercial uses on Trousdale Drive and El Camino Real.

On September 10, 2003, the mayors of the cities of Burlingame, Millbrae, and San Bruno sent a joint letter stating a compromise position that the only acceptable alternative for the combined communities is one that goes west of Skyline Boulevard and uses Sneath Lane. This alternative would be a combination of the PUA and PG&E's proposed northern route except that it would use the Sneath Lane transition station alternative.

The City of Burlingame supports the PUA and states that it would also support the MPUA. It is concerned that the existing 60 kV Jefferson-Martin line runs right behind Burlingame neighborhoods and that, in PG&E's Proposed Project, the existing towers would be replaced with much taller towers. It is also concerned that Route Option 1B would leave the current 60 kV transmission line in place and would install the 230 kV line in other residential neighborhoods within the city, in particular, Skyline Boulevard, Trousdale Drive, and El Camino Real. Burlingame submits that, if the Commission approves Route Option 1B, it must ensure that appropriate mitigation measures are undertaken, including measures Burlingame requests in addition to those in the FEIR.

The City of Millbrae points to a series of major construction projects that have disrupted its commercial district around El Camino Real. It opposes the

A.02-09-043 ALJ/CFT/tcg

use of El Camino Real for the Jefferson-Martin project, stating that this alternative would cause even more severe and prolonged disruption than the previous projects.

The City of San Bruno opposes the proposed San Bruno Avenue transition station site as counter to the city's Redevelopment Plan, which aims to turn the area into a gateway to San Bruno characterized by multifamily housing, retail opportunities, and the nearby state parkland. San Bruno states that it would support either elimination of the need for a transition station, such as Route Option 1B, or another location for a transition structure in San Bruno.

As described in Section II.C, Daly City proposes a northern alternative to both the Proposed Project and the Collocation Alternative, which would collocate the new 230 kV line with the existing Jefferson-Martin 60 kV line across San Bruno Mountain. If this alternative is not explored, Daly City supports the Collocation Alternative.

The City of South San Francisco supports the northern segment of PG&E's Proposed Project and strongly opposes the Collocation Alternative. South San Francisco maintains that the northern segment of PG&E's Proposed Project would be least disruptive because it would be constructed in streets or in recently disturbed construction areas, would only minimally affect residences, and would raise little concern regarding toxic contamination. CBE-101 and Genentech express similar views. Golden Gate Produce Terminal opposes the portion of the Collocation Alternative, as originally proposed, that would disrupt its operations.

## IV. Project Need

PG&E asserts that the Jefferson-Martin project is necessary for four reasons: (1) to reliably meet projected electric demand in the Project Area; (2) to

A.02-09-043  ALJ/CFT/tcg

satisfy applicable planning criteria; (3) to diversify the transmission system serving the Project Area; and (4) to implement the ISO Board of Governors' April 2002 Resolution approving the proposed Jefferson-Martin project for addition to the ISO-controlled grid.  In this section, we describe the reliability planning criteria that are applicable and then use them, along with other considerations, to assess need for the Jefferson-Martin project.

PG&E and the ISO use different geographical areas in assessing need for the Jefferson-Martin project.  The area PG&E refers to as the Project Area consists of the City and County of San Francisco, Burlingame, Millbrae, San Bruno, South San Francisco, Brisbane, Colma, Daly City, Pacifica, and Hillsborough.  The ISO evaluates need for a broader San Francisco Peninsula Area, which the ISO characterizes as the area north of Palo Alto or north of the Ravenswood substation.

## A. Reliability Evaluation

### 1. Reliability Standards

The ISO's reliability criteria incorporate national North American Electric Reliability Council (NERC) and regional Western Electricity Coordinating Council (WECC) planning standards as well as local reliability criteria, in particular, certain modifications for the San Francisco Peninsula Area. The ISO Grid Planning Standards include reliability criteria for the forecasted operation of the transmission system for several scenarios or categories of system conditions, as follow:

- Category A (base case).  Normal ratings of equipment must not be exceeded with all generators, lines, and transformers in service and with no loss of load.

- Category B.  Emergency ratings of equipment must not be exceeded with the loss of (a) a single circuit, generator, or transformer or (b) a single circuit and a single generator.

- 22 -

A.02-09-043 ALJ/CFT/tcg

> Loss of load is not permitted unless the ISO Board of
> Governors decides that a capital project alternative is clearly
> not cost effective.

- <u>Category C.</u> Emergency ratings of equipment must not be
  exceeded with the loss of (a) a single circuit, generator, or
  transformer, or (b) a single circuit and a single generator;
  with that loss followed by manual adjustments and then the
  loss of another single circuit, generator, or transformer. Loss
  of load is allowed unless the ISO Board of Governors decides
  that the capital project is clearly cost effective.

The ISO's San Francisco Greater Bay Area Generation Outage Standard[8] modifies the Category A base case to require that normal ratings of equipment must not be exceeded with three units out of service: the largest single unit on the San Francisco Peninsula, one 50 MW combustion turbine on the San Francisco Peninsula, and one 50 MW combustion turbine in the Greater Bay Area but not on the San Francisco Peninsula.[9]

In addition, PG&E and the ISO apply grid planning criteria called the Supplementary Guide for Application of the Criteria for San Francisco. This Supplementary Guide, which pre-dates the ISO, requires that emergency ratings of equipment not be exceeded, with no loss of load, under four specific sets of conditions. PG&E and the ISO consider the Supplementary Guide to be a modification of Category C requirements.

---

[8] The ISO explains that it uses the standard because of the unusually large concentration of generation units in the greater Bay area and the fact that historical forced outage rates for units in the Bay area are significantly higher than the industry averages for similar units.

[9] Contingency analyses, e.g., Categories B and C, would be conducted with reference to this base condition, except that when screening for the most critical single generation outage, only units that are not on the San Francisco Peninsula would be considered.

A.02-09-043 ALJ/CFT/tcg

280 Citizens takes issue with the Supplementary Guide, stating that it was developed by PG&E, not the ISO, and is significantly more stringent than the ISO's planning standards in that the Supplementary Guide does not allow loss of load in certain contingencies under which the ISO's Category C would allow outages. PG&E rebuts 280 Citizens in this regard, pointing out that under Category C, involuntary load interruptions are not acceptable if the ISO Board has decided that the capital project being considered is clearly cost effective. PG&E asserts that, in approving the Jefferson-Martin project, the ISO found it to be cost effective.[10] In its view, loss of load is thus not allowed under either the ISO Category C criteria or the Supplementary Guide criteria.

280 Citizens contends that the contingency event modeled by PG&E to determine compliance with the Supplementary Guide reliability criteria has a miniscule probability of occurrence, which it estimates to be less 0.0000000257. PG&E responds that it is required to meet the standard, regardless of whether the contingency is a low probability event. PG&E explains that the established criteria are not based on probabilities of contingency events occurring, but on the reality that if a cable failure were to occur, it could be out up to several weeks.

280 Citizens point to the ISO's February 7, 2002 Planning Standards, which include a new transmission standard that considers the likelihood of certain contingencies occurring for planning purposes. PG&E responds that quoted standard deals with the preparation of annual transmission expansion

---

[10] Regarding the determination of cost-effectiveness, PG&E states that it submitted "decision quality cost estimates" to the ISO on April 4, 2002 before the ISO Board approved the Jefferson-Martin project. At that time, PG&E estimated the cost to be $173 million for the Proposed Project and $213 million for the AUA.

A.02-09-043  ALJ/CFT/tcg

plans and is inapplicable in this case.  The ISO maintains that it and PG&E are compelled by § 345 to plan the grid in accordance with national and regional reliability criteria which are deterministic, that generally accepted probabilistic standards do not yet exist, and that 280 Citizens does not propose any in this proceeding.

### 2. Generation Capacity

There are currently three major generation facilities in the Project Area: PG&E's Hunters Point power plant, Mirant Corporation's (Mirant) Potrero power plant, and United Airlines' cogeneration facility.  Hunters Point and Potrero both have steam turbines (Hunters Point Unit 4 and Potrero Unit 3) and combustion turbine units.  Current generation capacity in the Project Area includes the following:[11]

---

[11] 280 Citizens reported ISO data showing a combined capacity of 635.5 MW for these plants.  However, that total represents maximum capacity under ideal temperature conditions, which are unlikely to occur during peak load conditions.  We agree with PG&E and the ISO that the maximum capacity levels should not be used for transmission planning purposes.

A.02-09-043 ALJ/CFT/tcg

| Generating Unit | Net Rating (MW) |
|---|---|
| Hunters Point Unit 1 | 50 |
| Hunters Point Unit 4 | 163 |
| Potrero Unit 3 | 207 |
| Potrero Unit 4 | 50 |
| Potrero Unit 5 | 50 |
| Potrero Unit 6 | 50 |
| United Co-gen | 28 |
| Total | 598 |

In evaluating need for the Jefferson-Martin project, all parties include the existing Potrero units in the resource mix; they exclude the previously-planned Potrero Unit 7 since Mirant has withdrawn its Application for Certification at the CEC.  Parties disagree regarding the continued operation of Hunters Point units and inclusion of planned CCSF combustion turbines.

**Hunters Point.**  In assessing the reliability need for the Jefferson-Martin project, PG&E and the ISO assume that both units at Hunters Point will be shut down by the end of 2005.  The ISO has stated, however, that if Jefferson-Martin is not operational by the end of 2005 or if new generation has not come on line, it would require Hunters Point units to remain on-line under a "reliability must run" (RMR) contract.

Under the terms of a 1998 settlement agreement with CCSF, PG&E is obligated to "permanently shut down the Hunters Point Power Plant as soon as the facility is no longer needed to sustain electric reliability in San Francisco and the surrounding area and the Federal Energy Regulatory Commission (FERC) has authorized PG&E to terminate PG&E's Reliability Must Run contract for the facility."  The Commission approved this agreement in D.98-10-029.  The ISO and PG&E assert that inclusion of Hunters Point in the supply forecast would defeat the intent of the settlement agreement, because its inclusion would delay the

A.02-09-043 ALJ/CFT/tcg

perceived need for an alternative resource. The ISO maintains that new resources are built to attain planning goals, which, in the ISO's view, include closure of both units at Hunters Point.

Another concern with Hunters Point arises because the Bay Area Air Quality Management District (BAAQMD) will implement decreasing nitrogen oxide (NOx) emission limits beginning on January 1, 2005. For Unit 4 (constructed in 1958) to continue operations, PG&E must either undertake a $15 million retrofit to install Selective Catalytic Reduction equipment or obtain Interchangeable Emission Reduction Credits (IERCs) from BAAQMD. PG&E has received IERCs for Unit 4 for use through 2005 and states that, if necessary, it will seek additional IERCs to keep Unit 4 operational beyond 2005. If Unit 4 continues to operate, it is expected that all available IERCs would be consumed by the end of 2008. Unit 1 (constructed in 1976) will meet the new NOx standards, although other BAAQMD regulations limit its operation to no more than 877 hours per year.

The ISO argues that both Hunters Point units should be excluded from the supply forecast for environmental, economic, and mechanical considerations, in addition to the settlement agreement. It states that Hunters Point Unit 4 is at or beyond the useful life of generating units of similar vintage and type and is six times as likely to suffer a forced outage than the general generation portfolio in the ISO control area, while Hunters Point Unit 1 is approximately three times more likely than average to be offline. The ISO expects that Hunters Point would require significant and increasing investment to continue operations.

CARE supports the closure of both units at Hunters Point. CARE submits that Hunters Point disproportionately affects the health and well being of San Francisco's Bayview Hunters Point neighborhood. CARE explains that this neighborhood has the highest pollution emissions in the city and the highest

- 27 -

A.02-09-043 ALJ/CFT/tcg

asthma hospitalization rate—twice the citywide average. CARE maintains further that the Hunters Point plant has degraded the Bay ecosystem and is a contributor to light pollution in the area.

280 Citizens states that it shares the goals of other parties in this proceeding to shut down Hunters Point Unit 4. 280 Citizens maintains, however, that generation should continue to be available from Unit 1 and, if necessary, could be available from Unit 4 through 2008. ORA believes that it is reasonable to assume that at least Unit 4 will likely not operate beyond 2005.

**CCSF turbines.** The State of California received four 45 MW gas turbines as part of a settlement with Williams Energy Company and has made these turbines available to CCSF for siting within the San Francisco/Peninsula areas. ORA and 280 Citizens argue that the CCSF turbines should be counted among the available resources in analyzing need for the Jefferson-Martin project. PG&E, the ISO, and CCSF disagree.

CCSF reported that it was still in the process of identifying possible sites for the turbines and had not filed an Application for Certification with the CEC. Residents of southeast San Francisco oppose siting the turbines in their neighborhoods.[12] CCSF states that, particularly in light of this opposition, it is not certain that the turbines will be sited and constructed.

ORA and 280 Citizens believe that the combustion turbines likely will be sited and operational by 2006, based on the value of the turbines, CCSF's power purchase agreement with the California Department of Water Resources,

---

[12] A civil rights complaint by residents of the Bayview-Hunters Point community requests the United States Department of Energy to require that the CCSF turbines not be sited in Bayview Hunters Point.

A.02-09-043  ALJ/CFT/tcg

and CCSF's stated intent to file an Application for Certification at the CEC by March 2004.  ORA points out further that CCSF's Electricity Resource Plan includes the addition of 150 MW of new generation by 2004 and 250 MW by 2008.  The CCSF turbines could provide 180 MW of that capacity.

PG&E and the ISO assert that exclusion of the CCSF turbines from the resource mix is consistent with ISO Grid Planning Committee Guidelines, the Commission's Valley-Rainbow decision, and prudent transmission planning principles.  According to the ISO committee, in five-year planning cases, only generation that is under construction with a planned in-service date within the five years should be considered.  In ten-year planning cases, new generation projects that have received regulatory approval may be included.  PG&E and the ISO point out that in the Valley-Rainbow proceeding the Commission refused to assume that proposed generation projects that had not completed the regulatory approval process would "come on-line for purposes of our evaluation of reliability" (D.02-12-006, *mimeo.* at 34-35).

### 3. Transmission Capacity

In its power flow analyses, PG&E included transmission projects in the Project Area that either have ISO approval or are minor projects that do not require ISO approval and that are expected to be in place by 2006.  The ISO includes all transmission projects that have been approved by the ISO and are included in PG&E's annual expansion plan for 2003.

280 Citizens notes that PG&E has re-rated some but not all of the San Mateo-Martin 115 kV lines and has not assigned emergency ratings to any of these lines, although other PG&E transmission facilities have such emergency ratings.  280 Citizens suggests that the design carrying capacity of the overhead portions of each of these lines could be increased to 261 MVA using a four-foot-

- 29 -

A.02-09-043  ALJ/CFT/tcg

per-second wind speed and series reactors to balance the load. It suggests that the line ratings for the underground "dips" where the lines cross a highway could be adjusted to 231 MVA, or 261 MVA under emergency conditions. 280 Citizens concludes that re-rating these lines would increase the calculated LSC into the Project Area and that assigning emergency ratings would further increase the LSC. PG&E responds that the use of series reactors to balance loads as 280 Citizens suggests is experimental and problematic. PG&E also explains that the underground "dips" could not be given an emergency rating of 261 MVA because they are built with a high-pressure gas pipe inside another larger steel pipe and without sufficient ventilation to dissipate the added heat generated by a higher loading.

WEM joins 280 Citizens in expressing concern regarding the capacity of existing lines in the San Mateo-Martin corridor. WEM asserts that, if emergency ratings were established at 115% of normal, the corridor transmission system is capable of serving 1225 MW of load. PG&E responds that the 115% figure is hypothetical and that WEM provided no evidence showing it is prudent to assume, as WEM does, a 100% utilization of all transmission lines.

PG&E submits that, even if the San Mateo-Martin lines could be re-rated as 280 Citizens and WEM hypothesize, the suggestion that such re-rates should be assumed in analyzing need for the Jefferson-Martin project ignores the fact that no such re-rates are currently planned. PG&E cites D.02-12-066 as recognizing that prudent resource planning does not assume transmission upgrades that have not occurred and are not planned.

### 4. Distributed Generation, Energy Conservation, and Demand Response Programs

PG&E explains that its load forecasting methodology relies on historical load data, which reflects the absence of demand resulting from distributed

- 30 -

A.02-09-043  ALJ/CFT/tcg

generation, energy efficiency, energy conservation, and demand management programs. It maintains, therefore, that the effect of these factors based on growth rates consistent with past growth is reflected in the system load forecasts. Except for conservation, future programs are not explicitly included in the forecasting process. The ISO agrees that PG&E's methodology is reasonable.

280 Citizens and WEM assert that distributed generation, energy efficiency, energy conservation, and demand response programs were not appropriately considered in assessing need for the Jefferson-Martin project. WEM advocates a rapid increase in locally-based renewables, which WEM states would avoid the need for new transmission.

280 Citizens references goals in CCSF's Electricity Resource Plan of achieving more than 180 MW of new energy efficiency and distributed generation in 2004 and more than 420 MW by 2008, and asserts that, because these amounts are part of a new initiative, they would not be reflected in historical load growth data. 280 Citizens also points to the Energy Action Plan's goals of increasing conservation and energy efficiency and meeting energy needs first by renewable energy resources and distributed generation.

The ISO replies that the goals in the Electricity Resource Plan are commendable, but wholly speculative. PG&E states that it is not prudent transmission planning to assume that load reduction will occur at levels not proven out in the historical data. PG&E argues in addition that it is consistent with the ISO's guidelines and the Valley Rainbow decision to exclude consideration of possible, but unknown, distributed generation and other projects from supply forecasts.

- 31 -

A.02-09-043 ALJ/CFT/tcg

### 5. Load Forecasts

PG&E presented three load forecast scenarios for the Project Area: a "high" load forecast developed in September 1999, a "medium" forecast developed in December 2000, and a "low" forecast prepared in August 2002. These forecasts were based on 1-in-10 year weather conditions,[13] and PG&E updated them during the proceeding based on 2002 peak load data. PG&E prepared a new "low" forecast and recalibrated the other two forecasts to the temperature-adjusted 2002 peak load. The updated "medium" and "high" forecasts contain the previously forecasted growth patterns for years after 2002. PG&E submits that it is prudent to use all three load forecasts in assessing need for the Jefferson-Martin project, and to assign equal probabilities to each of the load growth scenarios.

PG&E's updated "low" load growth forecast is the same forecast used in PG&E's March 2003 Electric Grid Expansion Plan. The ISO states that it independently validated the reasonableness of this forecast in its 2003 grid planning process. The ISO based its analyses and testimony on PG&E's March 2003 forecast results, but for the San Francisco Peninsula Area since it analyzes need within that broader area. The March 2003 load forecasts for the Project Area (Exhibit 4) and the total San Francisco Peninsula Area (Exhibit 171) are summarized in Table 1.

Table 1

---

[13] The ISO's Grid Planning Standards require that transmission studies addressing local load serving concerns utilize a 1-in-10 year extreme weather load level, whereas studies focusing on regional facilities, i.e., major interties, may use a less stringent 1-in-5 year extreme weather load level. The ISO views more rigorous local area requirements as necessary because fewer options exist to mitigate performance concerns.

A.02-09-043  ALJ/CFT/tcg

Load Forecasts for PG&E's Project Area
and the San Francisco Peninsula Area
(MW)

| Year | Project Area | San Francisco Peninsula Area |
|------|--------------|------------------------------|
| 2003 | 1243 | 1857 |
| 2004 | 1266 | 1882 |
| 2005 | 1285 | 1915 |
| 2006 | 1308 | 1949 |
| 2007 | 1329 | 1978 |
| 2008 | 1349 | 2005 |
| 2009 | 1365 | 2027 |
| 2010 | 1381 | 2050 |
| 2011 | 1396 | 2070 |
| 2012 | 1412 | 2092 |

PG&E's "medium" forecast exceeds the "low" forecast in the Project Area by 80 MW in 2006; its "high" forecast exceeds the "low" forecast for that year by 103 MW.  The record does not contain comparable "medium" and "high" forecasts for the San Francisco Peninsula Area.

The ISO witness testified that PG&E's March 2003 forecast is the appropriate demand forecast to use in assessing Jefferson-Martin.  In briefs, the ISO states that the March 2003 forecast may be conservative because it reflects potential load growth during a period of economic downturn and future load may exceed the forecast.  The ISO now suggests that giving weight to the previous higher forecasts, as PG&E recommends, may be prudent.

280 Citizens criticizes PG&E's load forecasts as routinely over-forecasting demand in recent years.  To the extent the Commission relies on any of PG&E's load forecasts, 280 Citizens supports use of the "low" forecast, since it is based on the most recent economic and household growth projections and longer-term effects of the energy crisis.  280 Citizens maintains, however, that the

A.02-09-043  ALJ/CFT/tcg

"low" forecast still overstates future load growth, partly because it does not account for increases in distributed generation, energy conservation, and demand reduction programs.  PG&E responds that, when the California economy recovers, the demand forecast will again change, with demand perhaps growing at or near the previous pace.  PG&E points out that, if the 2003 peak is temperature-normalized, PG&E's "low" forecast actually under-predicted load growth in 2003 by 3 MW (which we note is about 0.2%).

### 6. Parties' Reliability Need Analyses

The parties used two different types of analyses in assessing the reliability need for the Jefferson-Martin project:  LSC (load serving capability) studies and power flow analyses.  LSC is the highest load level that can be served in an area by the electrical transmission system into the area and available generation within the area, without violating the relevant reliability criteria. Power flow analyses model the transmission system under specified load and contingency conditions to determine if any elements are overloaded and reliability standards violated.

In an LSC study completed in July 2003, the ISO examined the entire San Francisco Peninsula Area, not just the Project Area as defined by PG&E, explaining that transmission constraints "downstream" could limit the LSC regardless of the capability of the transmission system closer to the load.  The ISO's LSC study applied the ISO's reliability criteria, including the San Francisco Greater Bay Area Generation Outage Standard and the Supplementary Guide as described in Section IV.A.1.

A.02-09-043  ALJ/CFT/tcg

The ISO's LSC study analyzed and provided LSC results for 37 different scenarios. Table 2 summarizes scenarios that are most relevant to this proceeding. These scenarios assume that certain base case upgrades[14] as well as certain re-rates and upgrades south of the San Mateo substation[15] are undertaken, unless indicated otherwise.

Table 2

Selected ISO Load Serving Capability (LSC) Study Scenarios

| No. | Description | SF Peninsula Area LSC |
|-----|-------------|-----------------------|
| 02 | Hunters Point (HP) retired, only base case upgrades | 1596 |
| 03 | HP operational, only base case upgrades | 1971 |
| 11 | HP retired, Jefferson-Martin (J-M) operational | 1536 |
| 12 | HP & J-M operational | 2081 |
| 14 | HP retired, J-M & internal cable projects (ICP) operational | 2101 |
| 15 | HP, J-M & ICP operational | 2121 |
| 26 | Present day: HP operational, no upgrades | 1876 |
| 28 | HP #4 retired; HP #1 operational | 1731 |
| 29 | HP #4 retired; HP #1 and ICP operational | 1811 |
| 33 | HP #4 retired; HP #1 & J-M operational | 1666 |
| 34 | HP #4 retired; HP #1, J-M, & ICP operational | 2106 |

The ISO's LSC study identified and discussed that the ability of the Jefferson-Martin project to contribute to the LSC of the San Francisco Peninsula

---

[14] The assumed base case includes the Hunters Point-Potrero transmission project, which has been approved by the ISO and is being considered in A.03-12-039, as well as other projects that are under construction or completed.

[15] The assumed upgrades and re-rates south of the San Mateo substation include projects that are either under construction or completed.

A.02-09-043 ALJ/CFT/tcg

Area is limited by current transmission constraints south of the San Mateo substation and within CCSF's 115 kV cable system.[16] It concludes that reinforcements of both the transmission system south of the San Mateo substation and the 115 kV cable system within San Francisco are needed if the Jefferson-Martin project is to be used to reduce the amount of generation within San Francisco.[17]

To determine the maximum potential increase in LSC that could be obtained due to the Jefferson-Martin project, the LSC study undertook a separate analysis focused on only the San Mateo-Martin corridor. That separate analysis indicated that, with Hunters Point Unit 4 shut down, the Jefferson-Martin project could add up to 351 MW of capacity to the San Mateo-Martin corridor if all relevant transmission constraints to the north and south were removed. The ISO reports that solutions to these transmission constraints are being planned and have been incorporated in PG&E's 2003 transmission expansion plan. PG&E reports it is pursuing the re-rating of internal 115 kV cables within San Francisco and a new Hunters Point-to-Martin cable. In addition, PG&E has begun the preliminary step of asking ISO approval of a new Martin-to-Mission cable. PG&E states that this new cable project may not be needed until 2011, but that it plans to proceed with permit acquisition in case the project is needed earlier.

---

[16] Concern about these constraints was the centerpiece of WEM's participation in this proceeding.

[17] A comparison of scenarios 11 and 14 in the preceding table supports this conclusion. The internal cable projects considered in the LSC study include possible Martin-Mission (HX-1), Potrero-Mission (AX-2), and Potrero-Martin (AH-1) 115 kV projects.

A.02-09-043 ALJ/CFT/tcg

In its testimony in this proceeding, the ISO undertook and reported two additional LSC calculations. The additional analyses differ from the July 2003 LSC study in that they include two additional transmission upgrades south of the Martin substation that are in PG&E's 2003 Expansion Plan. Both of the new LSC calculations assume that Hunters Point is retired; one assumes that the Jefferson-Martin project is not built whereas the other assumes it is built. The ISO compares the LSC results without Jefferson-Martin (1862 MW) to the San Francisco Peninsula Area load forecast for 2006 (1949 MW) and concludes that the Jefferson-Martin project is needed by the end of 2005 to ensure that the projected load can be served reliably. The ISO's second calculation, which includes Jefferson-Martin and assumes that there are no transmission constraints within San Francisco,[18] indicates an LSC of 2092 MW, which would be sufficient to meet the forecasted area demand through 2012 if all transmission constraints within San Francisco were removed.

PG&E ran power flow analyses for the Project Area using ISO reliability criteria and 2006's "high," "medium," and "low" load forecasts, both with and without the Jefferson-Martin project. PG&E assumed that the Hunters Point units would be retired by the end of 2005 and that the CCSF combustion turbines would not be constructed by then. PG&E reports that its power flow analyses indicate that the Jefferson-Martin project would be needed in 2006 to avoid overload conditions, for all three load forecasts.

ORA states that scenarios 32 and 34 in the ISO's LSC study mirror ORA's assumptions, including that Hunters Point Unit 4 is retired and Unit 1

---

[18] Tr. at 2663 and 2671; Ex. 165, Attachment 2.

A.02-09-043  ALJ/CFT/tcg

remains operational.  ORA concludes that the CCSF turbines would provide a solution to the reliability problem in the near term, through 2006-2008, while Jefferson-Martin would provide a longer-term solution beyond 2008.  ORA is concerned that, should both the CCSF turbines and Jefferson-Martin come online by 2006, which it believes is likely, ratepayers will overpay for reliability since either project would meet near-term reliability needs in the area.

280 Citizens submits that PG&E's own calculations indicate that, if Hunters Point Unit 4 (but not Unit 1) is retired and the CCSF turbines are operational, Jefferson-Martin would not be needed under PG&E's "low" forecast through at least 2012.  Additionally, if both Hunters Point Units 1 and 4 remain operational (but the CCSF turbines are not built), there would be no need for the Jefferson-Martin project until 2014 under PG&E's "low" forecast, 2009 using the "medium" forecast, and 2008 using the "high" forecast.  280 Citizens emphasizes that these conclusions are reached using PG&E's planning contingencies and load forecasts, both of which 280 Citizens contests.

280 Citizens also conducted its own power flow analyses for the Project Area using PG&E's planning contingencies and "low" load forecast for 2006.  280 Citizens' power flow studies indicate that, without the Jefferson-Martin project, PG&E would not experience overload conditions in 2006 if Hunters Point Unit 4 is retired and either Unit 1 remains in service or the four CCSF combustion turbines are put into service.  PG&E and the ISO point out, however, that 280 Citizens' power flow studies show a 99.7% loading on one 115 kV circuit in the scenarios assuming Hunters Point Unit 1 remains in service, which they assert is not a reassuring margin of safety.

A.02-09-043  ALJ/CFT/tcg

## B. Delay or the No Project Alternative

The scoping memo required PG&E to describe its plan of action should the Jefferson-Martin project not be completed by September 2005. PG&E responds that its plan of action would depend on whether the Commission approves the project and there are simply construction-related delays, or denies the CPCN. If there are construction-related delays, PG&E expects that the ISO would require PG&E to delay shut down of Hunters Point until the Jefferson-Martin line becomes operational. If the Commission declines to issue a CPCN for the project, PG&E expects that the ISO would require PG&E to continue running Hunters Point until new generation is constructed within the Project Area. PG&E states that it would have to consider whether to attempt to obtain IERCs available for Unit 4 up through 2008 and/or commence the process to retrofit Unit 4's emission control equipment.

In accordance with CEQA requirements, the EIR evaluates the No Project Alternative in addition to route alternatives. In essence, this alternative examines environmental impacts if a project is not approved and built.

The FEIR states that its No Project alternative is based primarily on an April 18, 2003 letter from the ISO to PG&E and CCSF, which identified future requirements that would allow retirement of Hunters Point Unit 4. The requirements in that letter do not include construction of the Jefferson-Martin project. Consistent with that letter, the components of the FEIR's No Project Alternative include the following:

- Generation. The four CCSF turbines would be installed and Hunters Point Unit 4 would be closed.
- System Upgrades. Re-rating and upgrading of certain transmission lines, and installation of a new transformer would occur.

A.02-09-043  ALJ/CFT/tcg

- • System Improvements. PG&E system improvements would be made, including the conversion of San Mateo-Martin #4 from 60 kV to 115 kV and the installation of a Potrero-Hunters Point 115 kV underground cable.

- • System Management and Planning. PG&E and the ISO would continue to implement an Interruptible Load Program, demand-side management would be encouraged. Curtailment of electric service could be required in worst-case demand growth scenarios.

- • Special Protection Schemes. Continued and increased use of Special Protection Schemes would be needed to provide for controlled involuntary load curtailment during "high load" operating conditions.

The FEIR concludes that the environmental impacts of the No Project Alternative would result primarily from operation of gas-filed turbine generators, and would include substantial air emissions and ongoing noise near the generators as well as visual impacts of the generators depending on their locations. In addition, the No Project Alternative has the potential to result in electric service disruption and curtailments, which would increase use of back-up diesel generators, resulting in additional pollutant emissions. The FEIR concludes that the project alternatives it identifies as environmentally superior alternatives are preferred over the No Project Alternative.

CARE and 280 Citizens address the FEIR's No Project Alternative. CARE agrees with the FEIR's conclusion that the No Project Alternative is environmentally inferior to the Jefferson-Martin project. It maintains that the CCSF combustion turbines would be a less efficient alternative to the Jefferson-Martin project. In addition to environmental concerns cited in the FEIR regarding the No Project Alternative, CARE cites thermal pollution in the Bay caused by continued operation of power plants in San Francisco. 280 Citizens disputes the FEIR's analysis that the No Project Alternative would result in

- 40 -

A.02-09-043 ALJ/CFT/tcg

significant impacts due to emissions, arguing to the contrary that the new CCSF turbines would replace the polluting Hunters Point Unit 4.

### C. Discussion

As a preface to our assessment of need for the Jefferson-Martin project, we note that in Rulemaking (R.) 04-01-026, the Commission is considering whether G.O. 131-D should be amended to allow the Commission to defer to the ISO regarding need for proposed transmission projects. In the meantime, we will proceed consistent with our prior confirmations that § 1001 "places an ongoing responsibility on this Commission to evaluate the public convenience and necessity of proposed transmission projects, and therefore we independently assess the record developed in this proceeding to determine whether [the proposed project] is needed on the basis of either reliability or economics." (D.02-12-066, *mimeo.* at 7, see also D.01-10-029 and D.01-05-059.)

We address, first, the reliability criteria that are appropriate, then consider the generation, transmission, and other resources that should be included in the need assessment. We then address PG&E's load forecasts and determine what conclusions may reasonably be drawn from the parties' reliability analyses. Finally, we assess the extent to which the Jefferson-Martin project may have additional non-reliability benefits. We find that there is an adequate record to support a conclusion that the Jefferson-Martin 230 kV project is needed pursuant to § 1001. We conclude that we should grant a CPCN to PG&E to construct new 230 kV transmission facilities between the Jefferson and Martin substations. We determine the location and routing of the approved project in Section VII.

In Section IV.A.1, we describe the parties' positions regarding the reliability criteria that should be used in assessing need for the Jefferson-Martin project. The primary area of disgreement regards the Supplementary Guide,

- 41 -

A.02-09-043 ALJ/CFT/tcg

which predates the ISO and which 280 Citizens contends is significantly more stringent than planning standards developed by the ISO. 280 Citizens' concern is that the Supplementary Guide requires the electric system to be overbuilt to avoid the remote possibility of loss of load during simultaneous contingency conditions with a miniscule probability of occurrence.

From the description in the record, it does not appear that § 345 would require use of the Supplementary Guide in planning the transmission system in the San Francisco Peninsula Area.[19] As 280 Citizens asserts, the likelihood of the conditions modeled by the Supplementary Guide occurring simultaneously is extremely small. However, as PG&E notes, such an event could lead to prolonged outages, with attendant economic costs and hardship. We expect that design and construction of the transmission system to withstand such a low-probability event would protect the San Francisco Peninsula Area from other low-probability occurrences as well. As part of R.04-01-026, we are assessing the ISO's reliability standards. In the meantime, we do not find sufficient basis to deviate from the ISO's conclusion that the Supplementary Guide should be used in evaluating the Jefferson-Martin project.

One of the most contentious issues related to need for the Jefferson-Martin project is the manner in which its contribution to allowing the Hunters Point units to be retired should be considered. PG&E and the ISO, supported by CARE, view closure of Hunters Point as a planning goal that should be treated as

---

[19] Section 345 provides that the ISO "shall ensure efficient use and reliable operation of the transmission grid consistent with achievement of planning and operating reserve criteria no less stringent than those established by the Western Systems Coordinating Council and the North American Electric Reliability Council."

A.02-09-043  ALJ/CFT/tcg

a given. On that basis, they conclude that the Jefferson-Martin project is needed and should be operational by late 2005 in order to allow PG&E to provide reliable service.

We support the closure of Hunters Point, as evidenced by our approval in D.98-10-029 of PG&E's settlement agreement with CCSF, which provides that PG&E shut Hunters Point as soon as it is no longer needed to sustain electric reliability in San Francisco and the surrounding area. The ISO has established that Hunters Point Unit 1 and 4 are beyond their useful lives and are highly likely to suffer a forced outage. The ISO expects that Hunters Point would require significant and increasing investment to continue operation. In the spirit of the PG&E/CCSF settlement agreement, we agree with PG&E and the ISO that Hunters Point Units 1 and 2 should be closed as soon as technically possible. To facilitate this goal, we find that Jefferson Martin should be online at the earliest possible time, as soon as construction can be completed. With other transmission reinforcements in place, we believe that the sooner Jefferson Martin is operational the sooner PG&E will be able to decommission Hunters Point.

There are several environmental concerns that arise from the continued operation of the Hunters Point facility. For example, Hunters Point Unit 4 must comply with stricter emission limits at the beginning of 2005. While PG&E has received IERCs for Unit 4 for use through 2005 and could obtain additional IERCs if necessary, we believe that continued reliance on these power generation sources is not environmentally prudent or cost-effective. There are several environmental benefits that will occur when Hunters Point is decommissioned such as reduced air, noise, and thermal pollution. Such an outcome will be consistent with the community values of the Bayview and Hunters Point neighborhoods, as CARE has testified. We take note that shutting down the power plant may produce beneficial health impacts for the Bayview Hunters

- 43 -

A.02-09-043  ALJ/CFT/tcg

Point neighborhood.  We give those concerns great weight in balancing the competing interests in this proceeding.

Inclusion of the four CCSF combustion turbines in the resource mix used to assess need for the Jefferson-Martin project would not be consistent with the ISO's guidelines for either five-year or ten-year planning cases, since they have not received regulatory permits.  We take official notice of information on the CEC's website indicating that an Application for Certification was filed on March 18, 2004 (CEC Docket No. 04-AFC-1) for three of the four turbines.  In light of the on-going controversy about the turbines and the early stage of their certification process, we do not have sufficient confidence that the three CCSF combustion turbines subject to that application will be constructed in a timely fashion to warrant deviation from standard industry practice and include them in the resource mix used to evaluate need for the Jefferson-Martin project.  We have no information regarding the fate of the fourth CCSF combustion turbine.

A.02-09-043  ALJ/CFT/tcg

280 Citizens and WEM do not convince us that we should assume in assessing the Jefferson-Martin project that the 115 kV San Mateo-Martin are re-rated. We reject this position both because of concerns about technical feasibility and because PG&E is not currently planning such re-rates.

We reiterate our support, as expressed in the Energy Action Plan, for increased reliance on conservation, energy efficiency, and distributed generation as high-priority ways to meet California's energy needs. At the same time, there is no convincing evidence in the record that the near-term development of such resources is sufficiently certain to affect the need analysis for the Jefferson-Martin project. We find that PG&E has reflected these resources satisfactorily in its load forecasting methodology.

PG&E's March 2003 load forecast, which PG&E characterizes as its "low" load forecast, is the most credible of the three forecasts it presents in this proceeding. It is the forecast upon which PG&E bases its December 2003 transmission expansion plan submitted to the ISO. In its preparation, PG&E included current economic projections. The ISO reviewed PG&E's forecasting methodology in its most recent annual transmission planning process, and has found this forecast to be reasonable and sufficient for its own transmission planning purposes and for its testimony in this proceeding. For these reasons, we view PG&E's characterization of its current forecast as a "low" forecast to be disingenuous at best. We find it reasonable to use PG&E's March 2003 load forecast, contained in Table 1 above, in assessing need for the Jefferson-Martin project.

We turn now to the question of whether and the extent to which the Jefferson-Martin project is needed for reliability purposes. The ISO's method, which assesses the LSC based on the entire San Francisco Peninsula Area, is the most credible approach in the record. The ISO has made a convincing showing

- 45 -

A.02-09-043 ALJ/CFT/tcg

that the ability to serve electric load within San Francisco is affected by transmission facilities within the entire San Francisco Peninsula Area and also by transmission facilities connecting the Peninsula to the greater Bay area. The ISO's LSC study and its testimony provide the only reliability assessments in the record that take this broader view.

In conjunction with the San Francisco Peninsula Area load forecasts (Table 1), the ISO's LSC results for the San Francisco Peninsula Area allow us to make findings regarding reliability need for the Jefferson-Martin project. Continued operation of existing San Francisco generation, including both units at Hunters Point, would maintain system reliability at least through 2006 if base case transmission projects are constructed (see Table 2, scenario 3). However, the Jefferson-Martin project is needed for reliability purposes in 2007, even if Hunters Point were to remain operational (Table 2, scenario 12).[20] We find further that there would not be enough time for other alternatives such as a trans-Bay transmission line, as some parties have suggested, to be planned, permitted, and constructed to meet this reliability need.

The Jefferson-Martin project may allow Hunters Point to be retired if one or more internal transmission upgrades north of the Martin substation are also completed (Table 2, scenarios 11 and 14; Exhibit 165, Attachment 2). Increased reliance on transmission rather than local generation to meet San Francisco's power needs would create transmission constraints within San Francisco. Thus,

---

[20] We note that the issue of whether a five-year or a ten-year planning horizon should be used is irrelevant since the Jefferson-Martin project is needed in less than five years. We note further that the ISO's LSC results in scenarios 3 and 12 do not depend on the Supplementary Guide's reliability criteria.

A.02-09-043 ALJ/CFT/tcg

the Jefferson-Martin project by itself is not sufficient for closure of Hunters Point. The LSC study indicates that a combination of the Jefferson-Martin project and three internal cable projects, if constructed, may be sufficient to meet load reliably throughout the ten-year period studied (Table 2, scenario 14).

While the record demonstrates that the Jefferson-Martin project is needed for reliability purposes by 2007, the project has diversification, economic, and environmental benefits that warrant its construction more quickly than that.

The project will diversify the path and source of power brought into San Francisco. Currently, all major transmission lines importing power travel through a single corridor from the San Mateo substation to the Martin substation and receive power from the San Mateo substation. Thus, the system is vulnerable to events disrupting supply at the San Mateo substation and/or along the San Mateo-Martin corridor. We recognize that a Jefferson-to-Martin route for the project does not diversify the risk of loss of load due to equipment outages at the Jefferson substation, since all lines would continue to travel through that substation. However, to use 280 Citizens' terminology, a Jefferson-Martin line would eliminate the "choke point" at the San Mateo and Martin substations, as well as the sole reliance on the San Mateo-to-Martin corridor. While the San Mateo substation brings in power from the East Bay, the Jefferson-Martin project would tap power originating from the region south of the Peninsula area, thus diversifying the source of power.[21] Prompt construction of the project would allow these diversification benefits to be reaped sooner rather than later.

---

[21] At the same time, the Jefferson-Martin project would also relieve limitations across import lines from the East Bay, as the ISO demonstrated.

A.02-09-043  ALJ/CFT/tcg

The Jefferson-Martin project and closure of Hunters Point will also provide economic benefits.  In addition to a fixed revenue requirement for Hunters Point, ratepayers pay above-market variable costs in response to RMR dispatch notices.  To the extent power imported over the Jefferson-Martin line is from more cost-effective generators, there would be an economic benefit from the project.  In addition, continued operation of Hunters Point Unit 4 may require new emissions control equipment if IERC credits are not sufficient.  PG&E anticipates there may also be other retrofit costs needed to keep Hunters Point operating much beyond the end of 2005.  PG&E suggests additionally that the Jefferson-Martin project may allow the ISO to reduce the RMR requirement for Potrero.  As the ISO points out, construction cost increases may also act to offset any purported cost savings from deferring construction.

Last, but certainly not least, there are the environmental benefits of shutting down Hunters Point and possibly reducing Potrero generation as well, which include reductions in emissions, noise, and thermal pollution and the resulting health benefits.  Such an outcome will be consistent with the community values of the Bayview and Hunters Point neighborhoods, as CARE has testified.

## V. Project Alternatives Studied

In its application and Proponent's Environmental Assessment, PG&E identified several alternative routings for the Jefferson-Martin project.  During the EIR scoping process, numerous additional alternatives were identified, including minor routing adjustments for PG&E's Proposed Project, entirely different transmission line routes, alternative energy technologies, and non-wires alternatives.  Alternatives were then screened according to CEQA guidelines to determine those alternatives to carry forward for analysis in the EIR.  The

A.02-09-043 ALJ/CFT/tcg

Commission's environmental team rejected 26 alternatives that did not meet CEQA criteria for analysis. In Section IV, we have determined that alternative energy technologies and non-wires alternatives do not hold sufficient promise to eliminate the need for the Jefferson-Martin project. In this section, we address alternative routing configurations for the project.

### A. Southern Alternatives

In addition to the overhead segment of PG&E's Proposed Project, alternative configurations considered for the southern segment include the underground Route Option 1B contained in PG&E's Proponent's Environmental Assessment, the PUA (Partial Underground Alternative) developed by the Commission's CEQA consultants, and the MPUA (Modified Partial Underground Alternative) proposed by 280 Citizens and other intervenors. The FEIR also describes several hybrid alternatives that combine portions of these configurations. The FEIR concludes that Route Option 1B is the environmentally superior route for the southern segment.

### 1. Proposed Project--Southern Segment

PG&E's proposed southern segment would install the 230 kV line entirely overhead and, for the most part, along the existing, but widened, right of way, on a rebuild of PG&E's 60 kV transmission line in the SFPUC watershed lands. The rebuilt line would connect to the northern underground segment of the Proposed Project at a transition station near San Bruno Avenue.

Upon leaving Jefferson substation, the rebuilt line would traverse Edgewood Park and the Pulgas Ridge Natural Preserve, cross to the west of I-280, and continue north across the watershed. At about mile point 4.1, the alignment crosses back to the east of I-280, then passes the Ralston substation. Between the Ralston and Carolands substations, residential development in The

- 49 -

A.02-09-043 ALJ/CFT/tcg

Highlands area of unincorporated San Mateo and in the Town of Hillsborough lies immediately east of the alignment. The alignment then crosses to the west of I-280 and runs along the west side of the freeway and the eastern edge of the Crystal Springs Golf Course. At mile point 9.9, the alignment crosses back to the east of I-280 and continues in watershed land adjacent to residential development in the Town of Hillsborough and the City of Burlingame. At mile point 10.7, the alignment passes west of I-280 again and remains west of I-280 in watershed land until crossing east of Skyline Boulevard to the transition station at San Bruno Avenue in the City of San Bruno.

### a) Rebuild of Existing 60 kV Line

The FEIR finds that PG&E's proposed rebuild of the 60 kV line in the southern segment would have significant unmitigable (Class I) visual impacts at key viewpoints at Edgewood County Park, along southbound I-280, Lexington Avenue, Black Mountain Road, and north of the Carolands substation. It also identified Class I impacts for recreation and biological resources because of the high value of Edgewood Park habitat and recreational experiences. Because of its location within SFPUC watershed lands, the southern segment of the Proposed Project could result in permanent loss and/or temporary disturbance to sensitive plant communities and associated wildlife habitat. In particular, there is concern regarding impacts to wetlands and serpentine grasslands, which are habitats for protected species including the California Red-Legged Frog, the San Francisco Garter Snake, and the Bay Checkerspot Butterfly.

In light of the FEIR's conclusions regarding the environmentally superior route and the risk of an NPS veto (discussed in Section V.A.5), PG&E now supports Route Option 1B instead of the southern segment of the Proposed Project.

- 50 -

A.02-09-043 ALJ/CFT/tcg

The County of San Mateo, the City of Burlingame, and 280 Citizens oppose the southern overhead segment of the Proposed Project. These parties assert that replacing 60 kV towers with taller 230 kV towers[22] would create significant visual impacts in a highly valued scenic corridor. In their view, the project would exacerbate existing land use conflicts already created by the 60 kV line in residential areas, scenic corridors, and parklands. They argue that the project would compound existing conflicts with community values; the County of San Mateo asserts that the Proposed Project would be in conflict with the visual policies in the San Mateo County General Plan.

These parties are also concerned that this segment of the Proposed Project would expose residential neighborhoods to much higher EMF levels than the existing line. 280 Citizens maintains that the I-280 corridor communities now know about potential health impacts from prolonged exposure to elevated magnetic field levels and that, if the overhead portion of the Proposed Project is built, many residents of these affected neighborhoods will move rather than risk possible serious health impacts. EMF issues are discussed in more detail in Section VI.

### b) Transition to Northern Segment

PG&E proposes to place a transition station between the southern overhead and northern underground segments of the Proposed Project near the intersection of San Bruno Avenue and Glenview Drive. The FEIR identifies and analyzes three alternatives to the San Bruno Avenue transition station: a Sneath

---

[22] The FEIR states that the average height of the new towers would be 20 to 25 feet higher than the existing towers. Some towers would be as much as 50 feet higher than the towers being replaced.

A.02-09-043 ALJ/CFT/tcg

Lane transition station, a West of Skyline transition station, and a Glenview Drive transition tower. The FEIR concludes that a Glenview Drive transition tower is the best transition alternative because it would minimize land use, visual, seismic, and recreation impacts due to its location in a less visible area adjacent to an existing City of San Bruno water tank and east of the main trace of the San Andreas fault.

PG&E maintains that a San Bruno Avenue transition station would have few environmental impacts because it would avoid biologically sensitive areas and utilize a low-profile design to minimize visual impacts. PG&E states that, although the site is within the San Andreas fault zone and adjacent to potentially active secondary faults, seismic impacts would not be significant and would be less than for any other transition station alternative.

The FEIR concludes that the San Bruno Avenue transition station location would have Class I (significant unmitigable) land use and visual impacts. It would conflict with planned future development at the transition station site and would introduce an industrial character, structural prominence, and view blockage when viewed from Skyline Boulevard, San Bruno Avenue, or the nearby Sky Crest shopping center.

The City of San Bruno, the City of Burlingame, and 280 Citizens oppose the San Bruno Avenue transition station site. San Bruno asserts that a transition station at this site would introduce a new blighting condition within its Redevelopment Plan Area in violation of the state Redevelopment Law. In its view, a transition station here would run roughshod over the values of the community, which desires to turn the area into a gateway to San Bruno. The transition station would be across the street from shopping and planned townhouses and would displace a planned parking lot for public access to the recently completed trail entrance and bicycle and walking paths in the adjacent

- 52 -

A.02-09-043 ALJ/CFT/tcg

San Francisco State Fish and Game Refuge. The site is zoned for neighborhood commercial uses, with a maximum height of 28 feet, whereas the transition station would be 47 feet tall. San Bruno would support either the elimination of the need for a transition station, such as Route Option 1B, or another location for a transition structure in San Bruno that is more consistent with the industrial nature of such structures.

The West of Skyline Boulevard transition station alternative would be located on SFPUC watershed lands southwest of the corner of San Bruno Avenue and Skyline Boulevard. The Sneath Lane transition station alternative would be co-located with an existing Sneath Lane substation. The FEIR states that either of these alternatives would eliminate the unmitigable Class I visual and land use impacts of the proposed San Bruno Avenue transition structure. However, both of them would lie west of the active trace of the San Andreas fault, so that an underground crossing of that trace would be required. The FEIR concludes that this underground fault crossing would cause significant unmitigable (Class I) impacts for either alternative.

The Glenview Drive transition tower alternative would be located approximately 0.5 miles south of the proposed transition station on Glenview Drive adjacent to a water tank owned by the City of San Bruno. This alternative would reduce the visual impacts and land use conflicts associated with the proposed transition station site. It would be located east of the San Andreas fault and thus would not require an underground crossing of the San Andreas fault. It would be closer than the San Bruno Avenue location to the active trace of the San Andreas fault, but the FEIR concludes that that risk can be mitigated to a less-than-significant level. The FEIR also finds that, if the underground northern portion of the project is routed down San Bruno Avenue, there would be no

- 53 -

A.02-09-043 ALJ/CFT/tcg

significant unmitigable (Class I) impacts associated with the Glenview Drive transition tower.

PG&E states that, while a Glenview Drive transition tower would raise greater seismic risks than a San Bruno Avenue transition station, it is preferable from a seismic perspective to the Sneath Lane or West of Skyline locations. As a second option, PG&E is willing to accept the Glenview Drive transition tower, so long as it is used with the Proposed Project underground route.

The City of San Bruno states that, if the Commission selects a route that requires a transition station near San Bruno Avenue, it would accept the Glenview Drive transition tower option. However, it asks that, if the Commission approves a Glenview Drive transition tower, the underground line traverse the adjacent State property along Skyline Boulevard rather than use Glenview Drive to reach San Bruno Avenue. San Bruno explains that use of the Caltrans right of way would preserve Glenview Drive as a much-needed utility corridor.

### 2. Route Option 1B

In Route Option 1B, the 230 kV line would be entirely underground except for a crossing of the Crystal Springs Dam. The existing 60 kV line would not be modified in any way. From the Jefferson substation, the 230 kV line would be located within Cañada Road for about 5 miles to Highway 92. It would then turn onto Highway 92 before turning onto Skyline Boulevard. The route would continue north in Skyline Boulevard, crossing over Crystal Springs Dam. Several options exist for the transmission line where Skyline Boulevard crosses Crystal Springs Dam. At Golf Course Road, the route would turn to cross under I-280, turning north into the continuation of Skyline Boulevard immediately east

A.02-09-043 ALJ/CFT/tcg

of I-280 and staying on Skyline until Trousdale Drive. The route would travel east on Trousdale Drive, then turn north into El Camino Real. It would remain in El Camino Real until connecting with the northern segment at San Bruno Avenue.

The FEIR identifies Route Option 1B as the environmentally superior route in the southern segment. Route Option 1B would eliminate all significant visual impacts identified for the Proposed Project's southern segment. The FEIR describes several options for crossing the Crystal Springs Dam that would have no significant unmitigable impacts, and includes a revised overhead crossing, a top of the dam crossing, and a submarine cable option within the environmentally superior alternative. Route Option 1B would also eliminate the impacts associated with the San Bruno transition station, since the entire project would be underground. The FEIR concludes that Route Option 1B would minimize permanent impacts to the most relevant areas of land use, visual resources, and biology. The FEIR finds Route Option 1B preferred on the issue of geology and seismic issues because it would avoid the known active traces of the San Andreas Fault located along Skyline Boulevard near San Bruno Avenue. The FEIR also finds that Route Option 1B has the potential to reduce EMF exposure to residences, compared to the Proposed Project.

PG&E now supports Route Option 1B on the basis that it avoids the significant visual and biological impacts of most other southern segment alternatives and the associated opposition of federal and state natural resource agencies. CCSF submits that Route Option 1B is the most environmentally prudent choice for the southern segment, since its impact to the watershed can be mitigated so that there are no significant impacts.

The City of Burlingame, the County of San Mateo, the City of Millbrae, and 280 Citizens oppose Route Option 1B. They raise numerous concerns,

A.02-09-043 ALJ/CFT/tcg

including construction complexities due to existing underground utilities and seismic factors; construction impacts including noise, traffic, emergency access, and business losses; residential EMF exposure; and the fact that Route Option 1B would not address concerns regarding the existing 60 kV line.

Burlingame submits that Route Option 1B, which runs through residential neighborhoods and passes two schools, a convalescent facility, and a hospital, is not good public policy. Burlingame and Millbrae assert that Route Option 1B ignores the community value of economic revitalization, which they state the FEIR did not consider under CEQA in determining the environmentally superior route. Route Option 1B would result in El Camino Real "once again being torn apart, with the already struggling businesses significantly impacted."

San Mateo submits that the most preferable route to connect the Jefferson-Martin line from the I-280 corridor to the eastern portion of the northern segment is Sneath Lane rather than Trousdale Drive. It points out that Sneath Lane east of I-280 to El Camino Real is lined by professional and medical office buildings on one side and the Golden Gate National Cemetery on the other. At El Camino Real, Sneath is flanked by regional commercial development. In its view, Option 1B should be rejected because there are less populated alternatives, in particular Sneath Lane or San Bruno Avenue, with less public facilities involving children and at-risk residents.

Burlingame, San Mateo, and 280 Citizens assert that there is not enough space due to existing utilities in Trousdale Drive, Skyline Boulevard, and El Camino Real to install Jefferson-Martin feasibly. Burlingame maintains that Trousdale Drive is already heavily congested with utilities including storm drains, water and sewer mains, electric, gas, telephone, and cable lines. Lateral lines connecting the utilities to properties along the street traverse the street at depths which vary by as much as eight feet. A 60-inch diameter Hetch Hetchy

- 56 -

A.02-09-043 ALJ/CFT/tcg

water main crosses Trousdale Drive in two locations. Skyline Boulevard, while not as congested as Trousdale, still has a number of utilities beneath the street. Burlingame maintains that this congestion will require trench depths of at least twelve feet and vault depths of at least fourteen feet below the surface of the street.

PG&E responds that the presence of existing utilities along Route Option 1B is not expected to present unusual challenges. While final engineering will reveal the exact location of existing utilities, PG&E reports that its site investigations of Trousdale Drive, El Camino Real, and Skyline Boulevard establish that Route Option 1B is feasible. It asserts that Burlingame's own plans to install a new water main supply beneath Trousdale Drive prove that there is sufficient space in that street. PG&E also points out that the PUA supported by these parties would require the transmission line to travel underground in Glenview Drive, Sneath Lane, or San Bruno Avenue and that there are underground utilities in each of these streets.

PG&E maintains that seismic issues along Route Option 1B are insignificant and in no way affect the feasibility of constructing this route option. PG&E asserts that Route Option 1B has fewer seismic risks than any other southern alternative, because it avoids the known active traces of the San Andreas fault located along Skyline Boulevard near San Bruno Avenue. Burlingame argues to the contrary that seismic risks along Trousdale Drive would be significant due to the Serra fault which crosses the street, a moderate landslide risk along the drive, and liquefaction potential near the intersection of Trousdale and El Camino Real.

The FEIR states, and Burlingame concurs, that the Serra fault is capable of displacement of up to three feet. PG&E maintains to the contrary that the fault should not slip more than a foot. PG&E agrees to install reinforced duct banks in

- 57 -

A.02-09-043 ALJ/CFT/tcg

the area of the Serra fault that would be expected to withstand up to a three foot slip if warranted by further geological investigation.

Burlingame is concerned about the adequacy for Trousdale Drive of the FEIR's Mitigation Measure G-8a, since it was designed for the San Andreas fault. Burlingame points out, first, that there are conflicting reports regarding where the Serra fault crosses Trousdale Drive. Second, the San Andreas fault is a right lateral strike slip fault, whereas the Serra fault is a thrust fault. The two types of faults exhibit different types of movement; Burlingame contends that displacements along the Serra fault could occur within a zone up to 115 wide, thereby requiring mitigation across the entire zone.

As an additional seismic mitigation measure, Burlingame wants a geologist on site to observe the trenching in the relevant portion of Trousdale Drive to determine the location of the Serra fault. It requests a geotechnical study to assess the degree of possible displacement on the Serra fault. It also requests that PG&E be required to design the duct bank and associated vaults to withstand a 7.1 magnitude earthquake on the San Andreas fault and associated movement on the Serra fault, install a fire and security alarm system and a fire suppression system in each vault within Burlingame city limits, and place seismic monitors along the duct bank.

Regarding Burlingame's concerns about liquefaction, PG&E responds that this area is not underlain by bay muds, the material most likely to liquefy. PG&E asserts that the liquefaction risk along Trousdale is "high" compared to the "very high" liquefaction risk along portions of the Collocation Alternative. It states that mitigation measures could be used to ensure that the transmission line would survive any such event.

The County of San Mateo, the City of Burlingame, and 280 Citizens assert that Route Option 1B would create unnecessary traffic impacts. San Mateo

A.02-09-043  ALJ/CFT/tcg

characterizes El Camino Real as a critical regional and local transportation artery and argues that traffic closures would impair access to homes and commercial businesses and resulting economic loss. Burlingame points out that PG&E has not included in its cost estimates any business disruption costs for businesses along El Camino Real.

280 Citizens maintains that construction creates inherent hazards if conducted in a residential neighborhood. 280 Citizens and Burlingame are also concerned that construction activity could increase emergency services' response times. PG&E responds that, just as Burlingame will do for its planned water main construction, PG&E will make provision for emergency access during construction along Route 1B and will ensure that any impacts are less than significant.

Burlingame states that, if the Commission approves Route Option 1B, the city will place certain conditions, pursuant to rights retained under its franchise agreement, on project installation in its city streets. Burlingame describes its Public Works Department's standard that new utility infrastructure traversing the city (but not actually serving the city) must be buried two feet below the lowest existing utility in the right of way. Burlingame states that it would also require that PG&E undertake studies to determine the impact of the line on existing cast iron water pipes and install any necessary cathodic protection systems. Burlingame requests that the Commission acknowledge these mitigations and instruct PG&E to abide thereby.

PG&E responds that Burlingame does not have the right to place its own mitigation requirements on PG&E since the Commission has exclusive jurisdiction over the siting, construction, and design of transmission line projects. PG&E urges the Commission to deny Burlingame's request to include these mitigation measures. To the extent that implementation of adopted mitigation

A.02-09-043 ALJ/CFT/tcg

measures may require Burlingame's approval, PG&E requests that the Commission put in place a process whereby disputes between Burlingame and PG&E on these matters may be resolved by the Commission.

Burlingame asserts that the FEIR's Mitigation Measure T-1a, which requires the development and approval of Transportation Management Plans, is inadequate. Burlingame requests several additional mitigation measures related to construction timing, school access, hospital access, parking on Trousdale and Skyline, emergency access, noise control, and the provision of information to property owners.

280 Citizens submits that Route Option 1B would create new land use conflicts by creating a new utility corridor through residential neighborhoods. Just as significantly in its view, Route Option 1B would leave the existing 60 kV line in place, which would continue to be inconsistent with the residential areas, I-280 scenic corridor, and parklands through which it is located. 280 Citizens urges the Commission not to squander this unique opportunity to reduce existing land use conflicts and enhance visual and scenic values on the Peninsula. Burlingame voices similar views.

280 Citizens recognizes that Route Option 1B would reduce magnetic field levels below those of the Proposed Project. It contends, however, that approval of Route Option 1B with the existing 60 kV line left in close proximity to residences would result in aggregate magnetic field levels that would exceed the levels produced by the PUA. It argues further that Route Option 1B would exacerbate existing concerns about EMF exposure by locating the 230 kV line along Skyline Boulevard in close proximity to homes already affected by EMF exposure from the existing line. San Mateo notes that the FEIR did not consider the health and safety factor related to EMF exposures.

A.02-09-043 ALJ/CFT/tcg

PG&E asserts that Route Option 1B would have little or no biological impacts. While a consultation with the U. S. Fish and Wildlife Service (USFWS) would be needed regarding the crossing of the Crystal Springs Dam, PG&E states that it has developed a plan for constructing the crossing without negatively affecting California Red-Legged Frogs and has discussed this issue several times with USFWS. PG&E reports that USFWS has stated that it finds PG&E's proposed mitigation measures acceptable. PG&E expects compliance with the Endangered Species Act to proceed quickly and smoothly if Route Option 1B is selected.

### 3. Partial Underground Alternative and Modified Partial Underground Alternative

The Commission's environmental consultants developed and the EIR analyzed an alternative southern route called the PUA (Partial Underground Alternative). In the PUA, the existing double 60 kV line would be rebuilt with taller towers to carry the new 230 kV circuit and one 60 kV circuit, consistent with the southern segment of PG&E's Proposed Project. The PUA would differ from the Proposed Project, however, in that it would reroute two portions of the combined rebuilt line and would underground another portion in order to reduce impacts on sensitive areas. In this section, we describe issues arising from differences between the Proposed Project and the PUA and its variations. Issues common to the Proposed Project and the PUA, including transition station locations and NPS jurisdictional concerns are addressed elsewhere in this order.

Starting from the Jefferson substation, the PUA would reroute the initial 2.8 miles of the line to the west in order to avoid Edgewood Park and the Pulgas Ridge Preserve (called the southern reroute). In the next modification, approximately three miles of the combined line would be undergrounded (except for an overhead crossing of San Mateo Creek) between the Ralston and

A.02-09-043 ALJ/CFT/tcg

Carolands substations in order to reduce impacts on adjacent residences in the San Mateo Highlands and the Town of Hillsborough. The final modification (called the northern reroute) would reposition 1.5 miles of the rebuilt overhead line, between approximately the City of Burlingame city line and Trousdale Drive, to the west to avoid proximity to residences in the City of Burlingame.

The FEIR describes that the PUA would eliminate all of the significant unmitigable impacts of the Proposed Project's southern segment. The PUA would eliminate most visual impacts near residential areas[23] and would also eliminate two crossings of I-280 because the line would remain west of the freeway north of the Carolands substation. However, the FEIR finds that the PUA would create new significant unmitigable visual impacts along Cañada Road near Edgewood Road, at the I-280 crossing south of Carolands substation, and at the transition structure at Tower 7/39. For this reason, the FEIR finds the PUA less desirable than Route Option 1B.

280 Citizens supports a modification to the PUA which would move the underground portion up to 25 feet to the west in very limited areas to ensure that the lines are located at least 75 feet from residential property lines, in order to reduce EMF impacts on residences that border that portion of the transmission corridor. The PUA with that change is referred to as the MPUA (Modified Partial Underground Alternative). 280 Citizens states that the environmental impacts of the PUA's southern reroute may outweigh its benefits and, as a result, 280 Citizens would support either the Proposed Project's route through

---

[23] The FEIR suggests modifications to locations proposed in the draft EIR for transition towers/stations north and south of San Mateo Creek.

A.02-09-043 ALJ/CFT/tcg

Edgewood County Park or the southern reroute, whichever the Commission deems to be superior.

In the environmental review, the FEIR rejected the underground route change in the MPUA based on its assessment that moving the underground alignment to the west would cause greater impacts than it would mitigate.

280 Citizens and the City of Burlingame assert that the PUA or the MPUA would reduce the Proposed Project's land use conflicts and would be consistent with community values by rerouting the line out of Edgewood County Park, out of residential areas, and in a way that reduces visibility of the line along I-280, which has been designated as a scenic highway. In their view, the PUA or the MPUA would minimize visual impacts, construction impacts, and health impacts far better than either the Proposed Project or Route Option 1B. 280 Citizens characterizes the MPUA as a rare opportunity for the Commission to reduce both future impacts and existing impacts and to improve the environment in both San Francisco through the closure of Hunters Point Unit 4 and the I-280 corridor.

PG&E, CCSF, and CARE oppose both the PUA and the MPUA. These parties contend that the PUA and MPUA suffer from a host of environmental, technical, legal, and regulatory feasibility infirmities and that proponents of these route alternatives have a self-interested desire to enhance their property values at ratepayer expense.

PG&E argues that the rerouted overhead utility corridors in the PUA or the MPUA would significantly worsen existing scenic viewsheds, thereby degrading the recreational experience in the project area. While acknowledging that the southern reroute would have some visual impacts in the Cañada Road corridor, 280 Citizens and Burlingame respond that either the PUA or the MPUA would provide a net improvement in visual impacts. They point out that the

- 63 -

A.02-09-043  ALJ/CFT/tcg

underground section would remove overhead lines and that the northern reroute would relocate the line from the ridge on the east side of I-280 to a topographically lower area on the west side of I-280, both of which changes would improve visual impacts on the I-280 scenic corridor.  Burlingame sees the southern reroute, which would remove towers from Edgewood County Park and Pulgas Ridge, to be beneficial.

PG&E, CCSF, and CARE assert that the two overhead reroutes and trenching for the underground section of the PUA or the MPUA would have significant biological impacts.  The two new overhead corridors would be in currently undeveloped SFPUC watershed lands known to support rare plant and animal species protected under state and federal law.  The underground section of the PUA would require trenching through the largest remaining serpentine grassland in San Mateo County, which provides habitat for the protected Bay Checkerspot Butterfly, and the MPUA would exacerbate these biological impacts.  PG&E maintains that the new utility corridors would violate the SFPUC Watershed Management Plan which discourages new utility corridors in undeveloped watershed lands.

In response to PG&E's concerns, 280 Citizens and Burlingame submit that the temporary construction and biological impacts of the PUA and the MPUA are not significant and can be mitigated.  Burlingame points out that the FEIR determined that all impacts of the PUA to the serpentine grasslands and the special status species in the area would be mitigable to less than significant levels.

280 Citizens presented testimony that the serpentine habitat can be restored and even improved through revegetation with native serpentine plants and grasses.  280 Citizens points out that the serpentine habitat along the portion of the route that would be undergrounded has already been degraded

- 64 -

A.02-09-043 ALJ/CFT/tcg

significantly due to the existing access roads and SFPUC's frequent disking, mowing, and burning of broad areas maintained as firebreaks. PG&E acknowledges that the Bay Checkerspot Butterfly is no longer found north of Highway 92. It points out, however, that the USFWS Recovery Plan for Serpentine Soil Species of the San Francisco Bay Area identifies the MPUA-proposed trenching area as Priority 1 and 2 in the recovery strategy for the Bay Checkerspot Butterfly and the Marin Dwarf Flax.

280 Citizens argues that the MPUA is the only alternative that reduces EMF levels sufficiently to provide a prudent margin of safety for residents. San Mateo points out that, in finding that Route Option 1B is preferable to the PUA, the FEIR did not consider public health concerns related to exposure to EMF. San Mateo asks that, if the Commission does not choose the PUA or the MPUA, the Commission consider the potential removal of the existing 60 kV line similar to what was done in the Tri-Valley case.

PG&E argues that the multiple transitions in the PUA or the MPUA between underground and overhead configurations would decrease reliability due to the increased difficulties in locating the cause of a line outage. Burlingame responds that construction of a line with multiple overhead-to-underground transitions is not novel. It points out that utilities are working on development of a directional fault detector, which could be installed after it is developed. Since the risk of outages in an underground line is small and PG&E is exploring a manner in which to address this problem, Burlingame concludes that this reliability issue provides no basis for rejecting the PUA or MPUA.

The County of San Mateo asserts that PG&E has dramatically overstated the time that it would take for NPS approval if required, and the time and role of consultation with federal agencies under the Endangered Species Act. PG&E contests the credibility of San Mateo's time estimates, stating that San

- 65 -

A.02-09-043  ALJ/CFT/tcg

Mateo's witness had limited knowledge regarding the route options, did not know long it would take to resolve the NPS land rights dispute, agreed that plant and biological surveys would be required, and agreed that Section 7 consultations with the USFWS for the PUA or MPUA route could take a year. CARE maintains that the necessity of compliance with federal environmental regulations including NEPA would delay completion of the PUA or MPUA for several years, exacerbating San Francisco's electricity problems and creating the potential for further negative environmental impacts on residents of San Francisco's Bay View/Hunters Point neighborhoods due to continued operation of the Hunters Point power plant.

In addition to its other concerns, PG&E argues that the PUA or the MPUA cannot be legally required. PG&E asserts that undergrounding and re-routing of portions of the existing 60 kV line as proposed by the PUA and the MPUA would not mitigate a project impact or achieve a basic project objective but instead are attempts to enhance the environmental baseline. On that basis, PG&E concludes that these route proposals lack the required constitutional nexus to the Jefferson-Martin project and so violate the Takings Clause of the U.S. Constitution.

Burlingame responds that PG&E's assessment is based on an erroneous definition of the Jefferson-Martin project. Since the project, as initially proposed, would include significant modifications to the 60 kV line, Burlingame concludes that the 60 kV line is part of the project and that the PUA and MPUA may properly be considered. Burlingame's analysis is consistent with the FEIR, which states that, because modifications to the existing 60 kV line in the southern segment, as proposed by PG&E, would create adverse impacts, alternatives such as the PUA designed to mitigate those impacts may properly be considered under CEQA.

A.02-09-043  ALJ/CFT/tcg

280 Citizens asserts that the Commission has authority, independent of CEQA, to require PG&E to relocate or underground the existing 60 kV line as part of its approval of the Jefferson-Martin project.  It states that the Commission's authority under §§ 1001 and 1002 is much broader than the authority of most other state agencies under CEQA, and includes authority to condition its grant of a CPCN on the adoption of any changes to PG&E's existing utility plant and facilities as public convenience and necessity may require.  280 Citizens cites § 762, which empowers the Commission to direct public utilities to make changes to existing utility facilities and also invokes §§ 761, 768, and 701. 280 Citizens cites prior instances in which the Commission has required the removal and relocation of existing utility lines, including its determination in the Tri-Valley proceeding that an existing 60 kV line should be removed.

As a separate legal argument, PG&E maintains that the Commission may not select the MPUA since the FEIR rejected the MPUA from full consideration and did not analyze its impacts.  A very similar alternative was identified in the Alternatives Screening Report (FEIR, Volume 2, Appendix 1) as the West of Existing Corridor, East of I-280 Alternative, and not pursued in detailed analysis.

### 4. Hybrid Southern Alternatives

The FEIR analyzed several hybrid alternatives for the southern segment designed to reduce or avoid biological, visual, seismic, and other impacts associated with parts of the southern segment alternatives.  The FEIR concludes that Route Option 1B is environmentally superior to any of the hybrid southern alternatives.

A new Golf Course Drive transition station, west of the Carolands substation, would allow creation of a hybrid alternative using the underground

A.02-09-043 ALJ/CFT/tcg

Route Option 1B in the southernmost segment, which would minimize visual and biological impacts because the route would be underground and within roadways (except for the crossing of Crystal Springs Dam). From the new transition station, the overhead line would follow the route of either the PUA (including its northern reroute) or the Proposed Project to a transition station in the San Bruno Avenue area. This configuration would avoid Route 1B's effects on the residential areas along Skyline Boulevard and Trousdale Drive, as well as on businesses and traffic on El Camino Real. A Golf Course Drive transition station could also be used as a modification to the PUA to allow the 230 kV line to cross I-280 underground, thus reducing the height and mass of the transition tower at Tower 8/50 because it would be needed for only the 60 kV line.

A new transition tower at the existing tower 11/70 near the west end of Trousdale Drive could be used, similar to a Golf Course Drive transition station, to connect the southernmost portion of Route Option 1B with the portion of the Proposed Project north of the new transition tower. This would avoid effects on Trousdale Drive and El Camino Real. This transition tower alternatively could connect the southernmost portion of the Proposed Project with Route Option 1B's Trousdale Drive and El Camino Real segment. Such a hybrid would avoid the visual and biological impacts of the Proposed Project in the I-280 corridor between Trousdale Drive and San Bruno Avenue, visual concerns regarding the San Bruno transition station, seismic concerns regarding proximity to the San Andreas fault of the San Bruno transition station or its alternatives, and the use of San Bruno Avenue. Another possible transition tower location about 1,100 feet west of tower 11/70 could be used to connect the southernmost portion of the PUA or MPUA to Route Option 1B's Trousdale Drive and El Camino Real segment.

- 68 -

A.02-09-043  ALJ/CFT/tcg

The County of San Mateo states that, if the Commission is concerned about time deadlines and NPS review, the most appropriate alternative is a hybrid that uses Route Option 1B in the southernmost portion of the route, in order to reduce impacts on watershed lands and avoid the impacts of an underground route along Trousdale Drive and El Camino Real. San Mateo prefers the Golf Course Drive transition station because it would reduce exposure to residents along Skyline Drive.

PG&E states that the feasibility of the hybrid routes and their environmental impacts are based on the feasibility of their constituent parts, but that construction of an additional transition structure would create additional impacts. PG&E points out that each of the hybrid routes would involve some overhead or underground construction in SFPUC watershed lands, so NPS objections would still apply.

## 5. NPS Concerns

NPS did not participate as a party in this proceeding. However, it made known its views on the proposed Jefferson-Martin project and its variations through letters, statements at the PHC, comments on the draft EIR, and statements at a Commission meeting. NPS states that conservation easements it holds for the SFPUC watershed lands provide it with discretionary authority to review and approve the Jefferson-Martin project to the extent the project would require an expansion to PG&E's existing right of way through the watershed. NPS explains that it would issue a written approval determination that would be based on a NEPA document prepared by the project proponent,

- 69 -

A.02-09-043 ALJ/CFT/tcg

but that PG&E has "refused to prepare" a NEPA document for the project.[24]
PG&E and CCSF disagree with NPS regarding applicability of the conservation
easements but are concerned that NPS efforts to exert jurisdiction could cause
significant delays in the project. The FEIR also disagrees with NPS regarding the
applicability of the conservation easements.

Separate from any authority arising from the conservation easements,
NPS would have approval rights over any modifications within Edgewood
County Park and Pulgas Ridge Open Space Preserve that convert land to non-
recreation purposes, due to grants received under the federal Land and Water
Conservation Fund. It appears that the Proposed Project would, Route Option
1B would not, and the PUA/MPUA may require NPS approval for this portion
of their route.

NPS states that the southern segment of the Jefferson-Martin project as
proposed by PG&E is incompatible with NPS's conservation easements and that
it would not concur with the project as proposed. NPS contends that the
Proposed Project's impact on the scenic, recreational, and biological resources of
the watershed would be substantial and permanent. NPS supports
undergrounding both the existing 60 kV line and the new 230 kV line along
Cañada Road and disagrees with the draft EIR's decision to eliminate this option

---

[24] In this proceeding, there was much finger-pointing regarding whose responsibility it
would be to initiate NPS review or otherwise resolve the issue of NPS jurisdiction.
PG&E asserts that it would have been CCSF's responsibility as owner of watershed
lands, whereas other participants and, evidently, NPS believe P&GE should have acted
in this regard.

A.02-09-043 ALJ/CFT/tcg

from full consideration.[25]  NPS initially stated that the underground Route Option 1B is the only southern alternative fully examined in the FEIR that is consistent with the easements and therefore acceptable to NPS.

The County of San Mateo and 280 Citizens argue that the possibility that project alternatives may require federal environmental review provides no legal or practical justification for concluding that such alternatives are infeasible or should not be considered by the Commission.  San Mateo asserts that the fact that NPS staff commented negatively on certain route alternatives does not dictate the results of any NEPA review or prevent NPS from ultimately approving one of those routes if its approval is required.  280 Citizens takes the position that a Jefferson-Martin project is not needed until at least 2012, which would provide more than enough time to comply with any federal regulations that may apply.  280 Citizens and San Mateo submit that the Commission should base its decision in this proceeding on the merits of a route, not whether NPS review would be required or whether the project could be constructed by the end of 2005 as PG&E requests.

The City of Burlingame states that the NPS claim places the Commission in a difficult position.  Since a determination regarding the applicability of NEPA is outside the Commission's jurisdiction, Burlingame suggests that the Commission make a reasoned assessment regarding the

---

[25] Because Route Option 1B would avoid the adverse impacts of the Proposed Project caused by overhead collocation with the existing 60 kV line, the FEIR concludes that Route Option 1B would fully meet the objectives of the Proposed Project without any change to the 60 kV line.  It concludes that requiring that the 60 kV line be undergrounded in conjunction with Route Option 1B would not be a legally permissible alternative under CEQA.

A.02-09-043 ALJ/CFT/tcg

potential that the NPS claim may render one or more alternatives a legal impossibility and the repercussions that the NPS claim may have on the project, including the amount of possible delay and the impact of such delay. With the view that any delay needed to resolve the NPS claim should not endanger PG&E's ability to provide reliable service, Burlingame concludes that the Commission should not reject any of the southern route alternatives because of concerns regarding the NPS claim.

In a June 4, 2004 letter and subsequent letters, the NPS states that it recognizes that changes to Route Option 1B would meet many of the local communities' concerns. The NPS suggests that a hybrid alternative traversing a limited portion of the watershed may be acceptable if there are adequate mitigation measures to compensate for the impacts to recreational and natural resources. The hybrid route it is willing to consider would use Route Option 1B in the southernmost segment, transition above-ground at the existing tower 11/70 near the west end of Trousdale Drive, and follow the existing 60 kV line from that point north to tower 14/93. The 230 kV line would exit the watershed lands at that point and would use the Glenview Drive transition tower alternative. The NPS states that it is discussing mitigation measures with PG&E and is optimistic that adequate mitigations can be identified for this alternative route. In a July 6, 2004 letter, the NPS identifies a list of mitigation measures that, in its view, "would be necessary to offset the impacts to the natural and recreational resource values of the Peninsula Watershed lands that would be affected by the Trousdale Drive/Glenview Drive hybrid route." The NPS asks that the Commission include these mitigation measures as required elements of the Jefferson-Martin project if this route is approved for the project.

The hybrid route that the NPS states it is willing to consider appears to be the one that we approve for the southern portion of the Jefferson-Martin project.

- 72 -

A.02-09-043 ALJ/CFT/tcg

However, as explained in August 3 and August 9, 2004 ALJ rulings, which we affirm in this regard, the NPS mitigation measures were not submitted in a manner that would allow their consideration in this proceeding. It would be inappropriate to accept NPS's ex parte letters submitted outside the Commission's formal proceeding process, as well as outside the CEQA process, into the record as suggested in the August 9, 2004 ALJ ruling. We do not approve the NPS mitigation measures or include them in the mitigation monitoring program. Nor do we include their costs in the cost cap adopted for the project. If the NPS imposes mitigation measures through a NEPA process subsequent to our issuance of the CPCN for the Jefferson-Martin project, we could consider such measures through a petition for modification of today's order or a PG&E application for an increase in the cost cap pursuant to Pub. Util. Code § 1005.5(b).

### B. Northern Alternatives

The DEIR had identified the Collocation Alternative as the environmentally superior northern segment. However, in considering comments, it was determined that neither the PG&E proposed route nor the Collocation Alternative showed a significant environmental benefit compared to the other. Therefore, the FEIR modifies this DEIR determination and instead identifies two northern route options as environmentally superior: the northern segment of PG&E's Proposed Project with Route Option 4B and the Collocation Alternative with Route Options A, D, E, and F. The FEIR finds that the two alternatives have comparable levels of environmental impacts, with the Proposed Project's northern segment having environmental impacts greater than those of the Collocation Alternative in several issue areas, less impacts in other issue

- 73 -

A.02-09-043 ALJ/CFT/tcg

areas, and comparable impacts in yet other issue areas.  No significant unmitigable (Class I) impacts are identified for either northern route alternative.

PG&E, South San Francisco, CBE-101, Golden Gate Produce Terminal, and Genentech support the Proposed Project's northern segment and oppose the Collocation Alternative.  Daly City opposes the Proposed Project in the northern segment and supports either the Collocation Alternative or an alternative route collocated with the existing 60 kV Jefferson-Martin line across San Bruno Mountain.

If Route Option 1B were chosen for the southern segment, it would connect with either the northern segment of the Proposed Project or the Collocation Alternative at the intersection of El Camino Real and San Bruno Avenue.  Mitigation Measure T-9a, which the FEIR suggests if needed to avoid conflict with a planned grade separation project at the corner of San Bruno Avenue and El Camino Real, would affect the route of both the Proposed Project and the Collocation Alternative.  Beginning at the intersection of San Bruno Avenue and El Camino Real, the route would go north on El Camino Real and then turn east into Sneath Lane.  It would rejoin the Proposed Project route by turning north into the BART right of way at Huntington Avenue.  To rejoin the Collocation Alternative, the route would continue east past the end of Sneath Lane, under the railroad tracks, into Tanforan Drive and to Shaw Dive, where it would join the Collocation Alternative as originally defined.

### 1. Proposed Project—Northern Segment

The northern segment of PG&E's Proposed Project would head east along San Bruno Avenue from the transition station, and would turn north into Huntington Avenue to the BART right of way.  From the BART right of way, it would turn east into the new Lawndale Boulevard then north into Hillside

- 74 -

A.02-09-043 ALJ/CFT/tcg

Boulevard, east into Hoffman Street, and north into Orange Street. From Orange Street, the route would turn east into East Market Street, which becomes Guadalupe Canyon Parkway and crosses San Bruno Mountain through the San Bruno Mountain State and County Park. From Guadalupe Canyon Parkway, the route would turn north on Bayshore Boulevard to the Martin substation.

The FEIR analyzes several route alternatives for portions of the northern segment of the Proposed Project. Three different underground routes could be used in conjunction with any of the four transition station alternatives (described in Section V.A.1): the proposed route down San Bruno Avenue, an alternative route down Sneath Lane, and a route continuing north on Skyline Boulevard to Westborough Boulevard. A variation of the Westborough Boulevard route, called the Junipero Serra alternative, would turn from Westborough Boulevard north into Junipero Serra Boulevard and east into Serramonte Boulevard. The Sneath Lane route and the Westborough Boulevard routes would require crossings of the San Andreas fault, and the Skyline Boulevard portion of the Westborough route is very close to the fault. The FEIR concludes that the use of San Bruno Avenue would be preferred to either Sneath Lane or Westborough Boulevard.

A Cherry Avenue/Sneath Lane alternative would avoid the proposed Huntington Avenue grade separation project by turning north from San Bruno Avenue into Cherry Avenue and then east into Sneath Lane. It would continue to the BART right of way where it would rejoin the Proposed Project. Mitigation Measure T-9a, which would route the line from San Bruno Avenue north along El Camino Real and east on Sneath Lane to the BART right of way, is a less extensive route change that would achieve the same objective.

A short East Market Street alternative, which PG&E calls Route Option 4B, would avoid the dense residential neighborhoods along Hoffman Street and

A.02-09-043 ALJ/CFT/tcg

Orange Street (Route Option 4A) of the Proposed Project by continuing north on Hillside (past Hoffman) and turning into East Market Street. Route Option 4B would rejoin the proposed route at Orange Street and East Market. The FEIR includes Route Option 4B rather than 4A in its environmentally superior alternative because it would reduce or avoid the construction impacts to residences along Route Option 4A. Route Option 4B would pass Pollicita Middle School and Colma Elementary School. Both Route Option 4A and 4B would pass Susan B. Anthony High School at a distance. The FEIR concludes that the wider streets in Route Option 4B would make it easier to mitigate short-term construction impacts compared to Route Option 4A and would also allow a degree of EMF mitigation by placement of the line across the street from the schools and/or by deeper burial of the line.

PG&E maintains that its Proposed Project in the northern segment is preferable to the Collocation Alternative because it would be constructed under paved streets, raises none of the technical feasibility issues associated with the Collocation Alternative, and would have no significant environmental impacts. In addition, PG&E asserts that it could be constructed on time and at less cost to ratepayers. PG&E supports the use of either Route Option 4A or 4B.

South San Francisco supports the northern segment of the Proposed Project instead of the Collocation Alternative, contending that the Proposed Project route would be less disruptive because it will be constructed for the most part along recently disturbed construction areas, would only minimally affect residences, and would raise little concern that toxic contamination would be encountered during construction. South San Francisco points to the FEIR's statement that, because the portion of the route following the BART right of way would be placed within the clean engineered fill over the BART tunnel, it is unlikely that any geologic or paleontologic issues would be encountered there

- 76 -

A.02-09-043 ALJ/CFT/tcg

except for seismically induced ground shaking. Because soils within the BART right of way were excavated and stabilized during BART construction, there is little, if any, risk of liquefaction along that portion of the route.

San Bruno opposes installation of the Proposed Project in San Bruno Avenue, arguing that San Bruno Avenue is a relatively narrow street that is already over-used by various utilities. It maintains that installation of the Jefferson-Martin line in San Bruno Avenue would interfere with the ability to relocate existing utility lines beneath the roadway when they need to be replaced.

Daly City opposes the northern segment of PG&E's Proposed Project because of its possible effect on Daly City schools. Route Option 4B, determined to be environmentally superior in the FEIR, would pass three Daly City schools. Daly City prefers Route Option 4A, which PG&E had incorporated into its Proposed Project at Daly City's request, but notes that it also passes a school playfield. In addition, the northern segment of PG&E's Proposed Project would pass John F. Kennedy Elementary School on Guadalupe Canyon Parkway, regardless of whether Route Option 4A or 4B is chosen.

PG&E takes issue with Daly City's arguments that the Proposed Project would have unacceptable impacts on residential neighborhoods and schools along its route. PG&E argues, as the FEIR found, there would be no significant impacts from construction of the project on schools or residences under either Route Option 4A or 4B.

## 2. Collocation Alternative

The Commission's environmental consultants developed and analyzed a Modified Underground Existing 230 kV Collocation Alternative, commonly referred to as the Collocation Alternative. This alternative would be located in

A.02-09-043 ALJ/CFT/tcg

primarily commercial and industrial areas. It would use approximately 1.1 miles of the route of an existing underground 230 kV transmission line in Bayshore Boulevard through the City of Brisbane, but would follow a new route segment through South San Francisco and adjacent cities to avoid several congested utility areas.

Either the Proposed Project route (at San Bruno Avenue and Huntington Avenue), Route Option 1B (at San Bruno Avenue and El Camino Real), or the Sneath Lane route alternative (boring under two railroad crossings into Tanforan Avenue to Shaw Drive) could connect to the Collocation Alternative. Mitigation Measure T-9a would connect in the same manner as the Sneath Lane route.

Starting at San Bruno Avenue and Huntington Avenue, the Collocation Alternative would follow San Bruno Avenue east and turn north into the overhead 115 kV line corridor just east of Seventh Avenue. It would then turn west into Seventh Avenue just south of I-380, continue north past where Seventh Avenue becomes Shaw Road, and then travel via a bored crossing of a tributary of Colma Creek and through a large Park'N Fly parking lot to turn into Produce Avenue. It would then turn east into Airport Boulevard, and then northeast into Gateway Boulevard. From the end of Gateway Boulevard, the route would pass through a vacant lot (the Chiltern site) and then follow the eastern edge of a Union Pacific railroad right of way past the Oyster Point development. It would cross a CCSF drainage structure using an existing emergency access road or, if needed, a bored crossing. It would turn west into Sierra Point Parkway and then use a bored crossing under the railroad tracks into Van Waters and Rodgers Road. It would then turn north into Bayshore Boulevard, continuing into the Martin substation.

A.02-09-043 ALJ/CFT/tcg

Six route options (Route Options A through F) were identified in the FEIR to reduce potential impacts to land uses and transportation, based on comments on the draft EIR. The FEIR recommends that Route Options A, D, E, and F be incorporated into the Collocation Alternative, but states no preference between the original Collocation Alternative route and Route Options B and C.[26] From south to north, these route options are as follow:

> Route Option A would avoid Produce Boulevard and the Park'N Fly lot with a bore from Shaw Road under Highway 101 and the Colma Creek tributary to Marco Way. It would continue along Marco Way, turn north into Airport Boulevard and rejoin the original route at Gateway Boulevard.

> Route Option E would avoid the vacant contaminated Chiltern Site by turning east on Oyster Point Boulevard then north into Veterans Boulevard, rejoining the original route at the Union Pacific right of way.

> Route Options B and C would reduce disturbance to the Sierra Point landfill cap. With Route Option B, the line would be installed in the parking lot just east of the railroad right of way. With Route Option C the line would go further east, following Shoreline Court north to Sierra Point Parkway.

> Route Option D would avoid the west side loading dock area of Van Waters and Rodgers Road, with the line installed instead on the east side of the commercial facilities along Van Waters and Rodgers Road and paralleling the railroad right of way.

---

[26] The FEIR states that, Route Option B or C could be selected to minimize disturbance of the landfill cap, based on discussions among PG&E, the City of South San Francisco, and landowners.

A.02-09-043 ALJ/CFT/tcg

Route Option F would avoid use of the entrance ramp to
Van Waters and Rodgers Road by continuing the line north
adjacent to the railroad tracks and then west into Bayshore
Boulevard.

For two blocks immediately north of San Bruno Avenue, the
Collocation Alternative would be located within PG&E's overhead transmission
corridor, which has residences on Seventh Avenue along its western side. With
either the Sneath Lane alternative or Mitigation Measure T-9a, the Collocation
Alternative would avoid this residential area. The remainder of the Collocation
Alternative route consists of industrial areas and large office and hotel
complexes. Within the office complexes, an existing day care center would be
within approximately 100 feet of the project and a planned day care center would
be within 50 feet.

Daly City strongly prefers the Collocation Alternative to the northern
segment of PG&E's Proposed Project. It notes that PG&E's EMF Transmission
Line Guidelines prioritize protection in eight descending categories, with
schools/daycare and residential as the highest two categories. Daly City
maintains that the northern segment logically should pass through Category 3
(commercial/ industrial) areas rather than by schools and residences.
Opponents of the Collocation Alternative argue that it presents several
significant technical challenges and regulatory obstacles that may render it
infeasible.

PG&E and the City of South San Francisco contest the FEIR's finding
that the Collocation Alternative is preferable to the northern segment of the
Preferred Project with respect to soil conditions. The Collocation Alternative
would require trenching through hazardous waste sites and a closed landfill,
later maintenance of the line in such locations, and potential liability for releases
of hazardous substances. These parties argue that the presence of debris in fill

- 80 -

A.02-09-043 ALJ/CFT/tcg

and bay muds affects the feasibility and cost of borings under Colma Creek Tributary and in other areas where boring is proposed. Water quality could be affected by an accidental release of drilling muds, which the FEIR states commonly occurs on bored or drilled water crossings. South San Francisco points out that areas under the water table would require dewatering during construction. The parties also point out that 60% of the Collocation Alternative route lies in an area with either a very high or high liquefaction potential during earthquakes, leading to risk of lateral spreading and associated transmission line failure.

PG&E and South San Francisco raise concerns regarding access during construction to hotels and several businesses along the Collocation Alternative route. PG&E maintains that the restriction of access may be so severe that the local fire department may order some businesses to be vacated during construction. Although PG&E states that it would contest any liability, it is concerned that it may face potential business interruption claims from businesses that potentially may lose access to their facilities as a result of construction activities.

South San Francisco takes issue with the finding in the FEIR that the Collocation Alternative is preferable to the northern segment of the Proposed Project regarding air quality because construction would be further from receptors. South San Francisco asserts that this finding ignores the childcare centers, the hotels and their guests, and the businesses and their employees located along the Collocation Alternative. It argues that the FEIR contains no discussion of the potential air quality impacts of trenching and excavating in contaminated soils.

South San Francisco also takes issue with the finding in the FEIR that the Collocation Alternative is preferable to the northern segment of the Proposed

- 81 -

A.02-09-043  ALJ/CFT/tcg

Project regarding transportation and traffic because the Collocation Alternative is 4.8 miles long instead of the Proposed Project's 7.8 miles. South San Francisco argues that the FEIR's finding is based on an erroneous assumption that because the route is shorter, the impacts are less. South San Francisco maintains that lane closures on Guadalupe Canyon Parkway would not have the same disruptive impact as a closure on Gateway Boulevard or Bayshore Boulevard.

South San Francisco contests the effectiveness of the route options identified in the FEIR to mitigate negative impacts of the Collocation Alternative. Route Option A's bored crossing beneath Highway 101 and the Colma Creek tributary could result in the accidental release of drilling muds. Options B and C would not avoid disturbance to the Sierra Point landfill. Route Option D may not be effective in avoiding impact to the loading docks along Van Waters and Rodgers Road, since the bore pit may be located in the parking lot and loading area. South San Francisco maintains that the FEIR's analysis of Route Option E fails to identify contaminated brownfields along Veterans Boulevard and contains no traffic analysis of the effect of moving the route to Veterans. While within an existing road that contains other utilities, Route Option E would still run through a portion of the HMS property and would compromise the clean soil cap, which would trigger the jurisdiction of the Regional Water Quality Control Board. South San Francisco argues in addition that Route Option E would interfere with proposed development of the HMS property and would have a negative effect on the hotels and businesses located on Veterans Boulevard. South San Francisco concludes that none of the route options would eliminate disturbance of the landfill cover at Sierra Point Landfill, the capped Homart toxic site, or soil surrounding at least three leaking storage tanks along the route.

A.02-09-043 ALJ/CFT/tcg

### 3. Undergrounding of Existing Lines into Martin Substation

Throughout this proceeding, beginning in comments during the EIR scoping process and reiterated in its brief, Daly City asks the Commission to approve the undergrounding of existing overhead transmission lines into the Martin substation as part of the Jefferson-Martin project. In this alternative, the route for the Proposed Project would be modified to turn north off Guadalupe Canyon Parkway and follow the existing 60 kV corridor for approximately 0.4 mile down San Bruno Mountain, paralleling Linda Vista Drive into the Martin substation. The existing 60 kV power lines along this route would be undergrounded at the same time that the new 230 kV line is constructed.

The FEIR states that this alternative would not be within CEQA's "reasonable range of alternatives" and therefore is not a feasible alternative that can be evaluated in the EIR.[27] As a result, the alternative was eliminated from full analysis in the EIR. In addition, the FEIR describes conflicts with the current Habitat Conservation Plan for San Bruno Mountain which, it concludes, render the alternative regulatorily infeasible.

Daly City asserts that the FEIR did not study the cumulative impacts of the proposed Jefferson-Martin project and other power projects on Daly City's Bayshore neighborhood, which contains the Martin substation. Daly City

---

[27] The FEIR also explains that CEQA specifies that in order for a mitigation measure (and by inference, an alternative) to be feasible, it must meet relevant constitutional standards (CEQA Guidelines § 15124.4(a)(4)). Such standards include a requirement that there be an essential connection or relationship between an alternative and a legitimate lead agency interest dealing with the Proposed Project. The FEIR finds that such a connection is lacking in this instance.

- 83 -

A.02-09-043 ALJ/CFT/tcg

describes that power lines come up the Peninsula from both the US-101 and I-280 corridors to the Martin substation. The lines cross Guadalupe Canyon Parkway and are proximate to Midway Village (the County of San Mateo's largest housing authority complex), the area's largest day care center, two public schools, and residences.

Daly City describes its Bayshore redevelopment project and appeals to the Commission to prevent its current progress from being compromised. Daly City states that undergrounding the existing overhead transmission lines would be more cost-effective now as part of the Jefferson-Martin project rather than later. It contests the legal feasibility analysis in the FEIR and maintains that the Commission retains authority and discretion to mitigate localized or long term disparate impacts on any affected community, within the Commission's "community values" consideration of § 1002 and the State's Environmental Justice Policy.

PG&E concurs with the FEIR's legal analysis and asserts further that using the Jefferson-Martin project as a vehicle for Daly City's redevelopment plans would inappropriately place the financial burden of the City's redevelopment on all California ratepayers.

We agree with the FEIR's assessment that undergrounding the existing lines into Martin substation does not fall within a "reasonable range of alternatives" which would allow it to be evaluated in the Jefferson-Martin EIR. Section 15126.6(f) of the CEQA Guidelines states, "The alternatives shall be limited to ones that would avoid or substantially lessen any of the significant effects of the project." The "project" along Guadalupe Canyon Parkway includes only the installation of a new 230 kV line and, thus, the effects of the project are limited to the impacts associated with the installation of this 230 kV line. Undergrounding of the existing 60 kV lines into Martin substation would not

A.02-09-043 ALJ/CFT/tcg

avoid or lessen the impacts of the 230 kV line. For this reason, we find that the EIR properly excluded Daly City's proposal from full evaluation.

Contrary to Daly City's assertion, the EIR considers cumulative impacts of the proposed project and other projects. CEQA provides that the cumulative impact from several projects is the change in the environment which results from the incremental impact of the project when added to other closely-related past, present, and reasonably foreseeable probable future projects. (CEQA Guidelines § 15355(b).) The FEIR considers cumulative impacts in terms of both approved and future projects and also the impact of the Proposed Project and its alternatives on the existing environment. In doing so, the EIR captures the cumulative impacts of "closely related past projects," as opposed to other past projects which now constitute part of the pre-existing baseline.

Because the approved route for the northern segment will be completely underground in the Daly City area, there will be no cumulative visual impact with existing lines coming into the Martin substation. The short-term construction impacts will be minimal for residences along Linda Vista Drive closest to Guadalupe Canyon Parkway, since they will be over 500 feet away from the new underground line.

### 4. Other Northern Alternatives

Daly City requests that an alternative be considered in which a portion of the northern segment of the Proposed Project would be rerouted and collocated with the existing Jefferson-Martin 60 kV line already crossing San Bruno Mountain to the Martin substation. Daly City explains that it requests consideration of this alternative because of the opposition to the Collocation Alternative that has arisen. It views this proposal as a compromise routing that would avoid both the schools and residences in Daly City passed by the

- 85 -

A.02-09-043  ALJ/CFT/tcg

Proposed Project and the contaminated areas in South San Francisco affected by
the Collocation Alternative.  Daly City suggested this alternative in its joinder to
a motion requesting that the FEIR be modified in this regard and recirculated for
comment.  It reiterates this request in its briefs.

Daly City recognizes that this routing option was not considered in the
EIR but states that this alternative would share in most respects the same general
environmental characteristics and serpentine habitat as the southern segment of
the Proposed Project within the SFPUC watershed.  Since collocation with the
existing 60 kV line across San Bruno Mountain appears to be shorter in distance
than routing along Guadalupe Canyon Parkway, Daly City suggests that this
alternative may be less expensive that this segment of the Proposed Project.
Daly City believes that permitting across the San Bruno Mountain may take no
more than a few months, noting that San Bruno Mountain has been studied
comprehensively and is not subject to federal view corridor or other federal
easements.

On June 8, 2004, the Assigned Commissioner issued a ruling directing
that, pursuant to Pub. Util. Code § 1002, our environmental consultant undertake
an analysis of the San Bruno Mountain alternative and also an alternative route
segment that would use El Camino Real between San Bruno Avenue and
Lawndale Boulevard/McClellan instead of the BART right of way.  The resulting
analysis was filed on July 6, 2004.  As explained therein, the filed route analysis is
not a CEQA document but rather an informational document for our
consideration in determining whether a Supplemental FEIR should be prepared
regarding these alternative route segments.

The consultant reports that the analyzed route segments would have
greater environmental impacts than comparable portions of the route we
approve today.  The route analysis identifies that the San Bruno Mountain

- 86 -

A.02-09-043 ALJ/CFT/tcg

alternative would have significant and unmitigable biological, visual, and recreation impacts and would require modification to the San Bruno Mountain Habitat Conservation Plan, an undertaking that would take several years. The analysis identifies that the El Camino Real route segment would have substantially greater, though not unmitigable, environmental impacts compared to use of the BART right of way and also has feasibility concerns because of existing underground utilities in El Camino Real.

The route analysis addresses EMF exposures due to the two alternatives. The San Bruno Mountain route segment would pass residences underground along Hillside Boulevard and overhead near several streets in Daly City and Brisbane. Hillside Boulevard is 70 feet wide; if the line were placed on the northern side of Hillside adjacent to San Bruno Mountain County and State Park, EMF exposure would be minimal for the residences along the route. The consultant was not able to obtain sufficient information to calculate field levels for the overhead portion of the San Bruno Mountain alternative. The El Camino Real underground route segment would pass residences and South San Francisco High School. Because El Camino Real is 80 feet wide, EMF exposure in adjacent buildings may be significantly lower, depending on line placement, than along the BART right of way.

We do not require that a Supplemental FEIR be prepared for the San Bruno Mountain and El Camino Real route segments. It appears that, even if the environmental concerns could be overcome, the San Bruno Mountain alternative could not be approved and constructed before the Jefferson-Martin project is needed. Because we adopt specific EMF mitigation measures for the BART right of way and because of construction impacts and feasibility concerns, we see no need to consider the El Camino Real alternative further. On August 11, 2004, a newly-formed coalition of environmental groups filed a petition to

A.02-09-043 ALJ/CFT/tcg

intervene in this proceeding. The San Bruno Mountain Coalition states that it is primarily concerned with the San Bruno Mountain alternative and would represent the voice of the environmental community if further, in-depth study of that alternative is undertaken. Because a Supplemental FEIR will not be prepared for the San Bruno Mountain alternative, we do not grant the San Bruno Mountain Coalition's petition to intervene.

## C. Other Project Alternatives

280 Citizens maintains that the FEIR fails to give sufficient consideration to the "cross-Bay" alternative presented in the San Francisco Long-Term Electric Transmission Planning Technical Study. 280 Citizens represents that the FEIR did not fully evaluate this alternative because it would not meet two of PG&E's project objectives: (1) connection of the Jefferson and Martin substations and (2) PG&E's specified on-line date. 280 Citizens asserts that PG&E's framing of the "objectives" of the Jefferson-Martin project should not limit the evaluation of potentially superior alternatives that would allow PG&E to meet future load in the Project Area. It argues in particular that, consistent with its view that the Jefferson-Martin project is not needed within the time frame identified by PG&E, there is no reason to eliminate this alternative on the grounds that it could not be constructed in time to meet future demand.

CEQA Guidelines § 15126 (a) requires the EIR to describe a reasonable range of alternatives to the project or location that would feasibly attain most of the basic project objectives of the project. CEQA Guidelines § 15364 further provides that the alternatives must be capable of being accomplished in a successful manner within a reasonable period of time taking into account economic, environmental, legal, social, and technological factors.

A.02-09-043 ALJ/CFT/tcg

The FEIR did not eliminate the Moraga-Potrero Alternative (across the San Francisco Bay) from detailed analysis solely on the basis of concerns that it could not attain the applicant's objective that construction occur within the projected time-frame. 280 Citizens fails to recognize the significant feasibility concerns raised by this alternative. Separate from timing concerns, each of the Bay crossing options has regulatory and/or technical feasibility problems. A submarine crossing would be unlikely to be permitted by the BCDC due to the existence of land-based alternatives. The Bay Bridge option would require that Caltrans grant an exception to its longitudinal encroachment policy, which is very unlikely, and would also be in conflict with the Bay Bridge construction project. The BART tunnel Bay-crossing option was found to be infeasible due to BART safety concerns. Thus, we find 280 Citizens' criticism to be without merit.

## VI. EMF Issues

During the proceeding, there was a great deal of public interest and concern regarding potential health effects from EMF exposure due to power lines.[28] Several intervenors along the proposed Jefferson-Martin route ask that the Commission choose a route that reduces or eliminates the risks associated with EMF exposure, particularly to high priority groups including schools, day care centers, and residences.

---

[28] Electric fields are created whenever power lines are energized, whereas magnetic fields are created when current flows through the lines. Both electric and magnetic fields attenuate rapidly with distance from the source. Electric fields are effectively shielded by materials such as trees or buildings, whereas magnetic fields are not easily shielded by objects or materials. Therefore, concerns regarding potential power line EMF health effects arise primarily due to exposure to magnetic fields.

- 89 -

A.02-09-043 ALJ/CFT/tcg

The FEIR provided extensive information regarding EMFs. However, it did not consider EMF exposure in its determination of the environmentally superior routes on the basis that there is no agreement among scientists that EMF creates a potential health risk and there are no defined or adopted CEQA standards for defining health risk from EMF. As noted in D.90-09-059, § 1002 provides us with responsibility independent of CEQA to include environmental influences and community values in our consideration of a request for a CPCN. The intervening parties have made clear that the potential for health effects due to EMF from this project is of grave concern to the affected communities. Pursuant to § 1002, we consider EMF issues as we determine which project alternative should be authorized.

In 1991, the Commission initiated an investigation, I.91-01-012, into EMFs associated with electric power facilities. In D.93-11-013 in that proceeding, we found that, while EMF studies available at that time did not conclude that an EMF health hazard exists, it was appropriate to adopt several EMF policies and programs because of public concern and scientific uncertainty. We required that utilities undertake no-cost EMF mitigation measures and that they implement low-cost mitigation measures to the extent approved through a project's certification process.[29] We defined "low-cost" to be in the range of 4% of the total project cost but specified that this 4% benchmark is not an absolute cap. We found that, to be implemented, a mitigation measure should achieve some noticeable reduction in EMF but declined to adopt a specific goal for EMF

---

[29] The Commission's no-cost and low-cost EMF mitigation requirements were incorporated into G.O. 131-D.

A.02-09-043 ALJ/CFT/tcg

reduction.  We instructed that workshops be held and that the utilities develop EMF design guidelines for new transmission facilities.  We adopted several EMF measurement, education, and research programs and chose the California Department of Health Services (DHS) to manage the education and research programs.

### A. Scientific Research Regarding EMF

The FEIR and the parties in this proceeding reported the results of a number of scientific studies related to EMF.  Intervenors along possible Jefferson-Martin routes cite numerous scientific studies that, in their view, provide compelling reason for concern about the potential health risks associated with EMFs from power lines.  They maintain that numerous studies have demonstrated an association between EMFs and serious diseases, even if causal links have not been established.  San Mateo asserts that anxiety and lack of certainty about the safety of EMF exposure, by themselves, create a public health issue, citing potential stress-related health effects.  These intervenors recommend that, in light of the studies and continued uncertainty, the Commission choose a route alternative that reduces or eliminates the risks associated with EMF exposure.  280 Citizens asks that the Commission adopt a standard that transmission-related EMF exposure from the combined effect of the existing 60 kV and new 230 kV lines should not exceed 1 mG at residential property boundaries.  It asks that the Commission route the southern segment away from residential areas and schools where feasible and, where that is not feasible, require that the lines be undergrounded in a manner that achieves this standard.

PG&E responds that there is no scientific basis that EMF exposure causes adverse health effects.  Its expert witness testified that, despite decades of scientific inquiry, there remains insufficient scientific evidence to conclude that

A.02-09-043 ALJ/CFT/tcg

EMF causes any adverse health effects. PG&E asserts that the state of scientific knowledge remains where it was when the Commission adopted the precautionary approach of requiring no-cost and low-cost mitigation but declined to adopt a numerical limit. PG&E maintains that there is still no scientific basis to set any health-based EMF standard and concludes that there is no reason to depart from the Commission's 1993 no-cost, low-cost EMF reduction policy. CARE agrees with PG&E that EMF is not a serious consideration that would affect the balance of issues in this case.

The state of scientific knowledge has advanced in the period since we issued D.93-11-013. While causation has not been proved definitively, several studies in the intervening years have found correlations that we cannot responsibly ignore. In assessing the numerous scientific EMF studies, we find DHS's comprehensive review of existing EMF studies undertaken at the Commission's direction in I.91-01-012 to be of particular value. The DHS study reviewed several of the other scientific studies cited in this proceeding and thus took those studies' findings into account in its conclusions. Three DHS staff scientists undertook the evaluation and the DHS final report, published in 2002, identified their individual professional judgments regarding EMF risks. Their conclusions include the following:

- All three of the DHS scientists were inclined to believe that EMF exposure can cause some degree of increased risk of childhood leukemia, adult brain cancer, Lou Gehrig's Disease, and miscarriage.

- One scientist was "prone to believe" and two were "close to the dividing line between believing or not believing" that EMFs cause some degree of increased risk for adult leukemia.

- All three scientists had judgments that were "close to the dividing line between believing and not believing" that EMFs cause some degree of increased risk of suicide.

A.02-09-043  ALJ/CFT/tcg

- They were all inclined to believe that EMF exposure does not cause an increased risk of breast cancer, heart disease, Alzheimer's Disease, depression, or symptoms attributed by some to a sensitivity to EMFs.
- They all strongly believed that EMFs do not increase the risk of birth defects or low birth weight, and that EMFs are not universal carcinogens since a number of cancer types are not associated with EMF exposure.

While there is no definitive proof at this point, we must proceed with the knowledge that EMF exposure may increase the risk of certain health effects. In routing the Jefferson-Martin project and considering PG&E's EMF management plan for the project, it is entirely appropriate and prudent for us to consider the EMF levels that would be created by the various possible routings and configurations of the project. At the same time, we find that the state of scientific knowledge has not advanced to the point to support adoption of the numerical EMF exposure standard that 280 Citizens proposes.

### B. EMF along Routes under Consideration

Several intervenors along the proposed Jefferson-Martin routes ask that, if a Jefferson-Martin project is authorized, the Commission choose a route that reduces or eliminates the risks associated with EMF exposure.

The overhead southern segment of PG&E's Proposed Project would be located in watershed lands and would pass next to residential developments in the unincorporated San Mateo County area known as The Highlands, the Town of Hillsborough, and the City of Burlingame. It would pass the Hillcrest Juvenile Detention Home in San Mateo (over 125 feet east of the alignment) and Nueva School in the Town of Hillsborough on the opposite side of I-280 from the route.

The underground southern alternative Route Option 1B would be located partly in watershed lands but would traverse residential areas along Skyline Boulevard, Trousdale Drive and El Camino Real. It would pass Franklin

- 93 -

A.02-09-043 ALJ/CFT/tcg

Elementary School, set back about 75 feet from Trousdale Drive, and Mills-Peninsula Hospital, with buildings set back about 275 feet from Trousdale Drive.

The majority of the underground northern segment of the Proposed Project would pass through commercial areas. However, there are several residential areas along this portion of the Proposed Project, including along San Bruno Avenue, Huntington Avenue, the BART right of way, Lawndale Drive, Hillside Boulevard, Hoffman Street, and Orange Street. Route Option 4B would avoid the residential areas on Hoffman and Orange, but would pass other residences on Hillside Boulevard and East Market Street. The underground segment would pass Kaiser Permanente Medical Center and also several schools:

- Herman Tot Lot day care center (San Bruno)
- South San Francisco High School (South San Francisco, with school buildings set back 750 feet from the alignment)
- Los Cerritos Elementary School (South San Francisco)
- Boys and Girls Club (South San Francisco, 11 feet from the line)
- El Camino High School (South San Francisco, with school buildings 50 feet from the alignment)
- Susan B. Anthony High School (Route Options 4A and 4B, Daly City, with school buildings over 100 feet from the alignment)
- Pollicita Middle School (Route Option 4B, Daly City, some buildings near the sidewalk)
- Colma Elementary School (Route Option 4B, Daly City, some buildings near the sidewalk)
- John F. Kennedy Elementary School (Daly City, with a school building 40 feet from the alignment (Ex. 13, Att. 205 at E-20))

The Collocation Alternative would pass a small number of residences on San Bruno Avenue and would be near residences along a short segment on Seventh Street. If either the Sneath Lane alternative or Mitigation Measure T-9a is implemented to avoid the grade separation project at the intersection of San

- 94 -

A.02-09-043  ALJ/CFT/tcg

Bruno Avenue and Huntington Avenue, these residential areas would be avoided but residences along Tanforan Avenue would be passed.

PG&E calculated the expected 2006 magnetic fields along the portions of the Proposed Project and AUA routes that would pass through residential and commercial areas.  PG&E performed the calculations for four load scenarios:  low loading (load is less 5% of the year), medium loading (load is less 50% of the year), high loading (load is less 95% of the year), and normal summer peak (highest expected loading of the year).  In PG&E's view, the "medium" loading levels are the most apt for evaluation purposes.  We agree, because magnetic field levels at medium loading conditions are the best indication in the record of what year-round EMF exposure levels may be.

PG&E reported magnetic field levels for buildings along the routes, with building locations determined from aerial photographs.  PG&E cautioned that many buildings may be further from the transmission line than it assumed, due to roof overhangs or other factors that cause inaccuracies in interpreting the aerial photos.

280 Citizens submitted an independent evaluation of magnetic field levels in the southern segment for several scenarios, including the existing overhead 60 kV circuits alone, PG&E's proposed route with a 60 kV circuit and the new 230 kV circuit collocated overhead, PG&E's Route Option 1B for the 230 kV circuit and continued operation of the existing 60 kV line, and 280 Citizens' MPUA alternative with the 230 kV and 60 kV lines collocated underground.

Magnetic field exposures from the Jefferson-Martin project would depend on the distance from the line.  For overhead configurations, magnetic field exposures depend on tower placement and height in addition to horizontal distance from the line, e.g., field exposure would be lower near a tower because the line is higher in the air than it is near the mid-span.

A.02-09-043 ALJ/CFT/tcg

PG&E provided two sets of magnetic field exposure data along the southern overhead portion of the proposed project: (1) for the existing double-circuit 60 kV line operating by itself and (2) if the Proposed Project is built, i.e., for rebuilt towers carrying the new 230 kV circuit and a single 60 kV circuit. PG&E provided only normal summer peak loading data for the existing 60 kV line, but provided data for all four loading scenarios for the Proposed Project. Thus, we can compare peak magnetic field estimates, but not exposures during medium loading conditions, before and after the project is built.

Along the above-ground segment of the Proposed Project, the closest residential building is approximately 25 feet from the existing 60 kV line; 42 residential buildings are within 100 feet of the line. PG&E reports that during summer peak loading conditions, magnetic field exposure levels due to the existing line would be less than 1 mG for most residences along the route, between 1 mG and 3 mG along Lexington Avenue, and as high as 5.3 mG for homes along Skyline Boulevard. For the combined 60 kV and 230 kV circuits, the magnetic field levels during summer peak conditions would range up to 6.5 mG (4.5 mG during medium loading conditions) along Lexington Avenue and as high as 22.5 mG (15.5 mG during medium loading conditions) further north until the line crosses to the west of I-280 at mile point 10.7.

The PUA would reduce magnetic field exposures significantly compared to the Proposed Project, because it would underground the combined 230 kV and 60 kV lines near some residences and re-route the rebuilt line away from other residences. The MPUA would reduce magnetic field exposure further, because it would re-route the underground portion of the PUA to the west such that peak magnetic field levels at property boundaries would not exceed 1 mG.

PG&E provided magnetic field estimates for the underground portion of the Proposed Project and for Route Option 1B. Assuming a uniform duct bank

- 96 -

A.02-09-043 ALJ/CFT/tcg

depth, magnetic field levels along an underground installation would depend solely on distance from the line. The following table, compiled from PG&E's magnetic field studies,[30] shows the types and locations of buildings that are at specified distances from the underground line and the associated magnetic field levels under medium loading conditions. The BART right of way, Hoffman Street, Orange Street, San Bruno Avenue, and Hillside Boulevard are on the northern underground segment of the Proposed Project. Skyline Boulevard, Trousdale Avenue, and El Camino Real are on Route Option 1B, the underground southern alternative. This table does not include information for locations more than 50 feet from the underground line, for which magnetic field exposure would be less than 1.3 mG under medium loading conditions.

---

[30] Some information regarding buildings along the BART right of way was obtained from Exhibit 172.

A.02-09-043  ALJ/CFT/tcg

Table 3

Magnetic Field Exposure
Route Option 1B and Underground Northern Portion of Proposed Project
Medium Loading Conditions

| Distance from line (feet) | Magnetic field (mG) | Building type and location |
|---|---|---|
| 9 | 23.3 | Commercial—BART right of way |
| 10 | 20.7 | Commercial--BART |
| 11 | 18.4 | Boys & Girls Club--BART |
| 12 | 16.4 | Commercial--BART |
| 18 | 8.8 | Multi-family residential—BART* |
| 20 | 7.4 | Residential--Hoffman |
| 21 | 6.8 | Residential--Hoffman |
| 22 | 6.3 | Commercial--El Camino Real, BART |
| 25 | 5.0 | Residential--Hoffman and Orange, Commercial--BART |
| 26 | 4.6 | Commercial--Hillside, San Bruno, El Camino Real and Trousdale |
| 27 | 4.3 | Commercial--San Bruno |
| 28 | 4.0 | Commercial--San Bruno |
| 29 | 3.8 | Residential—Orange, El Camino Real |
| 30 | 3.6 | Residential—Hoffman, Orange, Trousdale Commercial—Hoffman, San Bruno, El Camino Real, Trousdale |
| 31 | 3.3 | Residential—Trousdale, Skyline |
| 32 | 3.2 | Residential—Trousdale, Skyline |
| 33 | 3.0 | Residential—Trousdale Commercial—BART, Skyline |
| 34 | 2.8 | Residential and commercial--Trousdale |
| 35 | 2.7 | Commercial—Trousdale, Skyline |
| 36 | 2.5 | various |
| 39 | 2.2 | various |
| 40 | 2.1 | various |
| 45 | 1.6 | various |
| 50 | 1.3 | various |

*PG&E reports living units are on the second floor, with magnetic fields of 5.3 mG.

A.02-09-043 ALJ/CFT/tcg

Magnetic field exposure for buildings along Route Option 4B would probably be less than along Hoffman and Orange Streets because Hillside Boulevard and East Market Street are wider and thus may allow the line to be placed further from the sidewalks. The record does not contain magnetic field calculations for the Collocation Alternative.

This recitation of the EMF calculations is useful to identify what portions of the route alternatives would create the highest exposures to magnetic fields. We recognize intervenors' concerns that this data does not reflect exposure levels in yards or other outdoor locations that may be closer to the line. However, the information is useful as an indication of exposures where residents would spend their sleeping and much of their waking hours while at home.

The highest reported magnetic fields would occur along the BART right of way in the northern segment of PG&E's Proposed Project. A few residences along the southern overhead segment of the Proposed Project exhibit exposure levels approaching those reported along portions of the BART right of way. Other relatively high exposure levels would occur on Hoffman and Orange. The highest calculated residential exposure on the southern underground Route Option 1B is less than one quarter of the highest calculated residential exposure on the northern route.

We take this information regarding magnetic field levels into account in adopting EMF mitigation measures in Section VI.C and as we weigh a variety of environmental and other factors in assessing the routes in Section VII.

PG&E maintains that magnetic field levels from the Proposed Project and the AUA are low and within the range of magnetic fields commonly encountered in everyday life. PG&E reported a study of everyday levels of magnetic field exposure, which indicated a 24-hour average to be 1.25 mG. Of the people studied, 43.6% had 24-hour average exposures of 1 mG or more, 14.3% had a

A.02-09-043  ALJ/CFT/tcg

24-hour average exposure over 2 mG, and 6.35% had an average exposure over 3 mG. PG&E also reported on magnetic field levels experienced locally, including in Burlingame, obtained by a PG&E witness walking around various streets, visiting commercial and governmental buildings, and riding mass transit. The PG&E witness found an average magnetic field of 11.4 mG during the two- or three-hour walk.

The FEIR describes research indicating that ambient magnetic fields in most residences and other buildings average approximately 1 mG. The FEIR also reports that typical magnetic fields emitted by appliances include the following (at a distance of 12 inches):

| Appliance | Magnetic Field (mG) |
|---|---|
| Electric range | 3 to 30 |
| Refrigerator | 0.3 to 3 |
| Clothes washer | 2 to 30 |
| Coffee maker | 0.8 to 1 |
| Vacuum cleaner | 20 to 200 |
| Color TV | 9 to 20 |
| Flourescent fixture | 2 to 40 |

In evaluating this data, we note that the level of EMF exposure attenuates with distance much more rapidly from appliances than from power lines, and that many appliances are operated only intermittently. We find the evidence elicited by the tour of Burlingame to be of limited usefulness since it was clear that the witness visited areas known to have relatively high EMF levels, e.g., check-out areas of the local library. It is clear that, for portions of the routes under consideration, residents would be subjected to cumulative magnetic field exposures far in excess of what they would be likely to receive from other sources.

A.02-09-043  ALJ/CFT/tcg

### C. EMF Management Plan for the Jefferson-Martin Project

PG&E implemented EMF design guidelines in 1994 following workshops as required by D.93-11-013. PG&E's EMF design guidelines describe the no-cost and low-cost measures that it undertakes as follows:

> No cost measures are those steps taken in the design stage, including changes in standard practices, which will not increase the project cost but will reduce the magnetic field strength.
>
> Low cost measures are those steps that will cost about 4% or less of the total project cost and will reduce the magnetic field strength in an area (e.g., by a school, near residences, etc.) by approximately 15% or more at the edge of the right of way. The total project cost is defined as all costs associated with the siting, design and construction of those specific new or upgraded transmission, substation, or distribution project facilities. The total project cost figure used, as a basis for low cost determination, is only that particular component of the project being evaluated for magnetic field reduction steps. As an example, when a substation and a transmission line are being designed, 4% of the total cost for the transmission line will be considered for magnetic field reduction from the line and 4% of the total substation cost will be considered for reduction from the substation. …

PG&E's EMF design guidelines establish a prioritization of areas for low-cost EMF reduction, based on its perception of public concern. Beginning with the groups of highest priority, PG&E's prioritization of areas for application of EMF mitigation measures is as follows:

1. Schools, licensed day care
2. Residential
3. Commercial/industrial (includes hospitals)
4. Recreational
5. Agricultural, rural
6. Undeveloped land, zoned for residential
7. Undeveloped land, zoned for commercial/industrial

A.02-09-043 ALJ/CFT/tcg

8. Unpopulated, forested, government owned land

The guidelines state that unless all areas within a priority group can receive equivalent treatment, no single area in that priority group will receive low-cost measures, with "equivalent" defined as the application of some type of low-cost measure to all areas in a priority group.

PG&E prepared a preliminary EMF management plan for the Jefferson-Martin project. In this plan, PG&E proposes arranging the phases of the overhead portion of the line to reduce magnetic field levels as a no-cost mitigation measure. That document states that there are no feasible no-cost mitigation measures for the underground portion of the project. PG&E reports that, with no-cost design measures, the base case magnetic field level during normal summer peak loading conditions would be 30.6 mG at one edge of the 100-foot right of way for the overhead line (the 230 kV circuit and one 60 kV circuit) and 15.0 mG at each edge of the 30-foot right of way for the underground portion of the 230 kV line.

PG&E's preliminary EMF management plan established 4% EMF budget benchmarks separately for each component of the Proposed Project. As low-cost mitigation near schools, the plan proposes to raise the height of towers by 20 feet or to lower the depth of underground conductors by 5 feet. This would lower the peak loading magnetic field at the edge of the right of way to 17.3 mG for the overhead rebuilt line (a 43.5% reduction) and to 11 mG for the underground 230 kV line (a 26.7% reduction). The preliminary plan does not propose to undertake any EMF mitigation measures in residential areas, however, since the total cost of these measures for all residential areas, in combination with school mitigation measures, would exceed 4% of the estimated cost of the transmission line portion of the project.

A.02-09-043 ALJ/CFT/tcg

The County of San Mateo is concerned that, under PG&E's EMF design guidelines and proposed mitigation plan for Jefferson-Martin, EMF mitigation would be limited and would reduce EMF in only a few areas. San Mateo points to PG&E's planned 4% limit and its policy to not provide low-cost mitigation to a priority group of customers unless all areas within the priority group can receive equal treatment.

During the evidentiary hearing, the ALJ questioned PG&E about possible changes to its EMF management plan for Jefferson-Martin and PG&E provided a written response (Exhibit 164). PG&E states first that, rather than creating separate 4% benchmarks for the transmission line and substation portions of the Jefferson-Martin project, it is willing to have a single EMF mitigation budget based on the total estimated costs of the entire project.

Second, PG&E responded to ALJ inquiries about PG&E's policy that, if it cannot provide low-cost EMF mitigation to all customers within a priority class and stay within its EMF mitigation budget, PG&E would not provide low-cost EMF mitigation to any customer within the class. PG&E states that it has concerns about any mitigation measure that does not require equal treatment within a priority class and asks that, if such an approach is adopted, the Commission provide clear direction on how to allocate the funds among land uses within the same priority class.

With that caveat, PG&E describes in Exhibit 164 ways in which EMF mitigation could be focused within a priority class. PG&E reports that an option applicable to a project with both overhead and underground segments would be to favor EMF mitigation for overhead lines instead of underground lines, since EMF levels at the edge of the right of way tend to be higher for overhead lines than for underground lines.

- 103 -

A.02-09-043 ALJ/CFT/tcg

PG&E also describes two options for targeted EMF mitigation applicable to underground lines. One option would be to lower the depth of the trench along all portions of the route adjacent to residential areas by an equal amount, with the depth determined by the EMF mitigation budget. A second option would be to provide mitigation based upon distance from the underground cable. For that option, after final design work is complete, PG&E could measure the distance from the planned line location to the nearest residential living unit (for example, a house rather than a garage or shed) on a block, and compare that to other blocks along the route. For blocks with residences closest to the line, the nominal depth of the trench would be lowered to achieve an estimated 15% reduction in magnetic field. This process would continue until the EMF mitigation budget is depleted. PG&E is concerned that this approach would require that line placement for the entire line be determined before any construction commences, contrary to current practice in which the actual location of the line is usually determined shortly before each stretch of the line is installed.

We require several changes to PG&E's preliminary EMF management plan for the Jefferson-Martin project in order to make more effective use of EMF mitigation funds. First, we adopt a single 4% EMF mitigation benchmark for all of the project, as PG&E suggests, rather than allowing the funds to be divided and administered separately for each component of the project.

Because the overhead portion of the route we authorize does not pass any high priority groups, we do not need to address PG&E's proposal in its preliminary EMF Management Plan to mitigate EMF exposure for the Jefferson-Martin project by raising the height of towers by 20 feet in targeted areas. As a general matter, we agree with PG&E's proposed low-cost EMF mitigation measure for underground routes in which it would lower the depth of the underground conductors by 5 feet. Starting with a standard 6-foot deep trench,

A.02-09-043 ALJ/CFT/tcg

an additional 5 feet would lower the peak load magnetic field at each edge of a 30 foot right of way by about 26.7%, to about 11 mG. We note that the magnetic field levels during non-peak conditions would be substantially less than this amount, and estimate based on data in Attachment 205 in Exhibit 13 that the magnetic field during medium loading conditions would be about 7.6 mG at each edge of a 30-foot right of way.

The record does not indicate construction costs or the EMF reduction that could be achieved if the trench is lowered more than five feet as an EMF mitigation measure. In an effort to make the most effective use of EMF mitigation funds, we will not require PG&E to lower the trench below a total depth of 11 feet due to EMF mitigation requirements.

PG&E's preliminary EMF management plan for Jefferson-Martin appears to assume that the conductors would be arranged in a vertical configuration in the underground duct bank. However, a triangular configuration would reduce EMF levels significantly. In the EMF calculations in Exhibit 13, PG&E utilizes a triangular configuration. We require that PG&E use a triangular configuration to reduce EMF levels as a no-cost mitigation measure unless there are obstacles or other impediments that would preclude such a configuration.

Modification of line placement is another EMF mitigation measure that may be implemented at no or relatively low cost in many instances. To the extent allowed by the location of existing underground utilities, PG&E may be able to choose line placement within the right of way in a manner that would reduce EMF exposure within buildings along the way. We instruct PG&E to undertake such strategic line placement along the entire route to the extent it can be accommodated at no or minimal cost. By "minimal" cost, we mean typical trenching and duct bank construction costs that may be incurred because the route may not be as direct as otherwise possible if strategic placement were not

- 105 -

A.02-09-043 ALJ/CFT/tcg

undertaken. As a general matter, we do not expect PG&E to undertake more extensive steps such as moving existing underground utilities in order to reduce EMF levels through strategic placement. PG&E should use its judgment, however, regarding the extent to which such additional strategic line placement could be undertaken as a low-cost measure.

PG&E reported particularly high magnetic field levels along portions of the BART right of way, as indicated in Table 3. In response to an ALJ inquiry regarding project design along the BART right of way, PG&E explains that the reported EMF levels were based on preliminary determinations of line placement in light of the expected BART tunnel location and other considerations. PG&E reports that the extent to which it would be able to place the transmission line further from the buildings along the right of way would depend upon the actual, as-built location of the BART tunnel, location of the BART right of way property line, surface and subsurface features, and the minimum bend radii in the routing of the line. PG&E commits, however to locate the line at least 34 feet from the edge of residential and commercial buildings along the BART right of way to the extent "safe, feasible, and cost-effective" as part of its EMF mitigation measures. We adopt this additional strategic line placement requirement, not just along the BART right of way but any place along the route where it is feasible to place the line at least 34 feet from residential living units or other buildings where people are expected to spend significant amounts of time. Such placement would reduce magnetic field levels to 3.0 mG at median loads. We do not expect this requirement to be overly expensive, since there appear to be only a few buildings to which it would apply.

In its EMF design guidelines, PG&E employs a criterion that a low-cost EMF reduction measure should reduce EMF by 15% or more, stating that this criterion is not meant to restrict choices of EMF reduction measures but to guide

- 106 -

A.02-09-043 ALJ/CFT/tcg

the design engineer on when a selection or combination is appropriate and justified in a given situation. Consistent with D.93-11-013, we agree that this 15% criterion should provide guidance only in choosing low-cost EMF mitigation measures. Because strategic line placement generally would entail minimal costs, at most, PG&E should undertake strategic line placement, including placement of the line at least 34 feet from buildings where feasible, even if the reduction in EMF is less than 15%.

PG&E's preliminary EMF mitigation plan for the Jefferson-Martin project would provide no low-cost EMF mitigation in any residential areas if lowering the trench an additional 5 feet in all residential areas would exceed a 4% EMF mitigation budget. The proposed decision would have required in such circumstances that the trench be lowered by 5 feet in selected residential areas depending on the distance of residential buildings from the line, up to a 4% EMF budget. In comments on the proposed decision, PG&E commits to lower the trench depth by an equal amount less than 5 feet for all residential blocks where a 15% effectiveness test is met, to the extent allowed by a 4% EMF budget.

The prioritized EMF mitigation approach in the proposed decision based on the distance of residential buildings from the line may have practical difficulties as PG&E suggests, although we do not believe them to be insurmountable. It appears that PG&E's proposal to lower the trench uniformly by an amount allowed by a 4% EMF budget would require similarly that the entire route be engineered prior to determining the depth allowed within the budget. Because of these practical difficulties and in recognition of the intense public concern regarding EMF exposure along residential portions of the route, we require that PG&E lower the trench by 5 feet in all residential areas where this would lower magnetic fields by at least 15%. The low-cost EMF mitigation measure that provides deeper undergrounding near schools and other high

- 107 -

A.02-09-043  ALJ/CFT/tcg

priority customers applies in addition to the requirements regarding strategic line placement, i.e., there may be locations where the line's alignment would be moved *and* it would be placed deeper underground. The determination of whether lowering the trench an additional 5 feet would reduce magnetic fields by at least 15% should be based on a comparison to field levels after strategic line placement. We believe that the adopted EMF mitigation requirements provide a reasonable balance of EMF mitigation for the Jefferson-Martin project in light of scientific studies that support legitimate concern regarding potential health effects of EMF exposure.

We adopt a 4% budget for EMF mitigation as a target budget, not a cap. If PG&E exceeds the cost cap we adopt for the Jefferson-Martin project due to EMF mitigation expenses in excess of the adopted target budget for EMF mitigation, it may seek an increase in the cost cap pursuant to § 1005.5(b).

## VII. Determination of Approved Route

We approve a route consisting of a hybrid of Route Option 1B and PG&E's Proposed Project in the southern segment and PG&E's Proposed Project in the northern segment modified to include Route Option 4B. The southern and northern segments will be connected using a new transition tower at Glenview Drive. The northern route may be modified, depending on the preference of the City of San Bruno, to implement Mitigation Measure T-9a if desired to avoid the Huntington Avenue grade separation project. The approved route will have no significant unmitigable (Class I) impacts and, thus, its choice does not require a Statement of Overriding Considerations.

A.02-09-043 ALJ/CFT/tcg

### A. Southern Segment

We conclude that a hybrid of Route Option 1B and PG&E's Proposed Project should be authorized for the southern segment of the Jefferson-Martin project.

The southernmost portions of the PUA and the Proposed Project would each cause significant, unavoidable, and permanent visual impacts. For the Proposed Project, the FEIR describes significant unmitigable (Class I) impacts at key viewpoints at Edgewood County Park, along southbound I-280, Lexington Avenue, Black Mountain Road, and north of the Carolands substation. While the PUA would eliminate those visual impacts, it would create its own set of significant unmitigable visual impacts, particularly along Cañada Road near Edgewood Road, at the I-280 crossing south of Carolands substation, and at one of the new transition structures needed to cross San Mateo Creek. Route Option 1B would have no or at most minimal visual impacts, depending on which crossing of Crystal Springs Dam is chosen.

PG&E's proposed overhead route, with its taller and bulkier towers and widened right of way, would cause permanent degradation of recreation at Edgewood County Park just north of the Jefferson substation. The PUA would enhance the recreational resource because it would allow existing transmission towers to be removed from the park. Route Option 1B would not be routed through and thus would maintain the existing baseline environmental conditions in the park.

Of the southern route options, Route Option 1B would have the least impact on biological resources. Because construction would be in existing roadways, habitat disturbance would be minimized. Both the southern portion of the Proposed Project and the PUA would have impacts on wetlands and habitats for protected species which would require careful mitigation. The

- 109 -

A.02-09-043  ALJ/CFT/tcg

Proposed Project would require extensive construction and increased permanent disruption in SFPUC watershed lands. The PUA would require two new overhead corridors and the underground section would require trenching through serpentine grassland. The MPUA, which would move the underground segment of the PUA to the west, would require development of a new right of way and trenching and disturbance through more areas of undisturbed serpentine grassland and sensitive habitat.

Due to underground construction and in particular its reliance on Trousdale Drive and El Camino Real, Route Option 1B would cause more intense construction-related impacts than would the other southern alternatives. These construction impacts would include increased noise, traffic delays, and some limits on access to residences and businesses.

The FEIR finds that Route Option 1B is preferable to the other southern routes with respect to geology factors. Both the Proposed Project and the PUA raise seismic concerns because of their high exposure to the main trace of the San Andreas fault near San Bruno Avenue. Route Option 1B would route the transmission line further to the east and would avoid the need for a transition station near the main trace. However, the Trousdale Drive portion of Route Option 1B would cross several traces of the Serra fault, which is classified as potentially active. Route Option 1B could encounter difficult excavation conditions related to existing underground utilities or artificial fill along Trousdale Drive and El Camino Real.

The FEIR did not consider EMF exposure in its determination of the environmentally superior alternative. In Section VI, we describe the magnetic field levels that would be created by the route options and the EMF mitigation measures we adopt. Residential EMF exposures would occur in the southernmost portion of PG&E's proposed above-ground route where the

- 110 -

A.02-09-043 ALJ/CFT/tcg

existing 60 kV line runs near residential neighborhoods. The PUA and the MPUA would mitigate these effects through selective re-routing or undergrounding in those areas. For Route Option 1B, EMF exposures would be most problematic north of Golf Course Road along Skyline Boulevard and along Trousdale Drive and El Camino Real.

The FEIR describes the possible creation of hybrid alternatives in the southern segment, with an intermediate transition station or tower allowing combinations of Route Option 1B and either the Proposed Project or the PUA. The overall environmental impact of each of the hybrid alternatives would encompass the impacts of the transition station or tower and the impacts of the route segments it connects.

One type of hybrid alternative would include the southernmost portion of either the Proposed Project or the PUA and would use Route Option 1B north of the intermediate transition station. We reject such hybrids because, among other concerns, they would cause significant unmitigable impacts in the watershed lands south of the intermediate transition station.

The other type of hybrid alternative would include the southernmost portion of Route Option 1B, which would reduce visual and biological impacts in that area. Its use of either the Proposed Project or the PUA would avoid effects on Trousdale Drive, El Camino Real, and (with the Golf Course Drive transition station) Skyline Boulevard. Such a hybrid alternative would reduce EMF exposure relative to Route Option 1B. However, use of the Proposed Project or the PUA route between the intermediate transition station and the San Bruno Avenue area would cause impacts to watershed lands.

The FEIR finds that most of the hybrid alternatives using Route Option 1B south of the intermediate transition station would have no significant unmitigable environmental impacts. The FEIR concludes that Route Option 1B

- 111 -

A.02-09-043 ALJ/CFT/tcg

for the entire southern segment is environmentally superior to such hybrid configurations because it would be underground and would not incur the visual impacts and disturbance to native habitat of the hybrid alternatives along the above-ground portions of their routes. The FEIR did not consider concerns regarding EMF exposure in making its determination regarding the environmentally superior route.

We find that the hybrid alternative using Route Option 1B north of the Jefferson substation, a transition tower replacing tower 11/70 west of Trousdale Drive, and PG&E's proposed overhead route north of the transition tower provides the best balance among the competing considerations. The portion of Route Option 1B south of the new transition tower will minimize visual and biological impacts in that portion of the route and will avoid impacts on Edgewood Park and the Pulgas Ridge Natural Preserve. The use of PG&E's proposed aboveground route north of the new transition tower will avoid Route Option 1B's effects on residences and businesses along Trousdale Drive and El Camino Real as well as seismic concerns in that area.

We reject use of a Golf Course Drive transition station because of adverse biological and visual impacts associated with both overhead options between that location and Trousdale Drive. The Proposed Project in this segment would have unmitigable (Class I) visual impacts and would traverse sensitive serpentine grasslands. The PUA would require a new right of way west of I-280, with substantial construction and access disturbance to this portion of the SFPUC watershed.

The chosen hybrid route eliminates most EMF concerns regarding the 230 kV line in the southern segment. Along the aboveground portion of the route, the new 230 kV line will be collocated on rebuilt towers with one of the two existing 60 kV lines, and the second 60 kV circuit will be eliminated. This portion

A.02-09-043  ALJ/CFT/tcg

of the line is routed away from populated areas so that EMF exposures are and will remain minimal.

The only place that the 230 kV line will pass near residential homes in the underground portion of the southern segment is the portion of Route Option 1B along Skyline Boulevard just south of Trousdale Drive.  With the adopted EMF management plan, it appears that magnetic field levels from the 230 kV underground line should not exceed 2.5 mG during medium loading conditions in any residence along this portion of the route.[31]  While these levels may not entirely allay public concerns about EMF exposure, we believe that the chosen hybrid route provides a reasonable balance of EMF concerns and other considerations.

The FEIR identified six options for crossing Crystal Springs Dam that would avoid creation of significant unmitigable impacts, including a revised overhead crossing, a "top of the dam" option, a submarine cable option, a "face of the dam" option, and temporary overhead and top of the dam crossings that would be used until the cable could be incorporated into a new bridge planned by the County of San Mateo.  The first three options were included in the FEIR's environmentally superior alternative.  The Town of Hillsborough has requested that the permanent overhead crossing not be allowed due to its visual and

---

[31] With elimination of one of the two 60 kV circuits north of tower 11/70, it is not clear whether or the extent to which PG&E would de-energize or dismantle that 60 kV circuit between the Trousdale Drive transition tower and the Jefferson substation. If there are reduced power flows on the 60 kV line, this would reduce EMF levels along this line as well.

A.02-09-043 ALJ/CFT/tcg

to better explain our selection of the Trousdale Drive hybrid route in lieu of the Golf Course Drive alternative.

280 Citizens suggests that adverse effects on the Loma Vista and Skyview neighborhoods could be addressed by a modification to the Trousdale Drive hybrid route chosen by the proposed decision. In this alternative, the underground 230 kV line would leave Skyline Boulevard near Summit Drive and would be collocated with the 60 kV line underground north along the existing 60 kV right of way for approximately 0.7 mile. The 230 kV and 60 kV lines would then be routed underground through a new corridor to Skyline Boulevard, which they would follow for the last 0.2 mile to Trousdale Drive, where they would turn west to the Trousdale Drive transition station.

280 Citizens characterizes this proposal as a variation of the West of Skyline Boulevard alternative route segment suggested in Burlingame's comments on the DEIR. 280 Citizens asserts that this alternative would significantly reduce EMF exposure to residents in the area and would remove approximately one mile of highly visible 60 kV towers and lines. 280 Citizens states that, because much of the route would follow PG&E's Proposed Project route, the FEIR has already evaluated the existing environment and construction impacts in the area. It points out that this area is predominantly non-native grassland with no sensitive serpentine habitat and suggests that any potential environmental impacts could be sufficiently mitigated by mitigation measures already identified in the FEIR. 280 Citizens maintains that any additional needed environmental review could be completed through an addendum to the FEIR without delaying construction in any material respect.

In reply comments, PG&E and CCSF oppose consideration of 280 Citizens's West of Skyline alternative at this late date. PG&E submits that this route would involve underground construction in watershed areas and that its

- 134 -

A.02-09-043 ALJ/CFT/tcg

biological impacts and its proximity to residences. In accordance with Pub. Util. Code § 1002, Hillsborough's request is granted. PG&E is authorized to determine which of the remaining five options to utilize, in order to allow the most timely and effective option in light of planned bridge and dam construction projects. We expect that PG&E's determination of which option to implement will take into account the preferences of the SFPUC, the County of San Mateo, and the USFWS.

We authorize a transition tower at Glenview Drive for the transition between the hybrid southern route and the underground northern route. We agree with the FEIR's conclusion that, of the four transition options presented in the FEIR, the Glenview Drive transition tower is preferable because it avoids an underground crossing of the San Andreas Fault, is less visible than other alternatives, and avoids land use conflicts. It would have no significant unmitigable impacts.

In summary, the authorized hybrid alternative is expected to have no significant unmitigable (Class I) environmental impacts. Biological and other potential adverse impacts that could arise due to this hybrid can be mitigated satisfactorily with the mitigation measures we adopt in Section VIII.B and the EMF management plan we adopt in Section VI.C. While this hybrid route is expected to cost approximately $19 million more than PG&E's cost estimates for the southern segment of the original Proposed Project, as described in Section XI, this additional cost is reasonable in light of the benefits of the adopted route.

We are not in a position to assess the validity of the assertion by the NPS that it would have discretionary authority to review and approve any Jefferson-Martin configuration that requires expansion of PG&E's existing right of way through the SFPUC watershed. We note, however, that the NPS has suggested that it is willing to consider the hybrid route that we authorize.

- 114 -

A.02-09-043  ALJ/CFT/tcg

### B. Northern Segment

For the northern segment of the Jefferson-Martin project, the FEIR provides environmental analysis that allows a choice between the Proposed Project's underground segment and the Collocation Alternative. The FEIR finds that both routes, with certain modifications, are environmentally superior and that neither route would have significant unmitigable (Class I) impacts. We approve PG&E's Proposed Project in the northern segment modified to include Route Option 4B. The route may be modified, depending on the preference of the City of San Bruno, to implement Mitigation Measure T-9a if desired to avoid the Huntington Avenue grade separation project.

Even with route options and mitigation measures designed to lessen its impacts, the Collocation Alternative would create greater impacts than the Proposed Project in several significant respects because of its construction through contaminated areas. The Collocation Alternative would have a high likelihood of encountering contaminated soils and groundwater during construction through and near three leaking underground tanks, two brownfield sites, and a capped landfill. By contrast, only one known contaminated site is likely to affect construction of the northern segment of the Proposed Project. Because construction would occur nearer to the San Francisco Bay, the Collocation Alternative would increase the likelihood of water quality effects on the Bay, compared to the Proposed Project.

The Proposed Project and the Collocation Alternative raise different seismic issues. The majority of the Collocation Alternative route would be in areas with either a very high or a high liquefaction potential along the Bay, whereas the Proposed Project runs further west near the San Andreas fault. We reject alternative configurations of the Proposed Project that would require the line to travel along or cross an active trace of the San Andreas fault. In Section

A.02-09-043  ALJ/CFT/tcg

IV.C, we describe that the Jefferson-Martin line diversifies the path and source of power brought into San Francisco. Some of the benefit of that diversification would be lost if this portion of the line were collocated in the existing San Mateo-Martin corridor, particularly since the line would share liquefaction risks with the existing 230 kV underground line through that same area.

The Collocation Alternative raises concerns, although perhaps not insurmountable, regarding commercial and emergency access to hotels and other businesses along the route. As a benefit, the Collocation Alternative would avoid construction-related impacts to residential areas, schools, and transportation corridors that will be affected by the Proposed Project. The northern segment of the Proposed Project will be routed adjacent to about 120 residences, several apartment buildings, and several schools. The Collocation Alternative would affect very few residences and no schools and, thus, would engender less EMF concern.

The FEIR notes that the Collocation Alternative would require work near pre-historic resources east of San Bruno Mountain, whereas the Proposed Project will require excavation into native undisturbed soils and potentially fossil-bearing rock during construction. The Collocation Alternative would avoid crossing San Bruno Mountain in Guadalupe Canyon Parkway. The Proposed Project will require construction work in the Hillside Boulevard bikeway and work near other recreational facilities, especially in San Bruno Mountain State and County Park.

On balance, we find that risks associated with construction through contaminated areas and along the Bay, along with the loss of diversification arising from collocating the line with the existing underground 230 kV line, militate against our choosing the Collocation Alternative. While the Proposed Project will require careful mitigation to ensure that its construction and other

- 116 -

A.02-09-043 ALJ/CFT/tcg

impacts are less than significant and to reduce EMF concerns, we find that it is better than the Collocation Alternative for the northern segment of the Jefferson-Martin project. We turn now to certain details regarding its route and mitigation measures.

In Section VII.A, we determine that a transition tower should be constructed at Glenview Drive to connect the overhead portion of the route to the northern segment. We find that, after transiting underground and exiting the Glenview Drive transition site, the line should travel north in Glenview Drive to San Bruno Avenue. San Bruno's request that the line use Skyline Boulevard rather than Glenview Drive to reach San Bruno Avenue is unacceptable because the line would travel along and cross an active trace of the San Andreas fault.

Consistent with the FEIR's assessment, we authorize the use of San Bruno Avenue for the project from Glenview Drive to Huntington Avenue. Seismic considerations are the primary factor in our choice of San Bruno Avenue rather than either Sneath Lane or Westborough Boulevard. While there are existing underground utilities, it appears that addition of the new 230 kV line will be feasible within San Bruno Avenue.

In the Proposed Project, the 230 kV line would turn north from San Bruno Avenue onto Huntington Avenue to the BART right of way. The FEIR describes that from San Bruno Avenue, two options are available depending on local jurisdiction preference as to whether the grade separation project at San Bruno Avenue and Huntington Avenue should be avoided or engineered as defined in Mitigation Measure T-9a. We authorize PG&E to determine, depending on the preference of the City of San Bruno and subject to Section XIV in G.O. 131-D, whether to construct the line to the intersection of San Bruno Avenue and Huntington Avenue or route the line north on El Camino Real and then east on Sneath Lane consistent with Mitigation Measure T-9a.

A.02-09-043  ALJ/CFT/tcg

As detailed in Section VI.B, several buildings along the BART right of way would be very close to the transmission line and, without mitigation, would receive quite high EMF exposure.  In Section VI.C, we require that PG&E undertake strategic line placement and other EMF mitigation measures to reduce EMF exposure along the BART right of way.

We agree with the FEIR that Route Option 4B is preferable to Route Option 4A.  Route Option 4B will avoid construction impacts to residences along Hoffman and Orange Streets.  Because Hillside Boulevard and East Market Street are wider than Hoffman and Orange, construction impacts will be less and EMF levels in residences along the way will be less.  While some buildings at Pollicita Middle School and Colma Elementary School are close to East Market Street, others are set further back.  The adopted EMF mitigation measures will reduce EMF levels to some extent through deeper trenches and strategic placement within the right of way.

## VIII. Environmental Analysis

As required by CEQA, we cannot approve PG&E's Proposed Project or an alternative unless we find that the project has been modified to mitigate or avoid each significant effect on the environment or that specific considerations make the mitigation measures or alternatives identified in the FEIR infeasible, and that specific overriding economic, legal, social, technological, or other benefits of the project outweigh the significant effects on the environment.  In this section, we address mitigation measures recommended in the EIR and suggested by the parties during the evidentiary hearings.

In Section VII, we describe the approved route for the Jefferson-Martin project and the specific reasons to support this choice based on the FEIR and other information in the record.  The adopted mitigation measures reduce the

- 118 -

A.02-09-043 ALJ/CFT/tcg

environmental effects of the approved Jefferson-Martin project to less than significant levels. As a result, no Statement of Overriding Considerations is needed.

Finally, we certify the FEIR in this section.

## A. Mitigation and Mitigation Monitoring

The conclusions in the FEIR regarding environmental impacts of the Proposed Project and its alternatives assume that the mitigation measures recommended in the FEIR and the impact-reduction measures proposed in the Proponent's Environmental Assessment, called Applicant Proposed Measures, are implemented. Certain modifications to the FEIR's mitigation measures are adopted in this section and included in an Addendum to the FEIR attached as Appendix A. Implementation of the Applicant Proposed Measures and the adopted mitigation measures, including the Addendum in Appendix A, is a condition of the approval of this project. All of the applicable FEIR mitigation measures, including those in Appendix A, are included in Appendix B.

PG&E asks that Mitigation Measure G-8a be revised to state that it applies only to a crossing of an active trace of the San Andreas fault. Mitigation Measure G-8a was intended to require the double-vault design only for the San Andreas fault, and the text of this measure is clarified in Appendix A in this regard. The measure is further clarified with an additional sentence addressing the Serra fault crossing that allows more flexibility in the design, but requires PG&E to take into consideration new fault analysis on the Serra fault. New fault analysis is required because of the disagreement between PG&E and the City of Burlingame about the displacement potential at the Serra fault and to ensure that an adequate structure is designed for the Serra fault crossing.

- 119 -

A.02-09-043  ALJ/CFT/tcg

PG&E requests that Mitigation Measure L-7a, aimed at mitigating disrupted access to businesses and residences, be modified.  PG&E is concerned that the requirement to provide access "at all times" by "quickly" laying a temporary steel bridge over the trench may not be feasible and may affect the construction schedule and project cost.  PG&E maintains that compliance, to the extent feasible, may be counterproductive and could create, in certain situations, more significant adverse impact to traffic and create unsafe situations.  In Appendix A, Mitigation Measure L-7a has been modified to allow more flexibility in the construction process while allowing construction to proceed as quickly as possible.

PG&E proposes modification to four biological resource mitigation measures and deletion of ten visual resource mitigation measures.  These measures apply to the overhead portions of the southern segment, and all were modified in the FEIR in response to PG&E's concerns about the original measures.  We modify Mitigation Measures B-5a and B-8a to include the option to obtain a permit to remove and relocate wildlife to a wildlife shelter if other portions of the measures cannot be implemented.  We also modify Mitigation Measure B-8b to require that PG&E recommend to the USFWS that the County of San Mateo be involved in any consultations regarding project-related construction in Edgewood Park or San Bruno Mountain Park.  We do not delete or further modify the other measures as modified in the FEIR.

The City of Burlingame requests that several mitigation measures be adopted in addition to those outlined in the FEIR.  With adoption of the hybrid route in the southern segment which avoids Trousdale Drive and El Camino Real, some of Burlingame's requested mitigation measures may be of reduced importance.  We address each of them in turn.

A.02-09-043 ALJ/CFT/tcg

Depth of the duct bank. The City of Burlingame states that a 12-foot burial depth may be required because of existing utilities in Trousdale Drive and Skyline Boulevard. This concern would continue to apply along Skyline Boulevard with the approved route. Burlingame requested that the duct bank be installed in a manner consistent with its Public Works Department's standard that new utility infrastructure traversing the city (but not actually serving the city) within city streets be buried two feet below the lowest existing utility in the right of way. Pursuant to Mitigation Measure U-1b, PG&E will be required to submit to the Commission documentation that appropriate jurisdictions have reviewed the project plans with respect to protection of existing underground utilities. Documentation must specifically include evidence that the project meets all necessary local requirements, that it complies with design standards, and that affected jurisdictions (e.g., Burlingame's PG&E Public Works Department) approve the final plans. Thus, Mitigation Measure U-1b will ensure, subject to Section XIV of G.O. 131-D as discussed below, that PG&E complies with the subject Public Works Department standard.

Installation of cathodic protection systems. Burlingame is concerned that proximity of cast iron pipes to magnetic fields from the line would reduce the life expectancy of these pipes. Mitigation Measure U-1c already addresses Burlingame's concern.

Duration of disruption. Burlingame requests that the Commission require that PG&E commit to the completion of construction on both Skyline Boulevard and Trousdale Drive within six months of commencement of work on each of those roadways or establish a phased construction of the portion of the project which will travel down these streets. Requiring PG&E to commit to completing work on Skyline Boulevard streets within six months could conflict with other mitigation measures and increase impacts in other issue areas. If construction

- 121 -

A.02-09-043  ALJ/CFT/tcg

delays occur, construction would be forced to weekends and possibly nights, causing more noise impacts. We see phased construction as a preferable approach which also accomplish the City's goal. Pursuant to Mitigation Measure T-1a and Applicant Proposed Measure 13.3, PG&E will be required to develop a Transportation Management Plan that will include limits on the length of open cuts. PG&E will need to obtain Burlingame's input regarding and, subject to Section XIV of G.O. 131-D, approval of the Transportation Management Plan for all construction areas within the City's public right of way. PG&E and Burlingame should agree upon a construction schedule during development and review of the Transportation Management Plan.

EMF management measures. In addition to deeper placement of the line, Burlingame requests that PG&E be required to mail specified EMF information to property owners within 300 feet of the line at least 90 days prior to commencement of construction. Mitigation Measure L-4a requires PG&E or its construction contractor to provide advance notice to residents or property owners within 300 feet of the alignment prior to the commencement of construction. We require that, as part of the mailing required by Mitigation Measure L-4a, PG&E disseminate EMF information comparable to its previous EMF-related bill inserts but modified to reflect EMF management policies we adopt in Section VI.C for the Jefferson-Martin project. This requirement is not included in Appendix A, however, because it is not a CEQA-related mitigation measure.

Access to Franklin Elementary School and Hope Technology School. Burlingame's requested limitations on construction during school hours are not applicable to the adopted project route, since it bypasses these schools.

A.02-09-043 ALJ/CFT/tcg

Access to Mills Peninsula Hospital. Burlingame's requests regarding access at the Mills Peninsula Hospital are not applicable to the adopted project route, since it bypasses this hospital.

Interference with parking. Burlingame requests that PG&E be required to provide alternative parking and compensation if access to a driveway is blocked for longer than specified times, and for a requirement that driveway access not be blocked for more than 72 consecutive hours. We believe existing mitigation measures are adequate in this regard. Pursuant to Applicant Proposed Measure 13.7, PG&E will be required to include details within its Transportation Management Plan regarding its residential notification process for temporary parking impacts and will minimize the length of any parking restrictions. Applicant Proposed Measure 13.6 requires PG&E to develop a plan to ensure adequate access at all times to affected businesses, homes, and other facilities. In addition, the Transportation Management Plan pursuant to Mitigation Measure T-1a requires the review and approval of all applicable jurisdictions such as the City of Burlingame.

Emergency access. Burlingame requests that 20 feet of clearance be maintained on city streets for emergency access at all times. We believe that Mitigation Measure T-6a will ensure that sufficient emergency vehicle access will be maintained. PG&E will be required to accommodate emergency vehicles with provisions such as plating over excavations, short detours, and alternate routes at all locations where access is blocked. These emergency response vehicle provisions will be presented in the Transportation Management Plan, which will require the review and approval of all applicable jurisdictions such as the City of Burlingame

Noise control. Burlingame asks for restrictions on the times that construction activity may occur, limits on noise levels, and a prohibition on the

- 123 -

A.02-09-043 ALJ/CFT/tcg

use of pile drivers within Burlingame's city limits. Applicant Proposed Measure 15.1 and Mitigation Measures L-4a and L-4b provide adequate mitigation of noise impacts to all communities, including Burlingame. However, given Burlingame's specific concerns, Commission staff recommends, and we concur, that a new mitigation measure be adopted consistent with Burlingame's recommendations. New Mitigation Measure N-1a is included in Appendix A.

Information to property owners. Burlingame requests that there be at least two public meetings prior to commencement of construction within the city, and that PG&E be required to place a "door hanger" notice at each residence along Skyline Boulevard and Trousdale Drive prior to construction. Mitigation Measures L-4a and L-4b provide assurance that the public receives adequate notice regarding construction activities. However, the additional measures requested by Burlingame have been added to Mitigation Measure L-4a in response to the City of Burlingame's specific concerns.

We note that many of the FEIR Mitigation Measures and Applicant Proposed Measures that include the development of a plan (e.g., Mitigation Measures T-1a and T-6a and Application Proposed Measure 13.6) require that PG&E obtain approval of the plan from the applicable local jurisdictions, such as the City of Burlingame. Although we believe that the combination of FEIR Mitigation Measures, modified FEIR Mitigation Measures, and Applicant Proposed Measures adequately address issues raised by the City of Burlingame, any unresolved concerns can also be addressed during the agency review period of the plans. Consistent with G.O. 131-D, Section XIV, public utilities are regularly required to consult with local agencies regarding land use matters. However, should the utility and agencies be unable to resolve their differences, the dispute may be brought to the Commission for resolution pursuant to the process outlined in the General Order.

A.02-09-043 ALJ/CFT/tcg

Based on its assessment of the mitigation-related requests of PG&E and the City of Burlingame, the Commission's Energy Division staff has prepared an Addendum to the FEIR (attached as Appendix A) that documents the adopted modifications to the FEIR mitigation measures. The Addendum concludes that the adopted modifications to the FEIR mitigation measures will not result in a significant impact to the environment. The staff concluded that preparation of the Addendum was appropriate under CEQA Guidelines §§ 15162, 15163, and 15264, because an Addendum is required under CEQA to incorporate minor technical changes to the FEIR where there are no new significant impacts. Given the findings of staff, we approve the Addendum to the FEIR. The Addendum documents modifications of Mitigation Measures G-8a, L-4a, L-7a, B-5a, B-8a, and B-8b and addition of Mitigation Measure N-1a.

The FEIR includes a Mitigation Monitoring, Compliance, and Reporting Program, which presents the process for monitoring the implementation of the recommended mitigation measures and Applicant Proposed Measures.

### B. Adequacy and Certification of the FEIR

The FEIR must contain specific information according to the CEQA Guidelines, §§ 15120 through 15132. The various elements of the FEIR satisfy these CEQA requirements. The FEIR consists of the draft EIR, with revisions in response to comments and other information received. Volume 3 of the FEIR contains the comments received on the draft EIR and individual responses to these comments.[32]

---

[32] CEQA Guidelines, §15132.

- 125 -

A.02-09-043 ALJ/CFT/tcg

The Commission must conclude that the FEIR is in compliance with CEQA before approving PG&E's request for a CPCN. The basic purpose is to ensure that the environmental document is a comprehensive, accurate, and unbiased tool to be used by the lead agency and other decisionmakers in addressing the merits of the project. The document should embody "an interdisciplinary approach that will ensure the integrated use of the natural and social sciences and the consideration of qualitative as well as quantitative factors."[33] It must be prepared in a clear format and in plain language.[34] It must be analytical rather than encyclopedic, and emphasize alternatives over unnecessary description of the project.[35] Most importantly, it must be "organized and written in such a manner that [it] will be meaningful and useful to decisionmakers and the public."[36]

We believe that the FEIR meets these tests. It is a comprehensive, detailed, and complete document that clearly discusses the advantages and disadvantages of the environmentally superior routes, PG&E's proposed route, and various alternatives. We find that the FEIR is a competent and comprehensive informational tool that CEQA requires it to be. The quality of the information therein is such that we are confident of its accuracy. We have considered that information in approving the Jefferson-Martin project as described in this decision.

---

[33] *Id.*, § 15142.

[34] *Id.*, §§ 15006(q) and (r), 15120, 15140.

[35] *Id.*, §§ 15006, 15141; Pub. Res. Code § 21003(c).

[36] Pub. Res. Code § 21003(b).

A.02-09-043 ALJ/CFT/tcg

As described in Section II.C, we deny the motion and joinder seeking that the FEIR be recirculated.

The Commission should certify the FEIR and the Addendum contained in Appendix A.

## IX. Consistency with Public Utilities Code Section 1002

Pub. Util. Code § 1002 requires the Commission to give consideration to community values, recreational and park areas, historical and aesthetic values, and influence on the environment. Our efforts here represent a balancing of these factors.

In determining that the Jefferson-Martin project is needed at this time, rather than deferring its construction until there is a demonstrated reliability need for the project, we give great weight to the community values of the Hunters Point and Bayview neighborhoods and their interest in closure of the Hunters Point power plant.

Except for the aboveground portion of the approved route, we have adopted environmentally superior alternatives as identified by our CEQA process. Use of the Route Option 1B configuration in the southernmost portion of the route avoids impacts on Edgewood Park and the Pulgas Ridge Natural Preserve. We eliminate the permanent overhead crossing option for Crystal Springs Dam because sufficient alternatives exist to accommodate this request by the Town of Hillsborough.

The hybrid configuration of the approved southern segment, with the above-ground portion between Trousdale Drive and Glenview Drive, is adopted in express consideration of the community values as expressed by County of San Mateo, the City of Burlingame, and other municipalities and consumer groups regarding the perceived importance of avoiding construction impacts and EMF

A.02-09-043  ALJ/CFT/tcg

exposure in populated areas along this portion of the route.  While we do not
adopt the PUA or the MPUA as some groups would have liked, the adopted
hybrid configuration represents a reasonable balancing of the communities'
interests and the need to protect environmental resources in the area.  We believe
that the impact of the above-ground portion of the authorized project on the
SFPUC watershed can be minimized through the adopted mitigation measures.

We reject PG&E's proposed transition station at San Bruno Avenue in
recognition of the City of San Bruno's redevelopment efforts and the
community's desire to maintain a residential, recreational, and neighborhood
commercial character for the area.

Thus, we have weighed all of the factors required under § 1002 and find
that PG&E should be granted a certificate of public convenience and necessity for
the Jefferson-Martin project as described herein.

## X. Compliance with Public Utilities Code Section 625

Pub. Util. Code § 625 provides that a public utility that offers competitive
services may not condemn any property for the purpose of competing with
another entity unless the Commission finds that such an action would serve the
public interest based on a hearing for which the owner of the property to be
condemned has been noticed and the public has an opportunity to participate
(Pub. Util. Code § 625(a)(1)(A)).  However, an exception is made for
condemnation actions that are necessary solely for an electric or gas company to
meet a Commission-ordered obligation to serve.  In that circumstance, the
electric or gas company is required to provide notice on the Commission
Calendar if and when it pursues installation of facilities for the purposes of
providing competitive services (Pub. Util. Code § 625(a)(1)(B)).

- 128 -

A.02-09-043  ALJ/CFT/tcg

PG&E states that the Jefferson-Martin project is being proposed and will be implemented to meet PG&E's obligation to serve. The project includes new fiber optic cable to provide internal communication links for line protection purposes. PG&E states that it has no current intention to use this fiber optic cable for competitive purposes or to lease it. In addition, since the San Francisco area is a net importer of power, there is no expectation that the Jefferson-Martin project could be used to export power from the area for competitive purposes.

In D.01-10-029, the Commission addressed the applicability of § 625 where PG&E is implementing a project to meet its obligation to serve, but aspects of the project may later have a competitive purpose. We described that § 625 provides two different levels of notice and oversight and that, "The lesser standard requires that when condemning properties to carry out a commission-ordered obligation, § 625 (a)(1)(B) is applicable, which only requires notice be provided to the Commission Calendar." With similar circumstances, we conclude as in D.01-10-029 that the lesser standard, notice, applies for the Jefferson-Martin project.

## XI. Project Costs

Pursuant to § 1005.5(a), we have jurisdiction and the responsibility to specify in the CPCN a "maximum cost determined to be reasonable and prudent" for the Jefferson-Martin project.[37] While FERC ultimately will decide how much of the costs for this project PG&E may recoup in transmission rates, we believe our cost cap has bearing on the amount PG&E may seek from FERC.

---

[37] We have affirmed our jurisdiction and responsibility regarding cost caps in several recent decisions, including D.01-05-059, D.01-10-029, and D.01-12-017.

A.02-09-043  ALJ/CFT/tcg

PG&E provided cost estimates for its Proposed Project and for several alternative routes considered during the proceeding.  It also developed a cost matrix that allows cost estimates to be generated for full project routes by adding up the costs of various combined route segments in the cost matrix.  PG&E's total cost estimates for some of the alternatives are as follow:

| | |
|---|---|
| PG&E's Proposed Project | $188.1 million |
| All-Underground Alternative (Route Option 1B in south with Proposed Project in north) | $212.5 million |
| Proposed Project in south with Collocation Alternative in north | $244.7 million |
| PUA in south with Proposed Project in north | $226.7 million |
| Route Option 1B to Golf Course transition to PUA to Proposed Project in north | $213.5 million |
| Route Option 1B to Trousdale transition To Proposed Project to Glenview Drive transition to Proposed Project in north[38] | $207.0 million |
| PUA to Trousdale transition to Route Option 1B to Proposed Project in north | $224.0 million |

PG&E explains that much of the difference in its cost estimates for the PUA compared to the southern segment of its Proposed Project stems from biology mitigation-related costs that PG&E estimates it would incur if the PUA is selected.  PG&E did not provide a cost estimate for the MPUA but maintains that

---

[38] This is the authorized route in Exhibit 147, Attachment 134, PG&E mistakenly labels this route as including the PUA rather than the Proposed Project between the Trousdale and Glenview Drive transition structures.

A.02-09-043 ALJ/CFT/tcg

it would likely cost more than the PUA because of greater biological impacts and because moving the underground portion further west would somewhat increase the length of the underground cables and related trenching.

280 Citizens contests PG&E's conclusion that the PUA would cost more than Route Option 1B, and argues to the contrary that Route Option 1B is likely to be more expensive than the PUA and its variations. 280 Citizens states that PG&E is asking the Commission to believe that a 27-mile project, of which only 15 miles is underground (the PUA with the Proposed Project in the north) will cost more than a 27-mile project, all of which is underground (Route Option 1B with the Proposed Project in the north).

280 Citizens identifies several factors which, it contends, PG&E did not consider and which would increase the cost of Route Option 1B, including a deeper trench through Burlingame streets, additional splice vaults on Trousdale Drive, and removal and reconstruction of the El Camino Real median. PG&E responds that 280 Citizens has not substantiated these claims. PG&E continues to believe that trenching at a depth of twelve feet in Trousdale Drive and El Camino Real will not be necessary. PG&E also contests the need for additional splice vaults on Trousdale Drive and 280 Citizens claim that PG&E would have to remove and restore the median in El Camino Real.

280 Citizens estimates that the MPUA in the southern segment with the Proposed Project in the northern segment would cost $203.3 million. It maintains that its methodology of estimating an all-in per-mile construction cost is more reliable than PG&E's "artificially detailed" cost estimates that have no engineering to back up the details. 280 Citizens concludes that the MPUA would cost $9 million less than Route Option 1B, even if PG&E has not underestimated that cost. PG&E takes issue with 280 Citizen's "rule of thumb" approach and

A.02-09-043 ALJ/CFT/tcg

also contends that 280 Citizens significantly underestimates biological mitigation costs of the MPUA.

We adopt a project cost cap for the approved route based on the record developed in this case. PG&E's cost estimate for this route is based on preliminary design work, at least for the segments of the project which are part of PG&E's Proposed Project, and on detailed cost estimates for each component of the construction project. We recognize that detailed engineering estimates have not been completed for the project and that some of the adopted environmental and EMF mitigation measures may not have been considered when PG&E developed its cost estimate. The adopted project route includes Route Option 4B rather than PG&E's route Option 4A. However, we believe that PG&E included sufficient contingency factors in the estimating procedure so that its estimates are of a sufficient reliability so that we can adopt a cost cap. We have no reason to believe that PG&E cannot complete its project within the cost cap we adopt today.

We authorize a total project cost cap of $206,988,000 for the approved Jefferson-Martin project, as reflected in PG&E's detailed cost estimates contained in Exhibit 147, Attachment 134. If, upon completion of the final, detailed engineering design-based construction estimates for the approved project, PG&E concludes that the costs will be materially (i.e., 1% or more) lower than the cost cap we adopt, PG&E shall submit with the estimate an explanation of why we should not revise the cost cap downward to reflect the new estimate. If the final estimate exceeds the cost cap we have adopted, then PG&E is free to exercise its rights to seek an increase in the cost cap pursuant to § 1005.5(b). However, the cost cap will not automatically adjust upward even if the final detailed costs exceed the cost cap. As explained in Section VI.C, PG&E may also seek an

A.02-09-043 ALJ/CFT/tcg

increase in the cost cap if EMF mitigation expenses in excess of the target EMF mitigation budget cause the cost cap to be exceeded.

## XII.  Comments on Proposed Decision

The proposed decision of the ALJ in this matter was mailed to the parties in accordance with § 311(d) and Rule 77.1 of the Commission Rules of Practice and Procedure.  A proposed alternate decision was mailed by President Michael R. Peevey. Comments and/or reply comments on the proposed decision and the proposed alternate decision were filed by PG&E, ORA, ISO, the City of Burlingame, Daly City, the Town of Hillsborough, the City of San Bruno, CCSF, South San Francisco and CBE-101, 280 Citizens, CARE, Genentech, and Southern California Edison Company (SCE).[39]

We have considered the filed comments and reply comments, many of which reiterate previously expressed views.  Based on these comments, we have made a number of modifications and clarifications to the decision, several of which warrant separate discussion.

In comments, Hillsborough opposes the permanent overhead option for crossing Crystal Springs Dam.  PG&E requests that it be provided broader flexibility regarding crossing the dam than the proposed decision would have allowed, including the face of the dam option.  We have accommodated these concerns as explained in Section VII.A.

Burlingame supports a Golf Course Drive hybrid alternative for the southern portion of the Jefferson-Martin project.  We have clarified the decision

---

[39] The ALJ granted SCE's motion to intervene for purposes of commenting on the treatment of EMF issues in the proposed decision and proposed alternate decision. SCE's comments are generally consistent with PG&E's views on this matter.

A.02-09-043 ALJ/CFT/tcg

consideration would require recirculation of the FEIR with concomitant construction delays. PG&E points out that the hybrid southern route adopted in the proposed decision would be underground in this area and thus would have no visual impacts on these neighborhoods. PG&E also disputes 280 Citizens's EMF concerns.

On July 1, 2004, 280 Citizens filed a motion, which PG&E opposes, seeking that the record be reopened for receipt of five photographs regarding its West of Skyline alternative. Those photographs are not needed for our consideration of 280 Citizens' comments, and the motion is denied.

We do not accept 280 Citizens's request that a new route alternative be examined west of Skyline in the Loma Vista and Skyview neighborhoods. To put it simply, this alternative would transfer impacts from certain residences along Skyline Boulevard to other residences adjacent to the SFPUC watershed. As shown by the FEIR (FEIR Volume 2 at Ap. 1-54), 280 Citizens's proposed route would traverse residential properties at both the north and south ends. 280 Citizens's suggestion that this route alternative would be constructed at least fifty feet from residential property boundaries is not possible, at least for those properties abutting the Caltrans right-of-way for I-280. In addition, compared to the adopted route, 280 Citizens's proposal would actually increase EMF levels for residences along the 0.2 mile of Skyline Boulevard where both the 60 kV and 230 kV lines would be undergrounded. Our adopted EMF mitigation measures require that the 230 kV trench be lowered an additional 5 feet in residential areas, which provides a reasonable amount of EMF mitigation along Skyline Boulevard. We find no merit in 280 Citizens's proposal.

Several parties comment on the proposed decision's instruction that PG&E not begin construction on the northern section of the Jefferson-Martin project until evaluation is completed of two route alternatives that did not receive full

- 135 -

A.02-09-043 ALJ/CFT/tcg

consideration in the FEIR. In comments, Daly City, South San Francisco, the County of San Mateo, and 280 Citizens support while PG&E and CARE oppose further study of the San Bruno Mountain alternative. In addition, PG&E opposes further study of the El Camino Real alternative to use of the BART right of way. As explained in Section V.B.4, we determine that these two route alternatives do not warrant further review.

Parties' comments regarding EMF policies and mitigation largely mirror positions taken during the hearings and in briefs, which are not repeated here. PG&E states that it would undertake most of the EMF mitigation required by the proposed decision as part of its final EMF management plan, including a triangular configuration of conductors in underground duct banks as a no-cost EMF reduction measure and strategic placement of the line to reduce EMF exposure as a no-cost and low-cost measure. We note, however, that PG&E did not include these measures in its preliminary EMF management plan for the Jefferson-Martin project. As a result, in Section VI.C we affirmatively require the use of these no-cost and low-cost measures.

The proposed decision would have required focused low-cost EMF mitigation in some residential areas if the trench could not be lowered an additional 5 feet in all residential areas within a 4% EMF mitigation budget. PG&E is concerned that undertaking EMF mitigation for some but not all residential areas could create a risk of perceived unfairness. PG&E also asserts that it is infeasible to determine final placement of the entire line before construction begins in order to assess which residences could be targeted for deeper trenches within an EMF budget. PG&E argues further that the proposed decision's requirement that the trench depth be lowered for all residential buildings with EMF exposures in excess of 3 mG. would create a *de facto* 3 mG magnetic field standard. PG&E reports that it expects to lower the trench

- 136 -

A.02-09-043  ALJ/CFT/tcg

somewhat, but less than 5 feet, for residential blocks where a 15% effectiveness test is met, to the extent allowed by the EMF budget.[40]  As explained in Section VI.C, we simplify the low-cost residential EMF mitigation program to require that the trench be lowered by 5 feet in all residential areas where this would reduce magnetic fields at least 15%.

In their comments, several parties request changes to the adopted mitigation measures.  PG&E proposes a further slight modification to mitigation measures B-5a and B-8a regarding the relocation of disturbed wildlife, which is reasonable and is adopted in the FEIR addendum attached as Appendix A and included in the comprehensive list of approved mitigation measures in Appendix B.  CCSF suggests certain mitigations for environmental impacts of the overhead line segment north of Trousdale Drive.  A review of CCSF's recommended mitigation measures reveals that its concerns are already addressed by the FEIR mitigation measures contained in Appendix B.

The City of San Bruno requests confirmation that PG&E must comply with certain specified FEIR mitigation measures.  PG&E is required to comply with the mitigation measures contained in Appendix B, which includes all of the mitigation measures identified by San Bruno except mitigation measure L-4d. That measure was intended only for the northern Collocation Alternative along Seventh Avenue and is not relevant to the adopted route.  San Bruno also asks that Commission monitors provide copies of weekly monitoring reports and contact San Bruno if construction problems arise.  During the construction

---

[40] In response to a July 2, 2004 ALJ ruling, PG&E filed estimates regarding EMF mitigation costs for the adopted route.  Due to concerns regarding their accuracy, as voiced by 280 Citizens, we decline to reopen the record to receive these cost estimates.

A.02-09-043  ALJ/CFT/tcg

monitoring period, weekly monitoring reports are posted on the Commission's web site and would identify any problems that have arisen.  Because San Bruno may access those reports, we see no need to require that the reports be affirmatively provided to the City.

San Bruno requests further that PG&E cooperate with San Bruno in designing the line to preserve utility corridors for future city utility needs. Mitigation measure U-1b, which requires that PG&E coordinate with local jurisdictions in final siting within streets, should address San Bruno's concerns in this respect.  Finally, San Bruno asks that PG&E be required to compensate it for costs incurred in reviewing design and construction of the line. Since the issue of reimbursement of local government costs was not raised during the hearings, we suggest that San Bruno discuss this matter with PG&E to determine PG&E's practices and plans in this regard.

## XIII. Assignment of Proceeding

Loretta M. Lynch is the Assigned Commissioner and Charlotte F. TerKeurst is the assigned ALJ in this proceeding.

## Findings of Fact

1.  The draft EIR described the route of the Collocation Alternative and identified and discussed its possible environmental impacts at length.  Parties were able to, and did, submit extensive and substantive comments on the Collocation Alternative.

2.  The route options for the Collocation Alternative added in the FEIR do not constitute significant new information for which recirculation is required.

3.  The project alternatives considered in the FEIR constitute a reasonable range of feasible alternatives, as required by the CEQA Guidelines.

4.  It is reasonable to use PG&E's March 2003 load forecast in assessing need for the Jefferson-Martin project.

A.02-09-043 ALJ/CFT/tcg

5. The Jefferson-Martin project is needed in order to allow PG&E to continue to reliably meet electric demand in the San Francisco Peninsula Area beginning in 2007, when demand is anticipated to be 1978 MW in the San Francisco Peninsula Area.

6. The Jefferson-Martin project has diversification, economic, and environmental benefits that warrant its construction before 2007.

7. The environmentally superior alternative for the Jefferson-Martin project based on the FEIR consists of Route Option 1B in the southern segment, with one of three crossings of the Crystal Springs Dam, in conjunction with either the Proposed Project's northern underground segment modified to include Route Option 4B rather than Route Option 4A or the Collocation Alternative.

8. It is reasonable to modify PG&E's preliminary EMF management plan for the Jefferson-Martin project, as described in Section VI.C.

9. For the southern portion of the Jefferson-Martin project, the hybrid alternative using Route Option 1B between the Jefferson substation and a new transition tower replacing tower 11/70 west of Trousdale Drive, and PG&E's proposed overhead route north of the transition tower provides the best balance among competing considerations. In particular, it will minimize visual and biological impacts south of the transition tower, avoid impacts on Edgewood Park and the Pulgas Ridge Natural Preserve, avoid Route Option 1B's effects on residences and businesses along Trousdale Drive and El Camino Real and seismic concerns in that area, and eliminate most EMF concerns regarding the southern segment.

10. It is reasonable to allow PG&E to determine which of five options for crossing Crystal Springs Dam to utilize, based on the timing of project construction and the preferences of the SFPUC, the County of San Mateo, and the USFWS.

A.02-09-043  ALJ/CFT/tcg

11.  The environmentally superior route consisting of Route Option 1B in the southern segment in conjunction with the Proposed Project's northern underground segment modified to include Route Option 4B rather than Route Option 4A poses less harm to the environment than do the other routes proposed by PG&E and other parties to this proceeding.

12.  The Proposed Project's northern underground segment is preferable to the Collocation Alternative because of the risks associated with the Collocation Alternative's construction through contaminated areas and along the Bay and the loss of diversification due to its collocation with the existing underground 230 kV line.

13.  Route Option 4B is preferable to Route Option 4A because it will avoid construction impacts to residences along Hoffman and Orange Streets.

14.  The approved route consisting of the Trousdale Drive hybrid alternative using Route Option 1B, with five options for crossing Crystal Springs Dam, and PG&E's Proposed Project in the southern segment in conjunction with the Proposed Project's underground northern segment with Route Option 4B reflects community values more accurately than does the environmentally superior route.

15.  We are not obligated to choose the least costly route if that route causes greater environmental harm than more costly routes or if some other route most closely reflects the prevalent community values.

16.  The Commission has reviewed and considered the information in the FEIR before approving the project.

17.  The FEIR identifies significant environmental effects of the route we approve that can be mitigated or avoided to the extent that they become not significant.  The FEIR describes measures that will reduce or avoid such effects.

- 140 -

A.02-09-043 ALJ/CFT/tcg

18. The environmental mitigation measures identified in the FEIR, with modifications in Appendix A, are feasible and will avoid significant environmental impacts. The environmental mitigation measures applicable to the approved transmission line route are in Appendix B.

19. As lead agency under CEQA, the Commission is required to monitor the implementation of mitigation measures adopted for this project to ensure full compliance with the provisions of the monitoring program.

20. The Mitigation Monitoring, Compliance, and Reporting Plan in Section G of the FEIR conforms to the recommendations of the FEIR for measures required to mitigate or avoid environmental effects of the project that can be reduced or avoided.

21. The Commission will develop a detailed implementation plan for the Mitigation Monitoring, Compliance, and Reporting Plan.

22. The FEIR identifies no significant environmental impact of the approved route that cannot be mitigated or avoided.

23. We have considered and approve of the discussion in the FEIR covering parks and recreation, cultural and historic resources, environmental impacts generally, and the public comment and response section.

24. The maximum reasonable and prudent cost for the approved project is $206,988,000.

25. The five photographs included in the comments of 280 Citizens on the proposed decision are not needed for our consideration of 280 Citizens's comments.

26. It is reasonable to not require that a Supplemental FEIR be prepared for the San Bruno Mountain and El Camino Real alternative route segments, as described in Section V.B.4.

A.02-09-043  ALJ/CFT/tcg

**Conclusions of Law**

1.  The Commission has jurisdiction over the proposed project pursuant to Pub. Util. Code § 1001 et seq.

2.  Recirculation of the FEIR is not required by CEQA because no "significant new information" is contained in the FEIR, as that term is used in CEQA.

3.  The motion by the City of South San Francisco and CBE-101 requesting recirculation of the FEIR should be denied.

4.  Because the FEIR considered a reasonable range of feasible alternatives, it is not necessary to amend the FEIR as Daly City suggests or to recirculate the FEIR for comments on Daly City's suggested alternative.

5.  PG&E's preliminary EMF management plan for the Jefferson-Martin project should be modified as described in Section VI.C.

6.  The Commission has authority to specify a "maximum cost determined to be reasonable and prudent" for the Jefferson-Martin project pursuant to Pub. Util. Code § 1005.5.

7.  The Commission should approve a maximum reasonable and prudent cost of $206,988,000 for this project.

8.  This Commission's determination regarding the maximum reasonable and prudent cost pursuant to § 1005.5 has bearing on the amount of cost recovery PG&E may seek from the FERC.

9.  The Commission retains authority to approve PG&E's EMF mitigation plan to ensure that it does not create other adverse environmental impacts.

10.  Commission approval of PG&E's application, as modified herein, is in the public interest.

11.  EMF mitigation measures, as described in Section VI.C and Section XII, should be adopted and made conditions of project approval.

A.02-09-043  ALJ/CFT/tcg

12.  The Jefferson-Martin 230 kV Transmission Line Project Addendum to Final Environmental Impact Report attached as Appendix A should be approved.

13.  Project approval should be conditioned upon construction according to the following route:

> Beginning at the Jefferson substation, the project should be constructed along a hybrid route  commencing with Route Option 1B in the southernmost segment; with PG&E authorized to determine which of five identified options for crossing Crystal Springs Dam to utilize based on the timing of project construction and the preferences of the SFPUC, the County of San Mateo, and USFWS; and transitioning to an overhead configuration at a new transition structure sited at the location of existing tower 11/70;

> From the new transition structure, the transmission line should be constructed as proposed in PG&E's Proposed Project until the line transitions underground at a new Glenview Drive transition tower located on a roadway divider between Glenview Drive and Skyline Boulevard west of an existing water tank, on land owned by Caltrans;

> From the new Glenview Drive transition tower, the line should be constructed in an underground configuration along Glenview Drive to its intersection with San Bruno Avenue where it should travel east down San Bruno Avenue; and

> From San Bruno Avenue, the line should be constructed consistent with PG&E's proposed underground route in the northern segment, modified to include Route Option 4B rather than Route Option 4A, to the Martin substation.

14.  Project approval should be conditioned upon use of Mitigation Measure T-9a at the discretion of the City of San Bruno.

15.  Project approval should be conditioned upon the completion of the mitigation measures in Appendix B.  The mitigation measures are feasible and will minimize or avoid significant environmental impacts.  Those mitigation measures should be adopted and made conditions of project approval.

A.02-09-043  ALJ/CFT/tcg

16.  Any disputes between PG&E and local governments regarding land use matters should be submitted to the Commission for resolution as provided in Section XIV of G.O. 131-D.

17.  After considering and weighing the values of the community, benefits to parks and recreational areas, the impacts on cultural and historic resources, and the environmental impacts caused by the project, we conclude that the CPCN for the Jefferson-Martin project as described in this decision should be approved.

18.  Based on the completed record before us, we conclude that other alternatives identified in the FEIR are infeasible, pose more significant environmental impacts, or are less consistent with community values than the route we select in this decision.

19.  Pub. Util. Code § 625(a)(l)(A) does not apply to this project.  However, PG&E must provide notice pursuant to § 625(a)(l)(B) if and when it pursues installation of facilities for purposes of providing competitive services.

20.  The motion of 280 Citizens to reopen the record for receipt of five photographs included in its comments on the proposed decision should be denied

21.  The Petition to Intervene of the San Bruno Mountain Coalition should be denied because a Supplemental FEIR for the San Bruno Mountain route alternative will not be prepared.

22.  This order should be effective today so that PG&E may proceed expeditiously with construction of the authorized project.


# O R D E R

**IT IS ORDERED** that:

A.02-09-043 ALJ/CFT/tcg

1. The motion by the City of South San Francisco and Concerned Businesses East of Highway 101 requesting recirculation of the Final Environmental Impact Report (FEIR) is denied.

2. Official notice is taken of information on the website of the California Energy Commission (CEC) indicating that the City and County of San Francisco filed an Application for Certification on March 18, 2004 (CEC Docket No. 04-AFC-1) for three combustion turbines.

3. A Certificate of Public Convenience and Necessity is granted to Pacific Gas and Electric Company (PG&E) to construct a 230 kV transmission line in the County of San Mateo from PG&E's existing Jefferson substation to its existing Martin substation and associated substation upgrades.

4. PG&E shall, as a condition of approval, build the project in accordance with the following route:

> Beginning at the Jefferson substation, the project shall be constructed along a hybrid route commencing with Route Option 1B in the southernmost segment; with PG&E authorized to determine which of five identified options for crossing Crystal Springs Dam to utilize based on the timing of project construction and the preferences of the SFPUC, the County of San Mateo, and the U.S. Fish and Wildlife Service; and transitioning to an overhead configuration at a new transition structure sited at the location of existing tower 11/70;

> From the new transition structure, the transmission line shall be constructed as proposed in PG&E's Proposed Project until the line transitions underground at a new Glenview Drive transition tower located on a roadway divider between Glenview Drive and Skyline Boulevard west of an existing water tank, on land owned by Caltrans;

> From the new Glenview Drive transition tower, the line shall be constructed in an underground configuration along Glenview Drive to its intersection with San Bruno Avenue where it shall travel east down San Bruno Avenue; and

A.02-09-043  ALJ/CFT/tcg

> From San Bruno Avenue, the line shall be constructed consistent with PG&E's proposed underground route in the northern segment, modified to include Route Option 4B rather than Route Option 4A, to the Martin substation.

5.  PG&E shall, as a condition of approval, build the project with use of Mitigation Measure T-9a at the discretion of the City of San Bruno.

6.  PG&E shall, as a condition of approval, comply with all applicable mitigation measures specified in Appendix B attached hereto, as directed by the Commission's Executive Director or his designee(s).  PG&E shall work with the Commission's Energy Division to create detailed maps for use in construction and mitigation monitoring.

7.  Modifications to PG&E's preliminary electric and magnetic field (EMF) plan for the Jefferson-Martin project are adopted as described in Section VI.C of this order.

8.  PG&E shall, as a condition of approval, build the project in accordance with its preliminary electric and magnetic field (EMF) management plan as modified consistent with Section VI.C of this order.

9.  Pursuant to Pub. Util. Code § 1005.5, the maximum cost determined to be reasonable and prudent for the Jefferson-Martin project is $206,988,000, subject to modification if the approved northern route is altered.

10.  Once PG&E has developed a final detailed engineering design-based construction estimate for the adopted route, if this estimate is one percent or more lower than the adopted maximum reasonable and prudent cost determined pursuant to Pub. Util. Code § 1005.5, PG&E must, within 30 days, show cause why the Commission should not adopt a lower amount as the maximum reasonable and prudent cost to reflect the final estimate.

11.  PG&E shall, prior to commencing construction, submit a detailed EMF mitigation plan for approval of the Commission's Energy Division.  The plan

A.02-09-043  ALJ/CFT/tcg

shall describe in detail each mitigation element, the cost of each element, and the percentage by which that mitigation will reduce EMF levels.

12. The Executive Director shall supervise and oversee construction of the project insofar as it relates to monitoring and enforcement of the mitigation conditions described in the FEIR as modified by Appendix A to this decision. The Executive Director may delegate his duties to one or more Commission staff members or outside staff. The Executive Director is authorized to employ staff independent of the Commission staff to carry out such functions, including, without limitation, the on-site environmental inspection, environmental monitoring, and environmental mitigation supervision of the construction of the project. Such staff may be individually qualified professional environmental monitors or may be employed by one or more firms or organizations. In monitoring the implementation of the environmental mitigation measures described in the FEIR as modified by Appendix A, the Executive Director shall attribute the acts and omissions of PG&E's employees, contractors, subcontractors, or other agents to PG&E. PG&E shall comply with all orders and directives of the Executive Director concerning implementation of the environmental mitigation measures described in Appendix B.

13. PG&E's right to construct the project as set forth in this decision shall be subject to all other necessary state and local permitting processes and approvals.

14. PG&E shall file a written notice with the Commission, served on all parties to this proceeding, of its agreement, executed by an officer of PG&E duly authorized (as evidenced by a resolution of its board of directors duly authenticated by a secretary or assistant secretary of PG&E) to acknowledge PG&E's acceptance of the conditions set forth in the Ordering Paragraphs of this decision. Failure to file such notice within 75 days of the effective date of this decision shall result in the lapse of the authority granted by this decision.

A.02-09-043 ALJ/CFT/tcg

15. The Final Environmental Impact Report and the Addendum in Appendix A for the Jefferson-Martin project are certified.

16. The Executive Director shall file a Notice of Determination for the project as required by the California Environmental Quality Act and the regulations promulgated pursuant thereto.

17. Upon satisfactory completion of the project, a notice of completion shall be filed with the Executive Director by the Energy Division.

A.02-09-043 ALJ/CFT/tcg

18. The motion of 280 Citizens to reopen the record for receipt of five photographs included in its comments on the proposed decision is denied.

19. The Petition to Intervene of the San Bruno Mountain Coalition is denied.

20. This proceeding is closed.

This order is effective today.

Dated August 19, 2004, at San Francisco, California.


MICHAEL R. PEEVEY
President
CARL W. WOOD
LORETTA M. LYNCH
GEOFFREY F. BROWN
SUSAN P. KENNEDY
Commissioners


I reserve the right to file a concurrence.

/s/ MICHAEL R. PEEVEY
President

I reserve the right to file a concurrence.

/s/ CARL W. WOOD
Commissioner


I reserve the right to join Commissioner Wood's concurrence.

/s/ SUSAN P. KENNEDY
Commissioner

A.02-09-043 ALJ/CFT/tcg

**ATTACHMENT A**
**Page 1**

**LIST OF APPEARANCES IN**
**A.02-09-043**

Stephan C. Volker
Attorney At Law
BRECHER & VOLKER, LLP
436 14TH STREET, SUITE 1300
OAKLAND CA 94612
(510) 496-0600
svolker@volkerlaw.com
For: CALIFORNIAN FOR RENEWABLE ENERGY, INC.

Grant A. Rosenblum
Operator Corporation
CALIFORNIA INDEPENDENT SYSTEM
151 BLUE RAVINE RD.
FOLSOM CA 95630
(916) 608-7138
grosenblum@caiso.com

Lynne Brown
Member
CALIFORNIANS FOR RENEWABLE ENERGY, INC.
RESIDENT, BAYVIEW HUNTERS POINT
24 HARBOR ROAD
SAN FRANCISCO CA 94124
l_brown123@yahoo.com
For: CALIFORNIANS FOR RENEWABLE ENERGY, INC.

Michael E. Boyd
President
CALIFORNIANS FOR RENEWABLE ENERGY, INC.
5439 SOQUEL DRIVE
SOQUEL CA 95073
(408) 465-9809
michaelboyd@sbcglobal.net
For: CALIFORNIANS FOR RENEWABLE ENERGY, INC.

Joseph P. Como
Deputy City Attorney
CITY AND COUNTY OF SAN FRANCISCO
CITY HALL,  ROOM 234
1 DR. CARLTON B. GOODLETT PLACE, RM. 234
SAN FRANCISCO CA 94102
(415) 554-4637
joe.como@sfgov.org
For: City and County of San Francisco

Stan Gustavson
City Attorney
CITY HALL
333 90TH STREET
DALY CITY CA 94015

Pamela Thompson
City Attorney
CITY OF SAN BRUNO
567 EL CAMINO REAL
SAN BRUNO CA 94066
(650) 616-7057
pthompson@ci.sanbruno.ca.us
For: City of San Bruno

Mary K. Raftery
Attorney At Law
COUNTY OF SAN MATEO
OFFICE OF THE COUNTY COUNSEL
400 COUNTY CENTER
REDWOOD CITY CA 94063
(650) 363-4795
mraftery@co.sanmateo.ca.us
For: County of San Mateo

Edward W. O'Neill
Attorney At Law
DAVIS WRIGHT TREMAINE LLP
ONE EMBARCADERO CENTER, SUITE 600
SAN FRANCISCO CA 94111-3834
(415) 276-6500
edwardoneill@dwt.com
For: 280 Corridor Concerned Citizens Group

Michael B. Day
Attorney At Law
GOODIN MACBRIDE SQUERI RITCHIE & DAY LLP
505 SANSOME STREET, SUITE 900
SAN FRANCISCO CA 94111
(415) 392-7900
mday@gmssr.com
For: CITY OF BURLINGAME

Joan L. Cassman
HANSON BRIDGETT MARCUS, VLAHOS & RUDY
333 MARKET STREET, SUITE 2300
SAN FRANCISCO CA 94105
(415) 995-5021
jcassman@hansonbridgett.com
For: City of Millbrae

Mark Hudak
INGERSOLL,THOMPSON&HORN PROFESSIONAL
216 PARK ROAD
BURLINGAME CA 94010
(650) 342-9600

A.02-09-043  ALJ/CFT/tcg

**ATTACHMENT A**
**Page 2**

**LIST OF APPEARANCES IN**
**A.02-09-043**

(650) 991-8122
sgustavson@dalycity.org

Louis G. Leonard Iii
LATHAM & WATKINS
505 MONTGOMERY ST. SUITE 1900
SAN FRANCISCO CA 94111
(415) 391-0600
louis.leonard@lw.com
For: Pacific Gas & Electric

Richard W. Raushenbush
Attorney At Law
LATHAM & WATKINS
505 MONTGOMERY STREET, SUITE 1900
SAN FRANCISCO CA 94111
(415) 395-8237
richard.raushenbush@lw.com
For: Pacific Gas & Electric Company

Patrick Whitnell
STEVEN MATTAS, CITY ATORNEY
Attorney At Law
MEYERS NAVE RIBACK SLVER & WILSON
555 12 ST., SUITE 1500
OAKLAND CA 94607
(510) 808-2000
pcw@meyersnave.com
For: City of South San Francisco

Peter W. Hanschen
Attorney At Law
MORRISON & FOERSTER, LLP
101 YGNACIO VALLEY ROAD, SUITE 450
WALNUT CREEK CA 94596-8130
(925) 295-3450
phanschen@mofo.com
For: Genentech

David Kraska
Attorney At Law
PACIFIC GAS & ELECTRIC COMPANY
PO BOX 7442
SAN FRANCISCO CA 94120
(415) 973-7503
dtk5@pge.com
For: PG&E

mhudak@cmithlaw.com
For: Town of Hillsborough

Zachary R. Walton
PAUL,HASTINGS,JANOFSKY&WALKER LLP
55 SECOND STREET, 24TH FLOOR
SAN FRANCISCO CA 94105-3441
(415) 856-7076
zacharywalton@paulhastings.com
For: GatewayProperty Owners Asso./HMS Oyster Point
Blvd.,LLC/Concerned Business East of 101

Marion Peleo
Legal Division
RM. 4107
505 VAN NESS AVE
San Francisco CA 94102
(415) 703-2130
map@cpuc.ca.gov

Jeanne B. Armstrong
RITCHIE & DAY, LLP
505 SANSOME STREET, SUITE 900
SAN FRANCISCO CA 94111
(415) 392-7900
jarmstrong@gmssr.com
For: City of Burlingame

Michael J. Valencia
Attorney
ROSS HACKETT DOWLING VALENCIA WALTI
600 EL CAMINO REAL
SAN BRUNO CA 94066-0279
(650) 588-0367
ross-ndv@pacbell.net

Richard Tom
Law Department
SOUTHERN CALIFORNIA EDISON COMPANY
2244 WALNUT GROVE AVENUE
POST OFFICE BOX 800
ROSEMEAD CA 91770
(626) 302-4430
richard.tom@sce.com

Stephen E. Pickett
Attorney At Law
SOUTHERN CALIFORNIA EDISON COMPANY
2244 WALNUT GROVE AVENUE
ROSEMEAD CA 91770

A.02-09-043 ALJ/CFT/tcg

**ATTACHMENT A**
**Page 3**

**LIST OF APPEARANCES IN**
**A.02-09-043**

(626) 302-4430
picketse@sce.com
For: SOUTHERN CALIFORNIA EDISON COMPANY

Peter H. Weiner
ZACHARY R. WALTON/JON L. WELNER
Attorney At Law
PAUL HASTINGS JANOFSKY AND WALKER, LLP
55 2ND STREET, 24TH FLOOR
SAN FRANCISCO CA 94105-3441
(415) 856-7000
peterweiner@paulhastings.com
For: Gateway Property Owners Assn/HMS Oyster Pt
Blvd/Concerned Businesses E of 101

Martha Debry
TOWN OF HILLSBOROUGH
1600 FLORIBUNDA AVENUE
HILLSBOROUGH CA 94010
(650) 375-7409
mdebry@hillsca.org
For: Town of Hillsborough

A Karp
Attorney At Law
WHITE & CASE LLP
3 EMBARCADERO CTR STE 2210
SAN FRANCISCO CA 94111-4050
(415) 544-1103
jkarp@whitecase.com
For: Mirant Americas, Inc

Barbara George
Executive Director
WOMEN'S ENERGY MATTERS
PO BOX 883723
SAN FRANCISCO CA 94188-3723
(415) 330-9844
bgwem@igc.org
For: Women's Energy Matters

**(END OF ATTACHMENT A)**

(

A.02-09-043  ALJ/CFT/tcg

# APPENDIX A

A.02-09-043  ALJ/CFT/tcg

# APPENDIX B

D0408046/A0209043 Appendix A

D0408046/A0209043 Appendix B

ALJ/KOT/tcg                                    **Mailed 8/25/2004**


## PUBLIC UTILITIES COMMISSION OF THE STATE OF CALIFORNIA

Resolution ALJ-184
Administrative Law Judge Division
August 19, 2004


## RESOLUTION

**RESOLUTION ALJ-184. Adopting annual process for setting hourly
rates to use in calculating compensation awards to intervenors.**

---

## I. Introduction

In today's resolution, we adopt an annual process for setting and updating hourly rates
for use by intervenors in seeking compensation for substantially contributing to a
Commission decision, as provided in the statutory intervenor funding program. (Pub.
Util. Code §§ 1801-1812. Unless otherwise stated, all citations to statute are to the Public
Utilities Code.) The hourly rates that we establish through this process will govern
intervenors and their representatives who have recently participated in our
proceedings, and will provide guidance to other intervenors and representatives.

## II. Background

In Decision (D.) 03-10-061 and D.03-10-062, we directed the Executive Director and
Chief Administrative Law Judge to "develop a comprehensive process for the
Commission to annually set rates for intervenor attorney, expert, and paralegal fees...."
On October 29, 2003, the Executive Director and Chief Administrative Law Judge wrote
to over 40 regular participants in our proceedings, including frequent intervenors and
utilities from the various regulated industries. Their letter invited comments and
suggestions to begin development of this annual process. Specifically, the Commission
sought input on the following questions:

1. What annual process do you recommend for setting hourly rates?
2. How would the annual process you recommend meet (1) the standards of
   Section 1806, and (2) the goals of D.03-10-062, specifically, "promote fairness
   in awards, both in absolute and relative terms" and "increase administrative
   efficiency [so that intervenors are paid] on a more expedited basis"?

179111                               - 1 -

Resolution ALJ-184  ALJ/KOT/tcg

> 3. Consistent with Section 1806, what information should the Commission accept or require in setting hourly rates?

Aglet Consumer Alliance (Aglet), SBC Pacific Bell (SBC), Pacific Gas and Electric (PG&E), Southern California Edison (SCE), The Utility Reform Network (TURN), AT&T Communications of California, Inc., Greenlining Institute (Greenlining), and Grueneich Resource Advocates served opening comments, on November 14, 2003. Latino Issues Forum (LIF) served opening comments on November 25, 2003. SCE and Greenlining served reply comments on December 2, 2003 and PG&E, Aglet, LIF, SBC, and TURN served reply comments on December 3, 2003.

The comments raise three main issues, which we discuss and resolve below. We expect, however, to refine the process over time, based on our experience and suggestions by everyone involved.

## III. Individual Rates vs. General Ranges

Commenters differ on whether the process should produce individual rates for particular advocates or ranges of rates based upon general levels of training and experience. Some commenters suggest that the number of advocates eligible to claim intervenor compensation is sufficiently small that standardized rates for general levels of training and experience are unnecessary and cannot accurately account for different levels of experience and skill. Some commenters suggest that we adopt default rates based on general levels of training and experience but allow advocates to seek higher rates if they feel their specific training, experience, and skill warrant. Others recommend adopting ranges of rates based on training and experience, allowing advocates to present evidence of where they fall within the range.

After reviewing the comments, we propose to adopt rates for individual advocates based on their specific training and experience, taking into consideration the compensation of persons with comparable training and experience. With the additional data that we intend to gather, we can adopt fair rates for these advocates for a particular calendar year.

We intend that, in general, when we adopt a rate for a particular advocate for a particular calendar year, the intervenor seeking to recover fees for that advocate's work in that calendar year will use that rate in calculating the intervenor's compensation request. This generalization is subject to several qualifications. We observe, first, that historically we have augmented an advocate's rate by a "multiplier" in consideration of various specific factors on a case-by-case basis. We will continue that practice, but because a multiplier is case-specific, it does not actually change the adopted hourly rate for that advocate. Second, an intervenor may request an adjustment to an adopted hourly rate but must show good cause for doing so. For example, if a court or

Resolution ALJ-184  ALJ/KOT/tcg

regulatory agency awarded the advocate a higher hourly rate for work in the same
calendar year, the intervenor may ask us to use the higher rate. The burden is on the
intervenor to justify the higher rate, and in the example just given, we would expect the
intervenor to address, among other things, the standard used by the court or agency in
setting the higher rate and the comparability of the work performed at the Commission
to the work performed at the court or agency.

Finally, the adopted rate carries our expectation about the level of the advocate's
performance; to the extent that the advocate performs above or below that level in a
particular proceeding we would consider augmenting or reducing the hourly rate. For
example, we expect that advocates with experience before the Commission have a
certain level of knowledge about our Rules of Practice and Procedure and filing
requirements, so a seasoned advocate who fails to follow these rules would not be
performing at a level consistent with what we would expect from someone of that
training and experience. Thus, in that circumstance, we may consider awarding a lower
hourly rate for the advocate's work in that proceeding. Similarly, an advocate who
surpasses expectations may ask us to award a higher hourly rate. For example, where
an advocate served ably in the dual role of attorney and expert, eliminating the
intervenor's need to employ separate individuals for each role, we may consider
awarding a higher hourly rate for that advocate's work in that proceeding.

Of necessity, we can adopt specific hourly rates only for those advocates who already
have experience at the Commission. We also encourage new intervenors and advocates
to participate in our proceedings. The annual process will develop information that will
enable prospective intervenors to project reasonable rates by referring to ranges of
training and experience revealed in that process. Particularly for attorney advocates,
we have found from over 20 years of setting hourly rates that the rates tend to fall
within three ranges, based on length of relevant experience and roughly corresponding
to the associate, partner, and senior partner levels within a law firm. We expect to
continue to specify these general ranges, which should be utilized by new intervenors
and advocates in developing their proposed hourly rates.

## IV. Data Requirements

Section 1806 requires that the Commission "take into consideration the market rates
paid to persons of comparable training and experience who offer similar services" when
awarding compensation to advocates eligible for intervenor compensation. For this
consideration, we must have sufficient data about the training and experience of
advocates of both intervenors and others offering similar services on behalf of utilities
and this Commission. We also need information about the "comparable market rate"
for those service providers that are paid by utilities and the Commission. Commenters

- 3 -

Resolution ALJ-184  ALJ/KOT/tcg

propose various types of information be gathered during a proceeding to set hourly rates.

So that we may assess the training and experience of Commission practitioners, we propose that current or prospective intervenors that expect to make requests for compensation for work in a given calendar year submit information about the training and experience of the personnel they expect to perform work on their behalf.  The information submitted must cover both attorneys and non-attorneys.  Intervenors must include the past rates adopted for their advocates in their filing and a proposed rate for the upcoming year.  On the same date as the intervenor filing, respondent utilities[1] must submit a list of the training and experience of in-house personnel who have worked on matters before the Commission during the prior calendar year.[2]  The utilities must prepare a similar list for outside counsel, experts, or other service providers who have supported the utilities' efforts before the Commission during the prior calendar year.  Each of the utilities' lists must identify the title of the individual and type of service provided, describe the individual's training (for example, degrees and years obtained), and indicate the individual's experience appearing or supporting work before the Commission.

We agree with commenters that we currently have insufficient information regarding the "market rate for services paid by the … public utility, … to persons of comparable training and experience who are offering similar services."  (§ 1806.)  Therefore, we direct the utilities to provide this information for all persons identified on the above-described lists.  For in-house personnel, the utilities must develop an effective hourly rate by identifying salary, benefits and other compensation, and an allocation of overheads for each individual listed.  For outside service providers, the utilities must identify the rates charged to the utility (and the usual billing rate, if different) for each individual listed.[3]

---

[1] The "respondent utilities" will be each utility that we have required to pay an award for intervenor work performed in any of the three calendar years preceding the calendar year for which we are setting hourly rates.

[2] This listing must include in-house utility witnesses, attorneys, and project managers; however, the utility may limit the listing to those persons who have participated in Commission proceedings during the past three years or will participate in the upcoming calendar year.

[3] To the extent that this information suggests logical ranges for comparing compensation rates for persons with similar experience, we encourage the utilities to group them accordingly.

- 4 -

Resolution ALJ-184  ALJ/KOT/tcg

Hourly rates paid by the Commission itself to its staff and consultants are also relevant under Section 1806, which says in part that the compensation we award "may not, in any case, exceed the comparable market rate for services paid by the commission or the public utility, <u>whichever is greater</u>" (emphasis added). We assume that hourly rates in the private sector generally exceed those paid by the Commission, but we will test this assumption by having our Executive Director review the data provided by the utilities. Following this review, the Executive Director will report instances, with appropriate data, in which the Commission has paid rates exceeding those paid by the utilities. Absent any such instances, the report need only note that fact, without further data.

In addition, we encourage intervenors and other interested persons to submit other information, for example, market surveys or benchmarking studies. We also invite independent experts or individuals with specialized knowledge of billing information to submit relevant information at the same time as intervenors and utilities submit their data.

As a general matter, Section 1806 requires us to look first to the compensation of practitioners before this Commission in setting rates for intervenors because of the statute's requirement to consider the costs of providers of similar services. However, we allow intervenors and others, when appropriate, to refer to rates charged or awarded for work in other forums.

## V. Timing

Commenters propose different timing for the annual process. Some commenters suggest that rates be set for a base year and then adjusted annually by some type of index (for example, the Consumer Price Index) for some period of time before the base rate is re-evaluated. Some commenters suggest that rates be based on prior year data and applied retroactively to the awards for the past year. Others suggest that we adopt rates prospectively for the coming year. Others suggest that it is sufficient if rates are adopted for a given calendar year by April of that same year, as requests for compensation for work performed during January through March are unlikely to be resolved before April.

We agree with TURN that intervenors are unlikely to request an award of compensation for work performed in a given year prior to April of that same year. Therefore, our procedure is designed to adopt rates no later than April 30 for use that calendar year.

As described above, we are requiring utilities to submit data on compensation paid to in-house and outside representatives for the prior calendar year. We will adjust the prior year rates by the Consumer Price Index to bring them to a current year basis. The

- 5 -

Resolution ALJ-184  ALJ/KOT/tcg

rates requested by each intervenor will be compared against the adjusted utility rates and other data submitted to assess whether the intervenor requests the market rate for persons of comparable training and experience who are offering similar services.

We do not at this time adopt a base year rate with subsequent annual adjustments based on an index of general inflation; we agree with certain parties that market rates for advocates do not necessarily move in lockstep with inflation rates. We are open to considering an index that is more narrowly targeted to cost increases for the professional services that we compensate through the intervenor compensation program.

We will use the following generic schedule for the annual process beginning for 2005 calendar year rates:

| January 15 | Utilities submit data/Intervenors submit proposed rates and supporting information |
| February 5 | Filings (by intervenors, utilities, or other interested persons) describing how January 15 data do or do not support proposed rates for particular advocates |
| March 23 | Draft decision adopting rates |
| April 22 | Commission adopts hourly rates |

This timing would begin for 2005 calendar year rates.

The draft resolution contemplated doing the same process in the middle of this year to derive 2004 calendar year rates. Several considerations, including our review of comments on the draft resolution, prompt us to revise our approach to 2004.

First, there are reasonable concerns and questions about how the new process will work. To address them, we will institute the rulemaking for 2005 rates soon after our adoption of this resolution. We build into the rulemaking time to work out implementation issues before launching the above schedule. This implementation phase will include submission of preliminary data sets for utilities' 2003 costs of representation in our proceedings. Following submission, there will be a workshop. Our intent is that this implementation process will help all the participants reach a common understanding on matters such as level of detail, format, and aggregation.

Second, we will use an alternative approach, discussed in the draft resolution, for establishing 2004 rates. Under this approach, we will adopt an escalation factor and allow intervenors to use that factor to calculate award requests for work done in 2004. In other words, where we have approved an hourly rate for an advocate for 2003, an

Resolution ALJ-184  ALJ/KOT/tcg

intervenor may escalate that rate by the factor when seeking compensation for that advocate's work done in 2004. There will be a rebuttable presumption that a rate so escalated is reasonable.

The comments contain information that supports an escalation factor of 8%.[4] In fact, 8% is at the low end of the information; however, we note that the Of Counsel surveys (which TURN and Aglet regularly rely on and which report annualized increases exceeding 10% in recent years) do not appear to reflect changes in public sector salaries. The latter, which are relevant to hourly rate determination under Section 1806, have not, at least at the State level, kept pace with private sector salaries. Consequently, under these limited circumstances, we find an 8% escalation factor is reasonable.

An intervenor may still make an individualized showing in appropriate circumstances, e.g., regarding an advocate new to our proceedings, or an advocate who (in the intervenor's opinion) had progressed to a significantly higher level of expertise since we had last set an hourly rate for that advocate. Similarly, a utility could oppose an increase to an advocate's hourly rate, whether the increase was predicated on the escalation factor or an individualized showing.

**VI. Nature of the Annual Process**

The annual process should provide greater certainty to intervenors and reduce controversy in particular award requests. We want to keep the annual process short and informal because we recognize that the cost of a slow burdensome process might outweigh the hoped-for benefits. Thus, we will use notice-and-comment procedure for receiving input from utilities, intervenors, and other participants. Analysis of the data should be straightforward, and we see no need for evidentiary hearings.

---

[4] The most remarkable information comes from PG&E, whose comments attach copies of two opinions by federal district court judge Vaughn R. Walker (N.D. Cal.). On the one hand, Judge Walker approves hourly rates for certain attorneys in 2001-02 that are somewhat lower than some rates this Commission has approved for the corresponding timeframe. On the other hand, Judge Walker uses census data for the San Francisco metropolitan area that indicate (under his methodology) an increase in the average hourly billing rate of almost 27% from 2001 to 2002. This calculation does not necessarily tell us about hourly rate escalation in more recent years, which concern us here; further, we note that Section 1806, which governs our determination of hourly rates, does not depend on census data and differs from the statute and judicial precedents to which the federal court is subject.

Resolution ALJ-184 ALJ/KOT/tcg

We will formalize the process, however, to the extent of issuing an order instituting rulemaking. The reports and comments produced for the annual process shall be submitted for filing in the corresponding rulemaking docket.

We anticipate some concern regarding confidentiality, particularly for personal financial data. We note that we have granted confidential treatment for the personal financial data submitted by intervenors to establish "significant financial hardship," which is one component of eligibility to claim intervenor compensation. Utilities must provide cost data, as described above, but they may aggregate the data and may omit the names of individuals, provided that the utility certifies that the data submitted comply fully with the requirements of Part IV above. Further, when submitting information claimed to be confidential, the party asserting the claim must submit a redacted (public) and an unredacted (sealed) version of the document containing the information and must state the statutory basis for asserting confidentiality under the Public Records Act. (Gov. Code § 6250 et seq.)

## VII. Comments on Draft Resolution

As provided by Section 311(g)(1) and Rule 77.7(c) of the Commission's Rules of Practice and Procedure, this resolution was mailed in draft for public review and comment. We received comments from Aglet, Greenlining, PG&E, SBC, SCE, TURN (joined by Utility Consumers' Action Network), Valencia Water Company (Valencia), and Verizon California Inc. (Verizon). We received replies from AT&T, LIF, WorldCom, Inc. (MCI), SBC, SCE, and TURN (joined by Aglet).

In general, commenters expressed support for the proposed annual process. Several utility commenters assert that the cost information was excessive in detail, and that further steps should be taken to protect personal privacy and confidentiality when appropriate. In response, we have changed the draft resolution in various ways, in particular, adopting a proposal by TURN and Aglet to reduce the cost information burden. Further, we will not try to do a full-scale proceeding for calendar year 2004 rates this year, as contemplated by the draft resolution. Instead, we authorize (with certain qualifications) the use of an escalation factor by intervenors seeking new hourly rates for calendar year 2004, and we require data filings and a workshop in preparation for the first (calendar year 2005) formal rulemaking fully implementing the annual process.

Besides those issues discussed above, only two other issues appear in the comments. First, several commenters debate our use of "multipliers," which we mentioned in Part III of the draft resolution solely to explain that the annual process makes no change to our historic practice regarding their use. The subject is otherwise beyond the scope of this resolution. Similarly, these commenters debate whether intervenors do or do not

Resolution ALJ-184  ALJ/KOT/tcg

face greater risks or delays than litigants in other forums in recovering their fees and costs. The debate is irrelevant for purposes of setting hourly rates under Section 1806.

Second, Valencia asks that "small" utilities (in essence, those with annual California revenues less than $500 million) be excluded from the annual process. We will retain the requirement that a utility participate in the annual process if we ordered the utility to pay an award for intervenor work performed in any of the three calendar years preceding the calendar year for which we are setting hourly rates. In practice, intervenor awards involving small utilities are infrequent, but they occur often enough that, consistent with § 1806, we should have data on costs of representation incurred by those utilities.

Findings

1. To date, the hourly rates used for calculating intervenor compensation awards have been developed and updated largely on a case-by-case basis.

2. An annual process for developing and updating hourly rates may be preferable to the case-by-case approach, in that the annual process may reduce controversy, avoid redundant litigation, and improve the perceived and actual fairness of the adopted hourly rates.

3. The annual process set forth in this resolution should be implemented with the understanding that the process may be refined over time.

4. It is reasonable under the circumstances to use an 8% escalation factor, as described in Part V, to set hourly rates for work performed in calendar year 2004.

Order

1. The annual process set forth in this resolution is adopted for developing and updating hourly rates of intervenors' representatives.

2. To set hourly rates for calendar year 2005, the Commission will institute a Rulemaking utilizing the adopted annual rate process. The annual process, with such refinements as the Commission may adopt over time, will be implemented through annual rulemakings, beginning with calendar year 2005.

Resolution ALJ-184  ALJ/KOT/tcg

3. For calendar year 2004 only, the Commission will use a blend (described in Part V of the discussion) of an escalation factor and current procedures to set hourly rates.

This resolution is effective today.

I hereby certify that this resolution was adopted by the Public Utilities Commission at its regular meeting of August 19, 2004, and that the following Commissioners approved it.

/s/ STEVE LARSON

STEVE LARSON
Executive Director


MICHAEL R. PEEVEY
President
CARL W. WOOD
LORETTA M. LYNCH
GEOFFREY F. BROWN
SUSAN P. KENNEDY
Commissioners

# *Public Utilities Commission of the State of California*

### *Public Agenda 3140*
### *Thursday, October 7, 2004 10:00 a.m.*
### *San Francisco, California*

**Commissioners**
**Michael R. Peevey, President**
**Geoffrey F. Brown**
**Susan P. Kennedy**
**Loretta M. Lynch**
**Carl W. Wood**

*For each agenda item, a summary of the proposed action is included; the Commission's decision may, however, differ from that proposed.*

*Website:  http://www.cpuc.ca.gov*

**Scheduled Commission Meetings**
**505 Van Ness Avenue, San Francisco**

| *Ratesetting Deliberative Meeting\* Room 5305 (1:30 p.m.)* **Closed to the Public** | *Commission Meeting Auditorium (10 a.m.)* **Open to the Public** |
|---|---|
| Monday, October 25, 2004 (San Francisco) | Thursday, October 07, 2004 (San Francisco) |
| Monday, November 15, 2004 (San Francisco) | Thursday, October 28, 2004 (San Francisco) |
| Monday, November 29, 2004 (San Francisco) | Friday, November 19, 2004 (San Francisco) |
| Monday, December 13, 2004 (San Francisco) | Thursday, December 02, 2004 (San Francisco) |
|  | Thursday, December 16, 2004 (San Francisco) |

*\*Ratesetting Deliberative Meeting dates are reserved as noted but will be held only if there are ratesetting matters to be considered and a Commissioner has requested that a Ratesetting Deliberative Meeting be held.*

**Matters of Public Interest**
*For the convenience of the public and media representatives, items of widespread public interest will be taken up at the beginning of the meeting.*

For further information contact the Public Advisor
(415) 703-2074    E-mail: public.advisor@cpuc.ca.gov

 This location is accessible to people with disabilities.  If specialized accommodations for the disabled are needed, e.g. sign language interpreters, please call the Public Advisor at (415) 703-2074 or TTY# (415) 703-5282 or toll free # 1-866-836-7825 three business days in advance of the meeting.

Consent Agenda - Orders and Resolutions (continued)

**17**
[3919]
**A04-02-016 - Charles Stanley, dba Morongo Basin Airport Transport (Applicant).**
This decision authorizes Applicant to operate as a passenger stage corporation between points in Los
Angeles, Riverside, and San Bernardino Counties, on the one hand, and Los Angeles International
Airport, Ontario International Airport, Los Angeles Amtrak Station, and Los Angeles Greyhound
Station, on the other hand.  This proceeding is closed.
(Exam Clark)
*Pub. Util. Code §1701.1 -- This proceeding is categorized as Ratesetting.*
http://www.cpuc.ca.gov/Cyberdocs/AgendaDoc.asp?DOC_ID=180671

**18**
[3920]
**A04-04-029 - Abbas T. Daryaei, dba American Shuttle (Applicant).**
This decision authorizes Applicant to operate as a passenger stage corporation between points in
Orange County and John Wayne Airport, and to establish a zone of rate freedom. This proceeding is
closed.
(Exam Clark)
*Pub. Util. Code §1701.1 -- This proceeding is categorized as Ratesetting.*
http://www.cpuc.ca.gov/Cyberdocs/AgendaDoc.asp?DOC_ID=180673

**19**
[3921]
**A04-06-013 - Bahram Shahab and Mehrdad Haji Moradi, dba LAXpress Airport Shuttle and**
**Xpress Shuttle.**
This decision authorizes Bahram Shahab and Mehrdad Haji Moradi to transfer their passenger stage
corporation (PSC) certificate to Consolidated Airport Transportation Systems, Inc. (Transferee), and
Transferee is authorized to extend the PSC authority and establish a zone of rate freedom.  This
proceeding is closed.
(Exam Clark)
*Pub. Util. Code §1701.1 -- This proceeding is categorized as Ratesetting.*
http://www.cpuc.ca.gov/Cyberdocs/AgendaDoc.asp?DOC_ID=180672

**20**
[3927]
**R_____ - Rulemaking to set hourly rates for purposes of calculating intervenor**
**compensation awards, pursuant to Public Utilities Code Section 1801 and following, for work**
**performed in calendar year 2005.**
This decision commences the workshop and rulemaking process set forth in Resolution ALJ-184
(dated August 19, 2004) for developing hourly rates to be used in calculating intervenor compensation
awards for work performed in calendar year 2005.
http://www.cpuc.ca.gov/Cyberdocs/AgendaDoc.asp?DOC_ID=181516

ALJ/KOT/tcg                                          **Mailed 10/12/2004**

**BEFORE THE PUBLIC UTILITIES COMMISSION OF THE STATE OF CALIFORNIA**

Rulemaking to Set Hourly Rates for
Purposes of Calculating Intervenor
Compensation Awards, Pursuant to
Public Utilities Code Section 1801 and
Following, for Work Performed in
Calendar Year 2005.

FILED
PUBLIC UTILITIES COMMISSION
OCTOBER 7, 2004
SAN FRANCISCO, CALIFORNIA
RULEMAKING 04-10-010

## ORDER INSTITUTING RULEMAKING

**Introduction**

Today's order commences the workshop and rulemaking process set forth
in Resolution ALJ-184 (dated August 19, 2004) for developing hourly rates to be
used in calculating intervenor compensation awards for work performed in
calendar year 2005.

**Preliminary Data Sets and Workshops**

Resolution ALJ-184 (see Attachment 1 to this order) provides for
"respondent" utilities to submit preliminary data sets regarding their expenses
for representation before the Commission during calendar year 2003.[1]  Following
these submissions, a workshop will be held to discuss methodology and
address any other implementation questions, so that addition of 2004 data, when

---

[1] For present purposes, "respondent" utilities will be each utility that, as of the date of
this order, we have required to pay an award for intervenor work performed in
calendar years 2001, 2002, or 2003.

181824                               - 1 -

R.04-10-010 ALJ/KOT/tcg

available, and subsequent adoption of hourly rates for calendar year 2005 may be accomplished with minimal controversy.

The preliminary data sets shall be filed and served November 19, 2004; the workshop should follow approximately two weeks after submission of the data sets. If any respondent utility or other party wishes to propose an alternative method for collecting the necessary hourly rate data for utilities' in-house or outside counsel, the party must file and serve a complete description of its proposal on November 19, 2004. In the case of a respondent utility, the proposal may accompany the utility's preliminary data set but does not relieve the utility from submitting its preliminary data set at the same time. The Commissioner or Administrative Law Judge assigned to this Rulemaking will issue a ruling regarding the dates for these events and addressing any other procedural matters. The dates are subject to adjustment, but consistent with our intent of establishing hourly rates by April 2005. (See Section V of Resolution ALJ-184.)

**Proposed Hourly Rates**

Following the workshop, the assigned Commissioner or Administrative Law Judge will establish a schedule for the utilities and intervenors to make their proposals regarding 2005 hourly rates, again consistent with our intent of establishing these rates by April 2005. The assigned Commissioner or Administrative Law Judge may adjust the resolution's process or data requirements as may be suggested in light of the workshop's results.

**Service by Electronic Mail (E-mail)**

Parties will exchange documents, and the Commission will serve rulings and decisions, under the e-mail service protocol attached to this order.

R.04-10-010 ALJ/KOT/tcg

**Scoping**

This Rulemaking is quasi-legislative in character. No formal hearings are anticipated. The schedule and scope of the proceeding are as set forth in the foregoing discussion and in Resolution ALJ-184.

**Finding of Fact**

A notice-and-comment process, as set forth in the foregoing discussion and in Resolution ALJ-184, is reasonable for setting hourly rates for purposes of calculating awards of intervenor compensation for work performed in Commission proceedings.

**Conclusion of Law**

Systematic consideration of the utilities' costs of representation, as contemplated by the foregoing discussion and Resolution ALJ-184, will assist the Commission in setting hourly rates in conformity with the standards of Public Utilities Code Section 1806.

**O R D E R**

**IT IS ORDERED** that:

1. Respondent utilities are required, and intervenors and others are invited, to participate in the process described above and in Resolution ALJ-184 (Attachment 2 to this order) for setting hourly rates to be used in calculating intervenor compensation awards for work performed in calendar year 2005. For purposes of this order, "respondent utilities" are each utility that, as of the effective date of today's order, was required by the Commission to pay an award for intervenor work performed in calendar years 2001, 2002, or 2003.

2. The initial service list for this Rulemaking is Attachment 3 to this order.

- 3 -

R.04-10-010 ALJ/KOT/tcg

3. Service of documents, including rulings and decisions issued by the Commission, is subject to the e-mail service protocol (Attachment 1 to this order).

This order is effective today.

Dated October 7, 2004, at San Francisco, California.

MICHAEL R. PEEVEY
President
CARL W. WOOD
LORETTA M. LYNCH
GEOFFREY F. BROWN
SUSAN P. KENNEDY
Commissioners

R.04-10-010  ALJ/KOT/tcg

# ATTACHMENT 1

R.04-10-010 ALJ/KOT/tcg

## ATTACHMENT 1
### Page 1

## INTERVENOR COMPENSATION RULEMAKING
## E-MAIL SERVICE PROTOCOL

This protocol is to be used in the context of the Commission's Rules of Practice and Procedure (Rules).[1] The protocol applies only to service of documents and does not alter any rules or party responsibilities with respect to the filing of documents with the Commission's Docket Office.

**Basics of E-mail Service**

E-mail service may be made by sending the document to be served as an attachment to an e-mail message or by sending an e-mail Notice of Availability, as set forth below, to each person whose name is on the official service list, to the assigned administrative law judge (ALJ), and to any other person required to be served by statute, by Commission rule or order, or by the assigned commissioner or ALJ. Service by e-mail is complete when the e-mail message is transmitted, subject to re-service in cases of failure of e-mail service.

**Serving documents as E-mail Attachments**

When serving documents as attachments to an e-mail message, the serving party must include in the subject line of the message the docket number of the proceeding and a brief identification of the document(s) to be served, including the name of the serving party, and must include in the text of the message the electronic format of the document(s) (e.g., PDF, Excel), and the name, telephone

---

[1] This protocol is adapted from, but is not the same as, the proposed revisions to the Rules set out in R.04-01-005.

R.04-10-010 ALJ/KOT/tcg

## ATTACHMENT 1
### Page 2

number, e-mail address, and facsimile transmission number of the person to whom problems with receipt of the document to be served should be directed.

An e-mail serving attached documents may not exceed 3.5 megabytes in total size.

### Serving a Notice of Availability

A Notice of Availability served by e-mail must contain in its subject line the docket number of the proceeding and the words "notice of availability," followed by a brief identification of the document to be served. A Notice of Availability may be served:

(1) if the document to be served, including attachments, exceeds 100 kilobytes;

(2) if a document to be served by sending an e-mail message with the document attached has attachments that are not readily reproducible in electronic format, would be too voluminous to attach to the e-mail message, or would be likely to cause e-mail service to fail for any other reason;

(3) if the document is served by making it available at a particular Uniform Resource Locator site (URL) on the World Wide Web. In this case, the Notice must contain a complete and accurate hyperlink to the URL at which the document to be served has been made available in a readily readable and downloadable form, and must state the date on which the document was made available at that site.

The Notice shall contain information about how to access or download the document to be served, or any other information required or allowed by the assigned commissioner or ALJ; it may not contain any attachments.

R.04-10-010 ALJ/KOT/tcg

**ATTACHMENT 1**
**Page 3**

**Format of Documents**

The entire document to be served must be merged into a single electronic file (*e.g.*, title page, table of contents, text, attachments, service list), unless the attachments would make the document too large to be served as an e-mail attachment. Documents to be served by e-mail or posted on the World Wide Web must be in readily readable, downloadable, printable, and searchable formats. Wherever appropriate, the assigned ALJ may require particular formats to be used.

**Failure of E-mail Service**

In the event of failure of e-mail service, the serving party must promptly re-serve the document by any means authorized by the Rules. E-mail service may be used to re-serve the document only if the receiving party consents to the re-use of e-mail service, or the serving party determines that the cause of the failure of e-mail service has been rectified.

**Commission Documents**

The Commission will serve rulings, decisions, and other documents in accordance with this protocol.

**Paper Copies to the ALJ**

The serving party must provide a paper copy of all documents served by e-mail service to the ALJ, unless the ALJ orders otherwise.

**Modification of Protocol**

The ALJ may modify this protocol as needed to ensure the efficient and fair conduct of this proceeding.

**(END OF ATTACHMENT 1)**

R.04-10-010  ALJ/KOT/tcg

# ATTACHMENT 2

R.04-10-010 ALJ/KOT/tcg

ALJ/KOT/tcg                                    **Mailed 8/25/2004**

## PUBLIC UTILITIES COMMISSION OF THE STATE OF CALIFORNIA

Resolution ALJ-184
Administrative Law Judge Division
August 19, 2004

# R E S O L U T I O N

**RESOLUTION ALJ-184. Adopting annual process for setting hourly rates to use in calculating compensation awards to intervenors.**

## I. Introduction

In today's resolution, we adopt an annual process for setting and updating hourly rates for use by intervenors in seeking compensation for substantially contributing to a Commission decision, as provided in the statutory intervenor funding program. (Pub. Util. Code §§ 1801-1812. Unless otherwise stated, all citations to statute are to the Public Utilities Code.) The hourly rates that we establish through this process will govern intervenors and their representatives who have recently participated in our proceedings, and will provide guidance to other intervenors and representatives.

## II. Background

In Decision (D.) 03-10-061 and D.03-10-062, we directed the Executive Director and Chief Administrative Law Judge to "develop a comprehensive process for the Commission to annually set rates for intervenor attorney, expert, and paralegal fees...." On October 29, 2003, the Executive Director and Chief Administrative Law Judge wrote to over 40 regular participants in our proceedings, including frequent intervenors and utilities from the various regulated industries. Their letter invited comments and suggestions to begin development of this annual process. Specifically, the Commission sought input on the following questions:

1. What annual process do you recommend for setting hourly rates?

R.04-10-010 ALJ/KOT/tcg

2. How would the annual process you recommend meet (1) the standards of Section 1806, and (2) the goals of D.03-10-062, specifically, "promote fairness in awards, both in absolute and relative terms" and "increase administrative efficiency [so that intervenors are paid] on a more expedited basis"?

3. Consistent with Section 1806, what information should the Commission accept or require in setting hourly rates?

Aglet Consumer Alliance (Aglet), SBC Pacific Bell (SBC), Pacific Gas and Electric (PG&E), Southern California Edison (SCE), The Utility Reform Network (TURN), AT&T Communications of California, Inc., Greenlining Institute (Greenlining), and Grueneich Resource Advocates served opening comments, on November 14, 2003. Latino Issues Forum (LIF) served opening comments on November 25, 2003. SCE and Greenlining served reply comments on December 2, 2003 and PG&E, Aglet, LIF, SBC, and TURN served reply comments on December 3, 2003.

The comments raise three main issues, which we discuss and resolve below. We expect, however, to refine the process over time, based on our experience and suggestions by everyone involved.

## III. Individual Rates vs. General Ranges

Commenters differ on whether the process should produce individual rates for particular advocates or ranges of rates based upon general levels of training and experience. Some commenters suggest that the number of advocates eligible to claim intervenor compensation is sufficiently small that standardized rates for general levels of training and experience are unnecessary and cannot accurately account for different levels of experience and skill. Some commenters suggest that we adopt default rates based on general levels of training and experience but allow advocates to seek higher rates if they feel their specific training, experience, and skill warrant. Others recommend adopting ranges of rates based on training and experience, allowing advocates to present evidence of where they fall within the range.

After reviewing the comments, we propose to adopt rates for individual advocates based on their specific training and experience, taking into consideration the compensation of persons with comparable training and experience. With the additional data that we intend to gather, we can adopt fair rates for these advocates for a particular calendar year.

We intend that, in general, when we adopt a rate for a particular advocate for a particular calendar year, the intervenor seeking to recover fees for that advocate's work in that calendar year will use that rate in calculating the intervenor's compensation request. This generalization is subject to several qualifications. We observe, first, that

- 2 -

R.04-10-010 ALJ/KOT/tcg

historically we have augmented an advocate's rate by a "multiplier" in consideration of various specific factors on a case-by-case basis. We will continue that practice, but because a multiplier is case-specific, it does not actually change the adopted hourly rate for that advocate. Second, an intervenor may request an adjustment to an adopted hourly rate but must show good cause for doing so. For example, if a court or regulatory agency awarded the advocate a higher hourly rate for work in the same calendar year, the intervenor may ask us to use the higher rate. The burden is on the intervenor to justify the higher rate, and in the example just given, we would expect the intervenor to address, among other things, the standard used by the court or agency in setting the higher rate and the comparability of the work performed at the Commission to the work performed at the court or agency.

Finally, the adopted rate carries our expectation about the level of the advocate's performance; to the extent that the advocate performs above or below that level in a particular proceeding we would consider augmenting or reducing the hourly rate. For example, we expect that advocates with experience before the Commission have a certain level of knowledge about our Rules of Practice and Procedure and filing requirements, so a seasoned advocate who fails to follow these rules would not be performing at a level consistent with what we would expect from someone of that training and experience. Thus, in that circumstance, we may consider awarding a lower hourly rate for the advocate's work in that proceeding. Similarly, an advocate who surpasses expectations may ask us to award a higher hourly rate. For example, where an advocate served ably in the dual role of attorney and expert, eliminating the intervenor's need to employ separate individuals for each role, we may consider awarding a higher hourly rate for that advocate's work in that proceeding.

Of necessity, we can adopt specific hourly rates only for those advocates who already have experience at the Commission. We also encourage new intervenors and advocates to participate in our proceedings. The annual process will develop information that will enable prospective intervenors to project reasonable rates by referring to ranges of training and experience revealed in that process. Particularly for attorney advocates, we have found from over 20 years of setting hourly rates that the rates tend to fall within three ranges, based on length of relevant experience and roughly corresponding to the associate, partner, and senior partner levels within a law firm. We expect to continue to specify these general ranges, which should be utilized by new intervenors and advocates in developing their proposed hourly rates.

**IV. Data Requirements**

Section 1806 requires that the Commission "take into consideration the market rates paid to persons of comparable training and experience who offer similar services" when awarding compensation to advocates eligible for intervenor compensation. For this

- 3 -

R.04-10-010 ALJ/KOT/tcg

consideration, we must have sufficient data about the training and experience of advocates of both intervenors and others offering similar services on behalf of utilities and this Commission. We also need information about the "comparable market rate" for those service providers that are paid by utilities and the Commission. Commenters propose various types of information be gathered during a proceeding to set hourly rates.

So that we may assess the training and experience of Commission practitioners, we propose that current or prospective intervenors that expect to make requests for compensation for work in a given calendar year submit information about the training and experience of the personnel they expect to perform work on their behalf. The information submitted must cover both attorneys and non-attorneys. Intervenors must include the past rates adopted for their advocates in their filing and a proposed rate for the upcoming year. On the same date as the intervenor filing, respondent utilities[1] must submit a list of the training and experience of in-house personnel who have worked on matters before the Commission during the prior calendar year.[2] The utilities must prepare a similar list for outside counsel, experts, or other service providers who have supported the utilities' efforts before the Commission during the prior calendar year. Each of the utilities' lists must identify the title of the individual and type of service provided, describe the individual's training (for example, degrees and years obtained), and indicate the individual's experience appearing or supporting work before the Commission.

We agree with commenters that we currently have insufficient information regarding the "market rate for services paid by the ... public utility, ... to persons of comparable training and experience who are offering similar services." (§ 1806.) Therefore, we direct the utilities to provide this information for all persons identified on the above-described lists. For in-house personnel, the utilities must develop an effective hourly rate by identifying salary, benefits and other compensation, and an allocation of overheads for each individual listed. For outside service providers, the utilities must

---

[1] The "respondent utilities" will be each utility that we have required to pay an award for intervenor work performed in any of the three calendar years preceding the calendar year for which we are setting hourly rates.

[2] This listing must include in-house utility witnesses, attorneys, and project managers; however, the utility may limit the listing to those persons who have participated in Commission proceedings during the past three years or will participate in the upcoming calendar year.

R.04-10-010 ALJ/KOT/tcg

identify the rates charged to the utility (and the usual billing rate, if different) for each individual listed.[3]

Hourly rates paid by the Commission itself to its staff and consultants are also relevant under Section 1806, which says in part that the compensation we award "may not, in any case, exceed the comparable market rate for services paid by the commission or the public utility, whichever is greater" (emphasis added). We assume that hourly rates in the private sector generally exceed those paid by the Commission, but we will test this assumption by having our Executive Director review the data provided by the utilities. Following this review, the Executive Director will report instances, with appropriate data, in which the Commission has paid rates exceeding those paid by the utilities. Absent any such instances, the report need only note that fact, without further data.

In addition, we encourage intervenors and other interested persons to submit other information, for example, market surveys or benchmarking studies. We also invite independent experts or individuals with specialized knowledge of billing information to submit relevant information at the same time as intervenors and utilities submit their data.

As a general matter, Section 1806 requires us to look first to the compensation of practitioners before this Commission in setting rates for intervenors because of the statute's requirement to consider the costs of providers of similar services. However, we allow intervenors and others, when appropriate, to refer to rates charged or awarded for work in other forums.

## V. Timing

Commenters propose different timing for the annual process. Some commenters suggest that rates be set for a base year and then adjusted annually by some type of index (for example, the Consumer Price Index) for some period of time before the base rate is re-evaluated. Some commenters suggest that rates be based on prior year data and applied retroactively to the awards for the past year. Others suggest that we adopt rates prospectively for the coming year. Others suggest that it is sufficient if rates are adopted for a given calendar year by April of that same year, as requests for compensation for work performed during January through March are unlikely to be resolved before April.

---

[3] To the extent that this information suggests logical ranges for comparing compensation rates for persons with similar experience, we encourage the utilities to group them accordingly.

R.04-10-010 ALJ/KOT/tcg

We agree with TURN that intervenors are unlikely to request an award of compensation for work performed in a given year prior to April of that same year. Therefore, our procedure is designed to adopt rates no later than April 30 for use that calendar year.

As described above, we are requiring utilities to submit data on compensation paid to in-house and outside representatives for the prior calendar year. We will adjust the prior year rates by the Consumer Price Index to bring them to a current year basis. The rates requested by each intervenor will be compared against the adjusted utility rates and other data submitted to assess whether the intervenor requests the market rate for persons of comparable training and experience who are offering similar services.

We do not at this time adopt a base year rate with subsequent annual adjustments based on an index of general inflation; we agree with certain parties that market rates for advocates do not necessarily move in lockstep with inflation rates. We are open to considering an index that is more narrowly targeted to cost increases for the professional services that we compensate through the intervenor compensation program.

We will use the following generic schedule for the annual process beginning for 2005 calendar year rates:

| | |
|---|---|
| January 15 | Utilities submit data/Intervenors submit proposed rates and supporting information |
| February 5 | Filings (by intervenors, utilities, or other interested persons) describing how January 15 data do or do not support proposed rates for particular advocates |
| March 23 | Draft decision adopting rates |
| April 22 | Commission adopts hourly rates |

This timing would begin for 2005 calendar year rates.

The draft resolution contemplated doing the same process in the middle of this year to derive 2004 calendar year rates. Several considerations, including our review of comments on the draft resolution, prompt us to revise our approach to 2004.

First, there are reasonable concerns and questions about how the new process will work. To address them, we will institute the rulemaking for 2005 rates soon after our adoption of this resolution. We build into the rulemaking time to work out implementation issues before launching the above schedule. This implementation

- 6 -

R.04-10-010 ALJ/KOT/tcg

phase will include submission of preliminary data sets for utilities' 2003 costs of representation in our proceedings. Following submission, there will be a workshop. Our intent is that this implementation process will help all the participants reach a common understanding on matters such as level of detail, format, and aggregation.

Second, we will use an alternative approach, discussed in the draft resolution, for establishing 2004 rates. Under this approach, we will adopt an escalation factor and allow intervenors to use that factor to calculate award requests for work done in 2004. In other words, where we have approved an hourly rate for an advocate for 2003, an intervenor may escalate that rate by the factor when seeking compensation for that advocate's work done in 2004. There will be a rebuttable presumption that a rate so escalated is reasonable.

The comments contain information that supports an escalation factor of 8%.[4] In fact, 8% is at the low end of the information; however, we note that the <u>Of Counsel</u> surveys (which TURN and Aglet regularly rely on and which report annualized increases exceeding 10% in recent years) do not appear to reflect changes in public sector salaries. The latter, which are relevant to hourly rate determination under Section 1806, have not, at least at the State level, kept pace with private sector salaries. Consequently, under these limited circumstances, we find an 8% escalation factor is reasonable.

An intervenor may still make an individualized showing in appropriate circumstances, e.g., regarding an advocate new to our proceedings, or an advocate who (in the intervenor's opinion) had progressed to a significantly higher level of expertise since we had last set an hourly rate for that advocate. Similarly, a utility could oppose an increase to an advocate's hourly rate, whether the increase was predicated on the escalation factor or an individualized showing.

---

[4] The most remarkable information comes from PG&E, whose comments attach copies of two opinions by federal district court judge Vaughn R. Walker (N.D. Cal.). On the one hand, Judge Walker approves hourly rates for certain attorneys in 2001-02 that are somewhat lower than some rates this Commission has approved for the corresponding timeframe. On the other hand, Judge Walker uses census data for the San Francisco metropolitan area that indicate (under his methodology) an increase in the average hourly billing rate of almost 27% from 2001 to 2002. This calculation does not necessarily tell us about hourly rate escalation in more recent years, which concern us here; further, we note that Section 1806, which governs our determination of hourly rates, does not depend on census data and differs from the statute and judicial precedents to which the federal court is subject.

R.04-10-010 ALJ/KOT/tcg

## VI. Nature of the Annual Process

The annual process should provide greater certainty to intervenors and reduce controversy in particular award requests. We want to keep the annual process short and informal because we recognize that the cost of a slow burdensome process might outweigh the hoped-for benefits. Thus, we will use notice-and-comment procedure for receiving input from utilities, intervenors, and other participants. Analysis of the data should be straightforward, and we see no need for evidentiary hearings.

We will formalize the process, however, to the extent of issuing an order instituting rulemaking. The reports and comments produced for the annual process shall be submitted for filing in the corresponding rulemaking docket.

We anticipate some concern regarding confidentiality, particularly for personal financial data. We note that we have granted confidential treatment for the personal financial data submitted by intervenors to establish "significant financial hardship," which is one component of eligibility to claim intervenor compensation. Utilities must provide cost data, as described above, but they may aggregate the data and may omit the names of individuals, provided that the utility certifies that the data submitted comply fully with the requirements of Part IV above. Further, when submitting information claimed to be confidential, the party asserting the claim must submit a redacted (public) and an unredacted (sealed) version of the document containing the information and must state the statutory basis for asserting confidentiality under the Public Records Act. (Gov. Code § 6250 et seq.)

## VII. Comments on Draft Resolution

As provided by Section 311(g)(1) and Rule 77.7(c) of the Commission's Rules of Practice and Procedure, this resolution was mailed in draft for public review and comment. We received comments from Aglet, Greenlining, PG&E, SBC, SCE, TURN (joined by Utility Consumers' Action Network), Valencia Water Company (Valencia), and Verizon California Inc. (Verizon). We received replies from AT&T, LIF, WorldCom, Inc. (MCI), SBC, SCE, and TURN (joined by Aglet).

In general, commenters expressed support for the proposed annual process. Several utility commenters assert that the cost information was excessive in detail, and that further steps should be taken to protect personal privacy and confidentiality when appropriate. In response, we have changed the draft resolution in various ways, in particular, adopting a proposal by TURN and Aglet to reduce the cost information burden. Further, we will not try to do a full-scale proceeding for calendar year 2004 rates this year, as contemplated by the draft resolution. Instead, we authorize (with

R.04-10-010 ALJ/KOT/tcg

certain qualifications) the use of an escalation factor by intervenors seeking new hourly rates for calendar year 2004, and we require data filings and a workshop in preparation for the first (calendar year 2005) formal rulemaking fully implementing the annual process.

Besides those issues discussed above, only two other issues appear in the comments. First, several commenters debate our use of "multipliers," which we mentioned in Part III of the draft resolution solely to explain that the annual process makes no change to our historic practice regarding their use. The subject is otherwise beyond the scope of this resolution. Similarly, these commenters debate whether intervenors do or do not face greater risks or delays than litigants in other forums in recovering their fees and costs. The debate is irrelevant for purposes of setting hourly rates under Section 1806.

Second, Valencia asks that "small" utilities (in essence, those with annual California revenues less than $500 million) be excluded from the annual process. We will retain the requirement that a utility participate in the annual process if we ordered the utility to pay an award for intervenor work performed in any of the three calendar years preceding the calendar year for which we are setting hourly rates. In practice, intervenor awards involving small utilities are infrequent, but they occur often enough that, consistent with § 1806, we should have data on costs of representation incurred by those utilities.

**Findings**

1. To date, the hourly rates used for calculating intervenor compensation awards have been developed and updated largely on a case-by-case basis.

2. An annual process for developing and updating hourly rates may be preferable to the case-by-case approach, in that the annual process may reduce controversy, avoid redundant litigation, and improve the perceived and actual fairness of the adopted hourly rates.

3. The annual process set forth in this resolution should be implemented with the understanding that the process may be refined over time.

4. It is reasonable under the circumstances to use an 8% escalation factor, as described in Part V, to set hourly rates for work performed in calendar year 2004.

R.04-10-010 ALJ/KOT/tcg

**Order**

1. The annual process set forth in this resolution is adopted for developing and updating hourly rates of intervenors' representatives.

2. To set hourly rates for calendar year 2005, the Commission will institute a Rulemaking utilizing the adopted annual rate process. The annual process, with such refinements as the Commission may adopt over time, will be implemented through annual rulemakings, beginning with calendar year 2005.

3. For calendar year 2004 only, the Commission will use a blend (described in Part V of the discussion) of an escalation factor and current procedures to set hourly rates.

This resolution is effective today.

I hereby certify that this resolution was adopted by the Public Utilities Commission at its regular meeting of August 19, 2004, and that the following Commissioners approved it.


                              /s/ STEVE LARSON
                              STEVE LARSON
                              Executive Director


                              MICHAEL R. PEEVEY
                                     President
                              CARL W. WOOD
                              LORETTA M. LYNCH
                              GEOFFREY F. BROWN
                              SUSAN P. KENNEDY
                                  Commissioners


**(END OF ATTACHMENT 2)**

- 10 -

R.04-10-010  ALJ/KOT/tcg

# ATTACHMENT 3
## Page 1

## SERVICE LIST

************ APPEARANCES ************

Robert Munoz
 WORLDCOM
201 SPEAR STREET,  9TH FLOOR
SAN FRANCISCO CA 94105
(415) 228-1135
robert.munoz@mci.com

William P. Adams
ADAMS ELECTRICAL SAFETY  CONSULTING
716 BRETT AVENUE
ROHNERT PARK CA 94928-4012
(707) 795-7549

Ronald L. Knecht
ADVOCATES FOR THE PUBLIC INTEREST
1009 SPENCER ST
CARSON CITY NV 89703-5422
(650) 968-0115
ronknecht@aol.com

James Weil
AGLET CONSUMER ALLIANCE
PO BOX 1599
FORESTHILL CA 95631
(530) 367-3300
jweil@aglet.org

Dan Geis
AGRICULTURAL ENERGY CONSUMERS ASSO.
925 L STREET, SUITE 800
SACRAMENTO CA 95814
(916) 441-6206
dgeis@dolphingroup.org

Darlene Clark
Attorney At Law
AT&T COMMUNICATIONS OF CALIFORNIA, INC.
795 FOLSOM STREET, ROOM 2169
SAN FRANCISCO CA 94107
(415) 442-2143
dareneclark@att.com

William A. Ettinger
Attorney At Law
AT&T COMMUNICATIONS OF CALIFORNIA, INC.
795 FOLSOM STREET, ROOM 625
SAN FRANCISCO CA 94107
(415) 442-2783
ettinger@att.com

Roger Kropke
BEAR VALLEY ELECTRIC SERVICE
PO BOX 1547
BIG BEAR LAKE CA 92315
kswitzer@scwater.com

Sharon De Cray
CALIFORNIA ALLIANCE OF INFORMATION SRVCS
C/O EDEN I&R
570 B STREET
HAYWARD CA 94541
(510) 537-2710
decray@edenir.org

Bill R. White
CALIFORNIA ASSOCIATION OF THE DEAF, INC.
1712 AVONDALE AVENUE
SACRAMENTO CA 95825

Glenn Semow
CALIFORNIA CABLE & TELECOMM. ASSOC.
4341 PIEDMONT AVENUE
OAKLAND CA 94611
(510) 428-2225
gsemow@calcable.org

J. Kendrick Kresse
CALIFORNIA CENTER FOR LAW AND THE DEAF
14895 EAST 14TH STREET, SUITE 220
SAN LEANDRO CA 94578
(510) 483-0922
ken.kresse@deaflaw.org

Bruce E. Stanton
Association,Inc.
CALIFORNIA MOBILEHOME RESOURCE & ACTION
1530 ALAMEDA
THE GARDEN ALAMEDA, SUITE 115
SAN JOSE CA 95126
(408) 971-0900

R.04-10-010 ALJ/KOT/tcg

# ATTACHMENT 3
## Page 2

Julian C. Chang
AT&T COMMUNICATIONS OF CALIFORNIA, INC.
795 FOLSOM STREET, ROOM 2164
SAN FRANCISCO CA 94107
(415) 442-3449
julianchang@att.com

Francis S. Ferraro
Vice President
CALIFORNIA WATER SERVICE COMPANY
1720 N. 1ST STREET
SAN JOSE CA 95112-4598
sferraro@calwater.com

Nikayla K. Nail Thomas
Executive Director
CALTEL
515 S. FLOWER STREET, 47/F
LOS ANGELES CA 90071
(213) 213-3740
nnail@caltel.org

Karen Johanson
CAUSE
60 ROSE HILL DRIVE
BLUFFTON SC 29910
(909) 303-0459
kbjoha@aol.com

E.B. Tommy Thomas
President
CHOCTAW COMM. INC. DBA SMOKE SIGNAL COMM
8700 S. GESSNER
HOUSTON TX 77074
(713) 779-0692

Peter Frech
CITIZENS CONCERNED ABOUT EMFS
PO BOX 120
SAN RAMON CA 94583
(925) 830-4655
pfrech@opendomain.com

Charles E. Born
Manager-State Government Affairs
CITIZENS TELECOMMUNICATIONS CO. OF CA
PO BOX 340
ELK GROVE CA 95759
cborn@czn.com

Dave Hennessy
CALIFORNIA MOBILEHOME RESOURCE & ACTION
29171 DELGADO RD.
HAYWARD CA 94544

Mark Savage
Attorney At Law
CONSUMERS UNION OF U.S., INC.
1535 MISSION STREET
SAN FRANCISCO CA 94103
(415) 431-6747
savama@consumer.org

Sean P. Beatty
Attorney At Law
COOPER, WHITE & COOPER, LLP
201 CALIFORNIA ST., 17TH FLOOR
SAN FRANCISCO CA 94111
(415) 433-1900
sbeatty@cwclaw.com

Phil Ceguera
COVAD COMMUNICATIONS
3420 CENTRAL EXPRESSWAY
SANTA CLARA CA 95051
(408) 616-6609
pceguera@covad.com

Doug Garrett
COX CALIFORNIA TELCOM, LLC, DBA COX COMM
2200 POWELL STREET, SUITE 1035
EMERYVILLE CA 94608-2618
(510) 923-6220
douglas.garrett@cox.com

Betty Jo Toccoli
CSBRT/CSBA
6101 WEST CENTENALIA AVENUE,342
CULVER CITY CA 90230
(800) 350-2722
csba@pacbell.net

David J. Marchant
Attorney At Law
DAVIS WRIGHT TREMAINE LLP
ONE EMBARCADERO CENTER, STE. 600
SAN FRANCISCO CA 94111-3834
(415) 276-6500
davidmarchant@dwt.com

R.04-10-010 ALJ/KOT/tcg

**ATTACHMENT 3**
**Page 3**

Dave Hennessy
CMRAA
3381 STEVENS CREEK BLVD.
SAN JOSE CA 95117
(408) 244-8134
cmraa@aol.com

Sara Zimmerman
DISABILITY RIGHTS ADVOCATES
449 15TH STREET, SUITE 303
OAKLAND CA 94612
(510) 451-8644
szimmerman@dralegal.org

Daniel Kirshner
ENVIRONMENTAL DEFENSE FUND
5655 COLLEGE AVENUE, SUITE 304
OAKLAND CA 94618
(510) 658-8008
dkirshner@environmentaldefense.org

Lee Burdick
Attorney At Law
FERRIS & BRITTON
401 WEST A STREET, SUITE 1600
SAN DIEGO CA 92101
(619) 233-3131
lburdick@ferrisbritton.com

Alan Ramo
GOLDEN GATE UNIVERSITY SCHOOL OF LAW
ENVIRONMENTAL LAW AND JUSTICE CLINIC
536 MISSION ST.
SAN FRANCISCO CA 94105
(415) 442-6654
aramo@ggu.edu

A Davis
Assistant Regional Manager
GOLDEN STATE MOBILEHOME OWNERS LEAGUE
22 YOSEMITE RD.
SAN RAFAEL CA 94903
(415) 472-5111

Jody London
DIAN M. GRUENEICH
GRUENEICH RESOURCE ADVOCATES
582 MARKET STREET, SUITE 1020
SAN FRANCISCO CA 94104
(415) 834-2300
jlondon@gralegal.com

Edward W. O'Neill
DAVIS, WRIGHT, TREMAINE, LLP
ONE EMBARCADERO CENTER, SUITE 600
SAN FRANCISCO CA 94111-3834
(415) 276-6500
edwardoneill@dwt.com

Phil Richardson
KOTTINGER RANCH HOMEOWNERS ASSOCIATION
1122 HEARST
PLEASANTON CA 94566
(925) 485-1222

Susan E. Brown
Attorney At Law
LATINO ISSUES FORUM
785 MARKET STREET, NO. 300
SAN FRANCISCO CA 94103
(415) 284-7224
lifcentral@lif.org

Kim Logue
Regulatory Analyst
LCI INTERNATIONAL TELECOM CORP.
4250 N. FAIRFAX DRIVE, 12W002
ARLINGTON VA 22203
(703) 363-4321
kim.logue@qwest.net

Thomas R. Dill
President
LODI GAS STORAGE, LLC
23265 N. STATE RT. 99 W. FRONTAGE RD
ACAMPO CA 95220
(209) 368-9277
trdill@westernhubs.com

Louie De Carlo
Compliance Manager
MCI METRO ACCESS TRANSMISSION SERVICES
201 SPEAR STREET, 9TH FLOOR
SAN FRANCISCO CA 94105

Richarf Severy
MCI TELECOMMUNICATIONS CORPORATION
9TH FLOOR
201 SPEAR STREET
SAN FRANCISCO CA 94105
richard.b.severy@mci.com

R.04-10-010 ALJ/KOT/tcg

**ATTACHMENT 3**
**Page 4**

Ed Patriquin
KOTTINGER RANCH HOMEOWNERS ASSOCIATION
3718 SMALLWOOD COURT
PLEASANTON CA 94566
(925) 426-7878
patriquin@home.com

Peter Miller
NATURAL RESOURCES DEFENSE COUNCIL
1834 DELAWARE STREET
BERKELEY CA 94703
(415) 777-0220
pmiller@nrdc.org

Marilyn Salmon
PACIFIC BELL INTERNET SERVICE
485 S. MONROE STREET
SAN JOSE CA 95128

Ed Kolto
Attorney At Law
PACIFIC BELL TELEPHONE COMPANY
140 NEW MONTGOMERY STREET, ROOM 1617
SAN FRANCISCO CA 94105
(415) 545-9422
ed.kolto@sbc.com

Deborah Shefler
PACIFIC GAS AND ELECTRIC COMPANY
77 BEALE STREET, B30A
SAN FRANCISCO CA 94105
(415) 973-2959
dss8@pge.com

Cynthia Schultz
PACIFICORP
900 S.W. FIFTH AVENUE, SUITE 2300
PORTLAND OR 97204
(503) 294-9246
cynthia.schultz@pacificorp.com

Leigh K. Jordan
PARK WATER COMPANY/APPLE VALLEY RANCHOS
9750 WASHBURN ROAD
PO BOX 7002
DOWNEY CA 90241-7002
(562) 923-0711
leigh@parkwater.com

Sara Steck Myers
Attorney At Law
122 - 28TH AVENUE
SAN FRANCISCO CA 94121
(415) 387-1904
ssmyers@att.net

Kathryn Ford
QWEST COMMUNICATIONS INTERNATIONAL, INC.
QWEST POLICY & LAW
1801 CALIFORNIA STREET, SUITE 4900
DENVER CO 80202
(303) 672-2776

James S. Adams
REDWOOD ALLIANCE
PO BOX 293
ARCATA CA 95521
(707) 822-7884

Greg R. Gierczak
Executive Director-Regulatory
ROSEVILLE TELEPHONE COMPANY
PO BOX 969
ROSEVILLE CA 95678
g.gierczak@surewest.com

Joseph Kloberdanz
SAN DIEGO GAS & ELECTRIC COMPANY
8330 CENTURY PARK COURT
SAN DIEGO CA 92123
(858) 654-1771
jkloberdanz@semprautilities.com

Irene K. Moosen
Attorney At Law
SAN FRANCISCO COMMUNITY POWER COOP.
53 SANTA YNEZ AVENUE
SAN FRANCISCO CA 94112
(415) 587-7343
irene@igc.org

Palle Jensen
Director Of Regulatory Affairs
SAN JOSE WATER COMPANY
374 WEST SANTA CLARA ST.
SAN JOSE CA 95196
(408) 279-7970
palle_jensen@sjwater.com

R.04-10-010  ALJ/KOT/tcg

**ATTACHMENT 3**
**Page 5**

Shawna Parks
Attorney At Law
449 - 15TH STREET, SUITE 303
OAKLAND CA 94612
(510) 451-8644
sparks@dralegal.org

PUBLIC ADVOCATES, INC.
1535 MISSION STREET
SAN FRANCISCO CA 94103-2500
(415) 431-7430
savama@consumer.org

Ed Kolto
SBC CALIFORNIA
140 NEW MONTGOMERY ST., RM 1617
SAN FRANCISCO CA 94105
(415) 545-9422
ed.kolto@sbc.com

Linda S Vandeloop
Regulatory Director
SBC PACIFIC BELL
140 NEW MONTGOMERY ST., SUITE 1718
SAN FRANCISCO CA 94105-2228
(415) 542-7556
LV8571@sbc.com

Vicki L. Thompson
Attorney At Law
SEMPRA ENERGY
101 ASH STREET HQ13
SAN DIEGO CA 92101
(619) 699-5130
vthompson@sempra.com

Marc Mihaly
Attorney At Law
SHUTE MIHALY & WEINBERGER LLP
396 HAYES STREET
SAN FRANCISCO CA 94102
(415) 552-7272
armi@smwlaw.com

Carl Zichella
Regional Staff Director
SIERRA CLUB CALIFORNIA
1414 K STREET, SUITE 500
SACRAMENTO CA 95814
(916) 557-1100 (104)

George M. Sawaya
2860 SHADY LANE
POLLOCK PINES CA 95726
(530) 644-5167

Keith Epstein
SBC ADVANCED SOLUTIONS, INC.
1010 N. ST. MARYS ST., 14TH FL
SAN ANTONIO TX 78215
(210) 246-8629
kel671@txmail.sbc.com

David R. Garcia
Attorney At Law
SOUTHERN CALIFORNIA EDISON COMPANY
2244 WALNUT GROVE AVENUE
ROSEMEAD CA 91770-7740
(626) 302-2336
david.garcia@sce.com

David B. Follett
Attorney At Law
SOUTHERN CALIFORNIA GAS COMPANY
633 WEST 5TH ST., SUITE 5200
LOS ANGELES CA 90071-2071
(213) 895-5134
dfollett@sempra.com

Andrew W. Bettwy
Attorney At Law
SOUTHWEST GAS CORPORATION
5241 SPRING MOUNTAIN ROAD
LAS VEGAS NV 89102
(702) 876-7107
andy.bettwy@swgas.com

Stephen M. Kukta
SPRINT CORP.
1850 GATEWAY DRIVE
SAN MATEO CA 94404
(650) 513-2714
stephen.h.kukta@mail.sprint.com

Keith Mccrea
Attorney At Law
SUTHERLAND, ASBILL & BRENNAN
1275 PENNSYLVANIA AVENUE, NW
WASHINGTON DC 20004-2415
(202) 383-0705
keith.mccrea@sablaw.com

R.04-10-010  ALJ/KOT/tcg

# ATTACHMENT 3
## Page 6

Mary O. Simmons
Vice President
SIERRA PACIFIC POWER COMPANY
RATES & REGULATORY AFFAIRS
6100 NEIL ROAD, P.O. BOX 10100
RENO NV 89520
(775) 834-5870
msimmons@sierrapacific.com

Andrew Ulmer
Attorney At Law
SIMPSON PARTNERS LLP
900 FRONT STREET, SUITE 300
SAN FRANCISCO CA 94111
(415) 773-1790
andrew@simpsonpartners.com

Robert Finkelstein
Attorney At Law
THE UTILITY REFORM NETWORK
711 VAN NESS AVE., SUITE 350
SAN FRANCISCO CA 94102
(415) 929-8876 X310
bfinkelstein@turn.org

Julia Levin
UNION OF CONCERNED SCIENTISTS
2397 SHATTUCK AVENUE, SUITE 203
BERKELEY CA 94704
(510) 843-1872
jlevin@ucsusa.org

Michael Shames
Attorney At Law
UTILITY CONSUMERS' ACTION NETWORK
3100 FIFTH AVENUE, SUITE B
SAN DIEGO CA 92103
(619) 696-6966
mshames@ucan.org

Connie D. Easterly
UTILITY DESIGN, INC.
5528 PACHECO BLVD.
PACHECO CA 94553-5126
(925) 952-9324
easterly@udi-tetrad.com

Itzel Berrio
Deputy General Counsel
THE GREENLINING INSTITUTE
1918 UNIVERSITY AVENUE, SECOND FLOOR
BERKELEY CA 94704
(510) 926-4000
iberrio@greenlining.org

Gillian Taylor
THE SIERRA CLUB
52 LA RANCHERIA
CARMEL VALLEY CA 93924
gtaylor@redshift.com

Elaine Duncan
Attorney At Law
VERIZON CALIFORNIA INC.
711 VAN NESS AVENUE, SUITE 300
SAN FRANCISCO CA 94102
(415) 474-0468
elaine.duncan@verizon.com

Donald R. Ward
PO BOX 2173
ORCUTT CA 93457
(805) 937-4860

Tom Dukich
Manager, Rates & Tariffs
WASHINGTON WATER POWER COMPANY
PO BOX 3727
SPOKANE WA 99220
(509) 489-0500

Raymond J. Czahar
Chief Financial Officer
WEST COAST GAS CO., INC.
9203 BEATTY DR.
SACRAMENTO CA 95826-9702
(916) 364-4100
westgas@aol.com

Mark Roberge
WILD GOOSE STORAGE INC.
450 SANSOME STREET, STE 1400
SAN FRANCISCO CA 94111

R.04-10-010 ALJ/KOT/tcg

**ATTACHMENT 3**
**Page 7**

Roger L. Poynts
UTILITY DESIGN, INC.
5520 PACHECO BLVD.
PACHECO CA 94553-5126
(925) 674-0218
poynts@udi-tetrad.com

Robert J. Diprimio
President
VALENCIA WATER COMPANY
24631 AVENUE ROCKEFELLER
VALENCIA CA 91355
(661) 295-6501
rdiprimio@valencia.com

Thomas A. Kiernan
VERIZON ADVANCED DATA, INC.
1166 6TH AVENUE, ROOM 22022
NEW YORK NY 10036
(212) 278-8416
tkiernan@banetworkdata.com

Barbara George
Executive Director
WOMEN'S ENERGY MATTERS
PO BOX 162008
SACRAMENTO CA 95816
(916) 739-1898
bgwem@igc.org

Karen M. Potkul
Vice President-Legal & Regulatory Affair
XO CALIFORNIA INC.
1776 W MARCH LN STE 200
STOCKTON CA 95207-6425
(949) 417-7766
karen.potkul@xo.com

********** STATE EMPLOYEE **********

Michelle Cooke
Administrative Law Judge Division
RM. 5006
505 VAN NESS AVE
San Francisco CA 94102
(415) 703-2637
mlc@cpuc.ca.gov

Steven Kotz
Administrative Law Judge Division
RM. 5112
505 VAN NESS AVE
San Francisco CA 94102
(415) 703-2437
kot@cpuc.ca.gov

********* INFORMATION ONLY **********

**(END OF ATTACHMENT 3)**

***Public Utilities Commission of the State of California***
*Steve Larson, Executive Director*

<u>*Headquarters*</u>
505 Van Ness Avenue
San Francisco, CA 94102
(415) 703-2782

<u>*Southern California Office*</u>
320 West 4th Street, Suite 500
Los Angeles, CA 90013
(213) 576-7000

*Website:* http://www.cpuc.ca.gov
*Calendar Archive:* http://www.cpuc.ca.gov/daily_calendar_archive/

**Daily Calendar**
**Thursday, October 21, 2004**

- Commission Meetings
- Notices
- Subscription Information (Daily Calendar and Agenda)
- Commissioner Office Hours
- Public Meetings and Workshops
- Notice of Draft Resolutions (PU Code § 311(g))
- New Filings
- Petitions for Modification and Applications for Rehearing
- Draft Decisions/Proposed Decisions/Alternates/Presiding Officer's Decisions/ Arbitrator's Reports
- Advice Letter Filings
- Miscellaneous Transportation Items
- Miscellaneous Telecommunication Matters
- Adjournments/Resettings/Hearings Concluded
- Removals from Calendar
- New Settings
- Law and Motion Hearings
- Final Oral Argument
- Hearings
- Notice of Denial of Request for Ex Parte Meeting
- Notice of All-Party Meetings (PU Code §1701.3(c))
- Notice of Ex Parte Communications

 **The Commission's policy is to schedule hearings (meetings, workshops, etc.) in locations that are accessible to people with disabilities.**

The CPUC encourages all Californians to participate in its meetings, hearings, workshops, and proceedings. We try to hold our public meetings only in places that are wheelchair accessible and which can accommodate specialized equipment and other services useful to people with disabilities. Please see the notice of the meeting you wish to attend for more specifics.

If you plan to attend and need specialized accommodations for a particular meeting that are not listed in the notice, request them from the Public Advisor's Office <u>at least three business days in advance of the meeting</u>. Contact the Public Advisor's Office by any one of the following:

|          |                             |      |                            |
|----------|-----------------------------|------|----------------------------|
| Email:   | public.advisor@cpuc.ca.gov  | FAX: | 415-355-5404 (Attn.: Public Advisor) |
| toll-free: | 1-866-849-8390            | TTY: | 1-866-836-7825 (toll-free) |
| Voice:   | 415-703-2074                |      | 1-415-703-5282             |

| 6709 | IEC | INTELLIGENT COMMUNICATIONS INTN'L, INC |
| 6717 | IER | BEE LINE LONG DISTANCE, LLC |
| 6718 | IEC | GROVELINE, LLC |
| 6720 | IER | INC 21.COM CORPORATION |
| 6721 | IER | ASIATEL, INC. |
| 6722 | IER | GLOBALPAY SOLUTIONS, INC. |
| 6728 | IER | PRIMO COMMUNICATIONS, INC |
| 6730 | IER | PREMIER TELECOM, INC |

If you have any questions or comments about this resolution, please direct them to the following by November 15, 2004:

> Joe McIlvain
> Telecommunications Division
> 415-703-2185 or jjm@cpuc.ca.gov.

---

### NEW FILINGS

10/7/04    **R04-10-010** - Rulemaking to set hourly rates for purposes of calculating intervenor compensation awards, pursuant to Public Utilities Code Section 101 and following, for work performed in calendar year 2005.

---

### PETITIONS FOR MODIFICATION AND APPLICATIONS FOR REHEARING

#### NONE

---

### DRAFT DECISIONS * PROPOSED DECISIONS * ALTERNATES * PRESIDING OFFICER'S DECISION * ARBITRATOR'S REPORTS

10/20/04    A02-05-046 - Application of Southern California Edison Company Regarding the Future Disposition of the Mohave Generating Station; **Proposed Decision of ALJ Brown.**

---

### ADVICE LETTER FILINGS

#### NONE

---

### MISCELLANEOUS TRANSPORTATION ITEMS
#### Filings with Consumer Protection and Safety Division

#### NONE

---

# *Public Utilities Commission of the State of California*

### *Public Agenda 3162*
### *Friday, November 18, 2005 10:00 a.m.*
### *San Francisco, California*

**Commissioners**
**Michael R. Peevey, President**
**John A. Bohn**
**Geoffrey F. Brown**
**Dian M. Grueneich**
**Susan P. Kennedy**

*For each agenda item, a summary of the proposed action is included; the Commission's decision may, however, differ from that proposed.*

*Website: http://www.cpuc.ca.gov*

---

**Scheduled Commission Meetings**
**505 Van Ness Avenue, San Francisco**

| *Ratesetting Deliberative Meeting\** *Room 5305* *(1:30 p.m.)* **Closed to the Public** | *Commission Meeting* *Auditorium* *(10 a.m.)* **Open to the Public** |
|---|---|
| Tuesday, November 29, 2005 (San Francisco ) (Will Be Held) | Friday, November 18, 2005 (San Francisco) |
| Monday, December 12, 2005 (San Francisco) | Thursday, December 01, 2005 (San Francisco) |
| Monday, January 09, 2006 (San Francisco) | Thursday, December 15, 2005 (San Francisco) |
| Monday, January 23, 2006 (San Francisco) | Thursday, January 12, 2006 (San Francisco) |
| | Thursday, January 26, 2006 (San Francisco) |

*\*Ratesetting Deliberative Meeting dates are reserved as noted but will be held only if there are ratesetting matters to be considered and a Commissioner has requested that a Ratesetting Deliberative Meeting be held.*

---

**Matters of Public Interest**
**For the convenience of the public and media representatives, items of widespread public interest will be taken up at the beginning of the meeting.**

---

For further information contact the Public Advisor
(415) 703-2074   E-mail: public.advisor@cpuc.ca.gov

---



This location is accessible to people with disabilities. If specialized accommodations for the disabled are needed, e.g. sign language interpreters, please call the Public Advisor at (415) 703-2074 or TTY# (415) 703-5282 or toll free # 1-866-836-7825 three business days in advance of the meeting.

**Regular Agenda - Other Utility Orders**

**44**
**[5021]**

**R04-10-010 - Rulemaking to set hourly rates for purposes of calculating intervenor compensation awards, pursuant to Public Utilities Code Section 1801 and following, for work performed in calendar year 2005.**

This decision approves principles to govern hourly rates for intervenors' representatives in calculating award requests for work performed in 2005.  This proceeding is closed.

(Comr Peevey - ALJ Kotz)

*Pub. Util. Code § 311 – This item was mailed for Public Comment.*

*Pub. Util. Code §1701.1 -- This proceeding is categorized as Quasi-Legislative.*

ALJ/KOT/sid

**Mailed 11/29/2005**

Decision 05-11-031  November 18, 2005

**BEFORE THE PUBLIC UTILITIES COMMISSION OF THE STATE OF CALIFORNIA**

| | |
|---|---|
| Rulemaking to Set Hourly Rates for Purposes of Calculating Intervenor Compensation Awards, Pursuant to Public Utilities Code Section 1801 and Following, for Work Performed in Calendar Year 2005. | Rulemaking 04-10-010 (Filed October 7, 2004) |

**FINAL DECISION ON 2005 RATES FOR
INTERVENORS' REPRESENTATIVES**

210378

R.04-10-010  ALJ/KOT/sid

# TABLE OF CONTENTS

**Title**                                                                                    **Page**

FINAL DECISION ON 2005 RATES FOR
INTERVENORS' REPRESENTATIVES.................................................................2
1. Introduction ......................................................................................... 2
2. Background ........................................................................................... 2
3. Development of the Record .............................................................. 3
4. Conceptual Issues................................................................................ 6
   4.1.  An Evolving Process................................................................... 6
   4.2.  In-House Versus Outside Representatives............................. 6
   4.3.  Productive Hours........................................................................ 8
5. Currently Authorized Hourly Rates ............................................... 9
   5.1.  Rates for Attorneys: 2003-2004 .............................................10
   5.2.  Rates for Experts: 2003-2004 .................................................13
6. Intervenors' Proposed Rates for 2005 ...........................................14
7. Authorized Hourly Rates for Work Performed in 2005 ..............15
8. Future Hourly Rate Updates...........................................................18
9. Confidentiality of Compensation Data..........................................20
10. Intervenor Status in this Rulemaking ..........................................21
11. Comments on Draft Decision ..........................................................22
   11.1.  Utility Comments .....................................................................23
   11.2.  Intervenor Comments .............................................................24
12. Assignment of Proceeding................................................................27
Findings of Fact.......................................................................................  27
Conclusions of Law.................................................................................  28
FINAL ORDER......................................................................................... 29

ATTACHMENT A – Intervenors' Proposed Rates for Attorneys:  2005
Intervenors' Proposed Rates for Experts:  2005

R.04-10-010 ALJ/KOT/sid

## FINAL DECISION ON 2005 RATES FOR
## INTERVENORS' REPRESENTATIVES

### 1. Introduction

In today's decision, we approve principles to govern hourly rates for intervenors' representatives.[1] We base these rates on (1) compensation data provided by utilities regarding the in-house and outside representatives who appear on their behalf before this Commission, and (2) the information provided by intervenors regarding the training and experience of their representatives. These rates are presumptively reasonable for calculating awards to intervenors for qualifying hours worked in calendar year 2005.

### 2. Background

Resolution ALJ-184 (August 19, 2004), which was Attachment 2 to the order instituting this rulemaking, states the background and intent of the rulemaking and resolves several threshold issues. The task of the rulemaking itself was to create data sets appropriate to carrying out the Commission's duties in setting intervenors' hourly rates under Pub. Util. Code § 1806. In relevant part, that section provides as follows:

> The computation of compensation ... shall take into consideration the market rates paid to persons of comparable training and experience who offer similar services. The compensation awarded may not, in any case, exceed the comparable market rate for services paid by the commission or the public utility, whichever is greater, to persons of

---

[1] "Representatives" for purposes of today's decision includes anyone with expertise that might be useful in presenting evidence or argument at the Commission. Thus, the term is not limited to lawyers but includes engineers, accountants, and economists, among others.

- 2 -

R.04-10-010 ALJ/KOT/sid

comparable training and experience who are offering similar services.

Today's decision constitutes the first iteration of what we envision as an annual process for updating hourly rates based on new compensation data and proposed rates from intervenors. This process should ensure compliance with the provisions of § 1806 and improve the fairness and transparency of the hourly rate determinations that go into the calculation of awards to intervenors.

### 3. Development of the Record

The range of potential issues under § 1806 is considerable. For example, how should the "market," to which § 1806 refers, be defined? Regarding the dollars per hour "market rate" paid by the utilities to their employees, what inputs (benefits, overheads) should be included in the dollars, and what assumptions should be made regarding the annual "billable" or "productive" hours worked, as distinguished from, e.g., vacation, training or administrative time. Not surprisingly, utilities differ regarding their approaches to compensation and personnel practices. Accordingly, a common reporting format and simplifying assumptions were needed to enable a fair analysis of the utilities' compensation data.

These issues were addressed and, to a remarkable extent, resolved at workshops held on December 9, 2004, and February 9, 2005. Certain utilities and intervenors continue to debate two conceptual issues, which we address later in today's decision. For now, however, these issues remain conceptual because the range of hourly rates proposed by the intervenors has proved in fact to be largely noncontroversial.

The success of the workshops is due to the participants, for which we acknowledge and thank them. Detail could easily have swamped this process;

R.04-10-010 ALJ/KOT/sid

that it did not do so is a tribute to the focus, candor, and collaborative spirit
displayed at the workshops.

In summary, the intervenors' hourly rates we establish today for their
work performed in 2005 are based on (1) a series of data sets[2] from the utilities,
which include both compensation data and summary information regarding
their representatives' qualifications, and (2) the intervenors' proposals, which
analyze the utility data sets in relation to the qualifications of representatives
who will appear on behalf of the intervenors. The intervenors' proposals were
subject to comment and reply comment on April 6 and 18, respectively.

The Commission's costs of representation are also relevant under § 1806.
Thus, in Resolution ALJ-184, we had our Executive Director review the utility
data and report any instances in which the Commission had paid rates exceeding
those paid by the utilities. The Executive Director duly reported, on June 7, 2005,
that the Commission had not paid rates exceeding those paid by the utilities.

Finally, we note that Verizon presented an alternative proposal to the
above data collection process. Verizon advocated retaining a private company,

---

[2] "Preliminary" data sets were submitted on November 19, 2004, by each utility that
had been required by the Commission to pay an award for intervenors' work
performed in 2001, 2002, or 2003. Revised data sets, using a spreadsheet developed by
Pacific Gas and Electric Company (PG&E), were submitted on January 31, 2005, by the
state's largest utilities. These utilities then provided 2004 data in submissions on
March 4 and (with additional data for in-house representatives) on May 13.
Consequently, our utility compensation data come chiefly from PG&E, San Diego Gas &
Electric Company, Southern California Edison Company (Edison), Southern California
Gas Company, SBC California, and Verizon California Inc. (Verizon). These utilities
historically have paid 85-95% of all intervenors' compensation awards for which we
have put the payment responsibility on individual utilities.

R.04-10-010 ALJ/KOT/sid

with expertise in personnel recruitment and compensation, to develop and analyze the "market rate" information. At Verizon's invitation, two prominent human resources consulting firms with extensive utility experience submitted responses describing how they would approach the project. The responses addressed scope of work, timing, project team, and cost, among other things.

The sense of the second workshop was that the alternative proposal could not be implemented at this time. We agree. Given our desire to set hourly rates before we receive large numbers of award requests involving 2005 work, we prefer to revisit the alternative proposal, if Verizon wishes to renew it, in our hourly rate update for 2006. In the meantime, we encourage Verizon and any others who may be interested in the alternative proposal to give more thought to its implementation, including at least the following questions:

1.  Will the hourly rate recommendations developed through the alternative proposal be credible and objective? How and when will the consultant's process and methodology be open to public scrutiny?

2.  Will the alternative proposal save time and effort for utilities, intervenors, and Commission staff? What other advantages might the alternative proposal have relative to the process that we rely on in today's decision?

3.  What is the process by which the consulting contract will be awarded, and how will it be funded?

The responses elicited by Verizon provide concrete examples that may be evaluated in terms of how well they address the issues posed in the first two questions. The third question is more problematic, particularly if the Commission itself is expected to solicit bids and award, administer, and fund the consulting contract.

R.04-10-010 ALJ/KOT/sid

## 4. Conceptual Issues

### 4.1. An Evolving Process

We are pleased with the results of this attempt at an all-inclusive revision to intervenors' hourly rates. We recognize, however, that it is a first attempt. As such, the process used here should be subject to refinement based on experience and further consideration of alternatives, such as that proposed by Verizon, or use of an index narrowly targeted to the cost of the professional services that representatives provide. Accordingly, while we are confident the hourly rates we approve today are reasonable, this rulemaking is not necessarily a template for future hourly rate updating.

### 4.2. In-House Versus Outside Representatives

Some intervenors and utilities debate whether the Commission, in setting intervenors' hourly rates, should rely on pay scales for in-house representatives, outside representatives, or some blend. Given the lack of controversy regarding the range of intervenor rates proposed in this proceeding, we find that the debate is not yet ripe for definitive resolution, but we will offer some guidance for future hourly rate updates.

The nature of the debate is easy to understand. Employees generally receive a salary that seems low relative to the hourly rates charged by outside representatives, even after taking account of employee benefits and overheads in addition to their base salary. Intervenors argue their circumstances and services parallel those of outside representatives, and their hourly rates should be set accordingly. Utilities argue against exclusive reliance on the rates charged by outside representatives. PG&E would use a "blend" of data from in-house and

- 6 -

R.04-10-010  ALJ/KOT/sid

outside representatives to determine intervenors' hourly rates; Edison would rely exclusively on compensation data for in-house representatives.

Much of the debate centers on the degree of risk intervenors face in recovery of their fees and costs of representation, and whether and how we should take account of risk in setting intervenors' hourly rates. For example, according to Aglet Consumer Alliance, a "comparable market rate" as contemplated by § 1806 would be set at a level to account for (among other risks intervenors face) "payment contingencies, the risk of nonpayment, and the timing of eventual payment." PG&E suggests that intervenors exaggerate these risks, noting, e.g., that intervenors may substantially contribute to a decision, and thus qualify for compensation, without "prevailing" on the merits. Edison considers risk to be irrelevant to hourly rate determination; specifically, Edison reads "similar services" in § 1806 to refer to the type of tasks actually required in a Commission proceeding, not the circumstances of payment.

We consider that hourly rate determinations under § 1806 will involve weighing various factors and the use of sound judgment. Risk is among the relevant factors: The same sentence from which Edison extracts "similar services" also directs our attention to "market rates." To further complicate the question, risks may be asymmetric. Outside representatives must find paying clients and set budgets accordingly. Intervenors risk late payment and disallowances. Based on this record, we cannot say the level of risk is more, less or the same in considering "similar services." What we know about markets supports the intervenors' contention that risk counts. On the other hand, invoking risk does not automatically entitle intervenors to a risk premium.

We agree with PG&E about the use of a blend of data from in-house and outside representatives. Section 1806 requires consideration of the broad market

- 7 -

R.04-10-010 ALJ/KOT/sid

for regulatory expertise, with special attention to the rates for services paid by the utilities and the Commission itself. What the statute does <u>not</u> provide is a simple formula for translating all these inputs ("market rates," "comparable training and experience," "similar services") into hourly rates for particular intervenor representatives. We expect, however, that analysis of the data we receive in the updating process will enable us to establish a reasonable <u>range</u> of rates for representatives classified by their training and their experience.

We find encouraging the fact that the actual hourly rate proposals submitted by intervenors in this proceeding do, in general, fall within a reasonable range. (PG&E itself acknowledges that, for the most part, it does not disagree with rates proposed by intervenors.) We suspect that one reason for the relative lack of controversy over the rate proposals is the qualifications that many intervenors' representatives bring to the table; they include individuals with national reputations and decades of experience. Such representatives would be highly compensated whether they were working in-house or outside.

### 4.3. Productive Hours

As part of the compensation data collected, we directed utilities to develop an "effective hourly rate" for salaried in-house representatives. The rate was to reflect benefits and an allocation of overheads. The issue here is the extent to which the effective hourly rate should account for time such as vacation, sick leave, or other time not spent on regulatory work (e.g., training, administrative matters, other assignments). The PG&E spreadsheet reduces annual hours by an

allowance for such non-productive time, which has the result of increasing the effective hourly rate of an in-house representative.[3]

We find that the PG&E spreadsheet approach regarding productive hours is appropriate.  First, we note that outside representatives typically charge only for "billable" hours, i.e., those hours performing the work for which they were retained.  The productive hours concept corresponds roughly to billable hours and thus enables a more realistic comparison between hourly rates for in-house and outside representatives.  Second, under the statute, we may only compensate intervenors for time that is related to and necessary for their substantial contribution to a Commission decision.  Thus, the statute itself suggests that we use productive hours as the basis for our hourly rate calculations.

## 5. Currently Authorized Hourly Rates

Here we examine the authorized hourly rates paid to intervenors in 2003 and 2004 in light of the data from utilities on their expenses for representation in our proceedings (new intervenor rates proposed for 2005 are examined in Sections 6 and 7 of this decision).  Regarding the hourly rates we currently authorize for intervenors, we find these rates are within the ranges of hourly rates that utilities pay their representatives overall.  This is true both for attorneys and experts, at all levels of experience.  The currently authorized intervenor rates are generally higher than those that utilities pay their in-house representatives; however, considering all the utility data, we find that our

---

[3] As compared to Edison's preferred approach, namely, to divide the annual salary by 2,080 [40 hours per week times 52 weeks].

- 9 -

R.04-10-010 ALJ/KOT/sid

currently authorized rates do not exceed the "comparable market rate" within the meaning of § 1806.

Pursuant to the schedule outlined in the ALJ's February 18, 2005 ruling, the state's six major utilities and 15 intervenors filed comments and related compensation data for 2003-2004 (the utilities earlier filed 2003 data).[4] The tables in the next two sections summarize the data.

### 5.1. Rates for Attorneys: 2003-2004

The table below shows hourly rates for attorneys for 2003 and 2004. The data from the intervenors is supplemented by our own historical records of previous awards. The participants in this proceeding agreed the data for attorney hourly rates would be disaggregated into the following groups, based on the number of years since completion of law school: 0-2 years; 3-4 years; 5-7 years; 8-12 years; and 13 years and over.

Generally, we found a concentration of attorneys (data points) in the higher levels of experience for intervenors and the utilities, with both groups having long experience in utility-related work and work before the Commission. The number of filed data points for intervenors is shown in parenthesis for each level of experience. For the utilities, only three of the utilities filed data sets with a breakdown of the number of data points (individuals) for 2003, and one utility filed a breakdown for 2004. The utility data points also were not disaggregated into the levels of experience described above. Using these data sets, we conservatively estimate that the utility attorney rate ranges are based on about

---

[4] Initial data were filed by many utilities, then only by the large utilities as the proceeding progressed. See note 2 above.

R.04-10-010 ALJ/KOT/sid

100 in-house attorneys and 50-75 outside attorneys for each year. The breadth of the utility sample relative to the much smaller number of intervenor attorneys suggests that the rate ranges we derive from the sample are reasonably robust for our purposes.

### Attorney Rates 2003-2004

| Years Experience | 2003 | 2004 |
|---|---|---|
| **13+years** | | |
| Utilities  (outside) | $195-$625 | $205-$585 |
| Intervenors (11) | $250-$450 | $250-$490 |
| Utilities  (in-house) | $185-$420 | $170-$475 |
| | | |
| **8-12 years** | | |
| Utilities  (outside) | $170-$490 | $190-$535 |
| Intervenors (5) | $275-$300 | $270-$325 |
| Utilities  (in-house) | $150-$220 | $135-$215 |
| | | |
| **5-7 years** | | |
| Utilities  (outside) | $250-$425 | $250-$400 |
| Intervenors (1) * | $225-$250 | $250-$270 |
| Utilities  (in-house) | $115-$160 | $130-$165 |
| | | |
| **3-4 years** | | |

- 11 -

R.04-10-010  ALJ/KOT/sid

| Utilities  (outside) | $230-$395 | $185-$400 |
|---|---|---|
| Intervenors (0) | N/A | N/A |
| Utilities  (in-house) | N/A | $160 |
|  |  |  |
| **0-2 years** |  |  |
| Utilities  (outside) | $165-$395 | $130-$400 |
| Intervenors (1) | N/A | $190 |
| Utilities  (in-house) | N/A | N/A |

\* One individual awarded two rate levels each year

For 2003 and 2004, we find that all currently authorized intervenor attorney rates fall within the range of utility outside attorney rates.  The utility outside attorney rates comprise a wider range than the intervenor rates, which may be due to a wider range of specialties and project-specific work for which the utilities hire outside attorneys.  The rates paid to in-house utility attorneys are lower than those paid to intervenor attorneys in all categories for these years.  However, at the most senior attorney level, which includes 11 of the 18 intervenor attorneys in our data, the top of the range of rates for both years for in-house utility attorneys is only slightly lower than the top of the range for intervenor attorneys.

For 2004, intervenor attorney rates increased an average of 8% from 2003 (the increase deemed reasonable in Resolution ALJ-184).  The average increase for utility outside attorneys for 2004 was roughly 5%.  For utility in-house attorneys (based on limited data), there appears to have been little or no increase, except at the high end of the range for the most senior attorneys.  By comparison, in reviewing other cost-of-living data readily available to the public,[5] we found the general rate of inflation for 2004 to be 2.7%.

---

[5]  Social Security Administration; U.S. Dept. of Labor; Federal Reserve Bank.

R.04-10-010  ALJ/KOT/sid

### 5.2.  Rates for Experts:  2003-2004

The data on the hourly rates paid to experts show that, as with rates for attorneys, all currently authorized rates for 2003 and 2004 for intervenor experts fall within the range of those rates utilities paid to their outside experts, with utility expert rates comprising a wider range than intervenor expert rates.  The rates utilities paid to their in-house experts also comprise a wider range than intervenor rates for 2004, and are very close to the rate range for intervenors for 2003.  The table below shows these rate ranges.  Based on the table, we find our rates for experts to be reasonable even if we looked only to the rates that utilities pay their in-house experts.

Similar to the data for attorneys, the number of data points filed for intervenor experts is shown in the table.  For the utilities, the actual number of data points is extrapolated from three data sets for 2003 and one data set for 2004.

### Expert Rates 2003-2004

|  | 2003 Range | 2004 Range |
|---|---|---|
|  |  |  |
| **Utilities*** |  |  |
| Outside (125) | $65-$450 ** | $90-$475 |
| In-House (200) | $70-$315 | $60-$420 |
|  |  |  |
| **Intervenors (28)** | $110-$330 | $110-$360 |
|  |  |  |

\* For utilities, excludes rates paid to executive level experts (company presidents, directors and officers).

\*\* Excludes rate of $735 paid by one utility to one outside expert in 2003.

R.04-10-010 ALJ/KOT/sid

Unlike the rates for attorneys, the rates for experts were not disaggregated into levels based on years of experience. However, where the experience level of the individual experts was provided, we found that, similar to attorneys, most experts appearing in Commission proceedings have at least 10 years' experience, including some with over 25 years' experience.

For intervenors, most rates paid to individual experts increased by 8% from 2003 to 2004 (the increase deemed reasonable in Resolution ALJ-184). The table aggregates the utility data, but looking at each utility individually, we found no major increases for these years, and in some cases found decreases.

## 6. Intervenors' Proposed Rates for 2005

Intervenors generally are proposing rate increases for work performed in 2005. For individual attorneys, intervenors propose increases from 1-40%, with a median increase of 10%, compared to currently authorized rates for those attorneys. For individual experts, intervenors propose increases from 8-65%, with a median increase of 12%, compared to currently authorized rates for those experts.[6] As we discuss below, we find that many of these proposed increases for individuals are unreasonable because they fail to consider the utility cost data, especially the generally stable hourly rates for 2003-2004 reported by the utilities.

The intervenor proposals vary widely, depending on the intervenor and the individual representative, but they rely chiefly on three perceptions. First, many intervenors regard Resolution ALJ-184 as providing the basis for a similar general increase in 2005. However, we instituted this rulemaking in large part to

---

[6] Attachment A contains a summary of the intervenors' hourly rates proposed for 2005.

R.04-10-010 ALJ/KOT/sid

provide a better record than we ever had before from which to derive a reasonable escalation rate for intervenor fees. We now have that record so further reliance on Resolution ALJ-184 is misplaced.

Second, some intervenors believe that many or most of our currently authorized rates are below the "comparable market rate" required by § 1806. They propose increases to close this perceived gap. As discussed earlier, however, the data we have collected refute this belief. Our currently authorized rates meet the § 1806 comparability requirement.

Third, and more appropriately, many intervenors base proposed increases on the training and experience of individual representatives. For example, an additional year of work may have moved an attorney to a higher experience level. Also, the last authorized rate for several representatives predates 2004. Further, the currently authorized rate for a few representatives seems to fall demonstrably below the rate for their peers among utilities and intervenors. We find that proposals geared to the training and experience of individual representatives persuasively justify an increase in many cases, although not necessarily so sizeable an increase as that proposed.

In short, we will not authorize a general increase in intervenor rates for 2005 over those rates authorized for 2004. We discuss below the general principles we will apply in setting rates for intervenor hours worked in 2005.

## 7. Authorized Hourly Rates for Work Performed in 2005

In this part of today's decision, we establish principles and approve ranges to guide authorized hourly rates for work performed in 2005. We begin with our general approach and then discuss particular issues raised by the showings of the intervenors in support of their hourly rate proposals.

- 15 -

R.04-10-010 ALJ/KOT/sid

Initially, we intended to set individual rates for all intervenor representatives in this proceeding. We have decided not to do so, given the large number of intervenor representatives, especially those for whom no authorized rate currently exists. Instead, the principles and ranges set forth below should enable quick determination of the appropriate hourly rate for each type of intervenor representative and level of experience. First-time representatives must make a showing in the compensation request to justify their proposed hourly rate taking into consideration rates previously awarded representatives with comparable training and experience.

The recent utility data show little or no increase from 2003 to 2004 in the hourly rates that utilities are paying for representation in Commission matters. The very limited utility data for 2005 are consistent with this trend. Thus, absent the considerations listed below, we will not authorize an increase from previously authorized rates for work performed in 2005.

The following tables show the range of rates authorized for intervenor attorneys and experts in 2004. We will authorize rates only within these same ranges for 2005. Intervenors new to our proceedings, with work performed in 2004 or 2005, will be authorized rates within these same ranges.

2005 Hourly Rates for Intervenors' Attorneys:
(based on years' experience since completion of law school)

| | |
|---|---|
| 13+ years: | $270-$490* |
| 8-12 years: | $270-$325 |
| 5-7 years: | $250-$270 |
| 3-4 years: | $185-$220** |

- 16 -

R.04-10-010 ALJ/KOT/sid

0-2 years:          $135-$190***

*The low-end range for 2004 is $250, but this is anomalous in light of the range for 8-12 years
  and thus is increased to $270 for 2005.
**No 2004 data for intervenors for 3-4 years. Low-end rate from utility outside attorneys. The
  high-end rate is approximately 15% above the rate for 0-2 year level (the average differential
  requested by intervenors for 2005 between these same levels).
***Low-end rate from utility outside attorneys – no data from intervenors. .

## 2005 Hourly Rates for Experts:

$110-$360*

* Exact Rate to be determined from training and experience of individual as compared to peers.

Under the following conditions, a request justifying an increase in a
previously authorized rate for a particular representative, for work performed in
2005, may be considered. No rates will be authorized outside the ranges shown
above.

1.  Where a representative's last authorized rate was for work
    done before 2004, an increase is reasonable, but we will limit
    the increase to 3% per year, which is roughly the recent rate
    of inflation as reported by various government agencies.
    (See note 5.)

2.  Where additional experience since the last authorized rate
    would move a representative to a higher level of
    qualification (e.g., from intermediate to senior), an increase
    is reasonable to bring the representative's hourly rate within
    the range of the representative's peers at the higher level.

3.  Where a representative's last authorized rate is below that of
    the range of rates shown in the tables above for
    representatives with comparable qualifications, an increase
    is reasonable to bring the representative's rate to at least the
    bottom level of the rate range. Here, we have in mind

R.04-10-010 ALJ/KOT/sid

certain representatives who have historically sought rates at
or below the low end of the range of rates for their peers[7].
We emphasize, however, that for any given level of
qualifications, there will always be a range of rates in the
market, so this increase is intended to narrow but not
necessarily eliminate perceived disparities.

## 8. Future Hourly Rate Updates

We envision an annual ongoing process for updating the hourly rates paid

to intervenors. As stated in Resolution ALJ-184, this annual process should be

short and informal. To that end, we designate the Chief Administrative Law

Judge, in consultation with the President of the Commission, to take the

necessary steps to coordinate and facilitate a process for updating the hourly

intervenor rates for work performed in 2006. Such steps may include holding

workshops, adjusting the timing or the content of the data sets, and providing for

comment periods. The following procedures should facilitate and simplify the

process, but they in turn may be revised and refined over time, upon further

consideration of any alternatives or as the Commission deems necessary.

**Utilities:**

1. Beginning in 2006, the state's six largest utilities shall
   annually serve on all parties to this proceeding, by April 30,
   data sets showing, for the two preceding calendar years, the
   hourly rates paid to all outside and in-house representatives
   (attorneys and experts) who participate in our proceedings,
   using the spreadsheet format and type of data developed in
   this proceeding.

---

[7] For example, William Marcus of JBS Energy, Inc. has approximately 30 years'
experience and is a recognized expert in energy-related matters, yet has consistently
requested small rate increases at rates below that of his peers.

R.04-10-010  ALJ/KOT/sid

2. The data shall include the effective hourly rates paid to employees and the as-billed hourly rates of outside representatives, along with the number of data points (individuals) included in each level or group.

3. The data shall be accompanied by analysis of any escalation in rates over the two preceding years.

4. For attorneys, the data shall be disaggregated into the same levels of experience (years since completion of law school) described earlier; 0-2 years; 3-4 years; 5-7 years; 8-12 years; and 13 and over years.

5. For experts, the data shall be disaggregated by job classification and by levels of experience relevant to the classification:  0-2 years (entry); 3-9 years (journey); and 10 and over years (senior).

6. The data may be treated as confidential under the guidelines described later in today's decision.

**Intervenors:**

1. For any given year, all intervenor proposed rates shall be within the same range of utility rates from the year immediately preceding that year in which the work was performed, for individuals with similar training and experience.  For example, intervenor rates for work performed in 2006 shall be within the range of utility rates for 2005, subject to possible escalation (below).

2. Escalation, if any, to previously authorized rates shall be based on the increases in utility costs of representation, as shown in the utility data sets for the two preceding years.

3. Where additional experience since the last authorized rate would move a representative to a higher level of qualification (e.g., from intermediate to senior level), an increase beyond the inflation rate is reasonable to bring the

- 19 -

R.04-10-010  ALJ/KOT/sid

>     representative's hourly rate within the range of the
>     representative's peers at the higher level.
>
> 4.  An increase beyond the escalation rate may be reasonable on
>     the basis of a specific showing that a representative has
>     historically sought rates that appear to be at the low end of
>     the range of rates for their peers.  This increase is intended to
>     narrow but not necessarily eliminate perceived disparities.

## 9.  Confidentiality of Compensation Data

In Resolution ALJ-184, we discussed confidentiality issues as follows:

> We anticipate some concern regarding confidentiality,
> particularly for personal financial data.  We note that we have
> granted confidential treatment for the personal financial data
> submitted by intervenors to establish "significant financial
> hardship," which is one component of eligibility to claim
> intervenor compensation.  Utilities must provide cost data, as
> described above, but they may aggregate the data and may
> omit the names of individuals, provided that the utility certifies
> that the data submitted comply fully with the [resolution's]
> requirements ….  Further, when submitting information
> claimed to be confidential, the party asserting the claim must
> submit a redacted (public) and an unredacted (sealed) version
> of the document containing the information and must state the
> statutory basis for asserting confidentiality under the Public
> Records Act.  (Gov. Code § 6250 et seq.)

Many utilities did request confidential treatment for some of the data they

submitted, beyond redaction of individuals' names.  Other utilities did not

- 20 -

R.04-10-010 ALJ/KOT/sid

request further confidential treatment, and among those that did, there is no clear pattern.[8]

At the first workshop, intervenors noted that the redactions seemed excessive. They correctly point out that utility personnel costs may be litigated as a component of revenue requirement in general rate cases, that utility expert witnesses are routinely cross-examined regarding their fees, and that much compensation data are required to be reported periodically pursuant to federal securities law or general order of this Commission.

In response, the ALJ said that, in his opinion, and for the unique purposes of this proceeding, the public interest in revealing the redacted information was relatively slight. We agree. For example, neither the reasonableness of utility costs nor the credibility of utility witnesses is at issue here. It is of course necessary that intervenors have access to all the utility data, including redacted data, but intervenors had access to the full data sets upon execution of nondisclosure agreements.

In short, we will grant the motions for confidential treatment. In doing so however; we emphasize the peculiar nature and needs of this proceeding. By granting the motions here, we do not intend to disturb our precedent and practice as they may have evolved in other types of proceedings.

**10. Intervenor Status in this Rulemaking**

On August 23, 2005, the Greenlining Institute (Greenlining) filed a notice of intent (NOI) to claim intervenor compensation for its participation in this

---

[8] For example, Verizon reported base pay and incentives but redacted its calculation of overheads as a component of the effective hourly rate. Several utilities redacted the hourly rates paid to outside counsel.

R.04-10-010 ALJ/KOT/sid

rulemaking. On August 29, 2005, the Assigned Commissioner, President Peevey, ruled that Greenlining is not eligible to receive compensation, stating that Greenlining, and other intervenors participating in this proceeding, are essentially serving their own interests and not acting in their usual capacity as a customer representative.

Although Greenlining was ruled ineligible, the Assigned Commissioner also addressed the timeliness of its NOI. Greenlining filed its NOI approximately 10 months after this rulemaking commenced. Under §1804(a)(1), the NOI is normally due within 30 days after a prehearing conference (PHC) is held. No PHC was held in this proceeding, as is generally the case in a rulemaking. However, we encourage intervenors in such proceedings to file the NOI as soon as they have decided to participate in the proceeding.

We affirm the Assigned Commissioner's Ruling. As President Peevey noted, intervenors' financial stake in this proceeding is direct, immediate and substantial. This proceeding is unique in this regard, so no inference may be drawn regarding intervenors' ability in general to advocate on behalf of their constituents. Similarly, the guidance regarding NOI filing is helpful for rulemakings and other proceedings where no PHC is held.

## 11. Comments on Draft Decision

The draft decision of the ALJ in this matter was mailed to the parties in accordance with Pub. Util. Code § 311(g)(1) and Rule 77.7 of the Rules of Practice and Procedure. Comments were filed on November 7, 2005 by five parties (two intervenor groups and three utilities). Reply comments were filed on November 14, 2005 by three intervenors and two utilities. In light of the comments, we have made minor changes to correct or clarify the decision but

- 22 -

R.04-10-010 ALJ/KOT/sid

make no changes to our fundamental determinations. Our specific responses to the comments are set forth below.

### 11.1. Utility Comments

The utilities[9] focused on what they believe are burdensome requirements for future annual reports of compensation data. They make four recommendations: (1) use data sets submitted for experts by job classification but otherwise aggregated into one range level, as opposed to disaggregated levels of years of experience similar to that used for attorneys (PG&E, Verizon and Edison); (2) use available cost-of-living data to determine intervenor rates instead of requiring utilities to file annual data sets of hourly rates for their representatives (SBC); (3) require new data every three years, instead of annually, and use available cost-of-living data in the two off-years (Verizon); and (4) extend the deadline for filing annual data sets to April 30, instead of March 31 (PG&E, Verizon and Edison).

On the hourly rates for utility experts, we find it is appropriate to disaggregate the data by experience as well as job classification to determine an appropriate market rate level. The rate table for experts used in this proceeding is severely aggregated, from $110 to $360 between the bottom and top hourly rates for intervenor experts, without regard to the type of expertise or years of experience. In order to more accurately determine a "market rate" (§ 1806), we want more analysis in future updates. It seems reasonable, for example, that experts be disaggregated at least into the entry, journey and senior levels. We also want to know whether material rate differences exist based on the type of

---

[9]  PG&E, Verizon, SBC, and Edison.

R.04-10-010 ALJ/KOT/sid

expertise (engineering, economics, etc.). These factors seem fundamental to a decision on expert compensation, and our desire for more information on this subject is a strong reason why we continue with our original plan to do another hourly rate update in 2006.

On using cost-of-living data, §1806 requires that rates paid to intervenors shall be based on "market rates paid to persons of comparable training and experience," and that those rates may not "exceed the comparable market rate for services paid by the commission or the public utility." Using cost-of-living data as the sole determinant for setting intervenor rates would not comply with the statute or necessarily track the escalation in hourly rates for professional services, and we will not modify the draft decision in this area.

Regarding the annual due date for data sets, PG&E and the other utilities recommend it be extended to April 30, in view of the analysis and time required to compile an accurate record. No party opposes this request, and we have modified this order accordingly.

### 11.2. Intervenor Comments

The intervenors[10] generally state that: (1) our authorized hourly rate ranges for work performed in 2005 are inadequate and supported by insufficient data; (2) establishing hourly intervenor rates should take into account intervenors' asserted high risk of compensation delays or disallowances; (3) "productive hours" should be further defined; (4) intervenors should be eligible for compensation in this proceeding (reversing the Assigned

---

[10] The Utility Reform Network (TURN), San Luis Obispo Mothers For Peace (MFP). The Greenlining Institute and Latino Issue Forum filed replies generally supporting TURN.

- 24 -

R.04-10-010  ALJ/KOT/sid

Commissioner's Ruling of August 29, 2005); and (5) proceeding-specific multipliers should be allowed for increases to hourly rates.

Regarding the hourly rates authorized for 2005, intervenors argue that using rate ranges to determine "market rates" does not allow an adequate analysis of how the hourly rates for a specific individual might change from year to year. We disagree. Through the three principles discussed in Section 7, we provide ways for intervenors to make rate increase proposals for individuals based on specific circumstances. The intervenors also state that for 2005 work the data provided by the utilities is so limited that a reliable picture of "market rates" cannot be determined. Again we disagree. The utilities' data bases provide a large population of representatives, at least for 2003 and 2004. The data are adequate for our purpose, which is to derive a general escalation rate for this period.

Also regarding rates, the intervenors point out an inconsistency in the draft decision in the 2005 authorized rate ranges for attorneys (Section 7). The high-end rate for the 3-4 year experience level was the same as the 0-2 year level. This was mostly due to the minimal data points (intervenor attorneys) in both experience levels. We correct this inconsistency, and the decision now reflects a higher rate for the 3-4 year level.

The intervenors comment that the elements of risk they face should be accounted for in determining hourly rates. The utilities assert risk is irrelevant in determining hourly rates as the statute only allows intervenor compensation for the actual time directly related to or necessary for their substantial contribution to a Commission decision. As previously stated in this decision (Section 4.2), risk has been considered as a relevant factor, in that we have used a blend of in-house and outside rates to establish hourly rates for intervenors.

- 25 -

R.04-10-010 ALJ/KOT/sid

The intervenors comment that "productive hours" should exclude all tasks (e.g., training, work before the legislature) that are regularly performed by in-house representatives but unrelated to Commission proceedings. Exclusion could have the effect of raising the hourly rates of in-house representatives. The record is not clear on how much in-house productive hours would have to change before they cause in-house rates to exceed outside rates. Furthermore, as PG&E notes, its method does not include over-time hours worked by in-house representatives (inclusion would effectively lower the hourly rate). The uncertainty regarding productive hours is one reason we have decided to use a blend of in-house and outside hourly rates. This approach is reasonable given the state of the record in this proceeding.

Regarding the Assigned Commissioner's Ruling, the intervenors cite a previous proceeding on intervenor compensation rules (R.97-01-009 and D.00-02-0440) where intervenors were granted eligibility to claim compensation, and they assert on that basis that they should be granted eligibility here. However, R.97-01-009 was a broad overall review of the rules and policies of the intervenor program, by no means limited to hourly rate issues. Here, we are reviewing only the actual hourly rates paid to intervenors, not broad policy rules. We therefore find the intervenors have a direct financial interest in the outcome, and affirm the Assigned Commissioner's Ruling.

Lastly, the intervenors commented on the continued use of hourly rate multipliers. As addressed in Resolution ALJ-184 (Attachment 2 to the subject rulemaking), rate multipliers are outside the scope of this proceeding, case-specific, and do not change adopted hourly rates.

R.04-10-010 ·ALJ/KOT/sid

## 12. Assignment of Proceeding

This proceeding is assigned to Commissioner Michael R. Peevey and ALJ Steven Kotz.

## Findings of Fact

1. The purpose of this rulemaking is to develop a process for determining the hourly rates to be used in calculating intervenor compensation awards for work performed in 2005.

2. It is necessary to develop a process for determining hourly rates for intervenors for 2006 and beyond. This process is expected to evolve and may differ from the process used for today's decision.

3. The computation of compensation and hourly rates paid to intervenors takes into account the market rates paid to others of comparable training and experience offering similar services.

4. To determine market rates, it is necessary to collect data from the utilities and the intervenors relating to hourly rates paid for comparable services.

5. The parties developed a reasonable schedule and reporting format for filing data sets of hourly rates, and reviewed alternative proposals for collecting data.

6. Verizon presented an alternative proposal to the data collection process that will not be used for 2005, but may be revisited for 2006 if Verizon wishes to renew its proposal.

7. The Commission's own costs of representation are relevant under the meaning of § 1806.

8. The Executive Director reported that the Commission has not paid rates exceeding those paid by the utilities.

R.04-10-010 ALJ/KOT/sid

9. The data show a high concentration of representatives of the intervenors and the utilities (outside and in-house) appearing in Commission proceedings at the higher levels of experience.

10. The hourly rates currently authorized for intervenors for work performed in 2003 and 2004 are fully within the range of rates paid by utilities to their outside representatives, for both attorneys and experts, with similar training and at all levels of experience.

11. The hourly rates currently authorized for intervenors for work performed in 2003 and 2004 is slightly higher than the rates utilities pay their in-house representatives with similar training and experience.

12. The currently authorized 2003 and 2004 intervenor rates are reasonable and do not exceed the "comparable market rate" within the meaning of § 1806.

13. The last authorized increase in hourly rates for some intervenors was prior to 2004.

14. Some intervenors have historically sought rates that appear to be in the low end of the range of authorized rates for their peers.

15. Cost-of-living data readily available to the public from several federal agencies shows the general rate of inflation for 2004 to be 2.7%.

16. On August 23, 2005 Greenlining filed a NOI for intervenor compensation in this proceeding, and was ruled ineligible by the Assigned Commissioner on August 29, 2005.

## Conclusions of Law

1. Increases in hourly rates for work performed by intervenors in 2005 should not be authorized above rates previously authorized for 2004, except as discussed in the foregoing opinion.

- 28 -

R.04-10-010 ALJ/KOT/sid

2. For intervenors new to our proceedings for work performed in 2004 or 2005, authorized hourly rates should be within the same range of rates previously authorized for 2004 for other intervenors, for the same type of work and level of experience.

3. By April 30, 2006, and annually thereafter, or until further order, the state's six largest investor-owned utilities should file data sets, as described herein, on the hourly rates paid to outside and in-house representatives participating in our proceedings in the two preceding years.

4. Intervenors requesting an escalation of rates for work performed in 2006 and thereafter should include sufficient justification in the request for compensation, and be guided by the principles contained in today's decision.

5. The Assigned Commissioner's Ruling in this proceeding, dated August 29, 2005, denying intervenor status to Greenlining should be affirmed.

6. Today's decision should be made effective immediately.

### FINAL ORDER

**IT IS ORDERED** that:

1. No increases in hourly rates paid to intervenors for work performed in our proceedings in 2005 will be authorized above those rates previously authorized, except as described in today's decision.

2. For intervenors new to our proceedings for work performed in 2004 or 2005, hourly rates shall be within the same range of rates as those previously authorized for other intervenors for 2004, and as shown in the tables herein.

3. By April 30, 2006, and annually thereafter, Pacific Gas and Electric Company, Southern California Edison Company, San Diego Gas and Electric Company, Southern California Gas Company, SBC California, and Verizon

- 29 -

R.04-10-010 ALJ/KOT/sid

California Inc. shall serve data sets, as described herein, on the hourly rates they paid to attorney and expert representatives, both in-house and outside, for participation in our proceedings in the two preceding years.

4. The Chief Administrative Law Judge, in consultation with the President of the Commission, may take reasonable steps to coordinate and facilitate the hourly rate updating process for work performed in 2006 and beyond. Such steps may include, but are not limited to, holding workshops, adjusting the timing or contents of the utility data sets, providing for comment on the data sets, and considering refinements to the updating process.

5. Intervenors requesting increases in previously authorized rates, for work performed in 2006 and thereafter, shall be guided by the principles in today's decision.

6. The Assigned Commissioner's Ruling in this proceeding, dated August 29, 2005, is affirmed.

7. Rulemaking 04-10-010 is closed.

This order is effective today.

Dated November 18, 2005, at San Francisco, California.

> MICHAEL R. PEEVEY
> President
> GEOFFREY F. BROWN
> SUSAN P. KENNEDY
> JOHN A. BOHN
> Commissioners

Commissioner Grueneich recused herself
from this agenda item and was not part
of the quorum in its consideration.

R.04-10-010 ALJ/KOT/sid

# ATTACHMENT A

## Intervenors' Proposed Rates for Attorneys: 2005

The table below summarizes the rates for attorneys proposed by the intervenors for work performed in 2005. The first column shows 2004 rates paid by utilities and authorized for intervenors, the second column 2005 rates proposed by intervenors, and the third column the average percent increase (measured from the top of the rate range) from 2004. For 2005, the intervenors are proposing hourly rate increases for attorneys ranging from 1–40% above rates authorized for 2004, with a median increase of 10%. The number of data points for the intervenors is shown in parenthesis for each level of experience.

| Years Experience | 2004 | 2005 (Requested) | % Increase |
|---|---|---|---|
| **13+years** | | | |
| Utilities  (outside) | $205-$585 | N/A | N/A |
| Intervenors | $250-$490 (11) | $265-$530 (13) | 8% |
| | | | |
| **8-12 years** | | | |
| Utilities  (outside) | $190-$535 | N/A | N/A |
| Intervenors | $270-$325 (5) | $280-$415 (7) | 28% |
| | | | |
| **5-7 years** | | | |
| Utilities  (outside) | $250-$400 | N/A | N/A |
| Intervenors | $250-$270 (1) | $320-$335 (2) | 18% |
| | | | |
| **3-4 years** | | | |
| Utilities  (outside) | $185-$400 | N/A | N/A |
| Intervenors | N/A | $220-$230 (2) | N/A |
| | | | |
| **0-2 years** | | | |
| Utilities – outside | $130-$400 | N/A | N/A |
| Intervenors | $190 (1) | $200 (2) | 5% |

- 1 -

R.04-10-010  ALJ/KOT/sid

**Intervenors' Proposed Rates for Experts:  2005**

The table below identifies the range of rates requested by intervenors for 2005 for experts.  The number of data points for intervenors is shown in parenthesis in the table.  For 2005, the intervenors are proposing hourly rate increases for experts ranging from 8-65% above rates authorized for 2004, with a median increase of 12%. The utilities did not file hourly rate data for 2005 for experts.

|  | 2004 Range | 2005 Range (Requested) |
|---|---|---|
|  |  |  |
| **Utilities\*** |  |  |
| Outside | $90-$475 |  |
| In-House | $60-$420 |  |
|  |  |  |
| **Intervenors** | $110-$360 (28) | $140-$405 (43) |

\* For utilities, excludes rates paid to executive level experts (company presidents, directors and officers).

**(END OF ATTACHMENT A)**

ALJ/CFT/jva                                    **Mailed 4/14/2006**

Decision 06-04-018  April 13, 2006

## BEFORE THE PUBLIC UTILITIES COMMISSION OF THE STATE OF CALIFORNIA

| | |
|---|---|
| In the Matter of the Application of Pacific Gas and Electric Company (U 39 E) for a Certificate of Public Convenience and Necessity Authorizing the Construction of the Jefferson-Martin 230 kV Transmission Project. | Application 02-09-043 (Filed September 30, 2002) |

## OPINION GRANTING INTERVENOR COMPENSATION
## TO 280 CORRIDOR CONCERNED CITIZENS, CALIFORNIANS
## FOR RENEWABLE ENERGY, AND WOMEN'S ENERGY MATTERS
## FOR SUBSTANTIAL CONTRIBUTIONS TO DECISION 04-08-046

A.02-09-043  ALJ/CFT/jva

## TABLE OF CONTENTS

**Title**                                                                                                                      **Page**

OPINION GRANTING INTERVENOR COMPENSATION TO 280 CORRIDOR
CONCERNED CITIZENS, CALIFORNIANS FOR RENEWABLE ENERGY,
AND WOMEN'S ENERGY MATTERS  FOR SUBSTANTIAL CONTRIBUTIONS
TO DECISION 04-08-046 ................................................................................................................... 2

1.  Background ................................................................................................................ 2

2.  Requirements for Awards of Compensation ............................................................. 4

3.  Procedural Issues ...................................................................................................... 5

4.  WEM Showing of Financial Hardship ...................................................................... 6

5.  Substantial Contribution ........................................................................................... 8

    5.1.  280 Citizens .......................................................................................................... 9

        5.1.1.  Project Route ............................................................................................. 9

        5.1.2.  Environmental Review ........................................................................... 12

        5.1.3.  Project Need and Timing ....................................................................... 13

        5.1.4.  EMF Issues ............................................................................................ 14

        5.1.5.  Community Values .................................................................................. 15

        5.1.6.  Seismic Issues ........................................................................................ 16

        5.1.7.  Visual Impacts ....................................................................................... 17

        5.1.8.  Construction Impacts ............................................................................ 17

        5.1.9.  Project Costs .......................................................................................... 18

        5.1.10.  Biological Impacts ............................................................................... 19

    5.2.  CARE .................................................................................................................. 20

    5.3.  WEM .................................................................................................................. 21

A.02-09-043  ALJ/CFT/jva

**TABLE OF CONTENTS**

**Title**                                                                       **Page**

6.    Reasonableness of Requested Compensation ........................................................... 24

    6.1.    280 Citizens' Request ................................................................... 25

            6.1.1.    Hours Requested ..................................................... 28

            6.1.1.1.  Category 10 Hours ................................................ 31

            6.1.1.2.  Project Route (Category 4) ................................ 33

            6.1.1.3.  Environmental Review (Category 15) ............. 35

            6.1.1.4.  Project Need and Timing (Category 1) ............. 35

            6.1.1.5.  Project Costs (Category 7) .................................. 36

            6.1.1.6.  Remaining Substantive Issues ........................... 36

            6.1.1.7.  Travel Time ............................................................ 37

            6.1.1.8.  Time Spent on Compensation Request .............. 38

            6.1.2.    Market Rate Standard .................................................. 38

                 6.1.2.1.  Attorneys .............................................................. 38

                 6.1.2.2.  Paralegals ............................................................. 39

                 6.1.2.3.  Expert Witnesses and Consultants ................... 40

            6.1.3.    Expenses ....................................................................... 46

    6.2.  CARE's Request ........................................................................... 48

            6.2.1.    Hours Requested ......................................................... 50

                 6.2.1.1.  CARE Site Visit and Motions to Reopen the Record .............. 50

                 6.2.1.2.  Public Participation Hearings and Commission Meetings ..... 51

                 6.2.1.3.  Activities Unrelated to This Proceeding ................ 51

                 6.2.1.4.  Time Spent on Compensation Issues ..................... 52

                 6.2.1.5.  Attorneys and Paralegals ........................................ 52

                 6.2.1.6.  Boyd ...................................................................... 53

                 6.2.1.7.  Brown .................................................................... 54

                 6.2.1.8.  Smallwood ........................................................... 58

                 6.2.1.9.  Powers .................................................................. 60

                 6.2.1.10. Sarvey ................................................................. 60

A.02-09-043  ALJ/CFT/jva

## TABLE OF CONTENTS

**Title**                                                                                                    **Page**

      6.2.2.    Market Rate Standard ........................................................... 60

             6.2.2.1.  Law Offices of Stephan C. Volker .............................. 61

             6.2.2.2.  Gabrielli Law Office ................................................. 63

             6.2.2.3.  Francke ..................................................................... 63

             6.2.2.4.  Boyd ......................................................................... 64

             6.2.2.5.  Brown ...................................................................... 65

             6.2.2.6.  Smallwood, Powers, and Sarvey .............................. 65

      6.2.3.    Expenses .......................................................................... 68

    6.3.  WEM's Request ............................................................................ 68

      6.3.1.    Hours Requested ............................................................. 70

             6.3.1.1.  WEM Motion to Reopen the Record ......................... 70

             6.3.1.2.  Time Spent on Compensation  Issues ....................... 71

             6.3.1.3.  Travel ....................................................................... 71

             6.3.1.4.  Remainder of November 1, 2004 Compensation Request ...... 71

             6.3.1.5.  April 1, 2005 Supplemental Request for Compensation .......... 72

      6.3.2.    Hourly Rates ................................................................... 76

      6.3.3.    Expenses .......................................................................... 76

  7.    Assignment of Proceeding ...................................................................... 80

  8.    Comments on Draft Decision ................................................................. 80

Findings of Fact ................................................................................................ 80

Conclusions of Law ......................................................................................... 80

ORDER ............................................................................................................... 81

A.02-09-043  ALJ/CFT/jva

## OPINION GRANTING INTERVENOR COMPENSATION[1]
## TO 280 CORRIDOR CONCERNED CITIZENS, CALIFORNIANS
## FOR RENEWABLE ENERGY, AND WOMEN'S ENERGY MATTERS
## FOR SUBSTANTIAL CONTRIBUTIONS TO DECISION 04-08-046

This decision awards 280 Corridor Concerned Citizens (280 Citizens),
Women's Energy Matters (WEM), and CAlifornians for Renewable Energy
(CARE) intervenor compensation for their contributions to Decision
(D.) 04-08-046, in the following amounts: $718,501.61 to 280 Citizens, $126,713.40
to CARE, and $35,125.70 to WEM.

In their requests for intervenor compensation, these three parties
cumulatively requested almost $1.6 million.  We have scrutinized the requests
closely, taking into account the complexity and the high degree of public interest
in this proceeding, and as a result the awards granted to 280 Citizens, CARE, and
WEM are approximately two-thirds, one-half, and one-third, respectively, of the
amount requested.  This proceeding is closed.

## 1.    Background

In D.04-08-046, we granted a certificate of public convenience and
necessity (CPCN) to Pacific Gas and Electric Company (PG&E) to construct a
230 kilovolt (kV) transmission line between PG&E's Jefferson and Martin
substations, along with related facilities in the County of San Mateo.  We found
in D.04-08-046 that the Jefferson-Martin transmission project is needed in order
to allow PG&E to continue to reliably meet electric demand in the San Francisco
Peninsula area beginning in 2007.  The project also has diversification, economic,
and environmental benefits that warrant its construction more quickly than that.
We found that a combination of the Jefferson-Martin project and additional
transmission reinforcements north of the Martin substation and south of the
Jefferson substation would allow closure of the Hunters Point power plant in

A.02-09-043  ALJ/CFT/jva

San Francisco, bringing additional economic and environmental benefits.  We

adopted a construction cost cap of $206,988,000 for the authorized

Jefferson-Martin project.

Responding to public concern regarding potential health effects from

exposure to electric and magnetic fields (EMF), D.04-08-046 required several

changes to PG&E's preliminary EMF management plan for the Jefferson-Martin

project.  Concurrent with D.04-08-046, we initiated Rulemaking (R.) 04-08-020 to

consider potential improvements to our EMF regulations.

Several parties intervened and participated actively during the

environmental review, evidentiary hearing, and briefing process in the subject

proceeding.  Like other intervenors, 280 Citizens, CARE, and WEM each took

positions aimed at protecting the interests of its members.  With different

constituents, the positions taken by these parties were widely divergent.

280 Citizens sought to influence the route and timing of the new Jefferson-Martin

transmission project in the southern portion of the area through which the line

will be built.  CARE wants the existing Hunters Point power plant to be shut

down as quickly as possible and, with that goal in mind, opposed route

alternatives that could delay construction of the Jefferson-Martin project.  WEM

likewise advocated for closure of Hunters Point, focusing on the extent to which

the Jefferson-Martin line would change the load serving capacity of the

transmission system in the project area.  WEM also addressed distributed

generation, energy efficiency, energy conservation, and demand response

programs as alternatives to the transmission project, and raised concerns

regarding potential conflicts of interest in the preparation of cost estimates for

the Jefferson-Martin project.

- 3 -

A.02-09-043 ALJ/CFT/jva

PG&E opposes 280 Citizens' request for compensation in part, does not take a position on CARE's request, and opposes WEM's request in its entirety. PG&E argues that 280 Citizens exaggerated its influence on the D.04-08-046 and has not shown a substantial contribution on many issues for which it claims a contribution. PG&E asserts that the Commission did not adopt any of WEM's positions, in whole or in part, and that WEM did not make a substantial contribution to D.04-08-046 in any other respect.

## 2. Requirements for Awards of Compensation

The intervenor compensation program, enacted in Pub. Util. Code §§ 1801-1812, requires California jurisdictional utilities to pay the reasonable costs of an intervenor's participation if the intervenor makes a substantial contribution to the Commission's proceedings. The statute provides that the utility may adjust its rates to collect the amount awarded from its ratepayers. (Subsequent statutory references are to the Public Utilities Code unless otherwise indicated.)

All of the following procedures and criteria must be satisfied for an intervenor to obtain a compensation award:

1. The intervenor must satisfy certain procedural requirements including the filing of a sufficient notice of intent (NOI) to claim compensation within 30 days of the prehearing conference (or in special circumstances, at other appropriate times that we specify). (§ 1804(a).)

2. The intervenor must be a customer or a participant representing consumers, customers, or subscribers of a utility subject to our jurisdiction. (§ 1802(b).)

3. The intervenor should file and serve a request for a compensation award within 60 days of our final order or decision in a hearing or proceeding. (§ 1804(c).)

A.02-09-043 ALJ/CFT/jva

4. The intervenor must demonstrate "significant financial hardship." (§§ 1802(g), 1804(b) (1).)

5. The intervenor's presentation must have made a "substantial contribution" to the proceeding, through the adoption, in whole or in part, of the intervenor's contention or recommendations by a Commission order or decision. (§§ 1802(i), 1803(a).)

6. The claimed fees and costs are reasonable and are comparable to the market rates paid to experts and advocates having comparable training and experience and offering similar services. (§ 1806.)

For discussion here, the procedural issues in Items 1-4 above are combined, followed by separate discussions on Items 5 and 6.

## 3. Procedural Issues

280 Citizens, WEM, and CARE have satisfied all the procedural requirements necessary to make their requests for compensation, as explained below. WEM's compensation claim regarding its showing of significant financial hardship is discussed separately below.

The prehearing conference in this matter was held on January 30, 2003. 280 Citizens filed its timely NOI on February 7, 2003 and supplemented its NOI on March 27, 2003. On May 6, 2003, the assigned Administrative Law Judge (ALJ) found 280 Citizens to be a customer under the Public Utilities Code, that it met the significant financial hardship condition, and that it would be eligible for compensation. 280 Citizens filed its request for compensation on October 22, 2004, within 60 days of D.04-08-046 being issued, and supplemented its request on November 1, 2004.

On December 5, 2003, CARE filed a motion to intervene out of time with an attached NOI. WEM filed a petition to intervene out of time and an NOI on

A.02-09-043 ALJ/CFT/jva

December 2, 2003, and amended these filings on December 15, 2003. On
March 11, 2004, the assigned ALJ ruled to accept CARE's NOI as timely, found
insufficient information to determine whether CARE meets the definition of
customer or the significant financial hardship condition, and allowed CARE to
amend its NOI on or before March 25, 2004. CARE filed a supplement to its NOI
on March 25, 2004. On May 10, 2004, the assigned ALJ found that CARE was a
customer under the Public Utilities Code, met the significant financial hardship
condition, and would be eligible for compensation. CARE timely filed its request
for compensation on October 7, 2004, and filed corrections to its request on
October 29, 2004. In response to requests by the ALJ, CARE provided
supplemental information via several e-mails, which have been placed in the
correspondence file in this proceeding.

   The March 11, 2004 ALJ ruling also accepted WEM's amended NOI and
found that WEM is a customer under the Public Utilities Code as a representative
of Dorothy J. Edwards and Jesse Mason, PG&E ratepayers, but that WEM had
not provided documentation necessary to show significant financial hardship.
WEM timely filed its request for compensation on October 22, 2004, and
amended its request on April 1, 2005. WEM also filed supplemental information
regarding its compensation request on October 26 and November 1, 2004. On
October 27, 2004, WEM filed a motion for leave to file under seal certain
confidential materials regarding its clients' personal financial information, along
with a motion for protective order regarding this information. These motions
were granted by ALJ ruling dated November 10, 2004.

## 4.   WEM Showing of Financial Hardship

   An intervenor seeking compensation must show that, without undue
hardship, it cannot pay the reasonable costs of effective participation in the

- 6 -

A.02-09-043 ALJ/CFT/jva

proceeding. An intervenor representing consumers (§ 1802(b)1)(A)) or a representative authorized by a customer (§ 1802(b)(1)(B)) must disclose his or her finances to the Commission, under appropriate protective order, to make this showing. To receive a hardship finding under these subsections, an intervenor must show that the represented consumers "cannot afford, without undue hardship, to pay the costs of effective representation, including advocate's fees, expert fees, witness fees and other reasonable costs of participation." (§ 1802(g).) The Commission evaluates the hardship associated with a customer's participation in view of the customer's financial circumstances and the specifics of the proceeding, assessing what constitutes undue hardship on a case by case basis.

Here, WEM is a representative authorized by a customer because Edwards and Mason are PG&E customers represented by WEM. Both Edwards and Mason live in public housing near the Hunters Point power plant. Edwards is retired, and Mason receives Supplemental Security Income (SSI) benefits. WEM submitted Edwards' annual certification for eligibility for public housing and information regarding Mason's eligibility for SSI. Based on the information presented, we find that the cost of representation in this proceeding would present a significant financial hardship for both of them.[1]

---

[1] As described in D.98-04-059, represented customers must generally disclose their gross and net monthly income, monthly expenses, cash and assets, including any equity in real estate other than the participant's personal residence, in order to assist us in determining whether the customer's participation in the proceeding will create an undue financial hardship. Here, WEM did not provide this information for either Edwards or Mason. However, since eligibility for public housing and SSI benefits is restricted to persons with limited incomes, we find significant financial hardship in this case. WEM is cautioned that in future proceedings it must submit complete and timely information regarding customers' finances with its application for intervenor compensation in order to qualify for a hardship finding.

A.02-09-043 ALJ/CFT/jva

### 5.  Substantial Contribution

In evaluating whether a customer made a substantial contribution to a proceeding we look at several things.  First, did the ALJ or Commission adopt one or more of the factual or legal contentions, or specific policy or procedural recommendations put forward by the customer?  (See §1802(i).)  Second, if the customer's contentions or recommendations paralleled those of another party, did the customer's participation materially supplement, complement, or contribute to the presentation of the other party or to the development of a fuller record that assisted the Commission in making its decision?  (See §§ 1802(i) and 1802.5.)  As described in § 1802(i), the assessment of whether the customer made a substantial contribution requires the exercise of judgment.

> In assessing whether the customer meets this standard, the Commission typically reviews the record, composed in part of pleadings of the customer and, in litigated matters, the hearing transcripts, and compares it to the findings, conclusions, and orders in the decision to which the customer asserts it contributed.  It is then a matter of judgment as to whether the customer's presentation substantially assisted the Commission.[2]

Should the Commission not adopt any of the customer's recommendations, compensation may be awarded if, in the judgment of the Commission, the customer's participation substantially contributed to the decision or order.  For example, if a customer provided a unique perspective that enriched the Commission's deliberations and the record, the Commission could find that the customer made a substantial contribution.[3]

---

[2]  D.98-04-059, 79 CPUC2d 628 at 653.

[3]  See D.03-12-019, discussing D.89-03-063 (31 CPUC2d 402) (awarding San Luis Obispo Mothers for Peace and Rochelle Becker compensation in the Diablo Canyon Rate Case

A.02-09-043 ALJ/CFT/jva

With this guidance, we turn to the claimed contributions of each intervenor requesting compensation.

### 5.1.  280 Citizens

280 Citizens participated actively throughout the Jefferson-Martin proceeding.  It protested PG&E's application, participated in the environmental review process, conducted and responded to discovery, submitted extensive prepared testimony, conducted cross-examination, filed briefs, and commented on the proposed and alternate decisions.  280 Citizens submits that it made a substantial contribution regarding several issues, including the route for the Jefferson-Martin project, the Commission's environmental review, need and timing for the project, EMF issues, community values, seismic issues, visual impacts, construction impacts, project costs, and biological impacts.  We discuss 280 Citizens' contributions on specific issues below.

### 5.1.1. Project Route

280 Citizens opposed both PG&E's proposed overhead route (Route 1A) and PG&E's underground alternative (Route 1B) for the southern portion of the Jefferson-Martin project.  Commencing with scoping comments during the environmental review process, 280 Citizens identified a number of alternative routes and route segments aimed at reducing adverse impacts on residential areas, schools, and daycare facilities in the southern portion of the project area.

In its briefs, 280 Citizens stated that it supported the Partial Underground Alternative (PUA), developed by the Commission's environmental consultant, "or a variation thereof."  During the evidentiary hearings, 280 Citizens expressed a preference for a Modified PUA (MPUA) that would have relocated part of the

---

because their arguments, although ultimately unsuccessful, forced the utility to thoroughly document the safety issues involved.

A.02-09-043  ALJ/CFT/jva

underground portion of the PUA up to 25 feet to the west to reduce EMF exposure on nearby residences.

One alternative route that 280 Citizens suggested during the scoping process, which it called the Underground to Trousdale Drive route, was the same, in essential respects, as the adopted hybrid underground/overhead route, which combines the southernmost part of underground Route 1B with the portion of the overhead Route 1A north of Trousdale Drive. The Draft Environmental Impact Report (DEIR) did not analyze all portions of this hybrid route combination. In particular, the DEIR did not analyze the needed transition west of Trousdale Drive between the underground and overhead route segments. However, the Final Environmental Impact Report (FEIR) provided the complete environmental analysis needed to allow us to approve this hybrid route. The Commission found that the adopted hybrid route avoids Route 1B's adverse effects along Trousdale Drive and El Camino Real and is more consistent with community values and wishes.

We find that 280 Citizens made a significant contribution on routing issues by assisting in development of a full evidentiary record on PG&E's proposed project and potential alternative routes. While not its preferred route, the Underground to Trousdale Drive route, which 280 Citizens suggested early in the environmental review process, led to the hybrid route adopted in D.04-08-046. 280 Citizens, along with other intervenors, opposed Route 1B due to traffic impacts, residential hazards, and emergency response times during construction, and also due to on-going EMF exposures. 280 Citizens' evidence and advocacy assisted the Commission in its decision to reject the portion of Route 1B along Trousdale Drive and El Camino Real even though the FEIR had identified that route as environmentally superior. We note that portions of the

- 10 -

A.02-09-043 ALJ/CFT/jva

PUA and MPUA would have followed Route 1A, including the part of Route 1A included in the hybrid route adopted in D.04-08-046. Thus, while 280 Citizens did not prevail on the portion of the route south of Trousdale Drive, the Commission adopted the portion of 280 Citizens' recommended PUA/MPUA route north of Trousdale Drive.

PG&E asserts that 280 Citizens' support of routes after they had been rejected from full analysis in the EIR process did not make a substantial contribution to D.04-08-046. PG&E argues that such routes could not be adopted lawfully and therefore were irrelevant. PG&E's concern appears to be aimed primarily at 280 Citizens' support of the MPUA and, in its comments on the proposed decision, a West of Skyline (Boulevard) alternative to a portion of the hybrid route recommended in the proposed decision. For reasons stated below, we agree with PG&E that 280 Citizens did not substantially contribute to D.04-08-046 regarding certain MPUA and West of Skyline issues.

In D.04-08-046, we rejected the southernmost portions of both the MPUA and the PUA because of visual and biological impacts. While the MPUA would have reduced EMF exposure along the portion that deviated from the PUA--a concern not taken into account in the FEIR's determination not to analyze that portion of the MPUA--we did not find in D.04-08-046 that this portion of the MPUA warranted the further environmental analysis necessary before we could approve it in compliance with California Environmental Quality Act (CEQA). We find that 280 Citizens' advocacy of the portion of the MPUA that differed from the PUA did not make a substantial contribution to D.04-08-046.

280 Citizens characterized its West of Skyline alternative as a variation of a route segment that the FEIR declined to analyze fully. While this alternative would reduce EMF exposure to residents along Skyline Boulevard, in

- 11 -

A.02-09-043  ALJ/CFT/jva

D.04-08-046 we determined that it would increase EMF levels to other residences. We did not accept 280 Citizens' request that the West of Skyline route alternative receive a full environmental assessment. We find that 280 Citizens' late advocacy of this route segment did not make a substantial contribution to D.04-08-046.

PG&E argues additionally that 280 Citizens did not make a contribution in that it continued to oppose Route 1A after PG&E no longer endorsed that route. As 280 Citizens points out, PG&E supported Route 1A in its prepared testimony and never withdrew its request for that route, and the DEIR, FEIR, and D.04-08-046 all evaluated Route 1A. We find that 280 Citizens' on-going opposition to Route 1A contributed to our assessment of that route in D.04-08-046.

### 5.1.2. Environmental Review

280 Citizens participated throughout the Commission's environmental review process, arguing that PG&E failed to consider alternatives that could avoid or mitigate potentially significant adverse environmental effects. As described in Section 5.1.1, 280 Citizens suggested several alternative routes for the southern portion of the project, including an underground/overhead route identical in essential respects to the hybrid southern route approved in D.04-08-046. 280 Citizens' participation during the environmental review process enhanced the development and assessment of route alternatives and assisted the Commission in ensuring full compliance with CEQA. We find that 280 Citizens made a significant contribution to D.04-08-046 regarding the environmental review.

A.02-09-043 ALJ/CFT/jva

### 5.1.3. Project Need and Timing

PG&E asserted that the Jefferson-Martin project would be needed by late 2005 for reliability purposes. 280 Citizens maintained that the project would not be needed until after 2012.

In D.04-08-046, the Commission found that the Jefferson-Martin project would be needed for reliability purposes in 2007, although we approved construction of the project sooner than 2007 in order to capture diversification, economic, and environmental benefits. The Commission agreed with 280 Citizens that PG&E's March 2003 demand forecast should be used to assess the timing and need for the Jefferson-Martin project, contrary to PG&E's position that earlier, higher demand forecasts should also be considered. While supporting closure of the Hunters Point power plant as soon as technically possible, the Commission also agreed with 280 Citizens that Hunters Point could operate beyond 2005 if needed. We find that 280 Citizens made a substantial contribution to D.04-08-046 regarding the above issues.

280 Citizens asserted that PG&E's Supplementary Guide grid planning criteria should not be applied in evaluating the Jefferson-Martin project. While it does not appear that the California Independent System Operator (ISO) is required by statute to use the Supplementary Guide, in D.04-08-046 we did not find sufficient basis to deviate from the ISO's conclusion that these planning criteria should be used. We find that 280 Citizens did not make a substantial contribution to D.04-08-046 regarding the planning criteria.

The Commission rejected inclusion of planned City and County of San Francisco (CCSF) combustion turbines in the resource mix used in the need analysis, contrary to the position of 280 Citizens and Office of Ratepayer

- 13 -

A.02-09-043 ALJ/CFT/jva

Advocates (ORA)[4]. We also rejected 280 Citizens' position that the need analysis should assume that certain existing transmission lines in the area would be re-rated. 280 Citizens did not convince us to deviate from prior policies as articulated in D.02-12-066 regarding the treatment of resources that have not completed the regulatory approval process (the CCSF turbines) or are not planned (the transmission line re-rates), and we find that 280 Citizens did not make a substantial contribution to D.04-08-046 on the resource mix criteria.

The Commission found that PG&E reflected the near-term development of conservation, energy efficiency, and distributed generation satisfactorily in its load forecasting methodology. 280 Citizens and WEM described policies and programs established in recent years to increase reliance on these sources, and took issue with PG&E's omission of any explicit effect of these initiatives from its load forecasts. 280 Citizens did not provide any evidence, however, that the near-term development of such resources is sufficiently certain to be relied upon for transmission planning purposes. We find that 280 Citizens did not make a substantial contribution to D.04-08-046 on this forecasting issue.

In summary, we find that 280 Citizens made a substantial contribution to D.04-08-046 on some, but not all, aspects of project need and timing.

### 5.1.4. EMF Issues

280 Citizens' routing recommendations were based, in part, on its concerns regarding EMF exposure to residences along PG&E's proposed route. 280 Citizens submitted scientific studies that reported an association between EMFs and certain diseases, provided an independent evaluation of magnetic

---

[4] The Commission's Office of Ratepayer Advocates is now the Division of Ratepayer Advocates (DRA). The change was effective January 1, 2006, pursuant to Senate Bill 608.

A.02-09-043 ALJ/CFT/jva

field levels along several route alternatives, and presented testimony from residents along the route. It asked the Commission to adopt a standard that transmission-related magnetic field exposure should not exceed one milliGauss at residential property boundaries, to be achieved through either routing changes or undergrounding of the line.

As described in Section 5.1.1, the Commission adopted only a portion of the project route 280 Citizens recommended. However, as it notes, we agreed with it that EMF exposure from the project would significantly exceed what residents are likely to receive daily and that the risk of EMF exposure should be taken into account in determining the route for the project. However, we declined to adopt the numerical EMF exposure standard that 280 Citizens proposed.

Overall, we find that 280 Citizens made a significant contribution to the Commission's consideration of public concerns regarding potential health and safety risks of EMF exposure. 280 Citizens was instrumental in developing the record regarding EMF risks, the need to consider EMF exposure levels in routing the project, and the need to modify PG&E's proposed EMF Management Plan for the Jefferson-Martin project. In addition, 280 Citizens' advocacy contributed to the recommendation in the proposed decision that we open a new rulemaking to consider modifications to our EMF policies. We acted on that recommendation with our initiation of R.04-08-020.

### 5.1.5. Community Values

The Commission adopted a hybrid route for the southern portion of the Jefferson-Martin project "in express consideration of the community values" expressed by intervenors including 280 Citizens regarding "the perceived importance of avoiding construction impacts and EMF exposure in populated

- 15 -

A.02-09-043  ALJ/CFT/jva

areas along this portion of the route" (D.04-08-046, *mimeo.* at 125).  We find that 280 Citizens made a substantial contribution to the Commission's decision in this regard.

### 5.1.6. Seismic Issues

280 Citizens cross-examined PG&E's seismic experts and introduced several exhibits during cross-examination that provided information regarding the impact of recent large earthquakes on electric utility facilities and seismic design approaches PG&E has used in the past to address seismic issues. 280 Citizens argued in briefs that seismic issues should not preclude Commission consideration of a Glenview Drive transition tower or a Sneath Lane transition station alternative for connecting a southern overhead portion of the Jefferson-Martin project to the northern underground segment.  This argument countered PG&E's initial assertion that seismic concerns would preclude a transition station other than at San Bruno Avenue, a location that faced strenuous opposition by the City of San Bruno.  280 Citizens also asserted that the existence of earthquake faults that cross Trousdale Drive would drastically increase construction costs of the Trousdale Drive segment of Route 1B.

The Commission approved the Glenview Drive transition tower alternative.  While this location is closer than the San Bruno Avenue location to the active trace of the San Andreas fault, the FEIR concluded that the seismic risk can be mitigated to a less-than-significant level.  We rejected the Trousdale Drive segment of Route 1B, due to seismic and other concerns.

PG&E asserts that 280 Citizens did not make a substantial contribution on seismic issues since it did not present any testimony or evidence supported by a qualified expert.  However, we find that 280 Citizens' participation contributed to development of the record on seismic issues and assisted the Commission in

A.02-09-043 ALJ/CFT/jva

assessing alternative transition station locations and route options. Thus, we find that 280 Citizens made a substantial contribution to D.04-08-046 in this regard.

### 5.1.7. Visual Impacts

280 Citizens submits that it made a substantial contribution to the Commission's determination regarding visual impacts associated with the proposed project, in particular that it demonstrated that the proposed project would cause significant unmitigable impacts on residents living on Lexington Avenue in the San Mateo Highlands and on Black Mountain Road in Hillsborough. The FEIR and the Commission agreed that the proposed project would cause significant unmitigable visual impacts at these points.

PG&E argues that, since the MPUA advocated by 280 Citizens would have created significant unmitigable visual impacts, 280 Citizens did not make a substantial contribution regarding visual impacts. In D.04-08-046, the Commission rejected the southernmost portion of the proposed project and the PUA, and implicitly the MPUA, due in part to their significant, unavoidable, and permanent visual impacts. While 280 Citizens' preferred route had its own significant visual impacts, 280 Citizens nevertheless made a substantial contribution to D.04-08-046 because it enhanced the record regarding the visual impacts of the proposed project, which led the Commission to choose another alternative, the underground Route 1B, along that portion of the route.

### 5.1.8. Construction Impacts

280 Citizens states that it made a significant contribution to the Commission's consideration of construction impacts through San Mateo Highlands and Hillsborough, and in particular along Skyline Boulevard and Trousdale Drive. While the FEIR found Route 1B environmentally superior, the

- 17 -

A.02-09-043 ALJ/CFT/jva

Commission adopted a hybrid route, in part because it avoids construction impacts on residences and businesses along Trousdale Drive. This determination was based in part on the record developed by 280 Citizens and the City of Burlingame regarding construction impacts. We find that 280 Citizens made a significant contribution to D.04-08-046 in this regard because it helped develop a full record on this issue, and the Commission adopted its position in this respect.

### 5.1.9. Project Costs

280 Citizens submits that it made a substantial contribution to the Commission's consideration of project costs. PG&E and 280 Citizens were the only parties to provide cost estimates for the proposed Jefferson-Martin project and alternative routes. 280 Citizens states that its cost analyses forced PG&E to develop more fully the basis for its own cost estimates. 280 Citizens maintains that the record it helped develop will serve the Commission and PG&E's ratepayers if PG&E returns to the Commission in the future seeking an increase in the cost cap.

As part of its opposition to Route 1B, 280 Citizens asserts that PG&E underestimated Route 1B costs due to the presence of underground utilities along Trousdale Drive and El Camino Real and also seismic faults along Trousdale Drive. In D.04-08-046, we rejected that portion of Route 1B, in part because of the identified construction and seismic concerns. In Sections 5.1.6 and 5.1.8 of today's decision, we find that 280 Citizens made a substantial contribution to D.04-08-046 on construction and seismic issues related to Route 1B. The associated cost impacts were an integral part of 280 Citizens' showing in opposition to Route 1B. Because 280 Citizens prevailed regarding this portion of Route 1B, we find that 280 Citizens' cost analysis of Route 1B made a contribution to D.04-08-046.

A.02-09-043  ALJ/CFT/jva

280 Citizens asserted that, while underestimating Route 1B costs, PG&E overestimated costs of the PUA and the MPUA.  280 Citizens provided a cost estimate of the MPUA, the route that it preferred during the evidentiary hearings.  The MPUA differed from the PUA only in that portions of the underground segments of the PUA would be moved as much as 25 feet to reduce impacts on bordering residences.  280 Citizens estimated construction costs for the MPUA using an "all-in per-mile" approach and argued that PG&E's cost estimates were "artificially detailed" because engineering had not been performed.  The hybrid route we adopted contains the northernmost portion of the PUA/MPUA.  However, our determination of the "maximum cost determined to be reasonable and prudent" pursuant to § 1005.5(a) was based on PG&E's detailed cost estimates for the hybrid route.  We find that 280 Citizens did not make a substantial contribution to D.04-08-046 regarding the cost of the PUA/MPUA.

### 5.1.10.    Biological Impacts

280 Citizens maintains that it made a substantial contribution to the Commission's consideration of the biological impacts of alternative routes. 280 Citizens presented a rebuttal witness to counter PG&E's assertions that undergrounding segments of the line through serpentine soil-based habitats, as proposed in the PUA and the MPUA, would create significant biological impacts. The expert witness testified regarding the condition of serpentine soil-based habitats along potential project routes, the decades-long absence of the Bay Checkerspot Butterfly from the area in which the PUA or the MPUA would be constructed, and steps that could be taken to mitigate trenching impacts and restore the quality of the habitat.

- 19 -

A.02-09-043 ALJ/CFT/jva

'PG&E submits that 280 Citizens did not make a substantial contribution on biological impacts because during the hearings it continued to advocate the MPUA, which had been rejected from consideration in the FEIR due in part to its adverse impacts on biological resources, and also because 280 Citizens' witness admitted that Route 1B would have less impact on biological resources.

280 Citizens' rebuttal testimony regarding the biological impacts of undergrounding applied to both the PUA--a route alternative that was analyzed fully in the FEIR--and the MPUA, and supplemented the FEIR's analysis in this regard. We find that 280 Citizens made a substantial contribution in that it helped develop the record regarding biological impacts of route alternatives.

### 5.2. CARE

CARE presented testimony, cross-examined witnesses, and filed briefs and comments on the proposed decisions. As a representative of low-income residents of the Bayview Hunters Point neighborhood, CARE states that it was uniquely positioned "to advocate primarily for the most expedient alternatives that avoid processing or potential construction delay, while at the same time choosing the environmentally superior option when the options were essentially equal with regard to delay."

CARE presented evidence concerning the current environmental impact of the Hunters Point and Potrero power plants and argued that the plants should be closed as soon as possible. CARE also submitted evidence and argument concerning potential delays and environmental impacts associated with certain route alternatives.

CARE's position aligned closely with that of PG&E and the ISO, i.e., that the Jefferson-Martin project should be built on the schedule proposed by PG&E and the ISO and along the route proposed by PG&E. However, CARE provided

A.02-09-043  ALJ/CFT/jva

a unique perspective and supplemented the record regarding impacts of the Hunters Point units in the Bayview Hunters Point neighborhood and the interests of that community in closure of those units.  In determining that the Jefferson-Martin project should be built at the earliest possible time, before it is needed for reliability purposes, the Commission gave "great weight to the community values of the Hunters Point and Bayview neighbors" (D.04-08-046, *mimeo.* at 125).  For these reasons, we find that CARE provided a substantial contribution to D.04-08-046.  Like 280 Citizens, CARE also made a substantial contribution because it helped develop the evidentiary record regarding potential biological impacts of route alternatives under consideration.

On March 3 and April 26, 2004, CARE submitted motions in which it requested that the record be reopened regarding the impacts of trenching on biological resources in serpentine grasslands.  In its motions, CARE described a site visit undertaken on February 28, 2004[5] and requested an opportunity to present additional evidence based on that site visit.  The ALJ denied CARE's request and in D.04-08-046 we affirmed the ALJ's ruling in that regard.  CARE's February 2004 site visit and its subsequent motions did not make a substantial contribution to D.04-08-046, and CARE should not receive compensation for its efforts in this regard.

## 5.3.  WEM

WEM presented testimony, cross-examined witnesses, and filed briefs.  To further its stated goal of closing the Hunters Point power plant, WEM advocated that current transmission constraints south of the San Mateo substation and within San Francisco's 115 kV cable system could reduce or even eliminate the

---

[5] According to time records submitted with CARE's compensation request, the site visit may have occurred on February 26, 2004.

A.02-09-043 ALJ/CFT/jva

Jefferson-Martin project's ability to increase the load serving capability of the transmission system in the area. WEM entered as evidence several documents that, it asserted, raised questions regarding PG&E's and the ISO's portrayal of the capabilities of the existing transmission system and the date Hunters Point could be closed. It also cross-examined several witnesses regarding the load serving capability of the transmission system and the extent to which the Jefferson-Martin line would change the amount of power available to San Francisco. WEM addressed energy efficiency as an alternative for providing reliability in the affected area. WEM also questioned PG&E witnesses about a "potential conflict of interest in the preparation of cost estimates by a no-bid consultant that is also a potential bidder on the construction itself."

WEM maintains that its participation resulted in a more in-depth investigation that led to the Commission being satisfied that PG&E and the ISO are remedying the transmission constraints WEM highlighted. WEM concludes that its participation helped the Commission become better prepared to monitor progress toward closure of Hunters Point and to track the costs and benefits of the Jefferson-Martin project.

PG&E opposes WEM's compensation request, arguing that WEM did not make a substantial contribution to D.04-08-046 in any respect. PG&E asserts that WEM's prepared testimony provided no factual information, that WEM undertook inefficient, lengthy, and worthless cross-examination of witnesses, and that WEM's briefs misstated the evidentiary record.

PG&E argues that WEM misinterpreted PG&E and ISO reports, and that WEM erred in asserting that construction of the Jefferson-Martin project could impede, rather than assist, closure of the Hunters Point plant, since all of the other needed transmission upgrades already were contained in PG&E's 2003

- 22 -

A.02-09-043 ALJ/CFT/jva

transmission expansion plan. PG&E also maintains that WEM presented no evidence that conservation and renewable energy could be available in lieu of the Jefferson-Martin project, noting that, to the contrary, the FEIR and the Commission expressly found that these sources would not be sufficient to ensure reliable electric service in the affected area.

We find that WEM's scrutiny forced PG&E and the ISO to address more thoroughly the impact of Jefferson-Martin on the load serving capability of the transmission system. As an example, WEM cross-examined regarding PG&E's statement that the Jefferson-Martin project would add up to 351 megawatts (MW) of load serving capability to the San Mateo-Martin corridor compared to the ISO's testimony that the project would increase the transmission system's load serving capability by 230 MW. WEM's participation elicited that the 351 MW increase relied upon by PG&E assumed no transmission limitations either south of the San Mateo substation or north of the Martin substation. By contrast, as established by WEM cross-examination of an ISO witness (D.04-08-046, *mimeo.* at 37, ftn.18), the ISO recognized that transmission constraints exist in both areas and assumed that those constraints will be alleviated somewhat (but not completely) by other projects in PG&E's transmission expansion plan. We find that WEM's participation assisted the Commission in evaluating need for the Jefferson-Martin project and thus contributed substantially to the Commission's decision. However, as discussed in Section 6.3, WEM's compensation is reduced because of the inefficiency of its participation.

We find that WEM did not make a substantial contribution with respect to the treatment of energy efficiency and renewable energy in assessing need for the proposed project. As noted above, D.04-08-046 found that PG&E reflected these

- 23 -

A.02-09-043 ALJ/CFT/jva

sources satisfactorily in its load forecasting methodology. We also find that WEM did not make a substantial contribution regarding costs. D.04-08-046 did not address WEM's vague assertions regarding potential conflicts of interest in PG&E's preparation of cost estimates.

On March 3, 2004, WEM submitted a motion to reopen the record "on the basis that the Commission should consider information regarding (1) a proposed merchant transmission line across San Francisco Bay, (2) ISO power flow studies which WEM asserts demonstrate that the Jefferson-Martin project may reduce load serving capability in the San Francisco area, and (3) the possibility of imminent global climate collapse due to failure of the 'Ocean Conveyer' which drives ocean currents." The ALJ denied WEM's motion, and we affirmed that ruling in D.04-08-046. WEM's efforts related to this motion did not make a substantial contribution to D.04-08-046 and should not be compensated.

## 6. Reasonableness of Requested Compensation

280 Citizens, CARE, and WEM made substantial contributions as described above. After we have determined the scope of a customer's substantial contribution, we look at whether the compensation requested is reasonable.

In general, to be compensable the components of an intervenor's request must constitute reasonable fees and costs of the customer's preparation for and participation in a proceeding that resulted in a substantial contribution. The issues we consider to determine reasonableness are discussed below for each intervenor.

A.02-09-043 ALJ/CFT/jva

### 6.1.    280 Citizens' Request

2880 Citizens requests $1,067,081.20 for its participation in this proceeding. From the detailed documentation accompanying the request, we calculate the request to be $1,067,168.74, as indicated in Table 1 and Table 2.[6]

---

[6] The slight discrepancy between 280 Citizens' stated request and our calculation appears to be due to rounding differences.

A.02-09-043  ALJ/CFT/jva

## Table 1

## 280 Citizens Compensation Request

| Attorneys | Year | Rate | Hours | Total |
|---|---|---|---|---|
| Edward O'Neill | 2002 | $ 315.00 | 14.1 | $ 4,427.85 |
| " | 2003 | 435.00 | 148.9 | 64,764.98 |
| " | 2004 | 470.00 | 430.8 | 202,475.22 |
| Christopher Hilen | 2003 | 330.00 | 289.0 | 95,385.40 |
| " | 2004 | 360.00 | 456.3 | 164,264.40 |
| Jeffrey Gray | 2003 | 285.00 | 312.4 | 89,029.25 |
| " | 2004 | 310.00 | 365.6 | 113,348.92 |
| | | | | |
| Paralegals | | | | |
| Barbara  Nielsen | 2003 | 145.00 | 6.1 | 884.50 |
| " | 2004 | 155.00 | 17.1 | 2,656.70 |
| Judy Pau | 2003 | 135.00 | 34.0 | 4,585.50 |
| " | 2004 | 145.00 | 5.2 | 749.17 |
| | | | | |
| Experts | | | | |
| William Stephenson | 2003-2004 | 225.00 | 211.0 | 47,475.00 |
| Gary Tassainer | 2003-2004 | 210.00 | 365.5 | 76,755.00 |
| Rick Frandsen | 2003-2004 | 150.00 | 55.5 | 8,325.00 |
| Lyle Vance | 2003-2004 | 135.00 | 90.1 | 12,163.50 |
| Dennis Murphy | 2003-2004 | 225.00 | 34.0 | 7,650.00 |
| Jeffrey Shields | 2003-2004 | 225.00 | 508.5 | 114,412.50 |
| | | | | |
| Intervenor Compensation and Travel Time | | | | |
| O'Neill | 2002 | 157.50 | 0.3 | 47.25 |
| " | 2003 | 217.50 | 8.6 | 1,870.50 |
| " | 2004 | 235.00 | 21.7 | 5,099.50 |
| Hilen | 2003 | 165.00 | 4.1 | 676.50 |
| " | 2004 | 180.00 | 51.8 | 9,324.00 |
| Gray | 2003 | 142.50 | 20.2 | 2,878.50 |
| " | 2004 | 155.00 | 8.0 | 1,240.00 |
| Pau | 2003 | 67.50 | 0.2 | 13.50 |
| Tassainer | 2003-2004 | 105.00 | 40.5 | 4,252.50 |
| Subtotal | | | | 1,034,741.63 |
| Expenses | | | | 32,427.11 |
| **TOTAL** | | | | **$1,067,168.74** |

- 26 -

A.02-09-043  ALJ/CFT/jva

**Table 2**

**280 Citizens Expenses Request**

| | |
|---|---:|
| Copying | $ 19,810.41 |
| Fax and telephone | 37.00 |
| Lexis-Nexis | 3,241.15 |
| Filing/courier fees | 2,433.07 |
| Travel expenses | 6,878.35 |
| Database, transcripts | 27.13 |
| **Total Expenses** | **$ 32,427.11** |

280 Citizens states that it voluntarily omitted from its request one-third of the time its legal counsel spent on route alternatives and environmental review, recognizing that some of the time devoted to these issues was not as efficient or productive as 280 Citizens desired.  Consistent with Commission policy (D.02-11-019), 280 Citizens requests compensation for travel and intervenor compensation-related time at half the usual hourly rate, rather than by reducing the number of hours by half.  280 Citizens did not request compensation for Lara Lighthouse and Katie Carlin, residents of the San Mateo Highlands and Burlingame, respectively, who presented non-expert testimony addressing EMF and other community concerns.

280 Citizens did not quantify the benefits of its participation to ratepayers, noting that the Commission has recognized that it can be difficult, if not impossible, to assign specific ratepayer benefits to the contribution of intervenors in proceedings involving non-economic issues where no revenue requirement, revenue allocation, or rate design are at issue.  (See D.01-11-023.)  We agree that it is difficult to assign specific ratepayer savings to 280 Citizens' contribution in this proceeding.  Nonetheless, it is clear that ratepayers have benefited because 280 Citizens' participation assisted the Commission in assessing need for the

- 27 -

A.02-09-043  ALJ/CFT/jva

Jefferson-Martin project, determining the best route for the project, and adopting changes to PG&E's EMF Management Plan.  The Commission finds that 280 Citizens' participation in this proceeding has been productive.

PG&E suggests that the Commission discount 280 Citizens' compensation due to overlapping work performed by the County of San Mateo, Burlingame, Hillsborough, and other government entities on construction impacts, potential impediments to construction, and seismic issues.  280 Citizens responds that it coordinated with these other intervenors to reduce the likelihood of any duplication.  280 Citizens states that it took the lead role in the evidentiary hearings on nearly every issue that it and these other intervenors addressed and that it supplemented their contribution in a few other areas.

We agree that 280 Citizens' position was similar in some respects to positions taken by governmental entities along the southern portion of the route.  However, 280 Citizens took a more active role, in terms of providing more extensive expert testimony, more extensive cross-examination, and more comprehensive briefing.  The submitted time records support 280 Citizens' statement that it coordinated with the other entities.  We find that 280 Citizens' participation in this proceeding supplemented or complemented the efforts of the governmental entities but did not in any material way duplicate their participation.

### 6.1.1. Hours Requested

280 Citizens allocated its time to 16 categories of issues and provided a daily breakdown of hours with a brief description of each activity.  Table 3

- 28 -

A.02-09-043  ALJ/CFT/jva

describes these categories, along with the hours expended and the amount of requested compensation related to each category.[7]

### Table 3
### 280 Citizens Compensation Request by Category

| | | Before Allocation of Category 10 Hours | | Adjusted by Allocation of Category 10 Hours | |
| | | Total Hours | Total Cost | Requested Hours | Requested Cost |
|---|---|---|---|---|---|
| Category | Description | | | | |
| 1 | Project need and timing | 1,083.5 | $288,168 | 1,130.75 | $ 306,078.25 |
| 2 | Community values, land use | 23.8 | 7,662 | 71.1 | 25,572.25 |
| 3 | Health and safety, incl. EMF | 412.3 | 126,681 | 506.8 | 162,501.50 |
| 4 | Project route | 887.4 | 276,021 | 754.6 | 230,666.42 |
| 5 | Visual impacts | 27.2 | 9,321 | 50.8 | 18,275.63 |
| 6 | Construction impacts | 88.3 | 27,822 | 111.9 | 36,777.13 |
| 7 | Project costs | 228.1 | 58,814 | 251.7 | 67,768.63 |
| 8 | Seismic issues | 27.9 | 12,673 | 51.5 | 21,628.13 |
| 9 | Biological impacts | 195.3 | 67,746 | 218.9 | 76,700.63 |
| 10 | Time not directly allocated | 472.5 | 179,103 | 0 | 0 |
| 11 | Travel time | 84.5 | 25,917 | 84.5 | 12,958.50 |
| 12 | Intervenor compensation | 70.9 | 24,888 | 70.9 | 12,443.75 |
| 13 | Administrative and clerical | 204.2 | 33,320 | 0 | 0 |
| 14 | Other non-compensable time | 62.6 | 21,357 | 0 | 0 |
| 15 | Environmental review | 227.5 | 72,835 | 196.0 | 63,384.33 |
| 16 | Other compensable time | 19.5 | 4,138 | 0 | 0 |
| | **Total** | **4,115.5** | **$1,236,463** | **3,499.5** | **$1,034,755.13** |

Time spent on activities involving multiple issues that, in 280 Citizens' view, could not be allocated directly to a single issue was tracked in Category 10 and was subsequently allocated among the specific issues. The requested hours and compensation, as indicated in the rightmost columns in Table 3, reflect this allocation of Category 10 time. As reflected in the requested hours in Table 3,

---

[7] The slight discrepancies between the total requests indicated in Table 1 and Table 3 are due to rounding differences.

A.02-09-043 ALJ/CFT/jva

280 Citizens does not seek compensation for administrative and clerical time (Category 13), other non-compensable time (Category 14),[8] or for 19.5 hours (Category 16) that 280 Citizens states would otherwise be compensable.

PG&E suggests that the Commission reduce the compensation award to 280 Citizens because of claimed inefficiencies in its representation. PG&E asserts that 280 Citizens over-staffed the evidentiary hearings and, in particular, frequently had two or three attorneys present at the hearings. 280 Citizens responds that the time its attorneys spent in the hearing room was productive and efficient. It explains that its attorneys divided responsibilities, that each 280 Citizens attorney needed to participate in the hearing when other parties were cross-examining a witness for whom the attorney had responsibility, that it was uncertain about the length of time each witness would be on the stand, and that its attorneys spent time performing other work related to the proceeding when not involved in witness examination. We find 280 Citizens' explanation adequate and do not make the reduction PG&E suggests.

PG&E suggests that the billing categories used by 280 Citizens indicate an overlap among issue areas. PG&E's concern appears to arise because of the detailed manner in which 280 Citizens maintained its records, e.g., 280 Citizens' Category 3 ("health and safety, including EMF issues") arguably could be viewed as a subset of Category 2 ("community values and land use conflicts"). However, in reviewing 280 Citizens' billing records, we see no evidence of duplicate billings.

---

[8] From our review of 280 Citizens' detailed time records, Category 14, "Other non-compensable time," reflects activities such as meetings with elected officials and time spent on formation of 280 Citizens, press activities, public information, and an unsuccessful motion to reopen the record for the receipt of photographs included in its comments on the proposed decision.

A.02-09-043  ALJ/CFT/jva

PG&E claims that none of 280 Citizens' experts made any significant [1] contribution and, thus, that none of their costs warrant compensation. PG&E also asserts that 280 Citizens has not demonstrated that the costs associated with experts who did not testify are reasonable. We agree with 280 Citizens that in some instances it may be more cost efficient for individuals with lower rates to perform certain tasks. Compensation should not be denied simply because tasks were undertaken by non-testifying experts. A policy that only work performed by testifying experts is compensable would provide an incentive for those experts to perform all of the work in support of their testimony, resulting in possible increased costs for intervenors and, ultimately, ratepayers. Such an outcome would be counter to the goal in § 1801.3(b) of encouraging efficient participation.

After addressing the hours devoted to activities involving multiple issues (Category 10), we evaluate the reasonableness of the hours 280 Citizens claims for each of the relevant issue areas, and evaluate its request regarding travel time and time spent on compensation issues.

### 6.1.1.1.  Category 10 Hours

280 Citizens states that its attorneys and paralegals spent 472.5 hours that could not be allocated directly to individually tracked issues, which it reports in Category 10. This category includes activities such as 280 Citizens' protest, preparation for and participation at the prehearing conference, discovery, responding to procedural motions, general planning for the proceeding, coordination with other parties, testimony and transcript corrections, and preparation of briefs and comments on the proposed and alternate decisions. We accept 280 Citizens' tracking of such costs in a general category to be allocated among the substantive issues. While unusual, an allocation of such costs is

- 31 -

A.02-09-043  ALJ/CFT/jva

reasonable in this instance because of the multiple issues addressed by
280 Citizens and detailed in its compensation request, the large number of hours
that could not be allocated directly to the individual issues, and the resulting
impacts on the amount of the compensation request.

Based on our review of 280 Citizens' records, it was reasonable for
280 Citizens to accumulate the multi-issue hours in Category 10, with
two exceptions. First, 280 Citizens included time related to a public participation
hearing. We have consistently indicated since 1996 (D.96-08-040, 67 CPUC2d
562,577, and as recently as D.04-09-050, *mimeo.* at 12) that we do not award
compensation for time spent by a party related to public participation hearings,
as such hearings are an opportunity for non-parties to address the Commission.
In total, 2.2 hours of attorney O'Neill's time and 1.1 hours of attorney Gray's time
related to the public participation hearing should be disallowed. Second,
recognizing that 280 Citizens did not request compensation for time spent on its
unsuccessful motion to reopen the record filed on July 1, 2004, we disallow
1.5 hours of Gray's time related to review of PG&E's response to 280 Citizens'
motion.

280 Citizens states that its allocation of Category 10 hours reflects the
approximate percentage of 280 Citizens' total multi-issue time spent on each of
the substantive issues, but provides no support for this assertion. We find it
reasonable to allocate Category 10 time in proportion to the hours reported for
280 Citizens' attorneys and paralegals in each of the substantive categories. On
that basis, we adopt an allocation of Category 10 hours as indicated in Table 4.

A.02-09-043  ALJ/CFT/jva

**Table 4**
**Allocation of 280 Citizens' Category 10 Hours**
**To Substantive Issues**

| Category | Description | Requested | Adopted | Allocated Hours |
|----------|-------------|-----------|---------|-----------------|
| 1 | Project Need and Timing | 10% | 25% | 11.69 |
| 2 | Community Values | 10% | 1% | 4.7 |
| 3 | Health and Safety, including EMF | 20% | 13% | 60.8 |
| 4 | ProjectRoutes | 25% | 33% | 154.3 |
| 5 | Visual Impacts | 5% | 3% | 14.0 |
| 6 | Construction Impacts | 5% | 3% | 14.0 |
| 7 | Project Costs | 5% | 5% | 23.4 |
| 8 | Seismic Issues | 5% | 1% | 4.7 |
| 9 | Biological Issues | 5% | 8% | 37.4 |
| 15 | Environmental Review | 10% | 10% | 46.8 |

With removal of 4.8 hours from Category 10, as discussed, we address compensation for the remaining 467.7 hours in conjunction with our review of each of the substantive categories to which they are allocated.

### 6.1.1.2.  Project Route (Category 4)

280 Citizens reports that its attorneys and paralegals devoted 634.8 hours to development and advocacy of alternative routes. In addition, witness Tassainer spent 140 hours assessing load flow and other aspects of potential routes and expert (non-witness) Vance spent 48.1 hours assisting in the load flow analyses. Witness Shields spent 64.5 hours addressing right-of-way and other routing issues. These records show that over 70% of the hours spent on routing issues by 280 Citizens were logged by attorneys and paralegals.

- 33 -

A.02-09-043 ALJ/CFT/jva

While maintaining that each of the suggested alternative routes warranted review and analysis, 280 Citizens acknowledges that, "Whether they all warranted the time 280 Citizens devoted to their analysis is, however, admittedly debatable." As a result, 280 Citizens voluntarily removed from its compensation request one-third of its attorney and paralegal hours devoted to routing issues, as well as one-third of the Category 10 hours allocated to routing issues.

In Section 5.1.1, we find that 280 Citizens made a substantial contribution on routing issues, but not regarding its advocacy of the West of Skyline route segment or the portion of the MPUA that differed from the PUA. From the detailed documentation, we estimate that 280 Citizens' attorneys spent at least 130 hours on the West of Skyline alternative. While the documentation does not allow us to make a comparable assessment of hours spent addressing the MPUA, it is clear that support of the MPUA was a major focus of 280 Citizens' efforts in this proceeding. One-third of its attorney and paralegal hours, as 280 Citizens suggests, is not a sufficient reflection of the time spent on routing issues that did not contribute to D.04-08-046. Weighing 280 Citizens' extensive advocacy of these route segments and its substantial contribution in other respects, including identification of the Underground to Trousdale Drive hybrid route, we find that removal of one-half of 280 Citizens' attorney and paralegal time and one-half of its consultants' time spent on routing issues is a reasonable reduction to reflect its limited contribution on routing issues. We also remove one-half of Category 10 time allocated to routing issues from the compensation award.

- 34 -

A.02-09-043 ALJ/CFT/jva

### 6.1.1.3. Environmental Review
### (Category 15)

280 Citizens includes within this category its time spent participating in
the scoping process for the environmental review, preparation of comments on
the DEIR, and review of the FEIR. 280 Citizens reports that its attorneys devoted
189 hours and witness Shields 38.5 hours on this environmental review.
280 Citizens voluntarily excludes from its compensation request one-third of its
attorneys' hours and related Category 10 time from its compensation request,
acknowledging that some of the time devoted to environmental review was not
efficient or productive.

With 280 Citizens' voluntary exclusion of one-third of its attorneys' hours,
we find that the remaining time spent on environmental review is reasonable
and should be compensated. Consistent with 280 Citizens' treatment, we remove
from the compensation award one-third of the Category 10 time allocated to
environmental review.

### 6.1.1.4. Project Need and Timing
### (Category 1)

280 Citizens devoted more time to project need and timing than any other
issue. 280 Citizens states that its attorneys and paralegals spent 484.5 hours on
project need and timing. Witness Stephenson spent 211 hours addressing
reliability criteria, transmission line re-rating, and other aspects of the
transmission system. Shields spent 388 hours on other aspects of 280 Citizens'
showing regarding project need and timing. Thus, about 45% of the time
280 Citizens spent on project need and timing issues was logged by its attorneys
and paralegals.

PG&E argues that the testimony of 280 Citizens' witnesses regarding
project need had numerous deficiencies which should be considered in

- 35 -

A.02-09-043  ALJ/CFT/jva

determining compensation.  As described in Section 5.1.3, we find that
280 Citizens made a substantial contribution on some but not all aspects of
project need and timing.  280 Citizens' compensation should be reduced due to
its lack of contribution regarding reliability criteria; treatment of the CCSF
turbines; the re-rating of existing transmission lines in the area; and the treatment
of conservation, energy efficiency, and distributed generation in PG&E's load
forecast.  280 Citizens' time records, while detailed, do not allow us to segregate
the time spent on those aspects of its participation.  In our judgment,
280 Citizens' attorney and paralegal hours, as well as related consultant hours,
devoted to project need and timing issues should be reduced by two-thirds in
light of its limited contribution.  We also reduce the portion of Category 10 hours
allocated to this topic by two-thirds.

### 6.1.1.5.  Project Costs (Category 7)

280 Citizens' attorney devoted 94.6 hours to the issue of project costs.
Witnesses Tassainer and Shields spent 88 and 3.5 hours, respectively, addressing
project costs, with Tassainer providing alternative cost estimates for Route 1B
and the MPUA.  Vance spent another 42 hours on preparation of a cost model in
support of Tassainer's testimony.

In Section 5.1.9, we find that 280 Citizens made a substantial contribution
regarding costs of Route 1B, but did not make a substantial contribution
regarding costs of the PUA/MPUA.  Accordingly, we reduce 280 Citizens' hours
devoted to cost issues, along with the portion of Category 10 hours allocated to
this topic, by one-half.

### 6.1.1.6.  Remaining Substantive Issues

280 Citizens' attorneys and paralegals spent 240.8 hours on EMF and other
health and safety issues (Category 3); witnesses Tassainer and Shields devoted

- 36 -

A.02-09-043 ALJ/CFT/jva

106 hours and 10 hours, respectively, and Frandsen spent another 55.5 hours providing EMF modeling and analysis in support of Tassainer's testimony.

280 Citizens reports that its attorneys spent 19.8 hours and witness Shields spent 4 hours on the issue of community values (Category 2).

280 Citizens' attorneys spent 27.9 hours on seismic issues (Category 8) and 27.2 hours on visual impacts (Category 5). Its expert witnesses did not address these topics.

280 Citizens reports that its attorneys and paralegals spent 56.8 hours addressing construction impacts and other impediments to routes (Category 6). Expert Tassainer devoted 31.5 hours to this issue.

280 Citizens' attorneys and paralegals spent 161.3 hours, and expert Murphy spent 34 hours on biological issues (Category 9).

In Section 5.1, we find that 280 Citizens made a substantial contribution regarding each of these issues. The hourly breakdown reasonably supports the claim for total hours on these issues. We have reviewed the record and find that the level of hours is reasonable in light its contribution on each of these issues, and we award compensation for the entirety of 280 Citizens' effort, and for the portion of Category 10 time allocated to these categories.

### 6.1.1.7.  Travel Time

280 Citizens requests compensation for 44 hours of travel time for its attorneys and 40.5 hours for expert Tassainer, and bills this time at one-half the regular hourly rates. We do not compensate 280 Citizens for 1.5 hours of O'Neill's travel time related to a public participation hearing, or for 3 hours of travel time for attorney Hilen and 2.5 hours for O'Neill related to the West of Skyline Boulevard alternative. With those exceptions, we find reasonable and

- 37 -

A.02-09-043  ALJ/CFT/jva

award compensation for the remaining 77.5 hours of 280 Citizens' submitted travel time.

### 6.1.1.8.  Time Spent on Compensation Request

280 Citizens submits 70.9 hours for its attorneys and paralegals spent on compensation issues, billed at one-half the regular hourly rates. In light of the complexity of this proceeding and 280 Citizens' detailed documentation, which we found very helpful in assessing 280 Citizens' compensation request, we award compensation for all the time 280 Citizens devoted to preparing its compensation request.

### 6.1.2.  Market Rate Standard

Next we take into consideration whether the claimed fees and costs are comparable to the market rates paid to experts and advocates having comparable training and experience and offering similar services. For guidance, we set forth principles for setting intervenors' hourly rates in Resolution ALJ-184, and in D.05-11-031. Here, 280 Citizens seeks compensation for the work of three attorneys, two paralegals, and six outside consultants, as summarized earlier in Table 1.

### 6.1.2.1.  Attorneys

For attorney O'Neill, 280 Citizens requests hourly rates of $315 for work performed in 2002, $435 for 2003, and $470 for 2004. We find these rates reasonable. We previously approved a $315 rate for O'Neill for 2001 in D.02-11-024, and adopt it here for his 2002 work. In D.04-08-025, we previously approved a $435 rate for O'Neill for 2003 work, and we adopt that rate here. The requested rate of $470 for 2004 is approximately 8% above the 2003 rate,

A.02-09-043  ALJ/CFT/jva

consistent with the guidelines for 2004 rates set forth in Resolution ALJ-184, and
is adopted here.

For attorney Hilen, 280 Citizens is requesting hourly rates of $330 for 2003,
and $360 for 2004. In D.02-11-024, we previously approved rates for Hilen of
$275 for 2000, and $285 for 2001. 280 Citizens submits that Hilen was responsible
for a number of major issues, including cross-examination of witnesses. Hilen
has practiced law for 15 years, including 12 years in administrative and
regulatory law. The requested rate of $330 for 2003 is 16% above Hilen's 2001
rate, and the requested $360 rate for 2004 is approximately another 10% above
the requested 2003 rate. The guidelines in D.05-11-031 call for increases of 3%
per year, for 2005 work, for representatives whose last authorized rate was
before 2004. Though Hilen's work was in 2003 and 2004, we will use the same
principle here and adopt a rate of $305 for 2003, and $315 for 2004.

For attorney Gray, 280 Citizens is requesting hourly rates of $285 for work
performed in 2003, and $310 for 2004. In D.04-08-025, we previously approved a
$285 rate for Gray for 2003, and adopt that rate here. The requested $310 rate for
Gray for 2004 is approximately 8% above the 2003 rate and consistent with
Resolution ALJ-184. We also adopt that rate here.

### 6.1.2.2.  Paralegals

280 Citizens seeks compensation for work by paralegal Nielsen at hourly
rates of $145 for 2003, and $155 for 2004. We previously approved the requested
2003 rate in D.04-08-025, and adopt it here. The hourly rate requested for Nielsen
for 2004 represents an approximate 7% increase from 2003 and, consistent with
Resolution ALJ-184, is reasonable.

280 Citizens seeks compensation for work by paralegal Pau at hourly rates
of $135 for 2003, and $145 for 2004. We previously approved the $135 rate for

- 39 -

A.02-09-043 ALJ/CFT/jva

Pau for 2003 in D.04-08-025, and adopt that rate here. An hourly rate of $145 for Pau for 2004 represents an increase of 7.4% above the 2003 rate and, consistent with Resolution ALJ-184, is reasonable.

### 6.1.2.3. Expert Witnesses and Consultants

280 Citizens seeks recovery of the costs of expert witness Stephenson at a rate of $225 for work performed in 2003 and 2004. The Commission has not approved a compensation rate previously for Stephenson.

Stephenson provided analysis, expert consultation, and testimony regarding transmission capacity into the project area, the probability of PG&E's planning contingencies occurring in the future, and the likelihood of the project preventing a future blackout. Stephenson also evaluated and analyzed power flow data provided by PG&E and developed independent power flow models.

Stephenson has a B.S. in Electrical Engineering, and is a licensed Electrical Engineer specializing in transmission planning and generation consulting. From 1967 through 1993, Stephenson was employed by PG&E in positions of increasing responsibility in transmission planning, and ultimately was in charge of transmission planning for the San Francisco/Peninsula area. Since leaving PG&E, Stephenson has been a consultant, advising clients on issues related to electric transmission and generation. Stephenson testified before the Commission on two previous occasions, most recently with respect to San Diego Gas & Electric Company's application for approval of the Valley-Rainbow transmission project.

280 Citizens compares Stephenson's background, qualifications, and experience with those of Wayne Schmus and Anton Smeerdyk. All three are experienced electrical engineers, familiar with transmission planning. The

- 40 -

A.02-09-043 ALJ/CFT/jva

Commission previously approved an hourly rate of $190 for Schmus for work performed in 2001 and $190 for Smeerdyk for work performed in 2000-2001.

We find that Stephenson, Schmus, and Smeerdyk have comparable education, training and experience. We therefore will consider the hourly rates previously awarded to Schmus and Smeerdyk in setting an hourly rate for Stephenson. An hourly rate of $225 for work Stephenson performed in 2003 and 2004 is excessive. Using the 3% annual increase formula set forth in D.05-11-031 for representatives whose last authorized rate was prior to 2004, results in rates for Stephenson of $200/hour for 2003, and $210 for 2004. Thus, for Stephenson we adopt here rates of $200/hour for 2003, and $210/hour for 2004.

280 Citizens seeks recovery of the costs of expert witness Tassainer at a rate of $210 for work performed in 2003 and 2004. The Commission has not approved previously a compensation rate for Tassainer, who has a B.S. degree in Electrical Engineering and is a licensed professional engineer. Tassainer has over 30 years experience in engineering and management and has been a principal at Tasco Engineering, Inc. since 1982. His industrial and utility projects have included lighting, control, security systems, electrolytic process design, and underground distribution and transmission projects. He has designed substations, transmission lines, and generation facilities and has conducted a variety of studies related to electrical systems, including power factor studies, analyses on load following and exporting excess power generation, and feasibility studies for self generation or cogeneration facilities. He has served as project manager on generation and transmission projects.

Tassainer reviewed possible alternative routings for the Jefferson-Martin project and underground versus overhead or hybrid configurations, and served as a witness for 280 Citizens concerning routing and the effect of various route

- 41 -

A.02-09-043  ALJ/CFT/jva

designs on magnetic field levels.  He performed modeling of EMF levels for
different project alternatives, examined construction impediments and impacts
of alternative routes, and evaluated PG&E's cost estimates for its proposed
project and various alternative routes.

280 Citizens compares Tassainer's background, qualifications, and
experience to those of Smeerdyk.  Consistent with the rate awarded to
Stephenson, we adopt rates for Stephenson of $200/hour for 2003, and
$210/hour for 2004.

280 Citizens seeks recovery of the costs of consultant Frandsen at a rate of
$150 for work performed in 2003 and 2004.  The Commission has not approved
previously a compensation rate for Frandsen.

Frandsen holds a B.S. degree in Mechanical Engineering (1989) and an
M.B.A. (1991), and is a licensed professional environmental engineer.  He has
been involved with environmental modeling and analysis, including modeling
EMF levels, for over 15 years.  Frandsen's work in EMF modeling has included
analyzing both overhead and underground transmission lines.

In this proceeding, Frandsen used an Electric Power Research Institute
(EPRI) model to evaluate the existing overhead 60 kV lines along the
Jefferson-Martin route, PG&E's proposed route, and various alternative routes
and configurations.  Tassainer delegated much of the preliminary EMF modeling
work to Frandsen.

280 Citizens states that the Commission has not approved previously a
rate for an engineer with precisely Frandsen's education and experience.
However, 280 Citizens draws comparisons with an hourly rate of $150
established for 2003 for Roland Hwang, a Senior Policy Analyst at Natural
Resources Defense Council (NRDC), and Sheryl Carter, a Policy Analyst at

A.02-09-043 ALJ/CFT/jva

NRDC. Hwang has a B.S. (1986), a Masters degree in Mechanical Engineering
(1988), and a Masters in Public Policy (1992). Carter has a Masters in
Technology, Energy and Environmental Policy (1993) and has approximately
13 years' experience in energy policy and utility regulation. Based on this
comparison of educational background and experience, 280 Citizens asserts the
$150 rate for 2003 and 2004 is reasonable for Frandsen.

Although Hwang, Carter, and Frandsen share similar credentials, it
appears that the backgrounds of Hwang and Carter may have a greater emphasis
on public policy analysis, while in this proceeding, Frandsen performed
modeling to analyze the project and EMF levels. In D.02-11-019, we awarded an
hourly rate of $180 to engineer Frech for work performed in 2000-2002. We
noted that Frech had both engineering and business degrees and had extensive
experience in analyzing electromagnetic fields created by power lines and other
sources of electromagnetic radiation. Frech had also worked as a business
consultant specializing in the analysis of electric and magnetic fields for
approximately 14 years as of 2002.

We believe that Frandsen's background, training and experience more
closely resemble those of Frech than those of Hwang and Carter. In view of the
hourly rate we have previously awarded to Frech, we find that the requested
hourly rate of $150 per hour for Frandsen for work performed in 2003 and 2004 is
reasonable.

280 Citizens seeks recovery of the costs of consultant Vance at a rate of
$135 for work performed in 2003 and 2004. The Commission has not approved
previously a compensation rate for Vance.

Vance holds a B.S. in Aerospace Engineering (1990) and is a licensed
electrical engineer. He has specific expertise in performing feasibility analysis

A.02-09-043  ALJ/CFT/jva

for large electric generation and transmission projects.  For this proceeding, Vance analyzed the electrical feasibility of various alternative route designs by conducting load flow analysis, fault studies, fuse and relay coordination studies, and system stability analysis.  Vance also analyzed PG&E's cost estimates for the proposed project and alternate routes.  Tassainer delegated certain work to Vance so it could be performed at a billing rate lower than that charged by Tassainer.

In view of the hourly rates awarded to Frech and to Frandsen above, and the fact that Vance does not have an advanced degree, we believe that an hourly rate of $135 is reasonable and adopt this rate for Vance for 2003 and 2004.

280 Citizens seeks recovery of the costs of expert witness Murphy, a conservation biologist, at a rate of $225 for work performed in 2003 and 2004. The Commission has not approved previously a compensation rate for Murphy, who has a B.S. degree (1974) and a Ph.D. (1981).  From 1983 until 1997, Murphy served in the Center for Conservation Biology at Stanford University, first as its Director and then as its President, before joining the faculty at the University of Nevada, Reno, where he is Research Professor in the Biology Department and director of the graduate program in Ecology, Evolution, and Conservation Biology.

280 Citizens reports that Murphy has led efforts to create habitat conservation plans for spotted owls in the Pacific Northwest, birds and butterflies in California, and the desert tortoise in Southern Nevada.  He has published extensively, including several dozen papers on plant and animal species associated with serpentine soil-based grasslands on the San Francisco Peninsula.  Murphy provided expert consultation and testimony for 280 Citizens evaluating potential impacts of the MPUA on areas of serpentine grassland and

- 44 -

A.02-09-043  ALJ/CFT/jva

steps that could be taken to mitigate construction impacts and restore the serpentine grassland.

280 Citizens compares Murphy's credentials to those of Bill Trush, a fisheries biologist who provided expert services to the California Hydropower Reform Coalition in the PG&E bankruptcy proceeding evaluating downstream impacts of dams and planning and implementation of river restoration plans. The Commission approved an hourly rate for Trush of $200 for work performed in 2002 (D.04-08-025). Trush holds Ph.D. (1989), M.S. (1979), and B.S. (1974) degrees. According to D.04-08-025, Trush is an adjunct professor in the Fisheries Department at California State University at Humboldt and is the president and co-founder of a firm specializing in the downstream impact of dams and the planning and implementation of river restoration plans.

We agree with 280 Citizens that Murphy's education, qualifications, and experience are comparable to those of Trush. In view of the $200 hourly rate approved for Trush's work in 2002, we find that the requested hourly rate of $225 for Murphy's work is excessive for 2003. In light of D.05-11-031, a $210/hour rate for 2003, and a $220 rate for 2004 is reasonable.

280 Citizens seeks recovery of the costs of expert witness Shields at an hourly rate of $225 for work performed in 2003 and 2004. The Commission has not approved previously a compensation rate for Shields. Shields holds a B.S. in Natural Resource Planning and Interpretation and has worked in the electric power industry for 25 years. Shields served as Director of the Land Use Planning Department of Trinity County, California for four years, then spent seven years as the CEO/General Manager of the Trinity County Public Utility District, then 10 years as the CEO/General Manager of Emerald Public Utility District in

- 45 -

A.02-09-043 ALJ/CFT/jva

Eugene, Oregon. He also has worked for Enron, energy industry consulting firms, and the South San Joaquin Irrigation District.

Shields served as 280 Citizens' overall policy witness and provided expert consultation and testimony on transmission and generation resource planning, load forecasts, alternative generation resources, distributed generation, renewable initiatives, demand reduction, and alternative transmission routes.

280 Citizens compares Shields' background and experience to those of Michael McDonald, for whom the Commission approved an hourly rate of $250 for 2003 (D.04-08-025). Like Shields, McDonald has been involved in the electric industry since the 1970s. McDonald spent nine years as Assistant City Manager and then City Manager of the City of Healdsburg, which operates a municipal utility, and 13 years as General Manager of the Northern California Power Agency. McDonald later worked for Enron North America leading its power origination group. Given the similar industry experience, 280 Citizens submits that an hourly rate of $225 for Shields' work, compared to the $250 hourly rate approved for McDonald, is appropriate.

We agree with 280 Citizens that the backgrounds, qualifications, and experience of Shields and McDonald are comparable. In view of the $250 hourly rate approved for McDonald in D.04-08-025, an hourly rate of $225 for Shield's work in 2003 and 2004 is reasonable, and we approve it here.

### 6.1.3. Expenses

280 Citizens seeks recovery of expenses totaling $32,427.11, including copying, travel, legal research, filing, fax, transcripts, database and other costs, as shown in Table 2. We find that the claimed expenses are reasonable and should be allowed, with the exception of $95.00 claimed for expenses incurred by attorney Hilen for parking at his office during testimony preparation. It is not

- 46 -

A.02-09-043  ALJ/CFT/jva

appropriate for counsel to receive intervenor compensation for normal, everyday parking expenses at their own offices while performing work on a Commission proceeding.  280 Citizens is therefore entitled to recover a total of $32,332.11 for its expenses in this proceeding.

A.02-09-043  ALJ/CFT/jva

## 6.2.  CARE's Request

CARE requests $255,482.08 for participation in this proceeding.[9]  Based on the provided documentation,[10] we compute the request as $254,960.13, as indicated in Tables 5 and 6.

### Table 5

### CARE Compensation Request

|  | Year | Rate | Hours | Total |
|---|---|---|---|---|
| **Attorneys** | | | | |
| John Gabrielli | 2003-2004 | $ 300.00 | 117.4 | $  35,220.00 |
| Stephan Volker | 2004 | 400.00 | 56.3 | 22,520.00 |
| Joshua Harris | 2004 | 225.00 | 110.6 | 24,885.00 |
| Gretchen Dent | 2004 | 275.00 | 9.72 | 2,672.08 |
| Terry Franke | 2004 | 300.00 | 0.5 | 150.00 |
| | | | | |
| Paralegals | | | | |
| Melissa Moffitt | 2004 | 120.00 | 29.5 | 3,540.00 |
| Marnie Riddle | 2004 | 90.00 | 4.0 | 360.00 |
| Scott Yundt | 2004 | 120.00 | 16.0 | 1,920.00 |
| | | | | |
| **CARE Representatives** | | | | |
| Michael Boyd | 2003-2004 | 150.00 | 349.0 | 52,350.00 |
| Lynne Brown | 2003-2004 | 125.00 | 346.0 | 43,250.00 |
| | | | | |
| Experts | | | | |
| Shawn Smallwood | 2003-2004 | 200.00 | 157.5 | 31,00.00 |
| David Wright | 2004 | 200.00 | 34.0 | 6,800.00 |
| William Powers | 2003-2004 | 200.00 | 10.5 | 2,100.00 |
| Bob Sarvey | 2003-2004 | 200.00 | 83.6 | 16,720.00 |

---

[9]  In its original request, CARE sought $269,915.79.  It later revised this figure downward to $255,482.08.

[10]  CARE double-counted certain expenses, as acknowledged in a January 28, 2005 e-mail to the ALJ.

A.02-09-043  ALJ/CFT/jva

|  | Year | Rate | Hours | Total |
|---|---|---|---|---|
| **Intervenor Compensation and Travel** | | | | |
| Gabrielli | 2004 | 150.00 | 13.8 | 2,070.00 |
| Volker | 2004 | 200.00 | 5.6 | 1,120.00 |
| Harris | 2004 | 112.50 | 9.9 | 1,113.75 |
| Boyd | 2004 | 75.00 | 37.5 | 2,812.50 |
| Smallwood | 2003-2004 | 100.00 | 9.0 | 900.00 |
| Wright | 2004 | 100.00 | 4.0 | 400.00 |
| | | | | |
| **Subtotal** | | | | **$253,968.33** |
| Expenses | | | | $    991.80 |
| | | | | |
| **TOTAL** | | | | **$254,960.13** |

### Table 6

### CARE Expenses Request

| Copying | $ 550.17 |
|---|---|
| Internet research | 81.15 |
| Postage | 149.30 |
| Travel expenses | 131.69 |
| Film, processing | 16.53 |
| Meals | 53.96 |
| Telephone | 9.00 |
| | |
| **Total Expenses** | **$ 991.80** |

CARE maintains that it contributed to the proceeding in a manner that was productive and resulted in benefits to ratepayers in comparison to the costs of participation, although it did not attempt to quantify those benefits. CARE submits that ratepayer benefits resulted because it ensured that the environmental concerns associated with the Hunters Point and Potrero plants would be addressed quickly. In D.04-08-046, the Commission concluded that the Jefferson-Martin project should be built promptly in order to reap diversification,

- 49 -

A.02-09-043  ALJ/CFT/jva

economic, and environmental benefits, even though we found the project would not be needed for reliability purposes until 2007.  Our conclusion was based, in part, on CARE's showing regarding environmental benefits of closing Hunters Point and possibly reducing Potrero generation as well.  While difficult to quantify, it is clear that ratepayers will benefit due to earlier construction of the Jefferson-Martin project.  The Commission finds that CARE's participation in this proceeding has been productive in relation to the award to CARE authorized in today's decision.

### 6.2.1. Hours Requested

CARE provided a daily breakdown of hours with a brief description of each activity, but did not allocate the time among issues it addressed in the proceeding.  In response to inquiries by the ALJ, CARE provided additional information regarding its compensation request, including a partial allocation of the claimed hours into several categories.  While helpful, the additional detail was insufficient to allow a complete categorization and assessment of CARE's compensation request by issue.  As discussed later, some of CARE's time is disallowed.  We caution CARE to provide adequate detailed supporting documentation, including an allocation of time among issues, in any future compensation requests.  Next, we assess the remaining hours submitted for each individual.

### 6.2.1.1.  CARE Site Visit and Motions to Reopen the Record

As described in Section 5.2, we do not award compensation related to CARE's February 2004 site visit and its unsuccessful motions to reopen the record. Based on our review of CARE's submission, we remove 3.1 hours of Gabrielli's time, 1.5 hours of Volker's time, 7.4 hours of Harris' time, 13.5 hours of Boyd's time, 12.5 hours of Smallwood's time (four of which appear to be travel

A.02-09-043  ALJ/CFT/jva

time), and all of Wright's time as related to the February 2004 site visit and
CARE's subsequent motions.

### 6.2.1.2.  Public Participation Hearings and Commission Meetings

CARE included in its compensation request time spent preparing for and
attending one of the public participation hearings.  As we discuss in
Section 6.1.1.1, we do not award compensation for time spent by a party related
to public participation hearings.  In total, 0.8 hours of Gabrielli's time,
eight hours of Boyd's time (including 1.5 hours of travel), and eight hours of
Brown's time related to the public participation hearing should be removed.

CARE also included in its compensation request time spent identifying
non-members to speak at the two Commission meetings during which we
considered the Jefferson-Martin project.  Just as we do not compensate parties'
time devoted to public participation hearings, we exclude 13.5 hours of Boyd's
time (including 1.5 hour of travel time) and two hours of Brown's time spent
arranging for members of the public to speak at the Commission meetings.

CARE asks for compensation for both Boyd's and Brown's attendance at
the August 19, 2004 Commission meeting.  It is reasonable to compensate one
CARE representative, but not two.  We remove five hours of Brown's time spent
attending this Commission meeting.  Additionally, we find the eight hours Boyd
submitted for attendance at the Commission meeting to be excessive, and we
remove three hours from the request.

### 6.2.1.3.  Activities Unrelated to This Proceeding

CARE included in its request a number of hours, largely after reply briefs
were filed, for work that was outside the scope and unrelated to this proceeding.
These activities related to ongoing events involving the Hunters Point Naval

- 51 -

A.02-09-043 ALJ/CFT/jva

Shipyard, Federal Energy Regulatory Commission proceedings, a civil rights complaint, the Potrero 115 transmission line project, R.04-08-020, and other matters. We remove 20 hours of Gabrielli's time and 12.25 hours of Boyd's time spent on such activities unrelated to this proceeding.

### 6.2.1.4. Time Spent on Compensation Issues

CARE's daily billing records indicate that its NOI and intervenor compensation request required more hours than CARE reported in response to the ALJ's inquiry. Based on the billing records, we allocate 16.9 hours of Gabrielli's time, 10.5 hours of Volker's time, 10.7 hours of Harris' time, and 15.25 hours of Boyd's time to NOI and request issues. In light of the complexity of this proceeding, we award compensation for the full amount of time CARE devoted to compensation issues.

### 6.2.1.5. Attorneys and Paralegals

CARE obtained legal services from two law firms during this proceeding, and requests compensation totaling $37,290.00 for the Gabrielli Law Office and $58,130.83 for the Law Offices of Stephan C. Volker. CARE also consulted with attorney Franke of CalAware regarding CARE's California Public Records Act request to ORA (now DRA), and requests compensation for 0.5 hour of Franke's time.

Gabrielli's office assisted CARE throughout the proceeding, commencing with CARE's petition to intervene. Gabrielli assisted with preparation of CARE's testimony and advised CARE throughout the evidentiary hearings on strategy, testimony, and cross-examination, but did not attend the hearings. Gabrielli assisted in CARE's first motion to reopen the record.

Volker's office provided legal and professional services beginning February 3, 2004, as the evidentiary hearings were concluding. In addition to

- 52 -

A.02-09-043  ALJ/CFT/jva

Volker, attorneys Harris and Dent and paralegals Moffitt, Riddle, and Yundt
provided services to CARE.  Billing records indicate that Volker's office drafted
CARE's opening and reply briefs, its second motion to reopen the record,
comments on the proposed and alternate decisions, and CARE's request for
intervenor compensation.

We are concerned that CARE's use of two law firms resulted in
inefficiencies in the preparation of CARE's filings subsequent to its retaining
Volker.  Volker's billing records indicate significant charges related to research
and review of testimony and the record, activities that undoubtedly repeated
Gabrielli's earlier efforts to some extent.  In addition, while Volker's office
drafted CARE's filings subsequent to its retention, the documentation indicates
that Gabrielli continued to be consulted regarding such filings.  In addition, both
Gabrielli and Volker's office reviewed other parties' briefs, the proposed and
alternate decisions, and parties' responsive comments.  Because of these
inefficiencies, we reduce by 20% the hours billed by Volker's firm and Gabrielli's
hours after February 3, 2004, the date Volker's firm was retained.  With that
reduction (which does not apply to time spent on intervenor compensation
matters) and other adjustments described in preceding subsections of this order,
we approve compensation for the remaining hours submitted for Gabrielli and
for Volker's firm.  We also allow compensation for Franke's time.

### 6.2.1.6.  Boyd

Boyd is President of CARE.  As a policy expert, he submitted initial and
rebuttal testimony regarding community values of the Bayview Hunters Point
community and describing existing and potential sources of electricity to serve
the San Francisco area.  Boyd was not cross-examined, and his testimony was
received into evidence by stipulation.  Boyd attended most of the evidentiary

- 53 -

A.02-09-043 ALJ/CFT/jva

hearings and conducted the bulk of CARE's cross-examination of other witnesses. He signed CARE's pleadings until Volker's firm was retained in February 2004. Boyd's participation and testimony made a substantial contribution regarding community values in the Bayview Hunters Point community. CARE asks compensation for 349 hours of Boyd's time.

In preceding subsections, we adjust Boyd's time in several respects. With those adjustments (a reduction in the aggregate of about 50 hours), we find the remainder of Boyd's time to be reasonable.

### 6.2.1.7.  Brown

Brown submitted short initial and rebuttal testimony[11] addressing existing environmental and public health conditions in the Bayview Hunters Point neighborhood and expressing the community's desire that the Hunters Point and Potrero plants be shut. Brown is a low-income member of CARE who resides in the Bayview Hunters Point community. Brown was not cross-examined, and his testimony was received into evidence by stipulation. Brown's testimony assisted in CARE's substantial contribution regarding community values in the Bayview Hunters Point neighborhood. CARE asks compensation for 346 hours of Brown's time.

CARE requests compensation for Brown's time on more than a full-time basis between November 7, 2003 (the first day for which CARE requests any compensation) and December 19, 2003, and on about a half-time basis between January 5, 2004 and the completion of evidentiary hearings on February 5, 2004. CARE also requests compensation for eight hours of Brown's time later in 2004.

---

[11] Brown's initial prepared testimony contained about three pages of text, plus a resolution of the San Francisco Department of Public Health and a press release regarding childhood asthma. Brown's rebuttal testimony consisted of a single page.

A.02-09-043 ALJ/CFT/jva

For each day, CARE provides a description of Brown's activities and the total number of hours requested for that day. However, CARE does not break down Brown's daily hours by issue or activity. On most days, Brown reports that he engaged in organization and education of the Bayview Hunters Point community, read documents related to the Jefferson-Martin proceeding, and/or discussed matters with Boyd. Brown spent part of four days preparing his testimony. On ten days, Brown reports that he prepared for or attended the evidentiary hearings. Because Brown's daily log typically reports more than one activity each day but does not separate the hours accordingly, we use our discretion in evaluating this portion of CARE's request. We caution CARE that we may disallow future compensation requests if it does not provide adequately detailed supporting documentation.

In a preceding subsection of this order, we exclude 15 hours of Brown's time devoted to public participation hearings and Commission meetings. As discussed further below, we find that most of the remaining hours submitted for Brown should not be compensated because the time was not related to CARE's contribution in this proceeding or was not spent efficiently.

CARE requests compensation for 192 hours of Brown's time on 30 days when, CARE reports, Brown read documents such as the application, the Proponents Environmental Assessment, the FEIR, prehearing conference statements, testimony, and electricity resource and transmission planning documents. CARE's documentation typically reports that Brown spent 6 or 8 hours each day reading one specified document each day and, on about one-third of the days, engaging in other activities including community organizing and testimony preparation. The regularity of the reported hours and activities raises concerns regarding the accuracy of this documentation. Further, we see no

- 55 -

A.02-09-043  ALJ/CFT/jva

indication that Brown's time reported as devoted to reading the identified documents contributed either to his testimony — which was limited to existing conditions in the Bayview Hunters Point community — or to other aspects of CARE's contribution.  We find that CARE should not receive compensation for Brown's extensive reading efforts because they did not assist in CARE's contribution in this proceeding.

CARE indicates that Brown spent 10 hours researching and discussing a Peninsula Medical Center Replacement Project Revised DEIR.  Because it does not appear that this document is related to the Jefferson-Martin proceeding or that Brown's activities regarding it assisted in CARE's contribution, we do not grant compensation for this time.

Brown reports that he devoted part of four days to preparation of his direct testimony, in addition to other activities those days.  Because Brown's testimony assisted in CARE's substantial contribution, we award compensation for 20 hours as our estimate of the time Brown spent preparing his testimony in this proceeding.

CARE requests compensation for Brown's activities related to community organizing and education on 27 days prior to the evidentiary hearings.  Brown reports 177 hours on those days, including unspecified amounts of time spent on other activities on most of the days.  While CARE's representation of the concerns of the Bayview Hunters Point community contributed to D.04-08-046, CARE has not established that the extensive amount of community outreach reported by Brown was all related to CARE's participation in this proceeding and necessary to support the contribution that CARE made to D.04-08-046.  Some portion of this time was spent on matters not related to this proceeding, including CARE's "ongoing battle over HP Naval Shipyard," as mentioned in

- 56 -

A.02-09-043 ALJ/CFT/jva

several of the daily entries. Taking these concerns into account, we allow compensation for 30 hours as an estimate of the amount of Brown's time related to community organizing that assisted in CARE's substantial contribution regarding community values in the Bayview and Hunters Point neighborhoods.

Brown reports that he spent time on several days investigating "claims made by opponents to J-M project." Because CARE has not established any connection between Brown's efforts in this respect and CARE's contribution in this proceeding, we do not allow compensation for this time.

Brown indicates that he discussed matters with Boyd on 13 different days prior to the evidentiary hearings and reports 79 hours on those days. Recognizing that some of Brown's time was spent on other activities and that his discussions with Boyd included other topics such as the naval shipyard, we allow compensation for 20 hours as an estimate of Brown's time spent in discussions with Boyd that contributed to CARE's contribution in this proceeding.

Brown attended several days of the evidentiary hearings. CARE's compensation request includes 48 hours for Brown's reported attendance on January 16, 20, 26, 28, and 29, and February 4, 2004,[12] in addition to 23 hours spent on other days preparing for the hearings. In contrast to CARE's claim, the transcripts reveal that Brown attended the evidentiary hearings on January 14, 26, 28, 29 and 30, and February 2, 2004. On those days, following Boyd's cross-examination of ISO, CCSF, and 280 Citizens witnesses, Brown briefly questioned the witnesses by reading prepared questions, often a single question per witness. Brown showed at most a limited ability to deviate from the

---

[12] Boyd's time sheets indicate that he drove Brown to the evidentiary hearings on January 12, 16, 20, 26, 28 and 28, and February 2 and 4, 2004.

A.02-09-043 ALJ/CFT/jva

prepared script, choosing, for example, not to respond to objections. We conclude that Boyd could have asked Brown's prepared questions at least as effectively as Brown. Because Brown's attendance at the evidentiary hearings did not assist in CARE's contribution in other ways, we conclude that Brown's attendance was not efficient, and we exclude the 71 hours of Brown's time related to the evidentiary hearings.

In summary, we allow compensation for 65 hours of Brown's time as an estimate of time spent in preparation of testimony, community outreach, and discussions with Boyd that assisted in CARE's contribution to D.04-08-046.

### 6.2.1.8. Smallwood

Smallwood submitted initial testimony regarding potential environmental impacts of PG&E's Route 1B and the "no project" alternative, in which the Hunters Point and Potrero power plants would continue to operate. Smallwood's work focused on biological impacts. No party cross-examined Smallwood, and his prepared testimony was received into evidence by stipulation. CARE requests compensation for 166.5 hours of Smallwood's time, including 9 hours of travel time.

Smallwood's records indicate that he spent 56 hours preparing his testimony. In Section 5, we find that CARE's testimony supplemented the FEIR's analysis regarding biological impacts and made a substantial contribution to D.04-08-046. The time Smallwood spent preparing his testimony is reasonable, and we allow compensation for these hours.

In addition to disagreeing with 280 Citizens' analysis of biological issues, CARE spent significant time prior to and during the hearings challenging the credibility and ethics of 280 Citizens' witness Murphy, who testified regarding biological impacts of route alternatives. CARE cross-examined Murphy and

A.02-09-043 ALJ/CFT/jva

introduced several exhibits containing news articles and other sources critical of Murphy's past activities. However, CARE did not pursue its assertions regarding Murphy's credibility.

The FEIR found, similar to Murphy's and 280 Citizens' position, that biological impacts created by trenching through serpentine grassland could be mitigated to less than significant levels. The testimony of both Murphy and Smallwood, in addition to the FEIR and other evidence, assisted us in understanding potential biological impacts of the PUA and other route alternatives. CARE's efforts in questioning Murphy's credibility were not helpful in our consideration of biological issues, did not assist in CARE's contribution in this proceeding, and do not merit compensation.

According to CARE's documentation, Smallwood logged 43 hours (including about two hours of travel time) reviewing Murphy's published papers and court transcripts and otherwise researching Murphy's "past behavior as a biological consultant." Smallwood also spent 29 hours preparing for and participating in Murphy's cross-examination[13] and reviewing the resulting transcript. The remainder of Smallwood's time was spent on preparation of CARE's brief. While it is difficult to isolate their time devoted to this effort, both Gabrielli and Boyd also spent time on CARE's efforts to challenge Murphy's credibility.

We recognize that knowledge of Murphy's prior work may have had some usefulness as CARE developed its understanding of Murphy's testimony in this proceeding. However, it appears that Smallwood's extensive research into Murphy's prior activities was primarily for the purpose of attacking Murphy's

---

[13] During CARE's cross-examination of Murphy, Boyd asked questions about Murphy's credentials and Smallwood asked more substantive questions.

A.02-09-043 ALJ/CFT/jva

credibility. Lacking quantification of the amount of time Gabrielli and Boyd devoted to this effort, we find that 43 hours of Smallwood time spent researching Murphy's past activities to be unproductive, and remove this time from CARE's compensation request. With the exception of this time and the adjustment described in Section 6.2.1.2 related to CARE's February 2004 site visit, we find the remainder of Smallwood's hours to be reasonable.

### 6.2.1.9.  Powers

Powers submitted prepared testimony comparing potential environmental impacts of PG&E's Route 1B for the Jefferson-Martin project and the "no project" alternative, which would involve continued generation from the Hunters Point plant. Powers was not cross-examined, and his testimony was received into evidence by stipulation. We find that Powers' testimony contributed to our determination on project timing, and overall to D.04-08-046 and the 10.5 hours he spent in preparation is reasonable.

### 6.2.1.10.  Sarvey

CARE requests compensation for expert Sarvey, who previously assisted CARE regarding several energy projects before the California Energy Commission. Sarvey reviewed the FEIR, testimony of other parties, and other related documents; prepared cross-examination questions; and consulted with CARE on a daily basis throughout the hearings. While CARE requests compensation for 83.6 hours for Sarvey, its day-by-day documentation of Sarvey's time totals only 77.4 hours. With this adjustment, we find that Sarvey's time is reasonable and should be compensated.

### 6.2.2. Market Rate Standard

CARE maintains that the reasonableness of its proposed hourly rates is supported by the prevailing market rates for attorneys of like experience and for

A.02-09-043  ALJ/CFT/jva

experts practicing in their representative fields.  We address the requested hourly
rates below.

### 6.2.2.1.  Law Offices of Stephan C. Volker

Volker is a 1974 graduate of U.C. Davis School of Law, associate attorney
Dent is a 2002 graduate of U.C. Berkeley School of Law, associate attorney Harris
is a 2003 graduate of U.C. Davis School of Law, law clerk Moffitt is a 2004
graduate of U.C. Berkeley School of Law, law clerk Riddle is a 2004 graduate of
U.C. Berkeley School of Law, and Yundt is a third-year student at University of
San Francisco School of Law.

Volker has 30 years' experience practicing environmental law in
California.  CARE submits that the market value of Volker's services is between
$400 and $500 per hour, but requests an award of $400 per hour for work
performed in 2004.  CARE also asserts that the 2004 hourly rates of $225
requested for Harris, $275 for Dent, $120 for law clerks Moffit and Yundt, and
$90 for law clerk Riddle, are all within the current market range for their
respective levels of experience.

We previously awarded an hourly rate of $250 for Volker for work
performed in both 2002 and 2003.[14]  With an 8% upward adjustment, consistent
with Resolution ALJ-184, we find an hourly rate of $270 for Volker for work
performed in 2004 is reasonable.  CARE has not presented sufficient evidence to
justify an increase above this amount.

We previously have not awarded hourly rates for Dent and Harris.  For
comparison, we consider the rates awarded in other cases to attorneys with
comparable experience.  In D.05-04-049, we awarded $190 per hour rates for

_____
[14] D.05-02-003 and D.03-01-058.

A.02-09-043 ALJ/CFT/jva

junior associates for work performed in their fifth year of experience, $180 for work performed in their fourth year of experience, and $170 for work performed in the second and third year of experience for the years 2001 through 2004. In other cases, we have awarded higher hourly rates to attorneys who have recently graduated from law school. For example, in D.04-08-025, we awarded attorney Bonham, who had practiced law since 2000, an hourly rate of $185 for her work in 2001, $195 for 2002, and $220 for 2003. In D.04-02-026, we granted an hourly rate of $175 per hour to attorney Schue for work performed in her third year of legal practice in 2003. In addition, in D.04-05-050 and D.04-05-048, we awarded an hourly rate of $190 to attorney Edington of TURN for work performed in 2003, which was his first year of legal practice.

We will grant Dent an hourly rate of $190 for her work as a second year associate in 2004. We base this hourly rate on an average of the hourly rates previously awarded to attorneys Bonham and Schue.

We will grant Harris an hourly rate of $190 for work performed as a first year associate in 2004. This rate is consistent with the amount awarded to first year attorneys employed by TURN in D.04-05-050 and D.04-05-048.

We also previously have not addressed hourly rates for law clerks Moffitt, Riddle, and Yundt. In D.03-05-065, we granted an hourly rate of $95 for work performed by law clerk Goodson in 2002, during the summer between her second and third years of law school. Based on D.03-05-065, the requested hourly rate of $90 for law clerk Riddle, who graduated from law school in 2004, for work performed in 2004 is reasonable. Law clerk Moffitt is a law school graduate, and Yundt a third-year law student. The requested hourly rate of $120 for Moffitt and Yundt is overly high, and instead we grant them an hourly rate of $105.

A.02-09-043 ALJ/CFT/jva

### 6.2.2.2.  Gabrielli Law Office

CARE requests an hourly rate of $300 for attorney Gabrielli for work performed in 2003-04. We previously have not established an hourly rate for Gabrielli, who has practiced law since 1979.

CARE has not provided detailed information regarding Gabrielli's qualifications and experience that would be helpful in establishing an hourly rate. In D.05-06-024, we awarded attorney Beckman, a senior attorney at NRDC, who had been practicing law for 15 years and had extensive environmental law experience, an hourly rate of $275 for work performed in 2002, 2003, and 2004. In D.04-05-010, we awarded attorney Spellicsy, the former general counsel for the Planning and Conservation League, who had 18 years of legal experience, an hourly rate of $250 for work performed in 2002. Although Gabrielli has more years in legal practice than either Spellicsy or Beckman, he appears not to have substantial experience practicing before the Commission and has not demonstrated extensive subject matter expertise that would justify a higher hourly rate. Moreover, although Gabrielli assisted CARE with motions, prepared CARE's testimony, and advised CARE throughout the hearing on strategy, testimony and cross-examination, Gabrielli did not appear at the hearing. Based on his limited role in the litigation, we award Gabrielli an hourly rate of $250 for his work in 2003, and $270 for 2004. The latter rate is the same that we award Volker for 2004 work.

### 6.2.2.3.  Francke

CARE requests an hourly rate of $300 for Francke, general counsel and founder of Californians Aware, a nonprofit corporation which supports open government, free speech and freedom of the press. We previously have not established an hourly rate for Francke.

- 63 -

A.02-09-043  ALJ/CFT/jva

Francke graduated from law school in 1979.  Before founding Californians Aware, he was legal counsel for the California Newspaper Publishers Association from 1980 to 1990 and served as Executive Director and General Counsel of the California First Amendment Coalition from 1990-2004.  He has previously taught courses on media law at Stanford University and served on the Task Force on Privacy and Public Access, appointed to advise the standing committee on court technology at the California Judicial Council from 1996-97.  He is also a former member of the Advisory Committee for the National Center for Courts and the Media at the University of Nevada, Reno.  Based on Francke's background, qualifications, and experience, we find that an hourly rate of $270 is reasonable for the brief consultation Franke provided to CARE in 2004.

### 6.2.2.4.  Boyd

CARE requests a rate of $150 per hour for Boyd, CARE's President, and states it is reasonable and reflects the market value of his unique contributions to the proceeding.  We previously have not established an hourly rate for Boyd.

Boyd has a Bachelor's degree in physics, and has worked as an engineer from 1982 to 2002.  In this proceeding, he acted more as an advocate for the Bayview Hunters Point community than as an engineer.

In D.04-09-050, we granted an hourly rate of $100 per hour for Rochelle Becker, a policy expert and advocate for San Luis Obispo Mothers for Peace, based on her contributions to D.04-05-055, PG&E's Test Year 2003 General Rate Case.  Becker holds a business degree and has more than 20 years of experience representing San Luis Obispo Mothers for Peace in Commission and other administrative agency proceedings and attending local meetings on nuclear safety issues.  We believe that Boyd's role as a community advocate in this case is roughly comparable to that of Becker's participation compensated in

- 64 -

A.02-09-043 ALJ/CFT/jva

D.04-05-055.  Based on the hourly rate of $100 previously awarded to Becker for work performed in 2001-2004, we believe that an hourly rate of $100 for Boyd's work is appropriate for 2003 and 2004.

### 6.2.2.5.  Brown

CARE requests an hourly rate of $125 for Brown, a CARE community representative in Bayview Hunters Point.  We previously have not established an hourly rate for Brown.

Brown attended San Francisco City College.  He moved to Bayview Hunters Point in 1996 and has been a community activist and advocate there since 1997.

Our previous decisions provide limited guidance regarding an appropriate hourly rate for community activists or advocates with Brown's experience.  In D.04-09-050, we awarded San Luis Obispo Mothers for Peace hourly rates of $35 per hour for time spent by Zamek, Von Ruden, and Rafferty for research and $50 per hour for time spent by citizens Wagner and Schumann to prepare their declarations.  We noted that each of these individuals had several years of experience working with San Luis Obispo Mothers for Peace or other local community organizations and that these hourly rates were less than those commonly awarded to recent college graduates without any experience.  Based on D.04-09-050, we find that an hourly rate of $50 for Brown is reasonable for 2003 and 2004.

### 6.2.2.6.  Smallwood, Powers, and Sarvey

CARE maintains the $200/hour rate requested for Smallwood, Powers, and Sarvey is reasonable and within the market range for persons with their experience.  We previously have not established hourly rates for them.  CARE

A.02-09-043 ALJ/CFT/jva

did not provide information regarding hourly rates awarded to other professionals with comparable experience.

Smallwood has Ph.D. and M.S. degrees in Ecology, and a B.S. in anthropology. He has been a Senior Ecologist with BioResource Consultants since 1999, and a System Ecologist with the Institute for Sustainable Development since 1995. He is also a part-time faculty member at California State University at Sacramento, and has taught courses in contemporary environmental issues, natural resources conservation, mammalogy, behavioral ecology, and ornithology. He has published in his field and has given public presentations of research results at professional meetings.

Smallwood's background, qualifications, and experience are similar to those of hydrologist Purkey and biologist Trush, both of whom were awarded an hourly rate of $200 for work performed in 2002 in D.04-08-025. Like Smallwood, Purkey and Trush both hold M.S. and Ph.D. degrees. Purkey is a senior hydrologist for the National Heritage Institute. Trush is an adjunct professor at the Fisheries Department at California State University at Humboldt, and president of a consulting firm that specializes in evaluation of the downstream impacts of dams and the planning and implementation of river restoration plans. Based on the $200 hourly rates awarded to Trush and Purkey for work performed in 2002, the requested hourly rate of $200 for Smallwood for work performed in 2003 and 2004 is reasonable, and we approve it here.

Powers holds a B.S. degree in mechanical engineering and a masters degree in public health – environmental sciences. He is a registered professional mechanical engineer in California. Since 1994, he has worked as a consultant through Powers Engineering in San Diego. He has approximately 20 years of experience in his field.

- 66 -

A.02-09-043 ALJ/CFT/jva

Powers' background, qualifications, and experience are similar to those of engineer Frech, who holds a B.S. degree in mechanical engineering and an advanced degree, and engineer Frandsen, who holds a B.S. degree in mechanical engineer and an M.B.A., is a licensed professional environmental engineer, and has over 15 years of experience in his field. In D.02-11-019, we granted an hourly rate of $180 to engineer Frech for work performed in 2000-2002. We have also approved the requested hourly rate of $150 for Frandsen for his work on behalf of 280 Citizens in this proceeding.

In view of the hourly rate of $180 awarded to engineer Frech for his work in 2002, we find that the requested hourly rate of $200 for Powers for work performed in 2003 is excessive. An hourly rate of $185 is reasonable for Powers for 2003.

Sarvey holds a bachelor's degree in business administration and an M.B.A. from California State University at Hayward. He has worked with CARE on a number of energy-related projects before the California Energy Commission from 2001 to 2004. He also served as a member of the Advisory Board for the San Joaquin Valley Air Pollution Control district in 2000 and 2001.

In D.04-05-010, we granted an hourly rate of $110 to Tim McRae, Director of Special Projects for the Planning and Conservation League in 2003 and 2004. McRae holds both a bachelors and a masters' degree and at that time had approximately four years of experience as an advocate. We stated that McRae's background, qualifications, and experience were comparable to those of Devra Bachrach, a staff scientist at NRDC, to whom we had previously awarded an hourly rate of $100 for his work in R.02-10-001 in 2003. Bachrach also holds a bachelors and an advanced degree and at that time had approximately four years of experience.

- 67 -

A.02-09-043 ALJ/CFT/jva

Sarvey's background, qualifications, and experience are comparable to those of McRae and Bachrach. We therefore find that the requested hourly rate of $200 for Sarvey is unreasonably high and reduce his hourly rate for work performed in 2004 to $110 per hour.[15]

### 6.2.3. Expenses

After adjustment for double-counted expenses, CARE requests compensation for expenses totaling $991.80, including copying, postage, travel, and other expenses, as detailed in Table 6. We remove $111.54 of expenses related to CARE's February 2004 site visit. We also remove $53.96 spent on lunches during the evidentiary hearings, since we do not normally compensate such expenses, and because we do not award compensation for Brown's attendance at the hearings. With these adjustments, CARE's expenses are commensurate with the work performed. We find the remaining $826.30 reasonable.

### 6.3.   WEM's Request

WEM's initial request for compensation totaled $56,988.20. In its April 1, 2005 supplement, WEM requests an additional $48,663, stating its total compensation request is $105,651.20. Correcting for computational errors, we calculate that WEM's request at $106,325.70, as follows:

---

[15] We note that this hourly rate is also more consistent with the $100 hourly rate previously awarded to Becker of San Luis Obispo Mothers for Peace in D.04-09-050. Although Sarvey holds an advanced degree and Becker has only a bachelor's degree, Becker has at least 20 years of experience in representing Mothers for Peace in Commission and other administrative proceedings, as compared with Sarvey's three years of experience working with CARE on issues before the California Energy Commission.

A.02-09-043  ALJ/CFT/jva

## Table 7 `

## WEM Compensation Request

|  | Year | Rate | Hours | Total |
|---|---|---|---|---|
| **INITIAL REQUEST** | | | | |
| Professional Services | | | | |
| Barbara George | 2003 | $150 | 91.75 | $ 13,762.50 |
| " | 2004 | 150 | 256.00 | 38,400.00 |
| | | | | |
| **Travel and Intervenor Compensation** | | | | |
| Barbara George | 2003 | 75 | 6.25 | 468.75 |
| " | 2004 | 75 | 42.75 | 3,206.25 |
| | | | | |
| **Expenses** | | | | |
| Copying | | | | 857.57 |
| Postage | | | | 160.02 |
| Travel expenses | | | | 208.11 |
| Subtotal expenses | | | | 1,225.70 |
| | | | | |
| Total Initial Request | | | | $ 57,063.20 |
| | | | | |
| **SUPPLEMENTAL REQUEST** | | | | |
| **Professional Services** | | | | |
| Barbara George | 2003 | 150 | 121.75 | 18,262.50 |
| Maurice Campbell | 2003 | 200 | 155.00 | 31,000.00 |
| | | | | |
| Total Supplemental Request | | | | $ 49,262.50 |
| | | | | |
| **TOTAL** | | | | **$106,325.70** |

WEM did not quantify the benefits of its participation to ratepayers. As explained in Section 5.3, WEM's participation helped clarify the record regarding the impact of the Jefferson-Martin project on the load serving capability of the transmission system. This enhancement of the record assisted the Commission in evaluating need for the Jefferson-Martin project and, thus, made a substantial contribution to D.04-08-046. It is difficult to assign specific ratepayer savings to

A.02-09-043 ALJ/CFT/jva

WEM's contribution in this proceeding. Nonetheless, it is clear that ratepayers have benefited from WEM's participation because it assisted the Commission in evaluating need for the Jefferson-Martin project. The Commission finds that WEM's participation in this proceeding has been productive.

### 6.3.1. Hours Requested

Barbara George, Executive Director of WEM, submitted testimony, cross-examined other parties' witnesses, and filed briefs in this proceeding. The ALJ denied a PG&E motion to strike George's testimony, and her testimony was received into evidence. George was not cross-examined.

In Section 5.3, we find that WEM made a significant contribution to D.04-08-046 in that WEM's participation assisted the Commission in evaluating need for the Jefferson-Martin project, but that WEM did not make a substantial contribution with respect to energy efficiency, renewable energy, project costs, or its unsuccessful motion to reopen the record. WEM's compensation request provides a daily breakdown of George's hours with a brief description of each activity. While WEM's request does not allocate the claimed hours among the issues addressed in WEM's showings, its supporting documentation provides sufficient detail for us to determine an appropriate amount of compensation in light of WEM's limited contribution to D.04-08-046.

### 6.3.1.1.  WEM Motion to Reopen the Record

Based on our review of WEM's submission, we remove 15.25 hours of George's time in 2004, including time reviewing an ISO study for the Large Core subgroup, as related to WEM's unsuccessful motion to reopen the record.

A.02-09-043 ALJ/CFT/jva

### 6.3.1.2. Time Spent on Compensation Issues

WEM identifies that George spent 25.25 hours drafting and filing WEM's intervenor compensation request. Based on George's daily records, we allocate an additional hour of George's time in 2003 as an estimate of the time she spent preparing the NOI. With that adjustment, we award compensation for the 26.25 hours George spent on compensation issues.

### 6.3.1.3. Travel

WEM requests compensation for 24.25 hours of travel time for George. Consistent with D.05-01-007, we do not compensate WEM for travel undertaken to file documents, when a messenger service would have been more efficient. After removing 2.25 hours claimed for this purpose, we find the remaining 22 hours of George's travel time reasonable.

### 6.3.1.4. Remainder of November 1, 2004 Compensation Request

In its initial request, WEM seeks compensation for 331.5 hours of George's time in addition to hours addressed in the two preceding subsections. We must determine how much of this time was associated with WEM's substantial contribution to the Commission's assessment of need for the Jefferson-Martin project.

WEM's primary concern in this proceeding related to transmission constraints that could reduce the ability of the Jefferson-Martin project to increase the load serving capability of the transmission system in the area. While WEM did not allocate its time and costs among issues, it is clear that the bulk of George's time was devoted to this topic. We use our discretion to estimate that George spent 80 hours on issues on which WEM did not substantially contribute, namely, energy efficiency, renewable energy, and project costs. We remove these

- 71 -

A.02-09-043 ALJ/CFT/jva

80 hours and caution WEM that we may make larger disallowances in the future if it again fails to allocate its time and costs among issues.

Regarding the remaining 251.5 hours, we share some of PG&E's concerns regarding the efficiency of WEM's participation in this proceeding. George's cross-examination of other parties' witnesses was repetitive and inefficient, even with repeated curtailments by the ALJ. While George's efforts made a substantial contribution to D.04-08-046, much of the useful information obtained through cross-examination could have been elicited more efficiently through discovery or other means outside of the hearing room. Much of the lengthy cross-examination appears to have occurred due to George's misunderstandings of PG&E and ISO transmission studies and how those analyses had been refined over time. In addition to inefficient cross-examination, George's confusion regarding the PG&E and ISO analyses was reflected in her testimony and briefs. We reduce George's time by 50 hours to reflect the inefficiency of George's presentation. We find reasonable the remaining 201.5 hours of George's time submitted in WEM's November 1, 2004 compensation request.

### 6.3.1.5.  April 1, 2005 Supplemental Request for Compensation

WEM's supplement seeks compensation for an additional 121.75 hours of George's time and for 155 hours for Campbell, whom WEM characterizes as a technical consultant for WEM.[16] WEM states that the supplemental request for George represents time that was submitted in R.01-08-028, an energy efficiency rulemaking, but for which the Commission denied compensation in D.05-01-007.

---

[16] In time records attached to the April 1, 2005 supplemental request, George refers to Campbell as a community member. Campbell's statement of qualifications indicates that he is a community activist. Campbell has an M.B.A. and prior work experience in the computer industry.

- 72 -

A.02-09-043  ALJ/CFT/jva

WEM previously had not requested compensation for Campbell in either R.01-08-028 or this proceeding.  WEM's supplemental request provides a daily breakdown of George's and Campbell's hours included in the request, with a brief description of each activity.

In the supplement, WEM describes its work during 2003.  WEM states that it "had its hands full" with the energy efficiency rulemaking and, while interested in the Jefferson-Martin project, "we still did not feel we could handle another proceeding" (Third Supplement Request at 8).  WEM describes that it held two workshops[17] in fall 2003 "to train community members how to intervene at the [Commission]" and that George "discussed the Jefferson Martin proceeding as an example of a proceeding in which community members could intervene."  WEM describes that Lynne Brown, Jesse Mason, and others attended the workshops and expressed a desire to have community representation in the Jefferson-Martin proceeding.  WEM states that it agreed to intervene with Brown as its client.  After Brown decided to work with CARE, Mason and his sister Dorothy Edwards became WEM's clients.

WEM asserts that its efforts submitted for compensation in R.01-08-028 were also applicable to the Jefferson-Martin project but that WEM did not include those hours in its initial Jefferson-Martin compensation request to avoid double-billing.  WEM explains that, after D.05-01-007 denied compensation for WEM's time subsequent to D.03-04-055, WEM submitted these hours for George, as well as Campbell's hours, in its third supplement in this proceeding.

Much of George's time for which compensation was denied in R.01-08-028 involved contacting community members and others with regard to community

---

[17] WEM requests compensation for these workshops, which George's time sheets characterize as environmental justice workshops.

A.02-09-043  ALJ/CFT/jva

efforts to close the Hunters Point power plant. In D.05-01-007, we found that WEM's references to the pilot Peak Energy Program in its time entries appeared to be an effort to connect general community activism with respect to the power plant to the energy efficiency proceeding. We found the connection indirect at best and denied compensation. We commented that several of WEM's time entries reflected work related to the Jefferson-Martin project and that such work was not compensable in the energy efficiency rulemaking.[18]

WEM has not established that its time submitted in the third supplement assisted in its contribution in this proceeding. As D.05-01-007 notes, much of George's time now before us in WEM's third supplement was related to community organizing to close the Hunters Point power plant. The connection of such activities to the Jefferson-Martin proceeding is even more tenuous than to the energy efficiency rulemaking, since at that time WEM was not considering participation in this proceeding. We find that such activities did not assist in WEM's substantial contribution in this proceeding. In addition, to the extent hours in the supplement were related to energy efficiency, they are not compensable in this proceeding since WEM did not make a substantial contribution with respect to the inclusion of energy efficiency in assessing need for the Jefferson-Martin project.

We find that none of the hours in WEM's supplemental request assisted in WEM's clarification of the record in this proceeding regarding the load serving capability of the transmission system. In the course of activities aimed at hastening closure of the Hunters Point plant, WEM attended meetings in 2003 at which transmission issues and PG&E's plans to pursue the Jefferson-Martin

---

[18] In its third supplement, WEM mischaracterizes D.05-01-007 as determining that all of the hours rejected in that decision were applicable to the Jefferson-Martin project.

A.02-09-043 ALJ/CFT/jva

project were discussed. WEM became aware of the relevance of transmission constraints and the possible contribution that the Jefferson-Martin line could make toward closure of the Hunters Point plant. However, as WEM acknowledges, WEM viewed its activities during that time as related primarily to energy efficiency and closure of the Hunters Point plant. The submitted time records confirm that only after WEM decided to intervene in the Jefferson-Martin proceeding did George begin to review documents specific to this proceeding. That time was included in WEM's initial compensation request, which we assess in the previous subsection. The fact that WEM became aware of transmission issues and discussed the Jefferson-Martin project at a workshop earlier in 2003 is not sufficient to find that those hours assisted in WEM's substantial contribution in this proceeding.

WEM did not mention Campbell in any of its filings in this proceeding prior to the third supplemental request.[19] Campbell's time records indicate that his activities focused primarily on energy efficiency and environmental justice issues, with some attention paid to transmission issues relevant to closure of the Hunters Point plant and brief and peripheral attention paid to Jefferson-Martin. On August 11, 2003, he drafted a Community First Coalition (CFC) position on San Francisco energy issues, including Hunters Point, Jefferson-Martin, and San Francisco's proposed combustion turbines. He attended a CFC meeting on September 26, 2003 at which, among other things, the Jefferson-Martin project was discussed. Campbell briefly reviewed the Jefferson-Martin EIR on-line on October 16, 2003 and forwarded the Jefferson-Martin application and PEA to George on November 11, 2003. Campbell's hours submitted in the supplement

_____

[19] We note that WEM could have included Campbell's hours in its initial compensation request in this proceeding without "double billing" with its then-pending intervenor compensation request in R.01-08-028.

A.02-09-043 ALJ/CFT/jva

end in early December 2003. George's time records do not indicate that she conferred with Campbell in developing WEM's position in this proceeding. We find that Campbell's and George's time records do not support WEM's assertion that Campbell's efforts assisted in WEM's contribution to D.04-08-046. In summary, we conclude that none of George's and Campbell's time included in WEM's third supplemental request assisted in WEM in its substantial contribution to D.04-08-046.

### 6.3.2. Hourly Rates

WEM requests compensation for George at $150 per hour in 2003 and 2004. WEM claims half that rate for travel related to the proceeding and for preparation of its intervenor compensation request. We previously approved this same rate for George in D.05-01-007, and adopt it here for both years.

### 6.3.3. Expenses

WEM requests compensation for expenses totaling $1,225.70, including copying, postage, and travel expenses, as detailed in Table 7. WEM's reported expenses are commensurate with the work performed and we accept them as reasonable. We note that WEM submits bills for four fuel purchases, which we allow in this instance. We prefer to compensate automobile usage at the standard federal rate for mileage and instruct WEM that any future intervenor compensation requests should be consistent with this practice.

## 7. Awards

As set forth in the tables below, we award $718,501.61 to 280 Citizens, $126,713.40 to CARE, and $35,125.70 to WEM.

### Table 8

**Compensation Awarded to 280 Citizens**

| Attorneys | Year | Rate | Hours | Total |
|-----------|------|------|-------|-------|
| O'Neill | 2002 | $315.00 | 9.50 | $  2,992.50 |

A.02-09-043  ALJ/CFT/jva

| | | | | |
|---|---|---|---|---|
| O'Neill | 2003 | 435.00 | 110.82 | 48,206.70 |
| O'Neill | 2004 | 470.00 | 336.00 | 157,920.00 |
| Hilen | 2003 | 305.00 | 238.27 | 72,672.35 |
| Hilen | 2004 | 315.00 | 374.06 | 117,828.90 |
| Gray | 2003 | 285.00 | 196.98 | 56,139.30 |
| Gray | 2004 | 310.00 | 166.07 | 51,481.70 |
| **Paralegals** | | | | |
| Nielsen | 2003 | 145.00 | 6.10 | 884.50 |
| Nielsen | 2004 | 155.00 | 14.19 | 2,199.45 |
| Pau | 2003 | 135.00 | 15.65 | 2,112.75 |
| Pau | 2004 | 145.00 | 3.67 | 532.15 |
| **Experts** | | | | |
| Stephenson | 2003 | 200.00 | 30.67 | 6,134.00 |
| Stephenson | 2004 | 210.00 | 39.67 | 8,330.70 |
| Tassainer | 2003 | 200.00 | 168.00 | 33,600.00 |
| Tassainer | 2004 | 210.00 | 83.50 | 17,535.00 |
| Frandsen | 2003-2004 | 150.00 | 55.50 | 8,325.00 |
| Vance | 2003-2004 | 135.00 | 45.05 | 6,081.75 |
| Murphy | 2003 | 210.00 | 6.00 | 1,260.00 |
| Murphy | 2004 | 220.00 | 28.00 | 6,160.00 |
| Shields | 2003-2004 | 225.00 | 280.50 | 63,112.50 |
| **Intervenor Compensation and Travel Time** | | | | |
| O'Neill | 2002 | 157.50 | 0.30 | 47.25 |
| O'Neill | 2003 | 217.50 | 7.10 | 1,544.25 |
| O'Neill | 2004 | 235.00 | 19.20 | 4,512.00 |
| Hilen | 2003 | 152.50 | 4.10 | 625.25 |
| Hilen | 2004 | 157.50 | 48.80 | 7,686.00 |
| Gray | 2003 | 142.50 | 20.20 | 2,878.50 |
| Gray | 2004 | 155.00 | 8.00 | 1,240.00 |
| Pau | 2003 | 67.50 | 0.20 | 13.50 |
| Tassainer | 2003 | 100.00 | 24.00 | 2,400.00 |
| Tassainer | 2004 | 105.00 | 16.50 | 1,732.50 |
| **Subtotal** | | | | **$ 686,169.50** |
| Expenses | | | | 32,332.11 |
| **TOTAL** | | | | **$ 718,501.61** |

A.02-09-043  ALJ/CFT/jva

## Table 9

## Compensation Awarded to CARE

| Attorneys | Year | Rate | Hours | Total |
|---|---|---|---|---|
| Gabrielli | 2003 | $250.00 | 29.80 | $  7,450.00 |
| Gabrielli | 2004 | 270.00 | 52.86 | 14,272.20 |
| Volker | 2004 | 270.00 | 39.92 | 10,778.40 |
| Harris | 2004 | 190.00 | 81.92 | 15,564.80 |
| Dent | 2004 | 190.00 | 7.78 | 1,478.20 |
| Franke | 2004 | 270.00 | 0.50 | 135.00 |
| **Law Clerks** | | | | |
| Moffitt | 2004 | 105.00 | 23.60 | 2,478.00 |
| Riddle | 2004 | 90.00 | 3.20 | 288.00 |
| Yundt | 2004 | 105.00 | 12.80 | 1,344.00 |
| **CARE Representatives** | | | | |
| Boyd | 2003-2004 | 100.00 | 299.75 | 29,975.00 |
| Brown | 2003-2004 | 50.00 | 65.00 | 3,250.00 |
| **Experts** | | | | |
| Smallwood | 2003-2004 | 200.00 | 108.00 | 21,600.00 |
| Powers | 2003 | 185.00 | 10.50 | 1,942.50 |
| Sarvey | 2004 | 110.00 | 77.40 | 8,514.00 |
| **Travel and Intervenor Compensation** | | | | |
| Volker | 2004 | 135.00 | 10.50 | 1,417.50 |
| Gabrielli | 2003 | 125.00 | 1.10 | 137.50 |
| Gabrielli | 2004 | 135.00 | 15.80 | 2,133.00 |
| Harris | 2004 | 95.00 | 10.70 | 1,016.50 |
| Boyd | 2003-2004 | 50.00 | 36.25 | 1,812.50 |
| Smallwood | 2004 | 100.00 | 3.00 | 300.00 |
| **Subtotal** | | | | **$125,887.10** |
| Expenses | | | | $      826.30 |
| **TOTAL** | | | | **$ 126,713.40** |

A.02-09-043  ALJ/CFT/jva

### Table 10

### Compensation Awarded to WEM

| | Year | Rate | Hours | Total |
|---|---|---|---|---|
| George | 2003 | $150.00 | 55.20 | $ 8,280.00 |
| George | 2004 | 150.00 | 146.30 | 21,945.00 |
| **Travel and Intervenor Compensation** | | | | |
| George | 2003 | 75 | 6.25 | 468.75 |
| George | 2004 | 75 | 42.75 | 3,206.25 |
| Expenses | | | | $ 1,225.70 |
| **TOTAL** | | | | **$ 35,125.70** |

Consistent with previous Commission decisions, we order that interest be paid on the award amounts (at the rate earned on prime, three-month commercial paper, as reported in Federal Reserve Statistical Release H.15) commencing the 75th day after each intervenor filed its compensation request and continuing until PG&E makes full payment of the award.

We remind all intervenors that Commission staff may audit their records related to this award and that intervenors must make and retain adequate accounting and other documentation to support all claims for intervenor compensation. Each intervenor's records should identify specific issues for which it requested compensation, the actual time spent by each employee or consultant, the applicable hourly rate, fees paid to consultants, and any other costs for which compensation was claimed.

A.02-09-043  ALJ/CFT/jva

### 7.  Assignment of Proceeding

Dian M. Grueneich is the Assigned Commissioner, and Charlotte F. TerKeurst is the assigned ALJ in this proceeding.

### 8.  Comments on Draft Decision

This is an intervenor compensation matter.  Pursuant to Rule 77.7(f)(6) of the Commission's Rules of Practice and Procedure, the otherwise applicable 30-day period for public review and comment is waived.

### Findings of Fact

1.  280 Citizens, CARE, and WEM have met all the procedural requirements necessary to claim compensation in this proceeding.

2.  280 Citizens, CARE, and WEM each made a substantial contribution to D.04-08-046, as described herein.

3.  The requested hourly rates for attorneys and experts, and related expenses, for 280 Citizens, CARE, and WEM, as adjusted herein, are reasonable when compared to the market rates for persons with similar training and experience.

4.  The total of the reasonable compensation for 280 Citizens is $718,501.61.

5.  The total of the reasonable compensation for CARE is $126,713.40.

6.  The total of the reasonable compensation for WEM is $35,125.70.

7.  The appendix to this decision summarizes today's awards.

### Conclusions of Law

1.  280 Citizens, CARE, and WEM have fulfilled the requirements of Pub. Util. Code §§ 1801-1812, which govern awards of intervenor compensation, and are entitled to intervenor compensation for their claimed compensation, as adjusted herein, incurred in making substantial contributions to D.04-08-046.

A.02-09-043  ALJ/CFT/jva

2. 280 Citizens should be awarded $718,501.61 for its contribution to D.04-08-046.

3. CARE should be awarded $126,713.40 for its contribution to D.04-08-046.

4. WEM should be awarded $35,125.70 for its contribution to D.04-08-046.

5. Public review and comment regarding today's decision should be waived.

6. This order should be effective today so that 280 Citizens, CARE, and WEM may be compensated without further delay.

7. This proceeding should be closed.

## O R D E R

**IT IS ORDERED** that:

1. 280 Corridor Concerned Citizens (280 Citizens) is awarded $718,501.61 as compensation for its substantial contributions to Decision (D.) 04-08-046.

2. CAlifornians for Renewable Energy (CARE) is awarded $126,713.40 for its substantial contributions to D.04-08-046.

3. Women's Energy Matters (WEM) is awarded $35,125.70 for its substantial contributions to D.04-08-046.

4. Within 30 days of the effective date of this decision, Pacific Gas and Electric Company shall pay 280 Citizens, CARE, and WEM the respective awards. Payment of the award shall include interest at the rate earned on prime, three-month commercial paper as reported in Federal Reserve Statistical Release H.15., beginning December 21, 2004 for CARE, and January 5, 2005 for 280 Citizens and WEM, the 75th day after the filing date of each party's request for compensation, and continuing until full payment is made.

- 81 -

A.02-09-043  ALJ/CFT/jva

5.  Public review and comment regarding today's decision is waived.

6.  Application 02-09-043 is closed.

This order is effective today.

Dated April 13, 2006, at San Francisco, California.

MICHAEL R. PEEVEY
President
GEOFFREY F. BROWN
DIAN M. GRUENEICH
JOHN A. BOHN
RACHELLE B. CHONG
Commissioners

A.02-09-043  ALJ/CFT/jva

# ' APPENDIX

## Compensation Decision Summary Information

| | | |
|---|---|---|
| **Compensation Decision:** | D.06-04-018 | |
| **Contribution Decision(s):** | D.04-08-046 | |
| **Proceeding(s):** | A.02-09-043 | |
| **Author:** | TerKeurst | |
| **Payer(s):** | Pacific Gas and Electric Company | |

## Intervenor Information

| Intervenor | Claim Date | Amount Requested | Amount Awarded | Multiplier? | Reason Change/Disallowance |
|---|---|---|---|---|---|
| 280 Citizens | 10/22/2004 | $1,034,755.13 | $718,501.61 | NO | Reductions in compensable hours, permitted expenses, travel time, and requested hourly rates |
| WEM | 10/22/2004 | $105,325.70 | $35,125.70 | NO | Reductions in compensable hours and travel time |
| CARE | 10/7/2004 | $254,960.13 | $126,713.40 | NO | Reductions in requested hourly rates and compensable hours |

## Advocate Information

| First Name | Last Name | Type | Intervenor | Hourly Fee Requested | Year Hourly Fee Requested | Hourly Fee Adopted |
|---|---|---|---|---|---|---|
| Ed | O'Neill | Attorney | 280 Citizens | $315 | 2002 | $315 |
| " | " | " | " | $435 | 2003 | $435 |
| | | | " | $470 | 2004 | $470 |
| Christopher | Hilen | Attorney | 280 Citizens | $330 | 2003 | $305 |
| " | " | " | " | $360 | 2004 | $315 |
| Jeffrey | Gray | Attorney | 280 Citizens | $285 | 2003 | $285 |
| " | " | " | " | $310 | 2004 | $310 |
| Barbara | Nielsen | Paralegal | 280 Citizens | $145 | 2003 | $145 |
| " | " | " | " | $155 | 2004 | $155 |
| Judy | Pau | Paralegal | 280 Citizens | $135 | 2003 | $135 |
| " | " | " | " | $145 | 2004 | $145 |

A.02-09-043 ALJ/CFT/jva

| First Name | Last Name | Type | Intervenor | Hourly Fee Requested | Year Hourly Fee Requested | Hourly Fee Adopted |
|---|---|---|---|---|---|---|
| William | Stephenson | Engineer | 280 Citizens | $225 | 2003 | $200 |
| " | " | " | " | $225 | 2004 | $210 |
| Gary | Tassainer | Engineer | 280 Citizens | $210 | 2003 | $200 |
| " | " | " | " | $210 | 2004 | $210 |
| Rick | Frandsen | Engineer | 280 Citizens | $150 | 2003 | $150 |
| " | " | " | " | $150 | 2004 | $150 |
| Lyle | Vance | Engineer | 280 Citizens | $135 | 2003 | $135 |
| " | " | " | " | $135 | 2004 | $135 |
| Dennis | Murphy | Biologist | 280 Citizens | $225 | 2003 | $210 |
| " | " | " | " | $225 | 2004 | $220 |
| Jeffery | Shields | Electricity Policy Expert | 280 Citizens | $225 | 2003 | $225 |
| " | " | " | " | $225 | 2004 | $225 |
| Stephan | Volker | Senior Attorney | CARE | $400 | 2004 | $270 |
| Gretchen | Dent | Attorney – 2nd Year Associate | CARE | $275 | 2004 | $190 |
| Joshua | Harris | Attorney – 1st Year Associate | CARE | $225 | 2004 | $190 |
| Melissa | Moffett | Law clerk | CARE | $120 | 2004 | $105 |
| Marnie | Riddle | Law Clerk | CARE | $90 | 2004 | $90 |
| Scott | Yundt | Law Clerk | CARE | $120 | 2004 | $105 |
| John | Gabrielli | Senior Attorney | CARE | $300 | 2003 | $250 |
| " | " | " | " | $300 | 2004 | $270 |
| Terry | Franke | Senior Attorney | CARE | $300 | 2004 | $300 |
| Michael | Boyd | Community Advocate | CARE | $150 | 2003-2004 | $100 |
| Lynne | Brown | Community Advocate | CARE | $125 | 2003-2004 | $50 |
| Shawn | Smallwood | Ecologist | CARE | $200 | 2003-2004 | $200 |
| Bill | Powers | Engineer | CARE | $200 | 2003 | $185 |
| Bob | Sarvey | Analyst | CARE | $200 | 2004 | $110 |
| David | Wright | Biologist | CARE | $200 | 2004 | $0 |
| Barbara | George | Community Advocate | Women's Energy Matters | $150 | 2003-2004 | $150 |
| Maurice | Campbell | " | " | $200 | 2003 | $0 |

A.02-09-043  ALJ/CFT/jva

**(END OF APPENDIX)**

1  STEPHAN C. VOLKER (CSB #63093)
   JOSHUA A.H. HARRIS (CSB #226898)
2  MARNIE E. RIDDLE (CSB #233732)
   LAW OFFICES OF STEPHAN C. VOLKER
3  436 14th Street, Suite 1300
   Oakland, California  94612
4  Tel:   (510) 496-0600
   Fax:   (510) 496-1366
5
   Attorneys for Intervenors
6  CAlifornians for Renewable Energy

ORIGINAL

*Received*

*APR 1 7 2006*

*Public Utilities Commission*
*Mailroom*

9              BEFORE THE PUBLIC UTILITIES COMMISSION
10                          OF THE
                     STATE OF CALIFORNIA

11      ADMINISTRATIVE LAW JUDGE CHARLOTTE F. TERKEURST, presiding.

12

13  Application for a Certificate of Public      )    **PETITION OF CALIFORNIANS FOR**
    Convenience and Necessity Authorizing the    )    **RENEWABLE ENERGY FOR**
    Construction of the Jefferson-Martin 230 kV  )    **MODIFICATION OF OPINION**
14  Transmission Project                         )    **GRANTING INTERVENOR**
                                                 )    **COMPENSATION (D.06-04-018) AND**
15                                               )    **SUPPORTING DECLARATION OF**
                                                 )    **COUNSEL**
16                                               )
                                                 )
17  _____    )    Application 02-09-043
                                                      Agenda I.D. No. 5446
18                                                    Commission Hearing: 4-13-06
                                                      Mailing Date:  4-14-06
19

20                          I.    INTRODUCTION

21          Californians for Renewal Energy ("CARE") requests, pursuant to Rule 47, one

22  modification to the Commission's Opinion Granting Intervenor Compensation ("Opinion")

23  (D.06-04-018, April 13, 2006).  The Opinion's assignment of an hourly rate of $270 to CARE's

24  lead counsel, Stephan C. Volker, rather than the requested (and unopposed) hourly rate of $400,

25  appears to be the result of either legal or factual error.

26          The Opinion's stated reason for reducing Mr. Volker's hourly rate to $270 is that this

27  Commission awarded Mr. Volker an hourly rate of $250 several years ago in a different

28  proceeding.  The basis of that previous hourly rate, however, was not that Mr. Volker's market

    rate was then $250.  Rather, the basis was that Mr. Volker's client, the Sierra Club, had, on April

1    4, 2000 and *prior to its retention of Mr. Volker*, filed a Notice of Intent to Claim Compensation

2    ("NOI") which capped its future counsel's hourly rate at $250. Therefore, notwithstanding that

3    Mr. Volker's actual market rate in 2000 already exceeded $300, the Sierra Club only sought

4    compensation at the rate stated in its NOI – $250.

5        Application of Public Utilities Code section 1806, which directs that "[t]he computation

6    of compensation awarded pursuant to Section 1804 shall take into consideration the market rates

7    paid for persons of comparable training and experience who offer similar services," requires that

8    Mr. Volker's time now be compensated at comparable market rates. As previously documented

9    by CARE and Mr. Volker, market rates for Mr. Volker, an environmental lawyer for over 30

10   years, are at least $400 per hour.

11       Accordingly, CARE respectfully petitions this Commission to modify the Opinion to

12   correct Mr. Volker's hourly rate from $270 to $400.

13                          **II. REQUESTED MODIFICATION**

14       CARE requests the following modifications to the Opinion:

15   | PAGE | LINE | REQUESTED MODIFICATION |
|------|------|------------------------|
| 2 | 8 | $126,713.40 should read $132,585.50 |
| 61 | 18-22 | Delete paragraph and substitute: |
|  |  | We previously awarded a requested hourly rate of $250 for Volker for work performed primarily in 2000 and 2001,[14] noting then that "attorney Volker . . . has been awarded attorney's fees at the hourly rate of $300 based on his extensive experience in the field of environmental litigation." D.03-01-058 at 7. Based on the undisputed evidence submitted by CARE, we find that Mr. Volker's hourly rate in 2004 was at least $400, and therefore approve his compensation at that level. |
| 76 | 23 | $126,713.40 should read $132,585.50 |
| 78 | 6 | $270.00 should read $400.00 |
| 78 | 6 | $10,778.40 should read $15,968.00 |
| 78 | 22 | $135.00 should read $200.00 |
| 78 | 22 | $1,417.50 should read $2,100.00 |
| 78 | 28 | $125,887.10 should read $131,759.20 |

| | | |
|---|---|---|
| 1 | 78 | 30 | $126,713.40 should read $132,585.50 |
| 2 | '81 | 3 | $126,713.40 should read $132,585.50 |
| 3 | 81 | 13 | $126,713.40 should read $132,585.50 |
| 4 | App. 1 | 21 | $126,713.40 should read $132,585.50 |
| 5 | App. 2 | 17 | $270.00 should read $400.00 |

6

7    **III.**    **PUBLIC UTILITIES CODE SECTION 1806 REQUIRES THIS COMMISSION TO TAKE INTO CONSIDERATION THE**
8                   **MARKET RATE PAID TO PERSONS OF COMPARABLE TRAINING AND EXPERIENCE WHO OFFER SIMILAR**
9                   **SERVICES TO THOSE OF MR. VOLKER.**

10      Public Utilities Code section 1806 directs in pertinent part that "[t]he computation of

11 compensation awarded pursuant to Section 1804 shall take into consideration the market rates

12 paid to persons of comparable training and experience who offer similar services." Thus, in

13 determining whether Mr. Volker should be compensated at the requested rate of $400 per hour,

14 this Commission must "take into consideration the market rates paid to persons of comparable

15 training and experience who offer similar services," as explained below.

16    **IV.**    **THE OPINION DOES NOT CONFORM TO PUBLIC UTILITIES CODE SECTION 1806.**

17

18      The Opinion should be modified to conform to section 1806's mandate. It should reflect

19 the undisputed evidence submitted by CARE establishing that the market value of Mr. Volker's

20 services in 2004 was at least $400 per hour. There is no contrary evidence. No party objected to

21 Mr. Volker's requested rate of $400. There is no evidence that Mr. Volker's 2004 market rate

22 was less than $400 per hour.

23      The stated basis for the Opinion's selection of a $270 hourly rate is the $250 rate awarded

24 for Mr. Volker's services in a separate proceeding where the Commission simply granted the rate

25 requested.[1] As explained below, that request did not reflect the market value of Mr. Volker's

26 services. Rather, it reflected the $250 rate set forth in the NOI that Mr. Volker's client had

27 _____

28      [1]Opinion at 61, footnote 14, citing D. 05-02-003 and D. 03-01-058.

1    submitted before retaining him.

2          Unless corrected, the Opinion creates an inequity at odds with section 1806.  For

3    example, the Opinion correctly awards compensation at the rate of $470 per hour to lead counsel

4    for intervenor 280 Citizens, Edward O'Neill, for work performed in 2004, the same year for

5    which compensation is sought for Mr. Volker's services.  Opinion at 38.  Mr. O'Neill received

6    his law degree in 1977 (three years after Mr. Volker), and has extensive relevant experience

7    yielding a market rate of $470.00.  Mr. Volker likewise has extensive relevant experience,

8    including over thirty years of specialized experience in administrative and environmental law,

9    and over forty published rulings in state and federal courts.  *See*, Request of Californians for

10   Renewable Energy for Award of Compensation and Supporting Declaration of Counsel filed

11   October 6, 2004 ("CARE's Fee Request") at 7:5-12, and Exhibit 1 hereto.  Yet the Opinion

12   compensates Mr. Volker at an hourly rate *$200.00 lower than Mr. O'Neill*.  Similarly, the

13   Opinion correctly awards hourly rates of $315 to attorney Christopher Hilen, and $310 to

14   attorney Jeffrey Gray, associate counsel for 280 Citizens, for work performed in 2004.  Opinion

15   at 39.  Although Mr. Hilen has about half as much experience – 15 years – as Mr. Volker, and

16   Mr. Gray, less than one-third (nine years), their approved rates are respectively $45 and $40

17   *higher* than the $270 awarded Mr. Volker.  *Id.* at 39 and 61.  CARE requests parity with these

18   awards, consistent with section 1806.

19   **V.     MR. VOLKER'S MARKET RATE IS AT LEAST $400 PER HOUR.**

20         In support of CARE's Fee Request, it submitted the Declaration of Stephan C. Volker

21   documenting the market value of his services.  Mr. Volker's declaration stated that he had "thirty

22   years' experience as a practicing environmental lawyer in California," and "[d]uring the past

23   three decades [had] actively participated, typically as the lead plaintiffs' attorney, in over forty

24   published cases in state and federal courts." 7:5-10; see also, Exhibit 1 hereto.  Mr. Volker

25   testified that he was "familiar with the market value of [his] services, based on declarations

26   submitted by knowledgeable attorneys in numerous attorney fee motions in other proceedings."

27   *Id.* at 7:10-11.  Mr. Volker testified that based thereon, "[t]he market value of my services is

28   between $400 and $500 per hour." *Id.* at 7:11-12.  Had any party questioned this evidence,

-4-

1   CARE would have submitted additional documentation of this rate, such as the San Francisco

2   Superior Court's award of $450 per hour for all of Mr. Volker's time in 2004 successfully

3   prosecuting the California Coastal Commission for violating environmental laws. Supporting

4   Declaration of Counsel, *infra*, at 7:7-11. *See also*, Exhibit 1 hereto.

5            There is simply no evidence in this proceeding that the market value of Mr. Volker's time

6   is less than $400. No party objected to CARE's Request for Compensation, and no evidence

7   contrary to Mr. Volker's testimony was submitted by any party. Accordingly, consistent with

8   section 1806, the Commission should modify the rate awarded for Mr. Volker's time to reflect

9   the market rates paid to persons of comparable training and experience who offer similar

10  services: at least $400 per hour.

11  **VI.     THIS COMMISSION'S PREVIOUS RATE FOR MR. VOLKER**
              **WAS CAPPED BY THE $250 HOURLY RATE SET FORTH IN**
12            **THE SIERRA CLUB'S NOI IN THAT CASE.**

13           The Opinion does not address Mr. Volker's testimony documenting his market rate of at

14  least $400 per hour. Opinion at 61. Instead, it awards $270 per hour based on the $250 hourly

15  rate awarded Mr. Volker in a previous proceeding (D. 05-02-003 and D. 03-01-058), "[w]ith an

16  8% upward adjustment." Opinion at 61, footnote 14. The Opinion's reliance on the rate in this

17  previous proceeding appears to reflect either legal or factual error, as explained below.

18           The Opinion relies upon the Commission's previous award of "an hourly rate of $250 for

19  Volker for work performed in both 2002 and 2003 in D. 05-02-003 and D. 03-01-058," decisions

20  awarding compensation in the matter of Application [No. 99-12-025] of Valencia Water

21  Company (U342-W) seeking approval of its updated water management program ("Valencia

22  proceeding"). Mr. Volker's client in that matter, Sierra Club, had submitted an NOI "currently

23  estimat[ing] that its attorney will [provide services] . . . at a proposed hourly rate of $250/hour"

24  on April 4, 2000. Supporting Declaration of Counsel, *infra*, at 7:17-25. Subsequently the Sierra

25  Club retained Mr. Volker to represent it in the Valencia proceeding, which involved two four-day

26  evidentiary hearings in the summers of 2000 and 2001, coupled with extensive briefing before

27  and after those evidentiary proceedings. *Id.* On December 14, 2000, this Commission, per the

28  Honorable Josiah L. Neeper, granted the Sierra Club's motion for acceptance of its late-filed

1   NOI. *Id.* Following the first phase of the Valencia proceeding, by Decision 03-01-058 dated

2   January 30, 2003, this Commission awarded $46,990.96 for the legal services provided by Mr.

3   Volker (and incidental costs). Noting that "attorney Volker . . . has been awarded attorney's fees

4   at the hourly rate of $300 based on his extensive experience in the field of environmental

5   litigation," this Commission "conclude[d] that based on Volker's experience, the requested

6   hourly rate of $250 for services provided in 2000 and 2001 is reasonable." D. 03-01-058 at 7.[2]

7           Thereafter, by Decision 05-02-003, dated February 10, 2005, this Commission granted

8   Sierra Club's Second Request for Intervenor Compensation, for legal services provided by Mr.

9   Volker subsequently in the Valencia proceeding. In D. 05-02-003, this Commission awarded

10  Sierra Club $4,074.18 in compensation for further services provided by Mr. Volker and his staff

11  primarily in 2002, based on the same hourly rate previously requested by Sierra Club, $250. *Id.*

12  at 18. Neither the Sierra Club nor Mr. Volker represented, nor did this Commission find, that the

13  market value of Mr. Volker's services at that time was no greater than $250 per hour. Rather, the

14  Commission found the converse, that in 2000 and 2001 Mr. Volker's market rate was *no less*

15  *than* $250. D. 03-01-058 at 9, ¶ 6, emphasis added.

16  **VII.   EVEN ASSUMING ERRONEOUSLY THAT MR. VOLKER'S MARKET
             RATE WAS ONLY $250 IN 2000 OR 2001, THE OPINION'S 8%**

17  **ADJUSTMENT IS NOT APPLIED CORRECTLY.**

18          Additionally, the Opinion's conclusion that the $250 hourly rate awarded in

19  D. 05-02-003 and D. 03-01-058 was for "work performed in both 2002 and 2003," is in error. As

20  this Commission noted in D. 03-01-058, that award was "for services provided in 2000 and

21  2001." D. 03-01-058 at 7. The much smaller award in D. 05-02-003 was for work performed

22  primarily in 2002. D. 05-02-003 at 19. Accordingly, even assuming, contrary to the facts and

23  law as outlined above, that the hourly rate awarded in the Valencia proceeding was based on Mr.

24  Volker's actual market rate, because the vast bulk of that work was performed in 2000 and 2001,

25  the Commission's 8% upward adjustment would yield an hourly rate of either $314.93 ($250

26

27          [2]The Opinion erroneously states that D. 03-01-058 "awarded an hourly rate of $250 for
        Volker for work performed in both 2002 and 2003." Opinion at 61. In fact, D. 03-01-058 awarded

28      Mr. Volker "the requested hourly rate of $250 for services provided in 2000 and 2001." D. 03-01-
        058 at 7.

1   increased by three years (from 2001 to 2004) times the permissible 8% annual increase) or

2   $340.12 ($250 increased by four years (from 2000 to 2004) times 8%).

3                              **VIII.   CONCLUSION**

4          For the foregoing reasons, CARE respectfully requests that this Court modify the hourly

5   rate adopted for Mr. Volker from $270 to $400 to reflect the actual market value of his services

6   in 2004, which is at least $400.

7   Dated:  April 15, 2006

8                                          Respectfully submitted,

9

10                              By: _____

11                                          Marnie E. Riddle
                                            Attorney for Intervenor Californians for
                                            Renewable Energy

12

13                  **SUPPORTING DECLARATION OF COUNSEL**

14          I, Stephan C. Volker, hereby declare:

15          1.      I am lead counsel for Intervenor Californians for Renewable Energy ("CARE") in

16   this proceeding, and have personal knowledge of the following matters.

17          2.      I was lead counsel for Intervenor Sierra Club in the matter Application [No. 99-

18   12-025] of Valencia Water Company (U342-W) seeking approval of its updated Water

19   Management Program ("Valencia proceeding") which resulted in this Commission's awards of

20   compensation for my services for the Sierra Club in D. 03-01-058 (January 30, 2003) and D. 05-

21   02-003 (February 10, 2005), and have personal knowledge of the compensation requests

22   submitted by the Sierra Club to this Commission in that proceeding.  The summary of and

23   excerpts from the Sierra Club's NOI and this Commission's fee rulings (D. 03-01-058 and

24   D. 05-02-003) in the Valencia proceeding set forth above are true and correct of my personal

25   knowledge.

26          3.      Annexed as Exhibit 1 hereto is a true and correct copy of my current resume,

27   which accurately summarizes my experience and expertise in the field of environmental litigation

28   over the past 32 years.

1        4.      Annexed as Exhibit 2 hereto is a true and correct copy of the Declaration of

2    Michael Traynor which was submitted in support of my most recent fee application, filed in

3    Marin County Superior Court on April 3, 2006.  In his Declaration, Mr. Traynor, an attorney with

4    45 years' experience practicing in San Francisco, testified that in his professional judgment, the

5    hourly rate sought for my services in that proceeding, $475 per hour for legal services performed

6    between 2004 and 2006, was "within, albeit at the low end of, the prevailing market rates in the

7    San Francisco Bay Area for attorneys with experience and qualifications similar to Mr. Volker

8    . . . ." Exhibit 2 hereto at 4:1-3.

9        5,      In October 19, 2005, the San Francisco Superior Court, per the Honorable James

10   L. Warren, approved an attorney fee award for my successful prosecution of an action under the

11   California Coastal Act against the California Coastal Commission which compensated me at the

12   hourly rate of $450 for the entire time I spent on the matter, 226.2 hours.  The bulk of this time

13   was expended in 2004.

14       I declare under penalty of perjury that the foregoing facts are true of my personal

15   knowledge, that I am competent to and if called would so testify, and that this declaration was

16   executed on April 15, 2006 in Oakland, California.

17

18   Stephan C. Volker

19

20

21

22

23

24

25

26

27

28

# EXHIBIT 1

STEPHAN C. VOLKER
JOSHUA A.H. HARRIS
MARNIE E. RIDDLE

Law Offices of
**STEPHAN C. VOLKER**
436 14ᵗʰ Street, Suite 1300
Oakland, California 94612-2717
Phone 510/496-0600 ❖ Fax 510/496-1366
E-MAIL: svolker@volkerlaw.com

File No. 100.027

## STEPHAN C. VOLKER

### Biographical Statement
### March 2006

Stephan C. Volker is proprietor of the Law Offices of Stephan C. Volker in Oakland, California. A 1974 graduate of Martin Luther King School of Law at the University of California at Davis, Mr. Volker is a member of the state and federal bars of California and Alaska and the United States Supreme Court bar.

Mr. Volker has litigated over 250 land use, forest management, endangered species, clean water, oil and gas, mining, agricultural preservation, river protection, and other environmental cases from Alaska to California since 1974. He has been the principal attorney in numerous cases to protect wilderness and wilderness candidate areas in Alaska, Montana, and California, including critical grizzly and wolf habitat in Montana's Rocky Mountain Front and Alaska's Chilkat River Valley. He has secured injunctions against logging along the Wild and Scenic Trinity, Salmon, and Eel Rivers in California, damming of the Dry Creek fork of the Russian River, residential development on the slopes of the Sierra Buttes, and human harassment of killer whales. He has forced numerous industrial polluters to pay for their illegal pollution, and secured the largest civil penalty ever awarded under the citizen suit provisions of the Clean Water Act, against Union Oil Company, for pollution of San Francisco Bay. He has also successfully prosecuted a number of cases to protect agricultural land and wildlife habitat from urban sprawl under California's Williamson Act, Environmental Quality Act, and Planning and Zoning laws; Washington's Growth Management Act and Shoreline Management Act; and other environmental laws.

Mr. Volker has also successfully defended the Tahoe Regional Planning Agency's and Marin County's jetski ordinances, protected Lake Tahoe from harmful marina developments and prevented unplanned urban development of the Lakes Basin near the Sierra Buttes. He protected Joshua Tree National Park from development of what would have been the world's largest landfill dump and the Marin Headlands from what would have been Marin County's largest hotel. He secured a substantial monetary settlement to redress oil pollution of wetlands adjacent to Suisun Bay. He won a landmark appellate ruling under the Urban Water Management Planning Act requiring urban water agencies to fully address contamination of groundwater supplies, and two precedent-setting rulings from the federal circuit court of appeals upholding the standing of cities to bring suits to protect environmental quality.

Mr. Volker's litigation has also led to the recent promulgation by EPA of urgently needed water quality standards for the San Francisco Bay/Sacramento-San Joaquin River Delta ecosystem, preparation of comprehensive management plans to protect the six Wild and Scenic Rivers within the Ozark National Forest, development of a comprehensive management plan for the North Cascades National Park and Lake Chelan National

Recreation Area. Protection of Puget Sound waters from salmon farm pollution, prevention of new water diversions that would dewater the Russian, Eel and South Fork American rivers and several High Sierra lakes, and comprehensive revision of the General Plans of El Dorado and Riverside Counties.

Mr. Volker's current docket includes litigation to prevent harmful gravel mining of the Russian River watershed, prevent overdrafting of groundwater underlying the Santa Clara River Valley, protect the Medicine Lake Highlands near Mt. Shasta from geothermal development, defend the Cosumnes River and adjacent aquifers against dewatering due to excessive pumping, and protect the San Francisco Bay Area from a biowarfare lab proposed at the Lawrence Livermore National Laboratory.

From 1974 to 1977 Mr. Volker engaged in private practice in Southern California, where he represented citizens' groups, cities, and school districts in plaintiff's environmental and land use litigation, and drafted growth control initiatives for several cities. In 1977 Mr. Volker was named Director of the Sierra Club Legal Defense Fund's newly established Alaska office. From 1977 to 1980 he prosecuted environmental cases in state and federal courts in Alaska, involving forestry, mining and other public land law issues. From 1980 to 1998 Mr. Volker handled a variety of environmental and land use cases in state and federal courts in several western states from the Sierra Club (now Earthjustice) Legal Defense Fund's San Francisco, California home office. Since returning to private practice in 1998, Mr. Volker has continued to represent conservation organizations and public agencies in environmental litigation throughout the west. Mr. Volker is a recognized expert in several specialized fields of environmental law including water rights, water pollution, forest practices, land use planning, environmental review and agricultural land preservation. His docket has included the following published cases:

- ❖ *County of El Dorado and Voices for Rural Living v. California Department of Transportation*, 133 Cal.App.4th 1376 (California Environmental Quality Act – 2005)

- ❖ *State Water Resources Control Board Cases*, 136 Cal.App.4th 674 (California Water Quality Laws – 2005)

- ❖ *City of Sausalito v. O'Neill*, 386 F.3d 1186 (Standing, Marine Mammal Protection Act, Coastal Zone Management Act – 9th Circuit 2004)

- ❖ *Friends of the Santa Clara River v. Castaic Lake Water Agency*, 123 Cal.App.4th 1 (Urban Water Management Planning Act – 2004)

- ❖ *City of Martinez v. Texaco*, 353 F.3d 758 (Standing, Common Law and Statutory Remedies for Oil Pollution – 2003)

- ❖ *Friends of the Eel River v. Sonoma County Water Agency*, 108 Cal.App.4th 859 [2003 WL 21120693] (CEQA and Planning and Zoning Law – 2003)

- ❖ *Santa Teresa Citizen Action Group v. State Energy Resources Conservation and Development Com.*, 105 Cal.App.4th 1441 (Energy Commission Act, Due Process Clauses and Separation of Power Doctrines of U.S. and California Constitutions – 2003)

- ❖ *Personal Watercraft Coalition v. Marin County Board of Supervisors*, 100 Cal.App.4th 129 (Due Process and Commerce Clauses of U.S. and California Constitutions, Federal Boat Safety Act, Clean Air Act - 2002)

- ❖ *County of Amador v. El Dorado County Water Agency*, 76 Cal.App.4th 931 [91 Cal.Rptr.2d 66] (CEQA - 1999)

- ❖ *Lake Tahoe Watercraft Recreation Ass'n. v. Tahoe Regional Planning Agency*, 24 F.Supp.2d 1062 (TRPA Compact - E.D. Calif. 1998)

- ❖ *Sierra Club v. United States*, 23 F.Supp.2d 1132 (Wild and Scenic Rivers Act - N.D. Calif. 1998)

❖ *Newton County Wildlife Ass'n v. Rogers*, 113 F.3d 110 (Wild and Scenic Rivers Act - 8th Cir. 1997)

❖ *Newton County Wildlife Ass'n v. Rogers*, 948 F.Supp. 50 (Administrative Procedure Act - E.D. Ark. 1996)

❖ *Communities for a Better Environment v. Union Oil Co. of California*, 83 F.3d 1111 (Clean Water Act - 9th Cir. 1996)

❖ *North Cascades Conservation Council v. Chelan County*, EWGPHB No. 94-1-0015 (Washington Growth Management Act - 1994)

❖ *Bob Marshall Alliance v. Lujan*, 804 F.Supp. 1292 (NEPA, ESA - D.Mont. 1992)

❖ *Garat v. City of Riverside*, 2 Cal.App.4th 259 [3 Cal.Rptr.2d 504] (growth control initiative - 1991)

❖ *Lesher v. City of Walnut Creek*, 52 Cal.3d 531 [277 Cal.Rptr. 1] (growth control initiative - 1990)

❖ *The Wilderness Society v. Tyrrel*, 918 F.2d 813 (Wild and Scenic Rivers Act - 9th Cir. 1990)

❖ *Sierra Club v. Union Oil Co. of California*, 716 F.Supp. 429 (Clean Water Act - N.D. Cal. 1989)

❖ *Bob Marshall Alliance v. Hodel*, 852 F.2d 1223, 18 E.L.R. 21152 (NEPA, ESA - 9th Cir. 1988)

❖ *Sierra Club v. Union Oil Co. of California*, 853 F.2d 667, 18 E.L.R. 21299, 28 E.R.C. 1333 (Clean Water Act - 9th Cir. 1988)

❖ *The Wilderness Society v. Tyrrel*, 701 F.Supp. 1473, 19 E.L.R. 20557 (Wild and Scenic Rivers Act - E.D. Cal. 1988)

❖ *Sierra Club v. Union Oil Co. of California*, 19 E.L.R. 20362, 28 E.R.C. 1835 (Clean Water Act - N.D. Cal. 1988)

❖ *Greenpeace v. Evans*, 688 F.Supp. 579, 17 E.L.R. 21207 (NEPA, MMPA - W.D. Wash. 1987)

❖ *Sierra Club v. Union Oil Co. of California*, 813 F.2d 1480 (Clean Water Act - 9th Cir. 1987);

❖ *Friends of Westwood v. City of Los Angeles*, 191 Cal.App.3d 259 [235 Cal.Rptr. 788] (CEQA - 1987)

❖ *Bob Marshall Alliance v. Watt*, 685 F.Supp. 1514, 16 E.L.R. 20759 (NEPA, ESA - D. Mont. 1986)

❖ *Lewis v. Hayward*, 177 Cal.App.3d 103 [222 Cal.Rptr. 781] (Agricultural Land Preservation Act - 1986)

❖ *Sierra Club v. Union Oil Co. of California*, 22 E.R.C. 1342 (Clean Water Act - N.D. Cal. 1985)

❖ *Sierra Club v. Tosco Corporation*, 22 E.R.C. 2117 (Clean Water Act - N.D. Cal. 1984)

❖ *Honey Springs Homeowners Ass'n v. County of San Diego*, 157 Cal.App.3d 1122 [203 Cal.Rptr. 886] (Agricultural Land Preservation Act - 1984)

❖ *Southeast Alaska Conservation Council v. Alaska*, 655 P.2d 544, 19 E.R.C. 1098 (Alaska Constitution, and forestry and planning statutes - 1983).


Mr. Volker's recent accomplishments include:

❖ the first appellate court ruling enforcing the Urban Water Management Planning Act and requiring urban water agencies to remediate groundwater contamination

❖ two landmark appellate rulings recognizing the standing of cities to bring lawsuits to protect the environment

❖ a ruling overturning the federal government's approval of what would have been the world's

largest landfill ᷇ ᷇mp near Joshua Tree National Park

❖ an appellate court ruling overturning the California Department of Transportation's approval of a freeway interchange for a major casino development

❖ a settlement preventing construction of a major casino at Point Molate, California before required environmental studies are conducted

❖ an appellate court ruling overturning the State Water Resources Control Board's order allowing excessive diversions of water from the San Joaquin River and Delta

❖ an appellate court ruling overturning the National Park Service's approval of what would have been Marin County's largest hotel within the Golden Gate National Recreation Area

❖ an appellate court ruling holding that a water development project EIR must address potential impacts on other affected watersheds

❖ the first appellate court ruling in the nation upholding the validity of a county jetski ordinance against constitutional and federal preemption challenges

❖ the first appellate court ruling in the nation holding that federally licensed dams that store water for consumptive use are subject to state environmental regulation

❖ a ruling barring water development projects in California that are not consistent with valid local general plans

❖ an injunction prohibiting residential development on the slopes of the Sierra Buttes

❖ a ruling upholding the validity of the jetski ordinance adopted by the Tahoe Regional Planning Agency

❖ a ruling overturning the El Dorado County General Plan because of its failure to address low growth alternatives and watershed impacts of urban growth

❖ a settlement forbidding high density residential development within Yosemite National Park's historic community of Wawona

❖ an injunction requiring the United States Forest Service to adopt comprehensive management plans encompassing the entire watershed of Wild and Scenic Rivers

❖ a consent decree against EPA requiring adoption of water quality standards for the San Francisco Bay Delta Estuary

❖ a settlement requiring reinstatement of a whistleblower demoted by the California Department of Fish and Game because he had reported criminal pollution improperly authorized by his supervisor

❖ settlement of a case against Southern Pacific Transportation Company over its toxic spill of metam sodium into the Upper Sacramento River establishing a Railroad Monitor and appointing a representative of the conservation community to participate in overseeing implementation of a forty million dollar restoration fund

❖ settlement of a case against Riverside County, California requiring substantial revision of its general plan to protect open space, riparian corridors and wildlife habitat

❖ an order from the Eastern Washington Growth Management Hearings Board invalidating Chelan County, Washington's growth management ordinances as insufficient to protect agricultural resources, riparian corridors and wildlife habitat

❖ an injunction requiring removal of a large private bulkhead on the Stehekin River within the Lake Chelan National Recreation Area

❖ an order of the Washington Pollution Control Hearings Board vacating a waste discharge permit issued for a complex of salmon net pens proposed to be constructed in the mouth of the

Skagit River

- ❖ an order from the California State Water Resources Control Board disapproving a proposal to divert water from three High Sierra lakes and the South Fork American River to promote urban sprawl in western El Dorado County

- ❖ an injunction against the State of Washington which resulted in creation of a Clean Water Act permitting process to regulate operation of salmon net pens

- ❖ judgments against Union Oil Company of California resulting in the payment of the largest civil penalty and fee award in the history of the Clean Water Act ($5.55 million)

- ❖ a judgment against the City of Rocklin, California, overturning its approval of a major regional mall because it violated the California Environmental Quality Act

- ❖ settlement of a case against the National Park Service requiring preparation of a comprehensive EIS on management plans for the Lake Chela National Recreation Area in Washington

- ❖ injunctions against the Bureau of Land Management and the U.S. Forest Service prohibiting logging harmful to the South Fork Trinity, South Fork Eel and South Fork Salmon Wild and Scenic Rivers in California

- ❖ an injunction against the U.S. Forest Service requiring preparation of an EIS and full consultation under the Endangered Species Act on oil and gas leases in areas under study for wilderness designation in Montana.

# EXHIBIT 2

1 | STEPHAN C. VOLKER (CSB #63093)
JOSHUA A.H. HARRIS (CSB #226898)
2 | MARNIE E. RIDDLE (CSB #233732)
LAW OFFICES OF STEPHAN C. VOLKER
3 | 436 14th Street, Suite 1300
Oakland, California 94612
4 | Telephone: 510/496-0600
Facsimile: 510/496-1366
5 |
Attorneys for Petitioners/Plaintiffs
6 | CITIZENS FOR THE EAST SHORE STATE PARK

**FILED**

APR - 3 2006

MARIN COUNTY SUPERIOR COURT
BY: E. TURNER, DEPUTY

7

8

9                SUPERIOR COURT OF THE STATE OF CALIFORNIA

10                 IN AND FOR THE COUNTY OF MARIN

11

| | |
|---|---|
| 12  **CITIZENS FOR THE EAST SHORE STATE** ) | Case No. CV 052241 |
| **PARK,** ) | Contra Costa Case No. MSN094-1657 |
| 13            Petitioner, ) | |
| | **DECLARATION OF MICHAEL** |
| 14     v. ) | **TRAYNOR IN SUPPORT OF** |
| ) | **PETITIONER'S MOTION FOR** |
| 15  **CITY OF RICHMOND, a California** ) | **ATTORNEYS' FEES AND** |
| **Municipality, CITY COUNCIL OF THE** ) | **LITIGATION COSTS** |
| 16  **CITY OF RICHMOND, and DOES 1 through** ) | |
| 17  **X, inclusive,** ) | Action Filed: December 15, 2004 |
| ) | Action Transferred: May 17, 2005 |
| 18            Respondents. ) | |
| **and** ) | Date:  June 7, 2006 |
| 19 ) | Time:  9:00 a.m. |
| **UPSTREAM POINT MOLATE LLC, a** ) | Dept.: F |
| 20  **California Limited Liability Company,** ) | Judge: Hon. Vernon F. Smith |
| **HARRAH'S OPERATING COMPANY,** ) | |
| 21  **INC., a Delaware Corporation, and DOES XI** ) | |
| **through XX, inclusive,** ) | |
| 22 ) | |
| 23            Real Parties in Interest. ) | |
| ) | |
| 24  (CAPTION CONTINUES ON PAGE 2) | |

25

26

27

28

DECLARATION OF MICHAEL TRAYNOR IN SUPPORT OF
MOTION FOR ATTORNEYS' FEES AND LITIGATION COSTS

| | |
|---|---|
| EAST BAY REGIONAL PARK DISTRICT, | Case No. MSN04-1698 |
| Petitioner, | Action Filed: December 16, 2004 |
| v. | |
| CITY OF RICHMOND, RICHMOND CITY COUNCIL, and DOES I through X, inclusive, | |
| Respondents. | |
| UPSTREAM POINT MOLATE LLC, a California Limited Liability Company, HARRAH'S OPERATING COMPANY, INC., a Delaware Corporation, and DOES XI through XX, inclusive, | |
| Real Parties in Interest. | |

I, Michael Traynor, declare as follows:

1.    I am a senior counsel and served as a partner from 1969–2004 in the law firm of Cooley Godward LLP and practice in its office in San Francisco, California. I received a J.D. degree from Harvard Law School in 1960. From 1961 to 1963, I served as a deputy attorney general of the State of California in tax litigation, government law, and other matters. In 1962, I also served as special counsel to the California State Senate Committee on Local Government. In 1963, I joined Cooley Godward, where I specialize in litigation involving intellectual property, the First Amendment, complex business matters, and appellate matters. I have practiced extensively in California state courts and in the federal courts, including the Supreme Court of the United States. In addition to my practice, since 2000, I have served and am now serving as President of the American Law Institute ("ALI"). I am presently serving as an adviser for the Restatement (Third) of Restitution and Unjust Enrichment and recently completed service as an adviser for the Restatement (Third) of Torts: Apportionment, the Restatement (Third) of Torts: Product Liability, and the Restatement (Third) of Unfair Competition. I am a member of the California Academy of Appellate Lawyers, a Life Fellow of the American Bar

Foundation, a past President (1973) of the Bar Association of San Francisco, a former member

of the Board of Directors of the Environmental Law Institute (1999-2005), a former member of

the Board of Overseers of the RAND Institute for Civil Justice (1991-97), and a former trustee

(1974-1996), past Chairman (1989-91) and President (1991-92) of the Sierra Club Legal

Defense Fund, now called Earthjustice.  In 2004, the U.S. Court of Appeals for the Ninth Circuit

awarded to me its John P. Frank outstanding lawyer award.  I am listed in the current editions of

*The Best Lawyers in America, Who's Who in America* and *Who's Who in American Law.*

2.    I am informed that petitioners in the above matter request an award of attorneys'

fees for legal services performed by Stephan C. Volker.  I am further informed that Mr. Volker

received his J.D. in 1974 from the University of California at Davis, and since that time has been

engaged in the practice of environmental litigation, both in private practice (1974-1977) and

subsequently, for the Sierra Club Legal Defense Fund, where he litigated scores of cases under

state and federal laws throughout the western states until his recent return to private practice. I

have known Mr. Volker since he started working at the Sierra Club Legal Defense Fund in 1977

and am familiar with the litigation he has successfully prosecuted, his expertise, and his high

standing in the environmental litigation community. Mr. Volker is an exceptionally hard

working, tenacious and meticulous litigator with an impressive list of victories in environmental

cases, including dozens of published rulings in state and federal courts and administrative

tribunals, and a number of significant settlements, including what was at the time (1990) the

highest civil penalty ever awarded under the citizen suit provision of the federal Clean Water

Act.

3.    I am informed that petitioners wish to assign the hourly rate of $475 for legal

services performed by Mr. Volker between 2004 and 2006 and, for the same period, $175 per

hour for a first-year and $200 per hour for a second-year associate attorney.

4.    The hourly rates sought by petitioners are within, albeit at the low end of, the prevailing market rates in the San Francisco Bay Area for attorneys with experience and qualifications similar to Mr. Volker and his associates. The services of attorneys in my firm with experience levels comparable to Mr. Volker, and of first and second-year attorneys, have been billed at or above these rates for the periods described. The billing rates of my firm are comparable to the billing rates of other major law firms located in San Francisco.

5.    The prior experience of Mr. Volker in environmental litigation further supports the rate requested for him. Based on my own experience in my practice and my knowledge of others in my firm, where an attorney has special expertise relevant to the matter being litigated, the hourly rate is correspondingly higher.

6.    I am familiar with the caselaw governing the award of attorneys' fees in California under its "private attorney general" statute, Code of Civil Procedure section 1021.5, having reviewed dozens of fee motions, briefs, and rulings under this statute in cases prosecuted by attorneys at the Sierra Club Legal Defense Fund and Earthjustice over the past three decades. I have reviewed Mr. Volker's original and amended petitions as well as the settlement agreement reached in this proceeding. In my judgment Mr. Volker's success in settling this case to the benefit of his clients and the public warrants an award of his hourly rate for the time he and his law firm expended in this matter.

I declare under penalty of perjury that the foregoing is true and correct.

Executed March 27, 2006 at San Francisco, California.

_Michael Traynor_

MICHAEL TRAYNOR

1

**PROOF OF SERVICE BY MAIL OF REQUEST OF CALIFORNIANS FOR RENEWABLE ENERGY FOR AWARD OF COMPENSATION**
**Application 02-09-043**

2

3    I am a resident of the United States and of the State of California. I am employed in the County of Alameda. My business address is 436 - 14th Street, Suite 1300, Oakland, California

4    94612. My business telephone number is (510) 496-0600, and fax number is (510) 496-1366. I am over the age of eighteen years. I am not a party to the within action or proceeding. On

5    April 17, 2006, I served the following document(s):

6    **PETITION OF CALIFORNIANS FOR RENEWABLE ENERGY FOR MODIFICATION OF OPINION GRANTING INTERVENOR COMPENSATION (D.06-04-018) AND**

7    **SUPPORTING DECLARATION OF COUNSEL**

8    by e-mailing the above-entitled document to the parties' e-mail addresses indicated on the attached list of counsel or, if counsel has no e-mail address availability, said documents were

9    enclosed in an envelope which I placed for collection and mailing on the date and at the place shown below following our ordinary business practices. I am readily familiar with this

10   business's practice for e-mailing and collecting and processing correspondence for mailing. On the same day that correspondence is placed for collection and mailing, it is deposited in the

11   ordinary course of business with the United States Postal Service in a sealed envelope with postage fully prepaid, addressed as listed on the attached following pages.

12

13   I declare under penalty of perjury that the foregoing is true and correct. Executed April 17, 2006, at Oakland, California.

14

15   Yuri Miyagawa

16   **SEE ATTACHED CPUC-GENERATED LIST**

17

18

19

20

21

22

23

24

25

26

27

28

| Email | First Name | Last Name | Organization | Address | City | State | Zip |
|---|---|---|---|---|---|---|---|
| holly@gmail.com | HOLLY B. | PEASE | 280 CORRIDOR CONCERNED CITIZENS GROUP | 1701 BLACK MOUNTAIN ROAD | HILLSBOROUGH | CA | 94010 |
| jfccpa@sbcglobal.net | JOSE F. | CAMPOS | | 2935 TROUSDALE DRIVE | BURLINGAME | CA | 94010 |
| jnyberg@sanindependent.com | JUSTIN | NYBERG | REPORTER, INDEPENDENT/EXAMINER NEWSPAPI | 1828 EL CAMINO REAL, SUITE 606 | BURLINGAME | CA | 94010 |
| LUrushima@FremontGroup.com | LORI & ANDREW | URUSHIMA | | 1510 LOS ALTOS DRIVE | BURLINGAME | CA | 94010 |
| mmeloni@hillsca.org | MICHAEL | MELONI | TOWN OF HILLSBOROUGH | 1600 FLORIBUNDA AVENUE | HILLSBOROUGH | CA | 94010 |
| netsakt@aol.com | THOMAS M. | KISTEN | | 1320 BUCKINGHAM WAY | HILLSBOROUGH | CA | 94010-231 |
| | JOANNE | WILSON | CITY & COUNTY OF SAN FRANCISCO | 1657 ROLLINS ROAD | BURLINGAME | CA | 94010-582 |
| | KURT | LIGHTHOUSE | | 87 LOMA VISTA DR. | BURLINGAME | CA | 94014 |
| | MALCOLM | CARPENTER | | 1190 EL CAMINO REAL | COLMA | CA | 94015 |
| | TERRY | SEDIK | TOWN OF COLMA | 333 90TH STREET | DALY CITY | CA | 94015 |
| | JOHN | DICKEY | CITY OF DALY CITY | 330 DISTEL CICLE | LOS ALTOS | CA | 94022-140 |
| | TOM | FLAVIN | MIDPENINSULA REGIONAL OPEN SPACE DIST. | 2250 HOMESTEAD CT, APT 207 | LOS ALTOS | CA | 94024-733 |
| | LENNIE | ROBERTS | | 339 LA CUESTA | PORTOLA VALLEY | CA | 94028 |
| lennie@darwin.ptly.ca.us | | | COMMITTEE FOR GREEN FOOTHILLS ORG. | 1094 SPRINGFIELD DRIVE | MILLBRAE | CA | 94030 |
| | | | AMY & BURGHARDT TENDERICH | 621 MAGNOLIA AVENUE | MILLBRAE | CA | 94030 |
| | RALPH | PETTY | CITY OF MILLBRAE | 715 LAKEMEAD WAY | REDWOOD CITY | CA | 94062 |
| mario715@earthink.net | MARIO | RABINOWITZ | | 600 EL CAMINO REAL | SAN BRUNO | CA | 94066-027 |
| ross-rdv@pacbell.net | MICHAEL J. | VALENCIA | ROSS HACKETT DOWLING VALENCIA WALTI | 567 EL CAMINO REAL | SAN BRUNO | CA | 94066-429 |
| | GEORGE D. | FOSCARDO | CITY OF SAN BRUNO | 223 EDGEHILL DRIVE | SAN CARLOS | CA | 94070 |
| bethjimison@yahoo.com | BETH | JIMISON | | 242 LONGFORD DRIVE | SO. SAN FRANCISCO | CA | 94080 |
| | JACKIE | WILLIAMS | | 601 GATEWAY BLVD., STE. 1000 | SOUTH SAN FRANC | CA | 94080 |
| mdjoseph@adamsbroadwell.com | MARC D. | JOSEPH | ADAMS, BROADWELL, JOSEPH & CARDOZO | 1 DNA WAY | SOUTH SAN FRANC | CA | 94080 |
| sbaruch@gene.com | STEPHEN | BARUCH | | 1 DNA WAY | SOUTH SAN FRANC | CA | 94080-499 |
| peteryee@gena.com | PETER | YEE | | 902 BAINBRIDGE CT. | SUNNYVALE | CA | 94087 |
| | J.G. | MARINO | SOUTHERN CALIFORNIA EDISON | 801 VAN NESS AVENUE, STE. 2040 | SAN FRANCISCO | CA | 94102 |
| bruce.foster@sce.com | BRUCE | FOSTER | SAN FRANCISCO PUBLIC UTILITIES COMMISSIO | 1155 MARKET STREET, 4TH FLOOR | SAN FRANCISCO | CA | 94103 |
| scasey@sfwater.org | SEAN | CASEY | PACIFIC GAS AND ELECTRIC COMPANY | 77 BEALE STREET, MC-B9A | SAN FRANCISCO | CA | 94105 |
| | JOHN C. | STEWART | CALIFORNIA ENERGY MARKETS | 517-B POTRERO AVENUE | SAN FRANCISCO | CA | 94110 |
| Cem@newsdata.com | | | | ONE EMBARCADERO CENTER, SUITE 600 | SAN FRANCISCO | CA | 94111 |
| jeffgray@drlvrl.com | JEFFREY P. | GRAY | DAVIS WRIGHT TREMAINE LLP | 505 MONTGOMERY STREET, SUITE 1900 | SAN FRANCISCO | CA | 94111 |
| sarah.esmaili@lw.com | SARAH | ESMAILI | LATHAM & WATKINS | 505 MONTGOMERY STREET, SUITE 2000 | SAN FRANCISCO | CA | 94111 |
| Victor.Cayanan@lw.com | VICTOR | CAYANAN | LATHAM & WATKINS | 695 9TH AVE. NO.2 | SAN FRANCISCO | CA | 94118 |
| lisaweinzimer@sbcglobal.net | LULU | WEINZIMER | CALIFORNIA ENERGY CIRCUIT | PO BOX 7442 | SAN FRANCISCO | CA | 94120-744 |
| cpuccases@pge.com | LAW DEPARTMEN FILE ROOM | | PACIFIC GAS AND ELECTRIC COMPANY | FORT MASON, BUILDING 201 | SAN FRANCISCO | CA | 94123 |
| | JON | GERVAIS | U.S. NATIONAL PARK SERVICE | BUILDING 201, FORT MASON | SAN FRANCISCO | CA | 94123 |
| jonathan_gervais@nps.gov | JONATHAN | GERVAIS | GOLDEN GATE NATIONAL RECREATION AREA | 4909 3RD STREET | SAN FRANCISCO | CA | 94124 |
| | ESPANOLA | JACKSON | | 4909 3RD STREET | SAN FRANCISCO | CA | 94124 |
| frandacosta@att.net | FRANCISCO | DA COSTA | ENVIRONMENTAL JUSTICE ADVOCACY | | SAN FRANCISCO | CA | 94124 |

| Email | First | Last | Organization | Address | City | State | Zip |
|---|---|---|---|---|---|---|---|
| jwandrew@yahoo.com | JAMES | ANDREW | | 324A LOMBARD STREET | SAN FRANCISCO | CA | 94133 |
| | K. | KLAUSEN | | 754 DE SOTO DR. | PALO ALTO | CA | 94303-280 |
| | ANN | RISLEY | | 1895 LEXINGTON AVE. | SAN MATEO | CA | 94402 |
| | BONWIEN S. | SANA | | 1783 LEXINGTON AVE. | SAN MATEO | CA | 94402 |
| clifpat@earthlink.net | CLIFFORD E. | DONLEY | HIGHLANDS COMMUNITY ASSOCIATION | 30 SHELBURNE PLACE | SAN MATEO | CA | 94402- |
| | DEB | COGSWELL | | 1676 LEXINGTON AVE. | SAN MATEO | CA | 94402 |
| | DON & ROSE | MCFARLAND | | 1245 LAUREL HILL DRIVE | SAN MATEO | CA | 94402 |
| | G. M. | SULLIVAN | | 1895 LEXINGTON AVE. | SAN MATEO | CA | 94402 |
| | GIOVANNI | AGNOLI | | 1740 LEXINGTON AVE. | SAN MATEO | CA | 94402 |
| | HELGA | HAYSE | | 1668 LEXINGTON AVE. | SAN MATEO | CA | 94402 |
| | IVAN | CROCKETT | | 2004 LEXINGTON AVE. | SAN MATEO | CA | 94402 |
| | JAN | PASLIN | | 1684 LEXINGTON AVE. | SAN MATEO | CA | 94402 |
| | JANE | TATCHELL | | 1732 LEXINGTON AVE. | SAN MATEO | CA | 94402 |
| | JASON | LIPTON | | 1832 LEXINGTON AVE. | SAN MATEO | CA | 94402 |
| | JOHN | STOELLER | | 1712 LEXINGTON AVE. | SAN MATEO | CA | 94402 |
| | KATE | CALIN | | 1740 LEXINGTON AVE. | SAN MATEO | CA | 94402 |
| | KURT | JARNGIN | | 1759 YORKTOWN RD. | SAN MATEO | CA | 94402 |
| | LARRY | WONG | | 1690 LEXINGTON AVE. | SAN MATEO | CA | 94402 |
| | MARCENA | MAY | | 1711 YORKTOWN | SAN MATEO | CA | 94402 |
| | MARCIA | PAGELS | | 2031 NEW BRUNSWICK DR. | SAN MATEO | CA | 94402 |
| | MARGARET M. | FLYNN | | 1760 LEXINGTON AVE. | SAN MATEO | CA | 94402 |
| | MARGARET S. | JENSEN | | 1747 LEXINGTON AVE. | SAN MATEO | CA | 94402 |
| | MARLOWE | CONDE | | 1784 LEXINGTON AVE. | SAN MATEO | CA | 94402 |
| mnemschoff@earthlink.net | MICHELE | NEMSCHOFF | 280 CORRIDOR CONCERNED CITIZENS GROUP | 2020 LEXINGTON AVENUE | SAN MATEO | CA | 94402 |
| | MIKE | NAGLE | | 1756 LEXINGTON AVE. | SAN MATEO | CA | 94402 |
| | MOLLIE | BROWN | | 1716 LEXINGTON AVE. | SAN MATEO | CA | 94402 |
| | NED L. | BROYLES | | 1840 LEXINGTON AVE. | SAN MATEO | CA | 94402 |
| | NELL | BROWN | | 1415 LEXINGTON AVE. | SAN MATEO | CA | 94402 |
| | OLIVER | FRANK | | 1928 LEXINGTON AVE. | SAN MATEO | CA | 94402 |
| | PATRICIA | DOOLITTLE | | 1744 LEXINGTON AVE. | SAN MATEO | CA | 94402 |
| | PAUL | MARINELLI | | 1790 LEXINGTON AVE. | SAN MATEO | CA | 94402 |
| | PHYLLIS | GARRATT | | 1736 LEXINGTON AVE. | SAN MATEO | CA | 94402 |
| | RALPH | VOICE | | 1778 LEXINGTON AVE. | SAN MATEO | CA | 94402 |
| | RICHARD | COOK | | 2044 LEXINGTON AVE. | SAN MATEO | CA | 94402 |
| | ROBERT | CROSBY | | 1727 YORKTOWN | SAN MATEO | CA | 94402 |
| | ROGER | ASHBAUGH | | 2080 LEXINGTON AVE. | SAN MATEO | CA | 94402 |
| | SARESH | FAMILY | | 1775 YORKTOWN RD. | SAN MATEO | CA | 94402 |

| Email | First | Last | Organization | Address | City | State | Zip |
|---|---|---|---|---|---|---|---|
| | SCOTT | BRAXTON | | 1786 YORKTOWN RD. | SAN MATEO | CA | 94402 |
| | SHIZUKO | OGAWA | | 1724 LEXINGTON AVE. | SAN MATEO | CA | 94402 |
| | STEPHANIE | WOLF | | 1760 LEXINGTON AVE. | SAN MATEO | CA | 94402 |
| | SYLVIA | MERKADEAU | | 2051 NEW BRUNSWICK DR. | SAN MATEO | CA | 94402 |
| | TINA | STEVENS | | 1720 LEXINGTON AVE. | SAN MATEO | CA | 94402 |
| | VIJAY | KAPUR | | 1689 YORKTOWN ROAD | SAN MATEO | CA | 94402 |
| | WILLIAM | JAMES | | 1747 LEXINGTON AVE. | SAN MATEO | CA | 94402 |
| | WILSON | PINNEY | THE SAN MATEO HIGHLANDS COMMUNI. ASSO. | 1624 YORKTOWN ROAD | SAN MATEO | CA | 94402 |
| | YEONG | KIM | | 1860 LEXINGTON AVE. | SAN MATEO | CA | 94402 |
| | SHERRIE | FRIEDMAN | | 25 BURGUONE CT. | SAN MATEO | CA | 94402-400 |
| | CARLA | JADALLAH | | 1764 LEXINGTON AVE. | SAN MATEO | CA | 94402-402 |
| | CARLA M. | CORNAGLIA | | 2076 LEXINGTON AVE. | SAN MATEO | CA | 94403 |
| brflynn@flynnrci.com | BARRY | FLYNN | FLYNN & ASSOCIATES | 5440 EDGEVIEW DRIVE | DISCOVERY BAY | CA | 94514 |
| dietrichlaw@earthlink.net | WILLIAM F. | DIETRICH | DIETRICH LAW | 2977 YGNACIO VALLEY ROAD, 613 | WALNUT CREEK | CA | 94598-353 |
| | THOMAS F. | CASEY,III | HALL OF JUSTICE AND RECORDS | 400 COUNTY CENTER, 6TH FLOOR | REDWOOD CITY | CA | 94603 |
| jonathan_gervais@nps.gov | BARBARA | GOODYEAR | U.S. DEPT.OF INTERIOR SOLICITOR'S OFFICE | 1111 JACKSON STREET, SUITE 735 | OAKLAND | CA | 94607 |
| swoodruff@meyersnave.com | SKY | WOODRUFF | MEYERS, NAVE, RIBACK, SILVER & WILSON | 555 12TH STREET, SUITE 1500 | OAKLAND | CA | 94607 |
| mrw@mrwassoc.com | | | MRW & ASSOCIATES, INC. | 1999 HARRISON STREET, SUITE 1440 | OAKLAND | CA | 94612 |
| lynn@lmaconsulting.com | LYNN | ALEXANDER | LMA CONSULTING | 129 REDWOOD AVENUE | CORTE MADERA | CA | 94925 |
| gabriellilaw@sbcglobal.net | JOHN C. | GABRIELLI | GABRIELLI LAW OFFICE | 430 D STREET | DAVIS | CA | 95616 |
| puma@davis.com | K. SHAWN | SMALLWOOD | | L09 LUZ PLACE | DAVIS | CA | 95616 |
| rmccann@umich.edu | RICHARD | MCCANN | | 2655 PORTAGE BAY, SUITE 3 | DAVIS | CA | 95616 |
| cmkehrein@ems-ca.com | CAROLYN M. | KEHREIN | ENERGY MANAGEMENT SERVICES | 1505 DUNLAP COURT | DIXON | CA | 95620-400 |
| e-recipient@caiso.com | | | CALIFORNIA INDEPENDENT SYS OPER CORPORAT | 151 BLUE RAVINE RD. | FOLSOM | CA | 95630 |
| e-recipient@caiso.com | | | CALIFORNIA ISO | 151 BLUE RAVINE ROAD | FOLSOM | CA | 95630 |
| rsparks@caiso.com | ROBERT | SPARKS | CALIFORNIA ISO | 151 BLUE RAVINE ROAD | FOLSOM | CA | 95630 |
| LAdocket@cpuc.ca.gov | LOS ANGELES | DOCKET OFFICE | CALIFORNIA PUBLIC UTILITIES COMMISSION | 320 W. 4TH STREET, SUITE 500 | LOS ANGELES | CA | 90013 |
| beg@cpuc.ca.gov | Belinda | Gatti | CALIF PUBLIC UTILITIES COMMISSION | 505 VAN NESS AVENUE | SAN FRANCISCO | CA | 94102-321 |
| bcb@cpuc.ca.gov | Billie C. | Blanchard | CALIF PUBLIC UTILITIES COMMISSION | 505 VAN NESS AVENUE - | SAN FRANCISCO | CA | 94102-321 |
| cft@cpuc.ca.gov | Charlotte | TerKeurst | CALIF PUBLIC UTILITIES COMMISSION | 505 VAN NESS AVENUE | SAN FRANCISCO | CA | 94102-321 |
| hjb@cpuc.ca.gov | Harriett J. | Burt | CALIF PUBLIC UTILITIES COMMISSION | 505 VAN NESS AVENUE | SAN FRANCISCO | CA | 94102-321 |
| jaa@cpuc.ca.gov | Joseph A. | Abhulimen | CALIF PUBLIC UTILITIES COMMISSION | 505 VAN NESS AVENUE | SAN FRANCISCO | CA | 94102-321 |
| kcl@cpuc.ca.gov | Kelly C. | Lee | CALIF PUBLIC UTILITIES COMMISSION | 505 VAN NESS AVENUE | SAN FRANCISCO | CA | 94102-321 |
| lrm@cpuc.ca.gov | Lainie | Motamedi | CALIF PUBLIC UTILITIES COMMISSION | 505 VAN NESS AVENUE | SAN FRANCISCO | CA | 94102-321 |
| sjl@cpuc.ca.gov | Scott | Logan | CALIF PUBLIC UTILITIES COMMISSION | 505 VAN NESS AVENUE | SAN FRANCISCO | CA | 94102-321 |
| claufenb@energy.state.ca.us | CLARE | LAUFENBERG | CALIFORNIA ENERGY COMMISSION | 1516 NINTH STREET, MS 46 | SACRAMENTO | CA | 95814 |

| Email | First Name | Last Name | Company | Address | City | State | Zip |
|---|---|---|---|---|---|---|---|
| richard.tum@sca.com | RICHARD | TOM | SOUTHERN CALIFORNIA EDISON COMPANY | 2244 WALNUT GROVE AVENUE | ROSEMEAD | CA | 91770 |
| picketbae@sca.com | STEPHEN E. | PICKETT | SOUTHERN CALIFORNIA EDISON COMPANY | 2244 WALNUT GROVE AVENUE | ROSEMEAD | CA | 91770 |
| mhudak@cgmlhlawi.com | MARK | HUDAK | INGERSOLL,THOMPSON&HORN PROFESSIONAL | 216 PARK ROAD | BURLINGAME | CA | 94010 |
| mdebry@silllica.org | MARTHA | DEBRY | TOWN OF HILLSBOROUGH | 1600 FLORIBUNDA AVENUE | HILLSBOROUGH | CA | 94010 |
| sgustavson@dalycity.org | STAN | GUSTAVSON | CITY HALL | 333 90TH STREET | DALY CITY | CA | 94015 |
| maltery@co.sanmateo.ca.us | MARY K. | RAFTERY | COUNTY OF SAN MATEO | 400 COUNTY CENTER | REDWOOD CITY | CA | 94063 |
| pthompson@cd.sanbruno.ca.us | PAMELA | THOMPSON | CITY OF SAN BRUNO | 567 EL CAMINO REAL | SAN BRUNO | CA | 94066 |
| ross-nd-v@pacbell.net | MICHAEL J. | VALENCIA | ROSS HACKETT DOWLING VALENCIA WALTI | 600 EL CAMINO REAL | SAN BRUNO | CA | 94066-027 |
| joe.como@sfgov.org | JOSEPH PETER | COMO | CITY AND COUNTY OF SAN FRANCISCO | 1 DR. CARLTON B. GOODLETT PLACE, RM. 234 | SAN FRANCISCO | CA | 94102 |
| | Martin | Peleo | CALIF PUBLIC UTILITIES COMMISSION | 505 VAN NESS AVENUE | SAN FRANCISCO | CA | 94102-321 |
| map@cpuc.ca.gov | JOAN L. | CASSMAN | HANSON BRIDGETT MARCUS, VLAHOS & RUDY | 333 MARKET STREET, SUITE 2300 | SAN FRANCISCO | CA | 94105 |
| jcassman@hansonbridgett.com | PETER H. | WEINER | PAUL HASTINGS JANOFSKY AND WALKER, LLP | 55 2ND STREET, 24TH FLOOR | SAN FRANCISCO | CA | 94105-344 |
| peterweiner@paulhastings.com | ZACHARY R. | WALTON | PAUL,HASTINGS,JANOFSKY&WALKER LLP | 55 SECOND STREET, 24TH FLOOR | SAN FRANCISCO | CA | 94105-344 |
| zacharywalton@paulhastings.com | JEANNE B. | ARMSTRONG | LATHAM & WATKINS | 505 SANSOME STREET, SUITE 900 | SAN FRANCISCO | CA | 94111 |
| louis.leonard@lw.com | LOUIS G. | LEONARD III | LATHAM & WATKINS | 505 SANSOME STREET, SUITE 900 | SAN FRANCISCO | CA | 94111 |
| mday@gmsr.com | MICHAEL B. | DAY | GOODIN MACBRIDE SQUERI RITCHIE & DAY LLP | 505 SANSOME STREET, SUITE 900 | SAN FRANCISCO | CA | 94111 |
| Richard.Raushenbush@dlw.com | RICHARD W. | RAUSHENBUSH | RITCHIE & DAY, LLP | 505 MONTGOMERY ST. SUITE 1900 | SAN FRANCISCO | CA | 94111 |
| edwardonell@dwl.com | EDWARD W. | ONEILL | DAVIS WRIGHT TREMAINE LLP | 505 MONTGOMERY STREET, SUITE 2000 | SAN FRANCISCO | CA | 94111-383 |
| jkarp@whitecase.com | JOSEPH | KARP | WHITE & CASE LLP | ONE EMBARCADERO CENTER, SUITE 600 | SAN FRANCISCO | CA | 94111-405 |
| dts5@pge.com | DAVID | KRASKA | PACIFIC GAS & ELECTRIC COMPANY | 4 EMBARCADERO CENTER 24TH FLOOR | SAN FRANCISCO | CA | 94124 |
| l_brown123@hotmail.com | LYNNE | BROWN | CALIFORNIANS FOR RENEWABLE ENERGY, INC. | PO BOX 7442 | SAN FRANCISCO | CA | 94168-372 |
| wen@lgc.org | | GEORGE | WOMEN'S ENERGY MATTERS | 24 HARBOR ROAD | SAN FRANCISCO | CA | 94595-813 |
| phanschen@mofo.com | PETER W. | HANSCHEN | MORRISON & FOERSTER, LLP | PO BOX 883723 | WALNUT CREEK | CA | 94607 |
| pcw@meyersnave.com | PATRICK | WHITNELL | MEYERS NAVE RIBACK SILVER & WILSON | 101 YGNACIO VALLEY ROAD, SUITE 450 | OAKLAND | CA | 94612 |
| svolker@volkerlaw.com | STEPHAN C. | VOLKER | BRECHER & VOLKER, LLP | 555 12 ST., SUITE 1500 | OAKLAND | CA | 95073 |
| michaelboyd@abcglobal.net | MICHAEL E. | BOYD | CALIFORNIANS FOR RENEWABLE ENERGY, INC. | 436 14TH STREET, SUITE 1300 | SOQUEL | CA | 95630 |
| grosenblum@aiso.com | GRANT A. | ROSENBLUM | CALIFORNIA INDEPENDENT SYSTEM OPERATOR | 5439 SOQUEL DRIVE | FOLSOM | CA | 44702 |
| | JEFFERY | ARMBURSTER | POWER DEVELOPMENT MANAGER | 151 BLUE RAVINE ROAD | CANTON | OH | 80205 |
| michael@ymwp.com | MICHAEL | KLOEFKORN | | 130 THIRD ST., NW | DENVER | CO | 81301 |
| kjelmonsen@mms-ca.com | KEVIN J. | SIMONSEN | ENERGY MANAGEMENT SERVICES | 3225 BLAKE STREET, CABLE 28 | DURANGO | CO | 91770 |
| case.admin@sca.com | CASE | ADMINISTRATION | SOUTHERN CALIFORNIA EDISON COMPANY | 646 EAST THIRD AVENUE | ROSEMEAD | CA | 92116 |
| bpowers@bpowersengineering.com | BILL | POWERS | POWERS ENGINEERING | 2244 WALNUT GROVE AVENUE | SAN DIEGO | CA | 92123-153 |
| mturley@semprautilities.com | MARY I. | TURLEY | SAN DIEGO GAS & ELECTRIC COMPANY | 4452 PARK BLVD., SUITE 209 | SAN DIEGO | CA | 94005 |
| mountainwatch@earthlink.net | PHILIP | BATCHELDER | SAN BRUNO MOUNTAIN WATCH | 8330 CENTURY PARK COURT, CP22D | BRISBANE | CA | 94005-131 |
| | CAROL | NELSON | CITY OF BRISBANE | PO BOX 53 | BRISBANE | CA | 94010 |
| | CHEOL HOON | LEE | | 50 PARK PLACE | HILLSBOROUGH | CA | 94010 |
| dale@stwatercolors.com | DALE | PERKINS | | 1435 LAKEVIEW DRIVE | BURLINGAME | CA | |
| | | | | 3010 TROUSDALE DRIVE | | | |

ALJ/CFT/hkr                                         **Mailed 6/16/06**

Decision 06-06-025  June 15, 2006

**BEFORE THE PUBLIC UTILITIES COMMISSION OF THE STATE OF CALIFORNIA**

| | |
|---|---|
| In the Matter of the Application of Pacific Gas and Electric Company (U 39 E) for a Certificate of Public Convenience and Necessity Authorizing the Construction of the Jefferson-Martin 230 kV Transmission Project. | Application 02-09-043 (Filed September 30, 2002) |

## OPINION DENYING PETITION FOR MODIFICATION BY CALIFORNIANS FOR RENEWABLE ENERGY OF DECISION 06-04-018

Decision (D.) 06-04-018 awarded intervenor compensation to three parties for their substantial contributions to D.04-08-046, the Jefferson-Martin transmission certification proceeding.  CAlifornians for Renewable Energy (CARE), one of the three parties, was awarded $126,713.40.  CARE filed a petition to modify D.06-04-018 on April 17, 2006.  In the petition, CARE requests the hourly compensation rate for its lead counsel, Stephan Volker, be increased from $270, the adopted amount in the decision, to $400.  All of Volker's work was performed in 2004.  Adopting a $400/hour rate for Volker would increase the total award by $5,872.

As required by Pub. Util. Code § 1806, D.06-04-018 considered whether the claimed intervenor fees and costs are comparable to the market rates paid to experts and advocates having comparable training and experience and offering similar services.  In Resolution ALJ-184, we set forth guidelines and principles for setting intervenors' hourly rates for work performed in 2004.  In D.05-11-031, we set forth guidelines and principles for setting 2005 rates, and found that rates

237247                                  - 1 -

A.02-09-043 ALJ/CFT/hkr

previously adopted in 2003 and 2004 are reasonable. Resolution ALJ-184 deems an increase of 8% above previously adopted 2003 rates as reasonable for work performed in 2004. We previously adopted a rate of $250 for Volker for work performed in 2000-2003.[1] Increasing Volker's 2003 rate by 8% results in the $270 rate adopted in D.06-04-018 for his 2004 work.

We recognize the guidelines and principles set forth in Resolution ALJ-184 and D.05-11-031 primarily envision intervenor representatives who participate regularly and have received regular hourly rate adjustments; the guidelines and principles may be quite constraining for intervenor representatives who have had no recent adjustments in their hourly rates. In Volker's case, for example, D.06-04-018 constrains him to one 8% increase for a five-year period (2000-2004). It may be appropriate to allow veteran representatives, under some circumstances, to make the same showing regarding their reasonable rate that we would allow a representative new to our proceedings. However, we refer this issue for consideration in our current efforts (now underway) to develop hourly rates applicable to intervenors' work performed in 2006. We decline to make piecemeal adjustments to Resolution ALJ-184 and D.05-11-031, which is essentially what CARE's request would require of us.

We therefore find that the $270/hour rate awarded to Volker in D.06-04-018 complies with existing Commission directives, and we deny the petition for modification.

---

[1] D.05-02-003 and D.03-01-058.

A.02-09-043 ALJ/CFT/hkr

**Waiver of Comment Period**

This is an intervenor compensation matter. Accordingly, as provided by Rule 77.7(f)(6) of the Commission's Rules of Practice and Procedure (Rules), we waive the otherwise 30-day comment period for this decision.

**Assignment of Proceeding**

Dian M. Grueneich is the Assigned Commissioner, and Charlotte F. TerKeurst is the assigned Administrative Law Judge in this proceeding.

**Findings of Fact**

1. Stephan Volker was lead counsel for CARE in this proceeding.

2. Volker's work in this proceeding was performed in 2004.

3. D.06-04-018 adopted an hourly rate for Volker of $270.

4. Volker's rate was found reasonable in consideration of the guidelines in Resolution ALJ-184 for setting 2004 hourly rates.

5. The hourly rate guidelines in Resolution ALJ-184 and D.05-11-031 are being reviewed generically in connection with establishing hourly rates for 2006 work.

**Conclusions of Law**

1. Generic modifications, as appropriate, to the Commission's hourly rate guidelines and principles are preferable to piecemeal adjustments.

2. The petition for modification filed by CARE to increase the hourly compensation rate adopted in D.06-04-018 for attorney Stephan Volker to $400 should be denied, effective immediately.

3. Per Rule 77.7(f)(6), the comment period for this compensation decision may be waived.

4. This proceeding should be closed.

- 3 -

A.02-09-043  ALJ/CFT/hkr

# O R D E R

**IT IS ORDERED** that:

1. The petition for modification filed on April 17, 2006 in this proceeding by CAlifornians for Renewable Energy is denied.

2. The comment period for today's decision is waived.

3. Application 02-09-043 is closed.

This order is effective today.

Dated June 15, 2006, at San Francisco, California.

> MICHAEL R. PEEVEY
> President
> GEOFFREY F. BROWN
> DIAN M. GRUENEICH
> JOHN A. BOHN
> RACHELLE B. CHONG
> Commissioners

1  STEPHAN C. VOLKER (CSB #63093)
   JOSHUA A.H. HARRIS (CSB #226898)
2  MARNIE E. RIDDLE (CSB #233732)
   LAW OFFICES OF STEPHAN C. VOLKER
3  436 14th Street, Suite 1300
   Oakland, California 94612
4  Tel:  (510) 496-0600
   Fax:  (510) 496-1366
5
   Attorneys for Intervenors
6  CAlifornians for Renewable Energy

**ORIGINAL**

7

8

9              BEFORE THE PUBLIC UTILITIES COMMISSION
                              OF THE
10                     STATE OF CALIFORNIA

11     ADMINISTRATIVE LAW JUDGE CHARLOTTE F. TERKEURST, presiding.

12

| Application for a Certificate of Public ) | **APPLICATION OF CALIFORNIANS** |
|---|---|
| Convenience and Necessity Authorizing the ) | **FOR RENEWABLE ENERGY FOR** |
| Construction of the Jefferson-Martin 230 kV ) | **REHEARING OF DENIAL OF** |
| Transmission Project ) | **PETITION FOR MODIFICATION (06-** |
| ) | **06-025)** |
| ) | |
| ) | Application 02-09-043 |
| ) | Commission Hearing: 6-15-06 |
| ) | Mailing Date: 6-16-06 |

## I.   INTRODUCTION

Pursuant to Rule 85, Californians for Renewal Energy ("CARE") requests a rehearing of the Commission's Opinion Denying CARE's Petition for Modification (D.06-06-025, June 15, 2006) related to the underlying Opinion Granting Intervenor Compensation (D.06-04-018, April 13, 2006). CARE's Petition for Modification requested only one change to D.06-04-018, that the assignment of an hourly rate of $270 to CARE's lead counsel, Stephan C. Volker, be altered to the requested (and unopposed) hourly rate of $400. As discussed more thoroughly below, the Commission's denial of CARE's Petition for Modification was arbitrary and capricious and violated the Public Utilities Code. Mr. Volker's rate, therefore, should be revised to his market rate at the time the work in the present proceeding took place.

The stated reason in D.06-04-018 for reducing Mr. Volker's hourly rate to $270 is that

-1-

1  this Commission awarded Mr. Volker an hourly rate of $250 several years ago in a different

2  proceeding. The basis of that previous hourly rate, however, was *not that Mr. Volker's market*

3  *rate was then $250.*  Rather, the basis was that Mr. Volker's client, the Sierra Club, had, on April

4  4, 2000 and prior to its retention of Mr. Volker, filed a Notice of Intent to Claim Compensation

5  ("NOI") which capped its future counsel's hourly rate at $250.  Therefore, notwithstanding that

6  Mr. Volker's actual market rate in 2000 already exceeded $300, the Sierra Club only sought

7  compensation at the rate stated in its NOI – $250.

8        D.06-06-025 reiterates this logic, citing the Commission's resolution ALJ-184 and D.05-

9  11-031.  Specifically, the D.06-06-025 reads:

10       In Resolution ALJ-184, we set forth guidelines and principles for setting
         intervenors' hourly rates for work performed in 2004.  In D.05-11-031, we set
11       forth guidelines and principles for setting 2005 rates, and found that rates
         previously adopted in 2003 and 2004 are reasonable.  Resolution ALJ-184 deems
12       an increase of 8% above previously adopted 2003 rates as reasonable for work
         performed in 2004.  We previously adopted a rate of $250 for Volker for work
13       performed in 2000-2003.  Increasing Volker's 2003 rate by 8% results in the $270
         rate adopted in D.06-04-018 for his 2004 work.
14
   CARE challenges the Commission's mechanism, as delineated in ALJ-184 and D.05-11-031, for
15
   determining Mr. Volker's rate as arbitrary and capricious and contrary to the Public Utilities
16
   Code.
17
         The Commission's capping of future fees based on prior fee awards, without notice to the
18
   parties that would be affected in the future, arbitrarily assumes that past rates represent market
19
   rates for those past time periods.  Such an assumption does not take into account a myriad of
20
   relevant factors and circumstances underlying past fee awards – factors and circumstances
21
   demonstrating that all past fee rates do not automatically reflect past market rates.  For example,
22
   here, Mr. Volker's past fee award was not based on market rates.  Instead, Mr. Volker adhered to
23
   rates established in his client's NOI, which was filed prior to its selection of a lawyer for the
24
   case.  Mr. Volker's fee in that previous case therefore does not reflect his market rate – in fact,
25
   has nothing to do with his market rate – and, therefore, should not be used as a limiting factor on
26
   future fee awards.  Use of Mr. Volker's past, non-market rate to determine his current market rate
27
   is, thus, arbitrary and capricious.
28

                                              -2-

1    Additionally, application of Public Utilities Code section 1806, which directs that "[t]he

2  computation of compensation awarded pursuant to Section 1806 shall take into consideration the

3  market rates paid for persons of comparable training and experience who offer similar services,"

4  requires that Mr. Volker's time now be compensated at comparable market rates. As previously

5  documented by CARE and Mr. Volker, market rates for Mr. Volker, an environmental lawyer for

6  over 30 years, are at least $400 per hour. The Commission's refusal to modify its determination

7  that Mr. Volker's market rate equals $270 for work done in this proceeding, therefore, violates

8  the Public Utilities Code.

9    Accordingly, CARE respectfully applies to this Commission for a rehearing of the

10  Commission's D.06-06-025 and asks that Mr. Volker's hourly rate be corrected from $270 to

11  $400.

12                                    **II. ARGUMENT**

13  **A.    The Commission's Determination that Mr. Volker's Hourly Rate Was Properly Set
          at $270 is Arbitrary and Capricious.**

14

15    Niether D.06-04-018, nor D.06-06-025 addresses Mr. Volker's testimony documenting

16  his market rate of at least $400 per hour. D.06-04-018 at 61; D.06-06-025 at 2. Instead, the

17  decisions award $270 per hour based on the $250 hourly rate awarded Mr. Volker in a previous

18  proceeding (D. 05-02-003 and D. 03-01-058), "[w]ith an 8% upward adjustment." D.06-04-018

19  at 61, footnote 14; D.06-06-025 at 1-2. The Commission's reliance on the rate in this previous

20  proceeding, in the face of current, uncontroverted evidence demonstrating a much higher market

21  rate, is arbitrary and capricious. As such, the Commission should reconsider its denial of

22  CARE's Petition for Modification and revise Mr. Volker's rate to reflect his market rate at the

23  time the work in question took place.

24    D.06-04-018 relies upon the Commission's previous award of "an hourly rate of $250 for

25  Volker for work performed in both 2002 and 2003 in D.05-02-003 and D.03-01-058," decisions

26  awarding compensation in the matter of Application [No. 99-12-025] of Valencia Water

27  Company (U342-W) seeking approval of its updated water management program ("Valencia

28  proceeding"). Mr. Volker's client in that matter, Sierra Club, had submitted an NOI "currently

-3-

1    estimat[ing] that its attorney will [provide services] . . . at a proposed hourly rate of $250/hour"

2    on April 4, 2000.  Supporting Declaration of Counsel ih Support of CARE's Petition for

3    Modification, filed April 15, 2006 ("Supporting Dec.") at 7:17-25.  Subsequently the Sierra Club

4    retained Mr. Volker to represent it in the Valencia proceeding.  *Id.*  On December 14, 2000, this

5    Commission, per the Honorable Josiah L. Neeper, granted the Sierra Club's motion for

6    acceptance of its late-filed NOI.  *Id.*  Following the first phase of the Valencia proceeding, by

7    Decision 03-01-058 dated January 30, 2003, this Commission awarded $46,990.96 for the legal

8    services provided by Mr. Volker (and incidental costs).  Noting that "*attorney Volker . . . has*

9    *been awarded attorney's fees at the hourly rate of $300* based on his extensive experience in the

10   field of environmental litigation," this Commission "conclude[d] that based on Volker's

11   experience, the requested hourly rate of $250 for services provided in 2000 and 2001 is

12   reasonable."  D. 03-01-058 at 7,[1] emphasis added.

13        Thereafter, by D.05-02-003, dated February 10, 2005, this Commission granted Sierra

14   Club's Second Request for Intervenor Compensation, for legal services provided by Mr. Volker

15   subsequently in the Valencia proceeding.  In D.05-02-003, this Commission awarded Sierra Club

16   $4,074.18 in compensation for further services provided by Mr. Volker and his staff primarily in

17   2002, based on the same hourly rate requested by Sierra Club in its 2000 NOI, $250.  *Id.* at 18.

18   Neither the Sierra Club nor Mr. Volker represented, nor did this Commission find, that the

19   market value of Mr. Volker's services at that time was no greater than $250 per hour.  Rather, the

20   Commission found the converse, that in 2000 and 2001 Mr. Volker's market rate was *no less*

21   *than* $250.[2]  D. 03-01-058 at 9, ¶ 6, emphasis added.

22   _____

23        [1] D.06-04-018 erroneously states that D.03-01-058 "awarded an hourly rate of $250 for
     Volker for work performed in both 2002 and 2003." Opinion at 61.  In fact, D. 03-01-058 awarded
24   Mr. Volker "the requested hourly rate of $250 for services provided in 2000 and 2001." D. 03-01-
     058 at 7.
25
         [2] Additionally, D.06-04-018's conclusion that the $250 hourly rate awarded in
26   D.05-02-003 and D.03-01-058 was for "work performed in both 2002 and 2003," is in error.  As this
     Commission noted in D.03-01-058, that award was "for services provided in 2000 and 2001." D.03-
27   01-058 at 7.  The much smaller award in D.05-02-003 was for work performed primarily in 2002.
     D.05-02-003 at 19.  Accordingly, even assuming, contrary to the facts and law as outlined above, that
28

1    The Commission's current refusal to alter it method of calculation of Mr. Volker's fees

2    fails to account for the circumstances underlying the payment of $250/hour for Mr. Volker's

3    services.  The Commission's inherent presumption that $250/hour reflected Mr. Volker's past

4    market rate is *directly contradicted by the prior opinion's citation of a higher market rate –*

5    $300/hour – for Mr. Volker.  Pegging Mr. Volker's current market rate to Commission

6    determinations of past, non-market rates is arbitrary and capricious, and thus the Commission

7    should revise Mr. Volker's rate in this proceeding.

8    **B.    The Commission's Determination that Mr. Volker's Hourly Rate Was Properly Set
9          at $270 Violates Public Utilities Code Section 1806.**

10          **1.    Public Utilities Code Section 1806 Requires this Commission to Take into
                   Consideration the Market Rate Paid to Persons of Comparable Training and
11                 Experience Who Offer Similar Services to Those of Mr. Volker.**

12    Public Utilities Code section 1806 directs in pertinent part that "[t]he computation of

13    compensation awarded pursuant to Section 1806 shall take into consideration the market rates

14    paid to persons of comparable training and experience who offer similar services."  Thus, in

15    determining whether Mr. Volker should be compensated at the requested rate of $400 per hour,

16    this Commission must "take into consideration the market rates paid to persons of comparable

17    training and experience who offer similar services."  The Commission's decision to determine

18    Mr. Volker's rate based solely on a prior, non-market rate determination violates Section 1806.

19    **2.    D.06-06-025 Does Not Conform to Public Utilities Code Section 1806.**

20    Mr. Volker's rates should be modified to conform to section 1806's mandate.  The

21    Commission's determination of his rates should reflect the undisputed evidence submitted by

22    CARE establishing that the market value of Mr. Volker's services in 2004 was at least $400 per

23    hour.  There is no contrary evidence.  No party objected to Mr. Volker's requested rate of $400.

24    There is no evidence that Mr. Volker's 2004 market rate was less than $400 per hour.

25    The stated basis for D.06-04-018's selection of a $270 hourly rate is the $250 rate

26    _____

27    the hourly rate awarded in the Valencia proceeding was based on Mr. Volker's actual market rate,
      because the vast bulk of that work was performed in 2000 and 2001, the Commission's 8% upward
28    adjustment would yield an hourly rate of either $314.93 ($250 increased by three years (from 2001
      to 2004) times the permissible 8% annual increase) or $340.12 ($250 increased by four years (from
      2000 to 2004) times 8%).

1  awarded for Mr. Volker's services in a separate proceeding where the Commission simply

2  granted the rate requested.[3] As discussed above, that request did not reflect the market value of

3  Mr. Volker's services. Rather, it reflected the $250 rate set forth in the NOI that Mr. Volker's

4  client had submitted before retaining him.

5      Unless corrected, D.06-04-018 creates an inequity at odds with section 1806. For

6  example, the Opinion correctly awards compensation at the rate of $470 per hour to lead counsel

7  for intervenor 280 Citizens, Edward O'Neill, for work performed in 2004, the same year for

8  which compensation is sought for Mr. Volker's services. D.06-04-018 at 38. Mr. O'Neill

9  received his law degree in 1977 (three years after Mr. Volker), and has extensive relevant

10  experience yielding a market rate of $470.00. Mr. Volker likewise has extensive relevant

11  experience, including over thirty years of specialized experience in administrative and

12  environmental law, and over forty published rulings in state and federal courts. *See*, Request of

13  Californians for Renewable Energy for Award of Compensation and Supporting Declaration of

14  Counsel filed October 6, 2004 ("CARE's Fee Request") at 7:5-12. Yet D.06-04-018

15  compensated Mr. Volker at an hourly rate *$200.00 lower than Mr. O'Neill.* Similarly, the

16  Commission correctly awarded hourly rates of $315 to attorney Christopher Hilen, and $310 to

17  attorney Jeffrey Gray, associate counsel for 280 Citizens, for work performed in 2004. D.06-04-

18  018 at 39. Although Mr. Hilen has about half as much experience – 15 years – as Mr. Volker,

19  and Mr. Gray, less than one-third (nine years), their approved rates are respectively $45 and $40

20  *higher* than the $270 awarded Mr. Volker. *Id.* at 39 and 61. CARE requests parity with these

21  awards, consistent with section 1806.

22      **3.    Mr. Volker's Market Rate Is at Least $400 per Hour.**

23      In support of CARE's Fee Request, it submitted the Declaration of Stephan C. Volker

24  documenting the market value of his services. Mr. Volker's declaration stated that he had "thirty

25  years' experience as a practicing environmental lawyer in California," and "[d]uring the past

26  three decades [had] actively participated, typically as the lead plaintiffs' attorney, in over forty

27  published cases in state and federal courts." Supporting Dec. at 7:5-10. Mr. Volker testified that

28  _____

[3] D.06-04-018 at 61, footnote 14, citing D.05-02-003 and D.03-01-058.

-6-

1   he was "familiar with the market value of [his] services, based on declarations submitted by

2   knowledgeable attorneys in numerous attorney fee motions in other proceedings." *Id.* at 7:10-11.

3   Mr. Volker testified that based thereon, "[t]he market value of my services is between $400 and

4   $500 per hour." *Id.* at 7:11-12. Had any party questioned this evidence, CARE would have

5   submitted additional documentation of this rate, such as the San Francisco Superior Court's

6   award of $450 per hour for all of Mr. Volker's time in 2004 successfully prosecuting the

7   California Coastal Commission for violating environmental laws. *Id.* 7:7-11.

8        There is simply no evidence in this proceeding that the market value of Mr. Volker's time

9   is less than $400. No party objected to CARE's Request for Compensation, and no evidence

10   contrary to Mr. Volker's testimony was submitted by any party. Accordingly, consistent with

11   Section 1806, the Commission should grant this request for rehearing and change the rate

12   awarded for Mr. Volker's time to reflect the market rates paid to persons of comparable training

13   and experience who offer similar services: at least $400 per hour.

14               **III.    CONCLUSION**

15        For the foregoing reasons, CARE respectfully requests a rehearing of D.06-06-025 and

16   asks that this Court correct the hourly rate adopted in D.06-04-018 for Mr. Volker from $270 to

17   $400 to reflect the actual market value of his services in 2004, which is at least $400.

18   Dated: July 13, 2006

19                            Respectfully submitted,

20

21                       By:

22                           Joshua A.H. Harris
                               Attorney for Intervenor Californians for
                               Renewable Energy

23

24

25

26

27

28

1

**PROOF OF SERVICE BY MAIL OF REQUEST OF CALIFORNIANS FOR
RENEWABLE ENERGY FOR AWARD OF COMPENSATION**

2

**Application 02-09-043**

3

I am a resident of the United States and of the State of California. I am employed in the
County of Alameda. My business address is 436 - 14th Street, Suite 1300, Oakland, California

4

94612. My business telephone number is (510) 496-0600, and fax number is (510) 496-1366.
I am over the age of eighteen years. I am not a party to the within action or proceeding. On July

5

13, 2006, I served the following document(s):

6

**APPLICATION OF CALIFORNIANS FOR RENEWABLE ENERGY FOR REHEARING
OF DENIAL OF PETITION FOR MODIFICATION (06-06-025)**

7

8

by e-mailing the above-entitled document to the parties' e-mail addresses indicated on the
attached list of counsel or, if counsel has no e-mail address availability, said documents were
enclosed in an envelope which I placed for collection and mailing on the date and at the place

9

shown below following our ordinary business practices. I am readily familiar with this
business's practice for e-mailing and collecting and processing correspondence for mailing. On

10

the same day that correspondence is placed for collection and mailing, it is deposited in the
ordinary course of business with the United States Postal Service in a sealed envelope with

11

postage fully prepaid, addressed as listed on the attached following pages.

12

I declare under penalty of perjury that the foregoing is true and correct. Executed July 13,
2006, at Oakland, California.

13

14

Teddy Ann Fuss

15

16

**SEE ATTACHED LIST**

17

18

19

20

21

22

23

24

25

26

27

28

-8-

| | | |
|---|---|---|
| Kevin J. Simonsen<br>Energy Management Services<br>646 East Third Ave.<br>Durango, CO 81301<br>kjsimonsen@ems-ca.com | Bill Powers<br>Powers Engineering<br>4452 Park Blvd., Suite 290<br>San Diego, CA 92116<br>bpowers@powersengineering.com | Mary I. Turley<br>San Diego Gas &·Electric Co.<br>8330 Century Park Court, Cp22d<br>San Diego, CA 92123-1530<br>mturley@semprautilities.com |
| Dale Perkins<br>3010 Trousdale Drive<br>Burlingame, CA 94010<br>dale@sfwatercolors.com | Holly B. Pease<br>280 Corridor Concerned Citizens Group<br>1701 Black Mountain Road<br>Hillsborough, CA 94010<br>hbpease@yahoo.com | Jose F. Campos<br>2935 Trousdale Drive<br>Burlingame, CA 94010<br>jfccpa@sbcglobal.net |
| Justin Nyberg, Reporter<br>Independent/Examiner Newspaper<br>1828 El Camino Real, Suite 606<br>Burlingame, CA 94010<br>snyberg@smindependent.com | Lori and Andrew Urushima<br>1510 Los Altos Drive<br>Burlingame, CA 94010<br>Lurushima@FremontGroup.com | Michael Meloni<br>Town of Hillsborough<br>1600 Floribunda Ave.<br>Hillsborough, CA 94010<br>mmeloni@hillsca.org |
| Thomas M. Kasten<br>1320 Buckingham Way<br>Hillsborough, CA 94010<br>netsakt@aol.com | Lennis Roberts<br>Committee for Green Foothills Org.<br>339 La Cuesta<br>Portola Valley, CA 94028<br>lennie@darwin.ptvv.ca.us | Mario Rabinowitz<br>715 Lakemead Way<br>Redwood City, CA 94062<br>mario@earthlink.net |
| Michael J. Valencia<br>Ross Hackett Dowling Valencia Walti<br>600 El Camino Real<br>San Bruno, CA 94066-0279<br>ross-ndv@pacbell.net | Marc D. Joseph<br>Adams Broadwell Joseph & Cardozo<br>651 Gateway Blvd., Suite 900<br>South San Francisco, CA 94080<br>mdjoseph@adamsbroadwell.com | Bruce Foster<br>Southern California Edison<br>601 Van Ness Avenue, Suite 2040<br>San Francisco, CA 94102<br>fosterbc@sce.com |
| Sean Casey<br>City and County of San Francisco<br>1155 Market Street, 4th Floor<br>San Francisco, CA 94103<br>scasey@sfwater.org | Matthew Hirsch<br>San Francisco Bay Guardian<br>135 Mississippi<br>San Francisco, CA 94107<br>matthew@sfbg.com | California Energy Markets<br>517-B Potrero Avenue<br>San Francisco, CA 94110<br>Cem@newsdata.com |
| Jeffrey P. Gray<br>Davis Wright Tremaine LLP<br>280 Corridor Concerned Citizens Group<br>One Embarcadero Center, Suite 600<br>San Francisco, CA 94111<br>jeffgray@dwt.com | Sarah Esmaili<br>Latham & Watkins<br>505 Montgomery St., Suite 1900<br>San Francisco, CA 94111<br>sarah.esmaili@lw.com | Victor Cayanan<br>Latham & Watkins<br>505 Montgomery St., Suite 1900<br>San Francisco, CA 94111<br>Victor.Cayanan@lw.com |

| | | |
|---|---|---|
| Lulu Weinzimer<br>California Energy Circuit<br>695 9th Ave., #2<br>San Francisco, CA 94118<br>lisaweinzimer@sbcglobal.net | Jonathan Gervals<br>Golden Gate National<br>Recreation Area<br>Building 201, Fort Mason<br>San Francisco, CA 94123<br>jonathan_gervals@nps.gov | Francisco Da Costa<br>Environmental Justice<br>Advocacy<br>Chairperson, Rosemary<br>Cambra of the Muwekma<br>Ohlone Tribe<br>4909 Third Street<br>San Francisco, CA 94124<br>frandacosta@att.net |
| James Andrew<br>324A Lombard Street<br>San Francisco, CA 94133<br>jwandrew@yahoo.com | Clifford E. Donley<br>Highlands Community<br>Association<br>30 Shelburne Place<br>San Mate, CA 94402<br>clifpat@earthlink.net | Michele Nemschoff<br>280 Corridor Concerned<br>Citizens Group<br>2020 Lexington Avenue<br>San Mateo, CA 94402<br>mnemschoff@earthlink.net |
| Barry Flynn<br>Flynn & Associates<br>City & County of San<br>Francisco<br>1540 Discovery Bay Blvd.,<br>Suite G<br>Discovery Bay, CA 94514<br>brflynn@flynnrci.com | Barbara Goodyear<br>U.S. Dept. of Interior<br>Solicitor's Office<br>Nat'l. Park Service, Golden<br>Gate Nat'l. Recreation Area<br>1111 Jackson St., Suite 735<br>Oakland, CA 94607<br>bgoodyear@ios.doi.gov | Sky Woodruff<br>Meyers, Nave, Riback<br>555 12th St., Suite 1500<br>Oakland, CA 94607<br>swoodruff@meyersnave.com |
| MRW & Assoc.<br>1999 Harrison St., #1440<br>Oakland, CA 94612<br>mrw@mrwassoc.com | Lynn Alexander<br>LMA Consulting<br>129 Redwood Ave.<br>Corte Madera, CA 94925<br>lynn@lmaconsulting.com | John C. Gabrielli<br>Gabrielli Law Office<br>423 E Street<br>Davis, CA 95616<br>gumbrelli@cs.com |
| K. Shawn Smallwood<br>L09 Luz Place<br>Davis, CA 95616<br>puma@davis.com | Richard McCann<br>2655 Portage Bay. Suite 3<br>Davis, CA 95616<br>rmccann@umich.edu | Carolyn M. Kehrein<br>Energy Management Services<br>1505 Dunlap Court<br>Dixon, CA 95620-4208<br>cmkehrein@ems-ca.com |
| California Independent Sys<br>Oper Corporat<br>151 Blue Ravine Road<br>Folsom, CA 95630<br>e-recipient@caiso.com | Gary Deshazo<br>California ISO<br>151 Blue Ravine Road<br>Folsom, CA 95630<br>gdeshazo@caiso.com | Maria E. Stevens<br>CPUC<br>320 W. 14th St., Suite 500<br>Los Angeles, CA 90013<br>mer@cpuc.ca.gov |
| Belinda Gatti<br>CPUC<br>505 Van Ness Ave.<br>San Francisco, CA 94102-<br>3214<br>beg@cpuc.ca.gov | Billie C. Blanchard<br>CPUC<br>505 Van Ness Ave.<br>San Francisco, CA 94102-<br>3214<br>bcb@cpuc.ca.gov | Charlotte Terkeurst<br>CPUC<br>505 Van Ness Ave.<br>San Francisco, CA 94102-<br>3214<br>cft@cpuc.ca.gov |
| Harriett J. Burt<br>CPUC<br>505 Van Ness Ave.<br>San Francisco, CA 94102-<br>3214<br>hjb@cpuc.ca.gov | Joseph A. Abhulimen<br>CPUC<br>505 Van Ness Ave.<br>San Francisco, CA 94102-<br>3214<br>jaa@cpuc.ca.gov | Kelly C. Lee<br>CPUC<br>505 Van Ness Ave.<br>San Francisco, CA 94102-<br>3214<br>kcl@cpuc.ca.gov |

| | | |
|---|---|---|
| Lainie Motamedi<br>CPUC<br>505 Van Ness Ave.<br>San Francisco, CA 94102-3214<br>lrm@cpuc.ca.gov | Scott Logan<br>CPUC<br>505 Van Ness Ave.<br>San Francisco, CA 94102-3214<br>sjl@cpuc.ca.gov | Susan Lee<br>Aspen Environmental Group<br>CPUC Energy Division<br>235 Montgomery St., Suite 800<br>San Francisco, CA 94104<br>sll@aspeneg.com |
| Clare Laufenber Gallardo<br>California Energy Commission<br>1516 Ninth St., Ms 46<br>Sacramento, CA 95814<br>claufenb@energy.state.ca.us | Mark Hudak<br>Ingersoll, Thomposon & Horn<br>Town of Hillsborough<br>216 Park Road<br>Burlingame, CA 94010<br>mhudak@cmithlaw.com | Martha Debry<br>Town of Hillsborough<br>1600 Floribunda Ave.<br>Hillsborough, CA 94010<br>mdebry@hillsca.org |
| Stan Gustavson<br>City Hall<br>333 90th Street<br>Daly City, CA 94015<br>ajustavson@dalycity.org | Mary K. Raftery<br>County of San Mateo<br>400 County Center<br>Redwood City, CA 94063<br>mraftery@co.sanmateo.ca.us | Lee A. Thompson<br>Hall of Justice and Records<br>Burlingame Elementary School Dist.<br>400 County Center, 6th Flr<br>Redwood City, CA 94063-1662<br>lathompson@co.sanmate.ca.us |
| Pamela Thompson<br>City of San Bruno<br>567 El Camino Real<br>San Bruno, CA 94066<br>pthompson@ci.sanbruno.ca.us | Michael J. Valencia<br>Ross Hackett, et al.<br>600 El Camino Real<br>San Bruno, CA 94066-0279<br>ross-ndv@packbell.net | Marion Peleo<br>CPUC<br>505 Van Ness Ave.<br>San Francisco, CA 94102-3214<br>map@cpuc.ca.gov |
| Joseph P. Como<br>City and County of San Francisco<br>1 Dr. Carlton B. Goodlett Pl.<br>San Francisco, CA 94102-4682<br>joe.como@sfgov.org | Joan L. Cassman<br>Hanson Bridgett et al.<br>City of Millbrae<br>333 Market St., #2300<br>San Francisco, CA 94105<br>jcassman@hansonbridgett.com | Peter H. Weiner<br>Paul Hastings<br>Gateway Property Owners Assn/HMS<br>Oyster Pt. Blvd./Concerned Businesses of 101<br>55 2nd Street, 24th Floor<br>San Francisco, CA 94105<br>peterweiner@paulhastings.com |
| Zachary R. Walton<br>Paul Hastings<br>Oyster Pt. Blvd./Concerned Businesses of 101<br>55 2nd Street, 24th Floor<br>San Francisco, CA 94105<br>zacharywalton@paulhastings.com | Jeanne B. Armstrong<br>Ritchie & Day LLP<br>City of Burlingame<br>505 Sansome Street, #900<br>San Francisco, CA 94111<br>jarmstrong@gmssr.com | Louis G. Leonard III<br>Latham & Watkins<br>PG&E<br>505 Montgomery St., #1900<br>San Francisco, CA 94111<br>louis.leonard@lw.com |

| | | |
|---|---|---|
| Michael B. Day<br>Goodin MacBride et al.<br>City of Burlingame<br>505 Sansome St., #900<br>San Francisco, CA 94111<br>mday@gmssr.com | Richard W. Rauschenbush<br>Latham & Watkins<br>PG&E<br>505 Montgomery St., #1900<br>San Francisco, CA 94111<br>richard.raushenbush@lw.com | Edward W. O'Neill<br>Davis Wright Tremaine<br>280 Corridor Concerned<br>Citizens Group<br>One Embarcadero Ctr., #600<br>San Francisco, CA 94111-3834<br>edwqradoneill@dwt.com |
| A. Karp<br>White & Case<br>Mirant Americas, Inc.<br>Three Embarcadero Ctr.<br>#2210<br>San Francisco, CA 94111-4050<br>jkarp@whitecase.com | David Kraska<br>PG&E<br>P.O. Box 7442<br>San Francisco, CA 94120<br>dtk5@pge.com | Lynne Brown<br>Californians for Renewable<br>Energy<br>24 Harbor Road<br>San Francisco, CA 94124<br>l_brown123@yahoo.com |
| Peter W. Hanschen<br>Morrison & Foerster<br>Genentech<br>101 Ygnacio Valley Road,<br>#450<br>Walnut Creek, CA 94596-8130<br>phanschen@mofo.com | Patrick Whitnell<br>Meyers Nave, et al.<br>City of South San Francisco<br>555 Twelfth St., #1500<br>Oakland, CA 94607<br>pcw@meyersnave.com | Michael E. Boyd<br>Californians for Renewable<br>Energy<br>5439 Soquel Drive<br>Soquel, CA 95073<br>michaelboyd@sbcglobal.net |
| Grant A. Rosenblum<br>California Independent<br>System<br>151 Blue Ravine Road<br>Folsom, CA 95630<br>grosenblum@caiso.com | Barbara George<br>Women's Energy Matters<br>P.O. Box 162008<br>Sacramento, CA 95816<br>bgtwem@igc.org | Michael Kloefkom<br>3225 Blake Street, Cable 26<br>Denver, CO 80205<br>michael@vmwp.com |

L/jmc

**Mail Date
10/6/06**

Decision 06-10-023          October 5, 2006

BEFORE THE PUBLIC UTILITIES COMMISSION OF THE STATE OF CALIFORNIA

| | |
|---|---|
| In the Matter of the Application of Pacific Gas and Electric Company (U 39 E) for a Certificate of Public Convenience and Necessity Authorizing the Construction of the Jefferson-Martin 230kV Transmission Project. | Application 02-09-043 (Filed September 30, 2002) |

## ORDER MODIFYING DECISION (D.) 06-06-025 FOR PURPOSE OF CLARIFICATION AND DENYING REHEARING, AS MODIFIED

## I.    INTRODUCTION

In D.06-04-018, we set an hourly rate of $270 for work performed by Californians for Renewable Energy's ("CARE") lead counsel, Mr. Volker, in 2004, although CARE had requested an hourly rate of $400. *(Id.* at pp. 60-61 (slip op.).) Decision 06-04-018 found that this Commission considered the market rate standard set forth in Public Utilities Code section 1806, as presented by CARE, and awarded compensation based on an hourly rate of $250 for work performed by Volker in both 2002 and 2003. *(Id.* at pp. 60-61 (slip op.).)  No application for rehearing of D.06-04-018 was filed, and thus, this decision became final.[1]

---

[1] D.06-04-018 became final and unappealable on June 16, 2006. We note that CARE's application for rehearing and the petition for modification could be considered an impermissible collateral attack of D.06-04-018.

251294

A.02-09-043                          L/jmc

        In D.06-06-025, we denied CARE's petition for modification of D.06-04-018 on the grounds that the $270 hourly rate awarded to Mr. Volker in D.06-04-018 complies with existing Commission directives regarding intervenor hourly rates, including Resolution ALJ-184 (August 19, 2004). (D.06-06-025, pp. 1-2.) CARE timely filed an application for rehearing of D.06-06-025. In its rehearing application, CARE alleges that the Commission's determination that Mr. Volker's hourly rate of $270 is arbitrary and capricious, and that it violates Public Utilities Code section 1806. In addition, CARE claims that D.06-04-018's conclusion that the $250 hourly rate awarded in D.05-02-003 and D.03-01-058, was for work performed in both 2002 and 2003 is in error.

        After careful consideration of all the arguments presented in CARE's application for rehearing of D.06-06-025, we are of the opinion that good cause for rehearing has not been demonstrated. We will however modify D.06-06-025 to clarify that D.06-04-018 may have misspoken regarding the time period for the $250 hourly rate derived from D.03-01-058 and D. 05-02-003. Accordingly, CARE's application for rehearing of D.06-06-025, as modified, is denied.

## II.    DISCUSSION

### A.    CARE fails to establish legal error.

        CARE's section 1806 argument has no merit. In D.06-06-025, we reviewed the rationale in D.06-04-018 for awarding the hourly rate of $250 for the work Mr. Volker performed in 2004. We observed that D.06-04-018 was consistent with section 1806, which required the Commission "take into consideration the market rates paid to persons of comparable training and experience who offer similar services. (D.06-06-025, pp. 1-2, see also, *Opinion Granting Intervenor Compensation* [D.06-04-018], *supra*, pp. 37, 58-59, & 63 (slip op.).) We further noted that D.06-04-018 acted in a manner consistent with Resolution ALJ-184 and *Rulemaking to Set Hourly Rates for Purposes of Calculating Intervenor Compensation Awards, Pursuant to Public Utilities Code Section 1801 and Following, for Work Performed in Calendar Year 2005* [D.05-11-

A.02-09-043                          L/jmc

031] (2005) ___ Cal.P.U.C.3d ___, wherein we adopted rates for individual advocates based on their specific training and experience, taking into consideration the compensation of persons with comparable training and experience.[2]  Specifically, in D.06-06-025, we found the arguments set forth in CARE's petition for modification unpersuasive.  Most of the arguments were the same ones made during the proceeding that resulted in D.06-04-018.  Thus, in D.06-06-025, we affirmed the $250 hourly rate adopted in D.06-04-018, because it was consistent with section 1806 and Resolution ALJ-184.  Accordingly, we acted reasonably, and not arbitrarily or capriciously.

We note that in its rehearing application, CARE continues to argue that the hourly rate set forth in D.06-04-18 was not commensurate with Mr. Volker's years of legal practice in environmental law.  (Application for Rehearing, pp. 6-7.)  CARE reiterates the arguments it set forth in the petition for modification, but fails to specify how the Commission might have committed legal error in D.06-06-025 by rejecting the unpersuasive arguments set forth in the petition for modification on this issue.  Accordingly, no legal error has been demonstrated, and rehearing is denied.

**B.    Modification of D.06-06-025 for Purposes of Clarification**

In its petition to modify D.06-04-018 and application for rehearing of D.06-06-025, CARE asserts that:

> D.06-04-018's conclusion that the $250 hourly rate awarded in D.05-02-003 and D.03-01-058, was for 'work performed in both 2002 and 2003', is in error.  As this Commission noted in D.03-01-058, that award was 'for service provided in 2000 and 2001.'  The much smaller award in D.05-02-003 was for work performed primarily in 2002.

---

[2] In response to Mr. Volker's assertion that his prior rate should not be controlling, D.06-06-025 notes that "it may be appropriate to allow veteran representatives, under some circumstances, to make the same showing regarding their reasonable rate that we would allow a representative new to our proceedings" but defers this issue to current Commission efforts to develop hourly rates and declines to make the kind of piecemeal adjustments that CARE now requests.  (D.06-06-025, p. 2.)

3

A.02-09-043                    L/jmc

(Petition for Modification, p. 6, fn. 2, citations omitted; see also, Application for
Rehearing, p. 4, fn. 2, citations omitted.)  A review of D.03-01-058 and D.05-02-003
demonstrates that CARE's factual assertion may warrant clarification.  (See *Opinion on
Requestion for Intervenor Compensation* [D.03-01-058], *supra*, at p. 7; *Opinion on
Second Request for Intervenor Compensation* [D.05-02-003], *supra*, at pp. 13 & 17, and
attached Compensation Decision Summary.)  Decision 06-04-018 inadvertently attributes
the $250 hourly rate for work done only in 2002 and 2003.  (See *Opinion Granting
Intervenor Compensation*, *supra*, at p. 61.)  However, D.06-06-025, citing to
D.05-02-003 and D.03-01-058, correctly notes that the Commission previously adopted a
rate of $250 for Volker's work performed between 2000 and 2003.  (D.06-06-025, p. 2.)
Although D.06-06-025 sets forth the correct time period for the work performed at a $250
hourly rate, it does not acknowledge the error in D.06-04-018.  Accordingly, we will
modify D.06-06-025 to explain this issue.

   That D.06-04-018 inadvertently attributed the $250 hourly rate afforded
Volker for his 2002 and 2003 work in D.05-02-003 to both D.05-02-003 and
D.03-01-058 has no effect on the calculation of Mr. Volker's hourly rate in D.06-04-018
(as reaffirmed by D.06-06-025), because he also received $250 an hour for work
performed in 2000 and 2001.  Mr. Volker's hourly rate in 2003, his most recent prior year
in a proceeding before the Commission, was $250.  Pursuant to Resolution ALJ-184, an
8% escalation factor is applied to the hourly rate adopted for work performed in 2003.
(Resolution ALJ-184, pp. 6-7.)  Accordingly, and as noted in D.06-06-025, "increasing
Volker's 2003 rate by 8% results in the $270 rate adopted in D.06-04-018 for his 2004
work."  (D.06-06-025, p.2.)

   **THEREFORE, IT IS ORDERED THAT:**

   1. D.06-06-025 is modified to add the following clarification to footnote 1
on page 2:

> We note that D.06-04-018, p. 61 indicated that these
> decisions adopted an hourly rate of $250 for work performed
> in both 2002 and 2003.  We were mistaken as to the time
> period.  D.03-01-058 provided an hourly rate of $250 for

4

A.02-09-043                          L/jmc

2000 and 2001, and D.05-01-058 provided the same $250
hourly rate for work performed in 2002 and 2003.


2. CARE's Application for Rehearing of D.06-06-025, as modified, is
hereby denied.

This order is effective today.

Dated October 5, 2006, at San Francisco, California.


MICHAEL R. PEEVEY
President
GEOFFREY F. BROWN
DIAN M. GRUENEICH
JOHN A. BOHN
RACHELLE B. CHONG
Commissioners



COURT OF APPEAL OF THE STATE OF CALIFORNIA
FIRST APPELLATE DISTRICT

CALIFORNIANS FOR RENEWABLE )
ENERGY, )
 )
 )    No. A115703
        Petitioner, )
 )
    v. )
 )
CALIFORNIA PUBLIC UTILITIES )
COMMISSION, )
 )
        Respondent. )
 )
 )
PACIFIC GAS & ELECTRIC COMPANY )
 )
    Real Party in Interest )
 )

NOV 0 3 2008

EXECUTIVE DIRECTOR'S OFFICE

ON REVIEW OF CALIFORNIA PUBLIC UTILITIES COMMISSION
DECISION NOS. 06-10-023 AND 06-06-025
IN APPLICATION NO. 02-09-043

PETITION FOR WRIT OF REVIEW,
MANDAMUS OR OTHER APPROPRIATE RELIEF
[APPENDIX FILED SEPARATELY]

Stephan C. Volker (CBN #063093)
Joshua A. H. Harris (CSB #226898)
Marnie E. Riddle (CSB #233371)
LAW OFFICES OF STEPHAN C. VOLKER
436 14th Street, Suite 1300
Oakland, CA 94612
Tel:    510/496-0600
Fax:    510/496-1366

Attorneys for Petitioner Californians for
Renewable Energy

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................. iii

PETITION FOR WRIT OF REVIEW ......................... 1

I.    INTRODUCTION ..................................... 1

II.   PARTIES .......................................... 4

III.  PROCEDURAL AND FACTUAL HISTORY .............. 6

IV.   RIPENESS FOR REVIEW ........................... 8

V.    JURISDICTION ..................................... 8

VI.   VENUE ........................................... 9

VERIFICATION ......................................... 10

MEMORANDUM OF POINTS AND AUTHORITIES ........... 12

I.    THE COMMISSION'S DETERMINATION THAT MR.
      VOLKER'S HOURLY RATE WAS PROPERLY
      SET AT $270 IS ARBITRARY AND CAPRICIOUS. ....... 12

II.   THE COMMISSION'S DETERMINATION THAT MR.
      VOLKER'S HOURLY RATE WAS PROPERLY SET
      AT $270 VIOLATES PUBLIC UTILITIES CODE
      SECTION 1806. .................................... 15

      A.    Public Utilities Code Section 1806 Requires the
            Commission to Take into Consideration the
            Market Rate Paid to Persons of Comparable
            Training and Experience Who Offer Similar
            Services to Those of Mr. Volker. .................. 15

      B.    D.06-06-025 Does Not Conform to Public
            Utilities Code Section 1806. ...................... 16

C.    Mr. Volker's Market Rate Is at Least $400 per Hour. . . 18

III.    CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

CERTIFICATE OF WORD COUNT . . . . . . . . . . . . . . . . . . . . . . . . . 20

# TABLE OF AUTHORITIES

## STATUTES

Code of Civil Procedure
      § 388 .................................................... 12

Public Utilities Code
      § 701 ..................................................... 5
      § 1731 .................................................... 8
      § 1756 .................................................... 1
      § 1756(a) ................................................. 8
      § 1756(b) ................................................. 8
      § 1756(d) ................................................. 9

## OTHER AUTHORITIES

California Constitution
      Article XII, section 5 ...................................... 5

## PETITION FOR WRIT OF REVIEW

By this Verified Petition for Writ of Review, Mandamus, or Other

Appropriate Relief, petitioners allege as follows:

### I. INTRODUCTION

1.      Pursuant to Public Utilities Code section 1756, Californians

for Renewable Energy ("CARE") hereby petitions this Court for a writ of

review of the Public Utilities Commission's ("PUC's" or the

"Commission's") Decisions Denying CARE's Petition for Rehearing (D.06-

10-023, October 5, 2006) and previous Petition for Modification (D.06-06-

025, June 15, 2006) related to the underlying Opinion Granting Intervenor

Compensation (D.06-04-018, April 13, 2006) in A.02-09-043.[1]

2.      CARE's Petition for Rehearing and its Petition for

Modification requested only one change to D.06-04-018, that the

assignment of an hourly rate of $270 to CARE's lead counsel, Stephan C.

Volker, be altered to the requested (and unopposed) hourly rate of $400.

CARE seeks a readjustment of the hour rate awarded to its counsel in this

proceeding so that it can continue to represent unprivileged, under-

represented Californians in important proceedings before the PUC.  In the

---

[1] True copies of the Commission's Decisions 06-10-023, 06-06-025, and 06-04-018 are annexed in the Appendix as Tabs 4, 6, and 8, hereto and incorporated herein by this reference.

underlying proceeding at issue here, CARE advocated for the immediate closure of the Hunter Point Power Plant and defended the right to a healthy environment on behalf of the citizens of the Hunters Point and Bayview neighborhoods of San Francisco.

3.      As discussed more thoroughly below, the Commission's denial of CARE's petitions was arbitrary and capricious and violated the Public Utilities Code.  Mr. Volker's rate, therefore, should be revised to his market rate at the time the work in the present proceeding took place.  The PUC's stated reason for reducing Mr. Volker's hourly rate to $270 is that this Commission awarded Mr. Volker an hourly rate of $250 several years ago in a different proceeding.  The basis of that previous hourly rate, however, was *not that Mr. Volker's market rate was then $250*.  Rather, the basis was that Mr. Volker's client, the Sierra Club, had, on April 4, 2000 and prior to its retention of Mr. Volker, filed a Notice of Intent to Claim Compensation ("NOI") which capped its future counsel's hourly rate at $250.  Therefore, notwithstanding that Mr. Volker's actual market rate in 2000 already exceeded $300, the Sierra Club only sought compensation at the rate stated in its NOI – $250.

4.      In its calculation of Mr. Volker's rate, the Commission cited resolution ALJ-184 and D.05-11-031.  Specifically, the Commission

-2-

justified its decision not to alter Mr. Volker's rates by stating:

> In Resolution ALJ-184, we set forth guidelines and principles for setting intervenors' hourly rates for work performed in 2004. In D.05-11-031, we set forth guidelines and principles for setting 2005 rates, and found that rates previously adopted in 2003 and 2004 are reasonable. Resolution ALJ-184 deems an increase of 8% above previously adopted 2003 rates as reasonable for work performed in 2004. We previously adopted a rate of $250 for Volker for work performed in 2000-2003. Increasing Volker's 2003 rate by 8% results in the $270 rate adopted in D.06-04-018 for his 2004 work.

Appendix, Tab 6, pp. 216-217. CARE specifically challenges the

Commission's mechanism, as delineated in ALJ-184 and D.05-11-031, for

determining Mr. Volker's rate. The Commission's one-size-fits-all formula

is arbitrary and capricious and contrary to the Public Utilities Code.

　　　　5.　　　The Commission's capping of future fees based on prior fee

awards, without notice to the parties that would be affected in the future,

arbitrarily assumes that past rates represent market rates for those past time

periods. Such an assumption does not take into account a myriad of

relevant factors and circumstances underlying past fee awards – factors and

circumstances demonstrating that all past fee rates do not automatically

reflect past market rates. For example, here, Mr. Volker's past fee award

was not based on market rates. Instead, Mr. Volker adhered to rates

established in his client's NOI, which was filed prior to its selection of a

lawyer for the case. Mr. Volker's fee in that previous case therefore does

-3-

not reflect his market rate – in fact, has nothing to do with his market rate –

and, therefore, should not be used as a limiting factor on future fee awards.

Use of Mr. Volker's past, non-market rate to determine his current market

rate is, thus, arbitrary and capricious.

6.      Additionally, application of Public Utilities Code section

1806, which directs that "[t]he computation of compensation awarded

pursuant to Section 1806 shall take into consideration the market rates paid

for persons of comparable training and experience who offer similar

services," requires that Mr. Volker's time now be compensated at

comparable market rates.  As documented by CARE and Mr. Volker,

market rates for Mr. Volker, an environmental lawyer for over 30 years, are

at least $400 per hour.  No opposition was filed.  No contrary evidence is in

the record.  The Commission's refusal to modify its inaccurate

determination that Mr. Volker's market rate equals $270 for work done in

this proceeding, therefore, violates the Public Utilities Code.

7.      Accordingly, CARE respectfully applies to this Court for a

writ of review of the Commission's decisions and asks that this Court direct

the PUC to modify Mr. Volker's hourly rate from $270 to $400.

## II.    PARTIES

8.      Californians for Renewable Energy, Inc. ("CARE"), at all

-4-

times mentioned in this petition, has been and now is a non-profit public

benefit corporation organized under the laws of California in 1999 for the

purpose of educating the public about, and encouraging public agencies to

consider, alternative forms of renewable energy as a means of avoiding (1)

dependence on declining supplies of fossil fuels and (2) the harmful air

emissions their use occasions. CARE and its members are beneficially

interested in securing this Court's review of the Commission's decisions so

that its counsel will be fairly compensated for his work in the proceeding at

issue in this case. CARE also seeks review of the PUC's decision to ensure

that it can procure adequate counsel in future PUC proceedings. CARE

seeks to eliminate the risk that counsel for public-interest, non-profit

organizations may not, in the future, be able to participate in important PUC

decisionmaking processes based on inadequate and inaccurate hourly rate

compensation calculation mechanisms.

  9.  The respondent California Public Utilities Commission is a

public agency of the State of California vested with authority to regulate

public utilities pursuant to Article XII, section 5 of the California

Constitution and Public Utilities Code section 701.

  10.  Real Party in Interest, Pacific Gas & Electric Company

("PG&E"), is a California Corporation. PG&E filed the underlying

application for construction of a new electric transmission line between Jefferson substation and Martin substation, along with various related facilities.

### III.    PROCEDURAL AND FACTUAL HISTORY

11.    On August 19, 2004, the Commission issued Decision 04-08-046 in which it granted a Certificate of Public Convenience and Necessity to PG&E to construct the Jefferson-Martin transmission line.

12.    On October 7, 2004, CARE timely filed its Request for Award of Compensation and supporting declarations.  CARE submitted documentation demonstrating that Mr. Volker's market rates are at least $400 per hour.  Appendix, Tab 3.

13.    On November 16, PG&E filed opposition to other intervenors' requests for compensation, but did not oppose the request filed by CARE.

14.    On April 13, 2006, the Commission issued D.06-04-018, granting intervenor compensation to 280 Corridor Concerned Citizens, CARE, and Women's Energy Matters, for substantial contributions to Decision 04-08-046.  The Commission reduced the hourly rate for Mr. Volker from $400 to $270, citing for support ALJ-184.  The Commission based its decision on a 2003 award of compensation of $250 per hour for

Mr. Volker in an unrelated proceeding. Appendix, Tab 4.

15.    On April 17, 2006, CARE timely filed a petition for

modification of D.06-04-018, requesting that Mr. Volker's fee be modified

to reflect his current market rate. Citing Public Utilities Code section 1806,

which directs that "[t]he computation of compensation awarded pursuant to

Section 1804 shall take into consideration the market rates paid for persons

of comparable training and experience who offer similar services," CARE

requested a modification to Mr. Volker's rate and submitted further

documentation attesting to Mr. Volker's qualifications and experience and

demonstrating that his hourly rate is *at least* $400. Appendix, Tab 5.

16.    On June 15, 2006,the Commission issued D.06-06-025,

denying CARE's petition for modification of D.06-04-018. Appendix, Tab

6.

17.    On July 13, 2006, CARE timely filed a petition for rehearing

of D.06-06-025, again requesting that Mr. Volker's fee be modified to

reflect his current market rate. Again, petitioner argued that the

Commission's decision is arbitrary and capricious and violates Public

Utilities Code 1806. Appendix, Tab 7.

18.    On October 5, 2006, the Commission issued D.06-10-023,

denying CARE's petition for rehearing of D.06-04-018. Appendix, Tab 8.

-7-

## IV.    RIPENESS FOR REVIEW

19.    Petitioners' Application for Rehearing was timely filed pursuant to California Public Utilities Code section 1731 on July 13, 2006. The Commission denied CARE's petition on October 5, 2006.  Appendix, Tab 8.  Accordingly, petitioner's application is ripe for review by this Court.  No other adequate remedy is now available to petitioner, thus petitioner now seeks remedy from this Court.

## V.    JURISDICTION

20.    Pursuant to Public Utilities Code section 1756, this petition is timely filed within 30 days after petitioners' Application for Rehearing was denied.  This Court has jurisdiction over this petition pursuant to Public Utilities Code section 1756(a), which provides that,

> Within 30 days after the commission issues its decision denying the application for a rehearing . . ., any aggrieved party may petition for a writ of review in the court of appeal or the Supreme Court for the purpose of having the lawfulness of the original order or decision or of the order or decision on rehearing inquired into and determined.

Pub. Util. Code § 1756(a).  Additionally, pursuant to Public Utilities Code section 1759(b), a writ of mandamus shall lie from this Court to the Commission in all proper cases as prescribed in section 1085 of the Code of Civil Procedure.

## VI.    VENUE

21.    Pursuant to Public Utilities Code section 1756(d), "[t]he venue of a petition filed in the court of appeal pursuant to this section shall be in the judicial district in which the petitioner resides [or, in the case of a business] the judicial district in which the petioner has its principal place of business." Pub. Util. Code § 1756.  Because CARE is headquartered in San Francisco, California, venue lies in this Court.

**WHEREFORE, PETITIONERS PRAY:**

1.    That this Court issue its writ of review, mandamus or other appropriate relief directing the Commission to certify and transfer to this Court the Commission's record in this proceeding, and to set a briefing and hearing schedule on the merits;

2.    That this Court issue a writ of review, mandamus, or other appropriate order directing the Commission to modify its decision in D.06-06-025 and D.06-10-023 by changing Mr. Volker's market rate from $270 to $400; and

3.    That this Court grant such other relief as may be appropriate.

Dated:  November 2, 2006

Stephan C. Volker
LAW OFFICES OF STEPHAN C. VOLKER
436 14th Street, Suite 1300
Oakland, CA 94612
Tel: 510-496-0600

Attorneys for Petitioner CARE

## VERIFICATION

I, Stephan C. Volker, hereby declare:

      1.     I am an attorney licensed to practice law in the State of California and attorney of record for petitioners in this proceeding.

      2.     I have read the foregoing petition and believe to the best of my knowledge that it is true and correct and supported by the references to the Commission's record set forth above.

      3.     Attached hereto as Tab 1, and incorporated herein by this reference, is a true and correct copy of the Opening Post-hearing Brief of Intervenors Californians for Renewable Energy, in Favor of PG&E's Application for Certificate Of Public Convenience and Necessity, filed on 3/4/2004.

      4.     Attached hereto as Tab 2, and incorporated herein by this reference, is a true and correct copy the Corrected Closing Post-hearing Brief of Intervenor Californians for Renewable Energy in Support of PG&E's Application for Certificate of Public Convenience and Necessity, filed on 3/19/2004.

      5.     Attached hereto as Tab 3, and incorporated herein by this reference, is a true and correct copy of the Request of Californians for Renewable Energy for Award of Compensation and Supporting Declaration of Counsel, filed on 10/7/2004.

      6.     Attached hereto as Tab 4, and incorporated herein by this

reference, is a true and correct copy of the PUC's Opinion Granting Intervenor Compensation to 280 Corridor Concerned Citizens, Californians for Renewable Energy, and Women's Energy Matters for Substantial Contributions to Decision 04-08-046, filed on 4/13/2006.

7.     Attached hereto as Tab 5, and incorporated herein by this reference, is a true and correct copy of the Petition of Californians for Renewable Energy for Modification of Opinion Granting Intervenor Compensation (D.06-04-018) and Supporting Declaration of Counsel, filed on 4/17/2006.

8.     Attached hereto as Tab 6, and incorporated herein by this reference, is a true and correct copy of the PUC's Opinion Denying Petition for Modification by Californians for Renewable Energy of Decision 06-04-018, filed on 6/15/2006.

9.     Attached hereto as Tab 7, and incorporated herein by this reference, is a true and correct copy of the Application of Californians for Renewable Energy for Rehearing of Denial of Petition for Modification (06-06-025), filed on 7/13/2006.

10.     Attached hereto as Tab 8, and incorporated herein by this reference, is a true and correct copy of the PUC's Order Modifying Decision (D.) 06-06-025 for the Purpose of Clarification and Denying Rehearing, as Modified, filed on 10/5/2006.

-11-

11.    Petitioners have duly given notice by mail of this Petition for
Review to the California Attorney General in accordance with Code of
Civil Procedure section 388.

12.    I make this Verification because petitioners have their offices
in counties other than Alameda County, where I maintain my office.

I declare under penalty of perjury under the laws of the State of
California that the foregoing is true and correct, and that this Verification
was executed on November 2, 2006, in Oakland, California.

Stephan C. Volker

## MEMORANDUM OF POINTS AND AUTHORITIES

I.    **THE COMMISSION'S DETERMINATION THAT MR.
VOLKER'S HOURLY RATE WAS PROPERLY SET AT $270
IS ARBITRARY AND CAPRICIOUS.**

Neither D.06-06-025, nor D.06-10-023 addresses Mr. Volker's
testimony documenting his market rate of at least $400 per hour.  Appendix,
Tab 6, pp. 216-17; Tab 8, pp. 233-234.  Instead, the decisions award $270
per hour based on the $250 hourly rate awarded Mr. Volker in a previous
proceeding (D. 05-02-003 and D. 03-01-058), "[w]ith an 8% upward
adjustment."  Appendix, Tab 6, pp. 216-217; Tab 8, p. 235.  The

-12-

Commission's reliance on the rate in this previous proceeding, in the face of current, uncontroverted evidence demonstrating a much higher market rate, is arbitrary and capricious. As such, the Commission's decision to deny CARE's Petition for Modification should be reversed and the Commission should revise Mr. Volker's rate to reflect his market rate at the time the work in question took place.

The Commission relies upon its previous award of "an hourly rate of $250 for Volker for work performed in both 2002 and 2003 in D.05-02-003 and D.03-01-058," decisions awarding compensation in the matter of Application [No. 99-12-025] of Valencia Water Company (U342-W) seeking approval of its updated water management program ("Valencia proceeding"). Appendix, Tab 6, p. 217. Mr. Volker's client in that matter, Sierra Club, had submitted an NOI "currently estimat[ing] that its attorney will [provide services] . . . at a proposed hourly rate of $250/hour" on April 4, 2000. Appendix, Tab 5, p. 202.

Subsequently the Sierra Club retained Mr. Volker to represent it in the Valencia proceeding. *Id.* Following the first phase of the Valencia proceeding, by Decision 03-01-058 dated January 30, 2003, this Commission awarded $46,990.96 for the legal services provided by Mr. Volker (and incidental costs). Noting that "*attorney Volker . . . has been*

-13-

*awarded attorney's fees at the hourly rate of $300* based on his extensive experience in the field of environmental litigation," this Commission "conclude[d] that based on Volker's experience, the *requested hourly rate of $250 for services provided in 2000 and 2001* is reasonable." Appendix, Tab 5, p. 201.[2]

Thereafter, by D.05-02-003, dated February 10, 2005, this Commission granted Sierra Club's Second Request for Intervenor Compensation, for legal services provided by Mr. Volker subsequently in the Valencia proceeding. In D.05-02-003, this Commission awarded Sierra Club $4,074.18 in compensation for further services provided by Mr. Volker and his staff primarily in 2002, based on the same hourly rate requested by Sierra Club in its 2000 NOI, $250. *Id.* Neither the Sierra Club nor Mr. Volker represented, nor did this Commission find, that the market value of Mr. Volker's services at that time was no greater than $250 per hour. Rather, the Commission found the converse, that in 2000 and 2001 Mr. Volker's market rate was *no less than* $250.[3]  D. 03-01-058 at 9, ¶ 6,

_____

[2] D.06-04-018 erroneously states that D.03-01-058 "awarded an hourly rate of $250 for Volker for work performed in both 2002 and 2003." Appendix, Tab 4, p. 171. In fact, D. 03-01-058 awarded Mr. Volker "the requested hourly rate of $250 for services provided in 2000 and 2001." Appendix, Tab 5, p. 201.

[3] Additionally, D.06-04-018's conclusion that the $250 hourly rate awarded in D.05-02-003 and D.03-01-058 was for "work performed in both 2002 and 2003," is in error. As this Commission noted in D.03-01-058, that award was "for services

-14-

emphasis added.

The Commission's calculation of Mr. Volker's fees fails to account for the circumstances underlying the payment of $250/hour for Mr. Volker's services. The Commission's inherent presumption that $250/hour reflected Mr. Volker's past market rate is *directly contradicted by the prior opinion's citation of a higher market rate* – $300/hour – for Mr. Volker. Pegging Mr. Volker's current market rate to Commission determinations of past, non-market rates is arbitrary and capricious. Thus this Court should direct the Commission to revise Mr. Volker's rate in the underlying proceeding.

II.   **THE COMMISSION'S DETERMINATION THAT MR. VOLKER'S HOURLY RATE WAS PROPERLY SET AT $270 VIOLATES PUBLIC UTILITIES CODE SECTION 1806.**

   A.   **Public Utilities Code Section 1806 Requires the Commission to Take into Consideration the Market Rate Paid to Persons of Comparable Training and Experience Who Offer Similar Services to Those of Mr. Volker.**

   Public Utilities Code section 1806 directs in pertinent part that "[t]he

---

provided in 2000 and 2001." D.03-01-058 at 7. The much smaller award in D.05-02-003 was for work performed primarily in 2002. D.05-02-003 at 19. Accordingly, even assuming, contrary to the facts and law as outlined above, that the hourly rate awarded in the Valencia proceeding was based on Mr. Volker's actual market rate, because the vast bulk of that work was performed in 2000 and 2001, the Commission's 8% upward adjustment would yield an hourly rate of either $314.93 ($250 increased by three years (from 2001 to 2004) times the permissible 8% annual increase) or $340.12 ($250 increased by four years (from 2000 to 2004) times 8%).

computation of compensation awarded pursuant to Section 1806 shall take into consideration the market rates paid to persons of comparable training and experience who offer similar services." Thus, in determining whether Mr. Volker should be compensated at the requested rate of $400 per hour, this Commission must "take into consideration the market rates paid to persons of comparable training and experience who offer similar services." The Commission's decision to fix Mr. Volker's rate based solely on a prior, non-market rate determination violates Section 1806.

### B. D.06-06-025 Does Not Conform to Public Utilities Code Section 1806.

Mr. Volker's rates should be modified to conform to section 1806's mandate. The Commission's determination of his rates should reflect the undisputed evidence submitted by CARE establishing that the market value of Mr. Volker's services in 2004 was at least $400 per hour. There is no contrary evidence. No party objected to Mr. Volker's requested rate of $400. There is no evidence that Mr. Volker's 2004 market rate was less than $400 per hour.

The stated basis for D.06-04-018's selection of a $270 hourly rate is the $250 rate awarded for Mr. Volker's services in a separate proceeding

where the Commission simply granted the rate requested.[4]  As discussed

above, that request did not reflect the market value of Mr. Volker's

services.  Rather, it reflected the $250 rate set forth in the NOI that Mr.

Volker's client had submitted before retaining him.

Unless corrected, D.06-04-018 creates an inequity at odds with

section 1806.  For example, the Commission correctly awarded

compensation at the rate of $470 per hour to lead counsel for intervenor 280

Citizens, Edward O'Neill, for work performed in 2004, the same year for

which compensation is sought for Mr. Volker's services.  Appendix, Tab 4,

p. 148.  Mr. O'Neill received his law degree in 1977 (three years after Mr.

Volker), and has extensive relevant experience yielding a market rate of

$470.00.  Mr. Volker likewise has extensive relevant experience, including

over thirty years of specialized experience in administrative and

environmental law, and over forty published rulings in state and federal

courts.  Appendix, Tab 3, p. 57.  Yet D.06-04-018 compensated Mr. Volker

at an hourly rate *$200.00 lower than Mr. O'Neill*.  Similarly, the

Commission correctly awarded hourly rates of $315 to attorney Christopher

Hilen, and $310 to attorney Jeffrey Gray, associate counsel for 280 Citizens,

for work performed in 2004.  Appendix, Tab 4, p. 149.  Although Mr. Hilen

---

[4] Appendix, Tab 4, p. 171, footnote 14, citing D.05-02-003 and D.03-01-058.

has about half as much experience – 15 years – as Mr. Volker, and Mr.

Gray, less than one-third (nine years), their approved rates are respectively

$45 and $40 *higher* than the $270 awarded Mr. Volker. *Id.* at 149 and 171.

CARE requests parity with these awards, consistent with section 1806.

### C.     Mr. Volker's Market Rate Is at Least $400 per Hour.

In support of CARE's Fee Request, it submitted the Declaration of

Stephan C. Volker documenting the market value of his services. Mr.

Volker's declaration stated that he had "thirty years' experience as a

practicing environmental lawyer in California," and "[d]uring the past three

decades [had] actively participated, typically as the lead plaintiffs' attorney,

in over forty published cases in state and federal courts." Appendix, Tab 3,

p. 57. Mr. Volker testified that he was "familiar with the market value of

[his] services, based on declarations submitted by knowledgeable attorneys

in numerous attorney fee motions in other proceedings." *Id.* Mr. Volker

testified that based thereon, "[t]he market value of my services is between

$400 and $500 per hour." *Id.* Had any party questioned this evidence,

CARE would have submitted additional documentation of this rate, such as

the San Francisco Superior Court's award of $450 per hour for all of Mr.

Volker's time in 2004 successfully prosecuting the California Coastal

Commission for violating environmental laws. *Id.*

-18-

There is simply no evidence in this proceeding that the market value of Mr. Volker's time is less than $400. No party objected to CARE's Request for Compensation, and no evidence contrary to Mr. Volker's testimony was submitted by any party. Accordingly, consistent with Section 1806, this Court should order the Commission to change the rate awarded for Mr. Volker's time to reflect the market rates paid to persons of comparable training and experience who offer similar services: at least $400 per hour.

### III.    CONCLUSION

For the foregoing reasons, CARE respectfully requests from this Court a writ of review, mandate, or other appropriate relief to correct the hourly rate adopted in D.06-04-018 for Mr. Volker from $270 to $400 to reflect the actual market value of his services in 2004, which is at least $400.

Dated:  November 2, 2006          Respectfully submitted,

Stephan C. Volker
Attorney for petitioner CARE

-19-

## CERTIFICATE OF WORD COUNT

(California Rules of Court, Rule 14(c))

The text of this brief consists of 3979 words as counted by the Corel

WordPerfect version 12 word processing program used to generate this brief.

Dated:  November 2, 2006

_____
Stephan C. Volker
Attorney for Petitioner

## PROOF OF SERVICE

I am a citizen of the United States of America; I am over the age of 18 years and not a party to within entitled action. My business address is 436 14th Street, Suite 1300, Oakland, California 94612. On November 2, 2006, I served the document entitled

## PETITION FOR WRIT OF REVIEW,
## MANDAMUS OR OTHER APPROPRIATE RELIEF

on all parties by first class mail at Oakland, California, addressed to:

Executive Director
California Public Utilities
        Commission
Headquarters Office
505 Van Ness Avenue
San Francisco, CA 94102
415-703-2782

Richard W. Rauschenbush
Latham & Watkins
PG&E
505 Montgomery St., #1900
San Francisco, CA 94111

I certify under penalty of perjury that the foregoing is true and correct.

Dated:  November 2, 2006

Teddy Ann Fuss

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA
FIRST APPELLATE DISTRICT, DIVISION ONE

CALIFORNIANS FOR RENEWABLE
ENERGY

             Petitioner

v.

PUBLIC UTILITIES COMMISSION
OF THE STATE OF CALIFORNIA,

             Respondent.

PACIFIC GAS & ELECTRIC
COMPANY

             Real Party in Interest.

Case No. A115703

Cal. P.U.C. Decision Nos.
D.06-06-025 & D.06-10-023

## ANSWER OF RESPONDENT

RANDOLPH L. WU, SBN 78651
HELEN W. YEE, SBN 119434
DARWIN E. FARRAR, SBN 152735

505 Van Ness Ave.
San Francisco, CA 94102
Phone: (415) 703-1599

Attorneys for the California Public
Utilities Commission of the State
of California

December 6, 2006

258865

## TABLE OF CONTENTS

TABLE OF AUTHORITIES...............................................................ii

I.  STATEMENT OF FACTS & PROCEDURAL
    BACKGROUND ............................................................................2

II. ISSUES PRESENTED...................................................................5

III. STANDARD OF REVIEW ...........................................................5

IV. DISCUSSION ...............................................................................7

    A.  CARE IMPERMISSIBLY CHALLENGES THE LAWFULNESS OF
        COMMISSION DECISIONS THAT HAVE BECOME FINAL AND
        UNAPPEALABLE. ............................................................................... 7

    B.  CARE FAILS TO ESTABLISH LEGAL ERROR. ..................................... 9

        1.  D.06-06-025 and D.06-10-023 Conform to Public Utilities
            Code Section 1806. ................................................................. 9

        2.  D.06-060-025, as Affirmed by D.06-10-023, Takes into
            Consideration the Market Rate Paid to Persons of
            Comparable Training and Experience....................................... 12

        3.  The Commission Reasonably Rejected CARE's Petition for
            Modification. .......................................................................... 15

V.  CONCLUSION ...........................................................................18

CERTIFICATE OF WORD COUNT

CERTIFICATE OF SERVICE

ATTACHMENTS A - C

# TABLE OF AUTHORITIES

## STATUTES

Public Utilities Code

Section 1709 ........................................................................................... 8
Section 1731 ........................................................................................... 8
Section 1732 ........................................................................................... 7
Section 1756 ........................................................................................... 4
Section 1757 ........................................................................................... 4
Section 1801, et seq. ............................................................................ 11
Section 1804 ......................................................................................... 16
Section 1806 ................................................................................4,7,9,11,12
                                                                                    passim

## CALIFORNIA CASES

*Pacific Bell v. Public Utilities Com.*
(2000) 79 Cal.App.4th 269 ....................................................................... 5

*Greyhound Lines, Inc. v. Public Utilities Com.*
(1968) 68 Cal.2d 406 ............................................................................. 6

*Northern Cal. Assn. v. Public Utilities Com.*
(1964) 61 Cal.2d 126 .......................................................................8,9

*Young v. Industrial Acc. Com.*
(1944) 63 Cal.App.2d 286 ....................................................................... 9

## COMMISSION DECISIONS

*Application of Valenica Water Company*
[D.03-01-058] (2003) ___ Cal.P.U.C.3d ___ ......................................4,9,14,17

*In the Matter of Application of Pacific Gas and Electric Company
for CPCN Authorizing the Construction of the
Jefferson-Martin 230 kV Transmission Projection
("Order Granting Intervenor Compensation")*
[D.06-04-018] (2006) ___ Cal.P.U.C.3d ___ .................................2,3,7,11,13
                                                                                    passim

*Opinion Granting Intervenor Compensation for
Substantial Contributions to Decision 03-12-035*
[D.04-08-025] (2004) ___ Cal.P.U.C. 3d ___ ...................................14

*Opinion on Second Request for Intervenor Compensation*
[D.05-02-003] (2005) ___ Cal.P.U.C.3d ___ …………………………………… ………14

*Resolution* ALJ-184 (Issued August 25, 2004) ……………………………………..4,8,9,11,12
passim

*Rulemaking to Set Hourly Rates for Purposes of Calculating*
*Intervenor Compensation Awards, Pursuant to*
*Public Utilities Code Section 1801 and Following,*
*for Work Performed in Calendar Year 2005*
*("Order Regarding 2005 Intervenor Compensation")*
[D.05-11-031] (2005) ___ Cal.P.U.C.3d ___ …………………………..……8,9,11,12,15
passim

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA
FIRST APPELLATE DISTRICT, DIVISION ONE

| | |
|---|---|
| CALIFORNIANS FOR RENEWABLE ENERGY<br><br>Petitioner<br>v.<br><br>PUBLIC UTILITIES COMMISSION OF THE STATE OF CALIFORNIA,<br><br>Respondent.<br>_____<br><br>PACIFIC GAS & ELECTRIC COMPANY<br><br>Real Party in Interest. | Case No. A115703<br><br>Cal. P.U.C. Decision Nos.<br>D.06-06-025 & D.06-10-023 |

## ANSWER OF RESPONDENT

**TO THE HONORABLE JUSTICES OF THE COURT OF APPEAL OF THE STATE OF CALIFORNIA, FIRST APPELLATE DISTRICT, DIVISION ONE:**

Pursuant to California Rule of Court 58(b), Respondent, the California Public Utilities Commission ("Commission"), respectfully submits its Answer in opposition to the "Petition for Writ of Review, Mandamus or Other Appropriate Relief" ("Writ Petition"), filed by Californians for Renewable Energy ("CARE"). Respondent denies that the writ should be issued.

1

## I.    STATEMENT OF FACTS & PROCEDURAL BACKGROUND

The Writ Petition challenges the intervenor compensation awarded to CARE for its participation in Application (A.) 02-09-043, filed by Pacific Gas & Electric Company ("PG&E") for a Certificate of Public Convenience and Necessity ("CPCN") and authorization to construct the Jefferson-Martin transmission line. Specifically, it involves a challenge of Commission decisions, Decision (D.) 06-06-025 and D.06-10-023,[1] in which the Commission denied CARE's request to modify the hourly rate the Commission had awarded to Stephan Volker, CARE's lead counsel during the proceeding.

In D.06-04-018, the Commission awarded granted intervenor compensation to CARE for its substantial contributions to D.04-08-046, the decision approving the CPCN and authorizing PG&E to construct the Jefferson Martin transmission line. (See *In the Matter of Application of Pacific Gas and Electric Company for CPCN Authorizing the Construction of the Jefferson-Martin 230 kV Transmission Projection* ("*Order Granting Intervenor Compensation*") [D.06-04-018] (2006) ___ Cal.P.U.C.3d ___.)[2]

Although CARE requested an hourly rate of $400, the Commission in D.06-04-018 set an hourly rate of $270 for work performed by Mr. Volker.[3] *(Id.* at pp. 60-61 (slip

---

[1] A copy of D.06-06-025 and D.06-10-023 can be found as Tab 6 and Tab 8 (respectively) in Appendix to Petition for Writ of Review, Mandamus or Other Appropriate Relief ("CARE's Appendix").

[2] A copy of D.06-04-018 can be found as Tab 4 of CARE's Appendix.

[3] All of Mr. Volker's work was performed in 2004.

2

op.).)  Specifically, D.06-04-018 found that the Commission previously awarded an

hourly rate of $250 for work performed by Volker in both 2002 and 2003 (*id.* at p. 61

(slip op.)), and considered the market rate standard set forth in section 1806. (*Id.* at pp.

60-61 (slip op.).)

D.06-04-018 was mailed to parties on April 18, 2006.  No application for

rehearing of D.06-04-018 was filed and the decision became final and unappealable on

June 16, 2006. (D.06-10-023, p. 1.) On June 15, 2006, CARE filed a petition for

modification requesting only that the hourly rate of $270 assigned to Volker in D.06-04-

018 be changed to the $400 hourly rate set forth in CARE's request for compensation.[4]

On June 15, 2006 the Commission issued D.06-06-025 which denied CARE's petition for

modification.  In this decision, the Commission noted:

> As required by [Public Utilities Code] section
> 1806, D.06-04-018 considered whether the
> claimed intervenor fees and costs are comparable
> to the market rate paid to experts and advocates
> having comparable training and experience and
> offering similar services.  In Resolution ALJ-184,
> we set forth guidelines and principles for setting
> intervenors' hourly rates for work performed in
> 2004.  In D.05-11-031 we set forth guidelines and
> principles for setting 2005 rates, and found that
> rates previously adopted in 2003 and 2004 are
> reasonable. (D.06-06-025, pp. 1-2.)

Accordingly, based on the reasoning set forth in D.06-04-018, the Commission denied

CARE's Petition for Modification of D.06-04-018.

---

[4] The petition for modification can be found as Tab 5 of CARE's Appendix.

3

Upon denial, CARE timely filed an application seeking rehearing of D.06-06-025. In its rehearing application, CARE contended that Mr. Volker's experience warrants the $400 hourly rate and that the prior rate assigned to Mr. Volker was the result of a stipulation by the Sierra Club, Mr. Volker's client in D.03-01-058 [5] and D.05-02-003, and was not Mr. Volker's market rate.[6] CARE further alleged that the Commission's determination that Mr. Volker's hourly rate of $270 is arbitrary and capricious, and that it violates section 1806.

On October 5, 2006 the Commission issued D.06-10-023 which denied CARE's application for rehearing of D.06-06-025. In this order denying rehearing, the Commission found no legal error, and reiterated its position that D.06-04-018 complied with Public Utilities Code Section 1806 and Commission directives regarding intervenor hourly rates, including Resolution ALJ-184.[7] (D.06-10-023, pp. 2-3.) In D.06-10-023, the Commission also

---

[5] *Application of Valenica Water Company* [D.03-01-058] (2003) ___ Cal.P.U.C.3d ____. A copy of this decision can be found as Attachment C, in this Answer.

[6] CARE argues that the Commission's computation of the award is incorrect because Mr. Volker's work on D.03-01-058 was performed in 2000 and 2001, and the majority of his work on the related D.05-02-003 was performed in 2002. (See Petition, pp. 14-17, fns. 2-4.) This claim is without merit; Mr. Volker had an approved hourly rate and was compensated for work on D.05-02-003 that occurred in 2003 and Res. ALJ-184 provides for an 8% increase, "where [the Commission] approved an hourly rate for an advocate for 2003, . . . . " (Resolution ALJ-184, p. 7.)

[7] A copy of Resolution ALJ-184 can be found as Attachment B in this Answer. All section references are to the Public Utilities Code, unless otherwise specified.

4

noted that CARE's Petition for Modification of D.06-04-018 could be considered an impermissible collateral attack of D.06-04-018. (D.06-10-023, p. 1, fn. 1.) On the Commission's lawful denial of CARE's application for rehearing of D.06-06-025, the instant petition was filed. CARE raises the same legal challenges in its Writ Petition as it did in its application for rehearing.

## II.    ISSUES PRESENTED

1.  Should the Court reject the Writ Petition's improper collateral attack on D.06-04-018, Resolution ALJ-184, D.03-01-058, and D.05-11-031?

2.  Did the Commission correctly interpret Public Utilities Code section 1806 in determining the appropriate hourly rate for CARE's lead counsel, Mr. Volker?

3.  Did the Commission act reasonably in setting Mr. Volker's hourly rate at $270?

As demonstrated below, these questions must all be answered in the affirmative.

## III.    STANDARD OF REVIEW

Section 1756 (a) provides that, "any aggrieved party [to a Commission decision] may petition for a writ of review in the court of appeal...." Review of Commission decisions under section 1756 is discretionary, and the Court of Appeal is "not compelled to issue the writ if the PUC did not err...." (*Pacific Bell v. Public Utilities Com.* (2000) 79 Cal.App.4th 269, 279.)

Among other things, section 1757 specifies standards for the Court of Appeal's review of the instant case, which involves the awarding of intervenor compensation for participation in a proceeding that resulted in the granting of a certificate of public

convenience and necessity and the authorization for the construction of a transmission project. Pursuant to Section 1757, the Court's review:

> ". . . shall not extend further than to determine, on the basis of the entire record . . . whether any of the following occurred:
>
> > (1) The commission acted without, or in excess of, its powers or jurisdiction.
> >
> > (2) The commission has not proceeded in the manner required by law.
> >
> > (3) The decision of the commission is not supported by the findings.
> >
> > (4) The findings in the decision of the commission are not supported by substantial evidence in light of the whole record.
> >
> > (5) The order or decision of the commission was procured by fraud or was an abuse of discretion.
> >
> > (6) The order or decision of the commission violates any right of the petitioner under the Constitution of the United States or the California Constitution."

(Pub. Util. Code, §1757, subd. (a).)

In the Court's review, the Commission's interpretation of the Public Utilities Code should be given great weight. (*Greyhound Lines, Inc. v. Public Utilities Com.* (1968) 68 Cal.2d 406, 410 ["the commission's interpretation of the Public Utilities Code should not be disturbed unless its fails to bear a reasonable relation to statutory purposes and language...."].) In the instant case, the Commission has acted reasonably in determining that Mr. Volker's hourly rate was $270 per hour, and correctly interpreted section 1806. Accordingly, the Commission's determination of the hourly rate was lawful.

## IV.   DISCUSSION

### A.   CARE Impermissibly Challenges the Lawfulness of Commission Decisions that have Become Final and Unappealable.

In D.06-10-023, the Commission observed that CARE's Petition for Modification of D.06-04-018 could be considered an impermissible collateral attack on D.06-04-018, which became final and unappealable on June 16, 2006.  (D.06-10-023, p. 1, fn. 1.)  In its Writ Petition, CARE appears to be challenging the lawfulness of D.06-04-018.  (See Writ Petition, p.1 &  pp.16-17.)  CARE's challenge goes to "the stated reason in D.06-04-018 for reducing Mr. Volker's hourly rate to $270…." (See Writ Petition, p.1 & 16-17.)  Further, CARE argues that: (1) D.06-04-018 fails to address Mr. Volker's testimony documenting his market rate; (2) D.06-04-018 improperly relies upon the Commission's previous award of an hourly rate of $250 for Volker; and (3) that D.06-04-018 creates an inequity that is at odds with §1806.  (See Writ Petition, pp. 15-17.)

Rather than file an application for rehearing of D.06-04-018, CARE attempted to challenge the lawfulness of the decision through a petition for modification.[8]  In the absence of an application for rehearing, D.06-04-018 became final on May 15, 2006, and the ability to file a court challenge was then foreclosed.  (See Pub. Util. Code, §1732, subd. (b), providing "no cause of action arising out of any order or decision of the

---

[8] Rule 16.4(b) (formerly Rule 47(a)) of the California Public Utilities Commission Rules of Practice and Procedure provides:  "Filing a petition for modification does not stay the effectiveness of the decision or preserve the party's appellate rights; an application for rehearing is the vehicle to request rehearing and preserve a party's appellate rights." (Code of Regs., tit. 20, §16.4, subd. (b).)

commission shall accrue in any court," unless an application for rehearing has been filed; see also, Pub. Util. Code, §1709, which provides that "[i]n all collateral actions or proceedings, the orders and decisions of the commission which have become final shall be conclusive.")

Further, CARE attempts to challenge the lawfulness of other final and unappealable Commission decisions, including Resolution ALJ-184, D.03-01-058, and D.05-11-031.[9] (See Writ Petition, pp. 2-3.)  Resolution ALJ-184 and D.05-11-031 were issued on August 25, 2004 and November 29, 2005, respectively.  Because CARE did not seek rehearing of Resolution ALJ-184, D.03-01-058, or D.05-11-031, it cannot now seek judicial review.  Therefore, CARE has no cause of action arising from the decisions before this Court.  (Pub. Util. Code, §1731, subd. (b).)

The California Supreme Court addressed a similar attempt by a petitioner that failed to comply with the time limits established by section 1731 in *Northern Cal. Assn. v. Public Util. Com.* (1964) 61 Cal.2d 126, 133.  As is presently the case, in *Northern Cal.* the Petitioner sought to challenge the substantive terms of an earlier Commission decision by seeking judicial review of a denial of reopening and subsequent denial of rehearing.  The Supreme Court reviewed the record of the lower proceeding and

_____

[9] *Rulemaking to Set Hourly Rates for Purposes of Calculating Intervenor Compensation Awards, Pursuant to Public Utilities Code Section 1801 and Following, for Work Performed in Calendar Year 2005* ("*Order Regarding 2005 Intervenor Compensation*") [D.05-11-031] (2005) ___ Cal.P.U.C.3d ___, wherein the Commission adopted rates for individual advocates based on their specific training and experience, taking into consideration the compensation of persons with comparable training and experience.  A copy of this decision can be found as Attachment A in this Answer.

determined that the petitioner was actually seeking review of a decision that had become

final. (*Id.* at p. 437.)  The Court noted:

> Then as petitioner did here, he sought judicial review
> of the denial, basing his arguments on alleged defects
> in the original commission decision.  The court, in
> affirming the denial of the petition to reopen, said:
> 'Having failed to apply for a rehearing within the time
> limited fixed by the Code he cannot accomplish the
> same purpose by a petition to reopen, that petition
> differing in form only, not in its substance, from a
> petition for a rehearing.  (*Id.* at p. 437, citing *Young v.
> Industrial Acc. Com.* (1944) 63 Cal.App.2d  286, 291-
> 292,)

The Court went on to say the petitioner "…cannot now cure its failure seasonably to seek

judicial review of the certificate decision by the device of a series of late-filed petitions,

basing its right to review on the latest among them, when, in fact, it is seeking review of

the basic decision." (*Id.* at p. 437.)

Accordingly, CARE's efforts to challenge the lawfulness of D.06-04-018,

Resolution ALJ-184, D.03-01-058, and D.05-11-031 constitute an impermissible

collateral attack.  Consequently, the Commission respectfully requests that any attempts

by CARE to challenge the lawfulness of these final and unappealable decisions be

rejected.

**B.    CARE Fails to Establish Legal Error.**

**1.    D.06-06-025 and D.06-10-023 Conform to**
**Public Utilities Code Section 1806.**

CARE argues that D.06-06-025, and D.06-10-023 fail to conform to section 1806

on claims that section 1806 requires not only that the Commission consider the market

rates paid to persons of comparable training and experience who offer similar services,
but that the Commission pay practitioners their market rate, regardless of the practice
area from which the rate is derived. As set forth by CARE:

> The Commission's determination of his rates should
> reflect the undisputed evidence submitted by CARE
> establishing that the market value of Mr. Volker's
> services in 2004 was at least $400 per hour. (Writ
> Petition, p. 16.)

To the extent that it asserts that its evidence, uncontroverted or otherwise, is
controlling, CARE misstates the Commission's section 1806 obligation. The statute does
not require the Commission to base its determination on a party's evidence about its
market rate but only that the Commission "take into consideration the market rates paid
to persons of comparable training and experience who offer similar services." (Pub. Util.
Code, §1806.) The Commission therefore has wide discretion in weighing a party's
evidence and, even where otherwise uncontroverted, may consider other factors,
including prior Commission decisions, directives, and practices.

Moreover, in addition to taking into consideration the market rates paid to persons
of comparable training and experience who offer similar services, section 1806 directs
the Commission to consider the rates paid to attorneys of public utilities practicing before
the Commission in setting intervenor attorney rates. In relevant part, section 1806
provides that:

> ...[t]he compensation awarded may not, in any case,
> exceed the comparable market rate for services paid by
> the commission or the public utility, whichever is
> greater, to persons of comparable training and

experience who are offering similar services. (Pub.
Util. Code, §1806.)

In D.06-06-025, p. 1, the Commission noted that D.06-04-018 considered the factors set

forth in section 1806, including whether the claimed intervenor fees and costs are

comparable to the market rates paid to experts and advocates having comparable training

and experience and offering similar services. (D.06-06-025, p. 1, citing *Opinion*

*Granting Intervenor Compensation* [D.06-04-018], *supra*, pp. 37, 58-59, & 63 (slip op.).)

Further, D.06-04-018 acted in a manner consistent with Resolution ALJ-184 and D.05-

11-031.

Resolution ALJ-184 adopts "an annual process for setting and updating hourly

rates for use by intervenors in seeking compensation for substantially contributing to a

Commission decision, as provided in the statutory intervenor funding program." (Res.

ALJ-184, p.1, citing Pub. Util. Code, §§1801, et seq.)   Subsequently, in D.05-11-031,

the Commission undertook substantial research and gave additional consideration to

market rates.  As the Commission noted:

> Here we examine the authorized hourly rates paid to
> intervenors in 2003 and 2004 in light of the data from
> utilities on their expenses for representation in our
> proceedings (new intervenor rates proposed for 2005
> are examined in Sections 6 and 7 of this decision).
> Regarding the hourly rates we currently authorize for
> intervenors, we find these rates are within the ranges
> of hourly rates that utilities pay their representatives
> overall.  This is true both for attorneys and experts, at
> all levels of experience. (*Order Regarding 2005*
> *Intervenor Compensation* [D.05-11-031], *supra*, at pp.
> 9, 12, 28 (slip op).)

11

Based on the data the Commission solicited, D.05-11-031 found that for 2003 and 2004, "all currently authorized intervenor attorney rates fall within the range of utility outside attorney rates" and established rates for work by intervenor attorneys in 2005.[10] (*Id.* at p. 12 & 15-16 (slip op.).)  After the 8% upward adjustment to Mr. Volker's 2003 rate provided for by Res. ALJ-184, the $270 per hour rate afforded him is within the range of rates that D.05-11-031 found to be appropriate for attorneys with a comparable number of years of practice. (See D.06-06-025, p. 2.)

> **2.    D.06-060-025, as Affirmed by D.06-10-023, Takes into Consideration the Market Rate Paid to Persons of Comparable Training and Experience.**

Rather than identify an impropriety in the Commission's determination of Mr. Volker's hourly rate, CARE's assertions regarding the appropriate market rate further illustrate CARE's fundamental misunderstanding of section 1806.  Specifically, CARE fails to discern that a Commission practioner's hourly rate is not necessarily equivalent to the hourly rate that practitioner commands in their practice area outside the Commission. Indeed, section 1806 dictates that "[t]he compensation awarded may not, in any case, exceed the comparable market rate for services paid by the commission or the public utility, whichever is greater, to persons of comparable training and experience who are offering similar services." (Pub. Util. Code, §1806.)

---

[10] For the reasons previously discussed, CARE did not and cannot challenge the findings of D.05-11-031.

12

Consistent with section 1806, the Commission has the discretion, if not the obligation, to differentiate between experience practicing before the Commission and experience in other legal practice areas.  For example, in determining the appropriate compensation for one attorney, the Commission noted that, "[a]lthough Gabrielli has more years in legal practice than either Spellicsy or Beckman, he appears not to have substantial experience practicing before the Commission and has not demonstrated extensive subject matter expertise that would justify a higher hourly rate." (*Opinion Granting Intervenor Compensation* [D.06-04-018], *supra*, at p. 63 (slip op.).)

In addition to lacking any factual or legal support, CARE's claim that D.06-04-018 creates an inequity at odds with section 1806 fails to acknowledge that the rates developed for the practitioners it compares Mr. Volker to take into account those individuals' training and experience in Commission specific rules, practices, and procedures.[11]   For example, in its Writ Petition, CARE claims inequity where "the Commission correctly awarded compensation at the rate of $470 per hour to lead counsel for another intervenor's attorney (Edward O'Neill) for work performed in 2004, the same year for which compensation is sought for Mr. Volker's services."  What CARE fails to acknowledge is that though Mr. O'Neill has practiced law for a comparable number of years, he has significantly more Commission and energy specific experience than Mr. Volker. (*See Opinion Granting Intervenor Compensation for Substantial*

---

[11] CARE's offers no legal basis for its claim that an "inequity at odds with section 1806" arises where attorneys with a comparable number of years of experience are compensated at different rates.  Moreover, this sweeping contention fails to take into account a myriad of other factors, not the least of which is experience practicing before the Commission.

*Contributions to Decision 03-12-035* [D.04-08-025, p. 56 (slip op.)] (2004) ___
Cal.P.U.C. 3d ___.)

With regard to experience and training, Mr. Volker's supporting declaration states only: "I have 30 years' experience as a practicing environmental lawyer in California and have been awarded attorney's fees by state and federal courts and the CPUC on numerous occasions." (Request for Compensation, p. 7.)  Significantly, the declaration by Mr. Volker does not specifically identify any Commission proceedings that he participated in and subsequent CARE filings show only that Mr. Volker participated in Application (A.) 99-12-025, the proceeding in which the Commission adopted the hourly rate of $250 for work done by Mr. Volker between 2000 and 2003 which CARE now disputes.[12]  (*Opinion on Request for Intervenor Compensation* [D.03-01-058], *supra*, and *Opinion on Second Request for Intervenor Compensation* [D.05-02-003] (2005) ___ Cal.P.U.C.3d ___.)

That the Commission may weigh general versus Commission specific legal experience differently is consistent with section 1806, Resolution ALJ-184, and D.05-11-031. As set forth in Res. ALJ-184, "we expect that advocates with experience before the Commission have a certain level of knowledge about our Rules of Practice and Procedure and filing requirements." (Resolution ALJ-184, p. 4.)  Given Volker's extensive general legal but limited Commission experience, the $270 per hour rate afforded him in D.06-

---

[12] CARE's initial request for compensation failed to provide sufficient detail on several issues. Indeed, D.06-04-018 cautioned CARE and specifically directed it to "provide adequate detailed supporting documentation, including an allocation of time among issues, in any future compensation requests." (D.06-04-018, p. 5.)

14

04-018 is consistent with section 1806 and Commission decisions on intervenor compensation. Accordingly, the Commission did not err in D.06-06-025, as affirmed by D.06-10-023, when it denied CARE's petition for modification.

### 3. The Commission Reasonably Rejected CARE's Petition for Modification.

CARE argues that because the Commission determined the appropriate hourly rate for Mr. Volker on the basis of an award in a previous proceeding, the Commission ignored Mr. Volker's testimony documenting his market rate and acted in an arbitrary and capricious manner. (Writ Petition, p.12.) CARE's arguments have no merit.

Contrary to CARE's assertion, the Commission did consider Mr. Volker's testimony. Although it relied on previous decisions, the Commission in D.06-04-018 specifically acknowledged its consideration of CARE's uncontroverted evidence. (*Order Granting Intervenor Compensation* [D.06-04-018], *supra*, at p. 61 (slip op.).) In response to the Petition for Modification, the Commission reviewed its determinations in D.06-04-018, and found that the modification was not warranted and that D.06-04-018 was consistent with previous Commission decisions, including Resolution ALJ-184 and D.05-11-031. (D.06-06-025, p. 2.) Accordingly, the Commission determined the appropriate hourly rate by adjusting Mr. Volker's prior compensation awards by 8% per year.

In light of the Commission's having properly weighed the evidence and followed its own lawful directives on how hourly rates will be determined, CARE's last resort is to question the validity of Mr. Volker's previously determined rate. CARE argues that "[t]he Commission's calculation of Mr. Volker's fees fails to account for the

15

circumstances underlying the payment of $250/hour for Mr. Volker's services." (Writ

Petition, p. 15.)   Specifically, CARE asserts that the prior $250 per hour rate resulted

from an estimate of legal costs contained in a notice of intent to claim compensation

("NOI") submitted by Mr. Volker's client prior to D.03-01-058.  (Supporting Declaration

of Counsel in Support of CARE's Petition for Modification, filed April 15, 2006, p. 7.) [13]

Both on the record and as a matter of law, CARE's claim that Mr. Volker's prior

award did not reflect the market rate is without substance.  CARE refers to a section 1804

requirement that applies to all intervenors that plan to seek compensation.  As set forth in

section 1804:

> (a)(1) A customer who intends to seek an award under
> this article shall, within 30 days after the
> prehearing conference is held, file and serve on
> all parties to the proceeding a notice of intent to
> claim compensation.
> . . .
>
> (2)(A) The notice of intent to claim
> compensation shall include ...
>
> > (ii) An itemized estimate of the
> > compensation that the customer
> > expects to request, given the likely
> > duration of the proceeding as it
> > appears at the time.

(Pub. Util. Code, §1804, subd. (a)(1).)  Rather than an agreement between Mr. Volker's

former client and the Commission, and in spite of CARE's occasional reference to the

---

[13] The declaration is attached to the petition for modification, which can be found as Tab 5 of
CARE's Appendix.

required NOI estimate as a cap, there is nothing in the record to suggest either that Mr.

Volker or his client were in anyway prevented from requesting a higher rate, or that the

rate afforded Mr. Volker in D.03-01-058 was not market based.

In the absence of any statute, case law, or Commission decision preventing CARE

or any other intervenor from adjusting their NOI estimate of hourly wages upward,

CARE wrongly argues that the following statement in D.03-01-058 supports its position:

> Attorney Volker states that he has over 27 years
> experience as a practicing environmental lawyer in
> California and has been awarded attorney's fees at the
> hourly rate of $300 based on his extensive experience
> in the field of environmental litigation. We conclude
> that based on Volker's experience, the requested
> hourly rate of $250 for services provided in 2000 and
> 2001 is reasonable. (D.03-01-058, p. 7, see also Writ
> Petition, p.14, citing Appendix, Tab 5, p. 201.)

CARE claims this language shows that "the Commission found that in 2000 and 2001

Mr. Volker's market rate was no less than $250." (Petition for Modification, p. 6.) Here

again CARE misses the point. In D.03-01-058, the Commission did not purport to

establish Mr. Volker's market rate. Rather, consistent with section 1806, the

Commission balanced his complete lack of prior Commission experience with his

substantial and lucrative environmental law experience in determining Mr. Volker's

hourly rate for intervenor compensation.

Consequently, the award of an hourly rate of $270 in D.06-06-025 was consistent

with the mandates of section 1806 and previous Commission decisions, and thus, the

Commission acted reasonably and lawfully rather than arbitrarily or capriciously.

## V.    CONCLUSION

For the reasons discussed above, CARE has failed to demonstrate any basis for the Court to grant the Writ Petition.  Therefore, the Commission respectfully urges the Court to deny the Writ Petition.

Respectfully Submitted,

RANDOLPH L. WU, SBN 78651
HELEN W. YEE, SBN 119434
DARWIN E. FARRAR, SBN 152735

By: _____
          Darwin E. Farrar

Attorneys for Respondent California
Public Utilities Commission of the State
of California

505 Van Ness Avenue
San Francisco, CA 94102
Phone: (415) 703-1599
Email: edf@cpuc.ca.gov

December 6, 2006

18

## <u>CERTIFICATE OF WORD COUNT</u>

I certify that this Answer of Respondent in *Californians For Renewable Energy v. Public Utilities Commission of the State of California*, Case No. A115703, contains 4,896 words. In completing this word count, I relied on the "word count" function of the Microsoft Word program.

Dated:  December 6, 2006

_____

Darwin E. Farrar

## CERTIFICATE OF SERVICE

I hereby certify that I am a citizen of the United States, over the age of 18 years, with business address at 505 Van Ness Avenue, San Francisco, California, and am neither a party to nor interested in **Californians For Renewable Energy v. Public Utilities Commission of the State of California**, Case No. A115703, before the Court of Appeal of the State of California, First Appellate District.

On December 6, 2006, in San Francisco, California, I caused to be served by regular U.S. mail the following **"ANSWER OF RESPONDENT"** including **ATTACHMENTS A-C** to all parties listed on the attached service list. Each copy was enclosed in a sealed envelope and all postage thereon fully prepaid.

I certify under penalty of perjury that the foregoing is true and correct.

Angelita Marinda

## SERVICE LIST
## CASE NO. A115703

RICHARD TOM
ATTORNEY AT LAW
SOUTHERN CALIFORNIA EDISON COMPANY
2244 WALNUT GROVE AVENUE
ROSEMEAD, CA  91770

STEPHEN E. PICKETT
ATTORNEY AT LAW
SOUTHERN CALIFORNIA EDISON COMPANY
2244 WALNUT GROVE AVENUE
ROSEMEAD, CA  91770

MARK HUDAK
INGERSOLL,THOMPSON&HORN PROFESSIONAL
216 PARK ROAD
BURLINGAME, CA  94010

MARTHA DEBRY
TOWN OF HILLSBOROUGH
1600 FLORIBUNDA AVENUE
HILLSBOROUGH, CA  94010

STAN GUSTAVSON
CITY ATTORNEY
CITY HALL
333 90TH STREET
DALY CITY, CA  94015

MARY K. RAFTERY
ATTORNEY AT LAW
COUNTY OF SAN MATEO
OFFICE OF THE COUNTY COUNSEL
400 COUNTY CENTER
REDWOOD CITY, CA  94063

PAMELA THOMPSON
CITY ATTORNEY
CITY OF SAN BRUNO
567 EL CAMINO REAL
SAN BRUNO, CA  94066

MICHAEL J. VALENCIA
ATTORNEY
ROSS HACKETT DOWLING VALENCIA WALTI
600 EL CAMINO REAL
SAN BRUNO, CA  94066-0279

JOSEPH PETER COMO
CITY AND COUNTY OF SAN FRANCISCO
CITY HALL, ROOM 234
1 DR. CARLTON B. GOODLETT PLACE, RM. 234
SAN FRANCISCO, CA  94102

MARION PELEO
CALIF PUBLIC UTILITIES COMMISSION
LEGAL DIVISION
ROOM 4107
505 VAN NESS AVENUE
SAN FRANCISCO, CA  94102-3214

JOSEPH M. KARP
ATTORNEY AT LAW
WINSTON & STRAWN
101 CALIFORNIA STREET
SAN FRANCISCO, CA  94104-1513

DAVID KRASKA
ATTORNEY AT LAW
PACIFIC GAS AND ELECTRIC COMPANY
77 BEALE STREET, 31ST FLOOR
SAN FRANCISCO, CA  94105

JOAN L. CASSMAN
HANSON BRIDGETT MARCUS, VLAHOS & RUDY
333 MARKET STREET, SUITE 2300
SAN FRANCISCO, CA  94105

PETER H. WEINER
ATTORNEY AT LAW
PAUL HASTINGS JANOFSKY AND WALKER,LLP
55 2ND STREET, 24TH FLOOR
SAN FRANCISCO, CA  94105-3441

ZACHARY R. WALTON
PAUL,HASTINGS,JANOFSKY&WALKER LLP
55 SECOND STREET, 24TH FLOOR
SAN FRANCISCO, CA  94105-3441

JEANNE B. ARMSTRONG
RITCHIE & DAY, LLP
505 SANSOME STREET, SUITE 900
SAN FRANCISCO, CA  94111

LOUIS G. LEONARD III
LATHAM & WATKINS
505 MONTGOMERY ST. SUITE 1900
SAN FRANCISCO, CA  94111

MICHAEL B. DAY
ATTORNEY AT LAW
GOODIN MACBRIDE SQUERI RITCHIE & DAY LLP
505 SANSOME STREET, SUITE 900
SAN FRANCISCO, CA  94111

RICHARD W. RAUSHENBUSH
ATTORNEY AT LAW
LATHAM & WATKINS LLP
505 MONTGOMERY STREET, SUITE 2000
SAN FRANCISCO, CA  94111

EDWARD W. O'NEILL
ATTORNEY AT LAW
DAVIS WRIGHT TREMAINE, LLP
505 MONTGOMERY STREET, SUITE 800
SAN FRANCISCO, CA  94111-6533

LYNNE BROWN
CALIFORNIANS FOR RENEWABLE ENERGY, INC.
24 HARBOR ROAD
SAN FRANCISCO, CA  94124

PETER W. HANSCHEN
ATTORNEY AT LAW
MORRISON & FOERSTER, LLP
101 YGNACIO VALLEY ROAD, SUITE 450
WALNUT CREEK, CA  94596

PATRICK WHITNELL
ATTORNEY AT LAW
MEYERS NAVE RIBACK SLVER & WILSON
555 12 ST., SUITE 1500
OAKLAND, CA  94607

STEPHAN C. VOLKER
ATTORNEY AT LAW
BRECHER & VOLKER, LLP
436 14TH STREET, SUITE 1300
OAKLAND, CA  94612

GEORGE
WOMEN'S ENERGY MATTERS
PO BOX 548
FAIRFAX, CA  94978-0548

MICHAEL E. BOYD
CALIFORNIANS FOR RENEWABLE ENERGY
5439 SOQUEL DRIVE
SOQUEL, CA  95073

GRANT A. ROSENBLUM
ATTORNEY AT LAW
CALIFORNIA INDEPENDENT SYSTEM OPERATOR
151 BLUE RAVINE ROAD
FOLSOM, CA  95630

RANDOLPH L. WU
HELEN W. YEE
DARWIN E. FARRAR
CALIFORNIA PUBLIC UTILITIES COM.
505 VAN NESS AVENUE
SAN FRANCISCO, CA 94102

STEPHEN LARSON
EXECUTIVE DIRECTOR
CALIFORNIA PUBLIC UTILITIES COMMISSION
505 VAN NESS AVENUE
SAN FRANCISCO, CA 94102

COURT OF APPEAL OF THE STATE OF CALIFORNIA
FIRST APPELLATE DISTRICT, DIVISION ONE

CALIFORNIANS FOR RENEWABLE    )
ENERGY,                        )
                               )
                               )  No. A115703
        Petitioner,            )
                               )
                               )  Cal. P.U.C. Decision Nos.
        v.                     )  D. 06-06-025 and
                               )  06-10-023
CALIFORNIA PUBLIC UTILITIES    )
COMMISSION,                    )
                               )
        Respondent,            )
                               )
                               )
PACIFIC GAS & ELECTRIC         )
COMPANY,                       )
                               )
                               )
        Real Party In Interest.)

ON REVIEW OF CALIFORNIA PUBLIC UTILITIES COMMISSION
DECISION NOS. 06-10-023 AND 06-06-025
IN APPLICATION NO. 02-09-043

REPLY TO ANSWER OF RESPONDENT

Stephan C. Volker (CSB #63093)
Joshua A.H. Harris (CSB #226898)
Marnie E. Riddle (CSB #233732)
LAW OFFICES OF STEPHAN C. VOLKER
436 14th Street, Suite 1300
Oakland, CA 94612
Tel: 510/496-0600
Fax: 510/496-1366

Attorneys for Petitioner Californians for
Renewable Energy

## TABLE OF CONTENTS

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

I.   INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.  STANDARD OF REVIEW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

III. ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

     A.  CARE Properly Challenged the Commission's
         Decision to Deny Petitioner's Attorney His
         Market Rate. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

     B.  The Commission's Rate Determination Violates
         Section 1806 and is Arbitrary and Capricious. . . . . . . . . 12

         1.  The Commission Improperly Based Its Rate
             Determination Entirely on a Non-Market
             Rate Awarded to Mr. Volker in a Previous,
             Unrelated Commission Decision. . . . . . . . . . . . . . 12

         2.  The Commission's Interpretation of
             "Market Rate" Is Flawed and Represents
             a Post Hoc Rationalization of its
             Decision in this Case. . . . . . . . . . . . . . . . . . . . . . 16

         3.  The Commission's Reliance on ALJ-184 and
             D.05-11-031 Is Misplaced, As These Rulings
             Arbitrarily Froze All 2003 Rates, Whether or
             Not They Were Market Based. . . . . . . . . . . . . . . 23

         4.  CARE Merely Asks that ALJ-184 and
             D.05-11-031 Be Interpreted in a Manner
             That Sustains Their Constitutionality. . . . . . . . . 25

IV.  CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

CERTIFICATE OF WORD COUNT . . . . . . . . . . . . . . . . . . . . . . . . 33

## TABLE OF AUTHORITIES

### FEDERAL CASES

*Lambert v. People of the State of California*
    (1957) 355 U.S. 225 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

### STATE CASES

*Addison v. State of California*
    (1978) 21 Cal.3d 313 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Allen v. Sully-Miller Contracting Co.*
    (2002) 28 Cal.4th 222 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Conservatorship of Wendland*
    (2001) 26 Cal.4th 519 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*Greyhound Lines Inc. v. Public Utilities Com.*
    (1968) 68 Cal.2d 406 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*Hernandez v. Department of Motor Vehicles*
    (1981) 30 Cal.3d 70 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*In re Jackson*
    (1987) 43 Cal.3d 501 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*Knapp v. City of Gardena*
    (1990) 221 Cal.App.3d 344 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*Northern California Assn. v. Public Util. Com.*
    (1964) 61 Cal.2d 126 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 9, 10

*People v. Ramirez*
    (1979) 25 Cal.3d 260 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28, 29

*People v. Vasquez*
    (2004) 118 Cal.App.4th 501 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*PG&E Corp. v. Public Utilities Com.*
    (2004) 118 Cal.App.4th 1174 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*Ryan v. California Interscholastic Federation-San Diego Section*
    (2001) 94 Cal.App.4th 1048 . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28, 31

*Saleeby v. State Bar*
    (1985) 39 Cal.3d 547 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*San Jose Police Officers Assn. v. City of San Jose*
    (1988) 199 Cal.App.3d 1471 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*Smith v. Board of Medical Quality Assurance*
    (1988) 202 Cal.App.3d 316 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*Ventura County Dept. of Child Support Services v. Brown*
    (2004) 117 Cal.App.4th 144 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Verdugo Hills Hospital, Inc. v. Department of Health*
    (1979) 88 Cal.App.3d 957 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Yamaha Corp. of America v. State Bd. of Equalization*
    (1998) 19 Cal.4th 1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

## STATUTES

Public Utilities Code
    § 1731 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 11
    § 1731, subd.(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
    § 1756 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
    § 1801.3, subd.(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 17
    § 1804, subd.(e) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
    § 1806 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 12, 13, 14, 16, 17

## OTHER AUTHORITIES

Asimow, "Toward a New California Administrative Procedure Act:
    Adjudication Fundamentals"
    (1992) 39 UCLA L.Rev. 1067 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

58 California Jurisprudence 3d (2004 ed.; Supp. 2006) "Statutes"
    § 185 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

## I. INTRODUCTION

Both sides agree that the Public Utilities Code requires that intervenor compensation "shall take into consideration the market rates paid to persons of comparable training and experience who offer similar services." Pub. Util. Code §1806. The Public Utilities Commission ("PUC" or the "Commission") argues in its Answer that the rates at issue here, awarded to Stephan C. Volker, lead attorney for Californians for Renewable Energy ("CARE" or "petitioner"), satisfy that requirement.

However, the Commission points to no factual evidence in the record – no market-based determination of an appropriate rate – that supports its decision that Mr. Volker's rates should be set at $270, rather than the requested, documented, and unopposed hourly rate of $400. Instead, the Commission bases its computation *entirely* on a *non-market* rate previously awarded to Mr. Volker in a different decision. The only evidence in the record of Mr. Volker's market rate demonstrates that $400 per hour is, at a minimum, an appropriate market rate. Nothing in the PUC's Answer changes this straightforward analysis.

While on its face this case may seem to be about money, it is not.

The total amount at issue here is $5,872,[1] less than the expense to petitioner's counsel of this appeal.  Rather, this case involves the public's ability – specifically here, the ability of CARE members who live in the low-income neighborhoods of Hunter's Point and Bayview in San Francisco – to participate in PUC decisionmaking proceedings on a level playing field with utility and Commission lawyers.  The Commission's decision to derail CARE's unopposed fee request and permanently lock Mr. Volker into a lower echelon of fee recoveries will inhibit CARE's, and other similar organizations', ability to procure adequate legal counsel when necessary.

Thus, CARE seeks this Court's writ relief to ensure that intervenor compensation awards, such as the present one, are truly market-based.  The Legislature directed that the intervenor compensation program "shall "encourage the effective and efficient participation of *all groups* that have a stake in the public utility regulation process."  Pub. Util. Code §1801.3, subd.(b), emphasis added.  Without a fair and responsive method of determining market rates as required by the statute, the Commission will be unable to fulfill this lofty mandate.

---

[1] PUC's Opinion Denying Petition for Modification (D.06-06-025), reproduced in Petitioner's Appendix ("Ptr's. App."), Tab 6, p. 216.

## II. STANDARD OF REVIEW

The PUC claims that "the Commission's interpretation of the Public
Utilities Code should be given great weight." Answer, p. 6, citing
*Greyhound Lines Inc. v. Public Utilities Com.* (1968) 68 Cal.2d 406, 410.
According to black letter law, however:

> Notwithstanding the weight given to an administrative
> agency's interpretation of its enabling legislation, the ultimate
> responsibility for the interpretation of statutes rests with the
> courts. An administrative construction of a statute cannot
> prevail when a contrary legislative purpose is apparent, or if
> an alternative reading is compelled by the plain language of
> the provision. It is the duty of the court to state the true
> meaning of the statute, even if this requires the overthrow of
> an earlier erroneous administrative construction. An
> administrative agency cannot alter or enlarge the legislation,
> and thus an erroneous administrative construction does not
> govern the court's interpretation. Thus, the rule giving weight
> to administrative construction does not apply where the
> wording of the statute clearly calls for a different
> construction. If there is no ambiguity, and the administrative
> interpretation is clearly erroneous, the fact that it is long
> continued does not give it legal sanction.

58 Cal.Jur.3d (2004 ed.; Supp. 2006) "Statutes" § 185, citations omitted.

The PUC is not exempt from this rule. In *PG&E Corp. v. Public
Utilities Com.* (2004) 118 Cal.App.4th 1174, 1194-1195, the Court held,
notwithstanding a contrary PUC view, that "interpretation of statutes is a
question of law subject to independent judicial review." *Id.*, citing *Yamaha
Corp. of America v. State Bd. of Equalization* (1998) 19 Cal.4th 1, 7-8, 14-

15. Final, authoritative interpretation of a statute is not within the province of the administrative agency – here, the PUC – implementing the statute. *Id.* Rather, it is the task of this Court.

In performing this task, this Court must begin by "'examining the statutory language because it generally is the most reliable indicator of legislative intent.'" *Ventura County Dept. of Child Support Services v. Brown* (2004) 117 Cal.App.4th 144, 150, quoting from *Allen v. Sully-Miller Contracting Co.* (2002) 28 Cal.4th 222, 227. Further, this Court must "'give the language its usual and ordinary meaning, and if there is no ambiguity, . . . the plain meaning of the language governs.'" *Id.*

Under this primary rule of statutory construction, this Court must look at the words of the statute – in this case the words "market rate" as used in the Public Utilities Code – and if these words are unambiguous as we show below, apply the law as it was written by the Legislature. Because the Public Utilities Code calls for payment at "market rates" and Mr. Volker demonstrated that his market rate is between $400-500 per hour as documented by court-awarded fees expressly based on his market rate, the Commission's decision to assign him a *non-market* rate of $270 is in error and should be overturned.

-4-

# III. ARGUMENT

**A.    CARE Properly Challenged the Commission's Decision to Deny Petitioner's Attorney His Market Rate.**

After the Commission issued its initial decision granting intervenor compensation (D.06-04-018), CARE timely filed a petition for modification to adjust Mr. Volker's rate to his market rate. CARE did not wish to stay the effect of D.06-04-018, and thus did not file a petition for rehearing at that time, for two reasons. First, D.06-04-018 awarded, rather than denied, fees to CARE. CARE simply sought to correct what seemed at the time an inadvertent error in the original decision – the assignment of an obsolete rate to its senior counsel.

Second, CARE did not wish to further delay payment to the other compensation recipients, including CARE's expert witnesses, advocates, and community representatives. The Commission had already delayed its decision by approximately 19 months, despite its statutory duty to decide requests for compensation within 75 days.[2] Further delay would have

---

[2]

Public Utilities Code section 1804, subd.(e) directs that "[w]ithin 75 days after the filing of a request for compensation . . . the commission *shall* issue a decision that determines whether or not the customer has made a substantial contribution to the final order or decision in the hearing or proceeding" and then determine the amount of fees to be awarded." *Id.*, emphasis added. CARE submitted its request for compensation on October

caused palpable hardship to CARE's 14 experts and other representatives who had already waited two years to be paid for their services.

The Commission does not dispute that its procedures allowed CARE to seek correction of the error in Mr. Volker's rate through a petition for modification. Former Commission Rule 47 (now Rule 16.4) provides that "[a] petition for modification asks the Commission to make changes to an issued decision." That is precisely what CARE did: it requested a simple change to D.06-04-018. Ptr's. App., Tab 5, p. 196. On June 15, 2006, the PUC addressed, and denied, the merits of CARE's petition for modification. Ptr's. App., Tab 6 (D.06-06-025).

In its Answer, the PUC asserts for the first time that CARE utilized the wrong procedure on the grounds that a petition for modification alone "does not preserve the party's appellate rights." Answer, p. 7 and fn. 8, quoting Commission Rule 16.4(b) (formerly Rule 47(a)). The Commission implies, but does not say, that CARE thereby forfeited all recourse for the PUC's adverse ruling on its modification petition. This implication is incorrect. It is true, as Rule 16.4(a) makes clear, that "an application for

---

7, 2004, and at the request of the PUC, supplemental information on January 28, 2005. Then, 554 days after submission of CARE's compensation request, the Commission belatedly issued its determination on April 14, 2006. Ptr's. App., Tab 4 (D.06-014-018).

rehearing (see Rule 16.1) is the vehicle to . . . preserve a party's appellate rights." But a decision to first seek modification does not forfeit the right to later request rehearing of an adverse ruling *on the requested modification.* Rule 16.1, which governs applications for rehearing, *is* by its terms, *applicable to decisions denying petitions for modification.* Rule 16.1 directs that a party may seek "rehearing of a Commission order or *decision.*" Rule 16.1(a), emphasis added. The Commission's denial of CARE's petition for modification *is* such an appealable "decision." Decision 06-06-025 (Ptr's. App., Tab 6), p. 1.

Thus, CARE properly sought the surgical relief for which petitions for modifications are intended. After the Commission denied CARE's modification petition, CARE was entitled to "preserve its appellate rights" by filing a petition for rehearing of the Commission's "decision" denying CARE's modification petition.

CARE filed its rehearing petition on July 13, 2006, 28 days after the Commission denied CARE's petition for modification. Ptr's. App., Tab 7. Petitions for rehearing must be filed within 30 days. Pub. Util. Code § 1731, subd.(b). Thus, CARE's petition for rehearing of the Commission's denial of CARE's petition for modification was timely.

Accordingly, the Commission does not, and cannot, claim that

-7-

CARE's rehearing petition was untimely. Rather, the Commission contends that CARE is challenging Commission decisions that are unreviewable, citing *Northern California Assn. v. Public Util. Com.* (1964) 61 Cal.2d 126, 131. The Commission's reliance on *Northern California Assn.* is misplaced. In *Northern California Assn.*, the petitioner filed a motion to reopen the record 11 months after the record had been closed and five months after the Commission had issued its final decision approving a nuclear power plant. 61 Cal.2d at 130-133. Substantial "road and site preparation work" had already taken place on site. *Id.* at 131. When the Commission denied as untimely the petitioner's motion to reopen the record, the petitioner filed a motion for rehearing. *Id.* at 133. When the Commission denied that motion, the petitioner then filed a petition for review in the Supreme Court. *Id.*

*Northern California Assn.* is thus distinguishable in at least four respects. First, the petitioner in *Northern California Assn.* attempted to upset a final Commission decision after many months had passed, equities had shifted, and construction had begun. 61 Cal.2d at 131. Here, by contrast, no equities have shifted and no party has suffered prejudice.

Second, the *Northern California Assn.* petitioner filed an untimely petition to reopen the record and submit new evidence nearly one year after

-8-

the final decision, in an improper attempt to pry open the final decision on the merits. As the Supreme Court pointed out, "[t]here is no statutory right to reopen commission proceedings once submitted and decided," as a "petition to reopen [must] be filed before issuance of a decision." 61 Cal.2d at 134. The petitioner's attempt to bootstrap its untimely petition to reopen into a timely petition for rehearing was therefore, "obviously not made within the time limit fixed by section 1731 of the Public Utilities Code for making petitions for rehearing." *Id.*

Here, to the contrary, petitioner CARE filed a *timely* motion for modification within the deadline for *both* a petition for modification and a motion for rehearing. As such, the Commission's decision had not become final when CARE raised its concerns about Mr. Volker's rates.

Third, contrary to the *Northern California Assn.* scenario, CARE's decision to initially petition the Commission for modification, rather than unnecessarily staying the proceedings by demanding a full rehearing, was sanctioned by the Commission's modification procedure. PUC Rule 16.4. The Commission does not contend that CARE improperly invoked the Commission's procedure for modification. Nor do the Commission's rules regarding that procedure suggest that by invoking it, CARE thereby forfeited its right to seek rehearing of the Commission's denial of CARE's

-9-

modification petition. Rather, as explained above, the Commission's Rules allow an aggrieved party to preserve its appellate rights by seeking rehearing of a Commission "decision," including its "Decision" 06-06-025 denying CARE's petition for modification. Otherwise, Commission decisions on modification requests would be completely unreviewable.

CARE properly tailored its initial petition to the specific error in Mr. Volker's market rate. By placing the PUC and PG&E on notice of this claim in a timely manner and through an administrative review process sanctioned by the Commission, CARE preserved its right to pursue a full rehearing in the event its modification petition were denied.[3]

Fourth, in *Northern California Assn.*, the petitioner was clearly engaged in a collateral attack on the Commission's decision by filing an untimely petition to reopen the Commission's merit proceedings. 61 Cal.2d at 134. Here, by contrast, there is no suggestion that CARE has attempted to reopen the Commission's proceedings, or to belatedly raise issues it could have brought to the Commission's attention in a timely manner.

---

[3]Even if the Commission's Rule 16.1(a) did not expressly authorize rehearing of a "Commission order or decision," the Equitable Tolling Doctrine would preserve CARE's rights under these circumstances. *See, e.g., Addison v. State of California* (1978) 21 Cal.3d 313, 320-321 (court equitably tolled the limitations period on plaintiffs' state law causes of action while plaintiffs reasonably but unsuccessfully sought their review in federal court).

-10-

Rather, it is undisputed that CARE timely filed a petition for modification in which it squarely raised its objection to the erroneous rate assigned to Mr. Volker. And, it is undisputed that CARE's subsequent petition for rehearing of the Commission's denial of its modification petition was likewise timely.

Nor is there any suggestion that the Commission was never afforded a timely opportunity to address this market rate issue. To the contrary, the Commission *did* address this specific issue in D.06-06-025, its June 16, 2006, decision on CARE's petition for modification. Ptr.'s App., Tab 6, at pp. 1-3. In that decision, the Commission did not claim that CARE had invoked the wrong procedure by filing a petition for modification instead of a petition for rehearing. Instead, it specifically addressed the merits of this market rate issue. *Id.* In doing so, the Commission waived any procedural argument that CARE's petition for modification was improper. CARE then timely sought rehearing of the Commission's merits denial of CARE's modification petition under Public Utilities Code section 1731, and timely sought this Court's review of the Commission's denial of rehearing under Public Utilities Code section 1756.

In sum, where, as here, a petitioner files a petition for modification prior to the effective date of the final decision and then timely files a

-11-

petition for rehearing of the Commission's denial of its modification

request, no party is prejudiced by the petitioner's choice of remedies and the

issue raised remains reviewable by this Court. Additionally, where the

Commission recognizes the timeliness of the petitions for modification and

for rehearing by deciding each on the merits, the Commission cannot

thereafter claim that either petition was procedurally defective. For these

reasons, the Commission's claim that CARE impermissibly challenges final

and unappealable decisions is without merit.

**B.    The Commission's Rate Determination Violates Section 1806 and
       is Arbitrary and Capricious.**

    **1.    The Commission Improperly Based Its Rate
           Determination Entirely on a Non-Market Rate Awarded
           to Mr. Volker in a Previous, Unrelated Commission
           Decision.**

The Commission claims that it properly "weighed the evidence" and

fully considered "CARE's uncontroverted evidence" regarding Mr.

Volker's market rate. Answer, p. 15. Then, in contradiction, the

Commission explains that it "determined the appropriate hourly rate by

adjusting Mr. Volker's prior [2003] compensation awards by 8% per year."

*Id.* Thereafter, the PUC admits that, in setting the 2003 rate, it "did not

purport to establish Mr. Volker's market rate." Answer, p. 17. Thus, the

Commission admits that it did not consider Mr. Volker's market rates when

it adopted the low-end rate of $270 per hour for his services in the underlying proceeding.

The Commission fails, in its Answer, to address the basic problem with its approach for calculating Mr. Volker's fee – its failure to consider Mr. Volker's "market rate" in accordance with section 1806. Instead of considering the only evidence in the record pertaining to Mr. Volker's "market rate" of at least $400 per hour – *i.e.*, Mr. Volker's declaration supporting the request for fees – the Commission instead adjusted an admitted *non*-market rate by 8% and used the resulting hourly rate of $270 *rather than* Volker's market rate.

There is no record evidence that Mr. Volker's market rate was less than $400 per hour. As clearly stated in Mr. Volker's supporting declaration:

> I have 30 years' experience as a practicing environmental lawyer in California, and have been awarded attorney's fees by state and federal courts and the CPUC on numerous occasions. I have extensive experience in the field of environmental litigation. During the past three decades I actively participated, typically as the lead plaintiffs' attorney, in over 40 published cases in state and federal courts in California, Washington, Alaska, Montana and Arkansas. I am familiar with the market value of my services, based on declarations submitted by knowledgeable attorneys in numerous attorney fee motions in other proceedings. The market value of my services is between $400 and $500 per hour.

-13-

Ptr's. App., Tab 3, at p. 057.

Mr. Volker's declaration stating that "the market value of [his] services is between $400 and $500 per hour" is competent evidence of his market rate.[4] No party submitted any contrary evidence. PG&E did not oppose CARE's request for compensation and did not oppose Mr. Volker's rate of $400. There is no other market rate evidence in the PUC's record. The Commission has never adduced evidence that Mr. Volker's *market rate* is lower.

Instead, the Commission based its decision on a *non*-market rate, in violation of section 1806. The Commission attempts to justify its result by arguing that Mr. Volker's prior award of $250 per hour was based on his "market rate." Answer, p. 16. But the PUC's original ruling awarding Mr. Volker $250 per hour does *not* say that "$250 is Mr. Volker's market rate." Rather, it says that "[t]he adopted hourly rate [*i.e.*, $250] is *no greater than the market rate for individuals with comparable training and experience*" to Mr. Volker. Answer, Attach. C (D.03-01-058) at p. 9, emphasis added.

---

[4]In its petition for modification (Ptr's. App., Tab 5, at pp. 202-214) CARE supplemented Mr. Volker's initial declaration with a second declaration attaching his Biographical Statement as Exhibit 1 and the Declaration of Michael Traynor, a lawyer of 45 years' experience who attested that Mr. Volker's rate was at least $475 for work performed in 2004-2006, as Exhibit 2.

The Commission erroneously interprets this ruling to say just the *opposite*, that the awarded rate of $250 was "*no less than*" Mr. Volker's market rate. The Commission's backwards interpretation is thus refuted by the very ruling – D.03-01-058 – on which the Commission relies.

The record makes clear, as CARE explained in its petition to this Court, that the prior rate of $250 was derived from Mr. Volker's client's 2000 estimate of its overall, average attorneys' fee rate *before* Mr. Volker had even been hired. Petition, p. 12-15. In good faith and without the knowledge that it would be later used against him, Mr. Volker did not attempt, when filing his 2003 fee request, to increase the hourly rate previously assigned to his client's generic and as-yet-unspecified counsel. Now, according to the Commission, he should be locked to this non-market rate in all future proceedings even though it does not relate – in any manner whatsoever – to his market rate.

The Public Utilities Code requires consideration of "market rates" in calculating hourly rates for intervenor compensation awards. Here, the Commission took an old, non-market rate, adjusted it for inflation, and deemed the result a market rate. Because the Commission applied Public Utilities Code in an arbitrary and capricious manner, its decision should be modified to reflect Mr. Volker's market rate.

**2.    The Commission's Interpretation of "Market Rate" Is Flawed and Represents a Post Hoc Rationalization of Its Decision in this Case.**

In further defense of its decision, the Commission argues that CARE misconstrues section 1806's requirement to consider market rates. The Commission asserts that CARE would have the Commission "pay practitioners their market rate, regardless of the practice area from which the rate is derived." Answer, p. 10. The Commission's innuendo that CARE seeks an unjustifiably high rate from a different practice area is false. CARE asks no such thing. To the contrary, CARE merely seeks parity with the Commission's market rate awards to other lawyers with "comparable training and experience who offer similar services," as section 1806 mandates. The Commission's award of a non-market rate of $270 to Mr. Volker is not consistent with its award of a $470 market rate to attorney Edward O'Neill, a lawyer with three years less experience who offered similar services. Ptr.'s App. Tab 4, p. 148.

Shorn of rhetoric, the Commission's position simply ignores the market rate standard adopted by the Legislature. The Legislature has required the PUC to consider "the market rates paid to persons of comparable training and experience who offer similar services." Pub. Util. Code §1806. The only limitation on "market rates" is that they "may not, in

-16-

any case, exceed the comparable market rate for services paid by the commission or the public utility, whichever is greater, to persons of comparable training and experience who are offering similar services." *Id.* By the Commission's own calculation, comparable rates for utilities' attorneys with 13 or more years experience reached as high as $625 in 2003 and $585 in 2004, far in excess of the $400 requested by CARE's 30-year lawyer. Answer, Attach. A (D.05-11-031) at p. 11. Thus, the Commission's implication that Mr. Volker's $400 rate exceeds the market rate established by section 1806 is demonstrably wrong.

The Commission's Answer advances the novel claim that intervenor counsel must prove PUC-specific experience for compensation at reasonable market rates. Answer, pp. 13-14. Not so. The PUC has never construed section 1806 to require practitioners to make such a showing to recover their market rates. Rather, it has acknowledged, as it must, that section 1806's market rate cap encompasses a "wide[] range of specialities and project-specific work for which utilities hire outside attorneys." Answer, Attach. A (D.05-11-031) at p. 12.

Contrary to the Commission's novel argument here, this statutory cap does not create a two-tiered intervenor compensation program – one tier for intervenors who intervene in PUC proceedings all of the time, and

-17-

another, much lower one, for intervenors whose practice is not PUC-focused. The intervenor compensation program is not meant only for utility insiders and PUC gadflies. The program is meant to encourage and facilitate participation by members of the public that will be affected by the decision at hand – here low-income residents of Hunter's Point and Bayview affected by the noxious emissions of the Hunter's Point Power Plant. Pub. Util. Code § 1801.3, subd.(b). The Commission's position that it need only pay market rates to utility insiders undermines the basic purpose of the intervenor compensation program.

Furthermore, nothing in the record here shows that the PUC actually took into account Mr. Volker's prior PUC experience. The Commission's post hoc rationalization of its decision as based on Mr. Volker's "complete lack of prior commission experience" is demonstrably mistaken. If the Commission had indeed undertaken a detailed study of each practitioner's level of PUC and related administrative agency experience as part of its fee rate determinations, as it now claims it did here, the Commission would have found that Mr. Volker has *extensive experience* representing environmental causes in the PUC and in many other administrative agencies. Despite the Commission's new – and baseless – claim that Mr. Volker has a "complete lack of prior Commission experience" (Answer, p.

-18-

17), Mr. Volker has in fact participated in at least seven PUC proceedings,

several involving weeks of evidentiary hearings, on behalf of local

community groups, regional and national environmental organizations, local

governments, and energy conservation groups, including the following:

| Cause | Client | Case No. |
|---|---|---|
| Application of Pacific Gas and Electric Company for authorization to sell the El Dorado Hydroelectric Project to El Dorado Irrigation District Pursuant to Public Utilities Code §851 | League to Save Sierra Lakes, et al. | Application 98-04-016 |
| Rulemaking on Commission's own motion to provide for mitigation of local rail safety hazards within California | Friends of the River, et al. | R.93-10-002 |
| Application of Pacific Gas and Electric Company to Report Assessments of Inventory Balances and to Address Appraisal | Friends of the Eel River, et al. | A.98-05-022 |
| Application of Pacific Gas and Electric Company to Value Hydroelectric Plants and Related Assets Pursuant to Public Utilities Code Sections 367(b) and 851 | Friends of the Eel River, et al. | A.99-09-053 |

| Cause | Client | Case No. |
|-------|--------|----------|
| Application of Valencia Water Company (U34-W) seeking approval of its updated Water Management Program as ordered in Commission Resolution W-4154 dated August 5, 1999 | Angeles Chapter Sierra Club, et al. | A.99-12-025 |
| Application for a Certificate of Public Convenience and Necessity Authorizing the Construction of the Jefferson-Martin 230 kV Transmission Project | Californians for Renewable Energy | A.02-09-043 |
| Rulemaking Regarding Policies, Procedures, and Rules for the California Solar Initiative, etc. | Californians for Renewable Energy | R.06-03-004 |

In addition, Mr. Volker has participated in numerous administrative proceedings before other state and federal regulatory bodies similar to the PUC for decades, including the following illustrative proceedings:

| Cause | Agency | Case No. |
|-------|--------|----------|
| League to Save Sierra Lakes, et al., v. El Dorado County Water Agency | State of California Water Resources Control Board | Water Appropriation App. Nos. 29919-29922 and Petition for State-Filed App. No. 5645 |
| North Cascades Conservation Council and Washington Environmental Council v. Chelan County Board of Adjustment, et al. | State of Washington Shorelines Hearings Board | SHB No. 93-9 |

| Cause | Agency | Case No. |
|---|---|---|
| North Cascades Conservation Council and Washington Environmental Council v. Chelan County Board of Commissions | Eastern Washington Growth Planning Hearings Board, State of Washington | GPHB No. 93-1-0001 |
| Friends of the Navarro Watershed, et al. v. Unnamed Illegal Diverters of Water from Navarro River, etc., et al. | State of California Water Resources Control Board | Water Rights Applications 29711, etc. |
| Alpine County, et al., v. Pacific Gas & Electric Company | Federal Energy Regulatory Commission | Application to Amend Hydropower License No. 184 on South Fork American River, California |
| Marine Environmental Consortium, et al., v. State of Washington Department of Ecology, et al. | State of Washington Pollution Control Hearings Board | PCHB Nos. 96-257, et al. (applications for MPDES permits for salmon net-pen waste discharge permits) |
| Friends of the Eel River, et al., v. Pacific Gas & Electric Company | Federal Energy Regulatory Commission | Application for License Amendment for Hydroelectric Project 77-110 on the Eel River, California |

| Cause | Agency | Case No. |
|-------|--------|----------|
| Friends of the Eel River, et al., v. Pacific Gas & Electric Company, et al. | Federal Energy Regulatory Commission | Docket No. ER02-455-000, et al., Docket No. CP 02-39-000 et al., and Project Nos. 77-1116, et al. Regarding Relicensing Applications on PG&E Hydroelectric Facilities Throughout California |
| Alpine County, et al., v. Pacific Gas & Electric Company and El Dorado Irrigation District | Federal Energy Regulatory Commission | Application to Amend Hydropower License for Project No. 184 for Construction of a Dam and Canal on the South Fork American River, California |
| California Sportfishing Protection Alliance, et al. v. Sonoma County Water Agency | State of California Water Resources Control Board | Application Nos. 12919A, et al. to Add Points of Diversion and Rediversion to Water Rights Permits 12947A, et al. |

| Cause | Agency | Case No. |
|-------|--------|----------|
| Californians for Renewable Energy v. San Diego Gas & Electric Company, et al. | Federal Energy Regulatory Commission | Docket Nos. EL00-95-000, et al. (Proceedings to Establish Market-Based Rates for Energy Producers) |

The PUC did not, as it claims here, "weigh general versus Commission specific legal experience differently" (Answer, p. 14). Rather, it blindly plucked an old, non-market rate out of a different proceeding, adjusted it for inflation, and then arbitrarily assigned the resulting rate of $270 per hour to Mr. Volker. How can the PUC claim to have considered Mr. Volker's PUC-specific experience when it has not even bothered to *compile* such information in the first place?

The Commission's makeweight contention that it considered PUC-specific market rates and thus found $270 reasonable creates an inexcusably inequitable rate-setting scheme that favors PUC insiders and, moreover, is contrary to the specific facts and evidence in this case regarding Mr. Volker's prior experience.

**3.    The Commission's Reliance on ALJ-184 and D.05-11-031 Is Misplaced, As These Rulings Arbitrarily Froze All 2003 Rates, Whether or Not They Were Market Based.**

In its Answer, the Commission relies heavily on ALJ-184 and D.05-

11-031, which froze market rates awarded in 2003 and offered an 8% increase for every year thereafter. CARE does not dispute the potential utility of the Commission's attempts to simplify its intervenor rate determinations. However, the PUC's rate-freezing decisions should be applied only to prior decisions that specifically dealt with *market rates* and not indiscriminately to *all* 2003 intervenor fee awards.

The Commission's rigid application of ALJ-184 and D.05-11-031 to Mr. Volker's *non*-market 2003 rate is arbitrary and capricious. Such an overbroad application of the decision incorrectly assumes that all fees awarded in 2003 actually reflected market rates. Consequently, it fails to treat attorneys of similar backgrounds and experience equally. Worse, as applied here it locks practitioners into future fees scales that may not be based on the PUC's actual consideration of market rates.

Here, Mr. Volker was awarded the non-market rate of $250 for his work in 2000-2003. The Commission's inflexible application of ALJ-184 and D.05-11-031 converts Mr. Volker's non-market rate to a market rate. Despite the Commission's stated desire for *uniformity* and *consistency* in fee awards, its freezing of all 2003 rates, whether market or non-market based, accomplishes just the *opposite result*; it creates an *inequality* within the rates being allocated by the PUC.

-24-

The Commission argues that ALJ-184 and D.05-11-031 are final decisions and thus unreviewable. Answer, p. 8. This contention is mistaken. It is settled law that a party who is aggrieved by the particular application of a general rulemaking may challenge the regulation even though he did not challenge the rule when it was originally promulgated. As explained by the Supreme Court,

> "The validity of an administrative regulation, in whole or in part, *as applied* to a petitioner in an administrative mandamus proceeding, may be challenged therein by that petitioner where the basis of the challenge is that the regulation or some portion thereof is not a reasonable interpretation of the statute . . . and is therefore void." [Citation omitted.] *Verdugo Hills* noted that "abuse of discretion" under section 1094.5 is established if "the administrative agency has not proceeded in the manner required by law. Proceeding pursuant to an invalid regulation is not proceeding in the manner required by law." [Citation omitted.]

*Woods v. Superior Court* (1981) 28 Cal.3d 668, 678, emphasis added, quoting from *Verdugo Hills Hospital, Inc. v. Department of Health* (1979) 88 Cal.App.3d 957, 962-963.

Because ALJ-184 and D.05-11-031 are now being applied to Mr. Volker for the first time, CARE properly challenges the application of these fee-freezing decisions to CARE's attorney in this proceeding. *Id.* The PUC thus cannot insulate its erroneous fee decision from this Court's review by citing previous decisions that failed to establish Mr. Volker's market rates.

-25-

*Id.*

In sum, the Commission's application of the fee awards compiled in

ALJ-184 and D.05-11-031 to this proceeding is arbitrary and capricious,

because these rulings treat all 2003 fee awards as market-based

determinations and fail to distinguish non-market rates, thereby locking

certain attorneys such as CARE's counsel into non-market rate fee levels

with no apparent recourse.

### 4.    Assuming Arguendo that ALJ-184 and D.05-11-031 Were Proper, They Nonetheless Should be Interpreted in a Manner That Sustains Their Constitutionality.

Neither CARE nor Mr. Volker received notice by mail, fax or email

– much less by personal service – of the proceedings leading up to ALJ-

184[5] and D.05-11-031.[6] The Commission therefore failed to comply with

---

[5]ALJ-184 is based on an informal letter survey sent to "over 40 regular participants in [PUC] proceedings, including frequent intervenors and utilities from the various regulated industries." Answer, Attachment B, p. 1. *Only 9 parties submitted comments. Id.*, p. 2. Neither CARE nor Mr. Volker was among those surveyed. Neither had actual notice of the survey.

[6]Decision 05-11-03 resulted from a rulemaking instituted by the PUC. Neither CARE nor Mr. Volker received notice by mail, fax or email of this proceeding. Nor did they have actual notice of this rulemaking. *Only four regulated utilities and four frequent intervenors participated in this proceeding.* Answer, Attachment A, p. 23, fn. 9 (four participating utilities listed) and p. 24, fn. 10 (four participating intervenors listed). Decision 05-11-031 was admittedly only a "first attempt" to compile fee awards and, as the PUC acknowledged, "should be subject to refinement based on experience and further consideration of alternatives." Answer, Attachment A, p. 6.

the procedural due process guarantees of the California Constitution in approving ALJ-184 and D.05-11-031 by subsequently purporting to limit Mr. Volker's future compensation awards without giving proper notice.

CARE has no interest in challenging ALJ-184 and D.05-11-031 in this proceeding. CARE merely seeks just computation of Mr. Volker's market rate. Accordingly, CARE asks only that these two rulings not be applied to Mr. Volker. Since they cannot constitutionally be applied to Mr. Volker, CARE asks that they be construed so they are not so applied. To do so comports with settled law as we explain below.

According to long-standing rules of construction, the PUC's decisions should be interpreted so as to sustain their constitutionality. As stated in *People v. Vasquez*,

> If a statute is susceptible of two constructions, one of which
> will render it constitutional and the other unconstitutional in
> whole or in part, or raise serious and doubtful constitutional
> questions, the court will adopt the construction which, without
> doing violence to the reasonable meaning of the language
> used, will render it valid in its entirety, or free from doubt as
> to its constitutionality, even though the other construction is
> equally reasonable.

(2004) 118 Cal.App.4th 501, 506, quoting *Conservatorship of Wendland*

(2001) 26 Cal.4th 519, 548.[7] Thus, ALJ-184 and D05-11-031 should be

---

[7] Although here, the Court is asked to interpret broad-scale Commission
rulemaking decisions, the basic canon of construction remains the same.

applied to all parties that received proper notice of the proceeding from the

PUC, but not to those other parties, including Mr. Volker, who were

deprived of their procedural due process because they did not receive notice

of those proceedings and who are now negatively affected by the

Commission's decisions.

The scope of the procedural due process clause of the California

Constitution is broader than that of the U.S. Constitution. As discussed in

*Ryan v. California Interscholastic Federation-San Diego Section* (2001) 94

Cal.App.4th 1048, 1069 -1071, the state has expanded upon the narrower

federal jurisprudence in this area:

> Our state due process constitutional analysis differs from that
> conducted pursuant to the federal due process clause in that
> the claimant need not establish a property or liberty interest as
> a prerequisite to invoking due process protection. (*People v.
> Ramirez* (1979) 25 Cal.3d 260, 263-264 [158 Cal.Rptr. 316,
> 599 P.2d 622]; *Smith v. Board of Medical Quality Assurance*
> (1988) 202 Cal.App.3d 316, 327 [248 Cal.Rptr. 704].)
> Focused rather on an individual's due process liberty interest
> to be free from arbitrary adjudicative procedures (*People v.
> Ramirez, supra,* 25 Cal.3d at pp. 263, 268), procedural due
> process under the California Constitution is "much more
> inclusive" and protects a broader range of interests than under
> the federal Constitution (*San Jose Police Officers Assn. v.
> City of San Jose* (1988) 199 Cal.App.3d 1471, 1478 [245
> Cal.Rptr. 728], superseded by statute as stated in *Knapp v.
> City of Gardena* (1990) 221 Cal.App.3d 344, 347-348 [270
> Cal.Rptr. 524]; Asimow, Toward a New California
> Administrative Procedure Act: Adjudication Fundamentals
> (1992) 39 UCLA L.Rev. 1067, 1085-1086). According to our
> Supreme Court, it "has expanded upon the federal analytical

-28-

> base by focusing on the administrative process itself."
> (*Saleeby v. State Bar* (1985) 39 Cal.3d 547, 564 [216
> Cal.Rptr. 367, 702 P.2d 525].)

*Id.*

Consistent with the foregoing principle, in *People v. Ramirez*, the California Supreme Court held that application of the due process clauses of the California Constitution "must be determined in the context of the individual's due process liberty interest in freedom from arbitrary adjudicative procedures [and that] due process analysis must start not with a judicial attempt to decide whether the statute has created an 'entitlement' that can be defined as 'liberty' or 'property,' but with an assessment of what procedural protections are constitutionally required in light of the governmental and private interests at stake." *Id.*, 25 Cal.3d at pages 263-264; *accord, In re Jackson* (1987) 43 Cal.3d 501, 510; *Hernandez v. Department of Motor Vehicles* (1981) 30 Cal.3d 70, 81, fn. 12. The *Ramirez* Court explained that "the due process safeguards required for protection of an individual's statutory interests must be analyzed in the context of the principle that freedom from arbitrary adjudicative procedures is a substantive element of one's liberty." *Id.* at p. 268.

Additionally important here, proper notice is fundamental in both state and federal systems of procedural due process. "Ingrained in our

concept of due process is the requirement of notice. . . . Notice is required before property interests are disturbed, before assessments are made, before penalties are assessed. Notice is required in a myriad of situations where a penalty or forfeiture might be suffered for mere failure to act." *Lambert v. People of the State of California* (1957) 355 U.S. 225, 228.

Contrary to the foregoing due process rights guaranteed by the California Constitution and despite the fact that Mr. Volker's interests in future fee awards would be clearly and adversely affected, the PUC failed to notify Mr. Volker regarding the rate-freezing proceedings. According to ALJ-184, the administrative law judge in charge of the proceeding "wrote to over 40 regular participants in our proceedings, including frequent intervenors and utilities from the various regulated industries [and] invited comments and suggestions to begin development of this annual process." Answer, Attach. B, p. 1. The PUC thus provided notice and solicited comments from PUC *insiders*, but did not warn other practitioners such as Mr. Volker that their future intervenor rates would be fixed indefinitely by the proceeding.

Thus, Mr. Volker, along with any other attorney or expert not in the PUC's selective mailing list for the proceeding, was denied adequate notice of the proceedings that allegedly converted *all* of the 2003 rates into

-30-

"reasonable market rates" to be applied (with the slight 8% modification) to all future fee awards. As such, the PUC carried out "arbitrary adjudicative procedures" and denied many potential intervenors their right to "fair and unprejudicial decision-making" as defined by California due process jurisprudence. *Ryan v. California Interscholastic Federation-San Diego Section, supra*, 94 Cal.App.4th at 1070-71.

Where an administrative decision can be applied in harmony with the constitution, it should be so applied. Here, the rate-freezing mechanism contained in ALJ-184 and D.05-11-031 can be applied to those parties who received proper notice of the proceeding. It should not, however, be applied to those who were denied their procedural due process rights through lack of adequate notice. While a general guideline attempting to make easier the computation of rate awards seems like a beneficial step towards uniform intervenor compensation rates, the Commission's overly-rigid, imprecise method of fixing all future rates without notice to the parties involved unreasonably denied petitioner's counsel here an opportunity to dispute the Commission's arbitrary findings.

In sum, if this Court finds that ALJ-184 and D.05-11-031 are not arbitrary and capricious, it should, in the alternative, interpret those decisions in a manner that sustains their constitutionality. Here, such an

-31-

interpretation would likely limit their application to those parties with proper notice. Because CARE and Mr. Volker did not receive proper notice of the proceedings, they should not be bound by the resulting decisions and Mr. Volker's market rate should based on the undisputed evidence in the record that in 2004 his market rate was between $400 and $500 per hour.

### IV.    CONCLUSION

For the foregoing reasons, CARE respectfully requests this Court's writ to correct the hourly rate adopted in D.06-04-018 for Mr. Volker from $270 to $400 to reflect the actual market value of his services in 2004, which is at least $400.

Dated:  January 9, 2007              Respectfully submitted,

STEPHAN C. VOLKER
Attorney for petitioner CARE

## **CERTIFICATE OF WORD COUNT**

(California Rules of Court, Rule 8.204(c))

The text of this brief consists of 6735 words as counted by the Corel

WordPerfect version 12 word processing program used to generate this brief.

Dated:  January 9, 2007

STEPHAN C. VOLKER
Attorney for Petitioner

PROOF OF SERVICE

I am a citizen of the United States of America; I am over the age of 18 years and not a party to within entitled action.  My business address is 436 14th Street, Suite 1300, Oakland, California 94612.  On January 9, 2007, I served the document entitled

REPLY TO ANSWER OF RESPONDENT

on all parties by first class mail at Oakland, California, addressed to:

| | |
|---|---|
| Randolph L. Wu | Richard W. Rauschenbush |
| Helen W. Yee | Latham & Watkins |
| Darwin Farrar | PG&E |
| California Public Utilities | 505 Montgomery St., #1900 |
|     Commission | San Francisco, CA 94111 |
| Headquarters Office | |
| 505 Van Ness Avenue | David Kraska |
| San Francisco, CA 94102 | Pacific Gas and Electric Company |
| 415-703-2782 | 77 Beale Street, 31st Floor |
| | San Francisco, CA 94105 |

I certify under penalty of perjury that the foregoing is true and correct.

Dated:  January 9, 2007

Teddy Ann Fuss

COURT OF APPEAL, FIRST APPELLATE DISTRICT
350 MCALLISTER STREET
SAN FRANCISCO, CA 94102
DIVISION 1

CALIFORNIANS FOR RENEWABLE ENERGY,
Petitioner,
v.
PUBLIC UTILITIES COMM.,
Respondent;
PACIFIC GAS & ELECTRIC,
Real Party in Interest.

A115703
San Francisco County No. 0610023

**FILED**

**JAN 3 1 2007**

Court of Appeal - First App. Dist.
**DIANA HERBERT**
By_____
DEPUTY

BY THE COURT:

The petition for writ of review is denied.

The justices participating in the above entitled matter were:

Presiding Justice Marchiano, Justice Stein and Justice Swager

Date: _____          MARCHIANO, P.J.
                                 _____ P.J.

MARY JAMESON
AUTOMATIC APPEALS SUPERVISOR

JORGE NAVARRETE
SUPERVISING DEPUTY CLERK

SAN FRANCISCO

NATALIE ROBINSON
SUPERVISING DEPUTY CLERK

LOS ANGELES

☐ SAN FRANCISCO 94102
EARL WARREN BUILDING
350 McALLISTER STREET
(415) 865-7000

☐ LOS ANGELES 90013
RONALD REAGAN BUILDING
300 SOUTH SPRING STREET
(213) 830-7570





# Supreme Court of California

FREDERICK K. OHLRICH
COURT ADMINISTRATOR AND
CLERK OF THE SUPREME COURT

March 5, 2007

Stephan C. Volker
Law Offices of Stephan C. Volker
436 14th Street, Suite 1300
Oakland, CA 94612

Re:    **S150635 – Californians for Renewable Energy v. PUC (PG&E)**

Dear Mr. Volker:

The court has considered your application for relief from default and petition for review. Your application for relief from default has been denied. (Cal. Rules of Court, rule 8.60(e).)

The court has directed that the petition for review be returned to you. We are returning herewith the original of the petition for review. If you wish for the copies to be returned, please notify our San Francisco office within 10 days. Also enclosed is your check No. 3888 for $590.00.

Very truly yours,

FREDERICK K. OHLRICH
Court Administrator and
Clerk of the Supreme Court

By:  Ines Calanoc, Deputy Clerk

Enclosures

cc:   Court of Appeal, First Appellate District, A115703
      Randolph L. Wu, PUC
      Richard W. Rauschenbush, PG&E

IN THE SUPREME COURT OF
THE STATE OF CALIFORNIA

MAR - 1 2007

| | |
|---|---|
| CALIFORNIANS FOR RENEWABLE ENERGY )<br><br>    Petitioner, )<br>  v. )<br><br>CALIFORNIA PUBLIC UTILITIES COMMISSION, )<br><br>    Respondent, )<br>_____)<br><br>PACIFIC GAS & ELECTRIC COMPANY )<br><br>    Real Party in Interest )<br>_____) | No. **S150635**<br><br>Court of Appeal<br>First Appellate District<br>Case No. No. A115703<br><br>Cal. P.U.C. Decision Nos.<br>D.06-06-025 and<br>D.06-10-023 |

---

**PETITION FOR REVIEW OF DECISION OF THE COURT OF
APPEAL FOR THE FIRST APPELLATE DISTRICT**

---

Stephan C. Volker (CBN #063093)
Joshua A.H. Harris (CSB #226898)
Marnie E. Riddle (CSB #233732)
LAW OFFICES OF STEPHAN C. VOLKER
436 14th Street, Suite 1300
Oakland, CA 94612
Tel: 510/496-0600
Fax: 510/496-1366

Attorneys for Petitioner Californians for
Renewable Energy

## TABLE OF CONTENTS

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

PETITION FOR REVIEW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

ISSUES PRESENTED AND GROUNDS FOR REVIEW . . . . . . . . . . . . . . 2

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

I.    INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

II.   PARTIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

III.  PROCEDURAL AND FACTUAL HISTORY . . . . . . . . . . . . . . . . 11

ARGUMENTS IN SUPPORT OF REVIEW . . . . . . . . . . . . . . . . . . . . . . 14

I.    THE COMMISSION'S DETERMINATION OF
      PETITIONER'S COUNSEL'S HOURLY RATE
      VIOLATES PUBLIC UTILITIES CODE
      SECTION 1806. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

      A.    Factual Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

      B.    Public Utilities Code Section 1806 Requires
            the Commission to Take into Consideration
            the Market Rate Paid to Persons of Comparable
            Training and Experience Who Offer Similar
            Services to Those of Petitioner's Counsel. . . . . . . . . . . . . 17

      C.    Petitioner's Counsel's Market Rate Is At
            Least $400 per Hour. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

II.   THE COMMISSION'S ASSIGNMENT OF A
      NON-MARKET RATE TO MR. VOLKER
      BASED ON UNRELATED PROCEEDINGS OF
      WHICH NEITHER CARE NOR MR. VOLKER
      HAD NOTICE VIOLATES THEIR DUE
      PROCESS RIGHTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

**CERTIFICATE OF WORD COUNT** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

**ATTACHMENT 1** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

**PROOF OF SERVICE** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Lambert v. People of the State of California*
    (1957) 355 U.S. 225 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 22

## STATE CASES

*Hernandez v. Department of Motor Vehicles*
    (1981) 30 Cal.3d 70 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Knapp v. City of Gardena*
    (1990) 221 Cal.App.3d 344 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*People v. Ramirez*
    (1979) 25 Cal.3d 260 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23, 24

*Ryan v. California Interscholastic Federation*
    *– San Diego Section*
    (2001) 94 Cal.App.4th 1048 . . . . . . . . . . . . . . . . . . . . . . . . 5, 22, 25

*Saleeby v. State Bar*
    (1985) 39 Cal.3d 547 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*San Jose Police Officers Assn. v. City of San Jose*
    (1988) 199 Cal.App.3d 1471 . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Smith v. Board of Medical Quality Assurance*
    (1988) 202 Cal.App.3d 316 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

## STATUTES

Public Utilities Code
    § 701 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
    § 1804 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 9, 13
    § 1806 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

## <u>OTHER AUTHORITIES</u>

California Constitution
     Article XII, section 5  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
     Article I, section 7 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 5, 11

California Rules of Court
     Rule 8.500 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  6
     Rule 8.500(b)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 6
     Rule 8.504(e)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

United States Constitution
     Fourteenth Amendment  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

## PETITION FOR REVIEW

**To the Honorable Chief Justice of the California Supreme Court, and the Associate Justices of the Supreme Court of California:**

Petitioner and appellant Californians for Renewable Energy ("CARE") respectfully petitions this Court for review of the Decision of the Court of Appeal, First Appellate District, filed January 31, 2007 ("Decision", annexed as Attachment A hereto).  The Decision denied CARE's petition for writ review of Public Utilities Commission ("PUC" or "Commission") Decisions D.06-06-025 and D.06-10-023, in which the Commission assigned an erroneous non-market hourly rate of $270 to CARE's lead counsel, Stephan C. Volker, rather than the requested, documented and unopposed market rate of $400, based on a permanent and inflexible formula devised in an unrelated proceeding in which only PUC "insiders" participated and of which neither CARE nor Mr. Volker was afforded any notice.  The PUC's arbitrary and unfair determination of intervenor compensation threatens to exclude participation by PUC "outsiders" – including underprivileged, under-represented Californians as in this case – in important PUC proceedings, and thus should be reviewed and rectified.

## ISSUES PRESENTED AND GROUNDS FOR REVIEW

This Petition for Review presents the following two issues of first impression concerning the Commission's setting of intervenor compensation rates in an environmental justice context. Each raises "an important question of law" warranting this Court's review under Rule 8.500(b)(1) of the California Rules of Court:

> **(1)    Whether The Commission's Refusal to Recognize and Award Petitioner's Counsel's Actual Market Rate Violates Public Utilities Code Section 1806?**

Petitioner asks whether the Commission violated Public Utilities Code section 1806, which requires that "[t]he computation of compensation awarded pursuant to Section 1804 *shall take into consideration the market rates* paid for persons of comparable training and experience who offer similar services." Pub. Util. Code § 1806, emphasis added.

Representing low-income members of CARE who live in the Hunter's Point and Bayview neighborhoods of San Francisco, petitioner's counsel Mr. Volker and his firm qualified for compensation for their contribution to a Commission decision that facilitated the closing of a major source of excessive pollution in the area, the Hunter's Point Power Plant, through the importation of energy to the area via installation of high-voltage, electricity transmission lines. At the end of the proceeding, Mr.

-2-

Volker requested an award of compensation based on his market rate of $400/hour.  The request was unopposed.

The Commission, however, granted compensation to Mr. Volker at just $270 per hour, based on a previous compensation award in an unrelated proceeding (2000-2003) involving representation of the Sierra Club.  That previous award was *not* based on Mr. Volker's market rate.

The Commission justified its decision by reference to an unrelated PUC rate setting proceeding attended by some PUC insiders, in which the rates for *all* intervenors were fixed at 2003 rates, no matter what the basis for the prior rate determination.  This prior rate setting is now a permanent component of the PUC's rate determination mechanism (with modest increases for cost of living and inflation).  Thus, CARE's counsel Mr. Volker will never be paid his market rate at the PUC, unless the Commission's decision here is overturned.

Other "outsider" intervenors and their counsel are likewise subject to this prior rate setting even though, like CARE and Mr. Volker, they never received notice of that rate setting proceeding.  Thus, this Petition for Review raises an important question of law affecting the rights of all "outsider" intervenors who seek compensation for assisting consumers in PUC proceedings.

(2)    **Whether The Commission's Assignment of a Lower Non-Market Hourly Rate to Mr. Volker Based on Unrelated Proceedings of Which Neither CARE Nor Mr. Volker Had Notice Violates Their Due Process Rights?**

Petitioner also asks this Court to determine whether the Commission's failure to provide either CARE or Mr. Volker with notice of the unrelated proceedings in which the Commission purported to establish hourly rates for intervenors violated their due process rights under article I, section 7 of the California Constitution and the Fourteenth Amendment of the United States Constitutions. The first of these two proceedings, which culminated in ALJ-184, was based on an informal letter survey sent to "over 40 regular participants in [PUC] proceedings," of whom only 9 parties submitted comments.[1] Neither CARE nor Mr. Volker was among those surveyed, and neither had actual notice of the survey. The second proceeding upon which the PUC relied, Decision 05-11-03, resulted from a rulemaking instituted by the PUC.[2] Only four regulated utilities and four

---

[1]ALJ-184 is based on an informal letter survey sent to "over 40 regular participants in [PUC] proceedings, including frequent intervenors and utilities from the various regulated industries." Answer, Attachment B, p. 1. *Only 9 parties submitted comments. Id.*, p. 2. Neither CARE nor Mr. Volker was among those surveyed. Neither had actual notice of the survey.

[2]Decision 05-11-03 resulted from a rulemaking instituted by the PUC. Neither CARE nor Mr. Volker received notice by mail, fax or email of this proceeding. Nor did they have actual notice of this rulemaking. *Only four regulated utilities and four frequent intervenors participated in this proceeding.*

-4-

frequent intervenors participated in this proceeding.  Neither CARE nor Mr.

Volker received notice of this proceeding either.

The PUC's purported determination of Mr. Volker's market rate

based on unrelated proceedings of which neither CARE nor Mr. Volker had

notice violates the Due Process Clauses of both the California and the

United States Constitutions.  "Ingrained in our concept of due process is the

requirement of notice . . . .  Notice is required before property interests are

disturbed, before assessments are made, before penalties are assessed."

*Lambert v. People of the State of California* (1957) 355 U.S. 225, 228.  The

procedural Due Process Clause of the California Constitution, article I,

section 7, affords even broader protections than does that of the United

States Constitution, and clearly forbids the arbitrary fee-setting procedure

utilized by the PUC in this case.  *Ryan v. California Interscholastic*

*Federation – San Diego Section* (2001) 94 Cal.App.4th 1048, 1069-1071.

This Court's review of the constitutionality of the PUC's practice of

setting intervenor rates based on "insider" surveys that ignore the actual

market value and customary rate of "outsider" intervenor counsel is

---

Answer, Attachment A, p. 23, fn. 9 (four participating utilities listed) and p.
24, fn. 10 (four participating intervenors listed).  Decision 05-11-031 was
admittedly only a "first attempt" to compile fee awards and, as the PUC
acknowledged, "should be subject to refinement based on experience and
further consideration of alternatives."  Answer, Attachment A, p. 6.

essential to protect the due process rights of all intervenors in PUC

proceedings. Therefore this Court's review is necessary to settle an

important question of law as provided under Rule 8.500(b)(1).

## STATEMENT OF THE CASE

### I. INTRODUCTION

Pursuant to Rule 8.500 of the California Rules of Court, CARE

respectfully petitions this Court for review of the Court of Appeal's denial

of CARE's petition for writ review of the Commission's Decisions Denying

CARE's Petition for Rehearing (D.06-10-023, October 5, 2006) and

previous Petition for Modification (D.06-06-025, June 15, 2006) related to

the underlying Opinion Granting Intervenor Compensation (D.06-04-018,

April 13, 2006) in A.02-09-043.[3]

CARE seeks only one change to the Commission's compensation

determinations, that the assignment of a below-market rate of $270 to

CARE's lead counsel, Mr. Volker, be corrected to the requested (and

unopposed) *market* rate of $400. CARE seeks this correction so that it can

---

[3] True copies of the Commission's Decisions 06-10-023, 06-06-025, and 06-04-018 are annexed in the Appendix filed in the Court of Appeal proceeding as Tabs 4, 6, and 8. This Appendix is referred to throughout this Petition as "Appendix." Petitioner did not include the Appendix with this petition because to do so would violate Rule 8.504(e). Petitioner will gladly reproduce the one-volume Appendix upon receiving this Court's permission to do so.

continue to represent underprivileged, under-represented Californians in important proceedings before the PUC. In the underlying proceeding at issue here, CARE advocated for the immediate closure of the Hunters Point Power Plant and defended the right to a healthy environment on behalf of the citizens of the Hunters Point and Bayview neighborhoods of San Francisco.

As discussed more thoroughly below, the Commission's denials of CARE's petitions for modification and rehearing to correct this erroneous non-market rate violated the Public Utilities Code. The PUC should be directed to award Mr. Volker his market rate as required by Public Utilities Code section 1806. The PUC's stated reason for reducing Mr. Volker's hourly rate to $270 is that the Commission had established a schedule for intervenor counsel in two prior proceedings that culminated in PUC resolution ALJ-184 and Decision ("D.") 05-11-031. Specifically, the Commission refused to award Mr. Volker's actual market rate on the ground that:

> In Resolution ALJ-184, we set forth guidelines and principles for setting intervenors' hourly rates for work performed in 2004. In D.05-11-031, we set forth guidelines and principles for setting 2005 rates, and found that rates previously adopted in 2003 and 2004 are reasonable. Resolution ALJ-184 deems an increase of 8% above previously adopted 2003 rates as reasonable for work performed in 2004. We previously adopted a rate of $250 for Volker for work performed in

2000-2003. Increasing Volker's 2003 rate by 8% results in
the $270 rate adopted in D.06-04-018 for his 2004 work.

Appendix, Tab 6, pp. 216-217. CARE was never given notice of, nor an

opportunity to challenge, the Commission's erroneous calculation in ALJ-

184 and D.05-11-031 of Mr. Volker's rate.

That calculation did not award Mr. Volker's market rate and thus is

contrary to Public Utilities Code section 1806. The $250 hourly rate it set

was *not then Mr. Volker's market rate.* Rather, that rate had been requested

in a separate proceeding by a different client – the Sierra Club, not CARE –

in April 2000, *prior to its retention of Mr. Volker.* The Sierra Club had

filed a Notice of Intent to Claim Compensation ("NOI") which estimated its

future (and unknown) counsel's hourly rate at $250. Therefore,

notwithstanding that Mr. Volker's actual market rate in 2000 already

exceeded $300, the Sierra Club ultimately sought only the compensation at

the rate stated in its NOI – $250.

The Commission's capping of future fees based on prior fee awards,

without notice to the parties that would be affected in the future, arbitrarily

assumes that past rates represent market rates for those past time periods.

In this case, and undoubtedly many others, this assumption is mistaken. It

fails to take into account a myriad of relevant circumstances underlying past

fee awards – factors demonstrating that all past fee rates do not

-8-

automatically reflect past *market* rates. For example, here, Mr. Volker's past fee award was not based on market rates. Instead, Mr. Volker adhered to rates established in his client's NOI, which was filed prior to its selection of a lawyer for the case. Mr. Volker's fee in that previous case therefore does not reflect his market rate – in fact, it has nothing to do with his market rate – and, therefore, should not have been used as a limiting factor on future fee awards. Use of Mr. Volker's past, non-market rate to determine his current market rate is, thus, contrary to Public Utilities Code section 1806.

Public Utilities Code section 1806 directs that "[t]he computation of compensation awarded pursuant to Section 1804 shall take into consideration the market rates paid for persons of comparable training and experience who offer similar services." This simple criterion requires that Mr. Volker's time now be compensated at "comparable" market rates. As documented by CARE and Mr. Volker, market rates for Mr. Volker, an accomplished environmental lawyer for over 30 years, are at least $400/hour. No opposition to this requested $400 rate was filed by any party in the underlying PUC proceeding. And, no contrary evidence is in the record of that proceeding. The Commission's failure to correct its erroneous refusal to award Mr. Volker's market rate, therefore, violates

-9-

Public Utilities Code section 1806. Its further failure to provide notice to either CARE or Mr. Volker of the unrelated intervenor compensation proceedings in which Mr. Volker's compensation was mistakenly set at $250 violates the Due Process Clauses of the California and United States Constitutions.

Accordingly, CARE respectfully petitions this Court for a writ of review directing the PUC to afford procedural due process to all intervenor applications for compensation and, in this case, to correct Mr. Volker's award to his actual market rate of $400 as required by Public Utilities Code section 1806.

## II.  PARTIES

Californians for Renewable Energy, Inc. ("CARE"), at all times mentioned in this petition, has been and now is a non-profit public benefit corporation organized under the laws of California in 1999 for the purpose of educating the public about, and encouraging public agencies to consider, alternative forms of renewable energy as a means of avoiding (1) dependence on declining supplies of fossil fuels and (2) the harmful air emissions their use occasions. CARE and its members are beneficially interested in securing this Court's review of the Commission's decisions so that its counsel will be fairly compensated for his work not only in the

proceeding at issue here, but in all future proceedings. CARE also seeks

review of the PUC's decision to ensure that it can procure adequate counsel

in future PUC proceedings. CARE seeks to eliminate the risk that counsel

for public-interest, non-profit organizations may not, in the future, be able

to participate in important PUC decisionmaking processes because of

deficient intervenor compensation.

The respondent California Public Utilities Commission is a public

agency of the State of California vested with authority to regulate public

utilities pursuant to article XII, section 5 of the California Constitution and

Public Utilities Code section 701.

Real Party in Interest, Pacific Gas & Electric Company ("PG&E"), is

a California Corporation. PG&E filed the underlying application for

construction of a new electric transmission line between the Jefferson and

Martin substations, along with various related facilities, which allowed the

decommissioning of the Hunters Point Power Plant.

### III.    PROCEDURAL AND FACTUAL HISTORY

On August 19, 2004, the Commission issued Decision 04-08-046 in

which it granted a Certificate of Public Convenience and Necessity to

PG&E to construct the Jefferson-Martin transmission line.

On October 7, 2004, CARE timely filed its Request for Award of

Compensation for services culminating in D. 04-08-046. CARE's supporting declarations demonstrated that Mr. Volker's market rates were at least $400 per hour. Appendix, Tab 3.

On November 16, PG&E – the utility responsible for paying intervenor compensation in this proceeding – filed opposition to other intervenors' requests for compensation, *but did not oppose the request filed by CARE.*

On April 13, 2006, the Commission issued D.06-04-018, granting intervenor compensation to 280 Corridor Concerned Citizens, CARE, and Women's Energy Matters, for substantial contributions to Decision 04-08-046. The Commission reduced the hourly rate for Mr. Volker from $400 to $270, citing for support the rate setting established in a prior, unrelated proceeding, ALJ-184. Applying the latter ruling, the Commission based its decision on a 2003 award of compensation of $250 per hour for Mr. Volker in an unrelated proceeding in which he had represented the Sierra Club. Appendix, Tab 4.

On April 17, 2006, CARE timely filed a petition for modification of D.06-04-018, requesting that Mr. Volker's fee be modified to reflect his current market rate. Citing Public Utilities Code section 1806, which directs that "[t]he computation of compensation awarded pursuant to

-12-

Section 1804 shall take into consideration the market rates paid for persons of comparable training and experience who offer similar services," CARE requested a modification to Mr. Volker's rate and submitted further documentation attesting to Mr. Volker's qualifications and experience and demonstrating that his hourly rate was *at least* $400. Appendix, Tab 5.

On June 15, 2006, the Commission issued D.06-06-025, denying CARE's petition for modification of D.06-04-018. Appendix, Tab 6.

On July 13, 2006, CARE timely filed a petition for rehearing of D.06-06-025, again requesting that Mr. Volker's fee be modified to reflect his current market rate. Again, petitioner argued that the Commission's decision violated Public Utilities Code 1806. Appendix, Tab 7.

On October 5, 2006, the Commission issued D.06-10-023, denying CARE's petition for rehearing of D.06-04-018. Appendix, Tab 8.

On November 2, 2006, CARE petitioned the First District Court of Appeal for a writ of review of the Commission's decisions denying CARE's petition for modification and its petition for rehearing.

On January 31, 2007, the Court of Appeal summarily denied CARE's petition for review. Attachment A at p. 1. CARE did not petition the Court for rehearing because Rule 8.268(a)(1) does not permit rehearing of any decision that is final in the Court of Appeal upon its filing.

-13-

## ARGUMENTS IN SUPPORT OF REVIEW

I.   **THE COMMISSION'S DETERMINATION OF PETITIONER'S COUNSEL'S HOURLY RATE VIOLATES PUBLIC UTILITIES CODE SECTION 1806.**

A.   **Factual Background**

Neither D.06-06-025, nor D.06-10-023 addresses Mr. Volker's testimony documenting his market rate of at least $400/hour.  Appendix, Tab 6, pp. 216-17; Tab 8, pp. 233-234.  Instead, the decisions award $270/hour based on the $250 hourly rate awarded Mr. Volker in the previous Sierra Club proceeding (D. 05-02-003 and D. 03-01-058), "[w]ith an 8% upward adjustment." Appendix, Tab 6, pp. 216-217; Tab 8, p. 235. The Commission's reliance on the *non*-market rate awarded in this previous proceeding, in the face of current, uncontroverted evidence demonstrating a much higher *market* rate, violates Public Utilities Code section 1806.  As such, the Commission's decision to deny CARE's Petition for Modification should be reversed and the Commission directed to correct Mr. Volker's rate to reflect his market rate at the time the work in question took place.

The Commission relies upon its previous award of "an hourly rate of $250 for Volker for work performed in both 2002 and 2003 in D.05-02-003 and D.03-01-058," decisions awarding compensation in the matter of Application [No. 99-12-025] of Valencia Water Company (U342-W)

-14-

seeking approval of its updated water management program ("Valencia proceeding"). Appendix, Tab 6, p. 217. Mr. Volker's client in that matter, Sierra Club, had submitted an NOI "currently estimat[ing] that its attorney will [provide services] . . . at a proposed hourly rate of $250/hour" on April 4, 2000. Appendix, Tab 5, p. 202.

*Subsequently* the Sierra Club retained Mr. Volker to represent it in the Valencia proceeding. *Id.* Following the first phase of the Valencia proceeding, by Decision 03-01-058 dated January 30, 2003, the Commission awarded $46,990.96 for the legal services provided by Mr. Volker (and incidental costs). Noting that "*attorney Volker . . . has been awarded attorney's fees at the hourly rate of $300* based on his extensive experience in the field of environmental litigation," the Commission "conclude[d] that based on Volker's experience, the *requested hourly rate of $250 for services provided in 2000 and 2001* is reasonable." Appendix, Tab 5, p. 201.[4]

Thereafter, by D.05-02-003, dated February 10, 2005, the Commission granted Sierra Club's Second Request for Intervenor

---

[4] D.06-04-018 erroneously states that D.03-01-058 "awarded an hourly rate of $250 for Volker for work performed in both 2002 and 2003." Appendix, Tab 4, p. 171. In fact, D. 03-01-058 awarded Mr. Volker "the requested hourly rate of $250 for services provided in 2000 and 2001." Appendix, Tab 5, p. 201.

Compensation, for legal services provided by Mr. Volker subsequently in the Valencia proceeding. In D.05-02-003, the Commission awarded Sierra Club $4,074.18 in compensation for further services provided by Mr. Volker and his staff primarily in 2002, based on the same hourly rate requested by Sierra Club in its 2000 NOI, $250. *Id.* Neither the Sierra Club nor Mr. Volker represented, nor did the Commission find, that the market value of Mr. Volker's services at that time was no greater than $250/hour. Rather, the Commission found the converse, that in 2000 and 2001 Mr. Volker's market rate was *no less than* $250.[5] D.03-01-058 at 9, ¶ 6, emphasis added.

The Commission's calculation of Mr. Volker's fees fails to account for the circumstances underlying the payment of $250/hour for Mr. Volker's services. The Commission's inherent presumption that $250/hour

---

[5] Additionally, D.06-04-018's conclusion that the $250 hourly rate awarded in D.05-02-003 and D.03-01-058 was for "work performed in both 2002 and 2003," is in error. As the Commission noted in D.03-01-058, that award was "for services provided in 2000 and 2001." D.03-01-058 at 7. The much smaller award in D.05-02-003 was for work performed primarily in 2002. D.05-02-003 at 19. (Accordingly, even assuming, contrary to the facts and law as outlined above, that the hourly rate awarded in the Valencia proceeding was based on Mr. Volker's actual market rate, because the vast bulk of that work was performed in 2000 and 2001, the Commission's 8% upward adjustment would yield an hourly rate of either $314.93 ($250 increased by three years (from 2001 to 2004) times the permissible 8% annual increase) or $340.12 ($250 increased by four years (from 2000 to 2004) times 8%).)

reflected Mr. Volker's past market rate is *directly contradicted by the prior opinion's citation of a higher market rate* – $300/hour – for Mr. Volker. Pegging Mr. Volker's current market rate to Commission determinations of past, *non*-market rates plainly violates Public Utilities Code section 1806, as discussed more fully below.

    **B.**    **Public Utilities Code Section 1806 Requires the Commission to Take into Consideration the Market Rate Paid to Persons of Comparable Training and Experience Who Offer Similar Services to Those of Petitioner's Counsel.**

Public Utilities Code section 1806 directs in pertinent part that "[t]he computation of compensation awarded pursuant to Section 1806 shall take into consideration the market rates paid to persons of comparable training and experience who offer similar services." Thus, in determining whether Mr. Volker should be compensated at the requested rate of $400/hour, the Commission must "take into consideration the market rates paid to persons of comparable training and experience who offer similar services." The Commission's decision to fix Mr. Volker's rate based solely on a prior, non-market rate determination ignores his market rate.

Mr. Volker's market rate is established by undisputed evidence submitted by CARE showing that the market value of Mr. Volker's services in 2004 was at least $400/hour. There is no contrary evidence. No party

objected to Mr. Volker's requested rate of $400. There is no evidence that Mr. Volker's 2004 market rate was less than $400/hour.

As noted previously, the stated basis for the Commission's selection of a $270 hourly rate is the $250 rate awarded for Mr. Volker's services in the prior Sierra Club proceeding where the Commission simply granted the rate requested.[6] As discussed above, that request did not reflect the market value of Mr. Volker's services. Rather, it reflected the $250 rate set forth in the NOI that the Sierra Club had submitted before retaining Mr. Volker.

Unless corrected, the Commission's fee award in D.06-04-018 creates an inequity at odds with section 1806. For example, the Commission correctly awarded compensation at the rate of $470/hour to lead counsel for intervenor 280 Citizens, Edward O'Neill, for work performed in 2004, the same year for which compensation is sought for Mr. Volker's services. Appendix, Tab 4, p. 148. Mr. O'Neill received his law degree in 1977 (three years after Mr. Volker), and has extensive relevant experience yielding a market rate of $470.00. Mr. Volker likewise has extensive relevant experience, including over thirty years of specialized experience in administrative and environmental law, and over forty published rulings in state and federal courts. Appendix, Tab 3, p. 57. Yet

---

[6] Appendix, Tab 4, p. 171, footnote 14, citing D.05-02-003 and D.03-01-058.

-18-

D.06-04-018 compensated Mr. Volker at an hourly rate *$200.00 lower than Mr. O'Neill.*[7]

Similarly, the Commission correctly awarded hourly rates of $315 to attorney Christopher Hilen, and $310 to attorney Jeffrey Gray, associate counsel for 280 Citizens, for work performed in 2004.  Appendix, Tab 4, p. 149.  Although Mr. Hilen has about half as much experience – 15 years – as Mr. Volker, and Mr. Gray, less than one-third (nine years), their approved rates are respectively $45 and $40 *higher* than the $270 awarded Mr. Volker.  *Id.* at 149 and 171.  CARE requests parity with these awards, consistent with section 1806.

**C.    Petitioner's Counsel's Market Rate Is At Least $400 per Hour.**

In support of CARE's Fee Request, it submitted the Declaration of Stephan C. Volker documenting the market value of his services.  Mr. Volker's declaration stated that he had "thirty years' experience as a practicing environmental lawyer in California," and "[d]uring the past three

---

[7]

 In its briefing in the Court of Appeal, the PUC offered the post-hoc rationalization that Mr. Volker did not have enough *PUC-specific* experience and therefore his lower rate was justified.  As demonstrated in petitioner's Reply to Answer of Respondent below, however, in making this argument the PUC never even bothered to review its own files.  Had it done so, the PUC would have realized that Mr. Volker has appeared before the PUC on numerous matters of state-wide significance and has decades of relevant administrative agency experience.

decades [had] actively participated, typically as the lead plaintiffs' attorney, in over forty published cases in state and federal courts." Appendix, Tab 3, p. 57. Mr. Volker testified that he was "familiar with the market value of [his] services, based on declarations submitted by knowledgeable attorneys in numerous attorney fee motions in other proceedings." *Id*. Mr. Volker testified that based thereon, "[t]he market value of my services is between $400 and $500 per hour." *Id*. Had any party questioned this evidence, CARE would have submitted additional documentation of this rate, such as the San Francisco Superior Court's award of $450/hour for all of Mr. Volker's time in 2004 successfully prosecuting the California Coastal Commission for violating environmental laws. *Id*.

There is simply no evidence in the record that the market value of Mr. Volker's time is less than $400. No party objected to CARE's Request for Compensation, and no evidence contrary to Mr. Volker's testimony was submitted by any party. Accordingly, consistent with section 1806, this Court should order the Commission to correct the rate awarded for Mr. Volker's time to reflect the market rates paid to persons of comparable training and experience who offer similar services: at least $400/hour.

///

///

II.    **THE COMMISSION'S ASSIGNMENT OF A NON-MARKET RATE TO MR. VOLKER BASED ON UNRELATED PROCEEDINGS OF WHICH NEITHER CARE NOR MR. VOLKER HAD NOTICE VIOLATES THEIR DUE PROCESS RIGHTS.**

Petitioner also asks this Court to determine whether the Commission's failure to provide either CARE or Mr. Volker with notice of the unrelated proceedings in which the Commission purported to establish hourly rates for intervenors violated their due process rights. The first of these two proceedings, which culminated in ALJ-184, was based on an informal letter survey sent to "over 40 regular participants in [PUC] proceedings," of whom only 9 parties submitted comments.[8] Neither CARE nor Mr. Volker was among those surveyed, and neither had actual notice of the survey. The second proceeding upon which the PUC relied, Decision 05-11-03, resulted from a rulemaking instituted by the PUC.[9] Only four

---

[8]ALJ-184 is based on an informal letter survey sent to "over 40 regular participants in [PUC] proceedings, including frequent intervenors and utilities from the various regulated industries." Answer, Attachment B, p. 1. *Only 9 parties submitted comments. Id.*, p. 2. Neither CARE nor Mr. Volker was among those surveyed. Neither had actual notice of the survey.

[9]Decision 05-11-03 resulted from a rulemaking instituted by the PUC. Neither CARE nor Mr. Volker received notice by mail, fax or email of this proceeding. Nor did they have actual notice of this rulemaking. *Only four regulated utilities and four frequent intervenors participated in this proceeding.* Answer, Attachment A, p. 23, fn. 9 (four participating utilities listed) and p. 24, fn. 10 (four participating intervenors listed). Decision 05-11-031 was admittedly only a "first attempt" to compile fee awards and, as the PUC acknowledged, "should be subject to refinement based on experience and

-21-

regulated utilities and four frequent intervenors participated in this

proceeding.  Neither CARE nor Mr. Volker received notice of this

proceeding.

  The PUC's purported determination of Mr. Volker's market rate

based on unrelated proceedings of which neither CARE nor Mr. Volker had

notice violates the Due Process Clauses of both the California and the

United States Constitution.  "Ingrained in our concept of due process is the

requirement of notice . . . .  Notice is required before property interests are

disturbed, before assessments are made, before penalties are assessed.

Notice is required in a myriad of situations where a penalty or forfeiture

might be suffered for mere failure to act."  *Lambert v. People of the State of*

*California* (1957) 355 U.S. 225, 228.

  The procedural Due Process Clause of the California Constitution

affords even broader protections than does that of the United States

Constitution, and clearly forbids the arbitrary rate-setting procedure utilized

by the PUC in this case.  As discussed in *Ryan v. California Interscholastic*

*Federation – San Diego Section* (2001) 94 Cal.App.4th 1048, 1069-1071,

> Our state due process constitutional analysis differs from that
> conducted pursuant to the federal due process clause in that
> the claimant need not establish a property or liberty interest as

---

further consideration of alternatives."  Answer, Attachment A, p. 6.

a prerequisite to invoking due process protection. (*People v. Ramirez* (1979) 25 Cal.3d 260, 263-264 [158 Cal.Rptr. 316, 599 P.2d 622]; *Smith v. Board of Medical Quality Assurance* (1988) 202 Cal.App.3d 316, 327 [248 Cal.Rptr. 704].) Focused rather on an individual's due process liberty interest to be free from arbitrary adjudicative procedures (*People v. Ramirez, supra,* 25 Cal.3d at pp. 263, 268), procedural due process under the California Constitution is "much more inclusive" and protects a broader range of interests than under the federal Constitution (*San Jose Police Officers Assn. v. City of San Jose* (1988) 199 Cal.App.3d 1471, 1478 [245 Cal.Rptr. 728], superseded by statute as stated in *Knapp v. City of Gardena* (1990) 221 Cal.App.3d 344, 347-348 [270 Cal.Rptr. 524]; Asimow, Toward a New California Administrative Procedure Act: Adjudication Fundamentals (1992) 39 UCLA L.Rev. 1067, 1085-1086). According to our Supreme Court, it "has expanded upon the federal analytical base by focusing on the administrative process itself." (*Saleeby v. State Bar* (1985) 39 Cal.3d 547, 564 [216 Cal.Rptr. 367, 702 P.2d 525].)

*Id.*

Consistent with the foregoing principle, in *People v. Ramirez*, this Court held that application of the Due Process Clause of the California Constitution "must be determined in the context of the individual's due process liberty interest in freedom from arbitrary adjudicative procedures [and that] due process analysis must start not with a judicial attempt to decide whether the statute has created an 'entitlement' that can be defined as 'liberty' or 'property,' but with an assessment of what procedural protections are constitutionally required in light of the governmental and private interests at stake." *Id.*, 25 Cal.3d at pages 263-264; *accord, In re Jackson*

-23-

(1987) 43 Cal.3d 501, 510; *Hernandez v. Department of Motor Vehicles*

(1981) 30 Cal.3d 70, 81, fn. 12. The *Ramirez* Court explained that "the due

process safeguards required for protection of an individual's statutory

interests must be analyzed in the context of the principle that freedom from

arbitrary adjudicative procedures is a substantive element of one's liberty."

*Id.* at p. 268.

Contrary to the foregoing due process rights guaranteed by the

California and United States Constitutions and despite the fact that Mr.

Volker's interests (and those of his clients) in future fee awards would be

clearly and adversely affected, the PUC failed to notify Mr. Volker

regarding its rate-setting proceedings. According to ALJ-184, the

administrative law judge in charge of the proceeding did not attempt to

notify all counsel who had appeared in previous PUC proceedings. Instead,

he merely "wrote to over 40 regular participants in our proceedings,

including frequent intervenors and utilities from the various regulated

industries [and] invited comments and suggestions to begin development of

this annual process." Answer, Attach. B, p. 1. The PUC thus provided

notice to and solicited comments from some PUC *insiders*, but did not warn

other practitioners such as Mr. Volker that their future intervenor rates

would be fixed indefinitely by the proceeding.

Thus, Mr. Volker, along with any other attorney or expert not on the PUC's selective mailing list for the proceeding, was denied adequate notice of the proceedings that allegedly converted *all* of the 2003 rates into "reasonable market rates" to be applied (with the slight 8% modification) to all future fee awards. As such, the PUC carried out "arbitrary adjudicative procedures" and denied many potential intervenors their right to "fair and unprejudicial decision-making" as defined by California due process jurisprudence. *Ryan v. California Interscholastic Federation-San Diego Section, supra*, 94 Cal.App.4th at 1070-71.

Where an administrative decision can be applied in harmony with the constitution, it should be so applied. Here, the rate-freezing mechanism contained in ALJ-184 and D.05-11-031 can be applied to those parties who received proper notice of the proceeding. It should not, however, be applied to those who were denied their procedural due process rights through lack of adequate notice. While a general guideline attempting to make easier the computation of rate awards seems like a beneficial step toward uniform intervenor compensation rates, the Commission's overbroad attempt to fix all future rates without notice to the parties and counsel involved unreasonably denied petitioner's counsel here an opportunity to dispute the Commission's reliance on non-market rates.

-25-

In sum, the PUC's rate settings in ALJ-184 and D.05-11-031 cannot be applied constitutionally to CARE and its counsel, or to any other parties who were not afforded notice of these proceedings. Because CARE and Mr. Volker did not receive proper notice of the proceedings, they should not be bound by the resulting decisions and Mr. Volker's market rate should based on the undisputed evidence in the record that in 2004 his market rate was between $400 and $500 per hour.

### III.  CONCLUSION

For the foregoing reasons, CARE respectfully requests that this Court grant review of the Commission's decision and order the Commission to afford due process notice to intervenor counsel before purporting to fix their hourly rates, and to correct the hourly rate adopted in D.06-04-018 for Mr. Volker from $270 to $400 to reflect the actual market value of his services in 2004, which is at least $400.

Dated:  February 28, 2007          Respectfully submitted,

Stephan C. Volker
Attorney for petitioner CARE

# CERTIFICATE OF WORD COUNT

(California Rules of Court, Rule 8.504(d)(1))

The text of this brief consists of 5751 words as counted by the Corel

WordPerfect version 12 word processing program used to generate this brief.

Dated:  February 28, 2007

Stephan C. Volker
Attorney for Petitioner

COURT OF APPEAL, FIRST APPELLATE DISTRICT
350 MCALLISTER STREET
SAN FRANCISCO, CA 94102
DIVISION 1

CALIFORNIANS FOR RENEWABLE ENERGY,
Petitioner,
v.
PUBLIC UTILITIES COMM.,
Respondent;
PACIFIC GAS & ELECTRIC,
Real Party in Interest.

A115703
San Francisco County No. 0610023

**FILED**

JAN 3 1 2007

Court of Appeal - First App. Dist.
DIANA HERBERT
By_____
DEPUTY

BY THE COURT:

The petition for writ of review is denied.

The justices participating in the above entitled matter were:

Presiding Justice Marchiano, Justice Stein and Justice Swager

Date: _____    MARCHIANO, P.J.    _____ P.J.

ATTACHMENT A

## PROOF OF SERVICE

I am a citizen of the United States of America; I am over the age of 18 years and not a party to within entitled action. My business address is 436 14th Street, Suite 1300, Oakland, California 94612. On February 28, 2007, I served the document entitled

## PETITION FOR REVIEW OF DECISION OF THE COURT OF APPEAL FOR THE FIRST APPELLATE DISTRICT

on all parties by first class mail at Oakland, California, addressed to:

Randolph L. Wu
Helen W. Yee
Darwin Farrar
California Public Utilities
      Commission
Headquarters Office
505 Van Ness Avenue
San Francisco, CA 94102
415-703-2782

Richard W. Rauschenbush
Latham & Watkins
PG&E
505 Montgomery St., #1900
San Francisco, CA 94111

David Kraska
Pacific Gas and Electric Company
77 Beale Street, 31st Floor
San Francisco, CA 94105

Court of Appeal, First Appellate
District, Division 1
350 McAllister Street
San Francisco, CA 94102

I certify under penalty of perjury that the foregoing is true and correct.

Dated: February 28, 2007

_____
Teddy Ann Fuss

-29-

ALJ/XJV/tcg                                    **Date of Issuance 12/7/2007**

Decision 07-12-004  December 6, 2007

**BEFORE THE PUBLIC UTILITIES COMMISSION OF THE STATE OF CALIFORNIA**

| | |
|---|---|
| Application of Pacific Gas and Electric Company to Market Value Hydroelectric Generating Plants and Related Assets Pursuant to Public Utilities Code Sections 367(b) and 851.<br><br>(U 39 E) | Application 99-09-053<br>(Filed September 30, 1999) |

## OPINION GRANTING INTERVENOR COMPENSATION
## TO CALIFORNIA HYDROPOWER REFORM COALITION AND
## TO FRIENDS OF THE EEL RIVER AND
## CALIFORNIA SPORTFISHING PROTECTION ALLIANCE
## FOR SUBSTANTIAL CONTRIBUTIONS TO DECISION 07-04-011

This decision awards California Hydropower Reform Coalition (CHRC) $101,698.92 in compensation and jointly, Friends of the Eel River (Friends) and California Sportfishing Protection Alliance (California Sportfishing), $77,671.48 in compensation for their substantial contributions to Decision (D.) 07-04-011.[1] No opposition to these requests has been filed and in making these awards, this decision follows precedent established by D.07-07-031, which granted intervenor compensation to The Utility Reform Network (TURN) for its substantial contribution to D.07-04-011.

---

[1] Friends of the Eel River and California Sportfishing are two among a number of organizations and entities that refer to themselves as Conservation Groups. As we discuss in the body of today's decision, though we find the others ineligible for intervenor compensation, this finding does not reduce the award.

A.99-09-053 ALJ/XJV/tcg

Both awards are somewhat less than the total amounts requested. The award to CHRC is $1,000.00 less than the requested sum because we disallow noncompensable clerical time and calculate compensation for several hours devoted to compensation-related activities at half the approved hourly rate, rather than at full rate. The award to Friends and California Sportfishing is approximately $10,000.00 less than the requested sum because we do not escalate their lead attorney's hourly rate to the level sought and we allow only two-thirds of the 75+ hours claimed for preparation of compensation pleadings.[2]

Our review of any request is streamlined when an intervenor includes an Intervenor Compensation Claim Summary, which lays out in a simple table the name of each attorney and consultant for whom compensation is sought, the hourly fee requested, the year associated with that fee, and relevant information about education or experience (e.g., degree, year degree obtained; years of practice before this Commission). CHRC did so, as did TURN, and we urge all intervenors to submit a completed Intervenor Compensation Claim Summary with each request for compensation.

---

[2] The request, as originally filed, has three components: $55,605.00 associated with participation in A.99-09-053, $25,737.23 associated with participation in A.98-05-014/A.98-05-022 (which preceded A.99-09-053), and $10,103.25 for compensation-related expenditures attributed to the combined dockets. The request reports this total as $91,445.98, rather than $91,445.48, due to a $0.50 discrepancy in some subcomponents. The comments revise the request to $87,389.48 to reflect certain adjustments recommended by the proposed decision.

A.99-09-053  ALJ/XJV/tcg

# 1. Background

## 1.1. This Application; Precedent

D.07-04-011 outlines the unique and complex events that followed the filing by Pacific Gas and Electric Company (PG&E) of this application to "market value" and divest its hydroelectric generating assets pursuant to Assembly Bill (AB) 1890.[3]  D.07-07-031, the Commission's intervenor compensation award to TURN in connection with D.07-04-011, further summarizes these events.  We need not restate this procedural history in detail here but merely observe, again, that "[t]he California energy crisis, PG&E's bankruptcy filing, and the California Legislature's ban on public utility divestiture of electric generation plants ultimately overtook this application."  (D.07-07-031 at 1-2.)  Given these events and the subsequent settlement of the bankruptcy litigation, D.07-04-011 dismissed this application without a determination on the merits.  D.07-04-011 also found that "the right of eligible parties to request intervenor compensation in this proceeding should be protected" and ordered that "[e]ligible parties may request intervenor compensation."[4]

In determining to grant intervenor compensation to TURN for the substantial time and effort it devoted to evaluating the application during the proceeding's divestiture phase, D.07-07-031 discusses and relies upon a number of prior Commission decisions which order intervenor compensation awards though the underlying dockets were closed without decisions on the merits. Among these precedents are the proposed merger of MCI WorldCom, Inc. and

---

[3] 1996 Cal. Stats. Ch. 854 (Sept. 24, 1996).

[4] D.07-04-011 at Conclusion of Law 3 and Ordering Paragraph 2.

A.99-09-053  ALJ/XJV/tcg

Sprint Corporation that fell through because of objection from the U.S. Department of Justice and the European Union[5] and several energy crisis era proceedings, including the application of Southern California Edison Company to market value its hydrogeneration assets, which terminated for reasons similar (although not identical) to those relevant here.[6]

> D.07-07-031 states:

> [W]e have often held that the participation of intervenors in our proceedings is vital to our ability to make reasoned decisions, and that if we prohibit compensation where the proceeding might go away for reasons unrelated to the intervenors' actions, we might discourage participation in some of our most important proceedings.  (D.07-07-031 at 6-7.)

> D.07-07-031 concludes "there is ample precedent in the energy crisis – and indeed in the hydro valuation – context to award compensation here." (D.07-07-031 at 10.)  Therefore, though TURN had proposed the Commission expressly employ a four-part test in assessing the merits of TURN's compensation claim, D.07-07-031 does not discuss those factors.[7]

---

[5] D.02-07-030, 2002 Cal PUC LEXIS 438, at *14.

[6] D.04-03-031, 2004 Cal PUC LEXIS 78.

[7] The Commission did apply this four-part test in D.02-08-061 (in A.00-01-009), as well as in D.03-06-053 (in A.99-06-033 et al.) and in D.04-03-031 (in A.99-12-024) – all energy crisis era proceedings.  D.02-08-061 states:

> TURN's suggested review criteria have not been given a full airing, and we hesitate to adopt them as appropriate tests of substantial contribution in all proceedings before us.  (D.02-08-061 at 6.)

A.99-09-053 ALJ/XJV/tcg

### 1.1.1. Role of CHRC

CHRC participated in both phases of this proceeding: the divestiture phase, which occurred primarily between March and the end of September, 2000; and the parallel-track CEQA phase (referring to the California Environmental Quality Act), which commenced with the filing of PG&E's Proponent's Environmental Assessment (PEA) on October 29, 1999, continued through the release of the Commission's Draft Environmental Impact Report (DEIR) on November 11, 2000 and essentially shut-down after workshops on the DEIR in early February, 2001, followed in late February by PG&E's motion to suspend the CEQA phase. As D.07-04-011 relates, by that time Pub. Util. Code § 377[8] had been amended to prohibit the sale of any public utility electric generation before January 1, 2006. As we discuss in greater detail below, CHRC was actively involved in the hearings and settlement negotiations associated with the divestiture phase and participated in the CEQA phase through review of the PEA and DEIR.

### 1.1.2. Role of Friends and California Sportfishing

The request refers to ten organizations -- Friends, California Sportfishing and eight other entities -- as Conservation Groups. Though each entered an appearance as a separate party in this proceeding, the ten organizations participated collectively. For reasons we explain in Section 3.2, Friends and California Sportfishing are the only organizations that we find eligible to request intervenor compensation. Given the nature and focus of Conservation Groups'

---

[8] Unless otherwise stated hereafter, all references to a section or sections refer to the Public Utilities Code.

A.99-09-053  ALJ/XJV/tcg

unified participation in this docket, however, the ineligibility of the other eight organizations does not require us to reduce the award to Friends and California Sportfishing. Our assessment recognizes that Conservation Groups retained the same counsel and the same witnesses and presented a single viewpoint, effectively acting as one party. Their common concerns and interests centered on the environmental consequences of the proposed valuation and divestiture of PG&E's extensive hydroelectric facilities. Given the geographic and hydrologic inter-relatedness of much of the PG&E system and the conceptual commonality attached to associated valuation and divestiture issues, and absent inefficient or duplicative representation on these common issues or a focus on issues solely of concern to one or more of the ineligible organizations, we see no reason to reduce the request.

As we discuss in greater detail below, Conservation Groups – and therefore, Friends and California Sportfishing -- participated in the divestiture phase of this proceeding, where they presented expert witness testimony on economic valuation, fisheries, and hydrology, as well as the CEQA phase.

### 1.2.  A.98-05-014 and A.98-05-022

Friends and California Sportfishing also seek an award of intervenor compensation in the amount of $25, 737.23 (together with additional monies for preparation of the request for compensation) for their participation in A.98-05-014 and A.98-05-022. These dockets, filed by Southern California Edison Company (SCE) and PG&E, respectively, set out to develop valuation principles or methods for assigning market values to generation and generation-related assets held by each utility. The dockets were closed in March 2000 by D.00-03-019 when the Commission determined, given time constraints and the contentious subject, to move "straight to the valuation process without

- 6 -

A.99-09-053  ALJ/XJV/tcg

separately establishing principles for market valuation." (D.00-03-019, 200 Cal. PUC LEXIS 115, *3.)  Friends and California Sportfishing had been found eligible to file a request for intervenor compensation by ruling of the Administrative Law Judge (ALJ) assigned to those dockets[9] and actively participated by urging the Commission to recognize that valuation must go forward in accordance with the California Environmental Quality Act (CEQA).  Friends and California Sportfishing raised this issue at the prehearing conference and subsequently, filed a petition urging the Commission to deny PG&E's application and require the filing of a new one which addressed the environmental consequences of the proposed divestiture.

While the Commission closed A.98-05-014/A.98-05-022 without a decision on the merits, the focus on valuation issues, for PG&E, already had shifted to A.99-09-053.  Based on their participation on CEQA issues in A.98-05-014/ A.98-05-022, Friends and California Sportfishing claim credit for the Commission's establishment of a CEQA phase in A.99-09-053.  They point to D.04-03-031 as precedent for their claim.  That decision makes a combined intervenor compensation award to TURN of approximately $48,700.00.  The majority of the award, about $42,000, is for substantial contribution in A.99-12-024, SCE's hydroelectric divestiture docket (a parallel proceeding to A.99-09-053); the remaining $6,700 is for participation in A.98-05-014/ A.98-05-022.  Under the unique circumstances presented here, and to afford comparable treatment with TURN, we will authorize compensation in today's

---

[9] *See Administrative Law Judge's Ruling on Eligibility to Claim Intervenor Compensation,* March 12, 1999, A.98-05-014/A.98-05-022, by ALJ Bertram D. Patrick.  The ruling is attached as Ex. 4 to Conservation Groups' Request.

A.99-09-053  ALJ/XJV/tcg

decision to Friends and California Sportfishing for their participation in
A.98-05-014/A.98-05-022, even though that participation occurred some eight
years ago.

## 2. Requirements for Awards of Compensation

In this section and continuing through Section 8, we discuss the requests
for compensation stemming from this docket.  We discuss the request stemming
from A.98-05-014/A.98-05-022 in Section 9.

The intervenor compensation program, enacted in §§ 1801-1812, requires
California jurisdictional utilities to pay the reasonable costs of an intervenor's
participation if the intervenor makes a substantial contribution to a Commission
order, decision, or proceeding.  The statute provides that the utility may adjust
its rates to collect the amount awarded from its ratepayers.

All of the following procedures and criteria must be satisfied for an
intervenor to obtain a compensation award:

1. The intervenor must satisfy certain procedural requirements
   including the filing of a sufficient notice of intent (NOI) to claim
   compensation within 30 days of the prehearing conference, or in
   special circumstances at other appropriate times that we specify.
   (§ 1804(a).)

2. The intervenor must be a customer or a participant representing
   consumers, customers, or subscribers of a utility subject to our
   jurisdiction.  (§ 1802(b).)

3. The intervenor should file and serve a request for a
   compensation award within 60 days of our final order or decision
   in a hearing or proceeding.  (§ 1804(c).)

4. The intervenor must demonstrate "significant financial
   hardship."  (§§ 1802(g), 1804(b)(1).)

5. The intervenor's presentation must have made a "substantial
   contribution" to the proceeding, through the adoption, in whole

A.99-09-053  ALJ/XJV/tcg

> or in part, of the intervenor's contention or recommendations by
> a Commission order or decision.  (§§ 1802(i), 1803(a).)

6.  The claimed fees and costs must be reasonable (§ 1801), necessary
    for and related to the substantial contribution (D.98-04-059),
    comparable to the market rates paid to others with comparable
    training and experience (§ 1806), and productive (D.98-04-059).

The following section addresses Items 1-3 above, followed by separate
discussions of Items 4-6.

## 3. Timeliness of NOI and Request; Customer Status

The Commission conducted a prehearing conference in this matter on
November 16, 1999.  D.07-04-011, which authorized eligible intervenors to file
requests for compensation, mailed on April 17, 2007.

### 3.1.  CHRC

CHRC timely filed a NOI on December 15, 1999 (i.e., within 30 days of the
PHC) and timely filed a request for compensation on June 18, 2007 (i.e., within
60 days of the mailing of D.07-04-011).  CHRC filed a supplement to its request
on July 2, 2007.

Because the issue of CHRC's customer status was not resolved at the NOI
stage, we recount the problem and resolution here.  By ruling on January 31,
2000, the ALJ then-assigned to this docket noted several deficiencies in CHRC's
NOI, including its showings on customer status and financial hardship, and
declined to make a definitive finding on eligibility.[10]  With respect to customer
status, the ruling observes that CHRC's Protest and NOI both include lists of its
nonprofit members, but those lists do not appear to be identical.  The ruling

---

[10] *Administrative Law Judge's Preliminary Ruling on Notices of Intent to Claim Compensation,*
January 31, 2000, by the then-assigned ALJ, Barbara Hale.

A.99-09-053  ALJ/XJV/tcg

directs CHRC to rectify its showing on customer status within 15 days.  CHRC complied by tendering a response to the ruling on February 16, 2000, together with a motion for leave to file one day late.  The ALJ's February 18, 2000 Ruling authorizes the late filing and finds that the response adequately clarifies that CHRC represents the following nonprofit corporations:  American Whitewater, California Outdoors, California Trout, Foothill Conservancy, Friends of the River, Natural Heritage Institute, and Trout Unlimited.[11]

Referring to its NOI, CHRC's request reiterates that each of these nonprofit corporations is a voting member of its governing board, and that the nonprofit corporations have approximately 10,000 dues-paying members, nearly all of whom are residential customers of PG&E.  Finally, CHRC quotes from its governing protocols, which authorize it to represent these members in "rulemaking, ratemaking, and other proceedings that generally affect PG&E's hydropower system" both before this Commission and the Federal Energy Regulatory Commission.  (CHRC Request at 7.)  This showing is adequate to permit us to find that CHRC is a customer as defined by § 1802(b)(C).

### 3.2.  Friends and California Sportfishing

Conservation Groups filed a single NOI on February 11, 2000 on behalf of Friends, California Sportfishing and the following eight organizations and two other entities:  League to Save Sierra Lakes, Golden Gate Audubon Society, El Dorado County Taxpayers for Quality Growth, Marin Audubon Society, Center for Sierra Nevada Conservation, Northern Sierra Summer Home Association, Environmental Planning and Information Council of Western

---

[11] *Administrative Law Judge's Ruling Regarding Deficiencies in Notices of Intent,* February 18, 2000, by ALJ Barbara Hale.

A.99-09-053  ALJ/XJV/tcg

El Dorado County, Friends of the Russian River (now known as Russian Riverkeeper), as well as the Wiyot Tribe of the Table Bluff Reservation and Coyote (Fred Downey, Ph.D.).  By ruling on January 31, 2000, the ALJ granted party status to each of these persons and entities, noted their collective representation by Stephen C. Volker (consistent with the request in their November 29, 1999 motion to intervene), and authorized the late-filing of their protest.[12]  Subsequent rulings do not appear to have directly assessed the timeliness of the NOI.  Under the circumstances presented here, where intervention was sought and granted after the PHC occurred and where the subsequent NOI was filed fewer than two weeks after the ruling on intervention, we find the NOI to have been timely-filed.  Like CHRC, Conservation Groups filed their request on June 18, 2007, which is within 60 days of the mailing of D.07-04-011, and therefore timely.  We note that on June 22, 2007, Conservation Groups also filed a supplemental declaration of counsel in support of their request.

We turn next to the issue of customer status.  The February 18, 2000 ALJ Ruling raises a number of questions about the customer status showings (and significant hardship showings) by the organizations and persons which the NOI lists as members of Conservation Groups.  The ruling concludes that the NOI is insufficient to permit an eligibility ruling, but provides Conservation Groups with alternative remedies -- either they may file an amendment by February 25, 2000 or they may address the deficiencies in their future request.  The ruling explains that to establish eligibility, an organization that claims to represent

---

[12] *Administrative Law Judge's Preliminary Ruling Regarding Motions to Intervene*, January 31, 2000, by ALJ Barbara Hale.

A.99-09-053 ALJ/XJV/tcg

customers pursuant to its articles of incorporation or bylaws not only must
provide a copy of such document, but also – unless the authorization to
represent residential customers is explicit -- must explain how the document can
be read to support such a finding.  Conservation Groups' NOI included no
articles, bylaws or supporting arguments.

The ruling also notes that Consumer Groups' motion to intervene and
subsequent NOI provide "somewhat conflicting information as to the purpose of
some of the organizations" and advises that clarification is needed. (February 18,
2000 ALJ Ruling at 5.)  Finally, the ruling observes that the NOI does not explain
how the tribal entity, nor Coyote, the individual, fit within the statutory
definition of customer.

The docket card does not reflect that an amendment to the NOI, per se,
was ever filed.  Instead it appears that Conservation Groups sent a letter dated
February 29, 2000, to the Commission's Docket Office and requested that the
letter be forwarded to ALJ Hale.[13]  The letter advises that by ALJ ruling in
A.98-05-014/A.98-05-022 less than a year earlier, Friends and California
Sportfishing were found eligible to file for intervenor compensation.  The letter
states that articles or bylaws for the other eight organizations have been
enclosed, as well as a Federal Register Notice confirming that the tribe is
federally-recognized.[14]

---

[13] *See* Ex. 6 to Conservation Groups' request.

[14] Ex. 6 to Conservation Groups' request includes articles/bylaws for seven of the
organizations but documentation for the eighth, Golden State Audubon Society, is not
among them.

A.99-09-053  ALJ/XJV/tcg

In the request, itself, Conservation Groups seek intervenor compensation on behalf of the ten organizations listed above, but do not mention the Wiyot Tribe or Coyote.  The request includes, as further grounds for a finding of customer eligibility, a declaration of counsel that states, among other things, that each of the organizations includes residential customers and was authorized to represent them in Commission proceedings.

The previous eligibility determination for Friends and California Sportfishing in A.98-05-014/A.98-05-022 creates a rebuttable presumption, for them, "of eligibility for compensation in other commission proceedings commencing within one year of the date of that finding." (§ 1804(b)(1).)  This application was filed on September 30, 1999, less than seven months after the eligibility ruling in A.98-05-014/A.98-05-022.  Given no change in the underlying determinative factors (as evidenced by counsel's declaration), we extend the eligibility finding for Friends and California Sportfishing to this docket.

The information provided for the other eight organizations is insufficient to explicitly establish that they represent utility "customers" for the purposes of §1802(b), however.  The documents supplied merely establish that most of the organizations are nonprofit charitable corporations under § 501(c)(3) of the Internal Revenue Code (IRC) and that one is a mutual benefit corporation under IRC § 501(c)(4).  The request lacks the explanatory discussion required by the February 18, 2000 ALJ Ruling and the declaration of counsel is likewise vague; for example, it does not attempt to quantify the residential customer membership in any organization or describe how an organization authorized the representation of residential utility customers in this proceeding.  We cannot find, on this record, that the other eight organizations meet the § 1802(b)(C) definition of customer.  However, as we discuss in Section 1.1.2, our

- 13 -

A.99-09-053 ALJ/XJV/tcg

determination that only Friends and California Sportfishing have established eligibility for an award of intervenor compensation does not reduce the award.

## 4. Significant Financial Hardship

### 4.1. CHRC

Before a customer can be found eligible to request intervenor compensation, the customer must make a showing of significant financial hardship. Because the January 31, 2000 ALJ ruling could not assess fully CHRC's customer status, neither could it assess fully CHRC's claim of financial hardship. The former problem now having been rectified, we review CHRC's financial hardship showing.

CHRC's request sets forth the following:

> As stated in the verified 1999 Notice, CHRC was entirely
> dependent on charitable grants for its budget as an association.
> In late 1999 through early 2001, when this proceeding was
> active, it did not have any uncommitted funds for participation
> in this proceeding. Most importantly, this proceeding was
> intended to establish the market value of PG&E hydropower
> system, preparatory to the commission's decision whether the
> system would be divested or retained within the utility. CHRC
> members, including the nonprofit corporations and the dues
> paying individuals they represented, had very little economic
> interest in such valuation, relative to the cost of $115,000 for
> effective participation estimated in the 1999 Notice. (CHRC
> Request at 8-9.)

In the context of this proceeding, we agree that the economic interest of the individual members of each of CHRC's constituent nonprofit organizations is small in comparison to the cost of effective participation. We conclude that CHRC has made a showing of significant financial hardship.

A.99-09-053 ALJ/XJV/tcg

### 4.2. Friends and California Sportfishing

The extension of the previous eligibility determination for Friends and California Sportfishing applies to significant financial hardship as well as customer status.

## 5. Substantial Contribution

Section 1.1, above, provides the basis for finding that CHRC, as well as Friends and California Sportfishing, have made substantial contributions warranting an award of intervenor compensation. We therefore turn to the reasonableness of the compensation these intervenors seek here.

## 6. Reasonableness of Requested Compensation

In general, a request must demonstrate reasonable fees and costs of the customer's preparation for and participation in a proceeding that resulted in a substantial contribution. We first assess whether the hours claimed for the customer's efforts that resulted in substantial contributions to Commission decisions are reasonable by determining to what degree the hours and costs are related to the work performed and necessary for the substantial contribution.

### 6.1. CHRC

CHRC underscores that "the application in this proceeding affected not only utility service but also the non-power uses of lands and waters throughout Northern California, including recreation, fish and wildlife, and water supply" (CHRC Request at 11.) CHRC asserts the amount of its request is reasonable for the following reasons:

> Because of the range and significance of impacts on all ratepayers of Northern California, A.99-09-053 resulted in multiple interventions and "extensive" protests, comments, briefs, testimonies, motions, and other filings. [citation omitted] CHRC acknowledges that it and many other

- 15 -

A.99-09-053 ALJ/XJV/tcg

intervenors addressed the environmental impacts of divestiture
in such filings ...

CHRC made substantial efforts to coordinate with other
intervenors and otherwise minimize duplication efforts in this
proceeding. For example, CHRC, Environmental Defense, and
Center for Energy Efficiency and Renewable Technologies,
jointly developed and filed written testimonies (March 1, 16,
and June 18, 2000) for the evidentiary hearing the divestiture
phase; and then jointly sponsored those witnesses for
examination. These groups filed joint comments (Feb. 2, 2000)
on the PEA. CHRC limited our cross-examination to witnesses
whose testimony directly addressed how market valuation may
affect operations and land of the hydropower system. For that
reason, we participated in less than one-half of the evidentiary
hearing dates. We cooperated with other intervenors in
developing non-duplicative lines of cross-examination of such
witnesses, such as Leslie Everett (Vice-President and Corporate
Secretary, PG&E); David Moller (Senior Manager, Hydropower
Licensing, PG&E); and Norm Sweeney (Director, Hydro
Generation Department, PG&E).

CHRC filed a series of motions, or responses to motions, related
to procedure and schedule for the proceeding. *See* filings dated
February 3, July 14, July 26, July 31, September 5, and
December 29, 2000; and January 19 and March 5, 2001. These
sought modifications in the procedures and schedule set by the
Scoping Order (Jan. 13, 2000 as amended Feb. 28, 2000.) These
modifications were necessitated by the "extraordinary" crises in
the electricity market. [citation omitted] Before filing, we
actively solicited and obtained co-sponsorship of these
proposed modifications by various intervenors, including the
California Farm Bureau, East Bay Municipal Utility District,
Mendocino County Inland Water and Power Commission,
Office of Ratepayer Advocates, as well as other conservation
groups. (CHRC request at 16-17.)

A.99-09-053  ALJ/XJV/tcg

For these activities, CHRC seeks the following compensation:

| | Year | Hours | Rates | |
|---|---|---|---|---|
| **Attorney Fees** | | | | |
| Richard Roos-Collins | 1999 | 17.3 | $305 | $ 5,276.50 |
| | 2000 | 253.2 | $315 | $ 79,758.00 |
| | 2001 | 34 | $325 | $ 11,050.00 |
| (comp) | 2007 | 16 | $177 | $ 2,832.00 |
| | | | *Subtotal* | *$ 98,916.50* |
| **Paralegal Fees** | | | | |
| Amy Roon | 2000-1 | 19.4 | $50 | $ 970.00 |
| Christian Mastrodonato | 2000 | 12.3 | $50 | $ 615.00 |
| | | | *Subtotal* | *$ 1,585.00* |
| | | | **Total Advocacy Fees** | **$100,501.50** |
| **Other Costs** | | | | |
| Telephone (including fax, cell phone & conference calls) | | | | $ 1,018.09 |
| Postage and Delivery | | | | $ 222.48 |
| Photocopies & Document Production | | | | $ 789.95 |
| Travel | | | | $ 99.90 |
| Lexis | | | | $ 67.00 |
| | | | **Total Other Costs** | **$ 2,197.42** |
| **TOTAL** | | | | **$102,698.92** |

A.99-09-053 ALJ/XJV/tcg

CHRC states that the attorney fees do not include time for travel between Roos-Collins' office and the Commission and that time devoted to preparation of the compensation request has been billed at one-half the usual fee. Review of the supporting documentation corroborates this claim. However, review also shows that four hours devoted to compensation-related activities early in the proceeding (three hours for preparation of the NOI in 1999 and 1 hour for preparation of a response to the ALJ's NOI ruling in 2000) have not been billed at half the professional rate, as required. In all other respects, CHRC provides reasonable accounting and justification for its work in this proceeding. As adjusted for the error noted, we find that the hours CHRC claims for Roos-Collins are reasonable in light of the work performed.

CHRC states that the paralegal assistance "was for legal research, filing, and service in this proceeding." (CHRC Request at 20.) While legal research is compensable, purely clerical assistance is not – we deem the latter to be included in overhead subsumed within attorneys fees. CHRC's time records do not describe what specific tasks its paralegals, Roon and Mastrodonato, undertook on the days where they billed time. As an expedient, reasonable adjustment, given the relatively small number of hours at issue, we reduce the total number of paralegal hours by approximately one-quarter, from 31.7 hours to 24 hours, and allow 15 hours for Roon and 9 hours for Mastrodonato.

### 6.2. Friends and California Sportfishing

Conservation Groups' assert that the amount of their request is reasonable. As discussed in Section 1.1.2, we construe all representations made by Conservation Groups as having been made on behalf of Friends and California Sportfishing, the eligible intervenors. The request states:

A.99-09-053  ALJ/XJV/tcg

Conservation Groups intervened in the present proceeding in November 29, 1999.  Then, on March 2, 2000, Conservation Groups filed extensive direct testimony in opposition to PG&E's valuation application, including:

1.  Direct Testimony Regarding Fisheries in Opposition to PG&E Testimony Supporting Application 99-09-053, given by Terry Roelofs, Ph.D.

2.  Direct Testimony Regarding Valuation in Opposition to PG&E Testimony Supporting Application 99-09-053, given by Daniel M. Ihara, Ph.D.

3.  Direct Testimony Regarding Hydrology in Opposition to PG&E Testimony Supporting Application 99-09-053, given by Robert R. Curry, Ph.D.

These experts testified in support of a valuation proceeding that properly addressed and analyzed the critical environmental impacts of the divestiture of PG&E's hydroelectric facilities, both individually and collectively.  Further, the testimony called for extensive mitigation of the facilities' adverse impacts – based on past, present, and proposed future operations and the devastating impacts of those operations on river resources.

Then, in April 2000, Mr. Volker conducted cross-examinations of numerous witnesses over the course of at least six days of Commission proceedings.  These lengthy cross-examinations pertained to the deficiencies in PG&E's valuation proposals, and most importantly, the valuation estimates' failure to account for the environmental costs and benefits of various alternative valuation estimates.

On June 1, 2000, Conservation Groups filed scoping comments pursuant to the notice of preparation of an EIR for PG&E's valuation and/or divestiture of its hydroelectric facilities. Conservations Groups argued for intensive investigation of the environmental benefits of decommissioning of some or all of PG&E's facilities, including the Potter Valley Project.  They also requested further analysis of the patent or latent environmental and safety hazards associated with the facilities and a

A.99-09-053 ALJ/XJV/tcg

discussion of how these hazards should be accounted for in the valuation process. Further, the Groups called on the Commission to discuss the validity and impacts of prospective consumptive water uses associated with the facilities where then-existing consumptive uses of water diverted through PG&E facilities lacked necessary water rights. Finally, Conservation Groups asked that PG&E conduct more research into the cultural impacts of continued diversion of approximately 98% of the summer flow of the mainstream Eel River and of blocked access to critical spawning habitat of culturally-significant coho and Chinook salmon and steelhead trout.

In addition to these above-described substantive filings, Conservation Groups filed numerous procedural motions, joinder, and other submissions, including testimony in July 2000 by Guy Phillips, Ph.D. (Request at 11-13.)

Friends and California Sportfishing seek the following compensation for their participation in A.99-09-053 and for preparation of the compensation request, which as noted previously, seeks compensation not only for A.99-09-053 but also for A.98-05-014/A.98-05-022 (the figures are from the corrected request in the comments.)

A.99-09-053  ALJ/XJV/tcg

| | Year | Hours | Rates | |
|---|---|---|---|---|
| **Attorney Fees** | | | | |
| Stephen C. Volker | 1999 | 16.8 | $265 | $   4,452.00 |
| | 2000 | 133 | $280 | $ 37,240.00 |
| | 2001 | 9.9 | $295 | $  2,920.50 |
| | | | *Subtotal* | $ 44,612.50 |
| **Attorney Fees (Comp & Travel)** | | | | |
| Stephen C. Volker | 2000 | 14.0 | $140.00 | $  1,960.00 |
| | 2001 | 0.5 | 147.50 | $     73.75 |
| | 2007 | 8.5 | 250.00 | $  2,125.00 |
| Marnie E. Riddle | 2007 | 9.4 | $112.50 | $  1,057.50 |
| Joshua A. H. Harris | 2007 | 58.9 | $117.50 | $  6,920.75 |
| | | | *Subtotal (Comp)* | *$ 12,137.00* |
| **Outside Expert Fees** | | | | |
| Daniel M. Ihara, Ph.D. | 2000 | 12.25 | $100 | $  1,225.00 |
| Robert R. Curry, Ph.D. | 2000 | 10 | $125 | $  1,250.00 |
| Terry Roelofs, Ph.D. | 2000 | 8 | $100 | $    800.00 |
| Guy Phillips, Ph.D. | 2000 | 24 | $150 | $  3,600.00 |
| | | | *Subtotal* | *$  6,875.00* |
| **Other Costs** | | | | |
| Copy of draft EIR | | | | $     50.00 |
| | | | *Subtotal* | *$     50.00* |
| **TOTAL** | | | | **$ 63,674.50** |

The proposed decision observes several problems in the supporting documentation.  The comments correct the first problem, inclusion of some travel time and compensation-related work at full hourly rate.  While we allow the corrected travel time since it was incurred early in this proceeding, our policy has evolved and we may not allow compensation or reimbursement for routine

A.99-09-053 ALJ/XJV/tcg

commuting in the future.[15] The second problem concerns the time (and associated $10,103.25 in fees) related to preparation of the compensation request. As already noted, Conservation Groups seek a single award that consists of three parts – an award associated with participation in A.98-05-014/A.98-05-022, an award associated with participation in A.99-09-053, and an award for compensation-related expenses associated with preparing this single request, which does not apportion the hours between this docket and A.98-05-014/A.98-05-022.

This problem is compounded because the hours devoted to preparation of the compensation request (and the associated fees) appear excessive. We recognize that Conservation Groups used Harris, and to a lesser extent Riddle, both of whom bill at lower hourly rates than Volker, to prepare portions of the request. However, Harris' 58.9 hours, together with 9.4 hours by Riddle and 8.5 hours by Volker, total over 75 hours. By comparison, TURN reported – and we approved – 20.5 hours for work done at the NOI and request stages in connection with A.99-09-053. Billed at one half the approved hourly rate, D.07-07-031 awarded TURN $4,116.25 for compensation-related work. CHRC's request in connection with A.99-09-053 is in line with and somewhat lower than TURN's, both as to hours and associated fees.

---

[15] *See* D.07-04-010, which denies compensation for an intervenor's time and costs associated with "routine commuting," stating that: "An intervenor's fees are assumed to cover such overhead costs [including routine commuting], just as they cover administrative costs. If an intervenor has extraordinary travel costs, that are reasonable and justified....we will continue to compensate them." (D.07-04-010 at 11-12.) See also D.07-10-014, which denies rehearing of D.07-05-043, explaining that the Commission's prior practice did not constitute a rule, since the Commission has not reviewed them closely in the past.

A.99-09-053 ALJ/XJV/tcg

We recognize that unlike Friends and California Sportfishing, CHRC does not seek compensation for participation in A.98-05-014/A.98-05-02. However, TURN did and as Friends and California Sportfishing point out, part of the award D.04-03-031 grants is for TURN's participation in A.98-05-014/A.98-05-02. (See discussion in Section 1.2, above.) The part of that award attributable to compensation-related activities is only 11.25 hours and totals $1,904.00. Thus, TURN billed approximately 30 hours, valued at about $6,000, for compensation-related work in both proceedings.

While we do not suggest the presentations put forward by these parties are identical, we think TURN's billing provides a reasonable benchmark. After reviewing the comments, and recognizing that Friends and California Sportfishing have less experience practicing before the Commission, we reduce their compensation-related hours by approximately one-third, which likewise serves to reduce that portion of their claim by approximately one-third. As adjusted, we find this portion of the claim reasonable.

In other respects, the time records appear to support adequately the time claimed by Volker for his participation in this docket and by the four expert witnesses.

## 7. Hourly Rates

We next take into consideration whether the claimed fees and costs are comparable to the market rates paid to experts and advocates having comparable training and experience and offering similar services.

### 7.1. CHRC

In D.04-08-025, the Commission approved an hourly rate for Roos-Collins of $325/hour for work related to PG&E's bankruptcy proceeding; though the work spanned the years 2001-2004, most of it was done in 2002 and 2003. CHRC

A.99-09-053  ALJ/XJV/tcg

seeks, and we approve, the same rate for Roos-Collins' work in 2001 in this docket.

D.06-06-031 approves an hourly rate for Roos-Collins of $350 for 2006. D.07-01-009 authorizes a 3% cost of living adjustment (COLA) from 2006 to 2007. CHRC asks us to approve a 2007 rate for Roos-Collins of $354/hour, slightly less than the full COLA, and we do so.

For the two earlier years, 1999 and 2000, CHRC requests hourly rates of $305 and $315, respectively. These rates are generally consistent with the hourly rates approved during that period and are reasonably scaled to rates approved for Roos-Collins in subsequent years. We adopt the requested rates.

CHRC seeks $50/hour for each of its paralegals, Roon and Mastrodonato, for work done in 2000 and 2001. Both are college graduates. The rates are on the low end of the scale we have awarded for paralegal assistance during the relevant time period and we approve them.

### 7.2.  Friends and California Sportfishing

D.03-01-058 and D.05-02-003 approve an hourly rate for Volker of $250 for work done between 2000 and 2003 in other dockets. We adopt the same rate for Volker for work done in 2000 and 2001 in connection with this application, rather than the higher rates requested ($280 and $295, respectively). For 1999, no hourly rate has been established for Volker. Since litigation of this application did not begin until the last quarter of 1999, we allow the 2000 hourly rate for the limited number of hours Volker billed in 1999.

A.99-09-053  ALJ/XJV/tcg

Following the guidance of prior Commission decisions, we set Volker's
2007 rate as follows.  We escalate $270, the rate established for Volker for 2004,[16]
by 0% for 2005 (*see* D.05-11-031), and by 3% for 2006 and another 3% for 2007 (*see*
D.07-01-009), each time rounding the sum to the nearest $5.00.  The result is $290
and we approve this rate for Volker's work on this application in 2007.  Because
all of that work was related to preparation of the request, however, the 2007
award is calculated at one-half of $290, or $145.  Given the various problems with
the request noted in the proposed decision (some of which persist), we do not
find this work product to be of a caliber warranting an addition to the base fee of
$290/hour and decline, here, to further escalate Volker's 2007 hourly rate.

D.06-04-018 approves a rate of $190/hour for Harris in 2004.  Following
the same escalation procedure outlined above, we arrive at a 2007 rate for Harris
of $200/hour, rather than $250.  Likewise, D.06-04-018 approves a rate of
$90/hour for Riddle in 2004, as a law clerk.  She is now listed as a member of the
Law Offices of Stephen C. Volker.  The request does not state which year she was
admitted to the California bar but the comments rectify this omission.  Riddle
was admitted in December 2004.  D.07-01-009, the Commission's most recent
update of criteria and methodology for setting rates for attorneys and experts,
establishes the following ranges for 2007:  for attorneys with 0-2 years of
experience, the authorized rate scale is $145 - $200; with 3-4 years of experience,
the scale increases to $195 - $230.  For the purposes of today's decision, since

---

[16] Volker's 2004 rate was approved by D.06-04-018.  D.06-06-025 denied the request for
rehearing, which argued among other things that Volker's 2004 rate should be
$400/hour.

A.99-09-053  ALJ/XJV/tcg

Riddle's work solely concerned request preparation in the first half of 2007, we will set her rate at $200/hour.

We note that the request does not mention the prior awards to Volker in 2000-2003, or the prior award to Harris or Riddle in 2004. We presume either an oversight -- or a misunderstanding of the leave D.07-01-009 gives to intervenors to request increases above the established COLA in the calculation of 2007 rates. However, we caution that by failing to recognize and report the hourly rates the Commission has set in the past, an intervenor risks sanction, particularly where the rates sought are higher than the rates the Commission previously found to be reasonable. While D.07-01-009 authorizes an intervenor to seek an adjustment beyond the authorized COLA to the hourly rate established for 2007, such a request requires support. Here the only support for the rates sought for Harris and Riddle in the request is Volker's declaration that such rates are reasonable, market-based rates, given the dates each graduated from law school; the comments provide bar admission dates. The support for the increase in Volker's rate is more comprehensive and should Volker renew in a future, suitable proceeding, his effort to obtain an increase in the 2007 rate set by today's decision, he should provide support of this nature with the request.

We turn now to the rates requested for the four expert witnesses for their work in 2000: Ihara, Roelofs, Curry and Phillips. The Commission has not established rates for these individuals previously. The request includes a current resume or curriculum vita for each which lists education and experience, including other consultancy or other work product, such as research or published papers. We focus on each expert's qualifications in the 2000 timeframe in which the work at issue was done.

- 26 -

A.99-09-053 ALJ/XJV/tcg

Ihara, an instructor in economics at Humboldt State University since 1992, earned a Ph.D. in economics in 1991 from the University of Oregon. He also holds an M.S. in economics from the University of Oregon (1990) and a B.A. in English literature from the University of California, Berkeley (1969). In addition to holding various other teaching posts and coordinating academic, governmental and quasi-governmental conferences on climate change and related subjects, Ihara has authored numerous papers on climate change and related issues in environmental economics.

Roelofs, an instructor in the Department of Fisheries Biology at Humboldt State University, earned a Ph.D. in fisheries in 1970 from Oregon State University. He holds an M.S. in engineering from the University of Washington (1967) and a B.S. in fisheries from Michigan State University (1965). Roelofs has received awards for his professional work and continues to pursue research focusing on salmon recovery.

Curry, a research professor at the University of California, Santa Cruz, earned a Ph.D. in geomorphology and paleoclimatology from the University of California, Berkeley in 1967. He holds an M.S. and B.A. in geology from the University of Colorado (1960, 1961). Curry also serves as Research Coordinator and Senior Scientist for California State University, Monterey Bay, Watershed Institute. Curry's research specialties include wetlands and stream restoration, watershed systems, and environmental geology, to name only a few. His publications (books, monographs, journal papers, etc.) are extensive.

Phillips, earned a Ph.D. in environmental economics and law from the University of Wisconsin in 1976. He holds an M.A. in resource economics (1973) and a B.A. in economics (1971) from the same institution. Phillips has worked in senior levels of business, government and academia, serving, for example, as

- 27 -

A.99-09-053  ALJ/XJV/tcg

Assistant Secretary for Resources for California's Resources Agency, Principal Consultant to the California Legislature, Chief Consultant to Speaker pro tem Fred Keeley in the California State Assembly, Associate Professor at California State University, Sacramento.  He has also participated in several private sector ventures specializing in energy development and in river restoration.

In setting hourly rates for these experts for 2000, we look to rates set for other experts with comparable qualifications during the same period.  In D.01-10-008, for example, the Commission awarded J.B. Marcus and Jeff Nahigian, of JBS Energy, Inc., intervenor compensation for their consulting services to TURN.  Both are economists and D.01-10-008, working from established 1999 hourly rates of $150/hour for Marcus and $95/hour for Nahigian, increases them to $160/hour and $100/hour, respectively.  The decision relates their experience as follows:

> Marcus graduated from Harvard College with an A.B. magna cum laude in economics in 1974, and received an M.A. in Economics from the University of Toronto in 1975.  He has been directly involved in the field of energy policy and utility regulation for more than twenty years, first as an economist with the California Energy Commission and, since 1984, as a Principal Economist for JBS.  In this position, he is the firm's lead economist for all utility issues and supervises the work of five other analysts.

> * * *

> Nahigian, a Senior Economist with JBS, has more than ten years experience analyzing utility operations and rate design issues. He received a B.S. in Environmental Policy Analysis and Planning from the University of California, Davis, in 1986. After a brief stint as a policy analyst for the Independent Energy Producers Association, Nahigian joined the JBS staff in 1987.  His analysis served to provide the basis for much of the

- 28 -

A.99-09-053  ALJ/XJV/tcg

testimony Marcus has presented to the Commission in recent years.  (D.01-10-008 at 12-13.)

Comparing qualifications is imprecise, as many factors (such as education, experience and efficiency) must enter into hourly rate calibrations.  However, we find that the rates requested for Ihara, Roelofs, Curry and Phillips are reasonably documented and generally consistent with the range of hourly rates approved during the 2000 timeframe.  We approve these hourly rates for 2000.

## 8. Direct Expenses

CHRC seeks $2,197.42 for such costs as telephone services, postage, photocopying, and limited travel.  These costs are commensurate with the work performed and reasonable.

Friends and California Sportfishing seek $50 in reimbursement for the costs of obtaining a copy of the EIR but claim no other expenses.  We approve the reimbursement sought.

## 9. Compensation Sought for A.98-05-014 and A.98-05-022

As noted above in Section 1.2, Friends and California Sportfishing filed a timely NOI in A.98-05-014/ A.98-05-022 and were found eligible to file a request for an award of intervenor compensation.  Regarding the reasonableness of this request, Friends and California Sportfishing state:

> As a result of Conservation Groups' presentation in the prior proceeding, "the Commission held that all future applications aimed at establishing values for specific generation assets – such as the present proceeding, A.99-09-053 – are subject to CEQA review."  (Comments, p5, quoting Request at 5.)

They conclude: "This victory represents a very substantial contribution to this proceeding."  (Comments at 5.)

- 29 -

A.99-09-053 ALJ/XJV/tcg

In the corrected and revised request included with their comments, Friends and California Sportfishing seek the following compensation for their participation in A.98-05-014/ A.98-05-022:

| | Year | Hours | Rates | |
|---|---|---|---|---|
| **Attorney Fees** | | | | |
| Stephen C. Volker | 1999 | 60.2 | $265 | $ 15,953.00 |
| Stephen C. Volker, (comp & travel) | 1999 | 6.6 | $132.50 | $    874.50 |
| | | | *Subtotal* | **$ 16,827.50** |
| **Outside Expert Fees** | | | | |
| Guy Phillips, Ph.D. | 2/1999 | 14 | $150 | $  2,100.00 |
| | 3/1999 | 16.45 | $150 | $  2,467.50 |
| | 4/1999 | 14.7 | $150 | $  2,205.00 |
| | | | *Subtotal* | **$  6,772.50** |
| **Other Costs** | | | | |
| Postage | | | | $    141.50 |
| Photocopying | | | | $    563.95 |
| FAX | | | | $      6.45 |
| Mileage | | | | $      6.50 |
| BART | | | | $     10.80 |
| Transcripts | | | | $    318.98 |
| Paralegal services | | | | $    213.75 |
| Long Distance | | | | $       .90 |
| | | | *Subtotal* | **$  1,263.23** |
| **TOTAL** | | | | **$ 24,863.23** |

As discussed above, we have previously awarded Volker an hourly rate of $250/hour for 1999 and we adjust this portion of the request accordingly. We approve the rate sought for Phillips, consistent with the discussion in Section 7.2. We authorize reimbursement for all direct expenses, except the undocumented

- 30 -

A.99-09-053 ALJ/XJV/tcg

claim for paralegal services. Before we can approve such costs, we require disclosure of the qualifications of the individual who performed the services, the hourly rate sought and justification for it, together with billing records. Nothing has been provided. To the extent these costs represent clerical assistance, they should be subsumed within professional fees, as general office overhead. Though we allow the expenses for mileage and BART incurred in 1999, we may not do so in future. Our more recent policy is to disallow the costs of routine travel to the Commission for those who practice here frequently.

## 10. Awards

We award CHRC $101,698.92 as follows:

|  | Year | Hours | Rates |  |
|---|---|---|---|---|
| **Attorney Fees** | | | | |
| Richard Roos-Collins | 1999 | 14.3 | $305 | $ 4,361.50 |
| (comp) | 1999 | 3 | $152.50 | $ 457.50 |
| | 2000 | 252.2 | $315 | $ 79,443.00 |
| (comp) | 2000 | 1 | $157.50 | $ 157.50 |
| | 2001 | 34 | $325 | $ 11,050.00 |
| (comp) | 2007 | 16 | $177 | $ 2,832.00 |
| | | | *Subtotal* | *$ 98,301.50* |
| **Paralegal Fees** | | | | |
| Amy Roon | 2000-1 | 15 | $50 | $ 750.00 |
| Christian Mastrodonato | 2000 | 9 | $50 | $ 450.00 |
| | | | *Subtotal* | *$ 1,200.00* |
| | | | **Total Advocacy Fees** | **$99,501.50** |
| **Other Costs** | | | | **$ 2,197.42** |
| **TOTAL** | | | | **$101,698.92** |

A.99-09-053  ALJ/XJV/tcg

We award Friends and California Sportfishing $77,671.48 for A.99-09-053 and A.98-05-022/A.98-05-022, broken down as follows:

| | Year | Hours | Rates | |
|---|---|---|---|---|
| **Attorney Fees** | | | | |
| Stephen C. Volker | 1999 | 16.8 | $250 | $ 4,200.00 |
| | 2000 | 133 | $250 | $ 33,250.00 |
| | 2001 | 9.9 | $250 | $ 2,475.00 |
| | | | *Subtotal* | **$ 39,925.00** |
| **Attorney Fees (Comp & Travel)** | | | | |
| Stephen C. Volker | 2000 | 14 | $125 | $ 1,750.00 |
| | 2001 | 0.5 | $125 | $ 62.50 |
| | 2007 | 5.6 | $145 | $ 812 |
| Marnie E. Riddle | 2007 | 6.2 | $ 100 | $ 620 |
| Joshua A. H. Harris | 2007 | 38.8 | $100 | $ 3,880 |
| | | | *Subtotal (Comp and Travel)* | **$ 7,062.00** |
| **Outside Expert Fees** | | | | |
| Daniel M. Ihara, Ph.D. | 2000 | 12.25 | $100 | $ 1,225.00 |
| Robert R. Curry, Ph.D. | 2000 | 10 | $125 | $ 1,250.00 |
| Terry Roelofs, Ph.D. | 2000 | 8 | $100 | $ 800.00 |
| Guy Phillips, Ph.D. | 2000 | 24 | $150 | $ 3,600.00 |
| | | | *Subtotal* | **$ 6,875.00** |
| **Other Costs** | | | | $ 50.00 |
| **TOTAL (A.99-09-053)** | | | | **$ 53,912.00** |

A.99-09-053  ALJ/XJV/tcg

| | Year | Hours | Rates | |
|---|---|---|---|---|
| **Attorney Fees** | | | | |
| Stephen C. Volker | 1999 | 60.2 | $250 | $ 15,050.00 |
| Stephen C. Volker, (comp or travel) | 1999 | 6.6 | $125 | $     825.00 |
| | | | *Subtotal* | **$ 15,875.00** |
| **Outside Expert Fees** | | | | |
| Guy Phillips, Ph.D. | 1999 | 45.15 | $150 | $  6,772.50 |
| | | | *Subtotal* | **$  6,772.50** |
| **Other Costs** | | | | |
| | | | *Subtotal* | **$  1,049.48** |
| **TOTAL (A.98-05-014/A.98-05-022)** | | | | **$ 23,696.98** |

Consistent with previous Commission decisions, we order that interest be paid on each award amount (at the rate earned on prime, three-month commercial paper, as reported in Federal Reserve Statistical Release H.15) commencing on the 75th day after the respective parties, CHRC on the one hand and Friends and California Sportfishing on the other, each filed its compensation request, and continuing until full payment of the award is made.

Commission staff is authorized to audit an intervenor's records related to the award. Intervenors must make and retain adequate accounting and other documentation to support all claims for intervenor compensation. Intervenors that have received compensation should retain records that identify specific issues for which they requested compensation, the actual time spent by each employee or consultant, the applicable hourly rate, fees paid to consultants, and any other costs for which compensation was claimed.

- 33 -

A.99-09-053  ALJ/XJV/tcg

**11.  Comments on Proposed Decision**

The proposed decision of the ALJ in this matter was mailed to the parties in accordance with Section 311 of the Public Utilities Code and comments were allowed under Rule 14.3 of the Commission's Rules of Practice and Procedure. Comments were filed on November 14, 2007 by Friends and California Sportfishing.  No reply comments were filed.

Friends and California Sportfishing argue that the proposed decision errs by (1) failing to award them compensation for their participation in A.98-05-014/A.98-05-022, (2) approving too low an hourly rate for Riddle, (3) approving hourly rates for Volker that fail to recognize his market rate, and (4) finding that the time spent in preparing the compensation request was excessive.  On further review, we have revised the proposed decision to authorize reasonable compensation for A.98-05-014/A.98-05-022.  Accordingly, because we allow this claim, we also increase the portion of the total award attributable to preparation of the request for compensation.  We authorize a little more than $7,000 for compensation-related activities, which is less than the $10,000+ sought.  Further, based on the additional information provided in the comments, we have set Riddle's hourly rate at $200/hour.

We make no adjustments to Volker's hourly rates in today's decision, however.  Most of the work in these proceedings was done in the 1999-2001 timeframe and the rates awarded Volker during that timeframe are reasonable. For the year 2007, the year in which the compensation request was prepared, the rate we award is based upon established escalations during the interim period. Volker has previously challenged those escalations and we have rejected his

A.99-09-053 ALJ/XJV/tcg

challenge.[17] If Volker wishes to seek to have his 2007 rate reset, he should make that request in the future, where he can show a substantial contribution to a Commission decision based upon work performed during 2007. We continue to find that the quality and clarity of the compensation request filed here (for work done between 1999 and 2001), does not warrant establishment of a 2007 rate above standard escalation.

## 12. Assignment of Proceeding

Michael R. Peevey is the assigned Commissioner and Jean Vieth is the assigned ALJ in this proceeding.

### Findings of Fact

1. CHRC has satisfied all the procedural requirements necessary to claim compensation in this proceeding and has made a substantial contribution to this proceeding as described herein.

2. Friends and California Sportfishing, two members of Conservation Groups, have satisfied all the procedural requirements necessary to claim compensation in this proceeding and have made a substantial contribution to this proceeding as described herein. We find the other members of Conservation Groups ineligible to claim intervenor compensation; however, for reasons described herein, this ineligibility does not require us to reduce the award to Friends and California Sportfishing.

---

[17] *See D.06-06-025 and D.06-10-023, and related arguments in Californians for Renewable Energy* v. *Pacific Gas & Electric Company,* Cal. App. A115705, denied January 31, 2007.

A.99-09-053 ALJ/XJV/tcg

3. As adjusted to correct errors and other problems discussed herein, the hourly rates and expenses requested, respectively, by CHRC and by Friends and California Sportfishing, are reasonable.

## Conclusions of Law

1. CHRC and jointly, Friends and California Sportfishing, have fulfilled the requirements of Pub. Util. Code §§ 1801-1812, which govern awards of intervenor compensation, and are entitled to intervenor compensation for their substantial contributions to D.07-04-011.

2. CHRC should be awarded $101,698.92 for its contribution to D.07-04-011

3. Friends and California Sportfishing should be awarded $77,671.48, jointly, for their contribution to D.07-04-011.

4. This order should be effective today so that CHRC, and Friends and California Sportfishing, may be compensated without further delay.

## O R D E R

**IT IS ORDERED** that:

1. California Hydropower Reform Coalition (CHRC) is awarded $101,698.92 as compensation for its substantial contributions to Decision (D.) 07-04-011.

2. Friends of the Eel River (Friends) and California Sportfishing Protection Alliance (California Sportfishing), jointly, are awarded $77,671.48 as compensation for their substantial contributions to D.07-04-011.

3. Within 30 days of the effective date of this decision, Pacific Gas and Electric Company shall remit to CHRC and jointly, to Friends and California Sportfishing, the amounts awarded herein.

A.99-09-053  ALJ/XJV/tcg

4.  Interest shall be added to the award to CHRC and to the joint award to
Friends and California Sportfishing at the rate earned on prime, three-month
commercial paper, as reported in Federal Reserve Statistical Release H.15,
commencing on the 75th day after each filed its compensation request, effective
September 1, 2007, and continuing until full payment of the award is made

5.  Application 99-09-053 is closed.

This order is effective today.

Dated December 6, 2007, at San Francisco, California.


                              MICHAEL R. PEEVEY
                                   President
                              DIAN M. GRUENEICH
                              JOHN A. BOHN
                              RACHELLE B. CHONG
                              TIMOTHY ALAN SIMON
                                   Commissioners

A.99-09-053  ALJ/XJV/tcg

# APPENDIX

## Compensation Decision Summary Information

| | | |
|---|---|---|
| **Compensation Decision:** | D0712004 | **Modifies Decision?  No** |
| **Contribution Decision(s):** | D0704011 | |
| **Proceeding(s):** | A9909053 | |
| **Author:** | ALJ Vieth | |
| **Payer(s):** | Pacific Gas and Electric Company | |

### Intervenor Information

| Intervenor | Claim Date | Amount Requested | Amount Awarded | Multiplier? | Reason Change/Disallowance |
|---|---|---|---|---|---|
| California Hydropower Reform Coalition | 6/18/07 | $102,698.92 | $101,698.92 | No | Failure to discount intervenor compensation preparation time; administrative time not compensable |
| Friends of the Eel River and California Sportfishing Protection Alliance | 6/18/07 | $91,445.48 | $77,671.48 | No | Failure to justify hourly rate; failure to discount travel and intervenor compensation preparation time; excessive hours. |

A.99-09-053  ALJ/XJV/tcg

## Advocate Information

| First Name | Last Name | Type | Intervenor | Hourly Fee Requested | Year Hourly Fee Requested | Hourly Fee Adopted |
|---|---|---|---|---|---|---|
| Richard | Roos-Collins | Attorney | California Hydropower Reform Coalition | $305 | 1999 | $305 |
| Richard | Roos-Collins | Attorney | California Hydropower Reform Coalition | $315 | 2000 | $315 |
| Richard | Roos-Collins | Attorney | California Hydropower Reform Coalition | $325 | 2001 | $325 |
| Richard | Roos-Collins | Attorney | California Hydropower Reform Coalition | $354 | 2007 | $354 |
| Amy | Roon | Paralegal | California Hydropower Reform Coalition | $50 | 2000-1 | $50 |
| Christian | Mastrodonato | Paralegal | California Hydropower Reform Coalition | $50 | 2000 | $50 |
| Stephen C. | Volker | Attorney | Friends of the Eel River/California Sportfishing Protection Alliance | $265 | 1999 | $250 |
| Stephen C. | Volker | Attorney | Friends of the Eel River/California Sportfishing Protection Alliance | $280 | 2000 | $250 |
| Stephen C. | Volker | Attorney | Friends of the Eel River/California Sportfishing Protection Alliance | $295 | 2001 | $250 |
| Stephen C. | Volker | Attorney | Friends of the Eel River/California Sportfishing Protection Alliance | $500 | 2007 | $290 |

A.99-09-053  ALJ/XJV/tcg

| Marnie E. | Riddle | Attorney | Friends of the Eel River/California Sportfishing Protection Alliance | $225 | 2007 | $200 |
|---|---|---|---|---|---|---|
| Joshua A. H. | Harris | Attorney | Friends of the Eel River/California Sportfishing Protection Alliance | $250 | 2007 | $200 |
| Daniel M. | Ihara | Expert | Friends of the Eel River/California Sportfishing Protection Alliance | $100 | 2000 | $100 |
| Robert R. | Curry | Expert | Friends of the Eel River/California Sportfishing Protection Alliance | $125 | 2000 | $125 |
| Terry | Roelofs | Expert | Friends of the Eel River/California Sportfishing Protection Alliance | $100 | 2000 | $100 |
| Guy | Phillips | Expert | Friends of the Eel River/California Sportfishing Protection Alliance | $150 | 2000 | $150 |

**(END OF APPENDIX)**

COM/MP1/jyc                                    **Date of Issuance 12/7/2007**

Decision 07-12-007  December 6, 2007

**BEFORE THE PUBLIC UTILITIES COMMISSION OF THE STATE OF CALIFORNIA**

| | |
|---|---|
| Order Instituting Rulemaking Regarding Policies, Procedures and Rules for the California Solar Initiative, the Self-Generation Incentive Program and Other Distributed Generation Issues. | Rulemaking 06-03-004 (Filed March 2, 2006) |

**OPINION GRANTING INTERVENOR COMPENSATION
TO CALIFORNIANS FOR RENEWABLE ENERGY, CONSUMER
FEDERATION OF CALIFORNIA, AND GREEN POWER INSTITUTE FOR
CONTRIBUTIONS TO CALIFORNIA SOLAR INITIATIVE RULEMAKING**

## 1.    Summary

The decision awards the Consumer Federation of California (CFC) $48,656.78 in compensation for its substantial contribution to Decision (D.) 06-08-028.  This is a decrease from the requested amount of $87,013.02.  The amount is reduced because CFC did not make a substantial contribution in all of the areas it claims.  The reduction also reflects an adjustment to the requested hourly rate, and disallowance of compensation for clerical work.

This decision awards Californians for Renewable Energy (CARE) $39,810.98 in compensation for substantial contributions to several decisions in this rulemaking.  This is a decrease from CARE's requested compensation of $65,753.88.  The reduction reflects an adjustment to the requested hourly rates for CARE attorneys and representatives, and reductions to the hours claimed by CARE.

306541                          - 1 -

R.06-03-004 COM/MP1/jyc

The Green Power Institute (GPI) is awarded $13,893.50 in compensation for substantial contribution to D.07-01-018.

## 2.    Background

This rulemaking was initiated to develop rules and procedures for the California Solar Initiative (CSI) and the Self-Generation Incentive Program (SGIP), and to consider policies for the development of cost-effective, clean and reliable distributed generation (DG).

The Scoping Memo of April 25, 2006, divided this proceeding into three phases. Phase I has dealt with issues requiring immediate resolution to implement the CSI in 2007. Phase II addressed additional CSI and distributed generation issues including cost-benefit analyses and treatment of distributed generation output for the renewables portfolio standards. Phase III should resolve issues relating to SGIP management and participation by small utilities.

Phase I involved several decisions, including D.06-07-028 to revise solar system size requirements, and D.06-08-028 to adopt performance-based incentives (PBI) for payments to qualifying solar technologies through the CSI. The latter order also addressed an administrative structure and other CSI program design features. Among other provisions, D.06-08-028 recognized a need for a CSI program handbook to facilitate program implementation and directed the Energy Division to convene a workshop to discuss CSI Program Handbook development and create subgroups to work on sections of the handbook. The CSI Program Handbook was approved by an Assigned Commissioner's Ruling of December 20, 2006.

As the Commission prepared to vote on D.06-08-028, the Governor signed Senate Bill (SB) 1 into law, to take effect January 2007. SB 1 requires the Commission to implement CSI with a number of specific provisions, some of

- 2 -

R.06-03-004  COM/MP1/jyc

which differ from those in D.06-08-028.  In response to SB 1, the Commission adopted D.06-12-033 modifying certain provisions of D.06-08-028.

In Phase II, the Commission issued D.07-01-018.  In that decision, the Commission considered proposals on how to determine the portion of the Renewable Energy Credits (RECs) from renewable DG facilities that was supported by ratepayer subsidies.  The Commission determined that RECs are among several factors affecting the economics of solar and may play an important role in the development of renewables in California.  Thus, the Commission determined that renewable DG owners should retain 100% of the RECs associated with their facilities.

CARE and CFC actively participated in the proceeding by filing numerous pleadings and appearing at the meetings and workshops leading to D.06-08-028 and D.06-12-033.  CARE and CFC both participated in development of the CSI Handbook, as directed by D.06-08-028, and CFC was a member of the metering subgroup formed in compliance with D.06-08-028.  CARE and GPI participated in the proceeding and filed pleadings leading to D.07-01-018.

## 3.    Requirements for Award of Compensation

The intervenor compensation program, enacted in Pub. Util. Code §§ 1801-1812, requires California jurisdictional utilities to pay the reasonable costs of an intervenor's participation if the intervenor makes a substantial contribution to the Commission's proceedings.[1]  Section 1807 provides that the utility may adjust its rates to collect the amount awarded from its ratepayers.

---

[1] Unless otherwise indicated, all subsequent statutory references are to the Public Utilities Code.

R.06-03-004 COM/MP1/jyc

All of the following procedures and criteria must be satisfied for an intervenor to obtain a compensation award:

1.  The intervenor must satisfy certain procedural requirements including the filing of a sufficient notice of intent to claim compensation within 30 days of the prehearing conference (PHC), or in special circumstances at other appropriate times that we specify. (§ 1804(a).)

2.  The intervenor must be a customer or a participant representing consumers, customers, or subscribers of a utility subject to our jurisdiction. (§ 1802(b).)

3.  The intervenor should file and serve a request for a compensation award within 60 days of our final order or decision in a hearing or proceeding. (§ 1804(c).)

4.  The intervenor must demonstrate "significant financial hardship." (§§ 1802(g), 1804(b)(1).)

5.  The intervenor's presentation must have made a "substantial contribution" to the proceeding, through the adoption, in whole or in part, of the intervenor's contention or recommendations by a Commission order or decision. (§§ 1802(i), 1803(a).)

6.  The claimed fees and costs must be reasonable (§ 1801), necessary for and related to the substantial contribution (D.98-04-059), comparable to the market rates paid to others with comparable training and experience (§ 1806), and productive (D.98-04-059).

For discussion here, the procedural issues in Items 1-4 above are combined, followed by separate discussions on Items 5-6.

**4.    Procedural Issues**

A PHC in this proceeding was held on March 23, 2006. CARE, CFC, and GPI timely filed their notices of intent to claim compensation. In their notices, CARE, CFC, and GPI asserted, among other things, significant financial hardship for participation in the proceeding. On May 16, 2006, Administrative Law Judge (ALJ) Dorothy Duda issued a ruling determining that CARE, CFC, and GPI were

R.06-03-004 COM/MP1/jyc

eligible to claim intervenor compensation. The ruling found that all three intervenors met the definition of a customer pursuant to § 1802(b)(1)(C) and demonstrated significant financial hardship according to § 1802(g).

D.06-08-028 issued on August 24, 2006. On September 21, 2006, CFC filed an application for rehearing of that decision. The rehearing was denied by D.07-03-018, issued on March 1, 2007. CARE filed its compensation request on March 9, 2007. CFC filed its request on April 26, 2007. GPI filed its request on March 19, 2007. All three requests were filed within 60 days of the final order, consistent with the timing requirements of § 1804(c).

Southern California Edison Company (SCE) responded to CARE's request on April 9, 2007 and to CFC's request on May 29, 2007. CARE replied on April 24, 2007 and CFC replied on June 13, 2007.

We find that CARE, CFC, and GPI have satisfied all the procedural requirements necessary to make a request for compensation in this proceeding.

## 5. Substantial Contribution

In evaluating whether a customer made a substantial contribution to a proceeding we look at several things. First, we consider whether the ALJ or Commission adopted one or more of the factual or legal contentions, or specific policy or procedural recommendations put forward by the customer. (See § 1802(i).) Second, we look at whether the customer's contentions or recommendations paralleled those of another party, and, if so, did the customer's participation materially supplement, complement, or contribute to the presentation of the other party or to the development of a fuller record that assisted the Commission in making its decision. Section 1801.3(f) requires an intervenor to avoid unnecessary participation that duplicates similar interests that are adequately represented by another party, or unnecessary for a fair

- 5 -

R.06-03-004 COM/MP1/jyc

determination of the proceeding. Section 1802.5, however, allows an intervenor to be eligible for full compensation if its participation materially supplements, complements, or contributes to that of another party if the latter makes a substantial contribution to the Commission order.

As described in § 1802(i), the assessment of whether the customer made a substantial contribution requires the exercise of judgment.

> In assessing whether the customer meets this standard, the Commission typically reviews the record, composed in part of pleadings of the customer and, in litigated matters, the hearing transcripts, and compares it to the findings, conclusions, and orders in the decision to which the customer asserts it contributed. It is then a matter of judgment as to whether the customer's presentation substantially assisted the Commission.[2]

Should the Commission not adopt any of the customer's recommendations, compensation may be awarded if, in the judgment of the Commission, the customer's participation substantially contributed to the decision or order. For example, if a customer provided a unique perspective that enriched the Commission's deliberations and the record, the Commission could find that the customer made a substantial contribution.

With this guidance in mind, we turn to the compensation requests of CFC, CARE, and GPI with regard to various decisions in this rulemaking.

## 6.    CFC's Compensation Request

CFC asserts it made substantial contributions to our resolution of seven major issues in D.06-08-028 and to the metering subgroup and CSI Handbook. In its response to the request, SCE primarily argues that CFC participation

---

[2] D.98-04-059, 79 CPUC2d 628 at 653.

R.06-03-004 COM/MP1/jyc

duplicated the participation of other parties. While not all of CFC's positions were adopted, we find that CFC made a substantial contribution to D.06-08-028 on four of the seven topics it claims. We also find CFC made a substantial contribution to the metering subgroup and CSI Handbook development.

Below, we discuss CFC's claims by issue area.

## 6.1. Analysis of Substantial Contributions

### 6.1.1. Performance-Based Incentives

CFC states it substantially contributed to D.06-08-028 by recommending that all incentives be paid on the basis of actual performance, that the Commission factor in shade and other losses, and that payment of the incentives be based on geography. CFC also claims it contributed information the Commission relied on regarding capacity factors for solar energy systems.

CFC made a substantial contribution through comments on the need for performance based incentives, and the importance of factoring in design and geography in up front, or Expected Performance-Based Buydown, incentive payments. CFC provided unique perspectives on these issues from a consumer advocacy viewpoint. The Commission also relied on data CFC provided regarding capacity factors and performance of solar energy systems.

### 6.1.2. Incentive Adjustment Mechanism

CFC supported the staff's recommendation that the incentive mechanism be simple and transparent to allow marketers to predict what incentives would be paid. CFC made a substantial contribution to the decision because the Commission relied on parties' comments to keep the incentive mechanism simple and transparent. CFC also advocated that the Commission continue to monitor the solar market and adjust the incentive in the future as necessary. The

R.06-03-004 COM/MP1/jyc

Commission incorporated a periodic review of incentives into the program in D.06-08-028.

### 6.1.3. Incentives for Non-Photovoltaic Technologies

CFC urged the Commission not to pay incentives to non-photovoltaic (PV) technologies until it conducted further pilots to determine the cost-effectiveness of these new technologies.

The Commission rejected CFC's position. CFC's position was not helpful to our analysis as it focused on cost-effectiveness issues. The Commission made clear that cost-effectiveness analyses would be handled in a separate phase of this rulemaking. Therefore, there was no substantial contribution from CFC on this issue.

### 6.1.4. Energy Efficiency

CFC supported the staff recommendation that energy efficiency audits be a condition for participation in CSI. CFC also recommended that the Commission combine and coordinate other energy conservation programs with CSI. SCE notes that CFC's positions were virtually unanimous among party comments. There was no substantial contribution from CFC on the subject of energy efficiency audit requirements or energy efficiency coordination. CFC's comments primarily voiced support for prior Commission statements on energy efficiency improvements as a condition of solar incentives.

CFC also urged the Commission to condition incentives on customers' agreement to receive service on time-of-use (TOU) rates. This recommendation

R.06-03-004 COM/MP1/jyc

was not accepted in D.06-08-028,[3] as the Commission noted that it needed to consider, among other things, the overall economics of such an action for the solar owner and ratepayers. CFC's comments did not address the overall economics of a TOU requirement. Thus, we find CFC did not make a substantial contribution on this issue.

### 6.1.5. Administration

CFC urged appointment of an independent non-profit administrator for CSI, or in the alternative, proposed that the Commission should allow the CEC to continue to administer residential solar incentives until an independent administrator is chosen. CFC acknowledges the Commission instead chose to allow the SGIP program administrators to administer CSI. However, CFC claims it made a substantial contribution because D.06-08-028 endorsed "the concept of non-profit administration for the residential retrofit portion of CSI" and stated that:

> In the longer term, there are still very good reasons to consider non-profit administration for this portion of CSI…. The rationale articulated by the parties resonate with us, particularly that a non-profit administration might achieve economies of scale by consolidating residential retrofit programs statewide, exhibit lower overhead costs, and be driven by a mission to promote solar development. (D.06-08-028, pp. 59-60.)

Although CFC's recommendation on administration was not adopted, it made a substantial contribution by providing a unique perspective on this issue from a consumer advocacy perspective. The Commission relied on CFC's views

---

[3] Later, in SB 1, the legislature added a TOU requirement, which was later put into effect in D.06-12-033. CFC's claim does not include work toward D.06-12-033.

R.06-03-004 COM/MP1/jyc

in not foreclosing the idea of independent administration for a portion of CSI in the future.

### 6.1.6.   Metering

CFC claims it made a substantial contribution by supporting the staff proposal to install dedicated revenue grade meters to measure solar system output and raised the issue of who would pay for the meters. CFC also recommended that "measuring solar output with meters installed by utilities as part of their advanced metering systems would help reduce customer costs."

SCE notes a number of parties supported accurate revenue grade meters, and the Commission rejected the idea of delaying action on metering until implementation of advanced metering infrastructure proceedings.

A review of CFC's filings and D.06-08-028 does not support CFC's claim of substantial contribution on the topic of metering. Although CFC made a suggestion for meter coordination with AMI, this proposal was rejected. CFC's other comments on metering either merely supported the staff proposal or contained statements that were not sufficiently explained or developed to be useful and enhance the record on this topic. We find no substantial contribution on this topic.

### 6.1.7.   Monitoring and Evaluation

CFC urged the Commission to develop procedures for prompt verification of each customer's installation. In D.06-08-028, the Commission required program administrators to use trained personnel to verify system characteristics for all systems between 30 kW and 100 kW and a sample of systems under 30 kW.

A review of CFC's filings indicates it made several suggestions on the concept of verification to ensure systems produce their estimated output. CFC's

- 10 -

R.06-03-004 COM/MP1/jyc

filing contributed to the Commission's analysis of this issue, and we find CFC made a substantial contribution on the topic of verification.

### 6.1.8. CFC's Participation in Metering Subgroup and CSI Handbook

In addition to CFC's claiming work on seven issues in D.06-08-028, CFC claims it made substantial contributions after the issuance of D.06-08-028 as a part of the metering subgroup, and as part of the group developing the CSI Handbook in compliance with that decision.[4] CFC describes its participation in workshops, subgroup meetings and its work filing comments on the draft handbook. CFC claims it reminded the metering subgroup about the provisions of D.06-08-028 and pointed out differences and discrepancies between the decision and the group's draft CSI Handbook on metering issues. According to CFC, the final handbook is consistent with the D.06-08-028 because of CFC's work countering inconsistent proposals by other parties.

The Commission has emphasized its general policy encouraging alternatives to litigation and other approaches that reduce the cost and delay of formal proceeding. The Commission has previously indicated, "Compensation for meaningful [workshop] participation by intervenors who make a substantial contribution to the final decision is consistent with this policy." (D.00-07-013, mimeo., at p. 11.) The Commission has also recognized that "the nature of the workshop process makes it difficult to identify the unique role played by each of the participants." (*See* D.95-02-066.)

---

[4] The CSI Handbook was ultimately approved in an assigned Commissioner Ruling dated December 20, 2006, in keeping with the Process established in D.06-08-028.

- 11 -

R.06-03-004  COM/MP1/jyc

Consistent with these statements, we believe it is appropriate to compensate CFC for its participation in the metering subgroup and CSI Handbook process. While it is difficult to link CFC's work directly to the final CSI Handbook, we realize many of CFC's contributions may have occurred orally during discussions and interactions with staff and parties at meetings and workshops. CFC participated in subgroup and handbook meetings and workshops, drafted a minority report regarding its concerns with the handbook and metering subgroup's interpretation of metering communication functionality, and detailed handbook deficiencies regarding metering in its comments. Therefore, we will compensate CFC for its work contributing to the metering subgroup and CSI Handbook development.

### 6.2.  Contributions of Other Parties

Section 1801.3(f) requires an intervenor to avoid unnecessary duplication of efforts of other parties. Section 1802.5 provides that the participation of a customer that "supplements, complements, or contributes to the presentation of another party" may be compensated. The governing statutes envision that some participation that is duplicative may still make a substantial contribution. However, the statutes also envision that participation which is duplicative may be unnecessary and therefore not compensable at all. (D.98-04-059, p. 49.)

CFC contends that its position and presentations were distinct from those of other parties. SCE in its response to the request challenges these contentions. SCE argues that CFC largely duplicated the work of other parties and in most instances the very points which distinguished CFC's positions from other parties were points the Commission explicitly rejected. According to SCE, this includes CFC's positions on non-profit program administration, PBI for all size customers, metering through advanced metering infrastructure, and energy efficiency.

R.06-03-004 COM/MP1/jyc

      In a proceeding involving multiple participants, it is virtually impossible to completely avoid some duplication of the work of other parties. We find CFC's work provided distinct viewpoints from a consumer advocacy perspective and its work supplemented, complemented, and contributed to the overall development of the record regarding implementation of CSI.

## 6.3. Reasonableness of CFC's Requested Compensation

CFC requests $87,013.02 for its participation in this proceeding, as follows:

| Item | Rate | Hours | Amount |
|------|------|-------|--------|
| Attorney | $350 | 216.9[5] | $75,915.00 |
| Clerical | $ 75 | 11.6 | $    870.00 |
| Attorney (comp. request @1/2 rate) | $175 | 56.5 | $ 9,887.50 |
| Clerical (comp. request @1/2 rate) | $ 37.50 | 1.9[6] | $     71.25 |
| Direct expenses (printing, mailing, mileage @$0.405, parking) | | | $    269.27 |
| | | Total | **$87,013.02** |

      In general, the components of this request must constitute reasonable fees and costs of the customer's preparation for and participation in a proceeding that resulted in a substantial contribution. The issues we consider to determine reasonableness are discussed below.

### 6.3.1. CFC's Hours and Costs Related to and Necessary for Substantial Contribution

      We first assess whether the hours claimed for the customer's efforts that resulted in a substantial contribution to the Commission decision are reasonable

---

[5] CFC's initial request for compensation shows 2,166.9 hours. CFC's June 13, 2007 filing indicates the correct number of hours is 216.9.

[6] CFC's filing contained an error regarding clerical hours. We show the corrected figure of 1.9 hours here.

R.06-03-004 COM/MP1/jyc

by determining to what degree the hours and costs are related to the work performed and necessary for the substantial contribution.

Exhibit A of CFC's request for compensation contains daily records of hours of CFC's attorney and clerk with a brief description of each specific task performed. We note that CFC fails to identify a substantive issue that each task addresses, as required in Rule 17.4(b) of the Commission Rules of Practice and Procedure. CFC is cautioned that future requests must identify a substantive issue for each task description. A detailed review of Exhibit A leads to the following adjustments:

- First, we adjust the request to remove all separately designated clerical hours (11.6 hours @ $75.00 and 1.9 hours @ $37.50), as we consider routine clerical tasks to be overhead that should be captured in an attorney's hourly rates, consistent with our standard practice.[7]

- Second, we remove 11.1 hours in CFC's Exhibit A pertaining to work on petitions for modification of D.06-08-028 filed in March 2007, for which CFC states it is not seeking compensation at this time. (CFC, April 24, 2007, p. 27.)

- Third, we identify 79.6 hours for CFC's work related to the metering subgroup and the CSI Handbook. We compensate CFC for these hours, but identify them for purposes of our calculation in the next bullet point.

- Fourth, we identify 126.2[8] hours relating to work on D.06-08-028. We found that CFC did not make substantial contributions to D.06-08-028 on three of the seven issues

---

[7] See, e.g., D.06-09-011, 200 Cal. PUC LEXIS 315, *33; D.99-11-006, 1999 Cal. PUC LEXIS 657, *30.

[8] We arrive at this number as follows: 216.9 total hours, minus 11.1 hours for work on the petitions for modification, minus 79.6 hours for work on the metering subgroup, equals 126.2 hours.

R.06-03-004 COM/MP1/jyc

namely non-PV technologies, energy efficiency, and metering. Thus, we will reduce the hours claimed by 3/7, or 43%. We rely on this estimate because CFC did not specifically assign a substantive issue to its time records, as required by Rule 17.4(b). We will compensate CFC for 71.9 hours of work on D.06-08-028.[9]

- Finally, we adjust CFC's claim related to the intervenor compensation matters. CFC records 56.5 attorney's hours for these matters. We find this time excessive and reduce it to 20 hours, similar to the reduction we made to a previous request by CFC in D.07-07-017.

### 6.3.2.  CFC's Hourly Rate

We next take into consideration whether the claimed fees and costs are comparable to the market rates paid to experts and advocates having comparable training and experience and offering similar services.

CFC requests $350 per hour for the work performed by its attorney, Alexis K. Wodtke's, in 2006 and a few months of 2007. In D.07-07-017, the Commission approved a rate of $300 per hour for Wodtke's work in the 2006.

Since CFC seeks one hourly rate for Wodtke's work in this proceeding and this decision compensates a relatively small amount of her time spent in 2007, we find it appropriate to adopt one rate for CFC's work in 2006 and 2007. Should Wodtke seek in a future proceeding an increase in the 2007 rate set by today's decision, she should provide the required support for the rate increase with her request.

---

[9] The calculation is: 126.2 hours – 43% = 71.9 hours.

R.06-03-004  COM/MP1/jyc

### 6.3.3.  Productivity of CFC's Participation

D.98-04-059 directed customers to demonstrate productivity by assigning a reasonable dollar value to the benefits of their participation to ratepayers.  The costs of a customer's participation should bear a reasonable relationship to the benefits realized through their participation.

This showing assists us in determining the overall reasonableness of the request.

CFC made a substantial contribution on the issues of PBI, the incentive adjustment mechanism, administration, and monitoring and evaluation.  CFC also contributed, in part, to the metering subgroup and the development of the CSI Handbook.  Although it is difficult to assign quantifiable benefits to CFC's participation, we find that CFC's participation in this proceeding was productive, and bears a reasonable relationship to the benefits that ratepayers should realize from the CSI and SGIP program.

### 6.3.4.  CFC's Direct Expenses

The itemized direct expenses of $269.27 submitted by CFC are for printing, mailing, mileage, and parking.  The Commission does not reimburse intervenors for routine commute costs such as mileage and parking.  We reduce CFC's direct expenses by $62.49 claimed for mileage and parking expenses.  Otherwise, CFC's direct expenses are reasonable and commensurate with the work performed.

### 6.4.  CFC's Award

As set forth in the table below[10], we award $48,656.78 to CFC:

| Decision | Representative | Hours | Hourly Rate | Compensation |
|----------|---------------|-------|-------------|--------------|
| D.06-08-028 | Wodtke | 71.9 | $300 | $ 21,570.00 |

[10] The table covers CFC's work in 2006 and a few months in 2007 years.

R.06-03-004  COM/MP1/jyc

| Metering Subgroup and CSI Handbook | Wodtke | 79.6 | $300 | $ 23,880.00 |
|---|---|---|---|---|
| Compensation Preparation | Wodtke | 20 | $150 | $ 3,000.00 |
| Direct Expenses | | | | $   206.78 |
| | | | TOTAL | $48,656.78 |

## 7.    CARE's Compensation Request

CARE claims it made a substantial contribution to several decisions in this rulemaking, as well as to the CSI Handbook.  We will address each decision separately below.

### 7.1.    Analysis of Substantial Contributions

#### 7.1.1.    Contributions to D.06-07-028

CARE claims it urged the Commission to implement a revision to the system size eligibility rules and the Commission relied on this in making a system size eligibility rule change in D.06-07-028.  SCE opposes CARE's request for compensation with regard to this order because it maintains the compensation filing was not filed with 60 days of a final order.  According to SCE, the CARE's filing is late because the order was issued in July 2006, it did not go to rehearing, and D.06-12-033 did not modify it.  CARE responds that its request is timely because D.06-12-033 sought to modify system size eligibility rules based on passage of SB 1.

We find CARE's request for compensation for D.06-07-028 is timely because the potential existed throughout 2006 that the Commission might modify D.06-07-028 due to passage of SB 1.  SB 1 contains language concerning the maximum system size that can receive incentives, and it was reasonable for CARE to assume that D.06-07-028 might be modified as the Commission conformed CSI to SB 1.  In the end, D.06-12-033 did not modify the prior system

R.06-03-004 COM/MP1/jyc

sizing decision, but CARE could not have known this until D.06-12-033 and rehearing of D.06-08-028 became final.

Turning to CARE's claim of substantial contribution, a review of its filings reveals CARE only filed comments after the proposed decision was mailed for comment. CARE's comments on the proposed decision urge removal of all system size limitations in the long term. We find CARE did not make a substantial contribution to D.06-07-028 because its proposal was not adopted by the Commission and its only pleading was filed after the proposed decision mailed urging an outcome beyond the scope of the decision. Therefore, we will reduce CARE's compensation request by $4,465 to remove all hours related to D.06-07-028.

### 7.1.2.   Contributions to D.06-08-028

CARE contends it contributed to this order by urging higher incentive levels for non-taxable entities, by advocating for advanced revenue grade metering for all solar installations receiving incentives, and by urging the Commission to avoid premature incentive reductions by levying a non-refundable application fee.

We find CARE made a substantial contribution to D.06-08-028 on the topic of incentive levels for non-taxable entities and with its comments on metering. CARE's positions were generally unique and not duplicated by other parties. However, CARE's comments provided other proposals on topics such as net metering and power purchase agreements that were not adopted by the Commission and not within the scope of the topics the Commission was considering in this order. We review CARE's hours claimed in Section 7.C below where we determine the reasonableness of hours claimed based on the level of contribution.

- 18 -

R.06-03-004 COM/MP1/jyc

### 7.1.3.  Contributions to CSI Handbook

CARE claims it contributed to development of the CSI Handbook through the process ordered in D.06-08-028. Specifically, CARE contends it advocated for a non-discrimination clause to be included in the Handbook and for panel permanency requirements to maximize the environmental benefits of CSI incentive dollars.

As discussed above with regard to CFC, the Commission may award compensation for intervenor participation in certain workshops if the work makes a substantial contribution to a final decision. We also noted that the nature of the workshop process makes it difficult to identify the unique role played by each participant. CARE filed comments regarding Handbook development and a review of those comments indicates CARE made a substantial contribution to the CSI Handbook on the issues of non-discrimination and panel permanency, and CARE should be compensated for its time contributing to development of the CSI Handbook. CARE also provided substantial contribution on issues including host site and warranty requirements, load estimation, and inspection requirements.

### 7.1.4.  Contributions to D.06-12-033

CARE claims it contributed to this decision by urging the Commission not to exempt new construction projects from PBI and to not pay CSI incentives to facilities that displace natural gas usage. In addition, CARE claims it contributed by pushing for installation of TOU meters in the CSI program, even before SB 1 mandated TOU tariffs.

We find CARE made a substantial contribution to D.06-12-033 through comments on the issues of TOU tariffs, PBI incentives, and whether to pay incentives to gas displacing facilities. Although the Commission did not adopt

- 19 -

R.06-03-004 COM/MP1/jyc

all of the positions in CARE's filings, its comments on these three topics provided useful information and analysis that assisted the Commission in its decision-making.  CARE's comments also covered issues such as power purchase agreements and low income financing which were outside the scope of this phase.  We address the reasonableness of the hours claimed in Section 7.3 below.

### 7.1.5.   Contributions to D.07-01-018

CARE submits that it made a substantial contribution to D.07-01-018 by providing comments and reply comments to the ALJ's ruling and comments to the proposed decision.  CARE states that it contributed to the decision by arguing that RECs may become a valued commodity in a new market and would benefit DG owners by providing an additional source of support.  CARE also states that it contributed to the discussion of net energy metering by arguing that net metering is not a subsidy and as such should not be considered in the calculation of REC ownership.

We find that CARE was active in the proceeding and made a substantial contribution by providing comments and proposals to the ALJ ruling on net metering and REC subsidy issues.  CARE provided a proposal to apportion RECs between the utilities and DG system owners based on the percentage of the installed DG system cost that ratepayers fund through subsidies.  CARE also advocated that allowing DG owners to retain their RECs would provide additional support to the DG market and could help fulfill the SB 1 goal of creating a self-sustaining renewable market.  Although the Commission did not adopt CARE's proposal for apportioning RECs, the Commission benefited from CARE's comments regarding the role RECs may play in DG system owners' decisions to invest in renewables if they are allowed to maintain their RECs.

- 20 -

R.06-03-004 COM/MP1/jyc

In its comments to the ALJ ruling, CARE noted that DG owners could capitalize on their RECs by participating in the emerging free market trading systems, and argued that this could spur solar installation in California by providing further incentives to DG owners to invest in solar. In determining that RECs should remain with DG owners, the Commission similarly concluded that RECs could provide a benefit to DG system owners and transferring RECs from DG system owners to ratepayers could adversely impact a DG system owner's decision to invest in solar. Therefore, CARE contributed to the development of the record, however, we address the reasonableness of the hours claimed in Section 7.3 below.

### 7.2.    Contributions of Other Parties

CARE contends it contributed in a manner that did not duplicate the work of other parties because it advocated for maximum reductions in energy consumption along with maximization of benefits to the environment. CARE's environmental perspective differed from most if not all other intervenors. In a proceeding with multiple parties, it is almost impossible to avoid some duplication. We find that CARE's work supplemented and complemented the work of other parties by adding an environmental perspective. Moreover, CARE's compensation claim indicates CARE staff spent several hours communicating with other parties on the issues. CARE used this opportunity to discuss its positions with other parties with similar views to minimize duplication.

R.06-03-004  COM/MP1/jyc

### 7.3.  Reasonableness of CARE's Requested

CARE requests $65,753.88[11] for its participation in this proceeding as

follows:

| | CARE Rep. | Hours | Hourly Rate ($/hour) | Compensation |
|---|---|---|---|---|
| D.06-07-028 | Harris | 19 | 235 | $4,465.00 |
| D.06-08-028 | Volker | 3 | 500 | $1,500.00 |
| | Harris | 36.9 | 235 | $8,671.50 |
| | Boyd | 17 | 150 | $2,550.00 |
| | Brown | 6.5 | 80 | $ 520.00 |
| | Anthony | 26 | 200 | $5,200.00 |
| Handbook | Boyd | 30.5 | 150 | $ 4,575.00 |
| | Brown | 11.5 | 80 | $ 920.00 |
| | Anthony | 15.5 | 200 | $ 3,100.00 |
| D.06-12-033 | Harris | 8.6 | 235 | $ 2,021.00 |
| | Boyd | 22 | 150 | $ 3,300.00 |
| | Brown | 14 | 80 | $ 1,120.00 |
| | Anthony | 23.5 | 200 | $ 4,700.00 |
| D.07-01-018 | Harris | 12.5 | 235 | $ 2,937.50 |
| | Roberts | 21 | 125 | $ 2,625.00[12] |
| | Boyd | 29 | 150 | $ 4,350.00 |
| | Brown | 21.5 | 80 | $ 1,720.00 |
| | Anthony | 24 | 200 | $ 4,800.00 |
| General | Harris | 17.3 | 235 | $ 4,065.50 |
| Compensation Preparation | Harris | 20.2 | 117.5 | $ 2,373.50[13] |

[11] This differs from the $66,178.88 requested in CARE's filing due to an error CARE
made in adding the hours of Boyd and Anthony for work on D.06-08-028 and the CSI
Handbook.  CARE's detailed time records indicate Boyd and Anthony spent 47.5 and
41.5 hours, respectively, on those two matters.  CARE's summary table erroneously lists
hours for Boyd and Anthony for 41 and 48 hours, respectively.  The net effect of this
error is CARE claimed an excess $325 in total compensation.

[12] This differs from the $2,725.00 requested in CARE's request due to an error CARE
made in calculating the compensation for Roberts.

R.06-03-004 COM/MP1/jyc

|  | CARE Rep. | Hours | Hourly Rate ($/hour) | Compensation |
|---|---|---|---|---|
| Expenses |  |  |  | $    239.88 |
|  |  |  | **TOTAL** | **$65,753.88**[14] |

In general, the components of this request must constitute reasonable fees and costs of the customer's preparation for and participation in a proceeding that resulted in a substantial contribution. The issues we consider to determine reasonableness are discussed below.

### 7.3.1.  Hours and Costs

CARE requests compensation for two attorneys, three advocates, and one law clerk. Many of the claimed hours are for internal discussions among these individuals and multiple reviews of CARE's filings. We do not find it reasonable to compensate CARE for excessive hours either in meetings with each other or reviewing each other's work. We find this process was unreasonably duplicative and believe it resulted in excessive hours given the level of CARE's contributions to this proceeding. Below, we discuss requested hours for each decision in more detail and our corresponding reductions. CARE is given notice that in future compensation requests, we will carefully review whether it is appropriate to compensate the work of multiple individuals for preparing one filing.

### D.06-08-028

CARE request compensation for five people and almost 90 hours of work on D.06-08-028 as follows:

---

[13] In its reply on April 24, 2007, CARE increased this amount to $5,580.73. This is discussed in Section 7.3.1 below.

[14] This differs from the $65,853.88 requested due to the error noted in previous footnote.

R.06-03-004  COM/MP1/jyc

| CARE Representative | Hours Claimed [1] |
|---|---|
| Boyd | 17.0 |
| Brown | 6.5 |
| Anthony | 26.0 |
| Volker | 3.0 |
| Harris | 36.9 |
| Total | 89.4 |

We have reviewed the record and find that this amount of hours is excessive given the showing by CARE in its filings on the issue areas where it made contributions.  A review of CARE's comments indicates a large portion of its filings pertained to issues not addressed in the order and where no contribution is found, such as net metering and power purchase agreements. Therefore, we will reduce CARE's hours claimed by 20% to reflect its level of contribution.

### CSI Handbook

CARE claims compensation for three representatives and 57.5 hours of work toward the development of the CSI Handbook in December of 2006, as follows:

| CARE Representative | Hours Claimed |
|---|---|
| Boyd | 30.5 |
| Brown | 11.5 |
| Anthony | 15.5 |
| Total | 57.5 |

We find this level of hours reasonable given the complexity of the CSI Handbook, the hours required to attend workshops and write comments, and the fact that CARE made contributions to the handbook with comments on several topics.

### D.06-12-033

R.06-03-004 COM/MP1/jyc

CARE claims compensation for four people and 68 hours of work as follows:

| CARE Representative | Hours Claimed |
|---|---|
| Boyd | 22.0 |
| Brown | 14.0 |
| Anthony | 23.5 |
| Harris | 8.6 |
| Total | 68.1 |

We have reviewed the record and find that this amount of hours is excessive given the showing by CARE in its filings on the issue areas where it made contributions. CARE's filings leading up to this decision contained proposals and analysis of issues outside the scope of issues taken up during this phase such as power purchase agreements and low income financing proposals. Therefore, we will reduce CARE's hours claimed by 20% to reflect its level of contribution toward D.06-12-033.

### D.07-01-018

CARE claims requests compensation for five people and 108 hours of work in this proceeding, as follows:

| CARE Representative | Hours Claimed |
|---|---|
| Boyd | 29.0 |
| Brown | 21.5 |
| Anthony | 24.0 |
| Roberts | 21.0 |
| Harris | 12.5 |
| Total | 108.0 |

We have reviewed the record and find the claimed hours are excessive for the level of CARE's contribution. CARE devoted a large part of its reply comments to merely summarizing other parties' comments without adding any specific analysis or discussion. CARE also provided comments to the proposed decision that contained unrelated discussions to the proposed decision. We find

R.06-03-004 COM/MP1/jyc

it is reasonable to reduce the hours CARE claims by 20% to reflect its level of contribution toward D.07-01-018.

### Compensation Request

CARE initially requested $2,373.50 in compensation for 20.2 hours of work preparing its compensation request. On April 24, 2007, CARE increased its request to $5,580.73 to account for 8.1 hours of work and additional expenses by its attorney Stephan Volker. We find this revised amount unreasonable and excessive. Earlier in this order, we reduced CFC's time preparing its compensation request to 20 hours, based on D.07-07-017. Similarly, we will not compensate CARE for more than 20 hours of time preparing its compensation filing. As noted in D.07-07-017, we expect greater efficiency in filing requests for compensation and we do not see why this rulemaking warrants additional time to prepare a request. This is also consistent with our previous reduction of CARE's compensation preparation expenses in D.07-04-022.

### 7.3.2.  Hourly Rates

As an overview, CARE's request for compensation fails to mention prior awards to Volker, Harris, Brown and Boyd. Instead, CARE states that the hourly rates it proposes are reasonable based on prevailing market rates for attorneys and experts of like experience. CARE provides a biographical statement for Volker, but no documentation for Harris, Brown and Boyd to support that these attorneys and experts have experience warranting compensation above the rates the Commission has previously awarded. We caution that by failing to recognize and report the hourly rates the Commission has adopted in the past, an intervenor risks sanction, particularly where rates sought are higher than the rates the Commission previously found to be reasonable. While D.07-01-009 authorizes an intervenor to seek an adjustment to hourly rates established for

- 26 -

R.06-03-004 COM/MP1/jyc

2007 beyond the authorized cost of living adjustment (COLA), such a request requires support. In CARE's reply filing, the support provided for an increase to Volker's rate is more comprehensive. If CARE seeks hourly rate increases in the future, it must provide support of this nature with its initial filing for all attorneys and advocates seeking an increase.

CARE requests the same hourly rates for its work in 2006 and 2007. Since the amount of work performed by CARE in 2007 is insignificant, we find it appropriate to apply 2006 hourly rates for work in 2007.

### Attorneys

CARE requests compensation for its attorney Stephan C. Volker at $500/hour based on his 32 years of experience as an attorney. In D.06-04-018, the Commission compensated Volker at $270/hour for work in 2004. That award was based on a prior compensation at a rate of $250/hour awarded in D.05-02-003 and D.03-01-058. SCE responds that Volker should receive a 3% COLA over 2004 rates, or $278/hour.[15]

CARE responds that Volker's rate is improperly frozen at $270/hour because Volker once did work, below his normal rate, as a favor to Sierra Club. CARE claims this rate is inequitable given that similarly experienced attorneys have been awarded compensation at much higher rates. CARE claims that it is a violation of Volker's due process rights that he was not given notice that a rate of $250/hour in that one proceeding would forever freeze his future compensation requests. Further, CARE notes that although CARE's petition for modification of

---

[15] In D.05-11-031, the Commission did not adopt any general hourly rate increases, or COLAs, from previously authorized rates for work performed in 2005. Thus rates in effect in 2004 were also generally applicable in 2005.

R.06-03-004 COM/MP1/jyc

Volker's rate was denied in D.06-06-025, that order left open the possibility of future consideration of a reasonable rate for Volker's work. CARE's filing indicates Volker has experience appearing before the Commission in several proceedings, dating back to 1993, as well as experience appearing before other administrative agencies and regulatory bodies including the Federal Energy Regulatory Commission and the State of California Water Resources Control Board.

In D.05-11-031, the Commission allowed intervenors to request an increase to their previously determined hourly rates if they could show additional experience since their last award or show that their last rate was below the range for intervenors with similar experience. If we escalate Volker's 2004 rate by 0% for 2005 (see D.05-11-031) and by a 3% COLA for 2006, then round to the nearest $5, Volker would receive $280/hour, the lower end of the range for attorneys with 13 or more years of experience. An examination of CARE's filing indicates Volker provided three hours of work on this proceeding, and all the work related to either editing the work of the other attorneys or engaging in "office conference with co-counsel." While we acknowledge Volker's years of experience at this Commission and other regulatory agencies, compensation at $280/hour is within the range for other attorneys of his experience. We will not grant Volker an increase for his work on this particular case because it primarily involved meeting with or editing the work of the other attorneys. In addition, we find the total hours claimed for CARE excessive for the work performed and we have noted problems with the compensation request, particularly with regard to poor documentation for hourly rates. We will compensate Volker at $280/hour for his work in 2006.

R.06-03-004 COM/MP1/jyc

CARE requests compensation for its attorney Joshua A. H. Harris, at
$235/hour. The Commission has previously awarded compensation to Harris at
$190/hour for work in 2004. We will escalate the 2004 rate by 0% for 2005 (see
D.05-11-031) and by 3% for 2006. The result is then rounded to the nearest $5.
Thus, we will compensate Harris at $195/hour for 2006. This is within the range
of $190-$225 for attorneys with three to four years of experience.

CARE requests compensation for its law clerk, Bridget Roberts at
$125/hour. The Commission has not previously established an hourly rate for
Roberts. While performing work for CARE in 2006, Roberts was a law student at
U.C. Davis School of Law, scheduled to graduate in Spring of 2007.
In D.06-04-018, the Commission allowed compensation for law clerks in the
range of $90 to $105 per hour, depending on the individual's year in law school.
We will compensate Roberts at $100/hour for work in 2006, because in that year,
she was between her second and third year in law school.

### Advocates and Consultants

CARE requests compensation for its President, Mike Boyd, at $150
per hour. CARE's timesheets attached to its request demonstrate that Boyd
drafted numerous pleadings in this proceeding. The Commission has previously
awarded compensation to Boyd as a community advocate at $100/hour for work
in 2004. (See D.06-04-018, p. 64.) In D.07-04-022, the Commission increased Boyd
to $125/hour for 2006 work. However, D.07-04-022 contained an error escalating
Boyd's rate and the correct rate for 2006 work should be $115. We correct that
error in this order. We will grant Boyd compensation at $115/hour for 2006,
consistent with D.07-04-022.

CARE requests compensation for its Vice President and community
representative, Lynne Brown, at $80 per hour. CARE's timesheets indicate

- 29 -

R.06-03-004 COM/MP1/jyc

Brown's activities were primarily limited to reviewing and correcting documents prepared by Boyd. The Commission has previously awarded compensation to Brown at $50/hour for work as a community advocate in 2004. (See D.06-04-018 at pp. 54, 65.) In D.07-04-022, the Commission increased Brown's rate to $100/hour for work in 2006. We will grant Brown compensation at $100/hour for 2006.

CARE requests an hourly rate of $200 for Juliette Anthony,[16] its renewable energy legislative and regulatory consultant. The Commission has not previously established an hourly rate for Anthony. The Commission has set a range of compensation for experts at $120-$180/hour for work in 2007.

CARE provides a biographical statement for Anthony which describes her as an environmental activist and indicates she has five years of experience as SPG Solar's representative to solar trade associations. The statement also claims Anthony has advocated for alternative energy since 1991 and has experience in other environmental advocacy work, such as work to ban MTBE and economic justice issues. The statement describes Anthony as a "fundraiser, volunteer and board member of a number of environmental groups." Prior to becoming an activist, Anthony held positions as Research Librarian at a number of libraries and universities. Anthony has an A.B. from Sweet Briar College, an M.A. from Brown, and an M.S. from Simmons Graduate School of Library Science.

From Anthony's biographical statement, we conclude she has experience as a regulatory and legislative advocate on solar and environmental issues. We are unable to conclude she qualifies as an expert in renewable energy or solar

---

[16] CARE's filing refers both to Juliette Arnold and Juliette Anthony. The ALJ has confirmed that CARE's consultant is Juliette Anthony.

R.06-03-004  COM/MP1/jyc

power because she does not have degrees in energy related fields, her publications do not pertain to renewable energy, and although she has worked for solar companies, her positions were advocacy oriented.  The biographical information leads us to conclude that we should compensate Anthony as a community activist or advocate rather than as an expert.  We will award Anthony compensation at a rate of $115/hour, on par with Boyd, because Anthony's biographical information shows many years of experience in environmental advocacy work.

### 7.3.3.  Productivity

The costs of a customer's participation should bear a reasonable relationship to the benefits realized through their participation.  This showing assists us in determining the overall reasonableness of the request.  CARE made a substantial contribution to this rulemaking on the issues of incentives levels and metering in D.06-08-028, on several CSI Handbook issues, and on TOU tariffs and the scope of incentives in D.06-12-033.  Although it is difficult to assign quantifiable benefits to CARE's participation, we find that CARE's participation in this proceeding was productive, and bears a reasonable relationship to the benefits that ratepayers should realize from the CSI and SGIP program.

### 7.3.4.  Direct Expenses

CARE submits itemized direct expenses of $239.88 for duplicating and Westlaw charges.  The cost breakdown included with the request shows these expenses to be commensurate with the work performed.  We find these costs reasonable.

### 7.4.  Award

CARE should receive compensation as follows:

R.06-03-004 COM/MP1/jyc

| Decision | CARE Rep. | Adjusted Hours | Hourly Rate | Compensation |
|----------|-----------|----------------|-------------|--------------|
| D.06-08-028 | Volker | 2.4 | $280 | $ 672.00 |
| | Harris | 29.5 | $195 | $5,752.50 |
| | Boyd | 13.6 | $115 | $1,564.00 |
| | Brown | 5.2 | $100 | $ 520.00 |
| | Anthony | 20.8 | $115 | $2,392.00 |
| Handbook | Boyd | 30.5 | $115 | $3,507.50 |
| | Brown | 11.5 | $100 | $1,150.00 |
| | Anthony | 15.5 | $115 | $1,782.50 |
| D.06-12-033 | Harris | 6.9 | $195 | $1,345.50 |
| | Boyd | 17.6 | $115 | $2,024.00 |
| | Brown | 11.2 | $100 | $1,120.00 |
| | Anthony | 18.8 | $115 | $2,162.00 |
| D.07-01-018 | Harris | 10 | $195 | $ 1,950.00 |
| | Roberts | 16.8 | $100 | $ 1,680.00 |
| | Boyd | 23.2 | $115 | $ 2,668.00 |
| | Brown | 17.2 | $100 | $ 1,720.00 |
| | Anthony | 19.2 | $115 | $ 2,208.00 |
| General | Harris | 17.3 | $195 | $ 3,373.50 |
| Compensation Preparation | Harris | 20.2 | $ 98 | $ 1,979.60 |
| Expenses | | | | $ 239.88 |
| | | | TOTAL | $39,810.98 |

## 8.  GPI's Compensation Request

GPI claims it made a substantial contribution to D.07-01-018.  No party opposed the request.

### 8.1.  Substantial Contribution

GPI submits that it made substantial contributions to D.07-01-018 by providing a PHC statement, a proposal on DG participation in the California Renewable Portfolio Standard (RPS), and comments to the proposed decision. GPI states it contributed to the decision by demonstrating that dividing the RECs

R.06-03-004 COM/MP1/jyc

from typical residential scale PV systems would not be worthwhile. GPI also asserts that it contributed to the decision by offering a proposal that would allow DG RECs to be counted towards the RPS obligation of a load-serving entity without automatically transferring the RECs to the utilities.

We find that GPI made a substantial contribution to D.07-01-018 even though GPI was not successful on every argument presented. GPI participated actively and contributed to D.07-01-018 by filing a PHC statement, comments and replies to the ALJ's questions regarding treatment of DG output for RPS purposes. The Commission benefited from GPI's analysis of the issues and GPI's participation in this portion of the proceeding.

GPI provided comments to the ALJ ruling of July 12, 2006, on subsidy and measurement issues for renewable DG facilities. GPI was among the parties who advocated against apportioning RECs between DG owners and the interconnected utility. In its comments, GPI provided data showing that residential scale DG produce only a few RECs per year. GPI argued that the transaction costs of metering, reporting, and participating in the Western Region Electricity Generation Information System, which only tracks whole RECs, would not be worthwhile for residential scale DG systems. In D.07-01-018, the Commission adopted GPI's position and determined that it should not apportion RECs between the ratepayers and the system owners because of the extensive work and the tracking and accounting issues that would be required. GPI's analysis assisted the Commission in this determination.

GPI also offered a proposal that would allow DG RECs to be counted towards the RPS obligation of the interconnected utility without automatically transferring the RECs from DG System owners to the utilities. Although the Commission determined that DG system owners should retain full ownership of

R.06-03-004  COM/MP1/jyc

the RECs produced by their generation, GPI's argument did result in more thorough consideration of the subsidy issue.  We find that GPI made a substantial contribution to D.07-01-018.

### 8.2.    Productivity

GPI submits that it has provided valuable information and insights to the proceeding, but D.07-01-0128 does not offer GPI the opportunity to identify specific monetary benefits to ratepayers.

We agree.  Although it is difficult to assign specific ratepayer savings to GPI's contribution to this portion of the proceeding, GPI's analysis assisted the Commission in determining that it should not apportion REC between the ratepayers and the system owners because doing so would require extensive work.  As a result, it benefited the ratepayers.

### 8.3.    Duplication

GPI states, to the extent possible, it avoided duplication and coordinated its efforts with other parties to minimize duplication where it was unavoidable. GPI was the only party that proposed a mechanism to allow accounting for DG energy towards the utilities' RPS obligation without transferring the DG RECs to the utilities.  We agree that GPI did not duplicate work by other parties in this area.  Although GPI's position on the issue of apportioning REC was similar to other parties, GPI provided more extensive data in its comments by providing information about residential scale PV RECs and took all reasonable steps to keep duplication of effort on the issue of apportioning REC to a minimum.

### 8.4.    Reasonableness of GPI's Requested Compensation

GPI requests $13,893.5 for its participation in this proceeding, as follows:

R.06-03-004 COM/MP1/jyc

| GPI's Work on Proceeding | | | | |
|---|---|---|---|---|
| **Attorney/Staff** | **Year** | **Hours** | **Hourly Rate** | **Total** |
| Gregory Morris | 2006 | 57 | $220 | $12,540.00 |
| Valerie Morris | 2006 | 6 | $ 31 | $    186.00 |
| Zoe Harold | 2006 | 6.5 | $ 31 | $    201.50[17] |
| **Subtotal:** | | | | **$12,927.50[18]** |
| Preparation of NOI and Compensation Request[19] | | | | |
| Attorney/Staff | Year | Hours | Hourly Rate | Total |
| Gregory Morris | 2007 | 7.5 | $110 | **!C15 Is Not In Table** |
| Subtotal Hourly Compensation: | | | | $25,855.00 |
| Expenses | | | | $    141.00 |
| **Total Requested Compensation** | | | | **$13,893.50[20]** |

### 8.4.1.   Hours and Costs Related to and Necessary for Substantial Contribution

GPI documented its claimed hours by presenting a daily breakdown of the hours of its staff, accompanied by a brief description of each activity. The hourly breakdown reasonably supports the claim for total hours.

### 8.4.2.   Hourly Rates

GPI seeks an hourly rate of $220 for Gregory Morris, for work performed in 2006 and $31 for its Research Associates, Valerie Morris and Zoe Harold. We previously approved an hourly rate of $220 for G. Morris in D.06-10-012, and adopt it here. D.06-10-012 adopted an hourly rate of $30 for GPI's research

---

[17] This differs from the $202.50 GPI requested due to an error made by GPI in calculating the requested amount for Harold.

[18] This differs from the $12,928.00 GPI requested due to the error noted in the previous footnote.

[19] Hourly rates are reduced 50% for preparation of the NOI and compensation request.

[20] This differs from the $13,894.00 GP requested due to the error noted above.

R.06-03-004 COM/MP1/jyc

associates for 2005 and D.07-01-009 authorized a 3% increase above 2005 rates for work performed in 2006. Thus, we adopt the requested $31 hourly rate for the GPI's Research Associates.

### 8.4.3. Direct Expenses

The itemized direct expenses submitted by GPI include the following:

| Printing & Photocopying | $ 24.36 |
|---|---|
| Postage & Delivery | $116.79 |
| **Total Expenses** | **$141.15** |

The cost breakdown included with the request shows the miscellaneous expenses to be commensurate with the work performed. We find these costs reasonable.

### 8.5. Award

We find GPI's compensation request to be reasonable and award GPI $13,894.

## 9. Interest on Awards

Consistent with previous Commission decisions, we order that interest be paid on the award amounts (at the rate earned on prime, three-month commercial paper as reported in Federal Reserve Statistical Release H.15) commencing on the 75th day after CARE, CFC, and GPI individually filed their compensation requests, and continuing until full payment of the award is made.

We direct Pacific Gas and Electric Company, San Diego Gas & Electric Company, Southern California Gas Company, and SCE to allocate payment responsibility among themselves based upon their California-jurisdictional gas and electric revenues for the 2006 calendar year, to reflect the year in which the proceeding was primarily litigated.

R.06-03-004 COM/MP1/jyc

We remind all intervenors that Commission staff may audit their records related to the award and that intervenors must make and retain adequate accounting and other documentation to support all claims for intervenor compensation. CARE's, CFC's, and GPI's records identify specific issues for which they have requested compensation, the actual time spent by each employee or consultant, the applicable hourly rate, fees paid to consultants, and any other costs for which compensation was claimed.

**10.    Comments on Proposed Decision**

The proposed decision of the Commissioner in this matter was mailed to the parties in accordance with Pub. Util. Code § 311 and Rule 14.3(a) of the Commission's Rules of Practice and Procedure.

CARE filed comments to the proposed decision on November 20, 2007. In its comments, CARE claims the decision errs on several points.

First, CARE claims it should be compensated for 8.1 hours of additional time spent preparing its reply to SCE's response to CARE's compensation request. While the proposed decision limited CARE to 20 hours for preparation of its compensation request, CARE maintains additional time was necessary to rebut SCE's arguments. We make no adjustment to the proposed decision because we consider a 20 hour limit reasonable, as discussed in the order.

Second, CARE argues it should be compensated for work on D.06-07-028 because it supported the proposed decision that became D.06-07-028 and provided examples of how the Commission's proposed decision would stimulate the solar market, in addition to providing an alternative viewpoint for future consideration. Although CARE supported the proposed decision in its comments, we do not find this rises to the level of a substantial contribution. Therefore, we will not compensate CARE for 19 hours of work in preparing

R.06-03-004 COM/MP1/jyc

comments on the proposed decision. There is no change to the order on this topic.

Third, CARE contends Anthony's rate should be at least $150 per hour. CARE has not justified a higher hourly rate for the work Anthony performed on its behalf in this proceeding. The proposed decision allowed compensation for Anthony at $105/hour, on par with Boyd. In its reply to the proposed decision, CARE supplemented Antony's biographical statement with information about Anthony's work as a consultant in 2006 and 2007 at the rate of $150/hour, and requested the same hourly rate for Anthony's work in this proceeding. We believe Anthony should be compensated at the same level as Boyd for the work she performed in this proceeding. CARE's compensation request indicates both Boyd and Anthony worked on preparing CARE's pleadings and wrote comments and replies on behalf of CARE. Nothing in CARE's request distinguishes Anthony's work as an expert deserving a higher hourly rate, or explains how it differed from Boyd's. We conclude that Anthony's work in this proceeding was similar to Boyd's and her compensation should also be comparable to Boyd's. We adjust Boyd's rate, as discussed below and make a similar adjustment to Anthony's rate.

Fourth, CARE claims Boyd's rate should be at least $125 per hour. The proposed decision compensates Boyd at a rate of $105/hour for 2006. CARE in its comments notes that in D.07-04-022, we adopted $125/hour for Boyd, and requests we apply the same rate for Boyd's work in this proceeding. In reviewing D.07-04-022, we find that we erred in calculating Boyd's 2006 rate in that order. In D.07-04-022, we explained how an intervenor's 2003 rate can be increased by 8% for 2004, 0% for 2005, and 3% for 2006. The decision also notes a reasonable minimum for experts of $110 for work in 2005. The decision errs by

R.06-03-004 COM/MP1/jyc

inflating $110 by 8% for 2005 even though it is a 2005 rate. Instead, Boyd's rate should have been $110 for 2005, then increased by 3% to $115 for work in 2006. We correct that error here and adopt a rate of $115 for Boyd's work in 2006.

Fifth, CARE comments that Brown's rate should be at least $100 per hour, applying the rate we adopted for Brown in D.07-04-022 for work in 2006. We have corrected this order to reflect Brown's rate of $100 per hour, as adopted in D.07-04-022.

Sixth, CARE comments that Volker's rate should reflect his market rate of at least $450 per hour. CARE claims the Commission has erroneously declared Volker's rate of $280 per hour a market rate, without proper notice to Mr. Volker. CARE claims the Commission relies on intervenor compensation rates set in resolution ALJ-184 and D.05-11-031, but the Commission failed to notify Volker before fixing his future rate in those decisions. Further, CARE argues the rate of $280 per hour for Volker is not within the market range of Bay Area attorneys with 33 years of experience. There is no adjustment to the proposed decision on this point. The decision considers an increase to Volker's rate, and denies an upward adjustment for Volker finding that the nature of Volker's 3 hours work on this particular case and other deficiencies in the compensation request do not warrant an adjustment above $280 per hour. Pursuant to D.05-11-031, CARE may request further review of Volker's rate in future claims, if it believes it is warranted.

Finally, we note that CARE's comments contained 13-pages of discussion and 25 pages of appendices, far beyond the 15-page limit set by Rule 14.3 of the Commission's Rules of Practice and Procedure (Rules) for opening comments on a proposed decision. CARE is on notice that in the future, it must meet the page

R.06-03-004  COM/MP1/jyc

limits set in our Rules.  To the extent CARE's future filings are in excess of the allowable limit, those pages will be stricken from its filings and not considered.

**11.    Assignment of Proceeding**

Michael R. Peevey is the assigned Commissioner, and Maryam Ebke and Dorothy Duda are the assigned ALJs in this proceeding.

**Findings of Fact**

1. CFC has satisfied all the procedural requirements necessary to claim compensation in this proceeding

2. CFC participated in metering subgroups and handbook meetings.

3. CFC made a substantial contribution to D.06-08-028 on the subjects of performance-based incentives, incentive adjustment mechanism, and monitoring and evaluation, the metering subgroup, and the CSI Handbook, as described herein.

4. CFC did not make a substantial contribution to D.06-08-028 on the subject of incentives for non-photovoltaic technologies, energy efficiency, and metering.

5. CFC requested hourly rates for its representative that, as adjusted herein, are reasonable when compared to the market rates for persons with similar training and experience.

6. CFC requested related expenses that are reasonable and commensurate with the work performed, except for clerical expenses, excessive hours for preparation of its compensation request, and expenses related to mileage and parking.

7. The total of CFC's reasonable compensation is $48,656.78.

8. CARE has satisfied all the procedural requirements necessary to claim compensation in this proceeding.

R.06-03-004  COM/MP1/jyc

9.  CARE made a substantial contribution to D.06-08-028, the CSI Handbook, D.06-12-033, and D.07-01-018 as described herein.

10.  CARE did not make a substantial contribution to D.06-07-028.

11.  CARE requested hourly rates for its representative that, as adjusted herein, are reasonable when compared to the market rates for persons with similar training and experience.

12.  Anthony's work was similar to Boyd's work in this proceeding.

13.  Many of CARE's claimed hours are for internal discussions among CARE representatives and multiple review of CARE's filings.

14.  The nature of Volker's work in this case, and other deficiencies in the compensation request, do not warrant an adjustment of Volker's rate above $280 per hour.

15.  CARE requested related expenses that are reasonable and commensurate with the work performed.

16.  The total of the reasonable compensation for CARE is $39,810.98

17.  GPI has satisfied all the procedural requirements necessary to claim compensation in this proceeding

18.  GPI made a substantial contribution to D.07-01-018 as described herein

19.  GPI requested hourly rates for its representatives that are reasonable when compared to the market rates for persons with similar training and experience.

20.  GPI requested related expenses that are reasonable and commensurate with the work performed.

21.  The total of the reasonable compensation for GPI is $13,893.50.

22.  The appendix to this opinion summarizes today's award.

R.06-03-004 COM/MP1/jyc

**Conclusions of Law**

1. 32800CFC should receive compensation for contributing to the metering subgroup and CSI handbook development.

2. CFC has fulfilled the requirements of §§ 1801-1812, which govern awards of intervenor compensation, and is entitled to intervenor compensation in the amount of $48,656.78 for its contributions to D.06-08-028 on the subjects of performance-based incentives, incentive adjustment mechanism, and monitoring and evaluation, the metering subgroup and the CSI Handbook.

3. CFC should not receive compensation for hours claimed for work on D.06-08-028 related to incentives for non-photovoltaic technologies, energy efficiency, and metering issues.

4. CARE has fulfilled the requirements of §§ 1801-1812, which govern awards of intervenor compensation, and is entitled to intervenor compensation in the amount of $39,810.98 for substantial contributions to D.06-08-028, the CSI Handbook, D.06-12-033, and D.07-01-018.

5. CARE should not receive compensation for hours claimed for D.06-07-028, because CARE did not make a substantial contribution to that decision.

6. CARE should not receive compensation for excessive hours spent either in meeting with each other or reviewing each other's work.

7. Anthony should receive the same hourly rate as Boyd in this proceeding.

8. GPI has fulfilled the requirements of §§ 1801-1812, which govern awards of intervenor compensation, and is entitled to intervenor compensation in the amount of $13,893.50 for its substantial contributions to D.07-01-018.

9. This order should be effective today so that CFC, CARE, and GPI may be compensated without further delay.

10. This proceeding should remain open.

R.06-03-004 COM/MP1/jyc

# O R D E R

**IT IS ORDERED** that:

1.  Consumer Federation of California (CFC) is awarded $48,656.78 as compensation for its substantial contribution to Decision (D.) 06-08-028, the metering subgroup and the California Solar Initiative (CSI) Handbook.

2.  Californians for Renewable Energy (CARE) is awarded $39,810.98 as compensation for its contribution to D.06-08-028, the CSI Handbook, D.06-12-033, and D.07-01-018.

3.  The Green Power Institute (GPI) is awarded $13,893.50 for its contribution to D.07-01-018.

4.  Within 30 days of the effective date of this decision, Pacific Gas and Electric Company (PG&E), San Diego Gas & Electric Company (SDG&E), Southern California Gas Company (SoCalGas), and Southern California Edison Company (SCE) shall pay CFC, CARE, and GPI their respective shares of the award. We direct PG&E, SDG&E, SoCalGas, and SCE to allocate payment responsibility among themselves, based on their California-jurisdictional gas and electric revenues for the 2006 calendar year, to reflect the year in which the proceeding was primarily litigated. Payment of the awards shall include interest at the rate earned on prime, three-month commercial paper as reported in Federal Reserve Statistical Release H.15, beginning on the 75th day after compensation requests were filed, as indicated below, and continuing until full payment of the award is made:

    a.  CFC's interest payments shall begin on July 10, 2007.

    b.  CARE's interest payments shall begin on May 26, 2007.

    c.  GPI's interest payments shall begin on June 2, 2007.

R.06-03-004  COM/MP1/jyc

5.   This proceeding shall remain open for further consideration of Phase II issues.

This order is effective today.

Dated December 6, 2007, at San Francisco, California.

MICHAEL R. PEEVEY
President
DIAN M. GRUENEICH
JOHN A. BOHN
RACHELLE B. CHONG
TIMOTHY ALAN SIMON
Commissioners

- 44 -

R.06-03-004  COM/MP1/jyc

# APPENDIX

## Compensation Decision Summary Information

| Compensation Decision: | D0712007 | | Modifies Decision?  No |
|---|---|---|---|
| Contribution Decision(s): | D0608028, D0612033, D0701018, California Solar Initiative Handbook, metering subgroup. | | |
| Proceeding(s): | R0603004 | | |
| Author: | ALJ Duda, ALJ Ebke | | |
| Payer(s): | Pacific Gas and Electric Company, San Diego Gas & Electric Company, Southern California Gas Company, and Southern California Edison Company | | |

### Intervenor Information

| Intervenor | Claim Date | Amount Requested | Amount Awarded | Multiplier? | Reason Change/Disallowance |
|---|---|---|---|---|---|
| Consumer Federation of California | 4/27/07 | $87,013.02 | $48,656.78 | No | -Failure to make substantial contribution<br>-Clerical time not compensable<br>-Failure to justify hourly rate<br>-Excessive hours for compensation preparation<br>-normal commute costs not compensable |
| Californians for Renewable Energy | 3/12/07 | $65,753.88 | $39,810.98 | No | -Failure to make substantial contribution<br>-Hours excessive given the level of contribution<br>-Failure to justify hourly rate<br>-Excessive hours for compensation preparation |
| The Green Power Institute | 3/19/07 | $13,893.50 | $13,893.50 | No | |

R.06-03-004 COM/MP1/jyc

## Advocate Information

| First Name | Last Name | Type | Intervenor | Hourly Fee Requested | Year Hourly Fee Requested | Hourly Fee Adopted |
|---|---|---|---|---|---|---|
| Alexis | Wodtke | Attorney | Consumer Federation of California | $350 | 2006 | $300.00 |
| Alexis | Wodtke | Attorney | Consumer Federation of California | $350 | 2007 | $300.00 |
| Alexis | Wodtke | Clerk | Consumer Federation of California | $75 | 2006 | $0 |
| Alexis | Wodtke | Clerk | Consumer Federation of California | $75 | 2007 | $0 |
| Gregory | Morris | Expert | The Green Power Institute | $220 | 2006 | $220.00 |
| Valerie | Morris | Analyst | The Green Power Institute | $31 | 2006 | $31.00 |
| Zoe | Harrold | Analyst | The Green Power Institute | $31 | 2006 | $31.00 |
| Stephan | Volker | Attorney | Californians for Renewable Energy | $500 | 2006 | $280.00 |
| Joshua A.H. | Harris | Attorney | Californians for Renewable Energy | $235 | 2006 | $195.00 |
| Mike | Boyd | Advocate | Californians for Renewable Energy | $150 | 2006 | $115.00 |
| Lynne | Brown | Advocate | Californians for Renewable Energy | $80 | 2006 | $100.00 |
| Juliette | Anthony | Advocate | Californians for Renewable Energy | $200 | 2006 | $115.00 |
| Bridget | Roberts | Law Clerk | Californians for Renewable Energy | $125 | 2006 | $100.00 |

**(END OF APPENDIX)**

STEPHAN C. VOLKER (CSB #63093)
JOSHUA A.H. HARRIS (CSB #226898)
LAW OFFICES OF STEPHAN C. VOLKER
436 – 14th Street, Suite 1300
Oakland, CA 94612
TEL:  (510) 496-0600
FAX:  (510) 496-1366

Attorney for Intervenors Friends of the Eel River and
California Sportfishing Protection Alliance

BEFORE THE PUBLIC UTILITIES COMMISSION
OF THE
STATE OF CALIFORNIA

| | |
|---|---|
| Application of Pacific Gas and Electric  )<br>Company to Value Hydroelectric Plants  )<br>and Related Assets Pursuant to Public  )<br>Utilities Code Sections 367(b) and 851  )<br>                                                      )<br>                                                      )<br>_____  ) | APPLICATION OF FRIENDS OF THE EEL RIVER<br>AND CALIFORNIA SPORTFISHING PROTECTION<br>ALLIANCE FOR REHEARING OF DECISION NO.<br>07-12-004<br><br>Application 99-09-053 |

## I. INTRODUCTION

Pursuant to Rule 16.1, Intervenors Friends of the Eel River and California Sportfishing

Protection Alliance ("Conservation Groups") hereby request a rehearing of D.07-12-004, the

Commission's final "Opinion Granting Intervenor Compensation to California Hydropower

Reform Coalition and to Friends of the Eel River and California Sportfishing Protection Alliance

for Substantial Contributions to Decision 07-04-011" filed December 7, 2007 (hereinafter

"Opinion"). Conservation Groups seek only a limited review of the Opinion, asking the

Commission to increase the hourly rates assigned to their lead counsel, Stephan C. Volker, to

reflect his market rates. As discussed more thoroughly below, the Commission's decision to

assign Mr. Volker rates lower than his market rates – despite a plethora of uncontradicted evidence in the record demonstrating his actual and much higher rates – violated the Public Utilities Code and is based on a fundamental violation of his and his clients' due process rights. The Commission's continued refusal to properly determine Mr. Volker's current, true market rate continues to hinder intervenor participation in important Commission proceedings by limiting Mr. Volker's clients ability to retain counsel on Commission matters.[1] Mr. Volker's rates, therefore, should be revised based on his market rates to at least $265 in 1999, $280 in 2000, $295 in 2001, and $450 in 2007.

In the Opinion, the Commission reduced Mr. Volker's requested hourly rates based on an hourly rate of $250 assigned to him several years ago in a different proceeding. D.07-12-004, p. 25. The basis of that previous hourly rate, however, was *not that Mr. Volker's market rate was then $250.* Rather, the basis was that Mr. Volker's client, the Sierra Club, had, on April 4, 2000 and prior to its retention of Mr. Volker, filed a Notice of Intent to Claim Compensation ("NOI") which capped its future counsel's hourly rate at $250. Therefore, notwithstanding that Mr. Volker's actual market rate in 2000 already exceeded $300, the Sierra Club only sought compensation at the rate stated in its NOI – $250. Thereafter, the Commission determined that all assigned rates for work done in 2002 and 2003 represented market rates and instituted a rate-freeze based on those previously assigned rates. ALJ-184, D.05-11-031, and D.07-01-009.

The Commission's proceedings capping of future fees based on prior fee awards were

---

[1] Intervenors have previously sought to correct the Commission's assignment of a non-market rate to Mr. Volker. Most notably, CAlifornians for Renewable Energy ("CARE") sought judicial review of the Commission's parallel rate determinations in D.06-04-018. *CAlifornians for Renewable Energy v. The Public Utilities Commission,* Court of Appeal, First Appellate District, Case No. A115703.

conducted. however. without notice to the parties that would be affected in the future.
Furthermore. the Commission arbitrarily assumed that past rates automatically represent market
rates for those past time periods.  Such an assumption does not take into account a myriad of
relevant factors and circumstances underlying past fee awards – factors and circumstances
demonstrating that all past fee rates *do not automatically reflect past market rates*.  For example.
here. Mr. Volker's past fee award was not based on market rates.  Instead. Mr. Volker adhered to
rates established in his client's NOI. which was filed prior to its selection of a lawyer for the
case.  Mr. Volker's fee in that previous case therefore does not reflect his market rate – in fact.
has nothing to do with his market rate – and. therefore. should not be used as a limiting factor on
all future fee awards.

Application of Public Utilities Code section 1806. which directs that "[t]he computation
of compensation awarded pursuant to Section 1806 shall take into consideration the market rates
paid for persons of comparable training and experience who offer similar services." requires that
Mr. Volker's time now be compensated at comparable market rates.  As previously documented
by Conservation Groups and Mr. Volker. market rates for Mr. Volker. an environmental lawyer
for more than 33 years. are at least \$265 in 1999. \$280 in 2000. \$295 in 2001. and \$450 in 2007.
The Commission's refusal to modify its award in this proceeding. therefore. violates the Public
Utilities Code.

Additionally. the Commission's reliance on the rate freezing mechanism violates Mr.
Volker's due process right because he was never given notice of the proceedings in which the
Commission determined that a non-market rate assigned in a past fee award would permanently
serve as the baseline for all future fee awards.  This lack of notice deprived Mr. Volker of the

ability to correct the Commission misapprehension that the prior fee award reflected a market rate for Mr. Volker. Thus, the Opinion improperly determined that Mr. Volker's should be compensated at the below-market rates instead of his market rates.

Accordingly, Conservation Groups respectfully apply to this Commission for a rehearing of the Opinion and ask that Mr. Volker's hourly rate be increased to at least $265 in 1999, $280 in 2000, $295 in 2001, and $450 in 2007.

## II. BACKGROUND

Conservation Groups filed their request for compensation on June 18, 2007.

On October 23, 2007, the Commission issued its proposed decision granting, in part, Conservation Groups' request.

On November 14, 2007, Conservation Groups filed comments on the proposed decision, asking for, among other requests, a reevaluation of Mr. Volker's assigned rate.

On December 7, 2007, the Commission issued the Opinion, in which the Commission responded positively to all of the Conservation Groups' requests, except for the request to reevaluate Mr. Volker's rate, which remained at below market rates..

In setting Mr. Volker's rates, the Opinion relied on a 2006 award of $270 for work performed in 2004. D.07-12-004 at 25. This 2004 rate was based, in turn, on a prior, non-market award of $250 for work done in 2000-2001. D.06-04-018. This 2000-2001 rate was awarded in A.99-12-025, wherein, *before* Mr. Volker's retention, Sierra Club had submitted an NOI "currently estimat[ing] that its [future] attorney will [provide services] . . . at a proposed hourly rate of $250/hour." Sierra Club NOI, A.99-12-025, April 4, 2000.

Following the first phase of A.99-12-025, by D.03-01-058 dated January 30, 2003, the

-3-

Commission awarded $46,990.96 for Mr. Volker's services in 2000 and 2001 based on the NOI's $250 rate. Importantly, D.03-01-058 noted that in previous litigation "*attorney Volker . . . has been awarded attorney's fees at the hourly rate of $300* based on his extensive experience in the field of environmental litigation." *Id.* at 9, ¶ 6, emphasis added.

Thereafter, by D.05-02-003, dated February 10, 2005, the Commission granted additional compensation for Mr. Volker's services in 2002-2003 based on the same non-market rate provided in the NOI. Neither the Sierra Club nor Mr. Volker represented, nor did the Commission find, that the market value of Mr. Volker's services was at that time only $250/hour. Rather, the Commission simply accepted the $250 rate provided in the NOI – a rate that Sierra Club had requested *prior to* Mr. Volker's involvement in the case. D.03-01-058 at 9, ¶ 6. The Commission, of course, gave Mr. Volker no indication that the non-market rate requested would *forever* saddle him with a vastly deflated pay range in all future Commission proceedings. *Id.*

Nonetheless, in a series of informal rate setting proceedings, the Commission subsequently decided, without notice to Mr. Volker or his clients, that all rates assigned to practitioners for work done in 2002 and 2003 should be deemed market rates and used as baselines to determine all future rates, adjusted only by slight cost of living increases. ALJ-184, D.05-11-031, and D.07-01-009. These decisions erroneously seized upon the rate of $250 per hour assigned to Mr. Volker in D.03-01-058 and D.05-02-033 and deemed it his market rate, despite the fact that the $250 figure was *not based on a market rate.*

Instead of correcting its error, the Commission here calculated Mr. Volker's rates based on the *non*-market rate erroneously established for him. Specifically, the Opinion states:

> D.03-01-058 and D.05-02-003 approve an hourly rate for Volker of $250 for work

done between 2000 and 2003 in other dockets. *We adopt the same rate* for Volker for work done in 2000 and 2001 in connection with this application, rather than the higher rates requested ($280 and $295, respectively). For 1999, no hourly rate has been established for Volker. Since litigation of this application did not begin until the last quarter of 1999, we allow the 2000 hourly rate for the limited number of hours Volker billed in 1999.

Following the guidance of prior Commission decisions, we set Volker's 2007 rate as follows. We escalate $270, the rate established for Volker for 2004, by 0% for 2005 (*see* D.05-11-031), and by 3% for 2006 and another 3% for 2007 (*see* D.07-01-009), each time rounding the sum to the nearest $5.00. The result is $290 and we approve this rate for Volker's work on this application in 2007. Because all of that work was related to preparation of the request, however, the 2007 award is calculated at one-half of $290, or $145.

D.07-12-004 at 25, emphasis added.

The Opinion's reduction of the rates requested for Mr. Volker was thus not based on his market rate. To the contrary, the rates assigned to Mr. Volker are *directly contradicted by the prior opinion's acknowledgment of Mr. Volker's higher market rate prior to 2000 of $300 hour.* Also, the Commission completely overlooked the undisputed evidence presented in the request for compensation and in the comments on the proposed decision that Mr. Volker's market rate is now at least $450 per hour, based on his 33 years' experience and numerous judicial fee awards including, as documented in the Exhibits to the comments, awards adjudicating his market rate at $450 in 2004 and $475 in 2005, and an expert's testimony confirming that $475 per hour was, in 2006, "at the low end of, the prevailing market rates in the San Francisco Bay Area for attorneys with experience and qualifications similar to Mr. Volker . . . ." Comments at 10 and Appendix 3 thereto at Exhibits A-C.

### III. ARGUMENT

The Opinion does not grant compensation for Mr. Volker's time at his market rates.

contrary to Public Utilities Code section 1806. Rather, the Opinion calculates his hourly rates starting with a *non*-market rate of $250 per hour estimated in an NOI filed in 2000 by the Sierra Club in A.99-12-025 before the Sierra Club's retention of Mr. Volker in that proceeding. The rate awarded to Mr. Volker in that proceeding was well below his adjudicated rate, a fact noted by the Commission in its award decision, as discussed above. This non-market rate was then erroneously declared his "market rate" when, without notice to Mr. Volker, the Commission in ALJ-184 and D.05-11-031 established benchmark rates for attorneys who had previously received Commission fee awards. The erroneous use of this non-market rate as a baseline for future awards violates Public Utilities Code section 1806 and the due process rights of Mr. Volker and his clients.

A.    **Stephan Volker's Rate Should Reflect his "Market Rate" as Required by Public Utilities Code Section 1806, Which Was at Least $265 in 1999, $280 in 2000, $295 in 2001, and $450 in 2007.**

The Opinion's failure to determine and award Mr. Volker's market rate is inconsistent with section 1806, which directs that "[t]he computation of compensation awarded pursuant to Section 1804 *shall* take into consideration the market rates paid to persons of comparable training and experience who offer similar services." *Id.*, emphasis added. The Opinion's selection of a *non*-market rate of $250 for Mr. Volker for 1999-2001 and $290 in 2007 in the face of undisputed evidence that his market rate was *at least* $265 in 1999, $280 in 2000, $295 in 2001, and $450 in 2007 is directly contrary to the statute.

Mr. Volker's market rate is established by this Commission's acknowledgment that Mr. Volker had received court-awarded fees at $300 per hour before 2002 (D.03-01-058 at 9, ¶ 6), and by Mr. Volker's Declaration that: he had "32 years' experience as a practicing

-6-

environmental lawyer in California." "[d]uring the past three decades [he has] actively participated. typically as the lead plaintiffs' attorney. in over 45 published cases in state and federal courts." he was "familiar with the market value of [his] services. based on declarations submitted by knowledgeable attorneys in numerous attorney fee motions in other proceedings." and that based thereon. currently "[t]he market value of [his] services is between $450 and $650 per hour." Request at 21-22 and Volker Biographical Statement.

Conservation Groups also submitted additional documentation of this rate. such as the San Francisco Superior Court's award of $450 per hour for all of Mr. Volker's time in 2004 successfully prosecuting an action against the California Coastal Commission for violating environmental laws. and the Marin Superior Court's award of $475 per hour for all of Mr. Volker's time in 2005 successfully prosecuting an environmental action against the City of Richmond. Comments at 10 and Appendix 3. Exhibits A and B thereto.

There is simply no evidence that Mr. Volker's market value was less than the rates sought for 1999 ($265). 2000 ($280) and 2001 ($295). or that it is less than $450 now. No party objected to the rates documented in the Request. nor presented evidence contrary to Mr. Volker's testimony and the extensive documentation in the Consrevation Groups' comments. Accordingly. consistent with section 1806. the Commission should correct Mr. Volker's rate to reflect the market rates paid to persons of comparable training and experience: at least $265 in 1999. $280 in 2000. $295 in 2001 and $450/hour in 2007.

**B.    The Commission Must Award Mr. Volker's Market Rate Consistent With the Due Process Rights of Mr. Volker and His Clients.**

The Opinion awarded Mr. Volker just $250/hour in 1999. 2000 and 2001 on the grounds

that the Commission had set $250 as his market rate in ALJ-184 and D.05-11-031, relying in turn

on the awards in D.03-01-058 and D.05-02-003, as discussed above. Neither ALJ-184 nor D.05-

11-031, however, afforded Mr. Volker any notice,[2] and neither actually considered any evidence

of his market rate. Rather, ALJ-184 and D.05-11-031 simply assumed, incorrectly, that rates

previously awarded attorneys in PUC proceedings were their market rates.[3] Although in some

cases this may have been true, it was not true for the rates awarded Mr. Volker in D.03-01-058

and D.05-02-003. In fact, the $250 non-market rate awarded Mr. Volker was so low that it

depressed the low range for attorneys of 13+ years experience *below* the low range for attorneys

with *less* (8-12 years) experience (D.05-11-131 at 11), a discrepancy the Commission admitted

was "anomalous" (*id.* at 17).

The Commission's purported but clearly erroneous determination of Mr. Volker's market

rate in proceedings of which Mr. Volker had no notice violates the Due Process Clauses of both

the California and the United States Constitution. As stated by the U.S. Supreme Court,

"[i]ngrained in our concept of due process is the requirement of notice . . . . Notice is required in

a myriad of situations where a penalty or forfeiture might be suffered for mere failure to act."

*Lambert v. People of the State of California* (1957) 355 U.S. 225, 228.

The procedural Due Process Clause of the California Constitution affords even broader

---

[2] The first proceeding, which resulted in ALJ 184, was based on an informal letter survey sent to "over 40 regular participants in [PUC] proceedings," of whom only 9 parties submitted comments. ALJ-184 at 1-2. Mr. Volker was not among those surveyed, nor did he receive notice of the survey. The second proceeding resulted from a rulemaking (R.04-10-010) instituted by the Commission. D.05-11-031. Only four regulated utilities and four frequent intervenors participated in this proceeding; Mr. Volker received no notice of this proceeding. D.05-11-032 at 23-24.

[3] ALJ-184 at 9-10; D.05-11-031 at 28.

protections than does that of the United States Constitution, and clearly forbids the unnoticed

rate-setting procedure utilized by the Commission here. As discussed in *Ryan v. California*

*Interscholastic Federation – San Diego Section* (2001) 94 Cal.App.4th 1048, 1069-1071.

> Our state due process constitutional analysis differs from that conducted pursuant
> to the federal due process clause in that the claimant need not establish a property
> or liberty interest as a prerequisite to invoking due process protection . . . .
> Focused rather on an individual's due process liberty interest to be free from
> arbitrary adjudicative procedures . . . ., procedural due process under the California
> Constitution is "much more inclusive" and protects a broader range of interests
> than under the federal Constitution . . . . According to our Supreme Court, it "has
> expanded upon the federal analytical base by focusing on the administrative
> process itself."

*Id.*, citations omitted.

Consistent with the foregoing principle, in *People v. Ramirez*, the California Supreme

Court held that application of California's Due Process Clause "must be determined in the

context of the individual's due process liberty interest in freedom from arbitrary adjudicative

procedures [and that] due process analysis must start not with a judicial attempt to decide

whether the statute has created an 'entitlement' that can be defined as 'liberty' or 'property,' but

with an assessment of what procedural protections are constitutionally required in light of the

governmental and private interests at stake." *Id.*, 25 Cal.3d at pages 263-264; *accord, In re*

*Jackson* (1987) 43 Cal.3d 501, 510; *Hernandez v. Department of Motor Vehicles* (1981) 30

Cal.3d 70, 81, fn. 12. The *Ramirez* Court explained that "the due process safeguards required for

protection of an individual's statutory interests must be analyzed in the context of the principle

that freedom from arbitrary adjudicative procedures is a substantive element of one's liberty." *Id.*

at 268.

Contrary to the foregoing and despite the fact that Mr. Volker's interests (and those of his

clients) in future fee awards would be clearly and adversely affected. the Commission failed to notify Mr. Volker before fixing his future rate based on an admittedly "anomalous" non-market award. D.05-11-031 at 17. ALJ-184 made no attempt to notify all counsel who had appeared in previous PUC proceedings. Instead. the ALJ merely "wrote to over 40 regular participants in [Commission] proceedings. including frequent intervenors and utilities from the various regulated industries [and] invited comments and suggestions to begin development of this annual process." ALJ-184 at 1. This notice to some PUC *insiders* did not warn other practitioners such as Mr. Volker that their future rates would be fixed indefinitely by the proceeding.

Thus. Mr. Volker. along with any other attorney not on this Commission's selective mailing list for the proceeding. was denied notice of the proceeding that converted *all* of the 2003 rates into "reasonable market rates" to be applied (with slight cost of living modifications) to *all* future fee awards. As such. this Commission carried out "arbitrary adjudicative procedures." denying Mr. Volker and others their right to "fair and unprejudicial decision-making." *Ryan. supra.* 94 Cal.App.4th at 1070-71. The Commission's overbroad attempt in ALJ-184 and D.05-11-031 to fix all future rates without notice to those affected denied Mr. Volker any opportunity to correct the Commission's mistaken reliance on non-market rates.

In sum. the attorney rate setting mechanism established in ALJ-184 and D.05-11-031 cannot be applied constitutionally to Mr. Volker. or to any other parties who were not afforded notice of these proceedings. Because Mr. Volker did not receive proper notice of the proceedings. he is not bound by the resulting decisions and his compensation here should be based on the undisputed record evidence that his market rate was at least $265 in 1999. $280 in 2000. $295 in 2001 and $450 in 2007.

-10-

## IV.  REQUEST FOR ORAL ARGUMENT

Pursuant to Rule 16.3, Conservation Groups hereby request oral argument on this matter because Conservation Groups' application for rehearing "presents legal issues of exceptional public importance." Rule 16.3(a)(3). The Commission's current rate setting mechanism unconstitutionally limits recovery by Conservation Groups and other similarly-situated intervenors. This imbalance creates an uneven playing field for participants in Commission proceedings and discourages, rather than encourages, public participation in the Commission's important decisionmaking processes. As such, oral argument is necessary to fully illuminate the important issues raised by this application.

In a parallel proceeding, CARE is filing a similar application for rehearing on Mr. Volker's hourly rate. For purposes of efficiency, Conservation Groups request that their application be heard at the same time as the application of CARE.

## V.  CONCLUSION

Conservation Groups seek an adjustment in their attorney's rate not only to bring parity with other intervenors to the present fee award, but also, and more importantly, to ensure that future participation in Commission proceedings will not be hindered by the current disparity in attorney fee awards.

Dated:  December 17, 2007            Respectfully submitted.

By:    _____

STEPHAN C. VOLKER
Attorney for Intervenors Friends of the Eel River
and California Sportfishing Protection Alliance

-11-

## DECLARATION OF COUNSEL

I, Stephan C. Volker, hereby declare:

1.      I am counsel for intervenor Conservation Groups and have personal knowledge of the following matters.

2.      Annexed as Exhibit 1 hereto is my Biographical Statement. I am requesting a rate of at least $450 per hour for work done in 2007 based on my three decades of experience in environmental and regulatory litigation. Prior awards in the PUC have not reflected my market rate, as defined in the Public Utilities Code, and therefore I ask that the Commission reevaluate my assigned rate based on my experience, as documented below.

3.      I have 33 years' experience as a practicing environmental lawyer in California, and have been awarded attorney's fees by state and federal courts and the CPUC on numerous occasions. I have extensive experience in the field of environmental litigation. During the past three decades I actively participated, typically as the lead plaintiffs' attorney, in over 45 published cases in state and federal courts in California, Washington, Alaska, Montana, and Arkansas. My most recent appellate victory, *Vineyard Area Citizens for Responsible Growth v. City of Rancho Cordova* (2007) 40 Cal.4th 412, is a landmark ruling under the California Environmental Quality Act.

4.      In October 2005 I received a judicial award of fees in *Sierra Club v. Coastal Commission, et al.*, San Francisco Superior Court Case No. CPF 03-503433, wherein the Court found that my "reasonable hourly rate" was $450 / hour for work done in 2004. Exhibit 2 hereto at 2:17. In September 2006 I received a judicial award of fees in *Citizens for the Eastshore State Park v. City of Richmond, et al.*, Marin County Superior Court Case No. CV 052241, wherein the

-12-

Court found that my "reasonable hourly rate[] of compensation" was $475 / hour for work done in 2005. Exhibit 3 hereto at 3:19. Based on those awards and the documentation provided for them, and my 33 years' experience in prosecuting fee awards. I believe that my market rate is between $450 and $650 per hour.

5.      As an example of my recognized expertise in environmental law, in 2007 I was selected by the California State Bar Association's Environmental Law Section to give presentations on recent developments in CEQA caselaw at the Section's annual Environmental Law Conference in Yosemite. I was also selected by Continuing Legal Education International to give a presentation on CEQA at its annual seminars for environmental law practitioners in Los Angeles and Sacramento last August and September.

6.      In addition. I have significant pertinent Commission experience, as summarized in the following table:

| Cause | Client | Case No. |
|---|---|---|
| Rulemaking on Commission's own motion to provide for mitigation of local rail safety hazards within California | Friends of the River, et al. | R.93-10-002 |
| Application of Pacific Gas and Electric Company for authorization to sell the El Dorado Hydroelectric Project to El Dorado Irrigation District Pursuant to Public Utilities Code §851 | League to Save Sierra Lakes, et al. | A.98-04-016 |
| Application of Pacific Gas and Electric Company to Report Assessments of Inventory Balances and to Address Appraisal | Friends of the Eel River, et al. | A.98-05-022 |

-13-

| Cause | Client | Case No. |
|-------|--------|----------|
| Application of Pacific Gas and Electric Company to Value Hydroelectric Plants and Related Assets Pursuant to Public Utilities Code Sections 367(b) and 851 | Friends of the Eel River, et al. | A.99-09-053 |
| Application of Valencia Water Company (U34-W) seeking approval of its updated Water Management Program as ordered in Commission Resolution W-4154 dated August 5, 1999 | Angeles Chapter Sierra Club, et al. | A.99-12-025 |
| Application for a Certificate of Public Convenience and Necessity Authorizing the Construction of the Jefferson-Martin 230 kV Transmission Project | Californians for Renewable Energy | A.02-09-043 |
| Rulemaking Regarding Policies, Procedures, and Rules for the California Solar Initiative, etc. | Californians for Renewable Energy | R.06-03-004 |
| Carol Dominguez v. PG&E | Californians for Renewable Energy | C.07-03-006 |

7.    I have also participated in numerous administrative proceedings before other state,

local and federal regulatory bodies bearing some similarities to the PUC for decades, including

the following illustrative proceedings during the past 15 years:

| Cause | Agency and Years | Case No. |
|-------|------------------|----------|
| Marine Environmental Consortium v. Washington Department of Ecology | Washington Pollution Control Hearings Board 1990-1992 | In re NPDES Permit Nos. WA-004037-1, et al. |
| The Wilderness Society v. Hastey | U.S. Interior Board of Land Appeals 1992-1994 | IBLA 92-537 |
| North Cascades Conservation Council and Washington Environmental Council v. Chelan County Board of Adjustment, et al. | State of Washington Shorelines Hearings Board 1994-1999 | SHB No. 93-9 |

| Cause | Agency and Years | Case No. |
|---|---|---|
| North Cascades Conservation Council and Washington Environmental Council v. Chelan County Board of Commissions | Eastern Washington Growth Planning Hearings Board, State of Washington 1994-1999 | GPHB No. 93-1-0001 |
| Friends of the Navarro Watershed, et al. v. Unnamed Illegal Diverters of Water from Navarro River, etc., et al. | State of California Water Resources Control Board 1994-2000 | Water Rights Applications 29711, etc. |
| The Wilderness Society v. Regional Forester G. Lynn Sprague | U.S. Department of Agriculture, Chief, U.S. Forest Service 1995-2003 | Appeal No. 95-13-00-0035-A217 |
| Marine Environmental Consortium, et al., v. State of Washington Department of Ecology, et al. | State of Washington Pollution Control Hearings Board 1996-1999 | PCHB Nos. 96-257, et al. (applications for NPDES permits for salmon net-pen waste discharge permits) |
| League to Save Sierra Lakes, et al., v. El Dorado County Water Agency | State of California Water Resources Control Board 1996-2001 | Water Appropriation App. Nos. 29919-29922 and Petition for State-Filed App. No. 5645 |
| Friends of the Eel River, et al., v. Pacific Gas & Electric Company | Federal Energy Regulatory Commission 1996-2006 | Application for License Amendment for Hydroelectric Project 77-110 on the Eel River, California |
| Alpine County, et al., v. Pacific Gas & Electric Company and El Dorado Irrigation District | Federal Energy Regulatory Commission 1997-1999 | Application to Amend Hydropower License for Project No. 184 for Construction of a Dam and Canal on the South Fork American River, California |

| Cause₁ | Agency and Years | Case No. |
|---|---|---|
| Save Medicine Lake Coalition v. Calpine | Siskiyou County Air Pollution Control District Board of Directors 1999 | Application for Authority to construct geothermal facilities in the Medicine Lake Basin |
| California Sportfishing Protection Alliance, et al. v. Sonoma County Water Agency | State of California Water Resources Control Board 2000-2007 | Application Nos. 12919A, et al. to Add Points of Diversion and Rediversion to Water Rights Permits 12947A, et al. |
| Friends of the Eel River, et al., v. Pacific Gas & Electric Company, et al. | Federal Energy Regulatory Commission 2001-2007 | Docket No. ER02-455-000, et al., Docket No. CP 02-39-000 et al., and Project Nos. 77-1116, et al. Regarding Relicensing Applications on PG&E Hydroelectric Facilities Throughout California |
| Voices for Rural Living v. Shingle Springs Band of Miwok Indians | Interior Board of Indian Appeals 2006-2007 | IBIA 07-034-A |

8.    I have recovered dozens of attorney fee awards under state and federal fee-shifting statutes from state and federal courts and administrative agencies over the past 33 years, aggregating several million dollars in recoveries. In these cases (save those before the California Public Utilities Commission to date) my recovery was usually based on my market rate in the relevant legal community. Based on my experience documenting the market value of my services in these cases, I am familiar with my market rate.

9.    As documented above, my current market rate is between $450 and $650. An additional illustrative declaration documenting this fact is the Declaration of Michael Traynor in Support of Petitioner's Motion for Attorneys' Fees and Litigation Costs filed in April 2006 in

-16-

Marin Superior Court in which Mr. Traynor attests that $450 per hour is "within, albeit at the low end of, the prevailing market rates in the San Francisco Bay Area for attorneys with experience and qualifications similar to Mr. Volker." Exhibit 4 hereto at 4:1-3.

I declare under penalty of perjury that the foregoing facts are true of my personal knowledge, that I am competent to and if called would so testify, and that this declaration was executed on December 17, 2007, in Oakland, California.

STEPHAN C. VOLKER

# EXHIBIT 1

STEPHAN C. VOLKER
JOSHUA A. H. HARRIS
BRIDGET A. ROBERTS
CAITLIN S. SISLIN

Law Offices of

**STEPHAN C. VOLKER**

436 14th Street, Suite 1300
Oakland, California 94612-2717
Phone 510/496-0600 ❖ Fax 510/496-1366
E-MAIL: svolker@volkerlaw.com

File No. 100.027

### STEPHAN C. VOLKER

**Biographical Statement**
**December 2007**

Stephan C. Volker is proprietor of the Law Offices of Stephan C. Volker in Oakland, California. A 1974 graduate of Martin Luther King School of Law at the University of California at Davis, Mr. Volker is a member of the state and federal bars of California and Alaska and the United States Supreme Court bar.

Mr. Volker has litigated over 250 land use, water rights, forest management, endangered species, clean water, oil and gas, mining, agricultural preservation, river protection, and other environmental cases from Alaska to California since 1974. He has been the principal attorney in numerous that have protected wilderness and wilderness candidate areas in Alaska, Montana, and California, including critical grizzly and wolf habitat in Montana's Rocky Mountain Front and Alaska's Chilkat River Valley. He has secured injunctions against logging along the Wild and Scenic Trinity, Salmon, and Eel Rivers in California, removal of an ancient grove of oak trees on the campus of the University of California at Berkeley, operation of a hazardous biowarfare lab at the Lawrence Livermore National Laboratory, damming of the Dry Creek fork of the Russian River, residential development on the slopes of the Sierra Buttes, and human harassment of killer whales. He has forced numerous industrial polluters to pay for their illegal pollution, and secured the largest civil penalty ever awarded under the citizen suit provisions of the Clean Water Act, against Union Oil Company, for pollution of San Francisco Bay.

Mr. Volker has successfully prosecuted numerous cases to protect agricultural land and wildlife habitat from urban sprawl under California's Environmental Quality Act ("CEQA"), Agricultural Land Preservation Act and Planning and Zoning laws; Washington's Growth Management Act and Shoreline Management Act; and other environmental laws. Most recently, he won a landmark decision from the California Supreme Court under CEQA requiring environmental impact reports to assure adequate water supplies and full disclosure of potential adverse impacts on rivers and wildlife.

Mr. Volker has also successfully defended the Tahoe Regional Planning Agency's and Marin County's jetski ordinances, protected Lake Tahoe from harmful marina developments and prevented unplanned urban development of the Lakes Basin near the Sierra Buttes. He protected Joshua Tree National Park from development of what would have been the world's largest landfill dump and the Marin Headlands from what would have been Marin County's largest hotel. He prevented urban development of the Honey Springs Ranch near Jamul, an area now set aside as a wildlife preserve. He secured a substantial monetary settlement to redress oil pollution of wetlands adjacent to Suisun Bay. He won a landmark appellate ruling under the Urban Water Management Planning Act requiring urban water agencies to fully address contamination of groundwater supplies, and two precedent-setting rulings from the federal circuit court of appeals upholding the standing of cities to bring suits to protect environmental quality.

Mr. Volker's litigation has also led to the recent promulgation by EPA of urgently needed water quality standards for the San Francisco Bay/Sacramento-San Joaquin River Delta ecosystem, preparation of comprehensive management plans to protect the six Wild and Scenic Rivers within the Ozark National Forest, development of a comprehensive management plan for the North Cascades National Park and Lake Chelan National Recreation Area, protection of Puget Sound waters from salmon farm pollution, prevention of new water diversions that would dewater the Russian, Eel and South Fork American rivers and several High Sierra lakes, protection of the Smith Flat Valley near Placerville from premature urban sprawl, comprehensive revision of the General Plans of El Dorado and Riverside Counties, adoption of an Urban Water Management Plan by Sonoma County, and protection of San Francisco Bay's Point Molate and El Dorado County's Shingle Springs area from development of major Indian casino resorts..

Mr. Volker's current docket includes litigation to prevent dewatering of the Russian and Santa Clara Rivers and overdrafting of their adjacent groundwater, protect the meadows and forests on the U.C. Santa Cruz campus from urban development, protect the Medicine Lake Highlands near Mt. Shasta from geothermal development, defend the Cosumnes River and adjacent aquifers against dewatering due to excessive pumping, and protect Yosemite National Park and the mountain hamlet of Wawona from a major resort development.

From 1974 to 1977 Mr. Volker engaged in private practice in Southern California, where he represented citizens' groups, cities, and school districts in plaintiff's environmental and land use litigation, and drafted growth control initiatives for several cities. In 1977 Mr. Volker was named Director of the Sierra Club Legal Defense Fund's newly established Alaska office. From 1977 to 1980 he prosecuted environmental cases in state and federal courts in Alaska, involving forestry, mining and other public land law issues. From 1980 to 1998 Mr. Volker handled a variety of environmental and land use cases in state and federal courts in several western states from the Sierra Club (now Earthjustice) Legal Defense Fund's San Francisco, California home office. Since returning to private practice in 1998, Mr. Volker has continued to represent conservation organizations, community groups and public agencies in environmental litigation throughout the west. Mr. Volker is a recognized expert in several specialized fields of environmental law including water rights, water pollution, forest practices, land use planning, environmental review and agricultural land preservation. His docket has included the following published cases:

❖ *Massachusetts v. Environmental Protection Agency*, __ U.S. __, 127 S.Ct. 1438 (Clean Air Act – 2007)

❖ *Vineyard Area Citizens for Responsible Growth v. City of Rancho Cordova*, 40 Cal.4th 412 (California Environmental Quality Act – 2007)

❖ *Pit River Tribe v. U.S. Forest Service*, 469 F.3d 768 (National Environmental Policy Act, Energy Policy Act of 2005, National Historic Preservation Act – 9th Cir. 2006)

❖ *Save Our Neighborhood v. Lishman*, 140 Cal.App.4th 1288 (California Environmental Quality Act – 2006)

❖ *State Water Resources Control Board Cases*, 136 Cal.App.4th 674 (California Water Quality Laws – 2006)

❖ *County of El Dorado and Voices for Rural Living v. California Department of Transportation*, 133 Cal.App.4th 1376 (California Environmental Quality Act – 2005) (depublished)

❖ *City of Sausalito v. O'Neill*, 386 F.3d 1186 (Standing, Marine Mammal Protection Act, Coastal Zone Management Act – 9th Cir. 2004)

❖ *Save Our Sunol v Mission Valley Rock Co.*, 124 Cal.App.4th 276 (Growth Control Initiative – 2004)

❖ *Friends of the Santa Clara River v. Castaic Lake Water Agency*, 123 Cal.App.4th 1 (Urban Water Management Planning Act – 2004)

❖ *City of Morgan Hill v. Bay Area Air Quality Management Dist.*, 118 Cal.App.4th 861 (California Environmental Quality Act – 2004)

❖ *Santa Teresa Citizen Action Group v. City of San Jose*, 114 Cal.App.4th 689 (California Environmental Quality Act – 2003)

❖ *City of Martinez v. Texaco*, 353 F.3d 758 (Standing, Common Law and Statutory Remedies for Oil Pollution – 2003)

❖ *Friends of the Eel River v. Sonoma County Water Agency*, 108 Cal.App.4th 859 (California Environmental Quality Act and Planning and Zoning Law – 2003)

❖ *Santa Teresa Citizen Action Group v. State Energy Resources Conservation and Development Com.*, 105 Cal.App.4th 1441 (Energy Commission Act, Due Process Clauses and Separation of Power Doctrines of U.S. and California Constitutions – 2003)

❖ *Personal Watercraft Coalition v. Marin County Board of Supervisors*, 100 Cal.App.4th 129 (Due Process and Commerce Clauses of U.S. and California Constitutions, Federal Boat Safety Act, Clean Air Act - 2002)

❖ *County of Amador v. El Dorado County Water Agency*, 76 Cal.App.4th 931 (California Environmental Quality Act – 1999)

❖ *Lake Tahoe Watercraft Recreation Ass'n. v. Tahoe Regional Planning Agency*, 24 F.Supp.2d 1062 (Tahoe Regional Planning Agency Compact - E.D. Calif. 1998)

❖ *Sierra Club v. United States*, 23 F.Supp.2d 1132 (Wild and Scenic Rivers Act - N.D. Calif. 1998)

❖ *Newton County Wildlife Ass'n v. Rogers*, 113 F.3d 110 (Wild and Scenic Rivers Act - 8th Cir. 1997)

❖ *Newton County Wildlife Ass'n v. Rogers*, 948 F.Supp. 50 (Administrative Procedure Act - E.D. Ark. 1996)

❖ *Communities for a Better Environment v. Union Oil Co. of California*, 83 F.3d 1111 (Clean Water Act - 9th Cir. 1996)

❖ *North Cascades Conservation Council v. Chelan County*, EWGPHB No. 94-1-0015 (Washington Growth Management Act - 1994)

❖ *Bob Marshall Alliance v. Lujan*, 804 F.Supp. 1292 (National Environmental Policy Act, Endangered Species Act - D.Mont. 1992)

❖ *Garat v. City of Riverside*, 2 Cal.App.4th 259 (growth control initiative - 1991)

❖ *Lesher v. City of Walnut Creek*, 52 Cal.3d 531 (growth control initiative - 1990)

❖ *The Wilderness Society v. Tyrrel*, 918 F.2d 813 (Wild and Scenic Rivers Act - 9th Cir. 1990)

❖ *Sierra Club v. Union Oil Co. of California*, 716 F.Supp. 429 (Clean Water Act - N.D. Cal. 1989)

❖ *Bob Marshall Alliance v. Hodel*, 852 F.2d 1223, (National Environmental Policy Act, Endangered Species Act - 9th Cir. 1988)

◇ *Sierra Club v. Union Oil Co. of California*, 853 F.2d 667 (Clean Water Act - 9th Cir. 1988)

◇ *The Wilderness Society v. Tyrrel*, 701 F.Supp. 1473 (Wild and Scenic Rivers Act - E.D. Cal. 1988)

◇ *Sierra Club v. Union Oil Co. of California*, 19 E.L.R. 20362, 28 E.R.C. 1835 (Clean Water Act - N.D. Cal. 1988)

◇ *Greenpeace v. Evans*, 688 F.Supp. 579, 17 E.L.R. 21207 (National Environmental Policy Act, Marine Mammal Protection Act - W.D. Wash. 1987)

◇ *Sierra Club v. Union Oil Co. of California*, 813 F.2d 1480 (Clean Water Act - 9th Cir. 1987);

◇ *Friends of Westwood v. City of Los Angeles*, 191 Cal.App.3d 259 (California Environmental Quality Act - 1987)

◇ *Bob Marshall Alliance v. Watt*, 685 F.Supp. 1514 (National Environmental Policy Act, Endangered Species Act - D. Mont. 1986)

◇ *Lewis v. Hayward*, 177 Cal.App.3d 103 [222 Cal.Rptr. 781] (Agricultural Land Preservation Act - 1986)

◇ *Sierra Club v. Union Oil Co. of California*, 22 E.R.C. 1342 (Clean Water Act - N.D. Cal. 1985)

◇ *Sierra Club v. Tosco Corporation*, 22 E.R.C. 2117 (Clean Water Act - N.D. Cal. 1984)

◇ *Honey Springs Homeowners Ass'n v. County of San Diego*, 157 Cal.App.3d 1122 [203 Cal.Rptr. 886] (Agricultural Land Preservation Act - 1984)

◇ *Southeast Alaska Conservation Council v. Watson*, 697 F.2d 1305 (Alaska National Interest Lands Act - 9th Cir. 1983)

◇ *Southeast Alaska Conservation Council v. Alaska*, 655 P.2d 544, 19 E.R.C. 1098 (Alaska Constitution, and forestry and planning statutes - 1983).

◇ *Humboldt County v. Bureau of Land Management*, 684 F.2d 1276 (R.S. 2477 (public lands easements) - 9th Cir. 1982)

◇ *PLAN for Arcadia v. Arcadia City Council*, 42 Cal.App.3d 712 (California Environmental Quality Act - 1974)

Mr. Volker's recent accomplishments include:

◇ a California Supreme Court ruling requiring cities and counties to assure adequate water supplies to new developments and to fully disclose their adverse impacts on fish and wildlife

◇ an appellate court ruling overturning the Department of Energy's approval of a hazardous biowarfare defense lab at Lawrence Berkeley National Laboratory

◇ an injunction preventing removal of a grove of ancient oak trees at the U.C. Berkeley Campus

◇ the first appellate court ruling enforcing the Urban Water Management Planning Act and requiring urban water agencies to remediate groundwater contamination

◇ two landmark appellate rulings recognizing the standing of cities to bring lawsuits to protect the environment

◇ a ruling overturning the federal government's approval of what would have been the world's largest landfill dump near Joshua Tree National Park

◇ an appellate court ruling overturning the California Department of Transportation's approval of a freeway interchange for a major casino development

-4-

- a settlement preventing construction of a major casino at Point Molate, California before required environmental studies are conducted
- an appellate court ruling overturning the State Water Resources Control Board's order allowing excessive diversions of water from the San Joaquin River and Delta
- an appellate court ruling overturning the National Park Service's approval of what would have been Marin County's largest hotel within the Golden Gate National Recreation Area
- an appellate court ruling holding that a water development project EIR must address potential impacts on other affected watersheds
- the first appellate court ruling in the nation upholding the validity of a county jetski ordinance against constitutional and federal preemption challenges
- the first appellate court ruling in the nation holding that federally licensed dams that store water for consumptive use are subject to state environmental regulation
- a ruling barring water development projects in California that are not consistent with valid local general plans
- an injunction prohibiting residential development on the slopes of the Sierra Buttes
- a ruling upholding the validity of the jetski ordinance adopted by the Tahoe Regional Planning Agency
- a ruling overturning the El Dorado County General Plan because of its failure to address low growth alternatives and watershed impacts of urban growth
- a settlement forbidding high density residential development within Yosemite National Park's historic community of Wawona
- an injunction requiring the United States Forest Service to adopt comprehensive management plans encompassing the entire watersheds of Wild and Scenic Rivers
- a consent decree against EPA requiring adoption of water quality standards for the San Francisco Bay Delta Estuary
- a settlement requiring reinstatement of a whistleblower demoted by the California Department of Fish and Game because he had reported criminal pollution improperly authorized by his supervisor
- settlement of a case against Southern Pacific Transportation Company over its toxic spill of metam sodium into the Upper Sacramento River establishing a Railroad Monitor and appointing a representative of the conservation community to participate in overseeing implementation of a forty million dollar restoration fund
- settlement of a case against Riverside County, California requiring substantial revision of its general plan to protect open space, riparian corridors and wildlife habitat
- an order from the Eastern Washington Growth Management Hearings Board invalidating Chelan County, Washington's growth management ordinances as insufficient to protect agricultural resources, riparian corridors and wildlife habitat
- an injunction requiring removal of a large private bulkhead on the Stehekin River within the Lake Chelan National Recreation Area
- an order of the Washington Pollution Control Hearings Board vacating a waste discharge permit issued for a complex of salmon net pens proposed to be constructed in the mouth of the Skagit River

-5-

- ❖ an order from the California State Water Resources Control Board disapproving a proposal to divert water from three High Sierra lakes and the South Fork American River to promote urban sprawl in western El Dorado County

- ❖ an injunction against the State of Washington which resulted in creation of a Clean Water Act permitting process to regulate operation of salmon net pens

- ❖ judgments against Union Oil Company of California resulting in the payment of the largest civil penalty and fee award in the history of the Clean Water Act ($5.55 million)

- ❖ a judgment against the City of Rocklin, California, overturning its approval of a major regional mall because it violated the California Environmental Quality Act

- ❖ settlement of a case against the National Park Service requiring preparation of a comprehensive EIS on management plans for the Lake Chela National Recreation Area in Washington

- ❖ injunctions in three separate suits against the Bureau of Land Management and the U.S. Forest Service prohibiting logging harmful to the South Fork Trinity, South Fork Eel and South Fork Salmon Wild and Scenic Rivers in California

- ❖ an injunction against the U.S. Forest Service requiring preparation of an EIS and full consultation under the Endangered Species Act on oil and gas leases in areas under study for wilderness designation in Montana.

-6-

# EXHIBIT 2

09/14/2005   11:23   510496:

10.309

STEPHAN C. VOLKER (CSB #63093)
JOSHUA A.H. HARRIS (CSB #226898)
MARNIE E. RIDDLE (CSB #233732)
LAW OFFICES OF STEPHAN C. VOLKER
436 – 14th Street, Suite 1300
Oakland, California 94612
Telephone: 510/496-0600
Facsimile: 510/496-1366

Attorneys for Petitioner/Plaintiff
Sierra Club

**F I L E D**
San Francisco County Superior Court

OCT 1 9 2005

GORDON PARK-LI Clerk
BY: _____
Deputy Clerk

SUPERIOR COURT OF THE STATE OF CALIFORNIA

COUNTY OF SAN FRANCISCO

SIERRA CLUB, a California non-profit corporation,    )    Civ. No. CPF 03-503433
                                                     )
              Petitioner and Plaintiff,             )    [PROPOSED] ORDER ON
                                                     )    PETITIONER'S MOTION FOR
       v.                                            )    ATTORNEYS' FEES AND
                                                     )    LITIGATION COSTS
CALIFORNIA COASTAL COMMISSION, and                   )
DOES 1 through 50, inclusive,                        )
                                                     )    Date:   August 31, 2005
              Respondents and Defendants,           )    Time:   9:30 a.m.
                                                     )    Dept.:  301
                                                     )    Judge:  James L. Warren
                                                     )
DAVID LUERS; and DOES 51 through 100,                )
inclusive,                                           )
                                                     )
              Real Parties in Interest               )
                                                     )

Petitioner's motion for attorneys' fees and litigation costs came on regularly for hearing in

Department 301 of this Court on August 31, 2005 at 9:30 a.m.  Stephan C. Volker appeared for

petitioners, Deputy California Attorney General Lisa Trankley appeared for respondent California

Coastal Commission, and David P. Lanferman and Aaron J. Foxworthy of Sheppard, Mullin, Richter

& Hampton appeared for real party in interest David Luers.  Having reviewed the parties' moving

and responding papers, having heard and considered the parties' arguments, and good cause appearing

from the record properly before the Court,

IT IS HEREBY ORDERED as follows:

1.    The Court finds that petitioner has satisfied the criteria set forth in Code of Civil

Procedure section 1021.5 for an award of attorneys' fees for its successful prosecution of this

23/14/2005  11:23   510496    VOLKER LAW OFFICES   PAGE  04/23

1    proceeding in that this proceeding has resulted in the enforcement of an important right affecting the

2    public interest in which a significant benefit has been conferred on the general public or a large class

3    of persons, the necessity and financial burden of private enforcement are such as to make the award

4    appropriate, and there is no monetary recovery from which such fees might otherwise be paid. The

5    general public has benefitted from this proceeding in that petitioners prevented the implementation

6    of a Coastal Commission decision which was not supported by adequate findings and substantial

7    evidence, thus assuring that the integrity of the Coast Act's stringent standards for coastal

8    development permits is maintained. Private enforcement was necessary, as no public agencies

9    stepped forward to enforce the Coastal Act in this case. To the contrary, the California Attorney

10   General vigorously defended the Coastal Commission's decision. The financial burden on petitioner

11   Sierra Club, a charitable conservation organization, clearly makes an award appropriate, since the

     Sierra Club has no private or pecuniary interest in this matter.

12          2.    The Court finds that San Francisco County is the forum court and the appropriate legal

13   community for the purpose of establishing reasonable hourly rates for petitioner's counsel.

14          3.    The Court finds that the reasonable hourly rates for petitioner's counsel based on the

15   relevant legal community are as follows:

16          Attorney Volker:           $450.00 per hour

17          Attorney Dent:             $200.00 per hour

18          Attorney Harris:           $200.00 per hour

19          Attorney Riddle:           $175.00 per hour

20          All law clerks             $120.00 per hour

21          4.    The Court finds that the reasonable hourly rate for petitioner's law clerks as measured

22   by the appropriate legal community is $120.00 per hour.

23          5.    The Court finds that respondent California Coastal Commission alone *alternately* shall bear full

24   liability for petitioner's/attorneys' fees and costs. The Court finds that it is not appropriate to make

25   David Luers, the real party in interest in this case, liable for any fees awarded. The Coastal

26   Commission bore the responsibility for ensuring that its decision was supported by adequate findings

27   and substantial evidence, and Mr. Luers did nothing wrong in the proceeding.

28

[PROPOSED] ORDER ON PETITIONER'S MOTION FOR
ATTORNEYS' FEES AND LITIGATION COSTS

2

09/14/2005   11:23   518496                VOLKER LAW OFFICE                PAGE  05/12

6.    The Court accepts petitioner's voluntary reduction in the hours initially claimed by 16.1 hours, including 15.3 hours totaling $2,647.00 in fees withdrawn in footnote 1 on page 7 of petitioner's August 24 Reply to the Coastal Commission and .8 hours totaling $360.00 in fees withdrawn at the hearing, for a total reduction of $3,007.00 in fees.

7.    Applying the hourly rates approved in paragraph 8, the Court awards compensation in the following amounts for petitioner's attorneys and law clerks:

| | | |
|---|---|---|
| Attorney Volker: | 226.2 hours at $450 = $ | 101,790.00 |
| Attorney Dent: | 4 hours at $200 = $ | 800.00 |
| Attorney Harris: | 150 hours at $200 = $ | 30,000.00 |
| Attorney Riddle: | 6.30 hours at $175 = $ | 2,562.50 |
| Law Clerk Bruya | 80 hours at $120 = $ | 9,600.00 |
| Law Clerk Stanfield | 0 hours at $120 = $ | 0 |
| Law Clerk Moffett | 10 hours at $120 = $ | 1,200.00 |
| Law Clerk Scott | 0 hours at $120 = $ | 0 |
| Law Clerk Riddle | 0 hours at $120 = $ | 0 |
| LAW CLERK YUNDT | 6.5 hrs at $120 = | 780.00 |

TOTAL LODESTAR FEES = $ ~~115~~ 146,732.50

8.    The Court finds that petitioner's "lodestar" amount shall be adjusted ~~by a factor of___, to reflect the contingent risk borne by petitioner's counsel,~~ not yielding a Total Merits Fee Award of $ 146,732.50

9.    The Court finds that petitioner is entitled to recovery of its *reasonable out reasonable* ~~its~~ costs of litigation as documented in the Declaration of Stephan C. Volker filed July 15, 2005 under *Beasley v. Wells Fargo Bank* (1991) 235 Cal.App.3d 1407, 1419. *Beasley* allows petitioner to recover *certain reasonable* ~~its~~ out-of-pocket litigation expenses that are normally of the type that would be billed to a client, such as travel, photocopying and postage, whether or not such litigation costs are also recoverable under Code of Civil Procedure section 1033.5. The Court finds that the unreimbursed litigation costs documented by petitioner in the July 15 Declaration of Stephan Volker, $ 3,527.51 ~~4,733.69~~, are reasonable and appropriate, yielding a Total Merits Cost Award of $ 150,260.01

[PROPOSED] ORDER ON PETITIONER'S MOTION FOR
ATTORNEYS' FEES AND LITIGATION COSTS

3

09/14/2005  11:23  518496                    VOLKER LAW OFFICES                    PAGE  07/11

1      1D    The Court also awards petitioner its reasonable Fee Motion Fees and Costs for

2  successful prosecution of its motion for attorneys' fees, at the hourly rates established above, as

3  documented in the Supplemental Declaration of Stephan C. Volker filed August 1, 2005 and the

4  Second Supplemental Declaration of Stephan C. Volker filed September 1, 2005, as follows:

**FEE MOTION FEES AND COSTS**

|  | Hours | Rate | Fee |
|---|---|---|---|
|  |  |  | $ |
| Lawyers: Stephan Volker | 10 | $450 | 4,500 ⁰⁰ |
| Joshua Harris | 0 | 200 | 0 |
| Marnie Riddle | 31 | 175 | 5,425 ⁰⁰ |
| **TOTAL FEE MOTION FEES** |  |  | $ 9,925 ⁰⁰ |
| Costs |  |  | 188 ⁰⁸ |
| **TOTAL FEE MOTION FEES AND COSTS** |  |  | $ 10,113 ⁰⁸ |

12      12.    Adding the **Total Merits Fees and Costs** awarded in paragraph 10,

13  ($ 146,732 ⁵⁰) to the **Total Fee Motion Fees and Costs** awarded in paragraph 11,

14  ($ 10,113 ⁰⁸ ) yields a **TOTAL AWARD** of $ 156,845 ⁵⁸ .  This sum shall be

15  paid by respondent California Coastal Commission to the Client Trust Account of Stephan Volker,

16  counsel for petitioner Sierra Club.  The Coastal Commission shall use its best efforts to obtain the

17  necessary monies and pay the fee award in a reasonable amount of time.  In the event that the

18  award is not paid within sixty (60) days from the date of this order, the Coastal Commission shall

19  advise the Court of the efforts it has taken to secure payment of the award, and explain what

20  efforts it intends to undertake to secure payment of the award as promptly as possible.

21  **IT IS SO ORDERED.**

22  Dated: ~~September~~ October 17, 2005

23  HONORABLE JAMES L. WARREN
    JUDGE OF THE SAN FRANCISCO COUNTY
24  SUPERIOR COURT

[PROPOSED] ORDER ON PETITIONER'S MOTION FOR
ATTORNEYS' FEES AND LITIGATION COSTS

# EXHIBIT 3

1 │ STEPHAN C. VOLKER (CSB #63093)
JOSHUA A.H. HARRIS (CSB #226898)
2 │ MARNIE E. RIDDLE (CSB #233732)
LAW OFFICES OF STEPHAN C. VOLKER
3 │ 436 14th Street, Suite 1300
Oakland, California 94612
4 │ Telephone: 510/496-0600
Facsimile: 510/496-1366
5
Attorneys for Petitioner/Plaintiff
6 │ CITIZENS FOR THE EASTSHORE STATE PARK

FILED 10.335

SEP - 3 2005

KIM TURNER
Court Executive Officer
MARIN COUNTY SUPERIOR COURT
By: E. Turner, Deputy

7

8

9                    SUPERIOR COURT OF THE STATE OF CALIFORNIA

10                        IN AND FOR THE COUNTY OF MARIN

11 │ CITIZENS FOR THE EASTSHORE STATE        )  Case No. CV 052241
PARK,                                   )
12 │                                         )  Contra Costa Case No. MSN094-1657
                             Petitioner,    )
13 │                                         )
                  v.                        )  [PROPOSED] ORDER GRANTING
14 │                                         )  ATTORNEYS' FEES TO CITIZENS
CITY OF RICHMOND, a California          )  FOR THE EASTSHORE STATE
15 │ Municipality, CITY COUNCIL OF THE      )  PARK
CITY OF RICHMOND, and DOES 1 through    )
16 │ X, inclusive,                          )  Action Filed: December 15, 2004
                                         )  Action Transferred: May 17, 2005
17 │                             Respondents.  )
                                         )
18 │ and                                     )
                                         )  Dept.: F
19 │ UPSTREAM POINT MOLATE LLC, a           )  Judge: Hon. Vernon F. Smith
California Limited Liability Company,   )
20 │ HARRAH'S OPERATING COMPANY,            )
INC., a Delaware Corporation, and DOES XI )
21 │ through XX, inclusive,                  )
                                         )
22 │                  Real Parties in Interest.  )
                                         )
23 │                                         )
                                         )
24 │ (CAPTION CONTINUES ON PAGE 2)

25

26

27

28

EAST BAY REGIONAL PARK DISTRICT,  )  Case No. MSN04-1698
                                  )
                  Petitioner,     )  Action Filed: December 16, 2004
                                  )
        v.                        )
                                  )
CITY OF RICHMOND, RICHMOND CITY   )
COUNCIL, and DOES I through X,    )
inclusive,                        )
                                  )
                  Respondents.    )
                                  )
UPSTREAM POINT MOLATE LLC, a      )
California Limited Liability Company, )
HARRAH'S OPERATING COMPANY,       )
INC., a Delaware Corporation, and DOES XI )
through XX, inclusive,            )
                                  )
            Real Parties in Interest. )

[PROPOSED] ORDER GRANTING ATTORNEYS' FEES
TO CITIZENS FOR THE EASTSHORE STATE PARK

1    Having reviewed the pleadings, briefs, and all materials submitted in this matter, and

2    good cause appearing therefrom, the Court HEREBY ORDERS as follows:

3        1. Petitioner Citizens for the Eastshore State Park ("Petitioner") is a successful party. Its

4    action resulted in a settlement agreement with Respondents that required Respondent City of

5    Richmond to comply with environmental review requirements set forth in the California

6    Environmental Quality Act, Pub. Res. Code Section 21000 *et seq.*, prior to transferring the Point

7    Molate property or taking other actions in support of the project.

8        2. Petitioner's action vindicated important rights affecting the public interest.

9
        3. Petitioner's action conferred a significant benefit on the public.
10
11       4. The necessity and financial burden of enforcement make the requested fee award

12   appropriate. Petitioner has no private pecuniary or property interest to protect in this litigation;

13   its interest is environmental.

14       5. Thus, Petitioner is entitled to attorneys' fees pursuant to Code of Civil Procedure

15   Section 1021.5.

16       6. The reasonable hourly rates of compensation for the work performed by Petitioner's

17   attorneys on this case are as follows:

18   **Attorney**                **Rate**

19   Stephan Volker              $475/hour

20   Josh Harris                 $225/hour in 2006; $200/hour prior to 2006

21   Marnie Riddle               $200/hour in 2006; $175/hour prior to 2006

22
         7. Petitioner's counsel reasonably spent, and are entitled to compensation for, 245.1
23
24   hours on this case, as set forth in Petitioner's briefs and declarations submitted to the court, for a

25   total fee of $97,247.50.

26       8. Petitioner's counsel is entitled to compensation for $1,675.50 in costs reasonably

27   incurred, as set forth in Petitioner's briefs and declarations submitted to the court.

28

[PROPOSED] ORDER GRANTING ATTORNEYS' FEES

9. The total amount to which Petitioner is entitled for fees and costs expended on this case against Respondents is thus $98,923.00.

IT IS HEREBY ORDERED THAT Petitioner be awarded $98,923.00 in attorneys' fees and costs, which shall be paid by Respondents.

Date: _9/3/06_

VERNON F. SMITH

_____

HONORABLE VERNON F. SMITH
Judge of the Superior Court

APPROVED AS TO FORM:

BARG, COFFIN, LEWIS & TRAPP LLP

Date: _____

By: _____

BRIAN HAUGHTON
DONALD SOBELMAN

Attorneys for Real Parties in Interest
UPSTREAM POINT MOLATE LLC and
HARRAH'S OPERATING CO., INC.

LAW OFFICES OF THOMAS N. LIPPE

Date: _____

By: _____

THOMAS N. LIPPE

Attorneys for Respondents
CITY OF RICHMOND and
RICHMOND CITY COUNCIL

SHUTE, MIHALY & WEINBERGER LLP

Date: _July 18, 2006_

By: _____

TAMARA S. GALANTER

Attorneys for Petitioner
EAST BAY REGIONAL PARK DISTRICT

[PROPOSED] ORDER GRANTING ATTORNEYS' FEES
TO CITIZENS FOR THE EASTSHORE STATE PARK

4

1       9. The total amount to which Petitioner is entitled for fees and costs expended on this

2  case against Respondents is thus $98,923.00.

3       IT IS HEREBY ORDERED THAT Petitioner be awarded $98,923.00 in attorneys' fees

4  and costs, which shall be paid by Respondents.

5

6  Date: _____

7                         _____

8                         HONORABLE VERNON F. SMITH
                            Judge of the Superior Court

9  APPROVED AS TO FORM:

10                       BARG, COFFIN, LEWIS & TRAPP LLP

11

12  Date: July 18, 2006        By: _____

13

14                         BRIAN HAUGHTON
                         DONALD SOBELMAN

15                       Attorneys for Real Parties in Interest
                       UPSTREAM POINT MOLATE LLC and

16                       HARRAH'S OPERATING CO., INC.

17

18                       LAW OFFICES OF THOMAS N. LIPPE

19  Date: _____     By: _____

20

21                         THOMAS N. LIPPE

22                       Attorneys for Respondents
                       CITY OF RICHMOND and

23                       RICHMOND CITY COUNCIL

24                       SHUTE, MIHALY & WEINBERGER LLP

25

26  Date: _____     By: _____

27                         TAMARA S. GALANTER

28                       Attorneys for Petitioner
                       EAST BAY REGIONAL PARK DISTRICT

9. The total amount to which Petitioner is entitled for fees and costs expended on this case against Respondents is thus $98,923.00.

IT IS HEREBY ORDERED THAT Petitioner be awarded $98,923.00 in attorneys' fees and costs, which shall be paid by Respondents.

Date: _____

_____

HONORABLE VERNON F. SMITH
Judge of the Superior Court

APPROVED AS TO FORM:

BARG, COFFIN, LEWIS & TRAPP LLP

Date: _____

By: _____

BRIAN HAUGHTON
DONALD SOBELMAN

Attorneys for Real Parties in Interest
UPSTREAM POINT MOLATE LLC and
HARRAH'S OPERATING CO., INC.

LAW OFFICES OF THOMAS N. LIPPE

Date: 7/25/06

By: _Thomas N. Lippe/sr_

THOMAS N. LIPPE

Attorneys for Respondents
CITY OF RICHMOND and
RICHMOND CITY COUNCIL

SHUTE, MIHALY & WEINBERGER LLP

Date: _____

By: _____

TAMARA S. GALANTER

Attorneys for Petitioner
EAST BAY REGIONAL PARK DISTRICT

[PROPOSED] ORDER GRANTING ATTORNEYS' FEES
TO CITIZENS FOR THE EASTSHORE STATE PARK

4

# EXHIBIT 4

1  STEPHAN C. VOLKER (CSB #63093)
   JOSHUA A.H. HARRIS (CSB #226898)
2  MARNIE E. RIDDLE (CSB #233732)
   LAW OFFICES OF STEPHAN C. VOLKER
3  436 14th Street, Suite 1300
   Oakland, California 94612
4  Telephone: 510/496-0600
   Facsimile: 510/496-1366
5
   Attorneys for Petitioners/Plaintiffs
6  CITIZENS FOR THE EAST SHORE STATE PARK

FILED

APR - 3 2006

MARIN COUNTY SUPERIOR COURT
BY: E. TURNER, DEPUTY

7

8

9              SUPERIOR COURT OF THE STATE OF CALIFORNIA

10                 IN AND FOR THE COUNTY OF MARIN

11

12 | CITIZENS FOR THE EAST SHORE STATE ) Case No. CV 052241
   | PARK,                            )
13 |                                  ) Contra Costa Case No. MSN094-1657
   |                      Petitioner, )
14 |                                  ) DECLARATION OF MICHAEL
   |      v.                          ) TRAYNOR IN SUPPORT OF
15 |                                  ) PETITIONER'S MOTION FOR
   | CITY OF RICHMOND, a California    ) ATTORNEYS' FEES AND
16 | Municipality, CITY COUNCIL OF THE ) LITIGATION COSTS
   | CITY OF RICHMOND, and DOES 1 through )
17 | X, inclusive,                    ) Action Filed: December 15, 2004
   |                                  ) Action Transferred: May 17, 2005
18 |                     Respondents. )
   | and                             ) Date:  June 7, 2006
19 |                                  ) Time:  9:00 a.m.
   | UPSTREAM POINT MOLATE LLC, a      ) Dept.: F
20 | California Limited Liability Company, ) Judge: Hon. Vernon F. Smith
   | HARRAH'S OPERATING COMPANY,       )
21 | INC., a Delaware Corporation, and DOES XI )
   | through XX, inclusive,           )
22 |                                  )
   |                                  )
23 |               Real Parties in Interest. )
   |                                  )
24 | _____ )
   | (CAPTION CONTINUES ON PAGE 2)
25

26

27

28

   DECLARATION OF MICHAEL TRAYNOR IN SUPPORT OF
   MOTION FOR ATTORNEYS' FEES AND LITIGATION COSTS

| | |
|---|---|
| 1 | EAST BAY REGIONAL PARK DISTRICT, )    Case No. MSN04-1698 |
| 2 | ⟨Petitioner, )    Action Filed: December 16, 2004 |
| 3 | v. ) |
| 4 | CITY OF RICHMOND, RICHMOND CITY )
| 5 | COUNCIL, and DOES I through X, )
| 6 | inclusive, )
| 7 | Respondents. )

1    EAST BAY REGIONAL PARK DISTRICT,     )    Case No. MSN04-1698
                                              )
2                  ⟨Petitioner,              )    Action Filed: December 16, 2004
                                              )
3         v.                                  )
                                              )
4    CITY OF RICHMOND, RICHMOND CITY          )
5    COUNCIL, and DOES I through X,           )
     inclusive,                               )
6                                             )
                  Respondents.                )
7                                             )
     UPSTREAM POINT MOLATE LLC, a             )
8    California Limited Liability Company,    )
     HARRAH'S OPERATING COMPANY,              )
9    INC., a Delaware Corporation, and DOES XI )
     through XX, inclusive,                   )
10                                            )
11                Real Parties in Interest.   )

12        I, Michael Traynor, declare as follows:

13        1.    I am a senior counsel and served as a partner from 1969–2004 in the law firm of

14   Cooley Godward LLP and practice in its office in San Francisco, California. I received a J.D.

15   degree from Harvard Law School in 1960. From 1961 to 1963, I served as a deputy attorney

16   general of the State of California in tax litigation, government law, and other matters. In 1962, I

17   also served as special counsel to the California State Senate Committee on Local Government.

18   In 1963, I joined Cooley Godward, where I specialize in litigation involving intellectual

19   property, the First Amendment, complex business matters, and appellate matters. I have

20   practiced extensively in California state courts and in the federal courts, including the Supreme

21   Court of the United States. In addition to my practice, since 2000, I have served and am now

22   serving as President of the American Law Institute ("ALI"). I am presently serving as an adviser

23   for the Restatement (Third) of Restitution and Unjust Enrichment and recently completed

24   service as an adviser for the Restatement (Third) of Torts: Apportionment, the Restatement

25   (Third) of Torts: Product Liability, and the Restatement (Third) of Unfair Competition. I am a

26   member of the California Academy of Appellate Lawyers, a Life Fellow of the American Bar

27

28

DECLARATION OF MICHAEL TRAYNOR IN SUPPORT OF
MOTION FOR ATTORNEYS' FEES AND LITIGATION COSTS                                              2

1  Foundation, a past President (1973) of the Bar Association of San Francisco, a former member

2  of the Board of Directors of the Environmental Law Institute (1999-2005), a former member of

3  the Board of Overseers of the RAND Institute for Civil Justice (1991-97), and a former trustee

4  (1974-1996), past Chairman (1989-91) and President (1991-92) of the Sierra Club Legal

5  Defense Fund, now called Earthjustice. In 2004, the U.S. Court of Appeals for the Ninth Circuit

6  awarded to me its John P. Frank outstanding lawyer award. I am listed in the current editions of

7  *The Best Lawyers in America*, *Who's Who in America* and *Who's Who in American Law*.

8          2.      I am informed that petitioners in the above matter request an award of attorneys'

9  fees for legal services performed by Stephan C. Volker. I am further informed that Mr. Volker

10  received his J.D. in 1974 from the University of California at Davis, and since that time has been

11  engaged in the practice of environmental litigation, both in private practice (1974-1977) and

12  subsequently, for the Sierra Club Legal Defense Fund, where he litigated scores of cases under

13  state and federal laws throughout the western states until his recent return to private practice. I

14  have known Mr. Volker since he started working at the Sierra Club Legal Defense Fund in 1977

15  and am familiar with the litigation he has successfully prosecuted, his expertise, and his high

16  standing in the environmental litigation community. Mr. Volker is an exceptionally hard

17  working, tenacious and meticulous litigator with an impressive list of victories in environmental

18  cases, including dozens of published rulings in state and federal courts and administrative

19  tribunals, and a number of significant settlements, including what was at the time (1990) the

20  highest civil penalty ever awarded under the citizen suit provision of the federal Clean Water

21  Act.

22          3.      I am informed that petitioners wish to assign the hourly rate of $475 for legal

23  services performed by Mr. Volker between 2004 and 2006 and, for the same period, $175 per

24  hour for a first-year and $200 per hour for a second-year associate attorney.

25

26

27

28

4.    The hourly rates sought by petitioners are within, albeit at the low end of, the prevailing market rates in the San Francisco Bay Area for attorneys with experience and qualifications similar to Mr. Volker and his associates. The services of attorneys in my firm with experience levels comparable to Mr. Volker, and of first and second-year attorneys, have been billed at or above these rates for the periods described. The billing rates of my firm are comparable to the billing rates of other major law firms located in San Francisco.

5.    The prior experience of Mr. Volker in environmental litigation further supports the rate requested for him. Based on my own experience in my practice and my knowledge of others in my firm, where an attorney has special expertise relevant to the matter being litigated, the hourly rate is correspondingly higher.

6.    I am familiar with the caselaw governing the award of attorneys' fees in California under its "private attorney general" statute, Code of Civil Procedure section 1021.5, having reviewed dozens of fee motions, briefs, and rulings under this statute in cases prosecuted by attorneys at the Sierra Club Legal Defense Fund and Earthjustice over the past three decades. I have reviewed Mr. Volker's original and amended petitions as well as the settlement agreement reached in this proceeding. In my judgment Mr. Volker's success in settling this case to the benefit of his clients and the public warrants an award of his hourly rate for the time he and his law firm expended in this matter.

I declare under penalty of perjury that the foregoing is true and correct.

Executed March 27, 2006 at San Francisco, California.

_Michael Traynor_

MICHAEL TRAYNOR

## PROOF OF SERVICE

I am a resident of the United States and of the State of California. I am employed in the County of Alameda. My business address is 436 - 14th Street, Suite 1300, Oakland, California 94612. My business telephone number is (510) 496-0600, and fax number is (510) 496-1366. I am over the age of eighteen years. I am not a party to the within action or proceeding. On December 17, 2007, I served the following document(s):

APPLICATION OF FRIENDS OF THE EEL RIVER AND CALIFORNIA SPORTFISHING PROTECTION ALLIANCE FOR REHEARING OF DECISION NO. 07-12-004

Application 99-09-053

by arranging for the e-mailing of the above-entitled document and attachments to the parties' e-mail addresses indicated on the attached list of counsel or, if counsel has no e-mail address availability, said documents were enclosed in an envelope and whereby I placed the envelope(s) for collection and mailing on the date and at the place shown below following our ordinary business practices. I am readily familiar with this business's practice for e-mailing and collecting and processing correspondence for mailing. On the same day that correspondence is placed for collection and mailing, it is deposited in the ordinary course of business with the United States Postal Service in a sealed envelope with postage fully prepaid, addressed as listed on the attached following pages.

I declare under penalty of perjury that the foregoing is true and correct. Executed December 17, 2007, at Oakland, California.

Teddy Ann Fuss

ADDRESSEES FOR SERVICE VIA U.S. POSTAL SERVICE

Jeff Taylor
Kings River Conservation District
4886 E. Jensen Avenue
Fresno, CA 93725-1899

Jim Doolittle
El Dorado Irrigation District
2890 Mosquito Road
Placerville, CA 95667

Modesto Irrigation District
P.O. Box 4060
Modesto, CA 95352

Dean R. Reynolds
2088 Mandeville Canyon Road
Los Angeles, CA 90049

Nettie Hoge
The Utility Reform Network
1104 Curtis S.E.
Albany, CA 94706

Gilbert Murphy
P.O. Box 1051
Larkspur, CA 94939

Robert N. Ferroggiaro
Federation of Fly Fishers
92770 Oak Leaf Way
Granite Bay, CA 95746

William Dombrowski
California Retailers Association
980 9th Street, Suite 2100
Sacramento, CA 95814-2741

Al Wright
U.S. Department of the Interior
Bureau of Land Management
2800 Cottage Way, Suite W-1834
Sacramento, CA 95825-1886

Dana S. Appling
SMUD
Legal Department MSB406
P.o. Box 15830
Sacramento, CA 95852-1830

Tim Nichols
City of Redding, Electric Department
P.o. Box 496071
Redding, CA 96049-6071

kmccrea@sablaw.com
jimross@r-c-s-inc.com
chilen@sppc.com
jbloom@winston.com
Dan.Hytrek@noaa.gov
sdrossi@calpx.com
douglass@energyattorney.com
sumner.koch@sce.com
bwilliams@sempra.com

mdjoseph@adamsbroadwell.com
ar@landwater.com
diane_fellman@fpl.com
rcosta@turn.org
bfinkelstein@turn.org
ctd@cpuc.ca.gov
michael.neville@doj.ca.gov
ek@a-klaw.com
jmalkin@orrick.com
phanschen@mofo.com
tmberliner@duanemorris.com
jack.gipsman@usda.gov
athomas@newenergy.com
bcragg@goodinmacbride.com
enriqueg@lif.org
jarmstrong@gmssr.com
lcottle@winston.com
mfogelman@reedsmith.com
rrcollins@n-h-i.org
stevegreenwald@dwt.com
ssmyers@att.net
zgrader@ifrfish.org
dwrlegal@water.ca.gov
sweber@water.ca.gov
rumla@earthlink.net
wbooth@booth-law.com
bepstein@fablaw.com
svolker@volkerlaw.com
ques@calindian.org
psly@ebmud.com
thaliag@greenlining.org
patrickm@crossborderenergy.com
bmcc@mccarthylaw.com
mokewatershed@excite.com
tomk@mid.org
tridam@mlode.com
sshupe@sonoma-county.org
rhendry@co.humboldt.ca.us
countycounsel@placer.ca.gov
jweil@aglet.org

jpayne@mp.usbr.gov
aivancovich@caiso.com

tcumpston@co.el-dorado.ca.us
lwhouse@innercite.com
ddifferding@exec.swrcb.ca.gov
cte@eslawfirm.com
dgallery@gallerylaw.com
etiedemann@kmtg.com
pmb@bkslawfirm.com
spuccini@dfg.ca.gov
rliebert@cfbf.com
atrowbridge@daycartermurphy.com
counsel@co.nevada.ca.us
yubakeeper@syrcl.org
jmeith@minasianlaw.com
robshulman@countyofplumas.com
mpa@a-klaw.com
SLTeichler@DuaneMorris.com
mike-jines@reliantenergy.com
barbara_klemstine@apses.com
ronknecht@aol.com

dhuard@manatt.com
pucservice@manatt.com
rshortz@morganlewis.com
rshimizu@mieco.com
klatt@energyattorney.com
kjk@kjkammerer.com
bruce.foster@sce.com
theresa.mueller@sfgov.org
norman.furuta@navy.mil
sdhilton@stoel.com
c.gardiner@pamsf.com
wvm3@pge.com
derkp@newsdata.com
darcy@cea.sfex.com
jsqueri@goodinmacbride.com
bassaka@steefel.com
jkarp@winston.com
stevegreenwald@dwt.com
cpuccases@pge.com
ecrem@ix.netcom.com
andy.vanhorn@vhcenergy.com
wam@mrwassoc.com
dmarcus2@sbcglobal.net
rschmidt@bartlewells.com

langridr@nature.berkeley.edu
philm@scdenergy.com

steve.edmondson@noaa.gov
rhendry@co.humboldt.ca.us
bill@jbsenergy.com
rmccann@umich.edu
e-recipient@caiso.com
SMorrison@caiso.com
tonywetzel@home.com
mtdemo@mtdemocrat.com
kcann@navigantconsulting.com
paul_maxwell@rmiinc.com
kevins@ncpa.com
george@ncpa.com

schneider@rsvl.net
cnota@fs.fed.us
mboccadoro@dolphingroup.org
blaising@braunlegal.com

lmh@eslawfirm.com
sak@bkslawfirm.com
jkmoore6891@sbcglobal.net

rflinsacto@att.net
ddavie@henwoodenergy.com
karen@lindhandassociates.com
cpeyton@sacbee.com

ldunswo@smud.org
ycwa@ycwa.com
chatigny@nid.dst.ca.us

fcady@psln.com
michael.corrigan@powerex.com
jeff.lam@powerex.com
bsk@cpuc.ca.gov
edf@cpuc.ca.gov
gkk@cpuc.ca.gov
xjv@cpuc.ca.gov
jci@cpuc.ca.gov
jmh@cpuc.ca.gov
txb@cpuc.ca.gov
campbem@hdcdojnet.state.ca.us
RSmith@caiso.com
ens@eob.ca.gov
guyphil@ix.netcom.com
rud@cpuc.ca.gov
randy.chinn@sen.ca.gov
rtavares@energy.state.ca.us



F I L E D
12-20-07
04:59 PM

STEPHAN C. VOLKER (CSB #63093)
JOSHUA A.H. HARRIS (CSB #226898)
LAW OFFICES OF STEPHAN C. VOLKER
436 14th Street, Suite 1300
Oakland, California  94612
Tel:   (510) 496-0600
Fax:   (510) 496-1366

Attorneys for Intervenor
CAlifornians for Renewable Energy

BEFORE THE PUBLIC UTILITIES COMMISSION
OF THE STATE OF CALIFORNIA

| | |
|---|---|
| Order Instituting Rulemaking Regarding Policies, Procedures and Rules for the California Solar Initiative, the Self-Generation Incentive Program and Other Distributed Generation Issues. | ) APPLICATION OF CALIFORNIANS FOR<br>) RENEWABLE ENERGY (CARE) FOR<br>) REHEARING OF D.07-12-007<br>)<br>) Rulemaking 06-03-004<br>) (Filed March 2, 2006)<br>)<br>)<br>)<br>) |

**I. INTRODUCTION**

Pursuant to Rule 16.1, Intervenor CAlifornians for Renewable Energy ("CARE") hereby requests a rehearing of D.07-12-007, the Commission's final "Opinion Granting Intervenor Compensation to CAlifornians for Renewable Energy, Consumer Federation of California, and Green Power Institute for Contributions to California Solar Initiative Rulemaking" filed December 7, 2007 (hereinafter "Opinion").  CARE seeks only a limited review of the Opinion, asking the Commission to increase the hourly rate assigned to CARE's lead counsel, Stephan C. Volker, from $280 per hour to his market rate of at least $450 per hour for work done in 2006. As discussed more thoroughly below, the Commission's decision to assign Mr. Volker a rate

- 1 -

lower than his market rate – despite a plethora of uncontradicted evidence in the record demonstrating his actual and much higher rate – violated the Public Utilities Code and is based on a fundamental violation of his and his clients' due process rights. The Commission's refusal to properly determine Mr. Volker's current, true market rate continues to hinder intervenor participation in important Commission proceedings by limiting Mr. Volker's clients' ability to retain counsel on Commission matters.[1] Mr. Volker's rate, therefore, should be revised based on his market rates to at least $450 for work done in 2006.

In the Opinion, the Commission reduced Mr. Volker's requested hourly rates based on an hourly rate of $250 assigned to him several years ago in a different proceeding. D.07-12-007, p. 27-29. The basis of that previous hourly rate, however, was *not that Mr. Volker's market rate was then $250*. Rather, the basis was that Mr. Volker's client, the Sierra Club, had, on April 4, 2000 and prior to its retention of Mr. Volker, filed a Notice of Intent to Claim Compensation ("NOI") which capped its future counsel's hourly rate at $250. Therefore, notwithstanding that Mr. Volker's actual market rate in 2002 already exceeded $300 (and in 2004, $350), the Sierra Club only sought compensation at the rate stated in its NOI – $250. Thereafter, the Commission determined that all assigned rates for work done in 2002 and 2003 represented market rates and instituted a rate-freeze based on those previously assigned rates. ALJ-184, D.05-11-031, and D.07-01-009.

The Commission's proceedings capping future fees based on prior fee awards were

---

[1] CARE has previously sought to correct the Commission's assignment of a non-market rate to Mr. Volker. Most notably, CARE sought judicial review of the Commission's parallel rate determinations in D.06-04-018. *CAlifornians for Renewable Energy v. The Public Utilities Commission*, Court of Appeal, First Appellate District, Case No. A115703.

conducted, however, without notice to the parties that would be affected in the future. Furthermore, the Commission arbitrarily assumed that past rates automatically represent market rates for those past time periods. Such an assumption does not take into account a myriad of relevant factors and circumstances underlying past fee awards – factors and circumstances demonstrating that all past fee rates *do not automatically reflect past market rates*. For example, here, Mr. Volker's past fee award was not based on market rates. Instead, Mr. Volker adhered to rates established in his client's NOI, which was filed prior to its selection of a lawyer for the case. Mr. Volker's fee in that previous case therefore does not reflect his market rate – in fact, has nothing to do with his market rate – and, therefore, should not be used as a limiting factor on all future fee awards.

Application of Public Utilities Code section 1806, which directs that "[t]he computation of compensation awarded pursuant to Section 1806 shall take into consideration the market rates paid for persons of comparable training and experience who offer similar services," requires that Mr. Volker's time now be compensated at comparable market rates. As previously documented by CARE and Mr. Volker, the market rate for Mr. Volker, an environmental lawyer for over 33 years, was at least $450 in 2006. The Commission's refusal to modify its award in this proceeding, therefore, violates the Public Utilities Code.

Additionally, the Commission's reliance on the rate freezing mechanism violates Mr. Volker's due process rights because he was never given notice of the proceedings in which the Commission determined that a non-market rate assigned in a past fee award would permanently serve as the baseline for all future fee awards. This lack of notice deprived Mr. Volker of the ability to correct the Commission misapprehension that the prior fee award reflected a market

- 3 -

rate for Mr. Volker. Thus, the Opinion improperly determined that Mr. Volker should be compensated at a below-market rate instead of his market rate.

Accordingly, CARE respectfully applies to this Commission for a rehearing of the Commission's Opinion and asks that Mr. Volker's hourly rate be increased to at least $450 for work done in 2006.

## II. BACKGROUND

CARE filed its request for compensation on March 12, 2007.

On April 9, 2007, Southern California Edison Company ("SCE") filed a response to CARE's request.

On April 24, 2007, CARE filed a reply to SCE's response.

On November 6, 2007, the Commission issued its proposed decision granting, in part, CARE's request.

On November 21, 2007, CARE filed comments on the proposed decision, asking for, among other requests, a reevaluation of Mr. Volker's assigned rate.

On December 7, 2007, the Commission issued the Opinion, in which the Commission denied CARE's request to reevaluate Mr. Volker's rate.

In setting Mr. Volker's rates, the Opinion relied on a prior, non-market award of $250 for work done in 2000-2001. D.07-12-007 at 27-29 citing D.05-02-003 and D.03-01-058. This 2000-2001 rate was awarded in A.99-12-025, wherein, *before* Mr. Volker's retention, Sierra Club had submitted an NOI "currently estimat[ing] that its [future] attorney will [provide services] . . . at a proposed hourly rate of $250/hour." Sierra Club NOI, A.99-12-025, April 4, 2000.

- 4 -

Following the first phase of A.99-12-025, by D.03-01-058 dated January 30, 2003, the Commission awarded $46,990.96 for Mr. Volker's services in 2000 and 2001 based on the NOI's $250 rate. Importantly, D.03-01-058 noted that in previous litigation *"attorney Volker . . . has been awarded attorney's fees at the hourly rate of $300 based on his extensive experience in the field of environmental litigation." Id.* at 9, ¶ 6, emphasis added.

Thereafter, by D.05-02-003, dated February 10, 2005, the Commission granted additional compensation for Mr. Volker's services in 2002-2003 based on the same non-market rate provided in the NOI despite Mr. Volker's declaration dated February 23, 2004 establishing that he had previously been awarded fees in judicial proceedings at $350 per hour.[2] Neither the Sierra Club nor Mr. Volker represented, nor did the Commission find, that the market value of Mr. Volker's services was at that time only $250 per hour. Rather, the Commission simply accepted the $250 rate provided in the NOI – a rate that Sierra Club had requested *prior to* Mr. Volker's involvement in the case. D.03-01-058 at 9, ¶ 6. The Commission, of course, gave Mr. Volker no indication that the non-market rate stated in the Sierra Club's NOI would *forever* saddle him with a vastly deflated pay range in all future Commission proceedings. *Id.*

Nonetheless, in a series of rate setting proceedings, the Commission subsequently decided, without notice to Mr. Volker or his clients, that all rates assigned to practitioners for work done in 2002 and 2003 should be deemed market rates and used as baselines to determine all future rates, adjusted only by slight cost of living increases. ALJ-184, D.05-11-031, and D.07-01-009. These decisions erroneously seized upon the rate of $250 per hour assigned to Mr.

---

[2]Request for Compensation of Sierra Club and Supporting Declaration of Counsel, filed February 23, 2004 in A.99-12-025, at 13:13.

Volker in D.03-01-058 and D.05-02-033 and deemed it his market rate, despite the fact that the

$250 figure was *not based on a market rate*.

Instead of correcting its error, the Commission here calculated Mr. Volker's rates based

on the *non*-market rate erroneously established for him. Specifically, the Opinion states:

> In D.06-04-018, the Commission compensated Volker at $270 / hour for work in
> 2004. That award was based on a prior compensation at a rate of $250 / hour
> awarded in D.05-02-003 and D.03-01-058.
> ...
> If we escalate Volker's 2004 rate by 0% for 2005 (see D.05-11-031) and by a 3%
> COLA for 2006, then round to the nearest $5, Volker would receive $280 / hour,
> the lower end of the range for attorneys with 13 or more years of experience.

Opinion at 28.

The Opinion's reduction in the rate requested for Mr. Volker was thus not based on his

market rate. To the contrary, the rate assigned to Mr. Volker is *directly contradicted by the prior*

*opinion's acknowledgment of Mr. Volker's higher market rate prior to 2002 of $300/hour*. Also,

the Commission completely overlooked the undisputed evidence presented in the request for

compensation and in the comments on the proposed decision that Mr. Volker's market rate is

now at least $450 per hour, based on his 33 years' experience and numerous judicial fee awards

including, as documented in the Exhibits to the comments, awards adjudicating his market rate at

$450 in 2004 and $475 in 2005, and an expert's testimony confirming that $475 per hour was, in

2006, "at the low end of, the prevailing market rates in the San Francisco Bay Area for attorneys

with experience and qualifications similar to Mr. Volker . . . ." Comments at 8 and Appendix 3

thereto at Exhibits A-C.

### III. ARGUMENT

The Opinion does not grant compensation for Mr. Volker's time at his market rate,

contrary to Public Utilities Code section 1806. Rather, D.07-12-007 calculates his hourly rate starting with a *non*-market rate of $250 per hour estimated in an NOI filed in 2000 by the Sierra Club in A.99-12-025 before the Sierra Club's retention of Mr. Volker in that proceeding. The rate awarded to Mr. Volker in that proceeding was well below his adjudicated rate, a fact noted by the Commission in its award decision, as discussed above. This non-market rate was then erroneously declared his "market rate" when, without notice to Mr. Volker, the Commission in ALJ-184 and D.05-11-031 established benchmark rates for attorneys who had previously received Commission fee awards. The erroneous use of this non-market rate as a baseline for future awards violates Public Utilities Code section 1806 and the due process rights of Mr. Volker and his clients.

A.     **Stephan Volker's Rate Should Reflect his "Market Rate" as Required by Public Utilities Code Section 1806, Which Was at Least $450 in 2006.**

The Opinion's failure to determine and award Mr. Volker's market rate is inconsistent with section 1806, which directs that "[t]he computation of compensation awarded pursuant to Section 1804 *shall* take into consideration *the market rates* paid to persons of comparable training and experience who offer similar services." *Id.*, emphasis added. The Opinion's selection of a *non*-market rate of $280 for Mr. Volker for 2006 in the face of undisputed evidence that his market rate was *at least* $450 in 2006 is directly contrary to the statute.

Mr. Volker's market rate is established by this Commission's acknowledgment that Mr. Volker had received court-awarded fees at $300 per hour before 2002 (D.03-01-058 at 9, ¶ 6), and by Mr. Volker's Declaration that: he had "32 years' experience as a practicing environmental lawyer in California," "[d]uring the past three decades [he has] actively participated, typically as the lead plaintiffs' attorney, in over 45 published cases in state and

- 7 -

federal courts," he was "familiar with the market value of [his] services, based on declarations submitted by knowledgeable attorneys in numerous attorney fee motions in other proceedings," and that based thereon, currently "[t]he market value of [his] services is between $450 and $650 per hour." Request at 13 and Exh. 3 thereto.

CARE also submitted additional documentation of this rate, such as the San Francisco Superior Court's award of $450 per hour for all of Mr. Volker's time in 2004 successfully prosecuting an action against the California Coastal Commission for violating environmental laws and the Marin Superior Court's award of $475 per hour for all of Mr. Volker's time in 2005 successfully prosecuting an environmental action against the City of Richmond. Comments at 8 and Appendix 3 thereto at Exhibits A-C.

There is simply no evidence that Mr. Volker's market value was less than the rates sought. No party presented evidence contrary to Mr. Volker's testimony and the extensive documentation in the Consrevation Groups' comments. Accordingly, consistent with section 1806, the Commission should correct Mr. Volker's rate to reflect the market rates paid to persons of comparable training and experience: at least $450 per hour in 2006.

**B.      The Commission Must Award Mr. Volker's Market Rate Consistent With the Due Process Rights of Mr. Volker and His Clients.**

The Opinion awarded Mr. Volker just $280 per hour on the grounds that the Commission had set $250 as his market rate in ALJ-184 and D.05-11-031, relying in turn on the awards in D.03-01-058 and D.05-02-003, as discussed above. Neither ALJ-184 nor D.05-11-031, however, afforded Mr. Volker any notice,[3] and neither actually considered any evidence of his

_____

[3] The first proceeding, which resulted in ALJ 184, was based on an informal letter survey sent to "over 40 regular participants in [PUC] proceedings," of whom only 9 parties submitted

market rate. Rather, ALJ-184 and D.05-11-031 simply assumed, incorrectly, that rates previously awarded attorneys in PUC proceedings were their market rates.[4] Although in some cases this may have been true, it was not true for the rates awarded Mr. Volker in D.03-01-058 and D.05-02-003. In fact, the $250 non-market rate awarded Mr. Volker was so low that it depressed the low range for attorneys of 13+ years experience *below* the low range for attorneys with *less* (8-12 years) experience (D.05-11-131 at 11), a discrepancy the Commission admitted was "anomalous" (*id.* at 17).

The Commission's purported but clearly erroneous determination of Mr. Volker's market rate in proceedings of which Mr. Volker had no notice violates the Due Process Clauses of both the California and the United States Constitution. As stated by the U.S. Supreme Court, "[i]ngrained in our concept of due process is the requirement of notice . . . . Notice is required in a myriad of situations where a penalty or forfeiture might be suffered for mere failure to act." *Lambert v. People of the State of California* (1957) 355 U.S. 225, 228.

The procedural Due Process Clause of the California Constitution affords even broader protections than does that of the United States Constitution, and clearly forbids the unnoticed rate-setting procedure utilized by the Commission here. As discussed in *Ryan v. California Interscholastic Federation – San Diego Section* (2001) 94 Cal.App.4th 1048, 1069-1071,

Our state due process constitutional analysis differs from that conducted pursuant

---

comments. ALJ-184 at 1-2. Mr. Volker was not among those surveyed, nor did he receive notice of the survey. The second proceeding resulted from a rulemaking (R.04-10-010) instituted by the Commission. D.05-11-031. Only four regulated utilities and four frequent intervenors participated in this proceeding; Mr. Volker received no notice of this proceeding. D.05-11-032 at 23-24.

[4]ALJ-184 at 9-10; D.05-11-031 at 28.

> to the federal due process clause in that the claimant need not establish a property
> or liberty interest as a prerequisite to invoking due process protection . . . .
> Focused rather on an individual's due process liberty interest to be free from
> arbitrary adjudicative procedures . . ., procedural due process under the California
> Constitution is "much more inclusive" and protects a broader range of interests
> than under the federal Constitution . . . .  According to our Supreme Court, it "has
> expanded upon the federal analytical base by focusing on the administrative
> process itself."

*Id.*, citations omitted.

Consistent with the foregoing principle, in *People v. Ramirez*, the California Supreme

Court held that application of California's Due Process Clause "must be determined in the

context of the individual's due process liberty interest in freedom from arbitrary adjudicative

procedures [and that] due process analysis must start not with a judicial attempt to decide

whether the statute has created an 'entitlement' that can be defined as 'liberty' or 'property,' but

with an assessment of what procedural protections are constitutionally required in light of the

governmental and private interests at stake." *Id.*, 25 Cal.3d at pages 263-264; *accord, In re*

*Jackson* (1987) 43 Cal.3d 501, 510; *Hernandez v. Department of Motor Vehicles* (1981) 30

Cal.3d 70, 81, fn. 12.  The *Ramirez* Court explained that "the due process safeguards required for

protection of an individual's statutory interests must be analyzed in the context of the principle

that freedom from arbitrary adjudicative procedures is a substantive element of one's liberty."

*Id.* at 268.

Contrary to the foregoing and despite the fact that Mr. Volker's interests (and those of his

clients) in future fee awards would be clearly and adversely affected, the Commission failed to

notify Mr. Volker before fixing his future rate based on an admittedly "anomalous" non-market

award.  D.05-11-031 at 17.  ALJ-184 made no attempt to notify all counsel who had appeared in

previous PUC proceedings.  Instead, the ALJ merely "wrote to over 40 regular participants in

[Commission] proceedings, including frequent intervenors and utilities from the various regulated industries [and] invited comments and suggestions to begin development of this annual process." ALJ-184 at 1. This notice to some PUC *insiders* did not warn other practitioners such as Mr. Volker that their future rates would be fixed indefinitely by the proceeding.

Thus, Mr. Volker, along with any other attorney not on this Commission's selective mailing list for the proceeding, was denied notice of the proceeding that converted *all* of the 2003 rates into "reasonable market rates" to be applied (with slight cost of living modifications) to *all* future fee awards. As such, this Commission carried out "arbitrary adjudicative procedures," denying Mr. Volker and others their right to "fair and unprejudicial decision-making." *Ryan, supra,* 94 Cal.App.4th at 1070-71. The Commission's overbroad attempt in ALJ-184 and D.05-11-031 to fix all future rates without notice to those affected denied Mr. Volker any opportunity to correct the Commission's mistaken reliance on non-market rates.

In sum, the attorney rate setting mechanism established in ALJ-184 and D.05-11-031 cannot be applied constitutionally to Mr. Volker, or to any other parties who were not afforded notice of these proceedings. Because Mr. Volker did not receive proper notice of the proceedings, he is not bound by the resulting decisions and his compensation here should be based on the undisputed record evidence that his market rate was at least $450 in 2006.

## IV. REQUEST FOR ORAL ARGUMENT

Pursuant to Rule 16.3, CARE hereby requests oral argument on this matter because CARE's application for rehearing "presents legal issues of exceptional public importance." Rule 16.3(a)(3). The Commission's current rate setting mechanism unconstitutionally limits recovery by CARE and other similarly-situated intervenors. This imbalance creates an uneven playing

- 11 -

field for participants in Commission proceedings and discourages, rather than encourages, public

participation in the Commission's important decisionmaking processes. As such, oral argument

is necessary to fully illuminate the important issues raised by this application.

In a parallel proceeding, Friends of the Eel River and California Sportfishing Protection

Alliance are filing a similar application for rehearing on Mr. Volker's hourly rate. For purposes

of efficiency, CARE requests that its application be heard at the same time as the application of

Friends of the Eel River and California Sportfishing Protection Alliance .

### V.  CONCLUSION

CARE seeks an adjustment in its attorney's rate not only to bring parity with other

intervenors to the present fee award, but also, and more importantly, to ensure that future

participation in Commission proceedings will not be hindered by the current disparity in attorney

fee awards.

Dated:  December 20, 2007

Respectfully submitted,

By: /s/ STEPHAN C. VOLKER
    STEPHAN C. VOLKER
    Attorney for Intervenor CARE

- 12 -

## DECLARATION OF COUNSEL

I, Stephan C. Volker, hereby declare:

1.    I am counsel for intervenor CARE and have personal knowledge of the following matters.

2.    Annexed as Exhibit 1 hereto is my Biographical Statement.  I am requesting a rate of at least $450 per hour for work done in 2007 based on my three decades of experience in environmental and regulatory litigation.  Prior awards in the PUC have not reflected my market rate, as defined in the Public Utilities Code, and therefore I ask that the Commission reevaluate my assigned rate based on my experience, as documented below.

3.    I have 33 years' experience as a practicing environmental lawyer in California, and have been awarded attorney's fees by state and federal courts and the CPUC on numerous occasions.  I have extensive experience in the field of environmental litigation.  During the past three decades I actively participated, typically as the lead plaintiffs' attorney, in over 45 published cases in state and federal courts in California, Washington, Alaska, Montana, and Arkansas.  My most recent appellate victory, *Vineyard Area Citizens for Responsible Growth v. City of Rancho Cordova* (2007) 40 Cal.4th 412, is a landmark ruling under the California Environmental Quality Act.

4.    In October 2005 I received a judicial award of fees in *Sierra Club v. Coastal Commission, et al.,* San Francisco Superior Court Case No. CPF 03-503433, wherein the Court found that my "reasonable hourly rate" was $450 / hour for work done in 2004.  Exhibit 2 hereto at 2:17.  In September 2006 I received a judicial award of fees in *Citizens for the Eastshore State Park v. City of Richmond, et al.,* Marin County Superior Court Case No. CV 052241, wherein

the Court found that my "reasonable hourly rate[] of compensation" was $475 / hour for work

done in 2005.  Exhibit 3 hereto at 3:19.  Based on those awards and the documentation provided

for them, and my 33 years' experience in prosecuting fee awards, I believe that my market rate is

between $450 and $650 per hour.

5.       As an example of my recognized expertise in environmental law, I was selected

by the California State Bar Association's Environmental Law Section to give  presentations on

recent developments in CEQA caselaw at the Section's annual Environmental Law Conference

in Yosemite last October.  I was also selected by Continuing Legal Education International to

give presentations on CEQA at its annual seminars for environmental law practitioners in Los

Angeles and Sacramento last August and September.

6.       In addition, I have significant pertinent Commission experience, as summarized

in the following table:

| Cause | Client | Case No. |
|---|---|---|
| Rulemaking on Commission's own motion to provide for mitigation of local rail safety hazards within California | Friends of the River, et al. | R.93-10-002 |
| Application of Pacific Gas and Electric Company for authorization to sell the El Dorado Hydroelectric Project to El Dorado Irrigation District Pursuant to Public Utilities Code §851 | League to Save Sierra Lakes, et al. | A.98-04-016 |
| Application of Pacific Gas and Electric Company to Report Assessments of Inventory Balances and to Address Appraisal | Friends of the Eel River, et al. | A.98-05-022 |
| Application of Pacific Gas and Electric Company to Value Hydroelectric Plants and Related Assets Pursuant to Public Utilities Code Sections 367(b) and 851 | Friends of the Eel River, et al. | A.99-09-053 |

- 14 -

| Cause | Client | Case No. |
|---|---|---|
| Application of Valencia Water Company (U34-W) seeking approval of its updated Water Management Program as ordered in Commission Resolution W-4154 dated August 5, 1999 | Angeles Chapter Sierra Club, et al. | A.99-12-025 |
| Application for a Certificate of Public Convenience and Necessity Authorizing the Construction of the Jefferson-Martin 230 kV Transmission Project | Californians for Renewable Energy | A.02-09-043 |
| Rulemaking Regarding Policies, Procedures, and Rules for the California Solar Initiative, etc. | Californians for Renewable Energy | R.06-03-004 |
| Carol Dominguez v. PG&E | Californians for Renewable Energy | C.07-03-006 |

7.    I have also participated in numerous administrative proceedings before other state, local and federal regulatory bodies bearing some similarities to the PUC for decades, including the following illustrative proceedings during the past 15 years:

| Cause | Agency and Years | Case No. |
|---|---|---|
| Marine Environmental Consortium v. Washington Department of Ecology | Washington Pollution Control Hearings Board 1990-1992 | In re NPDES Permit Nos. WA-004037-1, et al. |
| The Wilderness Society v. Hastey | U.S. Interior Board of Land Appeals 1992-1994 | IBLA 92-537 |
| North Cascades Conservation Council and Washington Environmental Council v. Chelan County Board of Adjustment, et al. | State of Washington Shorelines Hearings Board 1994-1999 | SHB No. 93-9 |
| North Cascades Conservation Council and Washington Environmental Council v. Chelan County Board of Commissions | Eastern Washington Growth Planning Hearings Board, State of Washington 1994-1999 | GPHB No. 93-1-0001 |

| Cause | Agency and Years | Case No. |
|---|---|---|
| Friends of the Navarro Watershed, et al. v. Unnamed Illegal Diverters of Water from Navarro River, etc., et al. | State of California Water Resources Control Board 1994-2000 | Water Rights Applications 29711, etc. |
| The Wilderness Society v. Regional Forester G. Lynn Sprague | U.S. Department of Agriculture, Chief, U.S. Forest Service 1995-2003 | Appeal No. 95-13-00-0035-A217 |
| Marine Environmental Consortium, et al., v. State of Washington Department of Ecology, et al. | State of Washington Pollution Control Hearings Board 1996-1999 | PCHB Nos. 96-257, et al. (applications for NPDES permits for salmon net-pen waste discharge permits) |
| League to Save Sierra Lakes, et al., v. El Dorado County Water Agency | State of California Water Resources Control Board 1996-2001 | Water Appropriation App. Nos. 29919-29922 and Petition for State-Filed App. No. 5645 |
| Friends of the Eel River, et al., v. Pacific Gas & Electric Company | Federal Energy Regulatory Commission 1996-2006 | Application for License Amendment for Hydroelectric Project 77-110 on the Eel River, California |
| Alpine County, et al., v. Pacific Gas & Electric Company and El Dorado Irrigation District | Federal Energy Regulatory Commission 1997-1999 | Application to Amend Hydropower License for Project No. 184 for Construction of a Dam and Canal on the South Fork American River, California |
| Save Medicine Lake Coalition v. Calpine | Siskiyou County Air Pollution Control District Board of Directors 1999 | Application for Authority to construct geothermal facilities in the Medicine Lake Basin |

- 16 -

| Cause | Agency and Years | Case No. |
|-------|------------------|----------|
| California Sportfishing Protection Alliance, et al. v. Sonoma County Water Agency | State of California Water Resources Control Board 2000-2007 | Application Nos. 12919A, et al. to Add Points of Diversion and Rediversion to Water Rights Permits 12947A, et al. |
| Friends of the Eel River, et al., v. Pacific Gas & Electric Company, et al. | Federal Energy Regulatory Commission 2001-2007 | Docket No. ER02-455-000, et al., Docket No. CP 02-39-000 et al., and Project Nos. 77-1116, et al. Regarding Relicensing Applications on PG&E Hydroelectric Facilities Throughout California |
| Voices for Rural Living v. Shingle Springs Band of Miwok Indians | Interior Board of Indian Appeals 2006-2007 | IBIA 07-034-A |

8.     I have recovered dozens of attorney fee awards under state and federal fee-shifting statutes from state and federal courts and administrative agencies over the past 33 years, aggregating several million dollars in recoveries. In these cases (save those before the California Public Utilities Commission to date) my recovery was usually based on my market rate in the relevant legal community. Based on my experience documenting the market value of my services in these cases, I am familiar with my market rate.

9.     As documented above, my current market rate is between $450 and $650. An additional illustrative declaration documenting this fact is the Declaration of Michael Traynor in Support of Petitioner's Motion for Attorneys' Fees and Litigation Costs filed in April 2006 in Marin Superior Court in which Mr. Traynor attests that $450 per hour is "within, albeit at the low end of, the prevailing market rates in the San Francisco Bay Area for attorneys with

- 17 -

experience and qualifications similar to Mr. Volker." Exhibit 4 hereto at 4:1-3.

I declare under penalty of perjury that the foregoing facts are true of my personal knowledge, that I am competent to and if called would so testify, and that this declaration was executed on December 20, 2007, in Oakland, California.

/s/ STEPHAN C. VOLKER
STEPHAN C. VOLKER

- 18 -

## PROOF OF SERVICE

I am a resident of the United States and of the State of California. I am employed in the County of Alameda. My business address is 436 - 14th Street, Suite 1300, Oakland, California 94612. My business telephone number is (510) 496-0600, and fax number is (510) 496-1366. I am over the age of eighteen years. I am not a party to the within action or proceeding. On December 20, 2007, I served the following document(s):

### APPLICATION OF CALIFORNIANS FOR RENEWABLE ENERGY (CARE) FOR REHEARING OF D.07-12-007

by arranging for the e-mailing of the above-entitled document and attachments to the parties' e-mail addresses indicated on the attached list of counsel or, if counsel has no e-mail address availability, said documents were enclosed in an envelope and whereby I placed the envelope(s) for collection and mailing on the date and at the place shown below following our ordinary business practices. I am readily familiar with this business's practice for e-mailing and collecting and processing correspondence for mailing. On the same day that correspondence is placed for collection and mailing, it is deposited in the ordinary course of business with the United States Postal Service in a sealed envelope with postage fully prepaid, addressed as listed on the attached following pages.

I declare under penalty of perjury that the foregoing is true and correct. Executed December 20, 2007, at Oakland, California.

/s/ Teddy Ann Fuss
Teddy Ann Fuss

L/mpg                                                        **Mail Date**
                                                            **3/17/08**

Decision 08-03-024  March 13, 2008


BEFORE THE PUBLIC UTILITIES COMMISSION OF THE STATE OF CALIFORNIA


| | |
|---|---|
| Application of Pacific Gas and Electric Company to Value Hydroelectric Plants and Related Assets Pursuant to Public Utilities Code Sections 367(b) and 851. | Application 99-09-053 (Filed September 30, 1999) |


### <u>ORDER DENYING REHEARING OF DECISION (D.) 07-12-004</u>


In Decision (D.) 07-12-004, we awarded Friends of the Eel River ("Friends") and the California Sportfishing Protection Alliance ("California Sportfishing") (collectively, "the Conservation Groups") compensation for their substantial contributions to D.07-04-011. In particular, D.07-12-004 awarded Conservation Groups $77,671.48 in compensation.[1] This award was approximately $10,000.00 less than the amount requested because we did not grant the lead attorney an hourly rate of $400, and because only two-thirds of the 75+ hours claimed for preparation of compensation pleadings was allowed.[2] D.07-12-004 awarded Conservation Groups'

---

[1] The request, as originally filed, has three components: $55,605.00 associated with participation in A.99-09-053, $25,737.23 associated with participation in A.98-05-014/A.98-05-022 (which preceded A.99-09-053), and $10,103.25 for compensation-related expenditures attributed to the combined dockets. The request reports this total as $91,445.98, rather than $91,445.48, due to a $0.50 discrepancy in some subcomponents. The comments revise the request to $87,389.48 to reflect certain adjustments recommended by the proposed decision.

[2] Subsequently, in D.08-02-003 the Commission denied the joint request of Friends and the California Sportfishing for additional intervenor compensation in the amount of $7,805. This claim was for time spent preparing comments on the proposed decision underlying D.07-12-004, which awarded them approximately $77,671 in compensation. Compensation was denied because the comments constitute an unproductive effort and excessive hours and because these intervenors failed to make a substantial contribution.

A.99-09-053                         L/mpg

lead attorney, Mr. Volker, an hourly rate of $290 per hour rather than the $400 per hour requested for his year 2007 work.[3]

On December 17, 2007, the Conservation Groups filed an application for rehearing of D.07-12-004. The Conservation Groups' application for rehearing request a limited review of D.07-12-004 in that it only seeks to have this Commission "increase the hourly rates assigned to their lead counsel, Stephan C. Volker, to reflect his market rates." (Rehrg. Application, p.1.) The Conservation Groups requested oral argument on this issue pursuant to Rule 16.3(a)(iii).

## I.    DISCUSSION

### A.    D.07-12-004 comports with section 1806.

The Conservation Groups argue that D.07-12-004 fails to conform to section 1806. They allege that D.07-12-004 did not consider the market rates in determining Mr. Volker's hourly rates. They argue that section 1806 requires not only that this Commission "consider the market rates paid to persons of comparable training and experience who offer similar services," but that we must base each practitioner's hourly rate on the rate the practitioner commands in the outside market. Specifically, the Conservation Groups assert:

> As previously documented by Conservation Groups and Mr. Volker, market rates for Mr. Volker, an environmental lawyer for more than 33 years, are at least $265 in 1999, $280 in 2000, $295 in 2001, and $450 in 2007. (Rehrg. Application, p.2.)

Contrary to the Conservation Groups' assertion, Public Utilities Code section 1801, et seq., does not require this Commission to determine and award the hourly rate an individual attorney receives based on their practice outside the Commission.[4] To the

---

[3] Conservation Groups sought a rate of $280, and $295 per hour for work done in years 2000 and 2001 (respectively), without acknowledging the previously set rate of $250 per hour for Mr. Volker for these years. (See D.07-12-004, p. 26.)

[4] All statutory references are to the California Public Utilities Code, unless otherwise noted.

A.99-09-053                        L/mpg

extent that it asserts that its evidence, uncontroverted or otherwise, is controlling, the Conservation Groups incorrectly state this Commission's section 1806 obligation.

Section 1806 does not direct us to accept as a given an individual attorney's hourly rate based on what he or she makes outside the Commission. Rather, the statute directs that we "take into consideration the market rates paid to persons of comparable training and experience who offer similar services." (Pub. Util. Code, §1806.) The Commission therefore has discretion in determining the hourly rate. Indeed, when taking into consideration the market rates paid to persons of comparable training and experience who offer similar services, section 1806 directs us to set intervenor rates relative to the rates paid attorneys that practice before this Commission. Specifically, section 1806 directs that:

> The compensation awarded may not, in any case, exceed the comparable market rate for services paid by the commission or the public utility, whichever is greater, to persons of comparable training and experience who are offering similar services. (Pub. Util. Code, §1806.)

This Commission has properly interpreted and implemented section 1806 through its decisions, including the ones adopting an annual process (see D.05-11-031 and Resolution ALJ-184) and those setting Mr. Volker's hourly rates (see D.06-04-018, D.06-06-025, and the decision now being challenged). (See discussion, *infra*.) The rate established for Mr. Volker in D.07-12-004, of $290 per hour, was the result of escalating the $270 per hour rate established for Mr. Volker in D.06-04-018.[5] In D.06-04-018 we considered the factors set forth in section 1806, including whether the claimed intervenor fees and costs are comparable to the market rates paid to experts and advocates having comparable training and experience and offering similar services.[6]

---

[5] See *Opinion Granting Intervenor Compensation to 280 Corridor Concerned Citizens, Californians for Renewable Energy, and Women's Energy Matters for Substantial Contributions to Decision 04-08-046* ("*Opinion Granting Intervenor Compensation*") [D.06-04-018] (2006) ___ Cal.P.U.C.3d ____.

[6] See *Opinion Denying Petition for Modification by Californians for Renewable Energy of*
(footnote continued on next page)

3

A.99-09-053                           L/mpg

         Further, D.06-04-018 and D.06-06-025 were consistent with Rulemaking to Set Hourly Rates for Purposes of Calculating Intervenor Compensation Awards, Pursuant to Public Utilities Code Section 1801 and Following, for Work Performed in Calendar Year 2005 ("2005 Hourly Rate Decision") [D.05-11-031] (2005) ___ Cal.P.U.C.3d ___, wherein this Commission adopted rates for advocates based on their specific training and experience, taking into consideration the compensation of persons with comparable training and experience.[7] As noted in D.05-11-031:

> Here we examine the authorized hourly rates paid to intervenors in 2003 and 2004 in light of the data from utilities on their expenses for representation in our proceedings (new intervenor rates proposed for 2005 are examined in Sections 6 and 7 of this decision).  Regarding the hourly rates we currently authorize for intervenors, we find these rates are within the ranges of hourly rates that utilities pay their representatives overall.  This is true both for attorneys and experts, at all levels of experience. (*2005 Hourly Rate Decision* [D.05-11-031], *supra*, at pp. 9, 12, 28.)

Based on the data solicited, D.05-11-031 found that for 2003 and 2004, "all currently authorized intervenor attorney rates fall within the range of utility outside attorney rates" and established rates authorized for work by intervenor attorneys in 2005.  (*Id.* at pp. 12 & 15- 16.)  In addition to establishing a range of experience based rates and providing for annual increases to attorney hourly rates, D.05-11-031 increased the rates established prior to 2004 to bring them within the current experience based rate range.

---

*(footnote continued from previous page)*

*Decision 06-04-018* [D.06-06-025](2006) ___ Cal.P.U.C.3d ____, p. 1 (slip op.), citing *Opinion Granting Intervenor Compensation* [D.06-04-018], *supra*, at pp. 37, 58-59, & 63 (slip op.).  In D. 06-10-023, the Commission denied a request for rehearing of D.06-06-025, which argued among other things that Volker's 2004 rate should be $400 per hour.  (*Order Denying Rehearing of D.06-06-025* [D.06-10-023] (2006) ___ Cal.P.U.C.3d ___.)

[7] Also, D.06-04-018 is consistent with Resolution ALJ-184, issued August 25, 2004 [adopting an annual process for setting and updating hourly rates for use by intervenors in seeking compensation].

A.99-09-053                     L/mpg

The initial hourly rate for Conservation Groups' attorney, Mr. Volker, was
established in D.03-01-058.[8] Consistent with its section 1806 obligation, in D.03-01-058
we considered Mr. Volker's prior experience in non-Commission proceedings, including
his having commanded $300 per hour in other venues.  As noted in *Re: Valencia Water
Company – Opinion on Request for Intervenor Compensation* ("*Volker's Hourly Rate in
Valencia Water Company Decision*") [D.03-01-058] (2003) ___ Cal.P.U.C.3d ___ :

> Attorney Volker states that he has over 27 years experience as
> a practicing environmental lawyer in California and has been
> awarded attorney's fees at the hourly rate of $300 based on
> his extensive experience in the field of environmental
> litigation.  We conclude that based on Volker's experience,
> the requested hourly rate of $250 for services provided in
> 2000 and 2001 is reasonable.  (*Id.* at p. 7 (slip op.).)

The Commission also set hourly rates for Mr. Volker in D.06-04-018 and D.06-06-025,
as affirmed by D.06-10-023.  He received an hourly rate of $270 for 2004.  After the
upward adjustments to Mr. Volker's rate provided for in D.06-06-025, D.07-12-004
provided for a $290 per hour rate, which falls within the range of rates which have been
found to be appropriate for attorneys with a comparable number of years of practice.

Ultimately, the Conservation Groups' assertions concerning the appropriate
market rate serve best to illustrate the fundamental misunderstanding that pervades their
challenge.  Specifically, the Conservation Groups fail to distinguish between the market
rate, the hourly rate a practitioner earns in a particular market, and the hourly rate
afforded a practitioner for work done at the Commission, as determined in various
previous decisions.  Consistent with section 1806, this Commission considered market
information to determine the appropriate range of hourly rates for individuals with a
comparable number of years of experience to Mr. Volker, examined Mr. Volker's

---

[8] The Conservation Groups wrongly claims that Mr. Volker's prior $250 per hour rate resulted
from an estimate of legal costs contained in a notice of intent to claim compensation submitted
by his client prior to D.03-01-058. (Rehrg. Application, p. 1.)  However, there is nothing in the
record or the Commission rules showing that Mr. Volker or his client were prohibited from
requesting a higher rate in that proceeding, so long as the rate was justified.

A.99-09-053                          L/mpg

evidence of his experience at the Commission and in other venues, and thereby set an

hourly rate for Mr. Volker's work at the Commission.[2]

**B.     The Conservation Groups mount an improper collateral attack
        on decisions that are now final.**

The Conservation Groups assert that "[n]either [Res] ALJ-184 nor D.05-11-

031 however afforded Mr. Volker any notice, and neither actually considered any

evidence of his market rate." Specifically, Conservation Groups allege a due process

violation on claims that "the attorney rate setting mechanism established in ALJ-184 and

D.05-11-031 cannot be applied constitutionally to Mr. Volker or to any other parties who

were not afforded notice of these proceedings." (Rehrg Application, p.10.) Conservation

Groups' due process claim is no more than an improper collateral attack on Resolution

ALJ-184 and D.05-11-031 which are now final. (See Pub. Util. Code, §1709, stating:

"In all collateral actions or proceedings, the orders and decisions of the [C]omission

which have become final shall be conclusive.") Furthermore, Conservation Groups claim

is also factually inaccurate. As an initial matter the Conservation Groups claim ignores

the fact that individual attorneys can get their rate changed in any appropriate proceeding.

Moreover, contrary to the Conservation Groups claims, like D.03-01-058, D.07-12-004

considered the evidence presented on Mr. Volker's hourly rates. (See *Volker's Hourly*

*Rate in Valencia Water Company Decision* [D.03-01-058], *supra*, at p.7 (slip op.), and

D.07-12-004, p.26.) Though the evidence outlining Mr. Volker's prior experience was

found to be more comprehensive, D.07-12-004 declined to increase the hourly rate after

finding that:

> Given the various problems with the request noted in the
> proposed decision (some of which persist), we do not find this
> work product to be of a caliber warranting an addition to the

---

[2] That this Commission may weigh general versus Commission specific legal experience
differently is consistent with Resolution ALJ-184. As set forth therein, "we expect that
advocates with experience before the Commission have a certain level of knowledge about our
Rules of Practice and Procedure and filing requirements." (Resolution ALJ-184, issued August
25, 2004, p. 4.)

A.99-09-053                          L/mpg

> base fee of $290/hour and decline, here, to further escalate
> Volker's 2007 hourly rate. (D.07-12-004, p. 25.)

That Conservation Groups' failed to make a showing that would support an increase in

Mr. Volker's rates for work done in 2000 – 2003 is further evidenced by the fact that

their request for compensation failed even "to recognize and report the hourly rates the

Commission has set in the past...." (D.07-12-004, p. 26.) Thus, rather than ignore the

evidence presented as Conservation Groups claim, we did consider it, but were not

persuaded.

     **C.**     **The Commission routinely adjusts the established market rates
and allows intervenors the opportunity to change their
individual hourly rate.**

     Res ALJ-184, D.05-11-031, and D.07-01-009 are part of this Commission's

"annual process for updating hourly rates based on new compensation data and proposed

rates from intervenors." (See Res ALJ-184, issued August 25, 2004, p. 1; *2005 Hourly

Rate Decision* [D.05-11-031], *supra*, at p. 3 (slip op.); and *Order Instituting Rulemaking

to Set Hourly Rates for Purposes of Calculating Intervenor Compensation Awards

Pursuant to Public Utilities Code Section 1801 and Following, for Work Performed in

Calendar Year 2006 ("2007 Hourly Rate Decision")* [D.07-01-009], *supra*, at p. 2 (slip

op.).) Through this "process" interested parties are afforded the opportunity to introduce

evidence going to, but not limited to, the appropriate market rates, practice categories,

and cost of living increases. Consistent with this objective, among other things, D.05-11-

031 established pay ranges for attorneys and expert witnesses based on years of

experience, and found a 3% cost of living increase to be appropriate in some

circumstances. (*2005 Hourly Rate Decision* [D.05-11-031], *supra*, at p. 28 (slip op.).)

     In addition to considering evidence regarding the market rates established

for attorney practice groups, this Commission has consistently afforded intervenors the

opportunity to modify their individual hourly rate. For example, in addition to adopting

A.99-09-053                        L/mpg

an annual process for setting and updating hourly rates for intervenors seeking

compensation, Resolution ALJ-184 provides that:

> [A]n intervenor may request an adjustment to an adopted
> hourly rate but must show good cause for doing so. For
> example, if a court or regulatory agency awarded the
> advocate a higher hourly rate for work in the same calendar
> year, the intervenor may ask us to use the higher rate. The
> burden is on the intervenor to justify the higher rate, and in
> the example just given, we would expect the intervenor to
> address, among other things, the standard used by the court or
> agency in setting the higher rate and the comparability of the
> work performed at the Commission to the work performed at
> the court or agency. (*Id.* at pp. 2-4.)

Resolution ALJ-184 is thus clear that, in addition to showing good

cause for an hourly rate increase, such as a being awarded a higher hourly rate by

a court or other regulatory agency, the intervenor requesting the higher rate bears

the additional burden of justifying the higher rate requested.[10]  While

Conservation Groups presented evidence of Mr. Volker's having received a higher

award in other venues, it failed address the standard used to set that rate, and made

no attempt to show how the work performed at that hourly rate was comparable to

the work done at the Commission for which the hourly rate increase was being

sought.  Indeed, in addition to noting that the entire 5.6 hours of year 2007 work

for which the increased hourly rate was sought "was related to preparation of the

request," we specifically note that Conservation Groups' failed to even "recognize

and report the hourly rates the Commission has set in the past...." (D.07-12-004,

p. 26.) Accordingly, their request for an increase from $290 to $400 per hour was

properly denied.

---

[10] More recently, among other things, D.07-01-009 established a process whereby individual
intervenor representatives in each experience level may obtain two 5% step increases every two
years. (*2007 Hourly Rate Decision* [D.07-01-009], *supra*, at p. 1 (slip op.).)

A.99-09-053                          L/mpg

### D.    The Request for Oral Argument should be denied.

In their application for rehearing, the Conservation Groups requested oral

argument.  Rule 16.3(a) of our Rules of Practice and Procedure provides, in relevant part:

> The request for oral argument should explain how oral argument will
> materially assist the Commission in resolving the application and
> demonstrate that the application raises issues of major significance
> for the Commission because the challenged order or decision:
>
> > (1) adopts new Commission precedent or departs from
> >     existing Commission precedent without adequate
> >     explanation;
> >
> > (2) changes or refines existing Commission precedent;
> >
> > (3) presents legal issues of exceptional controversy,
> >     complexity, or public importance; and/or
> >
> > (4) raises questions of first impression that are likely to
> >     have significant precedential impact.
>
> These criteria are not exclusive. The Commission has complete
> discretion to determine the appropriateness of oral argument in any
> particular matter.

(Code of Regs., tit. 20, §16.3, subd. (a).)

The rehearing applicants seek oral argument on claims that their application

for rehearing "presents legal issues of exceptional public importance."  Specifically, the

Conservation Groups assert that:

> The Commission's current rate setting mechanism
> unconstitutionally limits recovery by Conservation Groups
> and other similarly-situated intervenors. This imbalance
> creates an uneven playing field for participants in
> Commission proceedings and discourages, rather than
> encourages public participation in the Commission's
> important decision making processes. (Rehrg. Application,
> p.11.)

The merits of the Commission's current rate setting mechanism was not the subject of

D.07-12-004, that mechanism was adopted in D.05-11-031 and Resolution ALJ-184.

9

A.99-09-053                         L/mpg

Oral argument on issues not in the decision being challenge is inappropriate. We will therefore deny the Conservation Groups' request for oral argument.

**THEREFORE, IT IS ORDERED** that:

1.  Rehearing of D.07-12-004 is hereby denied.

2.  The request for oral argument is hereby denied.

3.  Proceeding, Application 99-09-053, is closed.

This order is effective today.

Dated March 13, 2008, at San Francisco, California.

MICHAEL R. PEEVEY
President
DIAN M. GRUENEICH
JOHN A. BOHN
RACHELLE B. CHONG
TIMOTHY ALAN SIMON
Commissioners

L/cdl

**CORRECTED
MAIL DATE 5/1/2008**

Decision 08-04-060          April 24, 2008 `

BEFORE THE PUBLIC UTILITIES COMMISSION OF THE STATE OF CALIFORNIA

| | |
|---|---|
| Order Instituting Rulemaking Regarding Policies, Procedures and Rules for the California Solar Initiative, the Self-Generation Incentive Program and Other Distributed Generation Issues. | Rulemaking 06-03-004 (Filed March 2, 2006) |

## ORDER DENYING REHEARING OF DECISION (D.) 07-12-007

### I.    BACKGROUND

In Decision (D.) 07-12-007, we awarded Californians for Renewable Energy ("CARE") compensation for its substantial contributions to D.06-08-028. In particular, D.07-12-007 awarded CARE $39,810.98 in compensation. This award was $25,942.90 less than the $65,753.88 requested due to reductions to the hours claimed by CARE and adjustments to the requested hourly rates for CARE attorneys. D.07-12-007 awarded CARE's lead attorney, Mr. Volker, an hourly rate of $280 per hour rather than the $500 per hour requested for his year 2006 work.[1]

On December 20, 2007, CARE filed an application for rehearing of D.07-12-007. In its rehearing application CARE requests a limited review of D.07-12-007 in that it only seeks to have this Commission "increase the hourly rates assigned to their lead counsel, Stephan C. Volker, to reflect his market rates." (Rehrg. Application, p.1.) In its rehearing application, CARE also requested oral argument on this issue pursuant to Rule 16.3(a)(iii).

---

[1] CARE sought a rate of $235 per hour and was awarded a rate of $195 per hour for work done in 2006 by attorney Harris.

326476                          1

R.06-03-004                              L/cdl

## II.    DISCUSSION

### A.    D.07-12-007 comports with section 1806.

CARE argues that D.07-12-007 fails to conform to Public Utilities Code section 1806.[2] CARE alleges that D.07-12-007 did not consider the market rates in determining Mr. Volker's hourly rates. CARE argues that section 1806 requires not only that this Commission "consider the market rates paid to persons of comparable training and experience who offer similar services," but that we must base each practitioner's hourly rate on the rate the practitioner commands outside the Commission. Specifically, CARE asserts:

> As previously documented by CARE and Mr. Volker, market rates for Mr. Volker, an environmental lawyer for more over 33 years, was at least $450 in 2006. (Rehrg. Application, p.3.)

Contrary to the CARE's assertion, Public Utilities Code section 1801, et seq., does not require this Commission to determine and award the hourly rate an individual attorney receives based on their practice outside the Commission. To the extent that it asserts that its evidence, uncontroverted or otherwise, is controlling, CARE incorrectly state this Commission's section 1806 obligation.

Section 1806 does not direct us to accept as a given an individual attorney's hourly rate based on what he or she makes outside the Commission. Rather, the statute directs that we "take into consideration the market rates paid to persons of comparable training and experience who offer similar services." (Pub. Util. Code, §1806.) The Commission therefore has discretion in determining the hourly rate. Indeed, when taking into consideration the market rates paid to persons of comparable training and experience who offer similar services, section 1806 directs us to set intervenor rates relative to the rates paid attorneys that practice before this Commission. Specifically, section 1806 directs that:

---

[2] All statutory references are to the Public Utilities Code, unless otherwise noted.

R.06-03-004                              L/cdl

>    The compensation awarded may not, in any case, exceed the
>    comparable market rate for services paid by the commission
>    or the public utility, whichever is greater, to persons of
>    comparable training and experience who are offering similar
>    services. (Pub. Util. Code, §1806.)

This Commission has properly interpreted and implemented section 1806 through its decisions, including the ones adopting an annual process (see D.05-11-031 and Resolution ALJ-184),[3] those setting Mr. Volker's hourly rates (see D.06-04-018, D.06-06-025), and the decision now being challenged.[4] (See discussion, *infra*.) The rate established for Mr. Volker in D.07-12-007, of $280 per hour, was the result of escalating the $270 per hour rate established for Mr. Volker in D.06-04-018. In D.06-04-018 we considered the factors set forth in section 1806, including whether the claimed intervenor fees and costs are comparable to the market rates paid to experts and advocates having comparable training and experience and offering similar services. (See *Opinion Denying Petition for Modification by Californians for Renewable Energy of Decision 06-04-018* [D.06-06-025] *supra*, at p. 1 (slip op.), citing *Opinion Granting Intervenor Compensation* [D.06-04-018], *supra*, at pp. 37, 58-59, & 63 (slip op.).)[5]

Further, D.06-04-018 and D.06-06-025 are consistent with D.05-11-031 wherein this Commission adopted rates for advocates based on their specific training and

---

[3] *Rulemaking to Set Hourly Rates for Purposes of Calculating Intervenor Compensation Awards, Pursuant to Public Utilities Code Section 1801 and Following, for Work Performed in Calendar Year 2005* ("*2005 Hourly Rate Decision*") [D.05-11-031] (2005) ___ Cal.P.U.C.3d ___; Resolution ALJ-184, issued August 25, 2004 [adopting annual process for setting hourly rates to use in calculating compensation awards to intervenors].

[4] See *Opinion Granting Intervenor Compensation to 280 Corridor Concerned Citizens, Californians for Renewable Energy, and Women's Energy Matters for Substantial Contributions to Decision 04-08-046* ("*Opinion Granting Intervenor Compensation*") [D.06-04-018] (2006) ___ Cal.P.U.C.3d ____.

[5] In D. 06-10-023, the Commission denied a request for rehearing of D.06-06-025, which argued among other things that Volker's 2004 rate should be $400 per hour. (*Order Denying Rehearing of D.06-06-025* [D.06-10-023] (2006) ___ Cal.P.U.C.3d ___.) On January 31, 2007, the California Court of Appeal summarily denied a writ petition, challenging the lawfulness of D.06-06-025 and D.06-10-023 in *Californians for Renewal Energy v. Public Utilities Commission of the State of California*, First Appellate District, Division 1, Case No. A115703. The California Supreme Court denied a petition for review on March 2, 2007.

3

R.06-03-004                    L/cdl

experience, taking into consideration the compensation of persons with comparable

training and experience.[6] As noted in D.05-11-031:

> Here we examine the authorized hourly rates paid to
> intervenors in 2003 and 2004 in light of the data from utilities
> on their expenses for representation in our proceedings (new
> intervenor rates proposed for 2005 are examined in Sections 6
> and 7 of this decision). Regarding the hourly rates we
> currently authorize for intervenors, we find these rates are
> within the ranges of hourly rates that utilities pay their
> representatives overall. This is true both for attorneys and
> experts, at all levels of experience. (*2005 Hourly Rate
> Decision* [D.05-11-031], *supra*, at pp. 9, 12, 28.)

Based on the data received, D.05-11-031 found that for 2003 and 2004, "all currently

authorized intervenor attorney rates fall within the range of utility outside attorney rates"

and established rates authorized for work by intervenor attorneys in 2005. (*Id.* at pp. 12

& 15- 16 (slip op.).) In addition to establishing a range of experience based rates and

providing for annual increases to attorney hourly rates, D.05-11-031increased the rates

established prior to 2004 to bring them within the current experience based rate range.

The initial hourly rate for CARE's attorney, Mr. Volker, was established in

D.03-01-058.[7] Consistent with our section 1806 obligation, in D.03-01-058 we

considered Mr. Volker's prior experience in non-Commission proceedings, including his

having commanded $300 per hour in other venues. As noted in *Re: Valencia Water

Company – Opinion on Request for Intervenor Compensation* ("*Volker's Hourly Rate in

Valencia Water Company Decision*") [D.03-01-058] (2003) ___ Cal.P.U.C.3d ____:

> Attorney Volker states that he has over 27 years experience as
> a practicing environmental lawyer in California and has been

---

[6] Also, D.06-04-018 is consistent with Resolution ALJ-184, issued August 25, 2004 [adopting an annual process for setting and updating hourly rates for use by intervenors in seeking compensation].

[7] CARE wrongly claims that Mr. Volker's prior $250 per hour rate resulted from an estimate of legal costs contained in a notice of intent to claim compensation submitted by his client prior to D.03-01-058. (Rehrg. Application, p. 1.) However, there is nothing in the record or the Commission rules showing that Mr. Volker or his client were prohibited from requesting a higher rate in that proceeding, so long as the rate was justified.

4

R.06-03-004                           L/cdl

> awarded attorney's fees at the hourly rate of $300 based on
> his extensive experience in the field of environmental
> litigation. We conclude that based on Volker's experience,
> the requested hourly rate of $250 for services provided in
> 2000 and 2001 is reasonable. (*Id.* at p. 7 (slip op.).)

The Commission also set hourly rates for Mr. Volker in D.06-04-018 and D.06-06-025, as affirmed by D.06-10-023. After the upward adjustments to Mr. Volker's rate provided for in D.06-06-025, D.07-12-007 provided for a $280 per hour rate, which falls within the range of rates that have been found to be appropriate for attorneys with a comparable number of years of practice.[8]

Ultimately, CARE's assertions concerning the appropriate market rate serve best to illustrate the fundamental misunderstanding that pervades its challenge. Specifically, CARE fails to distinguish between the market rate, the hourly rate a practitioner earns in a particular market, and the hourly rate afforded a practitioner for work performed at the Commission. Consistent with section 1806, this Commission considered market information to determine the appropriate range of hourly rates for individuals with a comparable number of years of experience to Mr. Volker, examined Mr. Volker's evidence of his experience at the Commission and in other venues, and thereby set an hourly rate for Mr. Volker's work at the Commission.[9]

**B.    CARE's rehearing application constitutes an improper collateral attack on decisions that are now final.**

CARE asserts that "[n]either Resolution ALJ-184 nor D.05-11-031 however afforded Mr. Volker any notice, and neither actually considered any evidence of his market rate." (Rehrg. Application, p.8.) Specifically, CARE alleges a due process

---

[8] Mr. Volker received an hourly rate of $270 for 2004.

[9] That this Commission may weigh general versus Commission specific legal experience differently is consistent with Resolution ALJ-184. As set forth therein, "we expect that advocates with experience before the Commission have a certain level of knowledge about our Rules of Practice and Procedure and filing requirements." (Resolution ALJ-184, issued August 25, 2004, p. 4.)

R.06-03-004                          L/cdl

violation on claims that "the attorney rate setting mechanism established in Resolution ALJ-184 and D.05-11-031 cannot be applied constitutionally to Mr. Volker or to any other parties who were not afforded notice of these proceedings." (Rehrg. Application, p.10.) CARE's due process claim is no more than an improper collateral attack on Resolution ALJ-184 and D.05-11-031, two Commission orders that are now final.[10]

CARE's claim's is also factually inaccurate. As an initial matter CARE's claim ignores the fact that individual attorneys can get their rate changed in any appropriate proceeding. Moreover, contrary to CARE's claims, like D.03-01-058, D.07-12-007 considered the evidence presented on Mr. Volker's hourly rates. (See *Volker's Hourly Rate in Valencia Water Company Decision* [D.03-01-058], *supra*, at p.7 (slip op.), and D.07-12-007, p.28.) After acknowledging Mr. Volker's years of experience at this Commission and before other regulatory bodies, D.07-12-007 declined to increase his hourly rate and stated:

> [C]ompensation at $280/hour is within the range for other attorneys of his experience. We will not grant Volker an increase for his work on this particular case because it primarily involved meeting with or editing the work of the other attorneys. (D.07-12-007, p. 28.)

Thus, rather than ignore the evidence presented as CARE claims, we considered it but in the context of the work actually performed in the instant proceeding, were not persuaded by it.

**C.     The Commission routinely adjusts the established market rates and allows intervenors the opportunity to change their individual hourly rate.**

Resolution ALJ-184, D.05-11-031, and subsequent decisions (e.g. D.07-01-009), are part of this Commission's "annual process for updating hourly rates based

---

[10] See Pub. Util. Code, §1709, which provides: "In all collateral actions or proceedings, the orders and decisions of the [C]omission which have become final shall be conclusive."

R.06-03-004                    L/cdl

on new compensation data and proposed rates from intervenors." (See Res ALJ-184, issued August 25, 2004, p. 1; *2005 Hourly Rate Decision* [D.05-11-031], *supra*, at p. 3 (slip op.); and *Order Instituting Rulemaking to Set Hourly Rates for Purposes of Calculating Intervenor Compensation Awards Pursuant to Public Utilities Code Section 1801 and Following, for Work Performed in Calendar Year 2006* ("*2007 Hourly Rate Decision*") [D.07-01-009] p. 2 (slip op.)] (2007) ___ Cal.P.U.C.3d ___) Through this "process" interested parties are afforded the opportunity to introduce evidence going to, but not limited to, the appropriate market rates, practice categories, and cost of living increases. Consistent with this objective, among other things, D.05-11-031 established pay ranges for attorneys and expert witnesses based on years of experience, and found a 3% cost of living increase to be appropriate in some circumstances. (*2005 Hourly Rate Decision* [D.05-11-031], *supra*, at p. 28 (slip op.).)

In addition to considering evidence regarding the market rates established for attorney practice groups, this Commission has consistently afforded intervenors the opportunity to modify their individual hourly rate. For example, in addition to adopting an annual process for setting and updating hourly rates for intervenors seeking compensation, Resolution ALJ-184 provides that:

> [A]n intervenor may request an adjustment to an adopted hourly rate <u>but must show good cause</u> for doing so. For example, if a court or regulatory agency awarded the advocate a higher hourly rate for work in the same calendar year, the intervenor may ask us to use the higher rate. The <u>burden is on the intervenor to justify</u> the higher rate, and in the example just given, we would expect the intervenor to address, among other things, the standard used by the court or agency in setting the higher rate and the comparability of the work performed at the Commission to the work performed at the court or agency. (*Id.* at pp. 2-4, emphasis added.)

Resolution ALJ-184 is thus clear that, in addition to showing good cause for an hourly rate increase, such as a being awarded a higher hourly rate by a court or other regulatory agency, the intervenor requesting the higher rate bears the additional burden of justifying the higher rate requested.

7

R.06-03-004                            L/cdl

   While CARE presented evidence of Mr. Volker's having received a higher

award in other venues, it failed to address the standard used to set that rate, and made no

attempt to show how the work performed at that hourly rate was comparable to the work

done at the Commission for which the hourly rate increase was being sought.  Indeed, in

addition to noting that Mr. Volker's "work on this particular case primarily involved

meeting with or editing the work of other attorneys" D.07-12-007 specifically notes that

"CARE's request for compensation fails to mention prior awards to Volker... ." (D.07-

12-007, p. 26.)  Accordingly, CARE's request for an increase from $280 to $500 per hour

was properly denied.

   **D.    The request for oral argument is denied.**

   CARE requested oral argument in its application for rehearing.  Rule

16.3(a) of our Rules of Practice and Procedure provides, in relevant part:

> The request for oral argument should explain how oral
> argument will materially assist the Commission in
> resolving the application and demonstrate that the
> application raises issues of major significance for the
> Commission because the challenged order or decision:
>
> (1) adopts new Commission precedent or departs
>     from existing Commission precedent without
>     adequate explanation;
>
> (2) changes or refines existing Commission
>     precedent;
>
> (3) presents legal issues of exceptional
>     controversy, complexity, or public importance;
>     and/or
>
> (4) raises questions of first impression that are
>     likely to have significant precedential impact.
>
> These criteria are not exclusive. The Commission has
> complete discretion to determine the appropriateness of
> oral argument in any particular matter.

R.06-03-004                        L/cdl

(Code of Regs., tit. 20, §16.3, subd. (a).)

The rehearing applicants seek oral argument on claims that their application for rehearing "presents legal issues of exceptional public importance." Specifically, CARE asserts that:

> The Commission's current rate setting mechanism unconstitutionally limits recovery by CARE and other similarly-situated intervenors. This imbalance creates an uneven playing field for participants in Commission proceedings and discourages, rather than encourages public participation in the Commission's important decision making processes. (Rehrg. Application, pp.11-12.)

The merits of the Commission's current rate setting mechanism was not the subject of D.07-12-007, that mechanism was adopted in D.05-11-031 and Resolution ALJ-184, and updated in subsequent Commission decisions (e.g. D.07-01-009). Oral argument on issues not in the decision being challenge is inappropriate. We will therefore deny CARE's request for oral argument.

**THEREFORE, IT IS ORDERED** that:

1.  Rehearing of D.07-12-007 is hereby denied.

2.  The request for oral argument is hereby denied.

3.  This proceeding, Rulemaking 06-03-004, is closed.

    This order is effective today.

    Dated April 24, 2008, at San Francisco, California.

MICHAEL R. PEEVEY
President
DIAN M. GRUENEICH
JOHN A. BOHN
RACHELLE B. CHONG
TIMOTHY ALAN SIMON
Commissioners